UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| KIMBERLY NGUYEN, On Behalf of Herself and All Others Similarly Situated, | ) ) ) | Case No. _____ |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| RAYMOND JAMES FINANCIAL, INC., and RAYMOND JAMES TRUST, N.A. | ) ) ) | |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Kimberly Nguyen ("Plaintiff"), by and through her counsel, alleges the following against Defendants Raymond James Financial, Inc. and Raymond James Trust, N.A. (collectively, "Raymond James" or "the Company") based upon personal information as to those allegations concerning Plaintiff, and upon information and belief as to the other allegations:

## I.      NATURE OF THE ACTION

1.      This is a reverse-churning class action based upon a scheme by Raymond James, a large, full service broker-dealer, to improperly take advantage of trusting clients by transferring their assets from commission-based accounts (where Plaintiff and the Class only paid commissions when they traded securities) to unsuitable fee-based managed account programs such as Raymond James Freedom wrap-fee accounts ("Freedom Accounts") and other Raymond James wrap-fee or fee-based programs (collectively, "Fee-Based Accounts"), which charge an annual fee based on a percentage of the total assets in an account regardless of the client's trading activity.

2.      The alleged scheme took advantage of a new proposed regulation – commonly known as the Fiduciary Rule – which was announced by the Department of Labor ("DOL") in April 2015. The purpose of the Fiduciary Rule was to provide additional protection to persons investing for retirement by expanding the definition of who acted as a fiduciary to broker-dealers such as Raymond James and their registered representatives.

3.      The Fiduciary Rule prohibited an advisor from accepting commissions or revenue sharing on the sale of investments in a retirement account unless the registered representative complied with the "Best Interests Contract Exemption" ("BICE"). To comply with BICE, a registered representative had to enter into a contractual agreement stating that the registered representative would act in the best interest of the client and avoid any misrepresentation of potential investment options. By complying with BICE, a registered representative could accept compensation from selling proprietary products, as well as earn money based on commissions from recommending certain products. However, BICE applied only to commission-based accounts where a commission is paid on each transaction, not Fee-Based Accounts where an advisor is paid an annual fixed percentage of the account balance.

4.      Generally, Raymond James and other large broker-dealers prefer Fee-Based Accounts because these accounts offer a more predictable, consistently recurring revenue stream compared to commission-based accounts. Fee-Based Accounts also tend to generate more revenue. A study by Cerulli Associates found that fee-based assets grew from 26% to 45% of total advisors' assets between 2008 and 2018. According to that study, in 2008, brokerage/commission assets were $7.5 trillion, while fee-linked assets were $2.6 trillion. In 2018, brokerage commission-linked assets had increased nearly 50% to $11.2 trillion, but fee-linked assets had increased by *246%* to $9 trillion.

5.      Prior to the announcement of the Fiduciary Rule, Raymond James was already encouraging its registered representatives to transition more of its clients to Fee-Based Accounts. Ironically, the announcement of the Fiduciary Rule, a rule designed to protect investors, provided Raymond James with an external rationalization to accelerate that transition process based on compliance with the Fiduciary Rule even though the Company could have just as easily complied with the Fiduciary Rule without transitioning clients to Fee-Based Accounts. However, Raymond James would have made less money if its clients stayed in commission-based accounts.

6.      Raymond James did publicly announce that clients could still maintain commission-based accounts with the Fiduciary Rule in place. But in reality, Raymond James encouraged registered representatives to move all clients to Fee-Based Accounts regardless of whether such accounts were suitable for them. Raymond James and its registered representatives had the information necessary to make the suitability determination through customer profiles and account trading history, but instead turned a blind eye to any violations of the Financial Industry Regulatory Authority ("FINRA") Rules (including Rule 2111) and its own internal policies regarding suitability.

7.      Fee-Based Accounts are not suitable for all investors. Clients who execute few trades in their accounts because their investment strategy is to buy and hold their assets end up paying substantially higher fees in a Fee-Based Account than in a commission-based account despite receiving little in return for those increased fees.

8.      Before transferring clients from commission-based to Fee-Based Accounts, Raymond James was required to determine what type of account was most suitable for those clients. Raymond James uniformly failed to make the required determination. As a result, Raymond James clients were transferred from commission-based to Fee-Based Accounts for no

reason other than to collect additional fees. As a result of this improper practice, Plaintiff and the Class paid higher fees and received little or no benefit from Raymond James.

