# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

## CASE NO. 8:20-cv-195-CEH-AAS

KIMBERLY NGUYEN, on behalf of
herself and all others similarly situated,

      Plaintiff,

v.

RAYMOND JAMES & ASSOCIATES, INC.,

      Defendant.

---

## DEFENDANT RAYMOND JAMES & ASSOCIATES, INC.'S
## *DAUBERT* MOTION TO EXCLUDE THE OPINIONS
## AND TESTIMONY OF DOUGLAS J. SCHULZ

---

Bernard R. Suter (admitted *pro hac vice*)
Bryce M. Cullinane (admitted *pro hac vice*)
KEESAL, YOUNG & LOGAN
450 Pacific Avenue
San Francisco, California 94133
Telephone:  (415) 398-6000
Facsimile:  (415) 981-0136

John E. Clabby
Caycee D. Hampton
CARLTON FIELDS, P.A.
Suite 1000
4221 West Boy Scout Boulevard
 Tampa, Florida 33601
Telephone:  (813) 223-7000
Facsimile:  (813) 229-4133

Markham R. Leventhal
CARLTON FIELDS, P.A.
Suite 400 West
1025 Thomas Jefferson Street, NW
Washington, DC 20007-5208
Telephone:  (202) 965-8100
Facsimile:  (202) 965-8104

*Counsel for Defendant Raymond James & Associates, Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

INTRODUCTION……………………………………………………… 1

STATEMENT OF FACTS………………………………………… 6

    A.    Allegations In Second Amended Complaint……………….…..6

    B.    Schulz Admits That Plaintiff's RJA Financial
        Advisor Conducted A Suitability Analysis, Rendering
        Schulz's "Liability Test" Irrelevant….………………………… 7

    C.    Schulz's Reports, Opinions And Testimony…………………… 8

    D.    Schulz Fails To Understand The Fundamental Differences
        Between And Among Different RJA Accounts…………………9

ARGUMENT…………………………………………………………..11

    A.    Plaintiff Bears The Burden Of Establishing That
        Schulz's Opinions And Testimony Are Admissible
        Under *Daubert* …………………………………………………11

    B.    Schulz's Opinions And Testimony Should Be Excluded
        Because He Is Not Qualified To Render His Opinions…………12

    C.    Schulz's Opinions And Testimony Should Be Excluded Also
        Because They Are Not Reliable……………………................13

        1.    Schulz's Opinions Conflict With Federal Securities
                Laws, Rules, And Regulations Addressing
                Suitability………………………………………….………14

        2.    Schulz's Methodology Is Flawed Because It Fails To
                Distinguish Between (i) Fee-Based Brokerage Accounts
                And Fee-Based Individual Accounts, On The One
                Hand, And (ii) Professionally-Managed Accounts,
                On The Other……………………….…………….…………17

3.   The Error Rate of Schulz's Untested Methodology Is Unknown……………………………………………..19

4.   Specific Examples Of The Impact Of Schulz's Erroneous Assumptions And Methodological Errors……………………………………………………20

5.   Schulz's Speculative Class-Wide "Damages" Model Is Flawed…………………………………………..24

D.   Schulz's Opinions And Testimony Should Be Excluded Because His Opinions Are Not Helpful To The Court…………24

CONCLUSION……………………………………………………25

LOCAL RULE 3.01(g) CERTIFICATION………………………………26

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Allison v. McGhan Med. Corp.*,
   184 F.3d 1300 (11th Cir. 1999) ............................................................ 12

*City of Tuscaloosa v. Harcros Chems., Inc.*,
   158 F.3d 548 (11th Cir. 1998) ............................................................ 12

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ...................................................................... 4, 24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
   509 U.S. 579 (1993) ................................................................. *passim*

*Fernandez v. UBS Financial Services Inc.*,
   2018 WL 4440498 (S.D.N.Y. Sept. 17, 2018) ............................... *passim*

*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ..................................................................... 12

*Kilpatrick v. Breg, Inc.*,
   613 F.3d 1329 (11th Cir. 2010) ......................................................... 13

*Krik v. Exxon Mobil Corp.*,
   870 F.3d 669 (7th Cir. 2017) ........................................................... 20

*Krukever v. TD Ameritrade, Futures & Forex LLC*,
   328 F.R.D. 649 (S.D. Fla. 2018) ....................................................... 25

*Lebron v. Sec'y of the Fla. Dep't of Children & Families*,
   772 F.3d 1352 (11th Cir. 2014) ......................................................... 20

*Rink v. Cheminova, Inc.*,
   400 F.3d 1286 (11th Cir. 2005) ......................................................... 11

*Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*,
   485 F.3d 840 (6th Cir. 2007) ................................................... 3, 14, 15

*Rowe v. Morgan Stanley Dean Witter*,
    191 F.R.D. 398 (D.N.J. 1999) ............................................................................3

*Sher v. Raytheon Co.*,
    419 F. App'x 887 (11th Cir. 2011) ....................................................................12

*United States v. Fedida*,
    942 F. Supp. 2d 1270 (M.D. Fla. 2013) ...........................................................20

*Walker v. Ergon Trucking, Inc*,
    2021 WL 3666595 (11th Cir. 2021) ..................................................................20

## FEDERAL STATUTES AND RULES

Fed. R. Evid. 702 ..................................................................................1, 11, 12, 20

## MISCELLANEOUS

FINRA
    Rule 2111 ............................................................................................1, 9
    NTM 12-25 ......................................................................................9, 15
    NTM 11-02 .............................................................................................9

Investment Advisers Act of 1940 ...........................................................................10

SEC Release No. 34-86031,
    2019 WL 2420297 (June 5, 2019) ................................................................4, 14

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993), Defendant Raymond James & Associates, Inc. ("RJA") moves to exclude the opinions and testimony of Plaintiff's purported "liability and damages" expert, Douglas J. Schulz ("Schulz"), including his initial report (Doc. 148-1, "Schulz Rpt.") and his rebuttal report (Doc. 148-13, "Schulz Rebuttal") (collectively, "Reports"), submitted in support of Plaintiff's Motion for Class Certification (Doc. 147) ("Cert. Mot."), attached thereto as Tabs 1 and 13.