9.    Raymond James was aware its registered representatives were moving clients from commission-based to Fee-Based Accounts in ever greater numbers yet did nothing but encourage it. As Raymond James admitted in its Form 10-K for fiscal year ending September 30, 2017 ("2017 Form 10-K"), its "18% revenue growth over fiscal 2016 was largely attributable to growth in Private Client Group (PCG) fee-based account assets" and its "increase in assets in fiscal year 2017 over the prior year level was due, in part, *to clients moving to fee-based alternatives in response to the recently implemented DOL regulatory changes*." (Emphasis added).

10.    Raymond James explicitly pointed to the Fiduciary Rule as one of the bases for the increase in Fee-Based Accounts. In its Form 10-K for fiscal year ending September 30, 2018 ("2018 Form 10-K"), the Company listed "*[h]eightened interest in fee-based relationships* due to regulatory environment" as one of its three "Key Performance Drivers" and represented that its "increase in financial assets under management reflected . . . *increased utilization of fee-based accounts in PCG, with a large influx due to aspects of the now-defunct DOL fiduciary rule*." (Emphasis added).

11.    As further evidence that Raymond James failed to have adequate processes and procedures in place to analyze accounts for suitability, it recently agreed to a $15 million settlement with the Securities and Exchange Commission ("SEC") due in part to the unsuitability of its Fee-Based Accounts for buy-and-hold clients. Specifically, on September 17, 2019, the SEC announced that it had instituted a settled order against three Raymond James entities for, *inter alia*, Raymond James's failure to perform ongoing reviews of advisory accounts that had no trading activity for at least one year (i.e., buy-and-hold accounts). According to that order, because

4

Raymond James did not conduct the reviews properly, it failed to determine whether a client's fee-based advisory account was suitable.

12.     In this case, Raymond James owed a duty to its clients under the FINRA Rules, including Rule 2111, to make sure they were in appropriate accounts. Raymond James breached that duty by not having processes and procedures in place to determine the suitability of Fee-Based Accounts before transitioning its commission-based clients into them, or by failing to follow those procedures.

13.     After transitioning clients into the managed Fee-Based Accounts, Raymond James had an ongoing duty to monitor those accounts to insure that Fee Based Accounts were suitable for its clients. Raymond James breached its  duties to its clients by failing to transfer clients out of the Fee-Based Accounts when those accounts were no longer suitable for the client  by not having processes and procedures in place to determine the suitability of the Fee-Based Accounts after the transition or failing to follow those procedures.

14.     As a result of Raymond James's breach of its duties, Plaintiff and the putative class paid more in fees and earned less for their retirement than they would have had they simply stayed in their commission-based accounts.

## II.     JURISDICTION AND VENUE

15.     This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs. Further, because Raymond James operates from and services customers in over 250 offices across the country (including through at least 150 offices in 30 states other than

Florida), Plaintiff, a Texas resident, and a member of the proposed Class, is a citizen of a different state than Raymond James, which, as alleged below, is a citizen of the State of Florida.

16.     This Court has personal jurisdiction over Raymond James because it is a Florida corporation with its principal place of business in Pinellas County, Florida, and it is engaged in substantial, not isolated activity within this state. Further, the causes of action brought in this Complaint arise from Raymond James operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state; and committing a tortious act within this state.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Raymond James is subject to personal jurisdiction here and is thus deemed to reside in the District pursuant to § 1391(c)(2), and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District

## III.    THE PARTIES

18.     Plaintiff Kimberly Nguyen is a resident of Garland, Texas and has been a Raymond James client since June 2015. Plaintiff is a "buy and hold" investor who originally opened a commission-based account with Raymond James in June 2015. In January 2016, Plaintiff's Raymond James financial advisor advised her to transfer her assets into a Raymond James fee-based Freedom Account. Plaintiff executed the Client Agreement and moved her assets with Raymond James into a Freedom Account. Between 2016 and 2018, Plaintiff paid over $7,432.17 in fees in the Freedom Account – substantially more than she would have paid had her assets stayed in a commission-based account – but she received no corresponding benefit from Raymond James.