## INTRODUCTION

Well-established regulatory rules, industry standards, and legal precedent require that financial advisors have a reasonable basis to believe that securities transactions or investment strategies they recommend to clients are "suitable" in light of each client's individual investment profile, *i.e.,* the client's age, other investments, net worth, financial situation and needs, tax status, investment objectives, investment experience, investment time horizons, liquidity needs, risk tolerance, and the like. *See* FINRA Rule 2111. Through her lawsuit, Plaintiff seeks to jettison this client-centric "suitability" rule and replace it with the following "***unsuitability***" rule concocted by Schulz, a self-proclaimed, longtime anti-industry "crusader,"[1] with no support from any law, rule, regulation, or industry literature:

---

[1] *See, e.g.*, Douglas J. Schulz and Tracy Pride Stoneman, Brokerage Fraud - What Wall Street Doesn't Want You to Know (2002).  As established in Schulz's deposition in this case, Pride Stoneman is Schulz's wife, a plaintiffs' securities attorney, and a former Board Member of the Public Investors Advocate Bar Association ("PIABA"), the primary bar association of plaintiff lawyers who sue broker-dealers.  Schulz, who has written numerous articles for PIABA, ran PIABA's golf

*If a commission-based account has both a 0.5% annualized cost and a turnover of less than 0.25, then switching that account to a fee-based Freedom Account is objectively unsuitable.* Schulz Rpt. ¶ 60. (Emphasis added.)

Plaintiff's Cert. Motion is ***completely dependent*** on "***whether Schulz's liability test is sufficient to establish that RJA failed to conduct a proper suitability analysis when switching customers from low-cost commission accounts to high-cost Freedom Accounts.***" Cert. Mot. at 2 (emphasis added). Schulz concocted this "liability test" "for the purpose of obtaining a numeric calculation for which [he] could make the argument that certain accounts were unsuitable in this case." Dep. 88:10-20.

Schulz's "liability test" was concocted for this case, has never been used before, and is not "sufficient" to establish liability, damages, or anything else. Schulz admitted (i) he knows of no literature or any securities professional who agrees with or endorses his "liability test" and (ii) his liability and damages formulas have not been subjected to any "peer review" or otherwise tested. Dep. 85:4–86:9; 119:10–120:25. This is the exact type of "test" that *Daubert* would exclude.

Schulz tries to redefine suitability (in direct contravention of applicable SEC and FINRA directives), creating a new formulation that has never been implemented and is at odds with all law and guidance. Schulz, in 2021, stands alone in holding the wrong and long-rejected view that "a mechanical comparison of costs" is a cognizable proxy for an ***individualized suitability analysis***:

---

tournament for several years. Deposition of Douglas J. Schulz ("Dep.") (July 16, 2021), attached as Exh. A, at 76:4-6. Pride Stoneman assisted Schulz with his Reports (*id.* at 57:18-19, 66:9–68:10) although she did not sign the Parties' Confidentiality Agreement before doing so (*id.* at 72:4-17).

"*'The Panel . . . <u>rejects</u> the notion that Respondent 1 was, in essence, <u>required</u> <u>to formulate</u> his <u>recommendation</u> <u>based</u> <u>on</u> <u>a</u> <u>single factor</u> – <u>costs</u>.'*"[2] (Emphasis added.)

In fact, efforts like Schulz's to attempt to convince a court that suitability can be determined formulaically across a class have been uniformly rejected because

"*Individual questions about client-focused suitability cannot be avoided through plaintiffs' statistical proof or other evidence*."[3]

Case law is consistent in holding that ***"[w]hether an investment is suitable*** for a particular client is an ***inherently individualized inquiry***; it depends on the ***unique characteristics*** of both ***the investor and the investment at a particular point in time***."[4] Such suitability claims are not amenable to class treatment. *See Fernandez*, 2018 WL 4440498, at *2.

Schulz also stands alone in concluding that through his concocted "liability test," suitability claims can be determined on a class-wide basis. *See, e.g., Rowe v. Morgan Stanley Dean Witter*, 191 F.R.D. 398, 413-14 (D.N.J. 1999) (purported class action based on suitability claim dismissed because of "highly individualized facts").

---

[2] *See Robert N. Clemens Trust v. Morgan Stanley DW, Inc.,* 485 F.3d 840, 849 (6th Cir. 2007), quoting *Dep't of Enforcement v. Respondent 1*, 2005 NASD Discip. LEXIS 17, at *30 (Mar. 15, 2005) ("Tailoring recommendations for individual investors requires more than a mechanical comparison of costs; in making a recommendation, a [broker] must take into account a variety of factors that bear upon whether a particular investment is suitable for a specific investor.").

[3] *Fernandez v. UBS AG*, No. 15-cv-2859, 2018 WL 4440498, at *16 (S.D.N.Y. Sept. 17, 2018) (emphasis added).

[4] *Id.* at *1 (emphasis added); *see also id.* at *16 ("A client-focused suitability analysis is necessarily individualized, requiring consideration of, among other things, the client's age, assets, tax status, annual income, net worth, investment objectives, risk tolerance, liquidity needs, and concentration of investments....Customer-specific suitability is an individualized concept based upon the unique profile of each client.") (internal citation and quotation omitted).

Schulz's mathematical "liability test" even contradicts the SEC's recent guidance published when it announced the new *enhanced* "best interests" standard, which replaced the suitability standard *after* Plaintiff closed her RJA accounts in 2018:

> [W]e emphasize that while *cost* must be considered, it *should **never** be the **only** consideration*.  Cost is only one of *many* important factors to be considered regarding the recommendation and that *the standard does not necessarily require the 'lowest cost option.'* Relatedly, we are emphasizing *the need to consider costs in light of other factors and the **retail** **customer's** **investment profile***.[5]  (Emphasis added.)

Tethered to this unprecedented "liability test" is Schulz's *ad hoc*, speculative "damages model," which seeks to dispense "automatic refunds" of the Freedom Program fees that purported class members paid pursuant to their individual contracts with RJA, *after* they fully benefitted from the services RJA provided them.