19.     Defendant Raymond James Financial, Inc. ("RJF") is an American multinational independent investment bank and financial services company incorporated in Florida and

headquartered in St. Petersburg, Florida. RJF provides asset management, investment advisory services and financial planning through its Private Client Group ("PCG") segment. RJF provides investment advisory and related administrative services to PCG clients through its asset management services division ("AMS") and through its wholly-owned subsidiary, defendant Raymond James Trust, N.A.

## IV.    CLASS ALLEGATIONS

20.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons, or their beneficiaries without limitation, who had their assets at Raymond James moved from commission-based accounts to a Fee-Based Account during the Class Period and were damaged thereby. Excluded from the Class are the officers and directors of Raymond James at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns.

21.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

22.    The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. The Class is readily definable and is one for which records likely exist in the files of Raymond James. Record owners and other Class members may be identified from records maintained by Raymond James or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions. While the exact number of Class members is unknown to Plaintiff, Raymond James has reported millions of dollars in increases in asset-based fees while commission-based fees have decreased during the Class Period. In addition, Raymond James has disclosed that a significant portion of that increase in assets came from existing clients. For example, Raymond James

provided in its 2017 Form 10-K that the increase in assets in Fee-Based Accounts was driven by "clients moving to fee-based alternatives versus traditional transaction-based accounts in response to the recently implemented DOL regulatory changes." Accordingly, Plaintiff reasonably believes there are thousands, if not tens of thousands, of members in the proposed Class.

23.     Plaintiff's claims are typical of the claims of the members of the Class as all Class members are similarly affected by Defendants' negligence and breach of their fiduciary duties that are complained of herein.

24.      Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation.

25.     Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class Members.

26.     Plaintiff is not aware of any other pending litigation concerning this controversy that involves Class Members.

27.      Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are the following:

(a)     Whether Raymond James breached its duties to the class by failing to employ appropriate supervisory measures to determine the suitability of Fee-Based Accounts before transitioning its clients into those accounts;

(b)     Whether Raymond James breached its duties to Class members by failing to conduct at least annual reviews to determine whether Fee-Based Accounts continued to be suitable for clients after the transition; and

(c)     To what extent the Class members have sustained damages and the proper

measure of damages.

28.     As further indication of the common questions of law, the agreements signed by

Plaintiff and the other Class members provides that it shall be enforced in accordance with the

laws of the State of Florida.

29.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy as joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for Class members to individually redress the wrongs

done to them. There will be no difficulty in the management of this action as a class action.

30.     This forum is particularly desirable for the prosecution of this class action because

Raymond James maintains offices in this District, and presumably maintains many of those

corporate records which are particularly germane to this action here. Raymond James operates

office complexes throughout this District, including in the cities of St. Petersburg and Tampa. As

a result of the foregoing, litigating on a class action basis in this forum will likely decrease the cost

of discovery and prosecution, generally.

31.     Churning cases[1] are adequate for class action treatment when they are based

predominately on common issues of facts relevant to the entire class. Reverse churning, by its

nature, involves a course of conduct more favorable for class treatment than traditional churning

because it occurs when a financial advisor moves a client from a commission-based account into

a Fee-Based Account for the sole purpose of generating fees. Raymond James's concerted and

uniform movement of commission-based clients into Fee-Based Accounts, all during a specific

---

[1]     Churning is the unlawful practice of executing excessive trades for an investment account by a financial advisor in order to generate commission from the account.

timeframe, and without an appropriate suitability check in place to determine if it was in the best interest of the client, for the purpose of generating fees, amounts to reverse churning and is well-suited for class treatment.

32.  Finally, the Class is readily definable and is one for which records likely exist in the files of Raymond James.

## V.    SUMMARY OF COMMON FACTUAL ALLEGATIONS

### A.    The Prohibition Against Reverse Churning

33.     In both reverse churning and churning, advisors do not act in the best interests of their clients. However, while churning is where an advisor executes trades in an account simply to generate commissions, reverse churning is where an advisor generates revenue at a client's expense by placing the client's funds in a managed account where the client pays an annual fee equal to a percentage of the account balance, then provides very little actual advice, trading, or account activity in exchange. Therefore, an advisory firm is able to generate more revenue at the expense of buy-and-hold clients who do not receive any cognizable benefit.