Schulz's damages model does not even attempt to measure damages attributable to Plaintiff's theory of liability, as required under *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), for at least two reasons.  *First*, Plaintiff's theory of liability improperly *presumes* that each and every class member's Freedom Account (i) was opened as a result of a financial advisor's recommendation, and (ii) was *per se* unsuitable and entitled such class member to an automatic refund of Freedom Account fees, but it *ignores* the obvious fact that there would be no "breach" of any duty – and a class member would suffer *no damage* as a result of any such non-

---

[5] *See* SEC Release No. 34-86031, 2019 WL 2420297, at *13 ("Regulation Best Interest: The Broker-Dealer Standard of Conduct") (June 5, 2019).  This SEC release confirms that "Regulation Best Interest enhances the broker-dealer standard of conduct beyond existing suitability obligations."  *Id.* at *134; *see also* *140, *177.

existent "breach" – if the Freedom Account was *actually suitable* for the class member (even if the Freedom Account had been recommended).[6]  *Second*, if any Freedom Accounts were *not actually suitable* for proposed class members, Plaintiff's damages model *does not attempt to measure* what clients would have received if RJA had performed a suitability analysis and recommended a suitable account.  *Id.*

Separately, Schulz's inability to distinguish and/or comprehend the fundamental differences between or among (i) *Fee-Based Brokerage Accounts* (such as Passport Brokerage accounts, which have not been offered by RJA since 2005) and (ii) self-directed and FA-directed *Fee-Based Individual Accounts* (such as Ambassador Accounts), on the one hand, and (iii) professionally managed, discretionary fee-based accounts managed by an investment committee ("*Managed Accounts*," such as the RJA Freedom Account that Plaintiff opened), on the other hand, further demonstrates that Schulz is not qualified to testify in this case, and that his opinions are neither reliable nor relevant.[7]  Similarly, Schulz's reliance on a 2005 NASD settlement and a 2019 SEC settlement – neither of which had anything to do with Managed Accounts such as the Freedom Account – as the foundation for his "damages model," further demonstrates that Schulz does not understand the accounts at issue here.  This is not surprising since Schulz has been out of the brokerage business for 30 years and has no modeling/statistical expertise.

---

[6] *See Fernandez,* 2018 WL 4440498, at *22.

[7] Declaration of Al Caudullo ("Caudullo Decl.") ¶¶ 3-19, attached hereto as Exh. B.  *See also*, Argument Section C.2., *infra.*

Schulz's unsupported opinions conflict with well-established law, they are methodologically unsound, and they are predicated on assumptions that are demonstrably incorrect, rendering his opinions unreliable and unhelpful to the Court.

## STATEMENT OF FACTS

### A.    Allegations In Second Amended Complaint

The Second Amended Complaint ("SAC") (Doc. 117) alleges that "RJA disclosed to its clients that it was transferring their assets into fee-based Freedom Accounts and advised them of the fees they would incur for the services associated with these fee-based Freedom Accounts."  SAC ¶ 18.  It also alleges: "After Plaintiff signed the Freedom Account Agreement, Plaintiff chose a portfolio model.  RJA then *liquidated the assets* in her commission-based account, transferred the funds to her fee-based Freedom Account, and *reinvested the funds*."  *Id*. ¶ 31 (emphasis added).

To open the Freedom Account, Plaintiff executed the Client Agreement ("Client Agreement"), which included a section entitled "Account Suitability" that listed pertinent financial and other information about Plaintiff's investment experience, objectives, and risk tolerance.[8]  She also executed a Freedom Agreement ("Freedom Agreement") which contained a Client Information & Profile[9] providing her annual income, net worth, investment experience, objectives and risk tolerance, time horizon, and other information for a suitability analysis as well.  Assets in a

---

[8] *See* Declaration of Dax Seale ("Seale Decl."), ¶ 24 & Exh. 3 thereto, attached as Exh. C.

[9] *See* Seale Decl. ¶ 25 & Exh. 4 thereto.

Freedom Account are professionally managed,[10] so Plaintiff selected an asset allocation investment strategy for the managers to execute in her account (the "Strategy").[11]   Plaintiff appointed RJA to act as her investment adviser, and she acknowledged that RJA "develops the Strategies, establishes the respective target allocations, and selects and monitors fund investments in the Strategies."[12]   The Freedom Account was an *actively monitored and managed* account, and Plaintiff authorized RJA to "invest and reinvest the assets of the Account," and to buy and sell securities to "annually rebalance" the account if the "asset allocation varies by more than certain predetermined percentages from the target allocation."[13]

### B.   Schulz Admits That Plaintiff's RJA Financial Advisor Conducted A Suitability Analysis, Rendering Schulz's "Liability Test" Irrelevant

The SAC alleges that RJA "*fail[ed] to conduct <u>any</u> suitability analysis to ensure that fee-based Freedom Accounts were suitable for its clients.*" SAC ¶ 9 (emphasis added).  But this allegation is inconsistent with the evidence; Plaintiff's RJA financial advisor, Dax Seale, did conduct a detailed suitability analysis.  Seale Decl. ¶¶ 16-23.  Even Schulz *admits* that Mr. Seale *did* in fact conduct an account suitability analysis.  Dep. 185:1-7.  Schulz also *admits* that Mr. Seale "knew his customer before the Freedom account was opened in January 2016."  Dep. 185:9–187:5.  Schulz states, however, that the *individualized suitability analysis* performed by Mr. Seale in regard

---

[10] *See* Caudullo Decl.  ¶¶ 3-12.

[11] Seale Decl. ¶ 26; *See also* Freedom Agreement.

[12] *See* Freedom Agreement at 1.

[13] *See id*. at 1, 2.

to the opening of Plaintiff's Freedom Account was supposedly *inadequate*.   Dep. 146:18–149:24. But Schulz then admitted that his *formula is irrelevant* to determining whether Mr. Seale's suitability analysis was adequate:

> And we know now, because – not because of my formula.  *We didn't need my formula to do this*. . . .  *You don't need my formula.  Throw it out*. Like somehow my formula made her account unsuitable. . . .
> *       *       *
> . . . But *let's take the named client where we have all this information*. *Forget my formula*.  *Forget Doug Schulz* -- Douglas Schulz was never born.  We know everybody who makes – I'm not here – would know that Dax Seale did not perform an adequate suitability analysis. *Without me, without my formula, without my reports*.  That's a given. That's – that's fact.  That's 101.  Put it up.  Blow it up.  There it is.  He didn't do it.
>
> And – and so you don't need – *you don't need me*.  *You don't need my formula*.  He didn't do it and it's proof positive.  We know that he did not conduct a – any – a proper, appropriate – we can use 'due diligence,' we can use 'reasonable diligence' – as *he's required under the regulations, under the policies, under know your customer, under suitability*.[14]

RJA agrees with Schulz on one narrow point: the Court does not need Schulz, his formulas, or his opinions.  As Schulz himself says, the Court should "Forget [Schulz's] formula.  Forget Doug Schulz."

## C.    Schulz's Reports, Opinions And Testimony

Few paragraphs in Schulz's Report or Rebuttal Report are pertinent to the Cert. Motion in view of Plaintiff's admission that the motion is *completely dependent* on the Court accepting Schulz's untested and unprecedented "liability test" (Cert. Mot. at 2), the central premise of which is:

---

[14] Dep. 149:25–150:4; 177:22–178-12. (Emphasis added.)