34.     On July 9, 2012, FINRA – the entity charged with regulating broker-dealers like Raymond James – formally adopted a rule prohibiting reverse churning. This rule, FINRA Rule 2111 – Suitability, created a duty to ensure that Fee-Based Accounts are only recommended to those clients for whom they are suitable as such accounts tend to be more expensive for clients who engage in little to no trading activity. The practice of reverse churning also violates the federal securities laws. *See Geman v. SEC*, 334 F.3d 1183 (10th Cir. 2003) (upholding SEC enforcement action).

**B.      Raymond James's Reverse Churning Scheme to Generate Revenue**

35.      As a broker-dealer, Raymond James is required to comply with FINRA rules, including FINRA Rule 2010 (mandating that Raymond James obey high standards of commercial honor and just and equitable principles of trade), FINRA Rule 2111 (mandating that Defendants have a reasonable basis to believe that a recommendation or investment strategy is suitable for a customer), and FINRA Rule 3010 (mandating that Defendants establish and maintain a system to supervise the activities of each registered representative).

36.      On April 14, 2015, the DOL released a proposed rule which sought to protect investors' retirement accounts by expanding the number of persons who were defined as fiduciaries when providing investment advice (the "Fiduciary Rule"). Prior to the announcement of the Fiduciary Rule, registered representatives working for broker-dealers such as Raymond James who were not registered under the Investment Advisor Act of 1940 were not considered fiduciaries unless they had discretionary control over their clients' accounts.

37.      The fiduciary rule expanded the "investment advice fiduciary" definition under the Employee Retirement Income Security Act of 1974 ("ERISA") to all financial professionals who worked with retirement plans or provided retirement planning advice, including registered representatives. The Fiduciary Rule prohibited an advisor from accepting commissions or revenue sharing on the sale of investments in a retirement account unless the advisor complied with BICE.

38.      To comply with BICE, an advisor had to enter into a contractual agreement stating that the advisor would act in the best interest of the client and avoid any misrepresentation of potential investment options. By complying with BICE, an advisor could accept compensation from selling proprietary products, as well as earn money based on commissions from

recommending certain products. However, BICE applied only to commission-based accounts, not Fee-Based Accounts where an advisor is paid an annual fixed percentage of the account balance.

39.     Prior to the proposed Fiduciary Rule, Raymond James offered retirement account customers the option of paying commissions on a per-trade basis in their accounts (commission-based accounts) or having Raymond James manage their account and pay an annual fee equal to a percentage of the total assets in the account (Fee-Based Accounts). Fee-Based Accounts were and are more desirable to financial services companies such as Raymond James because the revenue stream is constant and more predictable than in commission-based accounts, which require active trading to generate revenue.

40.     In response to the DOL Fiduciary Rule, Raymond James announced on October 27, 2016 that it would permit its 7,100 brokers to continue to offer both commission-based and Fee-Based Accounts to clients. During its Q4 2016 Earnings Call with investors, in response to a question about the DOL Fiduciary Rule, Defendant Reilly said "***right now our plans aren't to push people -- try to push people or heavily influence them under our fee-based platforms***," and that "we've been very clear from the beginning that our focus has been complying with the rule of giving the maximum flexibility for our advisors to serve our clients and have clients have choice. ***So we fully expect to offer commission-based accounts to the big and comply with the rules***."

41.     On that call, Reilly also represented that Raymond James was philosophically committed to giving clients and registered representatives choices regarding Fee-Based or commission-based accounts, stating that "I think our whole philosophy is to offer kind of products – roughly flexibility with clients and advisors. And I know that others believe they want to put them totally on fee-based platform and they are pushing them that way. And then when you do that you do get some misallocations where you discount. I – we're not looking to force anyone

under any platforms . . . our goal isn't to force someone onto a platform and kind of lower the fees and induce it."

42.    But in reality, Raymond James saw the Fiduciary Rule as an opportunity to move clients out of commission-based accounts and into Fee-Based Accounts under the guise of complying with the Fiduciary Rule even though the Company could have complied with the Fiduciary Rule without transitioning its commission-based clients. The transition of commission-based accounts to Fee-Based Accounts was doubly beneficial to Raymond James because it relieved the Company's financial advisors of the burden of complying with BICE as fiduciaries and it resulted in increased, steady revenue to the Company.