Q. . . . Is it your opinion that one in your position can make a suitability determination in the circumstances set forth in paragraph 60 by merely relying on the two factors that you have identified in your report that result in a 0.5 percent annualized cost and a turnover of less than 0.25?

MR. SCHWARTZ: Objection to form.

THE WITNESS: Yes.

Dep. 136:9-17. Schulz's unsupported opinion that "unsuitability" can be established solely on the basis of his concocted "objective unsuitability" liability test is wrong.[15]

### D.   Schulz Fails To Understand The Fundamental Differences Between And Among Different RJA Accounts

One significant error underlying Schulz's "liability test" is his failure to appreciate the significant differences between and among the various account types offered by RJA at different points in time. Those differences, which are explained in detail in the Caudullo Declaration, are briefly summarized below.

Although Schulz contends the 2005 NASD settlement supports his "liability test," RJA has not offered Fee-Based Brokerage Accounts – the account type underlying that settlement – since 2005, the year RJA entered that settlement. *See* Caudullo Decl. ¶ 17. Thus, Fee-Based Brokerage Accounts are ***not*** at issue in this case, and the 2005 NASD settlement cannot provide ***any*** support whatsoever for

---

[15] FINRA Rule 2111, upon which Plaintiff's SAC is predicated in part, mandates that individualized suitability analyses be conducted for each client and for each investment recommendation. *See Fernandez,* 2018 WL 4440498, at *16. *See also* FINRA NTM 12-25; FINRA NTM 11-02, attached hereto as Exh. D and Exh. E, respectively.

Schulz is also incorrect that suitability FINRA Rule 2111 applied to "account type" in the 2015-2018 timeframe. Declaration of Joseph Thomas ("Thomas Decl") ¶¶ 17-18, attached as Exh. F. It was not until ***June 5, 2020***, when the SEC's Regulation Best Interest became effective, that the SEC clarified that FINRA Rule 2111 should be read to include "account type." *See supra* n.5.

Schulz's opinions.  *See* Caudullo Decl. ¶¶ 14-18.  As detailed below, Schulz does not understand that Plaintiff did not open a Fee-Based Brokerage Account (and could not open one since they no longer existed).

In contrast to the Fee-Based Brokerage Accounts, which were subject to NASD (now FINRA) oversight since they were brokerage accounts, the two types of fee-based accounts discussed below are advisory accounts (not brokerage accounts) and thus subject to and governed by the Investment Advisers Act of 1940 ("40 Act") under the purview of the SEC.[16]  Fee-Based Individual Accounts are fee-based accounts in which (i) the financial advisor provides investment advice, and (ii) discretion (*i.e.*, investment decision-making authority) is either kept by the client (self-directed) or delegated to the financial advisor (discretionary).  *See* Caudullo Decl. ¶ 19.  Fee-Based Individual Accounts, like the Ambassador account, require the client to pay an asset-based annual fee (paid in quarterly installments) in lieu of a commission for each investment transaction.  *Id.*  Fee-Based Individual Accounts also are ***not*** at issue in this case since Plaintiff did not have one.[17]  Caudullo Decl. ¶¶ 3, 4; SAC ¶¶ 1, 3-10.  Importantly, the 2019 SEC settlement also relied upon by

---

[16] Fee-based advisory accounts are also subject to FINRA jurisdiction and oversight when a 40 Act investment adviser ("IA") and/or its investment adviser representative ("IAR") are acting as dual registrants (*i.e.*, in both an investment adviser capacity and in a financial advisor (or registered representative) capacity).

[17] The Court previously recognized this critical distinction: "[U]nlike the accounts in the SEC proceedings managed by an individual financial advisor and left inactive for over a year, Ms. Nguyen's account was managed and monitored by an investment committee and annually rebalanced. . . . Because the SEC proceedings concerned fee-based accounts left inactive, Ms. [Nguyen]'s Raymond James freedom account is different and subject to different claims."  *See* Nov. 19, 2020, Order on Plaintiff's motion to compel, at 5 (Doc. 92).

Schulz dealt with Fee-Based Individual Accounts, not Freedom Accounts.[18]

Finally, the Freedom Account that Plaintiff opened, and that underlies this case, was a ***Managed Account*** over which Plaintiff's financial advisor, Mr. Seale, did ***not*** have discretion.  Instead, Plaintiff granted discretion to RJA, which (i) through an investment committee in the AMS division, conducted research; selected, purchased, and sold the securities at its sole discretion; monitored the allocations and performance of the securities; and, for mutual funds, monitored the fund managers' performance; and (ii) charged a fee for the ***additional and different*** services and benefits of the Freedom Program, above and beyond what investors received in Commission-Based Brokerage Accounts and in Fee-Based Individual Accounts.[19]

## ARGUMENT

### A.   Plaintiff Bears The Burden Of Establishing That Schulz's Opinions And Testimony Are Admissible Under *Daubert*

Federal Rule of Evidence 702 permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to provide opinion testimony in limited circumstances.  The determination of admissibility is "uniquely entrusted to the district court," which has "considerable leeway in the execution of its duty."  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (quotation omitted).  But "[t]he burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown

---

[18] Caudullo Decl. ¶ 20.
[19] Caudullo Decl. ¶¶ 4-14.

by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). This is especially true for class certification, where expert opinion can be crucial. *Sher v. Raytheon Co.*, 419 F. App'x 887, 890 (11th Cir. 2011) ("[T]he district court erred as a matter of law by not sufficiently evaluating and weighing conflicting expert testimony on class certification.").

Expert testimony under Rule 702 and *Daubert* has three pre-requisites: (1) is the expert qualified; (2) is the expert's methodology reliable; and (3) will the testimony assist the trier of fact. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). The *Daubert* analysis does not judge the expert conclusions themselves. *Daubert*, 509 U.S. at 594-95. The focus must be solely on principles and methodology rather than the conclusion generated. *Id.* at 995. But conclusions and methodology are not entirely distinct from one another, and nothing in *Daubert* or Rule 702 requires a trial court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. *Id.*

## B. Schulz's Opinions And Testimony Should Be Excluded Because He Is Not Qualified To Render His Opinions

Nothing in Schulz's background qualifies him to render his concocted "objective unsuitability" opinions. Schulz – a professional witness who has testified almost exclusively for plaintiffs – has not worked for a broker-dealer since 1989; has not been licensed for over 30 years; has never been a branch manager, a compliance

officer, or a supervisor with a broker-dealer; has never held a supervisor's license or supervised any employee of a broker-dealer, and, as such, is unqualified to render any opinions in this case.  Dep. 52:11-15; 63:2–65:9; 74:1–75:12.  It is not surprising, then, that his "liability test" conflicts with case law, rules, and regulations.