43.    For buy-and-hold investors like Plaintiff and the putative class, however, Fee-Based Accounts were and are not suitable because they typically conducted few, if any, trades in their accounts and thus incurred few, if any, fees. By encouraging all retirement account customers to move to Fee-Based Accounts, which charge an annual fee based on a percentage of the total assets in the account even if the customer typically engaged in few, if any, trades in their account, Raymond James was able to increase its fees on those accounts for its own benefit without having to provide a corresponding benefit to the customer.

44.    FINRA Rule 2111 prohibits Raymond James from disclaiming responsibility for its suitability obligations or putting the onus of conducting a suitability review on its clients. Moreover, the SEC has stated that broker-dealers cannot avoid their suitability obligations through investor disclosures.

45.    Raymond James further failed to take reasonable measures to ensure the suitability of Fee-Based Accounts for Plaintiff and the other Class members in violation of the FINRA Rules and its own internal policies. At a minimum, Raymond James should have required its registered

representatives to consider a client's account activity history, holdings and investment objectives before recommending any transition to Fee-Based Accounts and to document that recommendation as well as the basis for it. But Raymond James's supervisory rules either did not require such a review and/or documentation or Raymond James failed to enforce its own rules, thereby effectively approving registered representatives' actions to move clients into unsuitable accounts.

46.     Raymond James violated the standard of care expected from similar professionals in the community under similar circumstances and as proscribed in FINRA Rules 2010, 2111, and 3010, by failing to employ appropriate supervisory measures to determine the suitability of Fee-Based Accounts for its customers before transitioning them from commission-based accounts.

47.     Raymond James also violated the standard of care owed to customers after the customers transferred into the Fee-Based Accounts. Raymond James has a continuing duty to monitor the accounts and  employ appropriate supervisory measures to determine the suitability of the Fee-Based Accounts after this transition. Upon knowledge and belief, Raymond James does not have compliance procedures that require annual review of accounts to make sure clients' accounts are properly invested according to the needs and goals of the client or failed to follow those procedures.

48.     Furthermore, Raymond James became a fiduciary to those customers who transferred into the Fee-Based Accounts because Raymond James had discretion over trading the assets in the Fee-Based Accounts. Thus, after transitioning customers into the Fee-Based Accounts, Defendants' failure to transfer customers *out* of the Fee-Based Accounts was a breach of the fiduciary duty Raymond James owed its customers.

49.     Raymond James knew or should have known that it was benefiting from its registered representatives' rule violations and supervisory lapses based on the Company's own

disclosures regarding its substantial revenue growth stemming from Fee-Based Accounts which were opened by existing clients.

50.     For example, in its financial report for the fourth quarter of fiscal year 2016, Raymond James announced a significant increase in its Fee-Based Accounts, providing that "[a]ssets in fee-based accounts ended the quarter at a record $231.0 billion, 29 percent over September 2015 and 12 percent over June 2016."

51.     Then, on April 26, 2017, in its financial report for the second quarter of fiscal year 2017, Raymond James announced that its Private Client Group segment saw an increase in assets in Fee-Based Accounts of $260.5 billion, representing significant growth of 33% over March 2016 and 8% over December 2016. In its release, Raymond James explained that "[r]ecord quarterly revenues and client assets in the Asset Management segment were lifted by market appreciation and increased utilization of fee-based accounts in the Private Client Group segment, which has accelerated in anticipation of the DOL Fiduciary Rule."

52.     This growth was also reflected in Raymond James's Form 10-Ks, with their 2017 Form 10-K announcing the following:

- "The 18% revenue growth over fiscal 2016 was largely attributable to growth in Private Client Group (PCG) fee-based account assets."

- "The Asset Management segment produced record net revenues of $487.7 million and record pre-tax income of $171.7 million, increasing 21% and 30% over fiscal 2016, respectively. Financial assets under management improved 25% to a record $96.4 billion. The increase in financial assets under management reflected market appreciation and increased utilization of fee-based accounts in PCG, partially in response to the DOL Fiduciary Rule."

- "Macro industry trends and factors such as the partial implementation of the Department of Labor's (DOL) Fiduciary Rule, which accelerated the shift to fee-based account utilization, also played a notable part in [Asset Management Services'] strong results."