Schulz's "liability test" and damages model, concocted for this case, take raw account data from RJA and purport to render statistical analyses of that data. However, Schulz admitted that he is not a data analytics expert, he has no formal education in data analytics, he is not a statistician, and he has no formal training in statistics.[20]  Schulz also admitted that Plaintiff's purported "numbers" expert, Arthur Olsen, had no input on the liability test or damages model that Schulz created.[21] Due to Schulz's lack of expertise, his foray into the world of formula construction and statistical analysis has been plagued by mistakes.  *See* Section C.4., *infra.*

## C.   Schulz's Opinions And Testimony Should Be Excluded Also Because They Are Not Reliable

Schulz's opinions – that he can "objectively" determine the unsuitability of a

---

[20] Dep. 45:22–46:6.  The extremely small sample size of 45 accounts initially utilized by Schulz and Olsen is not representative of anything and certainly does not support Plaintiff's fantastical conclusion that Schulz's analysis results in "minimum damages across the class projected between $50 – $100 million."  Cert. Mot. at 10.  Schulz's unsupported opinion that "at least 75% of the 32,000 accounts or at least 24,000 are likely class members by reference to the two objective, low-trading activity metrics" (Schulz Rpt. ¶ 146) is completely speculative and unreliable.  *See, e.g., Kilpatrick v. Breg, Inc.,* 613 F.3d 1329, 1337 (11th Cir. 2010) (district court concluded that a study analyzing 152 patients was "unreliable because it did not include any statistical analysis and did not explain whether it was statistically meaningful to extrapolate from such a small sample size.").

[21] Dep. 269:22-25.  As set forth in RJA's companion *Daubert* motion to exclude Olsen's testimony, Olsen simply (i) relied on Schulz's assumptions and directions, and then (ii) ran Schulz's formulas against the data set from Schulz, to initially identify persons fitting Schulz's numeric "liability test," and then to calculate "damages by applying a formula to the data as directed by Mr. Schulz."  June 4, 2021 Report of Arthur Olsen (Doc. 148-19) ("Olsen Rpt.") at 5.

Freedom Account by comparing "annualized cost"[22] and turnover[23] of the funding account against two threshold numbers he picked from thin air – are directly contradicted by (i) case law **_before_** Plaintiff opened her Freedom Account (*see, e.g., Clemens Trust,* 485 F.3d at 849-850), (ii) case law **_while_** Plaintiff maintained her Freedom Account (*see, e.g., Fernandez*, 2018 WL 4440498, at *16), and (iii) the SEC **_after_** Plaintiff closed her Freedom Account (SEC Release No. 34-86031, 2019 WL 2420297, at *13, *96 (June 5, 2019)) ("**_[W]e emphasize that while cost must be considered, it should _underline_never_ be the _underline_only_ consideration_**. . . . For example, **_recommendations of the 'lowest cost' security or investment strategy, without consideration of other factors, could violate Regulation Best Interest_**.") (emphasis added).

### 1.   Schulz's Opinions Conflict With Federal Securities Laws, Rules, And Regulations Addressing Suitability

None of the authorities immediately above or below were cited in the Cert. Motion; indeed, **_not a single "suitability" case was cited by Plaintiff in support of class certification_**, and for good reason: "The suitability rule applies on a recommendation-by-recommendation basis." FINRA NTM 12-25, A21.   That no mechanical application of a single "liability test"[24] can possibly be a proxy for a suitability

---

[22] Schulz's convoluted, fabricated, and untested "annualized cost" formula – which contains and relies on a number of flawed assumptions (*see* Argument at Section 4, *infra*) – is: "**_Annual Cost Percentage = ((commissions per year) + (other fees per year) – (IRA Fees year) + (transaction fees per year) / (no. of months account was open) x (12 Months))  / (annual average equity)_**."  Schulz Rpt. ¶¶ 48-51.

[23] Turnover, according to Schulz, can be defined as: **_Turnover = (annual total dollar amount of purchased securities) / (annual average equity)_**. *See* Schulz Rpt. ¶¶ 54-55.

[24] Although Schulz's supposed "liability test" requires two assumptions – a "cost" assumption and a

analysis is beyond dispute.  In *Clemens Trust,* 485 F.3d at 849-850, the Sixth Circuit rejected the plaintiff's argument that "the district court erred in concluding that a suitability determination requires a consideration of factors other than cost."

*Fernandez*, *supra,* 2018 WL 4440498, which is legally indistinguishable from this case, (i) analyzed the same key issues as here,[25] (ii) rejected ***all*** arguments made by plaintiffs similarly situated to Plaintiff here, and (iii) denied class certification of their suitability-based claims.   *Fernandez* confirmed well-established suitability principles that underlie this *Daubert* Motion, such as, the duty to recommend a suitable investment is not triggered without a ***recommendation*** (*id.* at *4); suitability analyses are ***inherently individualized*** (*id.* at *12); whether there was a failure to conduct suitability analyses is an ***inherently individualized inquiry*** (*id.* at *12); a *per se* suitability determination based on a ***single factor*** is ***illogical*** (*id.* at *15); suitability ***cannot*** be ***established*** by ***statistics*** (*id.* at *16); and ***numerous*** suitability ***mini-trials*** would be ***required*** if a class were certified (*id.* at *18).  The Court squarely rejected the sum and substance of plaintiffs' liability theory, *i.e.,* that suitability can be analyzed on a class-wide basis.  The same conclusion applies here.

---

"turnover" assumption – the "liability test" itself simplistically looks only at "costs" to determine purported "unsuitability."  The "turnover" assumption is used solely to determine who might fit into Schulz's imaginary class of investors whose accounts were, based on cost alone, *per se* "unsuitable" according to Schulz.

[25] "[T]he theory underlying [plaintiffs'] claim is *not* a standard suitability claim – *i.e.*, that an investment was not suitable – but rather simply that *defendants were obligated to conduct a suitability analysis and failed to conduct any such analysis*, regardless of whether the investment was suitable or not." *Id.* at *1 (emphasis added).