- "With many advisors deciding to move their smaller accounts to a fee-based solution, AMS was well-positioned to manage these accounts through the Freedom Foundation platform. This account solution was designed to offer advisors an efficient way to diversify smaller accounts with high-quality, professional managers, while building the framework for ongoing, multigenerational relationships. With the DOL rule as a tailwind, and combined impressive effort by the sales and operations teams, the Freedom Foundation platform has raised $1.1 billion in assets under administration."

- "Our Asset Management segment benefited from increased fee-based client assets, generating a 21% increase in net revenues to $488 million, while pre-tax income increased 30% to $172 million. The increase in net revenues primarily reflected increases in advisory fee revenues from managed programs and in non-discretionary asset-based administration fee revenues as financial assets under management in managed programs and assets held in non-discretionary asset-based programs increased 25% and 32%, respectively over the prior year level."

- "PCG assets in fee-based accounts as a percentage of overall PCG assets under administration increased compared to September 30, 2016 due, in part, to clients moving to fee-based alternatives versus traditional transaction-based accounts in response to the recently implemented DOL regulatory changes."

- "The increase in assets in fiscal year 2017 over the prior year level was due, in part, to clients moving to fee-based alternatives in response to the recently implemented DOL regulatory changes."

53. Similar statements were made in Raymond James's 2018 Form 10-K, including:

- "The increase in financial assets under management reflected market appreciation and increased utilization of fee-based accounts in PCG, with a large influx due to aspects of the now-defunct DOL fiduciary rule."

- Raymond James listing one of its three "Key Performance Drivers" as "Heightened interest in fee-based relationships due to regulatory environment."

- "Our Asset Management segment benefited from increased fee-based client assets, generating a 21% increase in net revenues to $488 million, while pre-tax income increased 30% to $172 million."

- "PCG assets in fee-based accounts continued to increase as a percentage of overall PCG assets under administration, representing 48% at September 30, 2018, compared to 45% at September 30, 2017 and 40% at September 30, 2016, due in part to clients moving to fee-based alternatives from traditional transaction-based accounts in response to the regulatory environment."

- "The increase in assets in fiscal year 2018 over the prior year level was primarily due to market appreciation and to clients moving to fee-based accounts from traditional transaction-based accounts partly in response to regulatory changes."

54. Due to its growth in Fee-Based Accounts, over the relevant time period Raymond James's stock has doubled from $41 per share to more than $90 per share.

55.     This growth has allowed Raymond James executives to reap significant benefits. For example, Raymond James recently gave its CEO Paul Reilly an 8% raise to $13.4 million in 2019 for "strong leadership that resulted in achieving record revenue."

56.     Raymond James continues to tout its growth in Fee-Based Accounts, as explained by Raymond James CFO Paul Shoukry in the Company's January 23, 2020, earnings call: "when you look at the 31% year-over-year growth in assets and fee-based accounts, I think everyone has acknowledged that's among the highest if not the highest in the industry."

57.     On June 21, 2018, the U.S. Court of Appeals for the Fifth Circuit officially vacated the Fiduciary Rule, thus removing Raymond James's public rational for moving commission-based clients' assets into Fee-Based Accounts. However, Raymond James did not then undertake a review of its Fee-Based Accounts to determine whether – in light of the changed regulatory environment – any clients should properly be placed back in commission-based accounts. Rather, Raymond James has continued to reap the windfall it received from Fee-Based Accounts.

58.      Raymond James's failure to comply with FINRA Rules, its own internal policies, and to properly supervise its registered representatives has cost investors millions in excess fees and lost investment income.

VI.     **CLAIMS FOR RELIEF**

<u>**COUNT I**</u>
**Negligence**

59.     Plaintiff hereby repeats, realleges and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

60.     As a securities broker dealer, Raymond James owed its customers a duty of care in accordance with the standard of care used by similar professionals in the community under similar

circumstances. That includes, but is not limited to, complying with FINRA Rules regarding suitability and to deal fairly with their clients.

61.     FINRA rules set forth the standards of care that are expected of broker-dealers such as Raymond James, including FINRA Rule 2010 (requiring that Defendants obey high standards of commercial honor and just and equitable principles of trade), FINRA Rule 2111 (requiring that Defendants have a reasonable basis to believe that a recommendation or investment strategy is suitable for the customer), and FINRA Rule 3010 (requiring that Defendants establish and maintain a system to supervise the activities of each registered representative).