Regarding purported damages, *Fernandez* determined that "the proper measure of market-adjusted damages is (1) what clients would have received if the defendant had performed a suitability analysis and recommended a suitable investment, less (2) what they actually received from their investments in the Funds." *Id.* at *21. Here, Schulz's damages model does not take into consideration either of the *Fernandez* damages components. Instead, it requires a simplistic "automatic refund" for all investors that fit into the "liability test" class that Schulz concocted. Moreover, *Fernandez* broadly rejected the plaintiffs' argument that "unsuitability" damages could be determined on a class-wide basis, regardless of the specific damages theory, because each investor's account would have to be analyzed:

> In order to measure [damages], one would have to understand the type of investment that each client would have invested in had UBS performed a 'suitability analysis' for that client. . . . That is, one would essentially have to perform a retrospective suitability analysis for each client. . . . *Id.* at *22 (citations and quotation omitted).

For the same reasons, the Court should reject Schulz's "liability test" and damages model. His "liability test" and testimony turn the law of suitability on its head. He takes an established and undisputed protocol that at its core focuses on an analysis of each *individual* investor and requires a recommendation that is tailored to the specific facts of each particular investor at the specific time of the recommendation, and replaces it with a math formula and a couple of supposedly "objective" thresholds that are not supported by any law, rule, or regulation, and never used by authorities in the securities industry. Similarly, Schulz's "automatic

refund" damages model fails to set forth any legitimate basis for awarding damages to Plaintiff on an individual basis, let alone damages on a class-wide basis. Schulz's opinions are completely unreliable and irrelevant and should be excluded also for this reason. Indeed, that Schulz would offer such fabricated opinions also demonstrates that he is unqualified.

> ### 2. Schulz's Methodology Is Flawed Because It Fails To Distinguish Between (i) Fee-Based Brokerage Accounts And Fee-Based Individual Accounts, On The One Hand, And (ii) Professionally-Managed Accounts, On The Other

Consistent with the fact that Schulz concocted his novel "expert opinions," he relies on no citations in his report for either his "liability test" or his damages model. Schulz Rpt. ¶¶ 48-62, 148-155. *In his rebuttal report, he cites only a 2019 SEC settlement and a press release concerning a 2005 NASD settlement*. Schulz Rebuttal ¶¶ 26, 39-47. Without any basis for doing so, Schulz contends that his formulas are similar to the methodology that he *assumes* was applied by the NASD in 2005 and the SEC in 2019 — in negotiated settlements, no less. Schulz cites no other support. Dep. 119:10–120:1. This speculation independently renders his opinions unreliable.

But even putting that to the side, Schulz, due to his lack of qualifications and of even rudimentary knowledge of the Freedom Account, overlooks the key differences between the *ipse dixit* "liability test" and damages model he concocted for this case, and what the NASD and SEC were addressing in the settled matters. *First*, the NASD and SEC only looked at *past* activity, so they knew *exactly* how a client traded (or did not trade); there was no speculative, hypothetical determination by

either the NASD or SEC of how a client *might have traded* in the future *with entirely different securities* (which Schulz attempts to compute).  *Second*, Schulz ignores the critical distinctions between the types of accounts underlying the NASD and SEC matters, on the one hand, and the type of account in this case, on the other hand.[26]

Schulz's opinions completely ignore that the Freedom Account platform underlying this case can *never* be inactive because regardless of whether or not there are trades in the account (and there typically are at least annual re-balancing trades), the AMS investment committee is always, at minimum, monitoring the performance of the mutual funds and/or ETFs in those accounts and the mutual funds' managers, and providing other services to the accounts.  *See* Caudullo Decl. ¶¶ 12, 22.

Indeed, this Court has already identified this critical distinction between account types.[27]  Schulz, however, has not.  Whether that is deliberate (because Schulz recognizes the dispositive difference the account type makes) or not (because Schulz does not understand the differences or have relevant experience), this failure

---

[26] *See* Caudullo Decl. ¶¶ 18, 20, 22.  The accounts at issue in the NASD and SEC matters could be "inactive" because the client or the client's financial advisor had decision-making authority over the trades in the account, so they could decide not to execute any trades or not to provide any other services in connection with the account.  Those accounts could also hold the same exact securities the client could have held in a commission-based brokerage account but yet charge a recurring annual fee (whether the fee was fixed or an agreed-to percentage of the account's value).  In contrast, Freedom Accounts necessarily are managed on a discretionary basis by professionals whose sole job is to manage investment programs.  Put simply, with the accounts at issue in the NASD and SEC matters, a client had the possibility of paying an annual fee but receive no trading or other services for that fee so that client would have been better off holding the exact same securities in a commission-based brokerage account, which was exactly the NASD's and SEC's concern.  That possibility never existed with Freedom Accounts.

[27] Order, Doc. 92, at 5 ("Because the SEC proceedings concerned fee-based accounts left inactive, [Plaintiff's] Raymond James freedom account is different. . . .").

to appreciate critical account differences is another reason his "liability test" and damages model opinions are not reliable, and why his opinions are not relevant and he is not qualified to act as an expert in this case.

### 3.   The Error Rate of Schulz's Untested Methodology Is Unknown

Yet another independent reason that Schulz's "liability test" and damages model are not reliable is that Schulz lacks the expertise in statistical analysis to offer those expert opinions.  Schulz did not perform any tests or try to ascertain the error rate of his formulas, and his fabricated formulations (and the numeric thresholds within them) are not derived from peer-reviewed sources and have not been submitted to any objective industry professionals for evaluation.  Dep. 86:3–87:12; 265:9-14.   Schulz, in concocting his formulas, did not review or select a peer-reviewed methodology, and then follow that peer-reviewed methodology.[28]

Rather, "this is the first and only use that [he has] made of the methodology that [he] came up with" and he "can't remember or think that [he] would have come up with a – utilized the methodology even in a nonclass case." Dep. 242:5-12.  *He* concocted *his* methodology *after* RJA produced data in this case, and he just "put together a formula for how we're going to apply all this to everybody." Dep. 244:24– 247:10.   These omissions alone provide yet another reason to exclude Schulz's

---

[28] Dep. 261:17-24; 265:9-14.   Schulz (or, more accurately, Plaintiff's lawyer, with speaking objections) testified that he could not have his formulas peer reviewed because RJA designated the data that it produced and to which Schulz applied his formulas as confidential.  This is a classic red-herring because Schulz could have had his formulas vetted by industry experts without using any data provided by RJA.  He could have published the formulas and simply explained that he intended to use them to "objectively" determine "unsuitability" and calculate purported damages.

opinions.[29]  Without an error rate or peer review, the Court cannot independently

verify whether Schulz's "liability test" and damages model are appropriate. *Walker v.*

*Ergon Trucking, Inc.*, 2021 WL 3666595, at *1 (11th Cir. 2021) (exclusion of expert

when methodology "used to reach his opinion . . . was not reliable because there was

no indication other experts in the field would also use that methodology").[30]