62.     Raymond James breached its duty and the standard of care expected from similar professionals in the community under similar circumstances and as proscribed in FINRA Rules 2010, 2111, and 3010 by failing to employ appropriate supervisory measures to determine the suitability of Fee-Based Accounts for its customers before transitioning them from commission-based accounts.

63.     After transferring Plaintiff and members of the Class into the Fee-Based Accounts, Defendants breached its duty and the standard of care expected from similar professionals in the community under similar circumstances and as proscribed in FINRA Rules 2010, 2111, and 3010 by failing to employ appropriate supervisory measures to determine the suitability of Fee-Based Accounts after the transition.

64.     As a direct and proximate result of the foregoing, Plaintiff and members of the Class have suffered damages.

## COUNT II
### Breach of Fiduciary Duty

65.      Plaintiff hereby repeats, realleges and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

66.    As a securities broker dealer, Raymond James owed customers a duty of care in accordance with the standard of care used by similar professionals in the community under similar circumstances. That includes, but is not limited to, a duty of fair dealing and to act in the best interests of its customers without regard to its own financial or other interests.

67.    By taking on the responsibility of discretionarily investing money belonging to Plaintiff and the other Class members after the transition of their assets into a Fee-Based Account, Defendants owed them a fiduciary duty.

68.    Upon transfer to the Fee-Based Accounts, Defendants knew that Plaintiff and the other Class members entrusted their assets to, and totally relied on the relationship of trust established with, Raymond James. Defendants thereby intentionally assumed the position of fiduciaries of Plaintiff's and the other Class members' assets at that time.

69.    Upon transfer to the Fee-Based Accounts, Plaintiff and the other Class members relied exclusively and without reservation upon the course of dealing and expertise of Raymond James. In effect, Defendants exercised total discretionary or control authority over the assets Plaintiff and the other Class members had in the Fee-Based Accounts.

70.    The fiduciary duty owed to Plaintiff and the other Class members by Defendants required Raymond James to manage the accounts of Plaintiff and the other Class members as dictated by their needs and objectives, to ensure that the investment strategy applied to their assets was reasonably suitable for them, and to act impartial and refrain from self-dealing.

71.    All of the foregoing fiduciary duties have been breached by Defendants by virtue of Defendants' failure to transfer Plaintiff and the other Class members out of the Fee-Based Accounts, and said breaches directly and proximately caused Plaintiff and the other Class members to suffer substantial damages for which Plaintiff prays for relief, full restitution of all losses,

punitive damages, and recovery of all costs and expenses, including reasonable attorneys' fees, for herself and on behalf of the Class.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.     Determining and certifying this action as a proper class action, appointing Plaintiff as class representative, and appointing her counsel as Class Counsel pursuant to Federal Rule of Civil Procedure 23;

B.     Declaring that Raymond James was negligent;

C.     Declaring that Raymond James breached its fiduciary duties;

D.     Awarding compensatory damages in favor of Plaintiff and the Class against Raymond James for damages sustained as a result of its wrongdoing, in an amount to be proven at trial;

E.     Awarding all appropriate relief, including actual damages, statutory damages, double damages, treble damages, punitive damages, consequential damages, restitution, disgorgement, and any other appropriate compensatory, equitable, or exemplary relief;

F.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs and expenses incurred in this action; and

G.     Awarding such other relief as the Court may deem just and proper.

## IX.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury as to all claims in this action.

Dated: January 24, 2020

**MANDELBAUM SALSBURG P.C.**

*/s/ Steven W. Teppler*
Steven W. Teppler, Trial Counsel
Florida Bar No. 0014787
11891 US Highway One, Suite 100
North Palm Beach, FL 33408
Phone: 561-328-4617
Fax: 561-214-4130
Email: steppler@lawfirm.ms

Jordan S. Coley
Florida Bar No. 0102367
FRANKLIN D. AZAR & ASSOCIATES, P.C.
6161 South Syracuse Way, Suite 200
Greenwood Village, CO 80111
Telephone: (303) 757-3300
Fax: (720) 213-5131
Email: coleyj@fdazar.com

Attorneys for Plaintiff and the Class