### 4.    Specific Examples Of The Impact Of Schulz's Erroneous Assumptions And Methodological Errors

Schulz's lack of qualifications and use of speculative and concocted formulas

have already demonstrated that his opinions and testimony are unreliable:

• **Schulz's Erroneous Use Of Mathematical Formulas** – As confirmed by

Olsen (Plaintiff's other "expert"), Schulz got the order of operations wrong – the

method by which one expresses in words and symbols the sequencing of

mathematical steps – in expressing the first part of his two-part formula ("annual cost

percentage") that is the foundation of Schulz's "objective unsuitability" test.[31]

• **Fluctuating Class Size, Etc.** – In his Rebuttal Report, RJA's damages expert

---

[29] *See United States v. Fedida,* 942 F. Supp. 2d 1270, 1280-1281 (M.D. Fla. 2013) (experts' opinions based on little more than experts' review of available scientific literature, without peer review or publication, and without evidence concerning known or potential error rates of experts' methodology, are not likely to meet requirements of Fed. R. Evid. 702). *Accord Lebron v. Sec'y of the Fla. Dep't of Children & Families*, 772 F.3d 1352 (11th Cir. 2014) (expert witness testimony was inadmissible because statistical opinion was beyond expertise of witness); *Krik v. Exxon Mobil Corp.*, 870 F.3d 669 (7th Cir. 2017) (district court properly excluded testimony from appellant's expert where expert ***did not identify any peer-reviewed scientific journal adopting the theory, and did not cite any medical studies or discuss an error rate***).

[30] *Id.* at *3 ("[The expert] never addressed . . . whether [his] methodology was tested, whether it was subject to peer review, whether it was generally accepted, or how it was otherwise reliable.").

[31] *See* Deposition of Arthur Olsen ("Olsen Dep.") (July 13, 2021), attached as Exh. G at 82:11–83:16; *compare* Olsen Rpt. ¶ 7 *with* the Schulz Rpt. ¶ 51 (same).

Klouda accurately explained how Schulz "artificially lower[ed] the annual cost percentage of the [commission] accounts"[32] because Schulz did not know how the Freedom Accounts work.  In response, after the deadlines for expert reports, Schulz instructed Olsen to change one of Schulz's untested assumptions in his damages model.  As a result, Schulz's unreliable results changed substantially as follows:

- Schulz's number of purported class members *dropped* by ~ 9%;[33]
- Schulz's "commission side" Cost (% of Assets) (*i.e.*, Schulz's "calculation" of how much clients paid for transactions in commission-based brokerage accounts)  *increased* by ~ 26%;[34]
- Schulz's fiction that class members were paying *9 times more* in fees in Freedom Accounts than in commission-based brokerage accounts[35] became *more than 22 times*.

Significantly, one (and, in fact, both) of the sets of numbers that Schulz presented as accurate and reliable are necessarily wrong[36] since both *cannot* be

---

[32] *See* June 25, 2021 Rebuttal Report of Peter J. Klouda, attached to the Declaration of Peter J. Klouda ("Klouda Decl."), attached hereto as Exh. H, at Exh. 2, ¶ 23.

[33] *See* Olsen Rpt. ¶ 34, and *compare* with July 12, 2021 Letter from Plaintiff's Counsel to RJA's Counsel, Tab 9 to Plaintiff's Cert. Mot., ¶ 2.  *Math:  Decrease from 34 to 31 equals 8.82% reduction*.

[34] *See* Olsen Rpt. ¶ 32, and *compare* with Tab 9 to Cert. Mot., ¶ 1.  *Math:  Increase from 0.35% to 0.44% equals 25.71% increase*.

[35] *See* Schulz Rpt. ¶ 69, and Schulz Rebuttal ¶ 3.c.

[36] Rather than admit his error, Schulz and Plaintiff's attorneys (i) continue to use the numbers despite knowing that at least one set of numbers is necessarily wrong, and (ii) further demonstrate the unreliability – if not the fabricated nature – of Schulz's opinions by attempting to disguise the error by repackaging both numbers as a *range* in Schulz's Deposition and in Plaintiff's Cert. Motion, where they repeat this falsehood multiple times. *See* Cert. Mot. at 1, 4, 6, 10, 12, 14, 24.

*See* Dep. 140:18–141:1; 149:19–150:5; 150:13-14; 178:13-17.  RJA makes note of Schulz's efforts to capitalize on his errors and unreliable methodology not because either his original "*9 times*" figure and/or his newly adopted (post-expert report) "*22 times*" figure and/or his brand new "*range opinion*" are admissible (none are), but because Schulz's multiple errors – and the elasticity and unpredictability of his numbers – easily demonstrate that Schulz's methodology, his "liability test," and his "damages model" are completely unreliable and irrelevant.

correct.  Yet, Plaintiff's Cert. Motion falsely states that "Plaintiff and other class members paid on average *between 9 and 22 times more* in annual fees in the Freedom Accounts than they would have paid in the commission-based brokerage accounts." Cert. Mot. at 1. This is not true, and the wild fluctuation in Schulz's figures and his failure to pick between his two sets of purported class members, further prove that his methodology is unreliable.

- **Sample Accounts 100% In Cash Prior To Opening Freedom Accounts** – Schulz's damages model awards 100% of the Freedom Account fees to investors if their commission-based brokerage accounts held 100% of the assets in cash – whether for two days or two years – before they opened Freedom Accounts.[37]  Cash holdings do not generate commissions and do not indicate the client is a "buy and hold" investor (or provide any other insight into the type of investor that client is since the account holds no investments).  For this reason alone, these clients could not be in Plaintiff's putative class, yet Schulz's "liability test" and damages model indiscriminately categorize them as "buy-and-hold" or "low-trading" investors and awards them damages.

---

[37] Four of the 34 or 31 putative class members (depending on which iteration of Schulz's liability test is being reviewed), were 100% in cash positions in their commission-based brokerage accounts prior to opening their Freedom Accounts (Acct. Nos. 8, 35, 42 & 48), and one purported class member was 97.08% in cash in the investor's commission-based brokerage account prior to opening a Freedom Accounts (Acct. No. 5).  Schulz opines that Freedom Accounts were unsuitable for these five clients – who supposedly used the commission-based brokerage account like a cash account – and awards 100% refunds even though the cash holdings in these accounts say *nothing* about the account-holder's investment preferences.  *Compare* Olsen Rpt. ¶ 18 (referencing RJA_(NGUYEN)_059060 to 059063) & its Exh. C, and Tab 9 to Plaintiff's Cert. Mot. (Letter from Plaintiff's counsel with untimely and improper revisions to Olsen Rpt.).

- **Large Subsequent Cash Deposits In Other Freedom Accounts** – The RJA data relied upon by Schulz and Olsen (*see, e.g.,* Olsen Rpt. ¶ 18) reflect thousands of instances in which the equity in clients' Freedom Accounts (*i.e.*, the accounts' value) increased from one month to the next by 25% or more, and in some instances by more than 1,000%, indicating in most instances that new money was deposited into the Freedom Accounts after the initial funding:

| ACCOUNT | MONTH | EQUITY | MONTH | EQUITY | $ DIFFERENCE | % DIFFERENCE |
|---|---|---|---|---|---|---|
| 27146 | April 2017 | $ 99,255 | May 2017 | $1,702,916 | $ 1,603,661 | 1616% |
| 1217 | January 2017 | $2,498,785 | February 2017 | $3,544,329 | $ 1,045,544 | 29% |
| 1217 | May 2017 | $3,633,138 | June 2017 | $4,654,044 | $ 1,020,906 | 28% |
| 20893 | December 2016 | $ 148,920 | January 2017 | $1,340,086 | $ 1,191,166 | 800% |
| 15094 | March 2017 | $ 58,796 | April 2017 | $ 750,338 | $ 691,541 | 92% |
| 15094 | November 2017 | $ 803,861 | December 2017 | $2,339,113 | $ 1,535,252 | 191% |

The above chart, which shows just a sliver of the data, demonstrates another major methodological flaw in Schulz's damages model: it seeks "automatic refunds" of the *additional* fees earned in the Freedom Accounts on the "new" money clients intentionally deposited in their Freedom Accounts, based on the model's speculative assumptions that (i) if the money had not been deposited into the Freedom Account, it would have been deposited in the client's commission-based brokerage account, and (ii) assuming the money would have been deposited into that account, the client would not have purchased any securities.   These assumptions underlying the damages model are speculative and nonsensical.

- **Multiple Accounts Held By Sample Account Holders** – Of the 59 sample Freedom Accounts analyzed by Schulz and Olsen, 24 of those account holders

(approximately 41%) had opened one or more other Freedom Accounts before or at the same time as the Freedom Account captured in the sample.   These additional Freedom Accounts totaled 32 accounts.  Caudullo Decl. ¶ 37.  Schulz assumes that if his "liability test" (aimed solely at the "funding" account) is met, then the relevant Freedom Account is *ipso facto* unsuitable – ***even if the client holding that Freedom Account has one or more other Freedom Accounts that are perfectly suitable for that client***. Plaintiff here actually falls within this additional nonsensical assumption.[38]

- **Additional Methodological Flaws** – Schulz's damages model, which requires that **all fees** from **two-thirds** of **all Freedom Accounts** be refunded, suffers from additional methodological flaws identified in the Klouda Declaration and his Rebuttal Report attached to it.  *See* Exh. H, ¶¶ 5-18 & Exh. 2 thereto.  Moreover, Schulz's model fails to give any meaningful or appropriate value to AMS' services and benefits, and the optional ancillary financial planning services by financial advisors, which vary between accounts.  Caudullo Decl. ¶¶ 12-13.

        **5.      Schulz's Speculative Class-Wide "Damages" Model Is Flawed**

For the multiple reasons set forth above, Schulz's damages model is unreliable and irrelevant and should be stricken under *Comcast* and *Fernandez*.  Unsurprisingly, Schulz cites no support for it in the law, rules, regulations, or academic or industry

---

[38] Plaintiff opened an initial Freedom Account six months before her second Freedom Account (the account at issue in this action), and yet she has made no claim that her initial Freedom Account was unsuitable – despite having an army of lawyers and "experts" in this case vigorously protesting that her second Freedom Account was unsuitable.  Seale Decl. ¶ 14.

literature.  He only tries to support it with the 2005 NASD press release and 2019 SEC settlement, which Section C.2. above explains is futile.  Schulz's speculative damages model, which calculates purported damages as the difference between *actual fees* paid in the Freedom Account minus the *hypothetical commissions* that might have been incurred if purported class members had kept the assets they transferred into a Freedom Account in the commission-based brokerage account, cannot replace the account-by-account review that is necessary as a matter of law. *See Fernandez,* 2018 WL 4440498, at *21, *22.  As was the case in *Krukever v. TD Ameritrade, Futures & Forex LLC*, 328 F.R.D. 649, 662 (S.D. Fla. 2018), "Calculating damages using 'readily available' data and a plug-and-chug formula . . . is simply impossible without conducting complex and fact specific inquiries to determine the proper and accurate data to plug into the formula."  Schulz ignores established law, and for this reason as well, his damages model is unreliable.

### D. Schulz's Opinions And Testimony Should Be Excluded Because His Opinions Are Not Helpful To The Court

Schulz's opinions and testimony are of no help to the Court because Schulz is not qualified to render the opinions proffered, and the opinions themselves are made up, contrary to established and applicable rules, regulations, and decisional law, untested, flawed methodologically, and extremely unreliable.

## CONCLUSION

For the reasons stated above and based on RJA's overwhelming evidence, the Court should exclude the opinions and testimony of Douglas J. Schulz.

Dated:  September 3, 2021

*/s/ John E. Clabby*
John E. Clabby (FBN 113664)
Caycee D. Hampton (FBN 100922)
CARLTON FIELDS, P.A.
Suite 1000
4221 West Boy Scout Boulevard
Tampa, Florida 33601
Telephone:  (813) 223-7000
Facsimile:  (813) 229-4133
jclabby@carltonfields.com
champton@carltonfields.com

Markham R. Leventhal (FBN 616140)
CARLTON FIELDS, P.A.
Suite 400 West
1025 Thomas Jefferson Street, NW
Washington, DC 20007-5208
Telephone:  (202) 965-8100
Facsimile:  (202) 965-8104
mleventhal@carltonfields.com
*Counsel for Defendant*
*Raymond James & Associates, Inc.*

Bernard R. Suter (admitted *pro hac vice*)
Bryce M. Cullinane (admitted *pro hac vice*)
KEESAL, YOUNG & LOGAN
450 Pacific Avenue
San Francisco, California 94133
Telephone:  (415) 398-6000
Facsimile:  (415) 981-0136
ben.suter@kyl.com

## LOCAL RULE 3.01(g) CERTIFICATION

The undersigned hereby certifies that defense counsel has conferred with counsel for Plaintiff by email, and Plaintiff opposes the relief requested herein.

Dated:  September 3, 2021

*/s/ John E. Clabby*
Attorney