# EXHIBIT A

Page 1

1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
2                          TAMPA DIVISION
3
     KIMBERLY NGUYEN, On Behalf of
4    Herself and All Others Similarly
     Situated,
5
             Plaintiff,
6                                          Case No.
     vs.                                   8:20-cv-195-CEH-AAS
7
     RAYMOND JAMES & ASSOCIATES, INC.,
8
             Defendant.
9    _____/
10
11            VIDEOTAPED DEPOSITION OF DOUGLAS J. SCHULZ
                    (Conducted Via Videoconference)
12
13    DATE:                July 16, 2021
14
      TIME:                10:05 a.m. to 1:43 p.m.
15
16    PURSUANT TO:         Notice by counsel for Defendant
                           for purposes of discovery, use
17                         at trial or such other purposes
                           as are permitted under the
18                         Federal Rules of Civil Procedure
19
      BEFORE:              Valerie A. Hance, RPR
20                         Notary Public, State of
                           Florida at Large
21
22                         Volume 1
                           Pages 1 to 154
23
24
25

Page 2

1  APPEARANCES:
2   STEVEN A  SCHWARTZ, ESQUIRE
    Chimicles, Schwartz, Kriner & Donaldson-Smith, LLP
3   361 West Lancaster Avenue
    Haverford, Pennsylvania  19041
4   sas@chimicles.com
        Attorney for Plaintiffs
5
6   BERNARD R  SUTER, ESQUIRE
    BRYCE M  CULLINANE, ESQUIRE
7   Keesal, Young & Logan
    450 Pacific Avenue
8   San Francisco, California  94133
    ben suter@kyl com
9   bryce cullinane@kyl com
10      -and-
11  JOHN E  CLABBY, ESQUIRE
    Carlton Fields, P A
12  4221 West Boy Scout Boulevard
    Suite 1000
13  Tampa, Florida  33607
    jclabby@carltonfields com
14
        -and-
15
    GIANLUCA MORELLO, ESQUIRE
16  Raymond James Financial, Inc
    880 Carillon Parkway
17  St  Petersburg, Florida  33716-1102
        Attorneys for Defendant
18
19  ALSO PRESENT:
20   Michael Peterman, Videographer
     Clay Lean, Paralegal - Keesal, Young & Logan
21
22
23
24
25

Page 3

1              I N D E X
2   DIRECT EXAMINATION BY MR. SUTER       Page 6
3   CERTIFICATE OF OATH              Page 153
4   REPORTER'S CERTIFICATE          Page 154
5
6           E X H I B I T S
            (None marked.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        THE VIDEOGRAPHER:  We're going on the video
2   record at 10:05 a.m. on Friday, July 16, 2021.  This
3   is Media Unit 1 of the videotaped deposition of
4   Douglas Schulz in the matter of Nguyen vs. Raymond
5   James & Associates filed in the United States
6   District Court, Middle District of Florida, Tampa
7   Division.
8        This deposition is being held by Veritext
9   Virtual Depositions by ZOOM.  My name is Michael
10  Peterman.  I'm the videographer.  Court reporter is
11  Valerie Hance with Veritext Legal Solutions.
12       Will counsel please introduce themselves.
13       MR. SUTER:  Good morning.  My name is Ben Suter
14  with Keesal, Young & Logan.  I represent the
15  defendant in this case, Raymond James & Associates,
16  Inc.
17       MR. CLABBY:  And my name is Jack Clabby from
18  Carlton Fields in Tampa, Florida, and I'm co-counsel
19  with Mr. Suter for defendant, Raymond James &
20  Associates, Inc.
21       MR. CULLINAN:  Good morning.  My name is Bryce
22  Cullinan.  I'm an associate at Keesal, Young &
23  Logan.  And with us, as well, is Clay Lean of
24  Keesal, Young & Logan.  He is a paralegal and he'll
25  be operating the Exhibit Share for us today.

Page 5

1        MR. SCHWARTZ:  Good morning.  My name is Steve
2   Schwartz from Chimicles, Schwartz, Kriner &
3   Donaldson-Smith.  I represent the plaintiff,
4   Kimberly Nguyen.
5        THE VIDEOGRAPHER:  That's everyone?
6        Will the court reporter please swear in the
7   witness.
8        THE REPORTER:  The attorneys participating in
9   this deposition acknowledge that I, the court
10  reporter, am not present with the witness and that I
11  will be reporting the proceedings and administering
12  the oath remotely.  This arrangement is pursuant to
13  the Florida Supreme Court Administrative Order
14  No. AOSC20-23.  The parties and their counsel
15  consent to this arrangement and waive any objections
16  to this manner of reporting.  Please indicate your
17  agreement by stating your name and your agreement on
18  the record.
19       MR. SUTER:  This is Ben Suter.  We agree.
20       MR. SCHWARTZ:  And this is Steve Schwartz.
21  Plaintiff agrees.
22           DOUGLAS J. SCHULZ,
23  the witness herein, being first duly sworn on oath, was
24  examined and deposed as follows:
25       THE WITNESS:  I do.

2 (Pages 2 - 5)

Page 6

1          DIRECT EXAMINATION
2 BY MR. SUTER:
3    Q.  Good morning, Mr. Schulz.  My name is
4 Ben Suter.  We've not met before.
5         Do you understand that the oath that you've
6 just taken is the same oath that is given in a court of
7 law?
8    A.  I assume so.
9    Q.  Okay.  And you've been deposed on any number of
10 occasions over the past 30 years; is that correct?
11   A.  That's correct.
12   Q.  Okay.  And you've given sworn testimony in
13 arbitration proceedings in the past 30 years or so,
14 correct?
15   A.  Yes.
16   Q.  Okay.  And in the court, you've also given
17 testimony; is that correct?
18   A.  Yes.
19   Q.  Okay.  The oath then, you understand that that
20 requires you to tell the truth and the complete truth,
21 correct?
22   A.  Yes.
23   Q.  Okay.  Thank you.
24      Could you state your full name for the record,
25 please.

Page 7

1    A.  Douglas Jerome Schulz.
2    Q.  And what is your address, please?
3    A.  301 Snowcrest Road, Westcliffe, Colorado 81252.
4    Q.  What is your occupation, sir?
5    A.  I have two occupations.  I'm a securities
6 consultant and I have a financial firm that lends money.
7    Q.  What is the name of your financial firm?
8    A.  I had two until just recently.  One was
9 Westward Financial, and the other one is done through an
10 entity called Schulz Partnership, LLLP.
11   Q.  And do those have the same address as the
12 address you gave us before?
13   A.  Westward Financial, but just to make that
14 clear, I -- I am no longer, as of about two months ago,
15 a partner in Westward Financial.
16      Schulz Partnership, LLLP, is at the same
17 address.
18   Q.  Great.  Thank you for clarifying that.
19      Do you have any devices in the room where you
20 are sitting where this deposition is being conducted
21 remotely on your end?
22      MR. SCHWARTZ:  Objection, overbroad.
23      THE WITNESS:  Did you say "recorded"?
24 BY MR. SUTER:
25   Q.  No, no.  Do you have any devices such as a cell

Page 8

1 phone or a laptop or a desk computer or an iPad with
2 you?
3    A.  I have all of the above.
4    Q.  Okay.  Are any of those on, other than the
5 computer that you're participating in this deposition
6 through?
7    A.  Well, here is a screen that's connected to a
8 computer over here.  And then over here is another
9 computer with another screen.
10   Q.  Okay.  And is that other screen on?  Is that
11 other screen turned on?
12   A.  It is.
13   Q.  Okay.  And is that on for purposes of pulling
14 up exhibits in this case?
15   A.  It is.
16   Q.  All right.  Is there anyone in the room with
17 you?
18   A.  There is not.
19   Q.  Okay.  Do you have any notes or other documents
20 in front of you related to this matter?
21   A.  In front of me, I have a pad and another pad.
22 And over there, I have a three-ring binder that
23 yesterday I printed out a -- I don't know -- thousand
24 pages of various exhibits.  And that's in that
25 three-ring binder.

Page 9

1      And in the other three-ring binder is, I think,
2 other exhibits that have been produced in this case.
3    Q.  Okay.  You received a package yesterday from
4 our law firm with an exhibit binder or two; is that
5 correct?
6    A.  I have not open -- my wife opened it, said
7 there is some -- some yellow -- white notebooks in
8 there.  I have -- since I was told not to look at it,
9 it's not in my office and I haven't looked at it.
10   Q.  Okay.  We appreciate that.  During perhaps the
11 first break, you could have those binders that sent
12 to you brought into the room, because we may be going
13 through some of those documents.  Okay?  Great.
14      Are you on any drugs or medications that would
15 make it difficult for you to understand and respond to
16 my questions here completely and truthfully?
17   A.  No.
18   Q.  Okay.  Have you been deposed via
19 videoconference before?
20   A.  I don't know.  I don't -- I don't -- I don't
21 know.  I may or may not have.  I don't recall.
22   Q.  Okay.  And if there are any glitches with the
23 technology on your end, if you can't hear us or
24 otherwise have problems, please let us know.  Okay?
25   A.  Okay.

3 (Pages 6 - 9)

Page 10

1  Q.  All right.  Good.
2      All right.  Let me give you a little bit of
3  background on depositions even though you've been
4  deposed in the past.
5      The oath that you gave, as I mentioned, is the
6  same oath that's given in a court of law.  We are here
7  being recorded in two matters.  One is by stenography.
8  We have a court reporter taking down everything so that
9  a booklet can be prepared at the end of this proceeding.
10  You're also being videotaped.
11     It's important that we not talk over each
12  other, that we give each other the opportunity to
13  complete our respective statements; my questions, your
14  answers.  And that makes it easier for the court
15  reporter.
16     You may hear on occasion an objection from
17  Mr. Schulz.  He is doing that for the record.  Unless
18  there is a privilege or some other reason that is
19  legally recognized for you not to respond to my
20  questions, you are required to do so.
21     Do you understand that?
22  A.  When you said objections by Mr. Schulz, did you
23  mean Mr. Schwartz?
24  Q.  Excuse me.  I did.  That's not the first time
25  people have confused the two names.  Excuse me.

Page 11

1  Mr. Schwartz.  Thank you, Mr. Schulz.
2      Are you represented by anyone here today?
3  A.  I -- I don't think the fact that I work for
4  Mr. Schwartz's firm means he represents -- I don't
5  know that.  I don't know.  I'm not a lawyer.  I don't
6  know how to answer that.
7  Q.  Okay.  Well, have you entered into any
8  arrangements with Mr. Schulz or his firm, the Chimicles
9  Schwartz firm, for them to offer my legal representation
10  to you?
11  A.  No, I have not.
12  Q.  Have you entered into any written agreements
13  with the Schwartz -- Chimicles Schwartz firm?
14  A.  I don't know who, because there is more than
15  one law firm that contacted me about working in this
16  case.  Somebody signed a contract.  As I sit here today,
17  I don't recall who that was.
18  Q.  Okay.  Did you sign that contract as well?
19  A.  I should have.  I usually do.  I'm going to
20  assume I did.
21  Q.  And what was the purpose of your signing
22  that contract?
23  A.  The purpose of my signing it or him signing it?
24  Q.  Your signing it.
25  A.  I don't know.  I'm not a lawyer.  I don't know

Page 12

1  why I signed it.  There is a line for me to sign and I
2  signed it.  I don't -- I don't -- no one has ever asked
3  me that question.
4  Q.  Didn't you sign that letter in order to
5  memorialize the written agreement that you felt would be
6  binding between you and whoever else, whichever lawyer
7  or law firm was also a party to the contract?
8  A.  I think that's asking for a legal conclusion,
9  and I let my lawyers handle all that.  One of my lawyers
10  drew up the contract, I signed the contract, and I let
11  them interpret the contract.
12  Q.  As an individual here, not necessarily in your
13  expert capacity, but not excluding that, have you ever
14  signed a contract without thinking that the contract
15  would be binding?
16     MR. SCHWARTZ:  Object -- objection, beyond the
17  scope of the expert report.  Objection -- that's the
18  only objection.
19     Go ahead.  You can answer, Mr. Schulz, if you
20  can.
21     THE WITNESS:  Well, again, let's just -- I'm
22  not a lawyer, so I'm not going to be giving any
23  legal opinions, so what -- it sounds like you're
24  asking me to make a legal conclusion about what my
25  contract does or doesn't bind the people who signed,

Page 13

1  and I don't have an opinion on that.
2  BY MR. SUTER:
3  Q.  Have you ever felt that when you signed a
4  contract that you would be bound by that contract's
5  terms?  I'm not asking for a legal conclusion.
6  A.  Well, in a nonlegal conclusion, in a nonexpert
7  conclusion, I am asked or requested to sign documents.
8      Because of my age, I've had a lot of
9  operations, and they're always having me sign documents.
10  Q.  And as you sit here today, you don't have any
11  understanding as to whether or not when you signed a
12  contract with somebody else whether that contract is or
13  might be binding on you according to its terms?
14     MR. SCHWARTZ:  Objection to form.  Objection,
15  beyond the scope.  Objection, calls for legal
16  conclusion.
17     THE WITNESS:  I -- I -- I have lawyers.  I let
18  lawyers make those decisions.  They tell me what to
19  do and not do and what -- what the documents I
20  signed do and don't -- because I'm in the lending
21  business, there is a lot of signing, but I have a
22  cadre of lawyers who handle all that.
23  BY MR. SUTER:
24  Q.  Have you ever signed a contract without a
25  lawyer giving you advice?

4 (Pages 10 - 13)

Page 14

1      MR. SCHWARTZ: Objection, overbroad.  Overbroad
2  as to time, overbroad as to scope, overbroad as to
3  what the meaning of "contract" is.
4      THE WITNESS:  I think because I mentioned that
5  I signed these medical documents, I don't know what
6  they -- I don't know what you even call those.  But
7  every time I get an operation, they punch a -- push
8  a bunch of documents in to me.  They look legalese
9  in their language.  I almost never read them.  But
10  I -- I -- I've never tried not to sign them, but I
11  suspect if I did they wouldn't operate on me, so I
12  sign them.  As to if they're binding or not, I've
13  luckily not yet been in a lawsuit with a doctor, so
14  I don't know.
15      MR. SCHWARTZ: And before we go on, I'm going
16  to interpose an objection.  I'm going to object to
17  any -- any questions that inquire about any personal
18  medical information regarding Mr. Schulz.  He has
19  already testified, with respect to drugs, that he is
20  capable to testify today accurately.  You want to
21  ask him a bland question whether he is physically
22  able to testify, that's fine, but I don't want the
23  witness getting into any personal medical
24  information.  That's part of the reason for my
25  objections to your contract questions as being

Page 15

1  overbroad and beyond the scope and improper.  And I
2  just want to get that clear so we keep this
3  deposition focused on issues of the -- of the day,
4  which is the expert opinions that Mr. Schulz has
5  rendered in this case.
6      MR. SUTER:  That's fine, Steve.  I have no
7  interest in asking questions about Mr. Schulz's
8  medical background or history or anything like that.
9  BY MR. SUTER:
10  Q.  Let me just ask you this question, sir.
11      Do you have an opinion, as we sit here today,
12  as to whether or not the plaintiff in this case,
13  Kimberly Nguyen, is bound by the contract, the account
14  agreement that she signed with Raymond James?
15      MR. SCHWARTZ:  Objection, calls for legal
16  conclusion.
17  BY MR. SUTER:
18  Q.  I'm not asking for a legal conclusion.  I'm
19  just asking for your expert opinion as someone who has
20  been in the securities industry for -- well, who was in
21  the securities industry decades ago, but who testifies
22  regularly as an expert witness.
23      MR. SCHWARTZ:  Objection, calls for legal
24  conclusion, and objection to form.
25      THE WITNESS:  No.

Page 16

1  BY MR. SUTER:
2  Q.  You have not formed an opinion as to whether or
3  not Ms. Nguyen is bound by her contract that she signed
4  with Raymond James; is that correct?
5      MR. SCHWARTZ:  Objection.
6      You can answer.
7      THE WITNESS:  I have -- I have nothing to add.
8  BY MR. SUTER:
9  Q.  I'm sorry.  Just want to get a clear answer to
10  my question.
11      Is it your expert opinion that Mrs. Nguyen is
12  not bound by the account agreement that she signed with
13  Raymond James in or about January 2016?
14      MR. SCHWARTZ:  Same objections.  Asked and
15  answered, calls for a legal conclusion.
16      You can answer, Mr. Schulz.
17      THE WITNESS:  I was not asked to address that
18  issue and I have no opinion on that issue.
19  BY MR. SUTER:
20  Q.  Okay.  Thank you for clarifying that.
21      Getting back to the -- the rules of the -- the
22  road here.  Once this deposition is completed, the court
23  reporter will prepare a booklet.  The booklet will be
24  sent to -- to you via counsel.  You will have an
25  opportunity to make any corrections or changes that you

Page 17

1  feel are appropriate.
2      Do you understand that?
3  A.  I do.
4  Q.  Okay.  And I'll just give you the heads up that
5  if you should make any changes or alterations to your
6  testimony, we will have the opportunity to comment on
7  that at trial or in hearings, and the inference could be
8  drawn that you were less than candid or fully truthful
9  if you make certain changes.
10      Do you understand that?
11      MR. SCHWARTZ:  I'm going to object.  I'm going
12  to instruct the witness not -- not only am I going
13  to instruct the witness, I'm going to object to
14  that.  That question was abusive, that question
15  contains legal arguments, and that question is just
16  patently improper.
17      You can answer to the extent you have any
18  answer to that, but you do not have to assume that
19  Mr. Suter's legal arguments that he made are
20  truthful and accurate.
21      THE WITNESS:  I've never heard anybody say
22  anything like that, and I think you're wrong and I'm
23  not going to agree to any of that.
24  BY MR. SUTER:
25  Q.  Okay.  You understand that you have the

Page 18

1 opportunity to make changes to the transcript once you
2 receive that?
3    A. That part, I understand.
4    Q. Okay. And if you make changes to your
5 transcript, do you understand that lawyers could comment
6 on those changes at a later time?
7    MR. SCHWARTZ: I'm going to object to that
8 question. Calls for speculation as to what any
9 responsible lawyer would do in this hypothetical
10 situation.
11    You can answer if you can.
12    THE WITNESS: I -- I have no opinion either
13 way.
14 BY MR. SUTER:
15    Q. Okay. The purpose of my pointing that out to
16 you is to, again, ask you to make sure that your answers
17 are complete and truthful so that that procedure of
18 having to comment on changes won't be necessary.
19    A. Generally, the question is --
20    MR. SCHWARTZ: I'm going to -- excuse -- excuse
21 me.
22    I'm going to object to that. If you want to
23 try to bully my -- bully the witness here, that is
24 improper. I can make a speech about how you ask
25 improper questions. I could do X, Y, and Z. We're

Page 19

1 here to get Mr. Schulz's testimony. If you're
2 interested in what he has to say, ask him a question
3 about what he has to say, but please don't ask him
4 questions about what you might do or your co-counsel
5 might do or what I might do after the fact. I think
6 we have to limit this deposition to Mr. Schulz's
7 role in this, which is his expert opinions.
8    MR. SUTER: That's fine, Steve. If you could
9 limit your objections to the proper format and not
10 give speaking objections, I would appreciate it.
11    Let's move on here.
12 BY MR. SUTER:
13    Q. Do you have any questions about the deposition
14 process before we get started, sir?
15    A. Will counsel Steve Schwartz or any of the other
16 counsel representing the claimants be provided with a
17 copy of the video version of this?
18    Q. Yes, they have the right to obtain the video if
19 they choose to do so.
20    A. Thank you.
21    Q. Okay. Any other questions?
22    A. I just wanted to make sure I recognized
23 everybody, or at least have been identified, that's on
24 the -- the phone number is an in-house counsel for
25 Raymond James? Is that what somebody said?

Page 20

1    Q. There is one in-house counsel for Raymond James
2 on the phone, yes.
3    A. And Mr. Peterman is the videographer?
4    THE VIDEOGRAPHER: Yes, I'm the videographer.
5    THE WITNESS: Okay. I have no other question.
6 BY MR. SUTER:
7    Q. Great. Well, then let's get started on the
8 substantive aspect of this deposition.
9    How did you first learn about the lawsuit
10 Kimberly Nguyen vs. Raymond James?
11    A. I don't recall exactly. Somewhere, seems like
12 a year ago, one of the lawyers contacted me. And I
13 don't recall -- I had been contacted earlier, and I
14 don't recall by who, but some time went by and then I
15 was contacted again.
16    Q. And do you remember the name of the lawyer who
17 first contacted you?
18    A. I think, but I'm not sure, it was Paul Wood.
19    Q. And what's your best recollection as to when
20 that was?
21    A. Roughly a year or more ago.
22    Q. Okay. Do you recall what he said to you or
23 what you said to him?
24    A. Well, like most lawyers when they call me, I
25 think he made sure there was no conflicts, and then he

Page 21

1 described the basic issues of his case and said that --
2 I can't remember -- most of my cases come by referral.
3 I don't recall, but I think he said somebody referred
4 him -- me to him and that, based on my credentials and
5 experience, he thought I might be qualified to be
6 assistance to them in their case. And I don't remember
7 the next step after that.
8    Q. Okay. How much time went by between that first
9 call and the next call?
10    A. Mr. Suter, I don't recall exactly, but I felt
11 like there was once a call a lot earlier, and then
12 everybody went away, and then they came back. And I
13 don't recall the timing of that. And I hope I'm not
14 confusing it with another case, but -- once that second
15 call came -- I'm sorry. What was the question?
16    Q. I was asking about the time difference between
17 the two calls that you referred to, the first one with
18 Mr. Wood and the second one with someone who you've not
19 yet identified.
20    A. Well, the second one is who I'm sure was
21 Mr. Wood. The first one, I don't know if it was
22 Mr. Wood or a paralegal, because often lawyers will have
23 a paralegal call me to make sure there are no conflicts.
24 But I think the second call was Mr. Wood.
25    Q. Okay. Do you recall what you were told by

6 (Pages 18 - 21)

Page 22

1 either the lawyer or the paralegal or whoever contacted
2 you of what the nature of the case was?
3     A.   Something about they have a class action
4 against Raymond James & Associates, and it deals with
5 the issue relating to the switch of -- of Raymond James'
6 clients from commission accounts to fee-based accounts.
7     Q.   Okay.  Had you ever been contacted to work on a
8 case that had similar characteristics or attributes?
9     A.   Well, this is where it gets a little confusing.
10 I am working on a similar case now.
11     Q.   Okay.  What is the name of that case?
12     A.   I don't know the exact name, but I -- the
13 defendant's Edward Jones.
14     Q.   Is that the Anderson vs. Edward Jones case?
15     A.   I don't know the title.
16     Q.   Okay.  When were you retained on the Anderson
17 case?
18         MR. SCHWARTZ:  Hold on.  I'm -- I'm going to
19     raise an objection.
20         Mr. Schulz, to the extent that you have been
21     designated as a testifying witness in that case,
22     Mr. Suter can have some small leeway to ask about
23     that.  To the extent that you have been hired as
24     a -- at this stage of that case -- and I'm not
25     counsel of record in that case -- but as a

Page 23

1     nontestifying consultant, then that is not subject
2     to discovery, I believe.
3         But subject to those comments, you can answer
4     to the extent you can or can't based on your role in
5     that case and what your obligations are to discuss
6     that role that you have at this stage in that case.
7 BY MR. SUTER:
8     Q.   Do you have the question in mind, sir?
9     A.   I'm sorry.  What?
10     Q.   Oh, do you have the question in mind?
11         MR. SCHWARTZ:  Before we go forward, I want to
12     make another -- this is an objection I will make;
13     which is that, Mr. Suter, your firm and you are
14     involved in that case, and I will object to the
15     extent you're going to try to use your deposition
16     for Mr. Schulz's opinions in this case to gain
17     discovery that you would not be able to obtain for
18     your client Edward Jones in the Edward Jones case.
19     That would be entirely improper if it is at a stage
20     or Mr. Schulz is not -- has not been designated as a
21     testifying expert and he is in the capacity as, at
22     this point in time, a nontestifying consultant.
23         So subject to all of that, you know, it's not
24     my case, so you can go ahead and try to answer
25     whatever the question is.

Page 24

1         MR. SUTER:  I'd appreciate if you'd keep your
2     objections in the proper form as opposed to making
3     speak -- speaking objections that appear to be
4     designed to influence the witness's testimony.
5         MR. SCHWARTZ:  Mr. Suter, this is an area of
6     privilege where I have a lot of leeway.  And I
7     believe what you're trying to do here is -- since
8     you just lost in the Ninth Circuit in the
9     Edward Jones case -- or your client did -- it seems
10     to me you're trying to get improper discovery from a
11     nontestifying consulting witness in this case
12     through the vehicle of this deposition in this case.
13         So this is not an issue of I'm objecting to
14     your question because I think your question is
15     improper and I need to keep my objections within the
16     bounds of speaking objections or nonspeaking
17     objections.  This is a situation where I believe
18     you're trying to trick the witness into disclosing
19     information for purposes of the Edward Jones case
20     that you're not entitled to, and I am not going to
21     allow that to happen if that's what you're trying to
22     do.  Now --
23         MR. SUTER:  Well, your premise is wrong.  Your
24     premise is wrong, Steve.  I'm not trying to do
25     anything other than figure out what this witness's

Page 25

1     background is and whether he's working on or
2     testifying in or involved with other similar
3     matters.  Okay?
4         So let's have the question read back.  And
5     please answer my question, Mr. Schulz.
6         (The reporter read the portion requested.)
7 BY MR. SUTER:
8     Q.   Can you answer that question, please.
9     A.   I told you I don't know the name of the case.
10     Q.   When were you retained on the Edward Jones
11 case, sir?
12     A.   Somewhere in the last year.
13     Q.   Okay.  Were you retained on the Edward Jones
14 case before you were retained on the Raymond James case?
15     A.   I don't know.
16     Q.   Do you have any records that would indicate one
17 way or another which case you were retained on first?
18     A.   Possibly.
19     Q.   Without telling me any communications with
20 counsel in the Edward Jones case, can you tell me
21 whether you have been retained as a testifying expert in
22 that case?
23     A.   I don't think so.
24         MR. SCHWARTZ:  I'm -- I'm going to -- I'm going
25     to interpose an objection.  I'm going to just ask

Page 26

1   the question.
2       Mr. Schulz, have you produced any report in the
3   Edward Jones case?  Because if the answer is no,
4   then -- and you haven't -- and, also, have you been
5   disclosed to the other side as an expert in the
6   Edward Jones case?  Because if the answer is no,
7   then it's my understanding of the rules that there
8   is no discovery permitted because there is a
9   privilege there.
10      Again, I don't represent you in that case.  I'm
11  just providing information to make sure there is
12  no -- no attempt to get improper privileged
13  information in the Edward Jones case by asking
14  questions in this case, please.
15      With that said, you can answer the question
16  that Mr. Suter posed to the extent that you believe
17  you properly can.
18  BY MR. SUTER:
19  Q.  Do you have the question in mind, sir?
20  A.  No.
21      MR. SUTER:  I'll ask the court reporter to read
22  it back, please.
23      (The reporter read the portion requested.)
24      MR. SUTER:  No.  That was "in that case,"
25  right?  Just want to make sure the court reporter

Page 27

1   got the reference to the Edward Jones case.
2   BY MR. SUTER:
3   Q.  All right.  So you don't know whether you're a
4   consultant or a testifying expert or anything else as
5   far as your role in the Edward Jones case; is that
6   correct?
7   A.  That's correct.
8   Q.  Okay.  Did you deal with the Franklin Azar firm
9   in the Edward Jones case?
10  A.  Yes.
11  Q.  Okay.  Are you dealing with the Franklin Azar
12  firm in this case as well?
13  A.  Yes.
14  Q.  Okay.  Are you dealing with the same lawyers in
15  the two cases at the Azar firm?
16  A.  Some yes, some no.
17  Q.  Okay.  Do you know whether or not the Chimicles
18  firm that Mr. Schwartz is with also involved in the
19  Edward Jones case?
20  A.  I don't know.
21  Q.  Okay.  And as a follow-up to Mr. Schwartz's
22  comment, have you prepared any reports in the
23  Edward Jones case?
24      MR. SCHWARTZ:  I'm going to instruct the
25  witness not to answer that question to the extent

Page 28

1   that any report has not been produced to
2   Edward Jones' counsel.
3       Sir, you are not permitted to ask an expert
4   witness whether he's prepared anything for lawyers,
5   as an expert consultant, when it has not been
6   disclosed to the other side.  And I will not let you
7   use this case as a vehicle to get the discovery in
8   to the Edward Jones case.
9       MR. SUTER:  I'm trying to --
10      MR. SCHWARTZ:  And before we go forward, I have
11  now gotten confirmation from my co-counsel just this
12  second that, in fact, there has been no
13  identification of Mr. Schulz as an expert witness in
14  the Edward Jones case, there has been nothing to
15  disclose to your client Edward Jones in the Edward
16  Jones case.
17      So I will tell the witness not to answer
18  questions about what he has done in the Edward Jones
19  case at least as it relates to reports.
20      MR. SUTER:  You raised the issue.  That's why I
21  asked the question, Mr. Schwartz.  I'm just trying
22  to walk the line, not cross it, but figure out the
23  extent of questions I can ask Mr. Schulz.  I want to
24  respect whatever privileges are applicable.  I'm
25  trying to ask a few foundational questions to figure

Page 29

1   out whether or not there is a privilege that's
2   appropriately assertible by whoever would have
3   standing to do that.
4       MR. SCHWARTZ:  Okay.  Mr. Suter, I'm not trying
5   to be obstructive here either.  I believe that the
6   appropriate way to have phrased your questions would
7   have been -- actually, no, you know -- because
8   you're counsel in the Edward Jones case, you know he
9   has not been identified, you know no report has been
10  exchanged pursuant to discovery in that case, so you
11  already have that information.
12      So you know that the questions you are asking
13  are improper, and you know that if you ask that in
14  your capacity as counsel representing Edward Jones,
15  ask him those questions, today, you couldn't get
16  that information from him.  So I do have a
17  fundamental problem with what you're -- what you're
18  doing, sir.
19      I think it's appropriate to ask if he was
20  retained in that case which is similar, but I think
21  asking what he has actually done in that case, if
22  anything -- and I'm not involved, I'm not the lawyer
23  in that case, so I -- I think you're on very shaky
24  ground here, and I really suggest that you move on.
25      MR. SUTER:  Mr. Schwartz, are you finished?

8 (Pages 26 - 29)

Page 30

1       MR. SCHWARTZ:  I am finished.
2       MR. SUTER:  Good.  Thank you.
3   BY MR. SUTER:
4       Q.  The questions I asked you, sir, were not for
5   any improper purpose.  I told you at least once, and
6   probably more than that, that I'm not interested in any
7   attorney-client communications or any information I'm
8   not entitled to.  Your counsel, if he represents you --
9   and I understand you're not sure, but Mr. Schwartz made
10  a point about distinguishing between a consulting role
11  and a testifying expert role.  Let's just be clear on
12  what is being done here, and it's not for any improper
13  purpose.
14      Have you any experience with any other case
15  that is similar in nature to this one, other than the
16  Edward Jones case, sir?
17      MR. SCHWARTZ:  Objection, overbroad.
18      But you can answer if you can.
19      THE WITNESS:  Yeah, that -- that was going to
20  be my problem.  I've done 1150 cases.  I can think
21  of a lot of cases that have similarities, so I --
22  that's -- that's hard for me to answer.
23  BY MR. SUTER:
24      Q.  Fair enough.  Have you ever -- well, strike
25  that.

Page 31

1       Do you understand the term "reverse churning"?
2       A.  I do.
3       Q.  Okay.  Tell us what reverse churning means?
4       A.  Reverse churning -- I can't -- I don't think I
5   can put it in the proper perspective without saying what
6   churning means, because that's -- in a sense, it's
7   reverse of what churning is.
8       Churning is when there is -- term typically
9   used is "excessive trading" made in an account usually
10  for the purpose of generating commissions for whoever is
11  making those trades.  And if they're excessive -- and we
12  don't -- I don't want to go down the definition of what
13  is excessive, but we'll just say that excessive means it
14  was too many in light of the client's investment
15  objectives and risk tolerance.  Okay?
16      So reverse churning is where -- same concept --
17  that there is cost involved that may or may not be in
18  the client's best interest, but, basically, you're
19  putting somebody in a account that has very little
20  activity and is charging a larger amount of money not in
21  the client's best interests.
22      So it's the opposite.  As opposed to churning,
23  there is not enough -- there is not enough activity to
24  justify the cost.
25      Q.  Okay.  And you've testified in multiple cases

Page 32

1   about churning, correct?
2       A.  I have.
3       Q.  And it is your expert opinion, sir, that
4   churning is a form of fraud; is that correct?
5       A.  I have maybe stated that in the past.  I'm
6   sorry.
7       Q.  Have you -- do you need the question read back,
8   sir?
9       A.  No, I was talking and I thought you interrupted
10  me.  I --
11      Q.  I don't believe I did.  And if I -- if there
12  was a sound that came through, I apologize, but can
13  you -- can you complete your answer if -- if you haven't
14  already done so.
15      A.  I think I'm complete.
16      MR. SUTER:  Okay.  Let me ask the court
17  reporter to read back the question and the answer,
18  please.
19      (The reporter read the portion requested.)
20  BY MR. SUTER:
21      Q.  You're saying "maybe."  Isn't that, in fact,
22  one of the opinions that you have consistently rendered
23  over a period of years?
24      A.  I just got a message that said -- I could not
25  hear everything she said, and I just got a message that

Page 33

1   said it was an interruption for a minute, so could you
2   have her read it back again?
3       Q.  And I'm sorry.  From whom was that message?
4       A.  And the little thing came across my screen --
5   screen and said something interrupted, internet or
6   something.
7       Q.  Okay.  So it wasn't from a person?  It was like
8   a system error; is that correct?
9       A.  Yeah.  That's what I think it was, sir.
10      MR. SUTER:  Okay.  So let's have the court
11  reporter read back the question and the answer one
12  more time, please.
13      (The reporter read the portion requested.)
14  BY MR. SUTER:
15      Q.  Okay.  And I think my follow-up question was:
16  You used the term "maybe."  Isn't it the correct or most
17  accurate testimony that you have definitely testified in
18  the past that churning is a form of fraud?
19      A.  I may or may have.
20      Q.  As you sit here today, you have no recollection
21  one way or the other as to whether you've ever testified
22  that churning is a form of fraud?
23      A.  I don't recall.
24      Q.  Have you ever written about that in the book
25  Brokerage Fraud that you and your wife, Tracy Pride

9 (Pages 30 - 33)

Page 34

1 Stoneman, published in 2002?
2     A.   I don't recall.
3     Q.   Okay.  Well, as you sit here today, is it your
4 understanding that churning is a form of fraud?
5         MR. SCHWARTZ:  Objection, overbroad.
6         You can answer.
7         Also, objection beyond the scope of his expert
8 report in this case.
9         THE WITNESS:  I don't recall.  I wasn't asked
10 to opine on that in this case, and I haven't had a
11 churning case in a while, so I don't think I can
12 answer that question.  I typically don't ask
13 regulatory questions without making sure that I've
14 recently read what is and what isn't.  So I don't
15 think I can answer that.
16 BY MR. SUTER:
17     Q.   What do you mean by "regulatory questions"?
18     A.   Well, I'm not a lawyer.  I'm a regulatory
19 expert.  So when I give opinions, it's based on my
20 understanding and reading of the regulations.  And so
21 that's what I meant.
22     Q.   Okay.  Is reverse churning, in your opinion,
23 sir, a form of fraud?
24     A.   I haven't formed an opinion on that.  I wasn't
25 asked to, so I don't have an opinion.

Page 35

1     Q.   Do you have an opinion, sir, as to whether
2 there was anything done by Raymond James in this case,
3 or by its financial advisor Dax Seale, that amounts to
4 fraudulent conduct as you understand that term?
5         MR. SCHWARTZ:  Yeah, I'll just interpose
6 objection to the extent you're calling for a legal
7 conclusion as opposed to an expert conclusion within
8 the field of Mr. Schulz's expertise.
9         MR. SUTER:  And just to be clear, I'm not going
10 to ask this witness for any legal conclusions.  The
11 only conclusions or opinions I'm going to ask him
12 about are his expert opinions or his opinions
13 related to the facts in this case.  Okay?
14         THE WITNESS:  What's the question?
15 BY MR. SUTER:
16     Q.   Do you have the question in mind?
17     A.   No.
18     Q.   Thank you.
19         MR. SUTER:  I'll ask the court reporter to
20 kindly read that back for us, please.
21         (The reporter read the portion requested.)
22         THE WITNESS:  I -- I have no opinion.  I've not
23 been asked to address if it was or wasn't, so I've
24 formed no opinion one way or the other.
25 BY MR. SUTER:

Page 36

1     Q.   All right.  With regard to this case and your
2 interaction with lawyers prior to this deposition,
3 approximately how many times have you consulted with
4 them regarding this matter?
5     A.   From the very get-go through today?
6     Q.   Yes.  Yes.
7     A.   Through -- through today?
8     Q.   Yes.
9     A.   And the question is how many times have I
10 communicated with them?
11     Q.   Sure.  I said "consulted," but "communicated"
12 is just as well.
13     A.   In any form whatsoever; phone, e-mail, the
14 like?
15     Q.   Yes.
16     A.   I have no idea.
17     Q.   More than a dozen?
18     A.   Yes.
19     Q.   More than 25?
20     A.   Probably.
21     Q.   And what's the maximum number that would be
22 your best estimate in terms of how many times you've
23 communicated either by phone, mail, e-mail, or
24 otherwise?
25     A.   I would -- be impossible for me -- me to give a

Page 37

1 maximum.  All I'm -- I -- I would say it's at least 25.
2 I might go -- I might go as high as 30.  After that, I
3 would just be speculating.
4     Q.   And do you understand that it's not
5 appropriate -- well, strike that.
6         Do you understand that we want your personal
7 knowledge here and your expert opinions rather than your
8 speculation?  Do you understand that?
9     A.   I understand that.  That's why I stopped.
10     Q.   Good.  All right.
11         And this is the first case that you've worked
12 on with the Chimicles firm, correct?
13     A.   With whose firm?
14     Q.   With Mr. Schwartz's firm.
15     A.   That is correct.
16     Q.   And the only case that you're working with them
17 on; is that correct?
18     A.   That's correct.
19     Q.   Okay.  And with regard to the Azar firm, are
20 you working on any cases with that firm, other than this
21 case and the Edward Jones case?
22     A.   I am not.
23     Q.   Okay.  Thank you.
24         What written documents do you recall receiving
25 from any lawyer in this case when you were first

10 (Pages 34 - 37)

1 presented a package of documents about this case?
2    A.   To the best of my recollection, and since it
3 might be a year ago and I have other cases, I'm not
4 going to be able to get -- be very specific, but I think
5 it was either the initial claim or an amended claim,
6 some kind of answer, and maybe some motions.  I think
7 there was or is a summary judgment motion of some kind.
8 And I don't think much more than that, but I don't
9 recall exactly.
10   Q.   Can you describe for us the scope of your
11 retention by Mr. Schwartz's firm?
12   A.   You mean throughout the, roughly, year or only
13 at the beginning?
14   Q.   What I'm trying to find out is what has the
15 Chimicles firm or Mr. Schwartz and his colleagues, what
16 have they asked you to do in this case?
17   A.   Well, it may be long.  Is, of course, I was
18 initially asked to review those first set of documents.
19 And -- and more documents started to pour in and I was
20 asked to review those documents.  And then I was told
21 that there was going to be a report due and that they
22 were going to be -- going to be asking me to prepare a
23 report to the Court.  And then I don't recall if they
24 made it clear at that time, but they said there would be
25 a rebuttal, but I think they said there wouldn't be a

1 surrebuttal or whatever that's called.
2       That was the main -- I mean, those were the
3 main assignments.
4    Q.   Were you asked to provide any opinions in this
5 case?
6    A.   Well, I -- I thought, by definition, my report
7 is my opinions.
8    Q.   Were you asked to provide any specific opinions
9 in this case?
10   A.   Well, there were discussions over the time of
11 what issues I was going to be addressing in my report,
12 if that's what you're asking.
13   Q.   Have you formed any opinions that are not
14 included in your June 4, 2021, report or in your
15 June 25, 2021, rebuttal report?
16       MR. SCHWARTZ:  Objection, overbroad.
17       But you can -- you can answer.
18       THE WITNESS:  Well, I -- that's a -- that's a
19 little tough.  I'm a very opinionated person and I
20 may have other opinions, but I don't -- I -- I -- I
21 don't know how to answer that.  I'm -- I -- I'm a
22 very opinionated person.  I'm sure I have other
23 opinions, but none that I -- I don't think that
24 they're of any big issue.  At least that's my
25 opinion.

1 BY MR. SUTER:
2    Q.   Is it your best understanding, as we sit here
3 today, Mr. Schulz, that with respect to this case, the
4 Nguyen vs. Raymond James case, the expert opinions about
5 which you intend to testify are set forth in the two
6 reports that you prepared in June in this case?
7    A.   I think that would be a correct statement.
8    Q.   Okay.  Are there any opinions that you would
9 intend to testify about that are not set forth in your
10 two reports that I have identified?
11   A.   I don't think there are.
12   Q.   Who is Arthur Olsen?
13   A.   He is a gentleman that was retained by, I
14 think, Mr. Schwartz's firm to do data analysis at my
15 request.
16   Q.   The data analysis was to be done at your
17 request as opposed to Mr. Olsen being retained at your
18 request; is that correct?
19       MR. SCHWARTZ:  Object -- object -- objection to
20       form.
21       THE WITNESS:  I think I understand the
22       question.  Let me try to answer what I think you're
23       asking.  I didn't hire him.
24 BY MR. SUTER:
25   Q.   Okay.  Did you ever have any dealings with

1 Mr. Olsen prior to this case?
2    A.   No.
3    Q.   Have you ever met Mr. Olsen in person?
4    A.   No.
5    Q.   Have you communicated with Mr. Olsen outside of
6 any lawyers that are representing the plaintiff in this
7 case?
8       MR. SCHWARTZ:  Objection to form.
9       THE WITNESS:  I don't understand the question.
10 BY MR. SUTER:
11   Q.   Have you ever sent Mr. Olsen e-mails regarding
12 this case that you didn't also copy the lawyers on?
13   A.   No.
14   Q.   Okay.  Have you ever had telephone
15 conversations or video chats with Mr. Olsen when the
16 lawyers were not present?
17   A.   I think -- I think that the very first time I
18 talked to him, I don't think any lawyers were on the
19 phone.
20   Q.   And do you recall what you discussed with
21 Mr. Olsen in that conversation?
22   A.   It was basically a meet and greet.  I didn't
23 know who he was, didn't know him.  It was just a get
24 friendly "Hi," "Who are you?" "Where do you live?"
25 "Where do you come from?" "What do you do for a living?"

11 (Pages 38 - 41)

Page 42

1 Talked about our backgrounds and, you know, looked
2 forward to being -- looking -- you know, "Look forward
3 to working with you."
4      He has got an incredible background, quite
5 impressive, and I -- I said, "Hey, you know, I might --
6 I might have use for you again in the future."  I had
7 never -- "You're a pretty talented guy."  And that was
8 about all that happened.
9   Q.  What directions, if any, did you provide to
10 Mr. Olsen, either directly or through counsel, with
11 respect to the data that you wanted him to analyze?
12   A.  Are -- are you -- are you asking me to tell you
13 everything I've ever provided to him?  What -- is that
14 what you're asking me, everything I've provided to him?
15   Q.  I'm asking -- you said that you wanted
16 Mr. Olsen to do some data analytics, or words to that
17 affected.  Is that -- am I correct on that?
18   A.  Yes, sir.
19   Q.  Okay.  And what was the data analytics
20 assignment that Mr. Olsen received as a result of your
21 requesting that he perform such analytics?
22   A.  Well, I -- I don't remember exactly the
23 timeframe, but somewhere in there this -- a lot of the
24 information and the Excel spreadsheets was provided from
25 Raymond James to counsel.  And I initially took a look

Page 43

1 at that, but it was already determined that I was not
2 going to be the data guy.  And so I was going through it
3 and analyzing it in a way of what I needed somebody to
4 do the analysis of to look at various issues in the
5 case.
6   Q.  Do you recall what those issues were and how
7 they were described to Mr. Olsen?
8      MR. SCHWARTZ:  Objection, compound.
9      THE WITNESS:  Well, one of the issues was I
10 wanted to know what was the -- I wanted to know as
11 much as I could.  I could only learn from whatever
12 Raymond James produced.
13      So it was -- it was -- I mean, some of it's a
14 cost efficiency thing too, and it's not cost
15 efficient to have me go through every Excel line and
16 client and everything else, so I was trying to come
17 up with some things that I could ask Mr. Olsen to
18 do.  "I'd like to know this and I'd like to know
19 that.  Can you start dumping this into your data
20 spreadsheets so I can know these various things?"
21      And I think one of them is -- initially, was
22 what was the training activity in the commission
23 accounts, what was the cost of commissions and fees
24 in the commission account.
25      And I think then subsequently -- or it might

Page 44

1 have been at the same time -- I'd like to know a lot
2 of the same information about what was going on in
3 the Freedom accounts.
4 BY MR. SUTER:
5   Q.  What was your purpose in asking Mr. Olsen to
6 review the data and to provide the information to you
7 about trading activity and costs and those sorts of
8 things?
9   A.  Well, it was based on, I think, the -- the
10 basic claims by the claimants that Raymond James had
11 taken a number of their clients from commission accounts
12 that were -- had low activity and were not generating
13 much in the way of fees and commissions for Raymond
14 James and the licensed brokers and advisors.  And
15 what -- then these brokers took these accounts and
16 recommended that they move their assets to a fee-based
17 account.  And I think -- I don't know if I knew the name
18 was Freedom at that time or not, but whatever, to these
19 fee-based accounts.
20      And so -- and where -- and -- and -- well,
21 there were a couple -- you know, obviously, were
22 numerous issues in the claim, but just purely from a
23 data standpoint, since there was a claim that these were
24 low-turnover, low-commission-based accounts, I wanted to
25 know if that was factual.  Okay.

Page 45

1      And then toward -- there was -- there is a
2 second part of the claimant's claim that is that once
3 they moved them over to Freedom, that they were still a
4 low-activity account, but at much higher cost.  So I
5 wanted him to look at the numbers that had been
6 provided, the 59, I think, originally, numbered
7 accounts, and provide me information so I could look in
8 to see if there was any basis for that claim.
9   Q.  Okay.  Any other reason for your having reached
10 out to Mr. Olsen as you've just described?
11   A.  That's all that comes to my mind right now.
12   Q.  Okay.  Did Mr. Olsen give you any feedback in
13 terms of how to analyze the data that you requested him
14 to look into?
15   A.  I -- I think the feedback came -- can't recall.
16 There was some feedback sometime along the line of what
17 I wanted the spreadsheets to look like, the formatting,
18 to a degree, and, you know, maybe how I wanted the
19 columns lined up.  And he may -- I think he had a couple
20 good suggestions.  And I think I said, "Oh, yeah, that
21 makes sense.  Let's do it that way."
22   Q.  Are you a data analytics expert?
23   A.  I don't hold myself out as that.
24   Q.  Do you have any formal education in data
25 analytics?

12 (Pages 42 - 45)

1    A.  I do not.
2    Q.  Are you a statistician?
3    A.  I am not.
4    Q.  Okay.  Have you ever had any formal training in
5  statistics?
6    A.  I have not.
7    Q.  Have you ever taken a course in statistics?
8    A.  I think I may have.  I went back to college for
9  a very short time, I think not much more than a
10  semester, of potentially getting a master's, and I think
11  there may have been a stat course in that.
12    Q.  And when was that?
13    A.  Ooh.  Hold on.  '70- -- somewhere around '77.
14  Between '77 and '82.
15    Q.  Okay.  And as of 1980, were you already working
16  at -- in the securities industry?
17    A.  I was.
18    Q.  Were you going to school while you were
19  getting started in the securities industry?
20    A.  Let me think.  I -- no.  Now that I think about
21  it, I only went one semester.  I don't even know if I
22  completed it.  Let's see.  Maybe, now, it was more like
23  '77, '78.
24    Q.  Okay.  And where did you go take this course?
25    A.  University of Texas in Dallas.

1    Q.  Okay.  And is it correct that if you took a
2  statistics course at the University of Texas in Dallas,
3  you did not complete that course?
4    A.  I don't recall.  That was a -- I was going
5  through a lot of change at the time.  I don't recall if
6  I finished any of those courses.  I only took three.  I
7  think an econ course, I think a statistics course, and
8  a -- trying to remember the third one.  I don't -- I may
9  not -- I got discouraged with the system and I decided
10  to quit and, I think, I probably didn't finish the
11  courses.
12    Q.  Okay.  And have you at any time since the late
13  '70s done any course work in statistics?
14    A.  No.
15    Q.  Okay.  Have you worked on any cases as an
16  expert witness in which the data analytics assignment
17  such as you gave to Mr. Olsen here was something that
18  you did in those other cases?
19    A.  Yes.
20    Q.  And were those in single-party cases or
21  multiple-party cases or class actions?  Any one of those
22  three categories?
23    A.  Probably all of them.
24    Q.  Have you been retained in class actions other
25  than this case and in the Edward Jones case?

1    A.  I have.
2    Q.  In how many cases have you been retained that
3  were class actions?
4    A.  I don't recall.
5    Q.  Is it more than one or two?
6    A.  More than one or two, but probably no more than
7  seven or eight.  Maybe -- maybe five.  I don't know.  No
8  one has ever asked me that.
9    Q.  Okay.  When was the first time that you were
10  retained in a class action?
11    A.  Well, since I don't remember them all, I'm not
12  going to remember the first.  I don't know.
13    Q.  I mean, was it when you were just cutting your
14  teeth as an expert witness in the '90s or was it, you
15  know, two months before the Edward Jones case?
16    MR. SCHWARTZ:  Objection to form.
17    THE WITNESS:  Well, assumes facts not in
18  evidence.  My first expert case was in '89.
19  BY MR. SUTER:
20    Q.  Okay.  And so, good, I'm glad you're -- your
21  recollection is -- is refreshed on that.
22    What was the case that you handled?  Was that
23  a -- a class action in '89?
24    A.  No.
25    Q.  Okay.  And as you sit here today, can you give

1  us an approximate date of the first class action you
2  ever were retained on?
3    A.  No.
4    Q.  Did you ever give testimony under oath in any
5  case that you have been retained on, other than the
6  testimony you're giving here today?
7    A.  What's the question?
8    MR. SUTER:  I'll ask the reporter to read it
9  back, please.
10    (The reporter read the portion requested.)
11    THE WITNESS:  About --
12  BY MR. SUTER:
13    Q.  I'm sorry.
14    A.  -- 650 times, I think.
15    Q.  Okay.  I apologize.  I thought I included
16  something I didn't include in that question.  Let me ask
17  it this way.
18    Other than your testimony here today, have you
19  ever given testimony in a purported class action?
20    MR. SCHWARTZ:  Objection to the word
21  "purported."
22    But you can answer.
23    THE WITNESS:  I don't recall.  I may or may not
24  have.
25  BY MR. SUTER:

13 (Pages 46 - 49)

1    Q.   Can you identify any party to any other case
2 that you have given testimony in that was a purported
3 class action?
4    A.   I thought that was the same question.  And I
5 think the same answer, I don't recall.
6    Q.   You don't recall either when it -- such
7 testimony was given, if it was given, or who any of the
8 parties were?
9    A.   That's correct.
10   Q.   And can you -- having given this a little bit
11 of thought over the last few minutes, can you now tell
12 us when the last time you testified, if at all, in a
13 class action other than this case?
14   A.   Well, it assumes facts in evidence.  I haven't
15 given it any thought and I don't know.
16   Q.   Okay.  Do you know what Rule 23 of the Federal
17 Rules of Civil Procedure is?
18   A.   No.
19   Q.   Have you ever been designated as an expert in
20 any class action other than this case?
21        MR. SCHWARTZ:  Objection to the word
22   "designated."
23        THE WITNESS:  I don't know.
24        MR. SCHWARTZ:  Objection to the extent you're
25   asking for a legal conclusion.

1 BY MR. SUTER:
2    Q.   Have you prepared any reports in any other case
3 that was labeled a class action?
4    A.   I don't know.
5    Q.   Have you given written reports of the nature
6 that the two reports you prepared in this case in any
7 other class action?
8    A.   I don't know.
9    Q.   Do you typically prepare written reports in the
10 arbitrations that you handle?
11   A.   No.
12   Q.   In what sorts of cases do you typically prepare
13 reports such as the two reports that you prepared in
14 this case?
15        MR. SCHWARTZ:  I'm going to object as vague.
16   Mr. Suter, I think you're talking about reports that
17   are provided to the other side.  I just want to make
18   sure that's clear for the witness and for the record
19   that's what you're referring to.
20        MR. SUTER:  Thank you.  That's actually a good
21   clarification.  Thank you, Steve.
22 BY MR. SUTER:
23   Q.   You understand that you were asked to prepare
24 two reports in this case, correct?  One was dated
25 June 4th, 2021.  The other was a rebuttal report dated

1 June 25, 2021.  Correct?
2    A.   Right.  Yes, sir.
3    Q.   Okay.  And can you think of any other case in
4 which you prepared formal reports such as the ones you
5 prepared in this case that were provided to the other
6 side of the lawsuit or lawsuits?
7    A.   Well, I never provided or not provided.  I
8 never know what's provided or not provided.  I have
9 produced written reports in other cases.  Where they go
10 after that, it's none -- none of my doings.
11   Q.   The 650 cases that you indicated you have
12 testified in, out of 1150 cases approximately, how many
13 of those cases were in arbitration versus court?
14   A.   Oh, the vast majority, but I don't have a
15 number.
16   Q.   Would you say like 90 or 95 percent of the
17 cases that you've testified in were arbitrations?
18   A.   I'd be comfortable with probably 90, but not
19 anything above that.  I don't know the number, but it --
20 I have never run that number.  Seems like I'm in more
21 courts now than I used to be, but I'll -- 85, 90,
22 somewhere in there.
23   Q.   Okay.  So if it's 90, and you have 650
24 testimonies, does that mean that you would have
25 testified in approximately, say, 50 to 65 court cases?

1        MR. SCHWARTZ:  Objection.  Objection, calls for
2   speculation based on the prior testimony.
3 BY MR. SUTER:
4    Q.   Just asking for your best estimate, sir.
5    A.   Yeah.  Or, I would say, no more than 50.
6    Q.   Okay.  And have you ever been designated as an
7 expert witness and not been allowed to testify as an
8 expert witness?
9    A.   I have.
10   Q.   Okay.  On how many occasions?
11   A.   One.
12   Q.   Was that in court or in arbitration?
13   A.   Arbitration.
14   Q.   So only one, one case over the past 30 years,
15 have you been disallowed as a expert in any legal
16 proceeding?
17        MR. SCHWARTZ:  Objection.  Objection to form.
18   Objection, calls for legal conclusion.  And
19   objection to the use of the word "disallow."
20        But you can answer.
21        THE WITNESS:  Can you repeat the question.
22        MR. SUTER:  Sure.  And I'll ask the court
23   reporter to read it back.
24        (The reporter read the portion requested.)
25        THE WITNESS:  Yeah, I -- I -- I don't know what

14 (Pages 50 - 53)

1  "disallowed" means.
2      I had a case in California where there was a
3  document dispute and I didn't get to testify because
4  of that.
5      And then supposedly floating around out there
6  is, supposedly, some other case that I don't know
7  anything about.  But every couple of years somebody
8  asks me about it, and I don't know anything about
9  it.
10     But the only one I know about that I remember
11 is this one in California.
12 BY MR. SUTER:
13  Q.  And that's the subject of a California court of
14 appeal decision; is that correct?
15  A.  Well, it was an arbitration.
16  Q.  Right.  But it was then challenged, it went to
17 the federal court, and then it went to the court of
18 appeal, and the court of appeal affirmed; is that
19 correct?
20  A.  I don't recall what happened.
21  Q.  Do you recall that that's a case that one can
22 find on the internet if one puts in their proper search
23 parameters?
24  A.  Counsel, you're going to have to speak up.
25 Sounds like you're mumbling.

1  Q.  Sorry.  Is that a case that you are aware is
2  publicly available if one searches on the internet?
3  A.  I don't know.
4  Q.  You've never looked for that?
5  A.  I have a file on that case somewhere, but I
6  don't go look for it.
7  Q.  Okay.  Do you recall ever having testified that
8  there were four or five occasions when you were either
9  disallowed as an expert witness or otherwise prevented
10 from testifying in legal proceedings?
11     MR. SCHWARTZ:  Objection to form.
12     THE WITNESS:  No, that misstates the facts.
13 BY MR. SUTER:
14  Q.  Okay.  All right.  With whom have you consulted
15 or communicated with concerning the matters that are the
16 subject of your expert reports?
17  A.  Who all have I consulted with?  Was that the
18 question?
19  Q.  Or communicated with, yeah.  In other words,
20 you communicated with Mr. Olsen, you communicated with
21 lawyers.  Can you identify anyone else that you
22 communicated with concerning the matters that are the
23 subject of your expert report?
24  A.  Well, there is a cadre of lawyers, so I've
25 communicated with all of them.  And Mr. Olsen.  Maybe my

1  wife.
2  Q.  Okay.  Do you recall anyone else?
3  A.  No, not that comes to mind.
4  Q.  I don't want you to tell me any -- anything
5  that you discussed with any counsel.  Okay?  I'm not
6  trying to find out about that.  But can you just tell me
7  whether or not the analyses and reports that you have
8  done in this case have been shared with lawyers in any
9  other cases?
10     MR. SCHWARTZ:  Hold on.
11     I -- Mr. Suter, I think you're once again
12 trying to either improperly get discovery in the
13 Edward Jones case where you are counsel, or trying
14 to find out about cases that I don't even know what
15 they might be.  But I would just caution the witness
16 that for areas where he is a nonidentified
17 testifying consultant, just to be mindful of
18 whatever confidential and privilege obligations
19 there are in those cases.
20     If you can answer the question the way he's
21 phrased it without violating any privilege or
22 whatnot, go ahead and try to.  I'm not sure you can.
23     And I'll make a specific objection, if you have
24 the question read back, about the form of the
25 question.  But go ahead.

1      THE WITNESS:  Well, that's a good objection
2  because that's where it gets sensitive.
3      I can say this, I think, clearly.  I --
4  on the Edward Jones case, I don't think I've shared
5  any documents at all of any kind with anybody
6  relating to this case.  But that's a little bit of a
7  difficult -- and I'm just going to say this and then
8  I'm going to shut up.  One of the -- one of the
9  lawyers is on both cases, so I don't know what that
10 means.  Then I'll just be quiet.
11 BY MR. SUTER:
12  Q.  Thank you.
13     Other than anyone who might be working on both
14 the Edward Jones case and this case on the plaintiff's
15 side, have you shared your opinions or expert report
16 with anyone not associated with a law firm having
17 involvement in either the Jones case or this case?
18  A.  I -- the only people I've shared my reports
19 with, other than everybody you listed, is my wife.
20  Q.  How much time have you spent on this engagement
21 since you were first contacted?
22  A.  I don't know.
23  Q.  Do you keep records of your time?
24  A.  I send bills, and the bills have time on them,
25 and so, by definition, there are records somewhere that

Page 58

1 have hours.
2    Q.  As you sit here today, you have no idea the
3 number of hours you've spent on this case since you were
4 first engaged?
5    A.  I have no idea.  It's not small, but I have no
6 idea.
7    Q.  And what's your best estimate of the amount of
8 fees that you have charged or incurred on this case?
9    A.  I'd be speculating.
10    Q.  I don't want you to speculate.  I'd like you
11 to --
12    A.  I don't --
13    Q.  -- answer the question.
14    A.  I don't -- I don't know, I mean, because, you
15 know, I think some of this case goes back to last year.
16 And so I don't know.
17    Q.  Okay.  You have records, though, that would
18 indicate what your billings were, correct?
19    A.  Yes, sir.
20    Q.  Okay.  And were those billings sent out
21 pursuant to the written engagement letter that you
22 described for us earlier that your counsel prepared?
23    A.  Yes, sir.
24    Q.  By the way, your wife, Tracy Pride Stoneman, is
25 a lawyer, correct?

Page 59

1    A.  Yes, sir.
2    Q.  And she is a securities attorney, correct?
3    A.  Done battle directly with Mr. Skippy Keesal.
4    Q.  Okay.  And with Mr. Suter as well, correct?
5    A.  You know, I -- I don't -- you said earlier that
6 we haven't met.  I'm shocked.  I know your name very
7 well and I know -- I know everybody.  I've gotten drunk
8 with some of those guys at your firm, so I'm surprised
9 that we -- maybe we've never met, but I can't believe
10 you haven't cross-examined me before.  We both have been
11 doing this a long time.
12    Q.  This is true.
13       By the way, is your wife acting as your counsel
14 in this case in any capacity?
15    A.  No.
16    Q.  Okay.  You and your wife are both members of
17 PIABA; is that correct?
18    A.  Now, Mr. Suter, you know I can't be a member of
19 PIABA.
20    Q.  Your wife is a member of PIABA; is that
21 correct?
22    A.  Yes, sir.
23    Q.  Okay.  And, in fact, she was on the board of
24 directors of PIABA for some period of time?
25    A.  For six years.

Page 60

1    Q.  Okay.  And describe for us what PIABA is,
2 please.
3    A.  That's an acronym for Public Investors
4 Arbitration Bar Association.
5    Q.  Okay.  And is that firm, at least in your mind,
6 a -- a group that consists primarily of plaintiffs' or
7 claimants' lawyers?
8    A.  Well, it's -- we just got to clarify the word
9 "primarily."  Many of PIABA lawyers work both sides of
10 the table.
11    Q.  Okay.  Do you know if any broker-dealers are
12 members of PIABA?
13    A.  Well, I don't think a broker-dealer.  I think a
14 lawyer could be, but I don't think a broker-dealer could
15 be.  I'm not a member.  I don't know the criteria, but
16 I -- that would sound funny.
17    Q.  Okay.  Have you written articles for PIABA?
18    A.  I have.
19    Q.  Approximately how many articles have you
20 written?
21    A.  It's on my list.  I think I've written, what,
22 30, 40 articles, but not all for PIABA.
23    Q.  Do you recall how many articles you've written
24 specifically for PIABA?
25    A.  I don't.

Page 61

1    Q.  Is it correct that the articles that you've
2 written for PIABA, at least those that you can recall,
3 are set forth in your June 4, 2021, expert report?
4    A.  It should be.
5    Q.  And what is the purpose of your writing
6 articles for PIABA?
7       MR. SCHWARTZ:  Objection, overbroad.
8       THE WITNESS:  I write articles for a reason.  I
9    don't particularly write articles for PIABA for a
10    reason.
11 BY MR. SUTER:
12    Q.  And what is your reason for writing articles in
13 general?
14    A.  Writing is what I do.  It's one of my hobbies.
15 I've written two books.  I consider myself an
16 intellectual.  I read and I write.  And I've been in the
17 business for 40-something years and I'm very into the
18 securities business, and I feel I have a expertise,
19 experience, and brain to put together some pretty good
20 research to help investors and people involved in both
21 investing and litigation.
22    Q.  Would it be fair to say that your interest, as
23 far as writing, is to assist plaintiffs or claimants
24 bring actions or prevail in actions against
25 broker-dealers?

16 (Pages 58 - 61)

Page 62

1  A. That's false.
2     MR. SCHWARTZ: Objection to form. Objection,
3  argumentative.
4     THE WITNESS: That's false.
5  BY MR. SUTER:
6  Q. Okay. Tell me what's false about that.
7     MR. SCHWARTZ: Objection, overbroad.
8  But go ahead and answer.
9     THE WITNESS: What's broad about it? The
10 entire sentence.
11 BY MR. SUTER:
12 Q. Do you consider yourself a -- an advocate for
13 plaintiffs?
14 A. I don't.
15 Q. Do you consider yourself a neutral expert
16 witness who would hold the same views whether retained
17 by the plaintiff or by a defendant?
18 A. I do.
19 Q. Do you advocate for investors ever?
20 A. I don't know what you mean by that question.
21 Q. You don't know what "advocate" means?
22 A. I don't understand --
23    MR. SCHWARTZ: Object. Objection to form.
24 Go ahead.
25    THE WITNESS: I don't understand the sentence.

Page 63

1  BY MR. SUTER:
2  Q. Let's talk about who you work for when you work
3  on a -- have worked on these 1150 cases.
4     For how many -- strike that.
5     In how many of those 1150 instances were you
6  representing individual investors?
7  A. I don't know.
8  Q. Do you have an approximate percentage of times?
9  A. Well, it's changed dramatically over the years.
10 Now, a much higher percentage of my business is not
11 working for individual claimants and not necessarily for
12 claimants at all.
13    And so at one time -- well, it actually --
14 early on, I did a fairly decent amount of business for
15 all the major brokerage firms. Then there was a period
16 where I was working much higher percentage for
17 claimants. And then, now, in the last five or ten
18 years, it's swung back and I'm doing a -- decent
19 amount or decent percentage of my work is for having
20 nothing to do with claimants at all or I'm working for
21 brokers or investment advisors.
22 Q. Can you give us an approximate number of times
23 that you have worked for broker-dealers such as
24 Merrill Lynch or Edward Jones or Raymond James or any of
25 the Wall Street firms in legal proceedings over the past

Page 64

1  30 years?
2  A. Probably no more than 10 or 15.
3  Q. And can you recall the names of any of the 10
4  or 15 broker-dealers that you worked with in legal
5  proceedings?
6     MR. SCHWARTZ: Before you proceed, Mr. Schulz,
7  again, I, obviously, don't represent Merrill Lynch
8  or Edward Jones or Raymond James. I know that
9  Ben Suter represents at least two of those entities.
10 But just be mindful if you have any privilege or
11 confidentiality obligations regarding the fact that
12 you worked for those firms or what the nature or
13 issue was. I don't know whether you do or you
14 don't, but I'm just trying to be protective of
15 Merrill Lynch, Edward Jones, and Raymond James in
16 light of the way this deposition has proceeded. But
17 with that caveat, feel free to answer any way you
18 want.
19    THE WITNESS: Yeah, I'm not -- I mean, some of
20 this is -- as I said, it was very early in my
21 career, so I'm not going to be able to come close to
22 remembering them all, but Dean Witter, PaineWebber,
23 Prudential, Southwest Securities. I was -- you
24 know, I did a number of work for, you know, regional
25 and smaller boutique firms, but the big -- the big

Page 65

1  names that come to my mind are those big three or
2  four. And I don't think -- I don't know if I ever
3  worked on a Merrill Lynch case. I can't remember.
4  BY MR. SUTER:
5  Q. And when was the last time that you worked for
6  any broker-dealer?
7  A. As an expert?
8  Q. As an expert.
9  A. It's been quite a while. Probably 20 years.
10 Q. And -- and have you done any work for any
11 broker-dealers in a nonexpert capacity at any time in
12 the last 20 years?
13 A. I think I did a small consulting job for
14 Schwab. It was not --
15 Q. Were you called --
16 A. It was -- it was a consultant thing on the
17 issue of unauthorized trading. It wasn't -- it wasn't
18 litigation. It was consulting.
19 Q. Do you recall the approximate year that that
20 was?
21 A. Quite a long time ago. At least over 10 years.
22 Q. Do you recall who you spoke with at Schwab?
23 A. I do not.
24    MR. SCHWARTZ: And I'm going to make the same
25 line of objections -- the same objections to this

17 (Pages 62 - 65)

Page 66

1 line of questioning.  Again, I don't represent
2 Schwab and I don't know, since it was not legal,
3 whether there is any confidentiality provisions, but
4 again, just warn the witness to be mindful of any
5 confidentiality obligations he might have with
6 respect to work for -- whether it's claimants or
7 brokerage houses.
8 BY MR. SUTER:
9    Q.  When you wrote your report dated June 4, 2021,
10 did anyone assist you with that?
11    A.  My wife, mostly just on grammar.  I may -- I
12 may have asked her a couple times.
13       Every once in a while, if I'm feeling a little
14 time caseload because of my caseload, I may have had
15 her look up -- you know, say, "Hey, I know there is a
16 regulation on this or a notice to members on that.  Can
17 you see if that's in our file or will you see if you can
18 track that down?"  I may have done that a couple of
19 times.  Probably not very much.  But it's not uncommon
20 that she assists me in that way sometimes, and so she
21 might have.
22       And then I probably had her read it at some
23 point.  Because in addition to being a lawyer, she was
24 an English major, so I probably had her read it to
25 correct some of my grammar.

Page 67

1    Q.  All right.  Was your wife acting as an
2 assistant to you as she assisted you with preparation of
3 your report, rather than as a lawyer?
4       MR. SCHWARTZ:  I'm going to raise an objection.
5 And I know you're not meaning this way, but I just
6 think there is a -- your wife is acting in her
7 capacity as your wife as opposed to assistant.  I
8 don't think we want to have the witness say that a
9 wife acts as an assistant.  But just be mindful of
10 the spousal issues that you may have to answer.
11       MR. SUTER:  I'm aware of the spousal privilege.
12 I'm aware of the attorney status of the wife.  What
13 I'm trying to get at is whose work product is the
14 report.  And if -- if she had a role in that, other
15 than as a, you know, spell checker or something like
16 that, I think we're entitled to know that,
17 especially if there was substantive input provided
18 by his wife who, as he mentioned, was, you know, a
19 board member, three years of PIABA, et cetera.
20 BY MR. SUTER:
21    Q.  So I'm just trying to get a sense of what your
22 wife did and what her role was as she assisted you with
23 the preparation of the report.
24    A.  Well, I think I was pretty clear.  And I think
25 I told you I don't even know if she did.  The only thing

Page 68

1 I know she did is I know she read it for English.  I
2 said I may have asked her to look something up for me,
3 but -- because I -- it's not uncommon, but it doesn't
4 mean it's common that I ask her to do that.  And I don't
5 have any specific recollection that I ever asked her to
6 do that, but I just wanted to give you that possibility.
7       But as far as her -- I would never say -- she
8 was never involved enough in anything having to do with
9 either report that I would ever refer to her as
10 assisting me, other than with the English.
11    Q.  Okay.  Well, you and your wife, Tracy Pride
12 Stoneman, co-authored the book Brokerage Fraud that came
13 out in 2002, correct?
14    A.  Yes.
15    Q.  Was she, in that capacity, only providing
16 grammatical or English support as opposed to substantive
17 thoughts and ideas about what should be in the book?
18    A.  She was very involved in that book and provided
19 much more than just grammar.
20    Q.  Okay.  And would you agree with me that some of
21 the concepts that are in your report are at least
22 touched on in your 2002 book that you co-wrote with your
23 wife?
24    A.  I think that's correct.  I think I quote my
25 book at least once in my report.

Page 69

1    Q.  Right.  And do you also quote a PIABA article
2 that you wrote called "Flat Fees or Fat Fees," correct?
3    A.  Yes.
4    Q.  You cite to that in your report, right?
5       And did your wife, Tracy Pride Stoneman, also
6 have some role in preparing the PIABA article "Flat Fees
7 or Fat Fees" that came out in 2003?
8    A.  No, none other than probably reading it for
9 grammatical checks.
10    Q.  Do you know if she was a member of PIABA's
11 board when that article came out?
12    A.  I have no idea one way or the other.
13    Q.  Do you have any recollection as to when the
14 six-year period started and ended that she was on the
15 PIABA board?
16    A.  I have no idea.
17    Q.  You don't know if it was ending last year or in
18 2006?  No idea?
19    A.  Well, I know it wasn't last year.
20    Q.  Okay.  So you do have some idea.  Do you have
21 any better estimate as to when she was on the board?
22    A.  I know it was before last year.
23    Q.  That's as precise as you can be?
24    A.  You want me to take some time and think about
25 it?

18 (Pages 66 - 69)

1    Q.  As you sit here right now, that's as precise as
2 you can be?
3        MR. SCHWARTZ: Objection, argumentative. You
4 can take -- take as much time as you need to figure
5 out this very important fact that's been asked.
6 BY MR. SUTER:
7    Q.  While you're thinking about that, did you sign
8 a confidentiality agreement in this case?
9        MR. SCHWARTZ: I'm going to object. If you
10 want him to think about it, try to answer a
11 question, then give him the time to think about it,
12 please. If you want to skip that and move on to a
13 new topic, then let's skip to a new topic. And I
14 don't think the witness should be required to think
15 about one question while he's answering another
16 question.
17       THE WITNESS: Thanks -- thanks, Counsel.
18       Yeah, which one am I supposed to answer now?
19 BY MR. SUTER:
20   Q.  Why don't you answer the last question. And if
21 it comes to you in the course of this deposition when it
22 was that your wife was last on the PIABA board, why
23 don't you share that with us.
24       So can you tell us whether or not you signed a
25 confidentiality agreement in this case?

1        MR. SCHWARTZ: Hold on. I'm going to object to
2 the instruction that Mr. Schulz try to multitask
3 during this deposition. This is a question and
4 answer.
5        But now that I've made that statement, because
6 I don't want Mr. Schulz to have -- then some point
7 in time be asked whether he was thinking about that
8 answer but forgot to -- forgot to mention about
9 exactly when his wife served on some board.
10       Subject to that objection, you can ask this
11 last question which I believe had to do with a
12 confidentiality protected --
13       THE WITNESS: It gets more complicated than
14 that. My wife's standing right outside my office.
15 Her office is right next to mine. I don't want to
16 get accused of something nefarious by Mr. Suter
17 that's not beyond him. "Well, Mr. Schulz, did you
18 or did you not ask your wife when you took a
19 bathroom break?"
20       So I just want it clear, I'm not asking my wife
21 about it and I'm not thinking about it anymore.
22       Can we move on to the next question?
23 BY MR. SUTER:
24   Q.  Yeah. Let's -- let's do that, Mr. Schulz. And
25 I appreciate your sensitivity to the fact that you

1 shouldn't be chatting with your wife during the course
2 of this deposition, so thank you for making that comment
3 and acknowledgement.
4        Did you sign a confidentiality agreement in
5 connection with this case?
6    A.  I have no idea. I may or may not have and I
7 have no recollection.
8        MR. SCHWARTZ: I'll represent to you that he
9 did.
10 BY MR. SUTER:
11   Q.  Did your wife sign a confidentiality agreement
12 in connection with this case?
13   A.  Why would my wife sign a confidentiality in --
14 my wife's not involved in this case? She did the
15 grammar. I don't think so. I don't know, but I can't
16 imagine that would happen. And I'm sure she would
17 refuse.
18       MR. SUTER: All right. We've been going about
19 an hour and 40 minutes. Why don't we give everyone
20 a five-minute break here.
21       MR. SCHWARTZ: Come back at 11:45?
22       MR. SUTER: That sounds good if that works for
23 everyone.
24       THE WITNESS: Five minutes? Is that five
25 minutes?

1        MR. SUTER: That's five minutes, sir.
2        THE WITNESS: All right. Enough time?
3        MR. SCHWARTZ: Yeah.
4        THE VIDEOGRAPHER: We are going -- we are going
5 off the video record. This ends Media Unit 1,
6 No. 1, at 11:41.
7        (Recess taken.)
8        THE VIDEOGRAPHER: Going back on the video
9 record at 11:50. Media Unit 2, No. 1.
10       MR. SUTER: Thank you.
11 BY MR. SUTER:
12   Q.  Mr. Schulz, are you ready to proceed?
13   A.  Yes, sir.
14   Q.  Okay. You started in the securities business
15 in approximately 1980; is that correct?
16   A.  Yes, sir.
17   Q.  Okay. Worked for Investor Diversified
18 Services, correct?
19   A.  Yes.
20   Q.  Okay. Merrill Lynch?
21   A.  Yes.
22   Q.  Bear Stearns?
23   A.  Yes.
24   Q.  Johnson & Freedman?
25   A.  Yes.

Page 74

1    Q.   Okay.  Do you currently hold any securities
2  licenses?
3    A.   No.
4    Q.   You had a Series 7, correct?
5    A.   I did.
6    Q.   Okay.  That Series 7 was last used in 1989; is
7  that correct?
8    A.   Well, that gets a little funny.  Technically,
9  that's right.  Let's just leave it at that.
10   Q.   Okay.  Series 7 license expired in the early
11 '90s, correct?
12   A.   I -- yes.
13   Q.   Okay.  And what is a Series 7?
14   A.   It's -- it's the one that allows you to be a
15 formal registered representative with a licensed
16 broker-dealer, and allows you to sell almost all the
17 underlying investments available.  Obviously, you can't
18 sell commodities, which I did also do.  And that was a
19 Series 3.
20   Q.   Okay.  And have you ever held a Series 9 or 10
21 license?
22   A.   No.
23   Q.   And a Series 9 or 10 is a supervisor license,
24 correct?
25   A.   I think they are, yes.

Page 75

1    Q.   Okay.  And you've never been a supervisor in a
2  broker-dealer, correct?
3    A.   That's correct.
4    Q.   And you've never supervised any employee of a
5  broker-dealer, correct?
6    A.   Correct.
7    Q.   And you've never been a branch manager of a
8  broker-dealer, correct?
9    A.   Correct.
10   Q.   Never been a compliance officer at a brokerage
11 firm, correct?
12   A.   Correct.
13   Q.   You wrote a book with your wife, Tracy Pride
14 Stoneman, in 2002 entitled "Brokerage Fraud:  What Wall
15 Street Doesn't Want You to Know"; is that correct?
16   A.   Yes.
17   Q.   Okay.  Do you recall stating in that book that
18 the NASD, which was the predecessor to FINRA, was the,
19 quote, fox guarding the hen house, closed quote?
20   A.   I think that's the name of a chapter.
21   Q.   And was that in reference to the NASD?
22   A.   Yes.
23   Q.   By the way, the PIABA organization that has a
24 golf tournament -- or at least did preCOVID; is that
25 right?

Page 76

1    A.   I didn't understand you.  I can't -- you --
2    Q.   I'm sorry.  I'll speak up.
3    A.   Yeah.
4    Q.   Did you ever run the golf tournament that PIABA
5  hosted?
6    A.   For a couple years, I did.
7    Q.   Okay.  You started a registered investment
8  advisor firm; did you not?
9    A.   Yes.
10   Q.   Was that entitled "Invest Securities
11 Consulting, PC"?
12   A.   PC, I think it was changed shortly thereafter
13 to Inc., but yes.
14   Q.   Okay.  And what years did you run that firm?
15   A.   I don't recall.  It's on my resume.  It was
16 roughly, I think, 15 years, I think.
17   Q.   Approximately 1993 to 2006?  Does that sound
18 about right?
19   A.   That sounds about right.
20   Q.   Okay.  Did you have any employees?
21   A.   At one time, I did.
22   Q.   And what was the maximum number of employees
23 you ever had at one time?
24   A.   One.
25   Q.   Who was that?

Page 77

1    A.   Debbie -- I don't remember her last name.
2    Q.   Was Debbie registered or would have been --
3    A.   Debbie who?
4    Q.   Was Debbie registered as a securities
5  professional or was she more administrative?
6    A.   She was administrative.
7    Q.   Is it correct that you were the only licensed
8  professional that was part of Invest Securities
9  Consulting?
10   A.   Correct.
11   Q.   Okay.  Who was the regulator that you
12 registered with -- or -- or regulators, plural -- that
13 you registered with when you were running Invest
14 Securities Consulting?
15   A.   Well, originally, before the laws changed, I
16 was registered with the Securities Exchange Commission.
17 And then when they changed the laws, I was registered
18 with various -- well, let me correct that.
19        I was always, even in the beginning, registered
20 with the SEC in any states that I did a particular
21 amount of business.  And then when I no longer needed to
22 be registered with the SEC, I quit being registered and
23 was then only licensed in various states that I
24 conducted business.
25   Q.   And why did you stop the business

20 (Pages 74 - 77)

1 Invest Secure -- excuse me -- Invest Securities
2 Consulting?  Why did that business terminate?
3     A.   Because managing money on a discretionary basis
4 is a pretty full-time job.  And, you know, some things
5 were happening in the markets, and I -- my securities
6 expert work was busy, and some other demands on my time.
7 I think I may have been starting my finance company, and
8 I decided I couldn't -- I didn't think I could do the
9 job I needed to do for my clients, and so I decided to
10 no longer -- other than family money, was not going to
11 manage money for private individuals and entities.
12     Q.   Okay.  Did you, in fact, at some point in time,
13 manage money on a discretionary basis for clients?
14     A.   I did.
15     Q.   As a registered investment advisor?
16     A.   I did.
17     Q.   Okay.  Do you know the difference between being
18 registered with FINRA to do business and being
19 registered with the SEC as an investment advisor?
20     A.   Well, there is lots of differences.  I -- I
21 don't know how to answer that question.  There is lots
22 of differences.
23     Q.   Okay.  Let me -- let me rephrase it.
24        You understand that FINRA regulates
25 broker-dealers, correct?

1     A.   Well, it does more than that, but, yes, that's
2 their primary business.
3     Q.   Do you know whether or not FINRA regulates
4 registered investment advisors?
5     A.   They do in some senses, yes.
6     Q.   In what senses, sir?
7     A.   Well, this issue has been addressed numerous
8 times over the last couple decades in that we often have
9 situation -- the term often used is "two hats."  And
10 that's when you have a Series 7 broker at a registered
11 broker-dealer who is both a licensed Series 7 broker,
12 but he is also a investment advisor representative,
13 because either, A, at some firms he may actually have a
14 somewhat separate entity or he may have the firm he's
15 working for is a registered investment advisor and he
16 may be acting both as an IRA, investment advisor --
17 IAR -- excuse me -- investment advisor representative,
18 he has to work for an investment advisor firm.
19        And so FINRA has said in those instances that
20 they are somewhat involved in the activities that
21 someone could argue is more when that individual's
22 acting as an investment advisor versus acting as a
23 Series 7 broker.
24     Q.   Investment advisors are not registered with
25 FINRA, correct?

1     A.   They can be.  I mean, if you --
2     Q.   In their capacities as --
3     A.   Raymond James -- Raymond James is registered
4 with both.
5        MR. SCHWARTZ:  Before we proceed, I think we're
6     starting to talk over each other a little bit.  So,
7     Mr. Suter, please wait until Mr. Schulz finishes.
8        And, Mr. Schulz, please, you know, give some
9     space -- after when Mr. Suter asks a question before
10     you start jumping in.  Okay?
11 BY MR. SUTER:
12     Q.   Is your registered investment advisory company,
13 Invest Securities Consulting, registered with FINRA?
14     A.   No.
15     Q.   All right.  Do you have before you a binder
16 that contains the expert witness reports?
17     A.   I can get it in front of me, if you'd like me
18 to.
19     Q.   Yes, please.
20     A.   And depending on how much we're going to read,
21 I apologize, my age causes me to have three pairs of
22 glasses, so I may switch back and forth occasionally.
23     Q.   Just do whatever works best for you, sir.
24     A.   Thank you.
25     Q.   All right.  Can you turn to Tab 123, please,

1 Exhibit 123.
2     A.   Oh, I don't -- I don't have them -- that's not
3 how they're in there.  Can you tell me what the document
4 is.
5     Q.   I'm looking for your June 4, 2021, expert
6 report.
7        Do you have that before you, sir?
8     A.   I do.
9     Q.   The title on the cover page is "Report of
10 Douglas J. Schulz Re Class Certification."
11        Do you see that?
12     A.   I do.
13     Q.   As you sit here today, can you recall ever
14 having prepared a report re class certification prior to
15 this one?
16     A.   I thought we talked about that for a long time
17 and I thought I said I don't recall.  I'm not going to
18 change my testimony just because you ask it twice.
19     Q.   And having this before you now does not refresh
20 your recollection, correct?
21     A.   It does not.
22     Q.   Okay.  You make reference to what you labeled
23 "Objective Metrics"; is that correct?  In this report.
24     A.   If that's what it says, that's what it says.
25     Q.   Turn to page 14, paragraph 48, please.

21 (Pages 78 - 81)

Page 82

1    Do you have that before you?
2    A.  I do.
3    Q.  Okay.  Who wrote paragraph 48?
4    A.  I did.
5    Q.  How about paragraphs 49, 50, 51, 52, and 53?
6    A.  I did.
7    Q.  Did anyone else assist you in the preparation
8 of those paragraphs I just identified?
9    MR. SCHWARTZ:  Objection, overbroad.
10    THE WITNESS:  We've already established that I
11 had numerous communications with counsel and some
12 communications with Mr. Olsen.  And it will be
13 impossible for me at this stage to tell you exactly
14 when or what we discussed on each and every
15 paragraph, but there were many of these paragraphs
16 that were discussed.  That's all I can say.
17 BY MR. SUTER:
18    Q.  As a result of those discussions, was your
19 original version of these identified paragraphs changed?
20    A.  I don't understand the question.
21    MR. SCHWARTZ:  Yeah.  Hold on.  I'm going to
22 object given the rules about drafts, but you want to
23 ask a more proper question, feel free.
24 BY MR. SUTER:
25    Q.  Without telling me what changes were made to

Page 83

1 paragraphs 48 through 53, if any, did the text of any of
2 those paragraphs change -- change as a result of having
3 discussions with anyone who did not author the original
4 version?
5    MR. SCHWARTZ:  Same objections.
6    THE WITNESS:  I don't understand the connection
7 to the original version.  I'm -- I'm confused.
8 BY MR. SUTER:
9    Q.  Did -- did paragraphs 48 through 53 change at
10 all as a result of discussions you had with anyone prior
11 to this report being finalized?
12    MR. SCHWARTZ:  Same objections.
13    THE WITNESS:  I thought I answered that, and I
14 think I answered it to the best of my ability.  I
15 can't add anything more to what I already said on
16 that question.
17 BY MR. SUTER:
18    Q.  Okay.  Who created the formula in Metric 1?  Or
19 the formulas?
20    A.  Me.
21    Q.  Okay.  Did those formulas change at all during
22 the course of your representation of -- strike that.
23    Did those formulas change at all from the time
24 that they were originally created to the time that this
25 report was prepared?

Page 84

1    MR. SCHWARTZ:  Objection to form and objection
2 to the words "originally created."
3    You can answer, sir.
4    THE WITNESS:  Probably.
5 BY MR. SUTER:
6    Q.  Your counsel just objected to the use of the
7 word "created."  You created these formulas?  Isn't that
8 your testimony?
9    A.  I did.
10    Q.  All right.  What was the purpose of creating
11 these formulas?
12    A.  What was the purpose?  What was the purpose?
13 I -- I -- I don't know how to answer.  The purpose was
14 to do some formulas or -- I don't know.  Are you asking
15 me the definition of the word "formula"?
16    Formula is utilized to take certain numbers --
17 and, remember, we established I'm not a statistician, so
18 maybe I don't know the right term or definition for the
19 word "formula."  But you use these to do a mathematical
20 equation that eventually ends up with an answer.  That's
21 the best I can do as a non-statistician.
22    MR. SUTER:  And could I have the question read
23 back -- back, please.
24    (The reporter read the portion requested.)
25 BY MR. SUTER:

Page 85

1    Q.  Have you answered that question to the best of
2 your ability, sir?
3    A.  I have.
4    Q.  Okay.  Were these formulas created for the
5 purpose of this litigation?
6    A.  Yes.
7    Q.  Who determined, as set forth in paragraph 53,
8 that a cost of 0.5 percent or 50 basis points is an
9 appropriate number with which to measure if an investor
10 is a low-turnover/buy-and-hold investor?
11    A.  Me.
12    Q.  Did anyone else assist you in making that
13 determination?
14    A.  No.
15    Q.  Can you name one other securities professional
16 who shares your opinion that a cost of 0.5 percent or 50
17 basis points is an appropriate number with which to
18 measure if an investor is a low-turnover/buy-and-hold
19 investor?
20    A.  Well, I haven't shown this report to anybody
21 and I haven't discussed my report with anybody and I
22 haven't discussed this number with anybody, so there
23 would be no way for me to know if they do or don't
24 agree.
25    Q.  Okay.  Do you understand what "peer review"

22 (Pages 82 - 85)

Page 86

1 means?

2    A.  I do.

3    Q.  Okay.  Has your formula that is set forth in

4 paragraphs 48, 49, 50, and 51 with respect to annual

5 cost analysis, have any of those formulas received peer

6 review?

7      MR. SCHWARTZ:  Objection to form.  Objection,

8   overbroad.

9      THE WITNESS:  No, why would I do that?

10 BY MR. SUTER:

11    Q.  Do you know what the rate of error is when the

12 formulas in paragraphs 48, 49, 50, and 51 are utilized?

13      MR. SCHWARTZ:  Objection to -- objection to

14   form.  Objection to the use of the words "rate of

15   error" in this context.

16      THE WITNESS:  I don't even know what you're

17   trying to imply.

18 BY MR. SUTER:

19    Q.  Have you done any tests or analyses to

20 determine if there is any error rate when one makes use

21 of the formulas that you've created for purposes of this

22 lawsuit?

23      MR. SCHWARTZ:  Same objections with respect to

24   the use of the word "error rate."  Objection to

25   form.  Objection, vague and ambiguous.

Page 87

1      THE WITNESS:  Well, first of all, I would have

2   assumed that there -- there was any serious errors,

3   your data and damage expert would have pointed them

4   out in his rebuttal, he did not.  So as I sit

5   here today, there is no controverting evidence or

6   testimony or -- or in any report of your experts,

7   when they had all the numbers and all the math and

8   all the documents.  And no one on your side, your

9   supposed experts -- you've had a supposed special

10   expert on just numbers -- has proposed what you're

11   proposing in your question.  So I feel very

12   confident that everything is good.

13 BY MR. SUTER:

14    Q.  And what testing did you do to determine that,

15 quote, everything is good, closed quote, with these

16 formulas?

17      MR. SCHWARTZ:  Same objections.

18      THE WITNESS:  Well, they're pretty straight --

19   they're pretty straightforward formulas.  I think

20   you're -- I think you're trying to read something in

21   that's not here.  I mean, it's -- it's -- it's

22   relative simple math.  I mean, this is not rocket

23   science, I mean.  I don't know where you're going,

24   but I think you're implying something that's not

25   relevant.

Page 88

1 BY MR. SUTER:

2    Q.  These formulas that you created for purpose of

3 this litigation seek what result, sir?

4      MR. SCHWARTZ:  Object.  Objection to form.

5   Objection, argumentative.

6      THE WITNESS:  I'm -- I'm just -- I'm just a

7   securities expert.  I don't -- I'm not seeking

8   anything.

9 BY MR. SUTER:

10    Q.  Were these formulas created for the purpose of

11 obtaining a numeric calculation for which you could make

12 the argument that certain accounts were unsuitable in

13 this case?

14      MR. SCHWARTZ:  Objection to form.  Objection,

15   compound.  Objection, argumentative.

16      THE WITNESS:  That that sounds probable.

17 BY MR. SUTER:

18    Q.  Can you think of any other reason that these

19 formulas were created?

20    A.  None come to my mind as I sit here.

21    Q.  Do you feel that you have the specialized

22 knowledge that will help the trier of fact with these

23 formulas?

24      MR. SCHWARTZ:  Objection to the extent you're

25   asking him for a legal conclusion.

Page 89

1      You can answer.

2      THE WITNESS:  I -- I can't answer the question.

3   It's so broad.  You know, you need to break that

4   down.  I -- I can't answer that question.

5 BY MR. SUTER:

6    Q.  Are you an expert in creation of formulas such

7 as the formulas set forth in paragraphs 48, 49, 50, and

8 51?

9      MR. SCHWARTZ:  Objection, vague, overbroad.

10      THE WITNESS:  So when you say "formulas," let

11   me see if I can understand the question, because I'm

12   still having a hard time with it.

13      Can you point me to exactly -- I got my reading

14   glasses back on -- what -- what formula you're

15   specifically asking me about?

16 BY MR. SUTER:

17    Q.  Sure.  Let's go to paragraph 48, which says

18 "Objective Metric 1, Annual Cost Analysis:  One

19 metric/formula for evaluating whether an account is

20 considered to have a low-trading activity is the annual

21 cost analysis."

22      And then underneath that, there is a formula

23 that has "annual cost percentage equals" and it goes on

24 from there.  And the same thing is true for paragraphs

25 49, 50, and 51.

23 (Pages 86 - 89)

Page 90

1    Do you see the four different formulas that are
2 set forth there?
3        MR. SCHWARTZ:  I'm going to object.  The
4   witness just asked to break it down formula by
5   formula.  I think you should just stick to one
6   formula at a time so he can answer the question, so
7   he knows -- so he knows what he's answering.
8        THE WITNESS:  Yeah, I agree.  I wanted one at a
9   time and now you've giving me four.  You want to
10   start over?
11 BY MR. SUTER:
12   Q.  Sure.  Would you confirm, sir, that you have
13 set forth a formula that you've created for purposes of
14 this litigation in paragraph 48?  You call it a, quote,
15 metric/formula?
16   A.  That's correct.
17   Q.  Okay.  Would you confirm for me, sir, that you
18 created a formula in paragraph 49, that is set forth in
19 that paragraph, and that the formula was created for
20 purposes of this litigation?
21        MR. SCHWARTZ:  Objection, compound.  And
22   objection to the use of the word "created," but --
23   and it's vague and overbroad.
24        But go ahead.
25        MR. SUTER:  Let me rephrase it.

Page 91

1 BY MR. SUTER:
2   Q.  Did you create the formula that's set forth in
3 paragraph 49, sir?
4   A.  Yeah, yeah, I think that's the problem.  You're
5 making this sound like these are unique.
6        These are standard formulas.  These are used in
7 the industry every day.  They're used in litigation,
8 they're used by brokerage firms.  These are pretty
9 vanilla-fudge formulas that everybody uses every day.  I
10 didn't have to create these.
11   Q.  Are you changing your testimony from a short
12 while ago or --
13        MR. SCHWARTZ:  I'm going to object as
14   argumentative.  And that's exactly why I objected to
15   the use of the word "created."
16        You can answer if you think you've changed
17   anything in your testimony.
18        THE WITNESS:  Yeah, I think you were just
19   squeezing in words.  I'm telling you the truth.
20   That's what it is.  If you want to say I
21   contradicted myself, go at it, if that makes you
22   feel good.
23 BY MR. SUTER:
24   Q.  Take a look at paragraph 50.  Did you create
25 the formula that's set forth in that paragraph 50?

Page 92

1        MR. SCHWARTZ:  Same objection regarding the
2   word "create."
3        THE WITNESS:  Created in a sense that I typed
4   it up and put it on a page.  Created in the fact
5   that it's somehow novel or different or not
6   something used regularly, no, I didn't create it.  I
7   typed it up, I put it in this report, I filed the
8   report.
9 BY MR. SUTER:
10   Q.  Okay.  What is the source of the formula in
11 paragraph 50?
12        MR. SCHWARTZ:  Objection, overbroad.
13        THE WITNESS:  My brain.
14 BY MR. SUTER:
15   Q.  Okay.  Any other source?
16   A.  Well, that's a normal formula used all the
17 time.  When I had my own damage and data firm, we used
18 this formula.  The brokerage firms use this formula.
19        Brokerage firms are required in their screening
20 process to keep track of clients' trades and costs.  And
21 it's basically the formula that's right here.
22        I'm not -- this is nothing -- this is nothing
23   unique.  This is very standard stuff.  The creating, I
24   typed it, but this is -- this is nothing different or
25   unique.

Page 93

1        MR. SCHWARTZ:  And I wanted to squeeze an
2   objection regarding calls for speculation to the
3   extent of the original source of these formulas and
4   mathematical concepts.
5 BY MR. SUTER:
6   Q.  Did you create the formula that is set forth in
7 paragraph 51?
8        MR. SCHWARTZ:  Same objections regarding the
9   word "create."
10        THE WITNESS:  Yeah, I'm -- you're -- you're
11   just -- you're just trying to twist things around
12   and I'm not going to answer that.  I've already made
13   it clear.  So I typed it, I put it down.  I'm going
14   to -- I'm going to leave it at that.
15 BY MR. SUTER:
16   Q.  What is the source of the formula in
17 paragraph 51?
18        MR. SCHWARTZ:  Same objection regarding
19   "source."  Overbroad, calls for speculation as to
20   the original source of the concept and the formula.
21        THE WITNESS:  My 40 years in the business, my
22   managing and dealing with thousands of clients and
23   thousands of investors, being involved in a thousand
24   or more securities cases, and my training and
25   expertise and my brain.

24 (Pages 90 - 93)

Page 94

1 BY MR. SUTER:
2    Q.   Okay.  Would you agree that paragraph 51 is the
3 one that Mr. Olsen was provided by you and that he used
4 to generate some numbers?
5        MR. SCHWARTZ:  Objection, overbroad.
6        THE WITNESS:  Well, that's assumes -- I --
7 that's assuming something I don't know if it's
8 factual.
9        As to exactly when -- I created these formulas.
10 As to when exactly the verbiage in paragraph 51 was
11 created in relationship to Mr. Olsen, I don't know
12 that answer.
13 BY MR. SUTER:
14    Q.   Did you, in fact, ask Mr. Olsen at some point
15 in time to use the formula in paragraph 51 in order to
16 calculate damages?
17    A.   That's correct.
18    Q.   And did Mr. Olsen, in fact, do that for you?
19    A.   Yes.
20    Q.   Directing your attention to paragraph 53.
21 Statement is made, "A cost of 0.5 percent or 50 basis
22 points is an appropriate number with which to measure if
23 an investor is a low-turnover/buy-and-hold investor."
24        Do you see that?
25    A.   I do.

Page 95

1    Q.   Is that your expert opinion, sir?
2    A.   That's what I wrote.
3    Q.   Is that your expert opinion?
4    A.   I think, by definition, if it's in this report,
5 it's my expert opinion.
6    Q.   Thank you.
7        What is the source of your making that specific
8 statement in paragraph 53?
9    A.   40 years in the business, in all kinds of
10 business.  I mean, every kind of aspect of the business;
11 compliance supervision, money management
12 recommendations, my readings, my research.  I did some
13 additional reading and research and -- coming up with
14 these numbers.  And all that combined together was
15 utilized to come up with that number.
16    Q.   Can you identify anything more specifically
17 than what you just testified to?
18        MR. SCHWARTZ:  Objection to form.
19        THE WITNESS:  Not -- not specifically at this
20 time.
21 BY MR. SUTER:
22    Q.   Okay.  Was this 0.5 percent or 50 basis points
23 number given peer review by anyone, to your knowledge?
24    A.   Nobody consulted with me in coming up with that
25 number.

Page 96

1    Q.   So you came up with that number on your own,
2 correct?
3    A.   Well, on my own.  It's based on lots of reading
4 and research and writings by other people, so to say I
5 came up with it on my own, I -- I don't have anything
6 more to say than what I've already said.
7        I didn't see your experts give a different
8 number.
9    Q.   The 50 basis point number was based on the
10 formula in 51, correct?
11    A.   I don't understand the question.
12    Q.   To the right of the number that you set forth
13 in paragraph 53, the 0.5 percent or 50 basis points
14 number, you relied on the formula set forth in
15 paragraph 51; is that correct?
16    A.   I don't think I said that in my report.
17    Q.   Well, how did you come to the 50 basis points
18 or 0.5 percent number?  Was that independent of the
19 formula set forth in paragraph 51?
20        MR. SCHWARTZ:  Objection, compound.  Objection,
21 overbroad.
22        THE WITNESS:  Well, I don't know if this is in
23 my report or my rebuttal report.  I did say that
24 separate from my knowledge and experience and
25 research to come up with that number, that I thought

Page 97

1 it was additional support for my opinion that that's
2 a proper number, was looking at the numbers that
3 then ended up being a result of the work by
4 Mr. Olsen.  But I think you're getting the cart
5 before the horse.
6 BY MR. SUTER:
7    Q.   Was Mr. Olsen retained to do anything other
8 than crunch the numbers that would be generated by
9 inputting the numbers on a spreadsheet into the formulas
10 that you've provided to him?
11        MR. SCHWARTZ:  Objection to form.  Objection,
12 overbroad.
13        THE WITNESS:  I don't know.  I didn't hire
14 Mr. Olsen.  I didn't -- I didn't -- I didn't -- I --
15 I don't know.  You have to ask Olsen.
16 BY MR. SUTER:
17    Q.   Has your technique or theory in coming up
18 with --
19    A.   Sorry, sorry.  I didn't hear the word.  "Your
20 technique" for what?
21    Q.   Excuse me.  I'll start over.  Apologies.
22        Is your technique or your theory for arriving
23 at the 0.5 percent or 50 basis point number in
24 paragraph 53, has that been tested by any person, to
25 your knowledge?

25 (Pages 94 - 97)

Page 98

1    A.  I don't know what tested means.
2    Q.  Has anyone besides you scrutinized this formula
3  to determine whether -- excuse me -- scrutinized the 50
4  basis point number to determine whether that is
5  something that can be generally accepted in the
6  securities field?
7        MR. SCHWARTZ:  Objection to form.  Objection,
8  calls for speculation.  Objection, overbroad.
9        THE WITNESS:  Well, your experts reviewed it
10  and they didn't come up with a different number, so
11  I guess they didn't have any problem with it.
12  BY MR. SUTER:
13    Q.  Did anyone, to your knowledge, test your
14  number, the 50 basis points, or 0.50 percent, to
15  determine whether your conclusion that this was a -- an
16  appropriate number to use in this case?
17        MR. SCHWARTZ:  Object.
18  BY MR. SUTER:
19    Q.  Are you aware of anyone who did that?
20        MR. SCHWARTZ:  Objection, compound.  Objection,
21  compound.  Objection, calls for speculation.  And
22  objection, it appears to be designed to ask if there
23  has been a violation of the protective order.
24        But you can answer if you can, sir.
25        THE WITNESS:  Well, we've already established

Page 99

1    that no one has seen the report.  We've already
2    established that I did not get assistance from any
3    individual in preparing my report.  So you keep
4    asking my question -- questions about if anybody has
5    tested it.
6        Well, you're -- the only people that have a
7    chance to test it were your experts, and they didn't
8    come up with a different number.  And no one else
9    has had a chance to test it, so I don't -- why do
10    you keep asking me these questions?  It's
11    self-evident that nobody could test it other than
12    your experts.
13        But you can send it and have it tested.  Go
14    ahead.  I guess you're going to have to get new
15    experts, which I hear you're going to probably do
16    anyway.
17  BY MR. SUTER:
18    Q.  From whom did you hear that we were going to
19  get new experts?
20    A.  Well, I heard it didn't go well for you.
21    Q.  Who did you hear that from?
22    A.  Counsel.
23    Q.  What did they say?
24    A.  They said -- I think one of them said -- I
25  don't remember which one.  I think he specifically

Page 100

1    said -- based on, I think it was, at least the first
2    one, Klouda's -- that it went so bad for Raymond James
3    or your firm -- I don't recall exactly -- that he is
4    probably going to be -- have to be let go.
5        Q.  Do you recall anything else that was said when
6    that was communicated to you?
7            MR. SCHWARTZ:  I'll -- I'll instruct you not to
8    answer the rest of that, sir.
9            MR. SUTER:  What basis?
10           MR. SCHWARTZ:  I don't think it's appropriate
11    discovery to ask about this.
12           MR. SUTER:  He volunteered it and he spoke
13    about it without objection.
14           Let me move on here.
15    BY MR. SUTER:
16       Q.  Can you specifically identify anything that you
17    read that supports your conclusion in paragraph 53 that
18    a cost of 0.5 percent or 50 basis points is an
19    appropriate number with which to measure if an investor
20    is a low-turnover/buy-and-hold investor?
21           MR. SCHWARTZ:  Objection, overbroad, compound.
22           THE WITNESS:  I -- I don't have anything to add
23    that's not already in my reports.  I think there is
24    some support in one or two of my reports where I --
25    but I don't recall as I sit here.

Page 101

1    BY MR. SUTER:
2       Q.  Did you conduct any research to come up with
3    the percentages that are in paragraph 53?
4       A.  I did.
5       Q.  What specific research did you do?
6       A.  Well, it was very extensive.  I probably
7    started with regulations, regulatory interpretations,
8    findings by the various regulators where either they
9    were talking about turnover, lack of turnover, churning,
10    reverse churning, any issues having to do with the issue
11    of -- well, remember, there is two.
12        Well, yeah, you're right, it's -- yeah, you're
13    right; that's a compound question.
14        Yeah, do you want to ask me about -- because
15    they're two separate numbers, why don't you ask me about
16    one number and then ask me about the other number,
17    because I -- it's two separate numbers.
18       Q.  I'm referring to paragraph 53 that refers to
19    a 0.5 percent or 50 basis points.  So are those the two
20    numbers that you're talking about?
21       A.  No.  We were just talking about a minute ago
22    about turnover, and now we're talking about cost, and
23    those are two different numbers.
24       Q.  Okay.  Well, let's focus on paragraph 53.
25        Can you identify any specific research that you

26 (Pages 98 - 101)

Page 102

1  relied on in coming to the conclusion that you reached
2  in paragraph 51 that I read into the record; i.e., the
3  cost of 0.5 percent or 50 basis points is an appropriate
4  number with which to measure if an investor is a
5  low-turnover/buy-and-hold investor?
6       MR. SCHWARTZ: Objection. I think you've now
7  completed or misspoken and said "paragraph 51" when
8  we're talking about the formula in paragraph 53,
9  so --
10      MR. SUTER: I'm sorry. The let me ask the
11  question again. I'm referring --
12      THE WITNESS: Well, wait. I need to object
13  too. You've changed the question. Before, you
14  asked me what I did, and I was answering that and we
15  got interrupted. Now you're asking me a different
16  question. So decide which question you want
17  answered.
18 BY MR. SUTER:
19  Q.  I'll ask the questions and I'll ask you to
20  respond to the questions, whichever they are.
21      Referring your -- directing your attention to
22  paragraph 53, that a cost of 0.5 percent or 50 basis
23  points is an appropriate number with which to measure if
24  an investor is a low-turnover/buy-and-hold investor.
25      Please identify any specific documents that you

Page 103

1  consulted to come up with this number of 0.5 percent or
2  50 basis points.
3   A.  Well, I think I gave -- I think -- I can't
4  remember everything I've written and read, but I think I
5  identified some support for that number in either my
6  rebuttal or my original report. So whatever that is is
7  what it is. I don't remember as I sit here.
8       And I think I was saying that I reviewed quite
9  a bit. And for me to try to remember everything I
10  reviewed, I'm not going to be able to do it.
11  Q.  Well, how about anything you can remember
12  reviewing as opposed to everything you reviewed? Can
13  you tell us anything that you reviewed?
14  A.  Well, I can do it in broad terms. I may not be
15  able to do it in specific terms. But I can tell you
16  what types of things I reviewed.
17  Q.  I'm asking for specific. Can you identify any
18  specific documents that you reviewed that support your
19  conclusion in paragraph 53 about a 0.5 percent or 50
20  basis point number being appropriate?
21  A.  I read a number of articles and treatises that
22  talked about cost. I read some, like I said, I think
23  some regulatory findings or interpretations. I read
24  that SIFMA document is one specific name I can remember
25  that I read that I -- I utilized, I know, in some of

Page 104

1  this report. And I think it had something to do with
2  this cost. And so -- and a quite a bit of others, but
3  that's the only one specifically I can name right now.
4   Q.  All right. Let's turn to paragraph 54, the
5  "Objective Metric 2, Turnover Analysis."
6       Do you see that?
7   A.  54? Yeah, yeah. Okay.
8   Q.  Did you create the formula that is set forth in
9  paragraph 54?
10      MR. SCHWARTZ: Same objections regarding the
11  word "create."
12      THE WITNESS: I didn't create that formula.
13  That formula has been around for 40 years.
14 BY MR. SUTER:
15  Q.  Okay. What is the source of that formula?
16      MR. SCHWARTZ: Objection.
17      THE WITNESS: I think I --
18      MR. SCHWARTZ: Objection, calls for speculation
19  as to the original source.
20      But go ahead if you can go back --
21      THE WITNESS: Yeah, I -- I -- it's -- it's -- I
22  would -- I don't remember when I first learned the
23  formula, if I was a broker or investment advisor or
24  when I started getting in litigation, but I know
25  that that number, that formula, has been used by the

Page 105

1  regulators and just about everybody else as long as
2  I've been doing this.
3  BY MR. SUTER:
4   Q.  Okay. How about the formula in page -- in
5  paragraph 55?
6       MR. SCHWARTZ: Same objections.
7       THE WITNESS: Well --
8  BY MR. SUTER:
9   Q.  What is the source of that formula?
10  A.  Same.
11      MR. SCHWARTZ: Objection.
12      THE WITNESS: Same. Same.
13      MR. SCHWARTZ: Well, hold on. Hold on. Same
14  objection.
15      THE WITNESS: I'm sorry.
16      MR. SCHWARTZ: Let's -- let's -- again, let's
17  keep a little bit of space. I know it's hard via
18  ZOOM, so we're all working in this new world, but
19  let's just, you know, keep the pace at a pace so we
20  can not have each -- each of us talk over each
21  other.
22      But subject to those objections, you can go
23  ahead and answer, sir.
24      THE WITNESS: Same.
25 BY MR. SUTER:

27 (Pages 102 - 105)

Page 106

1    Q.  So you're suggesting that the formula in 55 is
2  something that has been in the industry for decades; is
3  that correct?
4    A.  What?
5    Q.  I'm sorry?
6    A.  I would suggest that.  I would suggest it.
7    Q.  Thank you.  All right.  All right.
8        And what specific documents did you look to, if
9  any, to confirm that the formula that you had in
10 paragraph 55 is a formula that you believe has been
11 utilized for decades?
12   A.  I didn't have to.  I've been using that formula
13 for 30 years.  It's -- it's in every treatise, and
14 relating to churning and turnover and excessive trading.
15 The regulators use it.  It's everywhere.  It would --
16   Q.  Was there excessive trading --
17   A.  -- probably fill a suit -- I could probably
18 fill a suitcase for that formula.  It's been around
19 forever.
20   Q.  Was there excessive trading, in your opinion,
21 in this case?
22   A.  I don't -- was never asked to address that
23 issue.  Only the lack of trading; not the excessive
24 trading.
25   Q.  You have -- you do not have a -- an opinion as

Page 107

1  you sit here today as to whether there was excessive
2  trading; is that correct?
3    A.  I've never been asked to address it and so I
4  don't have an opinion one way or the other.  It was not
5  an issue in the case, so it was not ever asked of me.
6    Q.  Okay.  Directing your attention to paragraph 57
7  which reads, "In my experience and professional opinion,
8  if a commission-based account has a turnover of less
9  than or equal to 0.25, then it is a low-trading account
10 for which a fee-based account is not suitable."
11       Do you see that?
12   A.  I do.
13   Q.  Is that an opinion that was formulated for the
14 purpose of this case?
15   A.  I don't understand the question.
16   Q.  Did you formulate this opinion that a 0.25
17 figure represented low trading activity for which a
18 fee-based account is not suitable, was that opinion
19 formulated by you for purposes of this case?
20       MR. SCHWARTZ:  Objection, mischaracterizes the
21   part of the paragraph you read and didn't read.  And
22   objection to form.
23 BY MR. SUTER:
24   Q.  Can you answer it?
25   A.  Well, only in part.  Part of it does, part of

Page 108

1  it doesn't.
2    Q.  Can you explain your answer further, please.
3    A.  No.  Part of it does, part of it doesn't.
4    Q.  What part does, sir?
5    A.  That I think a turnover -- let me take the part
6  of the sentence that I did not formulate specifically
7  just for this case.  And that is that a -- a commission
8  account that has a turnover less than or equal to
9  0.25, that that is a low-trading account.
10       That was an opinion I've had and been aware of
11 for a long time, way before I was hired in this case.
12 The for which a fee-based account is not suitable, that
13 seems to be an opinion that has to do only with this
14 case.
15   Q.  Have you ever rendered an opinion in another
16 case where you opined, in your experience and
17 professional opinion, that a commission-based account
18 with a turnover of less than or equal to 0.25 was an
19 unsuitable account?
20       MR. SCHWARTZ:  Objection, calls for facts not
21   in evidence.
22       You can answer if you can.
23       THE WITNESS:  I don't know.
24 BY MR. SUTER:
25   Q.  Are you aware of any other literature in the

Page 109

1  securities field that reaches the conclusion or opinion
2  that if a commission-based account has a turnover of
3  less than or equal to 0.25, then it is an unsuitable
4  account?
5        MR. SCHWARTZ:  Objection, assumes that
6    literature actually discusses the issue.
7        But go ahead.
8        THE WITNESS:  The literature and all that's out
9    there addresses the issue as to what's a
10   low-turnover account.  As to the exact number that
11   the literature that's out there that says that
12   that's suitable or unsuitable, that's a separate
13   issue, but there is lots of support out there that
14   when talking about -- I don't think it's necessarily
15   narrowed down to a, quote, commission account, but
16   talks about an account, a portfolio that has certain
17   rates of turnover would or would not be considered a
18   low-turnover account.
19 BY MR. SUTER:
20   Q.  Can you point to any article or any written
21 document that reaches the conclusion that you reached
22 here, which is that a -- if a commission-based account
23 has a turnover of less than or equal to 0.25, it is then
24 a low-trading-activity account for which a fee-based
25 account is not suitable?

28 (Pages 106 - 109)

Page 110

MR. SCHWARTZ: Objection to form. Objection, compound. Objection, assumes a fact not in evidence.
But go ahead if you can, break that down with an answer, sir.
THE WITNESS: Yeah, I can't -- I mean, it's -- the question's a little absurd in that you're saying do I know of exactly a case parallel to this case, other than the Edward Jones, where this, this, and this.
I mean, I know all kinds of treatises, articles, regulations, interpretations, and all kinds of things that address parts of that sentence. But when you put it all together and put it in one sentence, can I point to something that says somewhere else does it say exactly that sentence, I can't point to that.
BY MR. SUTER:
Q. As far as you know, this is the only report that you've ever seen that states that if a commission account has a turnover of less than or equal to 0.25, then it is a low-trading-activity account for which a fee-based account is not suitable; is that correct?
MR. SCHWARTZ: Same objections. Compound, ignores the testimony that was just given.

Page 111

THE WITNESS: Yeah, I --
MR. SCHWARTZ: Hold on, Mr. Schulz. Let me finish. Let's keep our pace here, everyone.
It's compound, it ignores the testimony that was just given, it's asking him to discuss whole different topics that he has talked about.
You can go ahead and give a new answer or the same answer, but you can answer, but those are my objections.
MR. SUTER: I'd appreciate if you'd keep your objections to the appropriate format, nonspeaking objections, Mr. Schulz -- Mr. Schwartz.
BY MR. SUTER:
Q. Please answer the question that I posed, Mr. Schulz.
MR. SUTER: Let's have it read back.
THE WITNESS: No, you don't need to read it back. It's the same question and the same answer and I'm not going to give it again.
MR. SUTER: I'll ask the reporter to read back the witness's answer to my question, please.
MR. SCHWARTZ: Please identify which question the answer is being read back to.
(The reporter read the portion requested.)
MR. SUTER: All right. Well, let's -- let's go

Page 112

on from there.
BY MR. SUTER:
Q. Is it correct that, as you sit here today, you cannot identify any literature, anything that you read, that supports the statement that a turnover of less than or equal to 0.25 in a commission-based account is un -- renders that an unsuitable fee-based account?
MR. SCHWARTZ: Objection, asked and answered. Objection, ignores the answers that were not only just given, but just read back. If you have -- and objection, compound.
Same objections I made to the original questions. Feel free to answer the question again if you have more to add.
THE WITNESS: I've answered it twice. I have nothing more to add.
BY MR. SUTER:
Q. Do you identify anywhere in your report what the source is for your opinion that a commission-based account that has a turnover of less than or equal to 0.25 is an account that is not suitable if it is a fee-based account?
MR. SCHWARTZ: Objection, overbroad.
THE WITNESS: I object because I think it assumes something I didn't say. I don't think I

Page 113

ever said that. Do I say -- were you saying I said that in this paragraph somewhere?
BY MR. SUTER:
Q. Let me read the paragraph again so we're clear. And I'm going to read the exact language.
Quote, In my experience and professional opinion, if a commission-based account has a turnover of less than or equal to 0.25, then it is a low-trading-activity account for which a fee-based account is not suitable, closed quote.
There is no reference to any source for that conclusion. My question to you is very simply, do you state anywhere in your report what the basis is for your conclusion in paragraph 57 that I just read into the record?
MR. SCHWARTZ: Objection to form. Objection to the narrative.
THE WITNESS: I think there is support for that sentence all throughout my report and rebuttal report.
BY MR. SUTER:
Q. Can you identify any specific source for your conclusion in paragraph 57?
A. Well, yeah --
MR. SCHWARTZ: Hold on. Hold on.

1    Objection, overbroad.
2        And if you need to go through every paragraph
3  of both reports to do that, take the time to do it.
4        THE WITNESS:  Yeah.  Again, I'm confused now.
5        First, you asked if there was any support, and
6  I thought you meant in my reports.  I thought that's
7  what you inferred, that is there any support for
8  this.  And you didn't infer that there is support.
9        The answer to the question is:  Is there
10  support for this opinion?  And the answer is yes.
11  And I think it's throughout my original report and
12  my rebuttal.  That's the answer.
13 BY MR. SUTER:
14    Q.   And that's as precise as you can be in terms of
15  the specific support for paragraph 57?
16        MR. SCHWARTZ:  Objection, argumentative.
17        And same instruction.  If you want the witness
18  to go through every paragraph in each report and
19  specify them, then just ask him to do that and he'll
20  take the time to do that.
21        But that's my objection.  Go ahead.
22        THE WITNESS:  Yeah, that's just -- that's
23  just -- that's just a -- that's a -- that's just
24  being a bad-lawyer question.  Don't say stuff like
25  that.  You know the support's there.  And you're

1  either going to let me go through and put it on the
2  record -- or are you just going to make these
3  negative little sound bites to try to gain some
4  points?
5        Don't go down that path with me or I will.
6  I'll find it and I'll go through it and I'll read
7  either one.  Either let me do it or don't make those
8  Keesal, Young, Logan type of ridiculous attacks.
9 BY MR. SUTER:
10    Q.   Are you all right, sir?  You seem a little
11  agitated.  Would you like to --
12    A.   I don't like it --
13    Q.   -- take a break?
14    A.   I don't like it when you're unethical.  Okay?
15  Don't be unethical.  I've been very fair with you.
16  Don't start getting unethical with me.
17        The support's there.  You either let me go find
18  it or move on to the next question.
19    Q.   Are you finished, sir?
20    A.   I am.
21    Q.   I'm not going to respond to your inappropriate
22  ad hominem attacks here.  I'm more interested in seeing
23  if there is any support for the, quote, expert, closed
24  quote --
25    A.   No, you're not --

1    Q.   -- opinions.
2    A.   You're not interested in that or you would have
3  let me found it.  You're not interested in the support.
4  Don't say that.  And that's why you were admonished,
5  because you want -- you want it both ways.  You want to
6  ask me, but you don't allow me to take the time to do
7  it.
8        MR. SCHWARTZ:  I would --
9 BY MR. SUTER:
10    Q.   I'm going to ask you to -- to conduct yourself
11  professionally here so we can get through this process.
12    A.   You conduct yourself professionally.  You are
13  not conducting yourself professionally.
14        MR. SCHWARTZ:  I'm going to jump in here
15  because I -- but I do object, Mr. Suter, to some of
16  the statements you were making.
17        I think that right now we're at an unproductive
18  stage.  I think we need to get back to questions and
19  answers.  And maybe we should take another
20  five-minute break so we can get back to questions
21  and answers.
22        MR. SUTER:  Actually, I'd like to finish this
23  line of questioning, and I will do that.  We'll take
24  a break at an appropriate time.  We've been going
25  now since 11:50, which is slightly less than an

1  hour, or about an hour, I guess.
2 BY MR. SUTER:
3    Q.   Let me ask you some more questions about your
4  objective metrics, at least that are set forth in -- as
5  such in this report.
6        Directing your attention, sir, to paragraph 58.
7  Can you look at that, please.
8        Same question with respect to 58.  I don't see
9  a citation to anything specific to support that
10  paragraph.  Is there any support that you can identify
11  in this report or any rebuttal report as you sit here
12  today without reading the entire reports?
13        MR. SCHWARTZ:  Same objections.
14        THE WITNESS:  I have no idea what you're asking
15  me.
16 BY MR. SUTER:
17    Q.   Would you like me to clarify the question?
18    A.   I don't understand it, so I guess you'll have
19  to.
20    Q.   You have included a number of footnotes
21  throughout your reports.  This particular paragraph is
22  not footnoted.  Is there any specific report -- support
23  for this paragraph other than your reports generally?
24        MR. SCHWARTZ:  Same objections.  And, also,
25  asked and answered.

30 (Pages 114 - 117)

Page 118

1    THE WITNESS: I think the support is in the
2  paragraph itself.
3 BY MR. SUTER:
4    Q.  Okay.  Thank you for that clarification.
5    MR. SCHWARTZ: Objection to the description of
6  the witness's answer.
7 BY MR. SUTER:
8    Q.  All right.  Directing your attention to
9  paragraph 60 which reads as follows:  "In my opinion, if
10 a commission-based account has both" -- italicized -- "a
11 0.5 percent annualized cost and a turnover of less than
12 0.25, then that is sufficient to objectively show that
13 the account was a low-trading-activity account for which
14 a transfer to a fee-based Freedom account was not
15 suitable -- regardless of any proffered reason for the
16 switch.  This threshold reflects a" -- in italics --
17 "minimum objective standard" -- in italics -- "that must
18 be met to establish suitability.  If a commission-based
19 account has both a 0.5 percent annualized cost and a
20 turnover of less than 0.25, then switching that account
21 to a fee-based Freedom account is objectively
22 unsuitable."
23    Did I read that paragraph correctly, sir?
24    A.  Yes.
25    Q.  Okay.  Is that paragraph 60 your opinion?

Page 119

1    A.  Yes.
2    Q.  Okay.  What source materials, what documents,
3  in other words, did you rely on to reach the conclusions
4  that are set forth in paragraph 60?
5    MR. SCHWARTZ: Objection, overbroad.
6    THE WITNESS: Yeah, I don't know how I can
7  answer that without going on for 30 minutes.  But if
8  you want me to attempt, I'll start.
9 BY MR. SUTER:
10    Q.  Let me ask you to try to identify any specific
11 document that supports the following portion of your
12 opinion in paragraph 60.
13    Quote, If a commission-based account has both a
14 0.5 percent annualized cost and a turnover of less than
15 0.25, then switching that account to a fee-based Freedom
16 account is objectively unsuitable, closed quote.
17    Can you point to any literature in the
18 securities world that supports that specific opinion
19 that is rendered in the sentence that I just read?
20    MR. SCHWARTZ: Same objections.
21    THE WITNESS: Other than the criticisms and
22 fines by the SEC and NASD that relates to similar
23 accounts, not necessarily to Freedom accounts, I'm
24 unaware, as I sit here today, if there is any
25 literature out there that specifically talks about

Page 120

1  Freedom.
2 BY MR. SUTER:
3    Q.  Are you aware, whether it's in literature or
4  not, of any securities professional, whether it's a
5  expert witness or a regulator or a practitioner, that
6  has ever reached the conclusion that if a
7  commission-based account has both a 0.5 percent
8  annualized cost and a turnover of less than 0.25, then
9  switching that account to a managed fee-based account is
10 objectively unsuitable?
11    MR. SCHWARTZ: Objection, asked and answered.
12 Objective -- objection, calls for speculation.  Same
13 objections regarding the protective order that we
14 discussed earlier.
15    THE WITNESS: In this hypothetical of yours,
16 does the fee-based account have to be managed or can
17 it be unmanaged?
18 BY MR. SUTER:
19    Q.  Managed.
20    A.  Does it have to be a Freedom account or just
21 any managed fee-based account?
22    Q.  Any managed fee-based account similar to a
23 Freedom account.
24    A.  I -- I am not aware, as I sit here today, if
25 anybody has put it exactly like how I have put it here.

Page 121

1    Q.  Okay.  Thank you.
2    Did you work yourself with the Excel
3  spreadsheets?  In other words, go to a computer terminal
4  and click through different tabs and look at the
5  material that was set forth in the various spreadsheets
6  that were produced in this case?
7    A.  Can you rephrase exactly what you're asking I
8  did or didn't do.
9    Q.  Okay.  You received a number of Excel
10 spreadsheets from Mr. Schwartz's office, correct?
11    A.  Yes.
12    Q.  And, in fact, you were asked to have those,
13 basically, teed up and ready to review during the course
14 of this deposition, correct?
15    A.  I think I was asked that.
16    Q.  And do you, in fact, have those Excel
17 spreadsheets handy on your computer, on a monitor that's
18 in front of you, that you could go to if we wanted you
19 to look at some of these Excel spreadsheets on your
20 computer?
21    A.  Well, "those" is broad.  I have some Excel
22 spreadsheets on one of my computers.  Okay.
23    Q.  Are those Excel spreadsheets the ones that you
24 received from counsel in this case?
25    A.  I received them.  Yeah, I think I received them

31 (Pages 118 - 121)

Page 122

1 from counsel.
2     Q.   And those are the only ones I'm talking about
3 here.
4         Are those handy for you to pull up if I ask you
5 to do that?
6     A.   I think they're relatively handy.  I don't know
7 if I have them all up, but I have -- I have -- I have
8 them over here on this other screen.
9     Q.   Okay.  And how much time prior to today's
10 deposition have you spent going over those Excel
11 spreadsheets that -- that are available to you on your
12 computer?
13        MR. SCHWARTZ:  Objection.
14        THE WITNESS:  Well --
15        MR. SCHWARTZ:  Hold on.  Objection, vague.
16        But go ahead.
17        THE WITNESS:  I did not go over those Excel
18 spreadsheets in preparation for my testimony today.
19 BY MR. SUTER:
20    Q.   Okay.  You did review those Excel spreadsheets
21 over the course of the past, let's say, many months,
22 sometime in 2021, as those were provided to you prior to
23 your report being done, correct?
24    A.   I did.
25    Q.   Okay.  Approximately how much time did you

Page 123

1 spend going over the Excel spreadsheets prior to
2 finalizing your June 4, 2021, report?
3    A.   Well, I don't remember exactly how this
4 happened because I don't remember when Art was hired.  A
5 matter of fact, I'm almost sure he wasn't hired because
6 I was, at one point, recommending a data guy that I use.
7 And so I'm pretty sure he wasn't hired yet.
8        But the numbers -- the data came from Raymond
9 James.  And I don't think Art had been hired.  And I
10 started doing some of my own analysis since I used to
11 have a damage firm.  And so I -- excuse me -- I did
12 spend a decent amount of time on that -- I don't know
13 how much -- because I wanted to see what was there and
14 what then -- whenever the data guy was determined, I'd
15 be a step ahead of the game because I've already done
16 some preliminary numbers myself because, like I said, I
17 used to have my own proprietary spreadsheets for doing
18 damages.  So that was X number of hours.
19        And then when we got involved with Mr. Olsen,
20 obviously, as he prepared his whatever -- I don't know
21 how many drafts there were.  Each time, I reviewed
22 those.
23        And then, ultimately, when it was finally
24 complete and some changes were made in formatting, then
25 I started to take that data and enter it into my report.

Page 124

1    Q.   Okay.  So let's break it down into segments if
2 you can.
3        Prior to Mr. Olsen's involvement, can you
4 estimate how many hours or minutes you spent reviewing
5 the Excel spreadsheets that your counsel provided from
6 Raymond James?  You said "a decent amount of time."
7    A.   Probably a day.  You know, I don't always
8 necessarily get a full eight-, nine-hour day in a day,
9 but I think probably a day.
10    Q.   Did you reach any preliminary conclusions from
11 the data before Mr. Olsen was brought into the mix
12 there?
13    A.   Hmm.  Well, you know, some of the spreadsheets
14 that Raymond James produced actually already had some
15 calculations on them.  It wasn't just raw data.  Some of
16 the columns actually had some -- some formulas, to use
17 your term.  And so some of this, I could actually look
18 at myself without having to create my own formulas.
19        But I did create some of my own formulas.  And
20 I remember I even checked to see if the numbers that
21 Raymond James did were accurate.  So that's some of the
22 things I did.
23    Q.   And did you reach the conclusion that the
24 numbers that were provided to you by Raymond James were
25 accurate to the extent there were calculations made?

Page 125

1    A.   Well, they were accurate, but inaccurate,
2 because they -- when they did -- I think it was the
3 turnover column.  And I'm stretching myself back another
4 couple months.  They didn't properly annualize them.
5 And so I remember coming to that conclusion.
6    Q.   What do you recall about the annualization that
7 you took issue with?
8    A.   Well, I'm doing this from memory.  One of the
9 columns in one of their spreadsheets -- and I don't
10 recall if it was the Freedom accounts or the commission
11 accounts.  I don't recall, as I sit here.
12        They had a turnover.  I'm pretty sure it was a
13 turnover number, not a cost number.  And it had a
14 turnover for that -- I think that year or -- I don't
15 recall if they did three years and averaged them, but I
16 remember there was a number.  And I wanted to see if the
17 math was right, so I -- I could do it because all the --
18 the information was there.  You know, there was all
19 those numbers, 51, 52, A, B, C, D.
20        And I went back and found the client.  I had to
21 do it in rows, you know, like Client No. 22.  And so
22 then I found that client.  And then I found his actual
23 trades and I did the calculation for turnover myself.
24        Of course, I annualized it, because not
25 annualizing numbers is -- just doesn't make any sense.

32 (Pages 122 - 125)

Page 126

1 And I found that when I annualized it -- and I took more
2 than one example.  Probably took two or three
3 examples -- that the numbers that Raymond James put in
4 their turnover was not an annualized number.  It was
5 just a number based on just they took that amount.  And
6 that was what I found.
7      Q.  Okay.  And what's your best estimate of how
8 long you spent, after Mr. Olsen got involved, working
9 with the Excel spreadsheets yourself?
10      MR. SCHWARTZ:  Objection, vague.
11      THE WITNESS:  Yeah, I -- I -- I'm not going to
12 be able to come close.  I -- I don't know.  I have
13 no idea at all.
14 BY MR. SUTER:
15      Q.  And would -- would it be fair to conclude that
16 you looked to Mr. Olsen to do the number crunching once
17 he got involved in the process?
18      A.  That would be fair.
19      Q.  Okay.  And as far as directions to Mr. Olsen,
20 did you give him any directions in terms of the numbers
21 that you were hoping to find in the data; in other
22 words, the conclusions that you were hoping could be
23 reached?
24      MR. SCHWARTZ:  Objection, argumentative.
25 Objection to the word "hoping."  Objection,

Page 127

1 compound.
2      THE WITNESS:  No.
3 BY MR. SUTER:
4      Q.  Okay.  Thank you.
5      And did you come up with the numbers that you
6 utilized in paragraph 60 that we read into the record?
7 Did you come up with the 0.05 percent annualized costs
8 and turnover of 0.25 or less prior to receiving the
9 results of Mr. Olsen's work or after you received his
10 work?
11      A.  I'm almost positive I came up with it before.
12 Oh, matter of fact, I am positive I came up with it
13 before.
14      Q.  Okay.  So before Mr. Olsen crunched the numbers
15 for you, you had already reached the conclusion that,
16 quote, If a commission-based account has both a 0.5
17 percent annualized cost and a turnover of less than
18 0.25, then switching that account to a fee-based Freedom
19 account is objectively unsuitable, closed quote; is that
20 correct?
21      A.  I think that's correct.
22      Q.  Okay.  Do you know, from the data that you
23 asked Mr. Olsen to analyze, how many of the accounts in
24 the sample, percentage wise, met the definition for an
25 objectively unsuitable account according to your

Page 128

1 predetermined conclusion here in paragraph 60?
2      MR. SCHWARTZ:  Objection to the form.
3 Objection to the word "predetermined."
4      THE WITNESS:  Okay.  I'm going to try to help
5 you here, Mr. Suter.  I think I know where you're
6 trying to go, but I -- I'm trying to -- I was trying
7 because I knew you were going to get a little
8 detail, but I don't think I caught exactly what you
9 want from me.
10      What do you want me to -- what do you want to
11 know?  Maybe just have her reread it.  I apologize.
12      MR. SUTER:  Yeah, let's have it reread.  And if
13 it needs to be fixed, I will be happy to reask the
14 question.
15      (The reporter read the portion requested.)
16      THE WITNESS:  Okay.  There it goes, "Your
17 internet connection is unstable."
18      Yeah, I didn't get the question.  We probably
19 should take a break and let me ask my wife to check
20 our internet connection.
21 BY MR. SUTER:
22      Q.  Yeah.  Could I get an answer to the question
23 before we take a break, please.
24      A.  Oh, I couldn't hear -- I didn't -- I couldn't
25 hear it.  The internet -- I did not hear what she said.

Page 129

1      MR. SUTER:  Okay.  Let's have the court
2 reporter read it back one more time, please.
3      (The reporter read the portion requested.)
4      THE WITNESS:  I think the answer to that
5 question is -- so we got 59, and then 11 got
6 automatically thrown out.  And then the best of my
7 recollection, somehow three or four more, nothing
8 having to do with us.  Something else got thrown
9 out.  So I think we were left with between 40 and
10 45.
11      And then he used my formula and had the
12 spreadsheet do the math.  And I think -- I think
13 that 34 was the number out of the base of originally
14 59 that met my -- met my criteria.  That's my
15 recollection.
16 BY MR. SUTER:
17      Q.  So is it your understanding that 34 of the
18 original 59 accounts met your, quote, objective, closed
19 quote, standard for determining suitability?
20      MR. SCHWARTZ:  Objective -- objection, calls
21 for speculation and mischaracterizes the testimony.
22 The numbers are in his report.  Objection, calls for
23 a memory test too.
24      THE WITNESS:  The only problem is I think that
25 it's not -- we didn't run the formula on all 59.  I

33 (Pages 126 - 129)

1 think we only ran the number -- the formula on
2 somewhere between 40 and 45.
3 BY MR. SUTER:
4    Q.   Okay.  And I believe the figure of 40 -- 45 is
5 used in -- in your account.  But from the -- from the
6 original 59 that was reduced by 11, then was reduced by
7 another number, whatever that actual number is, do you
8 have a recollection here, as you sit here today, as to
9 what percentage of those 45 or so accounts were, under
10 your formula, deemed to be, quote, objectively
11 unsuitable?
12        MR. SCHWARTZ:  I'll object again.  And if you
13    want Mr. Schulz to go through his report, pull out a
14    calculator and crunch in the two numbers and do the
15    math that we've gone through ourselves, he can go
16    and do that, but objection, calls for speculation to
17    the extent you want him to speculate exactly what
18    the numbers are and then try to crunch the numbers
19    in his head.
20 BY MR. SUTER:
21    Q.   Just asking if you recall what percentage were,
22 quote, objectively unsuitable.  If you have a
23 recollection, please share that with us.  If you don't,
24 please tell me.
25    A.   I don't specifically recall, but I thought it

1 was 75 percent.
2    Q.   Whatever specific percentage, did you include
3 that in your report, to the best of your recollection?
4    A.   I don't recall.
5    Q.   I'm sorry.  You don't recall?
6    A.   No, sir.
7    Q.   Okay.  And if you were to go over the
8 spreadsheets or on the computer that -- that are
9 available to you, could you make that determination
10 here, or do you need Mr. Olsen's work to determine that
11 approximately 75 percent of the accounts that he
12 ultimately analyzed were, quote, objectively unsuitable,
13 closed quote, according to your analysis?
14        MR. SCHWARTZ:  Same objection as before with
15    respect to spreadsheets.  I think you are mixing and
16    matching different sets of spreadsheets.
17        You can answer to the extent you can.
18        THE WITNESS:  Well, I don't need to be a
19    statistician.  I don't need to go to Mr. Olsen.  I
20    don't need to go to the spreadsheets.  I thought we
21    just established a minute ago that the two -- only
22    two numbers we're talking about is what's the
23    relationship between 34 and 75.
24        Isn't that the question pending?
25 BY MR. SUTER:

1    Q.   34 and 45?
2    A.   Yes, sir.
3    Q.   Okay.  That is the ratio, but I'm trying to
4 figure out if you could do that without Mr. Olsen's work
5 or you needed his work to do that, to reach that
6 conclusion?
7    A.   I could probably do that.
8        MR. SCHWARTZ:  Hold on.
9        Objection, mischaracterized the testimony.
10    Objection, vague.  And objection that the question
11    is unintelligible.
12        (Phone interruption.)
13        THE WITNESS:  I won't -- Don't worry, I won't
14    answer that.
15        I probably could do it in my sleep, but I have
16    a calculator in my left hand.  I didn't need
17    Mr. Olsen.  I didn't need to go to the spreadsheet.
18    It's 75.5 percent, but, I mean, that -- you can
19    look at that.  I mean, maybe you couldn't, but I
20    could look at that.  I knew it was pretty close to
21    75 without even punching it in the calculator.  I
22    sure didn't need to go to Mr. Olsen.
23 BY MR. SUTER:
24    Q.   Got it.  Okay.  Good.  And I appreciate that
25 clarification.  That's very helpful.

1        What does, quote, objectively unsuitable mean?
2        MR. SCHWARTZ:  Hold on.  Objection to, again,
3    characterizing his answer before you ask the
4    question.  That's inappropriate to muddy the
5    transcript up that way.
6 BY MR. SUTER:
7    Q.   The question is, sir, what does the term,
8 quote, objectively unsuitable mean?
9    A.   I think that objectively speaking, that taking
10 everything into consideration, that it is unsuitable.
11    Q.   Is there a generally-accepted definition in the
12 securities world in which you operate for the term,
13 quote, objectively unsuitable?
14    A.   No, I -- I -- it -- in hindsight, I might not
15 say "objectively," but there is no -- no -- there is no
16 term in the industry that I'm familiar with that puts
17 the term -- using those two words in conjunction.  And
18 if it -- if it -- if it causes confusion, I wouldn't
19 have any problem with taking it out.
20    Q.   Okay.  Did you intend to convey, by using the
21 word, quote, objectively unsuitable, closed quote, that
22 one could simply look to the two metrics that you
23 identified in the paragraphs 48 through 62 and simply
24 apply those two metrics to determine objectively whether
25 a fee-based account that was transferred from a

34 (Pages 130 - 133)

Page 134

1  commission account was, quote, objectively unsuitable,
2  closed quote?
3      A.  Well, I've already -- I'm not going to say
4  anything more about the word "objectively."  I've
5  already said that maybe in hindsight I wouldn't use the
6  word.  So I've said everything I'm going to say about
7  the word "objectively."
8          I already make the point in my report,
9  repeatedly, that you can use the two matrixes, so I have
10 nothing more to say on the word "objectively."  There is
11 no special meaning.  I didn't mean it to have any
12 special meaning.  And that's my last I'm going to say
13 about it.
14     Q.  Okay.  Is it your testimony, sir, that one can
15 determine, with the mere use of the two metrics that you
16 have identified in your expert report, whether or not an
17 account was suitable or unsuitable?
18     A.  Can't ask -- or can't answer an incomplete
19 hypothetical.
20     Q.  What is incomplete?  Tell me what other
21 information you would need in order to determine, by
22 using your two metrics, whether or not an account is
23 suitable or unsuitable?
24         MR. SCHWARTZ:  Objection.  I should have
25     objected to the prior question as overbroad, not

Page 135

1      specific as to whether you're talking about the
2      specific issue in this case or in more general
3      circumstances.
4          You can answer if you can.
5          THE WITNESS:  I can't.  I can't answer the
6      question.  It's -- it's -- it assumes something that
7      I've not said, that's not in my report.  And I
8      don't -- I don't -- I can't -- you need to rephrase,
9      Counselor.  I can't answer.
10 BY MR. SUTER:
11     Q.  Can you tell me what you believe the question,
12 as asked, assumes that shouldn't be assumed?
13     A.  I can't answer that either.  I don't -- I don't
14 know what -- I don't know what you're trying to do.
15 Look, come on, you and your experts do so much
16 theoretical hypothetical throwing stuff up against the
17 wall, it's hard for me to keep track of it.
18     Q.  Sir, in the context of this case where you
19 reach the conclusion in paragraph 60 that, quote,
20 this -- strike that.  Let me read the whole thing.
21         Paragraph 60 reads, quote, In my opinion, if a
22 commission-based account has both a 0.5 percent
23 annualized cost and a turnover of less than 0.25, then
24 that is sufficient to objectively show that the account
25 was a low-trading-activity account for which a transfer

Page 136

1  to a fee-based Freedom account was not suitable
2  regardless of any proffered reason for the switch.  This
3  threshold reflects a minimum objective standard that
4  must be met to establish suitability.  If a
5  commission-based account has both a 0.5 percent
6  annualized cost and a turnover of less than 0.25, then
7  switching that account to a fee-based Freedom account is
8  objectively unsuitable, closed quote.
9          My question to you, sir, is:  Is it your
10 opinion that one in your position can make a suitability
11 determination in the circumstances set forth in
12 paragraph 60 by merely relying on the two factors that
13 you have identified in your report that result in a 0.5
14 percent annualized cost and a turnover of less than
15 0.25?
16         MR. SCHWARTZ:  Objection to form.
17         THE WITNESS:  Yes.
18 BY MR. SUTER:
19     Q.  Is it your testimony, sir, that the factors
20 that are set forth in FINRA Rule 2111 do not have to be
21 taken into consideration in order for you to render an
22 opinion that, quote, If a commission-based account has
23 both a 0.5 percent annualized cost and a turnover of
24 less than 0.25, then switching that account to a
25 fee-based Freedom account is objectively unreasonable,

Page 137

1  closed quote?
2          MR. SCHWARTZ:  Objection to form.  Objection,
3      overbroad.
4          THE WITNESS:  Can you break it down?  It was so
5      long, it was hard for me to keep up with you.
6          MR. SUTER:  I ask that it be read back and --
7      and if you still have a problem, I'll -- I'll try to
8      break it into smaller chunks.
9          MR. SCHWARTZ:  And before we read it back,
10     obviously, you can get your answer before we take a
11     break, but we're now almost at the halfway point and
12     it's been three and a half hours.  So when we wrap
13     up, at an appropriate time, I would like to take
14     lunch since it's almost 1:30 here.
15         MR. SUTER:  Sure, Steve, I'll be happy to
16     accommodate.  Let me just finish this line of
17     questioning.
18         MR. SCHWARTZ:  Sure.
19         MR. SUTER:  Madam Reporter, could you read back
20     the question, please.
21         (The reporter read the portion requested.)
22         MR. SUTER:  Unsuitable.
23 BY MR. SUTER:
24     Q.  Can you answer that question, sir?
25     A.  I -- I know what I want to say, but I don't

35 (Pages 134 - 137)

1 know if I'm supposed to give a "yes" or a "no," because
2 I don't know -- if somehow there is like a double
3 negative in there, are you not supposed to, so I don't
4 know -- can I -- can I try to give an answer and explain
5 as opposed to a "yes" or a "no"?
6    Q.  Please answer the question if you understand
7 the question.  If you don't understand the question,
8 then tell me.
9    A.  I can't answer.  I can't -- no, I can't,
10 because I -- it's so whatever, I can't -- I know the
11 right answer and I know the regulations.  I just
12 don't -- the way you've asked the question, I'm not sure
13 if I'm supposed to say "yes" or "no."
14       MR. SCHWARTZ:  My objection to form is because
15 of the negative in there before.
16 BY MR. SUTER:
17    Q.  The following is a portion of your conclusion
18 that you adhere to in this deposition.
19       Quote, If a commission-based account has both a
20 0.5 percent annualized cost and a turnover of less than
21 0.25, then switching that account to a fee-based Freedom
22 account is objectively unsuitable, closed quote.
23       Did I read that correctly from paragraph 60?
24    A.  Yes.
25    Q.  And that's your opinion, correct?

1    A.  Yes.
2    Q.  In order to reach that con- -- that opinion,
3 that conclusion, do you include or exclude any of the
4 factors that are set forth in FINRA Rule 2111?
5    A.  I do not exclude anything in the requirements
6 of 2111.
7    Q.  Do you include in your conclusion here that the
8 factors set forth in FINRA Rule 2111 must be considered
9 in conjunction with your conclusion about an account
10 being objectively unsuitable as set forth in the quoted
11 portion of paragraph 60 that I had just read?
12       MR. SCHWARTZ:  Objection to form.  Objection,
13 compound.  Objection, mischaracterized FINRA Rule
14 2011.
15       You can answer.
16       THE WITNESS:  I can't answer that with a "yes"
17 or "no."  Can I try to explain?
18 BY MR. SUTER:
19    Q.  Sure.  Why don't you explain to us how your
20 conclusion, quote, If a commission-based account has
21 both a 0.5 percent annualized cost and a turnover of
22 less than 0.25, then switching that account to a
23 fee-based Freedom account is objectively unsuitable,
24 closed quote.
25       Please explain how that fits with FINRA Rule

1 2111.
2    A.  Okay.  You're confusing suitable with
3 unsuitable.  And your experts got it confused too.
4       And there -- we have never -- though your
5 experts try to accuse us of it -- have ever said that
6 2111 needs to be ignored.  And we have never in the
7 claim or any of the filings or any of my reports ever
8 said anything like that or have ever said what -- again,
9 what your experts wrongfully accuse us of -- that we
10 didn't take these other factors that FINRA might require
11 under 2111 into consideration.
12       We just say we didn't need to.  Because you're
13 arguing, well, under some of these criteria, it could
14 have been suitable.  We don't argue against that.  We
15 say right.  We don't disagree with that; age, investment
16 objectives that your experts go on ad nauseam
17 repeatedly, repetitively, cumulatively.
18       We say that when you're looking at what's
19 unsuitable, as opposed to what is suitable, when you
20 have something so strong, so self-evident that points to
21 that any recommendation to go from a low-cost,
22 low-turnover account to a nine to 22 times higher
23 fee-based account, that once you find that out -- which
24 you're required to do -- there is no reason to look at
25 the other requirements under 2111, because it's patently

1 unsuitable.
2       That's what we're saying.  And I'm trying to
3 help, because you guys -- I mean, I don't know if you
4 want to get it, but that's -- that's the point.  And you
5 can go down all those other arguments and you can keep
6 doing it, but -- because the Court ain't going to buy
7 it.
8    Q.  Can you point to any rule or regulation that
9 states that an otherwise suitable account becomes
10 objectively unsuitable by application of the formulas
11 that you have in your expert report?
12    A.  Well, now you're --
13       MR. SCHWARTZ:  Hold on.  Hold on.
14       Objection to form.  Objection, mischaracterizes
15 the testimony that the witness just did.
16       You can answer that question.
17       THE WITNESS:  Yeah.  Now, you're -- every time,
18 you know, you don't like the answer you get.  So I
19 gave you the answer and then -- so you try to slip
20 in a new fact.  Now you've slipped in the formula.
21 Your original set of questions relating to 2111 and
22 everything else.  And now it's, oh, but only in
23 this.
24 BY MR. SUTER:
25    Q.  Can you answer my question or have you done

36 (Pages 138 - 141)

Page 142

1 your answer?
2     A.  No, I think it's a -- I think it's an
3 incomplete hypothetical and, as phrased, I can't answer.
4     Q.  Okay.  Well, let's try it this way.  And you
5 understand here, as a -- as an expert witness, I'm
6 entitled to ask you hypothetical questions, right?
7     A.  Well, they've got to have some basis in
8 reality, and you and your experts come up with this
9 stuff that has no basis.  It borderlines on comedy.
10     MR. SCHWARTZ:  I'll interpose my -- I'm trying
11     to help.  Your question had an assumption that
12     mischaracterized the witness's prior testimony that
13     the account was suitable, but then something made it
14     unsuitable.  And that was the problem that I
15     objected to in your question, because you made this
16     assumption that there was some suitability
17     determination and then something took it away.  And
18     that was exactly the opposite of what the witness
19     had just told you.
20     And I think we're all getting a little punchy
21     before lunch, but if you want to finish up the
22     topic, finish up the topic.
23     MR. SUTER:  Well, I'm going to finish up with
24     just a question or two here and we'll resume this
25     after lunch.

Page 143

1 BY MR. SUTER:
2     Q.  Let me ask you to assume, Mr. Schulz, that in
3 this case Dax Seale conducted a suitability analysis,
4 that that suitability analysis was reasonable, and that
5 Ms. Nguyen was put into this account with her consent
6 and knowledge, and that three years later an analysis of
7 the account made on the basis of your report here comes
8 up with the numbers that you believe objectively make an
9 account unsuitable.
10     Are you with me so far?
11     MR. SCHWARTZ:  Same objections that I just did.
12     And it also mischaracterizes the evidence in the
13     case.  And --
14     MR. SUTER:  It's a hypothetical, Steve.
15     MR. SCHWARTZ:  I'm not -- I'm not finished.
16     I'm not finished.
17     MR. SUTER:  I know, but you're coaching the
18     witness, which is completely inappropriate.
19     MR. SCHWARTZ:  I'm not coaching the witness.
20     Now, you asked --
21     MR. SUTER:  State your objection as to form and
22     then we'll get on with it.
23     MR. SCHWARTZ:  My last objection was the
24     hypothetical as stated is unintelligible.  But keep
25     on adding more hypo -- finish your hypothetical and

Page 144

1 then you can ask the witness if he can answer it.
2 BY MR. SUTER:
3     Q.  Is there anything unintelligible to you about
4 the hypothetical I was in the process of asking before
5 getting interrupted?  Was there anything that you didn't
6 understand about the assumption, sir?
7     MR. SCHWARTZ:  Objection, compound.
8     THE WITNESS:  I understand the words and I
9     understand that it is a complete hypothetical and
10     has no basis in fact whatsoever.
11     And I do -- I do understand, as an expert,
12     you're allowed to ask hypotheticals regardless of
13     how baseless they are, and so continue.
14 BY MR. SUTER:
15     Q.  Before continuing, let me ask you, have you
16 made a -- a determination as to credibility of any of
17 the witnesses here, whether it's Ms. Nguyen or
18 Mr. Seale?  Is that part of your role as an expert?
19     MR. SCHWARTZ:  Objection, overbroad.
20     THE WITNESS:  Nobody asked me to do that.
21 BY MR. SUTER:
22     Q.  And are you making determinations -- when you
23 say there is no basis for -- for the facts in my
24 hypothetical, are you telling us that you have, in fact,
25 made a determination as to whether or not somebody is

Page 145

1 being truthful or not truthful in their testimony?
2     MR. SCHWARTZ:  Objection, compound.  Objection,
3     argumentative.
4     THE WITNESS:  Well, only you, Counsel.  You're
5     the one that's -- I don't mean to be mean.  It's
6     only you who is coming up with a hypothetical that
7     has no basis in fact.  It has nothing to do with
8     Ms. Nguyen or Mr. Dax Seale.  You're coming up and
9     creating a hypothetical that has no basis in fact.
10     I don't need to rely or not rely on either one of
11     their testimony.  You're just coming up with
12     something completely far-fetched and made up.
13     Go ahead.  I'm listening.  I'll answer a
14     question, but don't try to imply that it has any
15     basis to reality, because it doesn't.  And I don't
16     need to rely on or not rely on their testimony for
17     it.  That it's self-evident and we have all the
18     facts and all the evidence to prove what you're
19     saying is false.
20 BY MR. SUTER:
21     Q.  And what you're suggesting, Mr. Schulz, that
22 I'm saying that is false is that Dax Seale conducted a
23 suitability analysis?  Is that what you're saying is
24 false or fantasy?
25     A.  That is not.

37 (Pages 142 - 145)

Page 146

1    MR. SCHWARTZ: Objection. Objection,
2  argumentative. Objection, mischaracterizing the
3  testimony.
4    THE WITNESS: Right, that's not what I said.
5  BY MR. SUTER:
6  Q.  Did Mr. Dax Seale conduct a suitability
7  analysis in connection with the opening of Ms. Nguyen's
8  Freedom account?
9  A.  I have no reason to sit here today that he did
10  not perform some kind of suitability analysis.
11  Q.  All right. Is it your conclusion, sir, that
12  Mr. Seale did, in fact, conduct a suitability analysis?
13  A.  Gee, that's funny. I thought I just said that.
14  I don't have any dispute that he conducted some form of
15  suitability analysis. I have no dispute -- if you want
16  to represent that he did, I have no reason to dispute
17  that he performed some kind of suitability analysis.
18  Q.  Thank you. And have you reached a conclusion
19  as to the adequacy of Mr. Seale's suitability analysis
20  in regard to the opening of the January 2016 Freedom
21  account?
22  A.  I have.
23  Q.  And what is that conclusion?
24  A.  That it was not adequate.
25  Q.  Okay. And I -- I'm going to save this for --

Page 147

1  for after lunch in terms of what the basis is for your
2  conclusion that it was not adequate, but let me -- let
3  me ask you to assume the following in this hypothetical,
4  and then we'll break for -- for lunch.
5    Assume that the suitability analysis done by
6  Mr. Seale in regard to Ms. Nguyen's January 2016 Freedom
7  account was adequate. Okay? Can you accept that
8  premise, even though you disagree with it, for the
9  purposes of the hypothetical?
10  A.  I can assume it's your made-up hypothetical.
11  Continue.
12  Q.  Okay. Under those circumstances where
13  Mr. Seale conducted an adequate suitability analysis, is
14  it your testimony that if after three years of being in
15  the Freedom account the formula that you created results
16  in Ms. Nguyen's account having an annualized cost of 0.5
17  percent and a turnover of less than 0.25 percent, then
18  what was an adequate suitability analysis three years
19  earlier becomes an inadequate suitability analysis
20  because of how the account performed cost wise and
21  turnover wise?
22    MR. SCHWARTZ: Objection to form. Objection,
23  unintelligible hypothetical. Objection,
24  mischaracterizes the witness's testimony.
25    Go ahead, Mr. Schulz. You can answer his

Page 148

1  question.
2    THE WITNESS: Only Skip Keesal could come up
3  with a more ridiculous question than that.
4    I think the objection by counsel was -- what
5  was it? That was the word I was going to use,
6  "unintelligible." Your hypothetical is so
7  disjointed and makes -- even if I could accept all
8  the made-up hypotheticals, then you try to connect.
9  You can't do that. That was a -- that was a
10  ridiculous question that I can't -- it was
11  unintelligible. I can't respond. It just went,
12  well, what, what, what, whoa, way over here. It
13  was -- there was no connection what so all --
14  whatsoever. No, can't respond.
15  BY MR. SUTER:
16  Q.  All right. Let me ask it a different way, and
17  then we'll break for lunch. And if you can't respond,
18  we'll see where that leads us.
19    Assume that Mr. Nguyen's account was suitable
20  and that Mr. Dax Seale performed an adequate suitability
21  analysis when the account was opened.
22    Are you with me so far?
23  A.  That he performed an adequate suitability
24  analysis. Got you.
25  Q.  Right. How do your metrics, Metric 1 and

Page 149

1  Metric 2, operate to make that suitable account
2  determination unsuitable? How do the -- how do the two
3  connect?
4    MR. SCHWARTZ: Objection, unintelligible
5  hypothetical, asked and answered, mischaracterized
6  his prior evidence.
7    But go ahead and explain it to him, if you can,
8  sir.
9  BY MR. SUTER:
10  Q.  Can you answer that question?
11  A.  I think I can answer that question.
12  Q.  Okay. Please do.
13  A.  We know from the regulators, their releases or
14  their notices. We now know from your internal policies
15  what your brokers -- your licensed brokers -- and let's
16  remember that Dax was also a registered investment
17  advisor or registered -- an investment advisor
18  representative, so he absolutely had a fiduciary duty.
19    We know that he was required, when going
20  through a suitability analysis, to evaluate the named
21  client, Ms. Nguyen's, commission account as to issues
22  relating to cost and turnover to determine if it would
23  be a suitable recommendation to recommend a fee-based
24  account that could be anywhere from nine to 22 times
25  higher. And we know now, because -- not because of my

38 (Pages 146 - 149)

Page 150

1  formula. We didn't need my formula to do this. We just
2  took the -- my formula, throw my -- you kept throwing in
3  my formula. You don't need my formula. Throw it out.
4  Like somehow my formula made her account unsuitable.
5      Dax Seale was required to go through that math.
6  And that's the regulations. That's why you're in
7  trouble, that's why you're going to lose this case.
8  Because he was required, and all your brokers are
9  required, to do that. And we know that Dax Seale didn't
10  do it, because if he did it, the numbers for the named
11  client go so off the chart, that to recommend for this
12  low-turnover, low-cost-basis account to go up -- what do
13  we now know? It's 22 times higher -- was patently
14  unsuitable, objectively unsuitable.
15      And so that's the story you have to live with.
16  And it has nothing to do with my formula.
17    Q.  Do you go so far as to say what Mr. Seale did,
18  according to your view of the world, was fraudulent?
19      MR. SCHWARTZ: Objection, argumentative.
20  Objection, calls for a legal conclusion.
21      THE WITNESS: Yeah, I mean, I was never --
22      MR. SCHWARTZ: You can go ahead.
23      THE WITNESS: I was never asked to give an
24  opinion one way or the other on any issues as it
25  relates to fraud, and I've given no such opinion.

Page 151

1  It's not in my report, it's not in my rebuttal
2  report, and I have nothing to add.
3  BY MR. SUTER:
4    Q.  You haven't reached a conclusion one way or
5  another?
6    A.  I didn't understand.
7    Q.  You have not reached a conclusion one way or
8  another, correct?
9    A.  Well, if I'm not asked to look at it, I don't
10  go -- I don't go making conclusions that I wasn't asked
11  to draw.
12      THE VIDEOGRAPHER: Mr. Suter, this is the
13  videographer. I need a media break.
14      MR. SUTER: All right. Let's do that. Let's
15  take our lunch break, come back at 15 minutes past
16  the hour? Does that work?
17      MR. SCHWARTZ: So you want to take about an
18  hour break?
19      MR. SUTER: No, 15 minutes past the hour. I
20  have 10:43 now. That would be 11:15; or 2:15 your
21  time, Steve; or 12:15 Mr. Schulz's time.
22      MR. SCHWARTZ: Enough for me if it's enough for
23  everyone else.
24      THE WITNESS: Can I -- enough for me.
25      MR. SUTER: Does that work for you?

Page 152

1      THE WITNESS: Enough for me.
2      THE VIDEOGRAPHER: Let me go off the record.
3      MR. SUTER: Thank you.
4      THE VIDEOGRAPHER: Going off the video record
5  at 1:43. This ends Media Unit 2, No. 1.
6      (Lunch recess taken.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 153

1              CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
4  COUNTY OF HILLSBOROUGH
5
6      I, the undersigned authority, certify that
7  DOUGLAS J. SCHULZ, appeared remotely before me via
8  videoconference and was duly sworn.
9
10      WITNESS my hand and official seal this 19th day
11  of July, 2021.
12
13
14
15      _Valerie a. Hance_
                 _____
16        Valerie A. Hance, RPR
17        Notary Public - State of Florida
18        My Commission Expires: 09/17/24
19        Commission No. HH010389
20
21
22  Type of Identification Produced: Driver's License
23
24
25

39 (Pages 150 - 153)

Page 154

```
1              REPORTER'S CERTIFICATE
2
3  STATE OF FLORIDA
4  COUNTY OF HILLSBOROUGH
5       I, Valerie A. Hance, Registered Professional
   Reporter, certify that I was authorized to and did
6  stenographically report the deposition of DOUGLAS J.
   SCHULZ; and that a review of the transcript was
7  requested; and that the transcript is a true and
   complete record of my stenographic notes.
8
        I further certify that I am not a relative,
9  employee, attorney, or counsel of any of the parties,
   nor am I a relative or employee of any of the parties'
10 attorney or counsel connected with the action, nor am I
   financially interested in the action.
11
12
        Dated this 19th day of July, 2021.
13
14
15
16
17
18
19  Valerie a. Hance
    _____
20      Valerie A. Hance, RPR
21
22
23
24
25
```

Veritext Legal Solutions
800-726-7007                                    305-376-8800

**&**

**&**   1:7 2:2,7,20 4:5
4:14,15,19,22,24
5:2 22:4 73:24

**0**

**0.05**   127:7
**0.25**   107:9,16 108:9
108:18 109:3,23
110:21 112:6,21
113:8 118:12,20
119:15 120:8 127:8
127:18 135:23
136:6,15,24 138:21
139:22 147:17
**0.5**   85:8,16 94:21
95:22 96:13,18
97:23 100:18
101:19 102:3,22
103:1,19 118:11,19
119:14 120:7
127:16 135:22
136:5,13,23 138:20
139:21 147:16
**0.50**   98:14
**09/17/24**   153:18

**1**

**1**   1:22,22 4:3 73:5,6
73:9 83:18 89:18
148:25 152:5
**10**   64:2,3 65:21
74:20,23
**1000**   2:12
**10:05**   1:14 4:2
**10:43**   151:20
**11**   129:5 130:6
**1150**   30:20 52:12
63:3,5
**11:15**   151:20
**11:41**   73:6

**11:45**   72:21
**11:50**   73:9 116:25
**123**   80:25 81:1
**12:15**   151:21
**14**   81:25
**15**   64:2,4 76:16
151:15,19
**153**   3:3
**154**   1:22 3:4
**16**   1:13 4:2
**19041**   2:3
**195**   1:6
**1980**   46:15 73:15
**1989**   74:6
**1993**   76:17
**19th**   153:10 154:12
**1:30**   137:14
**1:43**   1:14 152:5

**2**

**2**   73:9 104:5 149:1
152:5
**20**   65:9,12
**2002**   34:1 68:13,22
75:14
**2003**   69:7
**2006**   69:18 76:17
**2011**   139:14
**2016**   16:13 146:20
147:6
**2021**   1:13 4:2 39:14
39:15 51:25 52:1
61:3 66:9 81:5
122:22 123:2
153:11 154:12
**2111**   136:20 139:4
139:6,8 140:1,6,11
140:25 141:21
**22**   125:21 140:22
149:24 150:13
**23**   50:16

**24988**   153:15
154:19
**25**   36:19 37:1 39:15
52:1
**2:15**   151:20

**3**

**3**   74:19
**30**   6:10,13 37:2
53:14 60:22 64:1
106:13 119:7
**301**   7:3
**33607**   2:13
**33716-1102**   2:17
**34**   129:13,17
131:23 132:1
**361**   2:3

**4**

**4**   39:14 61:3 66:9
81:5 123:2
**40**   60:22 61:17
72:19 93:21 95:9
104:13 129:9 130:2
130:4
**4221**   2:12
**45**   129:10 130:2,4,9
132:1
**450**   2:7
**48**   81:25 82:3 83:1
83:9 86:4,12 89:7
89:17 90:14 133:23
**49**   82:5 86:4,12
89:7,25 90:18 91:3
**4th**   51:25

**5**

**50**   52:25 53:5 82:5
85:8,16 86:4,12
89:7,25 91:24,25
92:11 94:21 95:22
96:9,13,17 97:23
98:3,14 100:18

101:19 102:3,22
103:2,19
**51**   82:5 86:4,12
89:8,25 93:7,17
94:2,10,15 96:10
96:15,19 102:2,7
125:19
**52**   82:5 125:19
**53**   82:5 83:1,9 85:7
94:20 95:8 96:13
97:24 100:17 101:3
101:18,24 102:8,22
103:19
**54**   104:4,7,9
**55**   105:5 106:1,10
**57**   107:6 113:14,23
114:15
**58**   117:6,8
**59**   45:6 129:5,14,18
129:25 130:6

**6**

**6**   3:2
**60**   118:9,25 119:4
119:12 127:6 128:1
135:19,21 136:12
138:23 139:11
**62**   133:23
**65**   52:25
**650**   49:14 52:11,23

**7**

**7**   74:4,6,10,13
79:10,11,23
**70**   46:13
**70s**   47:13
**75**   131:1,11,23
132:21
**75.5**   132:18
**77**   46:13,14,23
**78**   46:23

**8**

**81252**  7:3
**82**  46:14
**85**  52:21
**880**  2:16
**89**  48:18,23
**8:20**  1:6

**9**

**9**  74:20,23
**90**  52:16,18,21,23
**90s**  48:14 74:11
**94133**  2:8
**95**  52:16

**a**

**a.m.**  1:14 4:2
**aas**  1:6
**ability**  83:14 85:2
**able**  14:22 23:17
  38:4 64:21 103:10
  103:15 126:12
**absolutely**  149:18
**absurd**  110:7
**abusive**  17:14
**accept**  147:7 148:7
**accepted**  98:5
  133:11
**accommodate**
  137:16
**account**  15:13
  16:12 31:9,19
  43:24 44:17 45:4
  89:19 107:8,9,10
  107:18 108:8,9,12
  108:17,19 109:2,4
  109:10,15,16,18,22
  109:24,25 110:21
  110:22,23 112:6,7
  112:20,21,22 113:7
  113:9,10 118:10,13
  118:13,14,19,20,21

119:13,15,16 120:7
120:9,9,16,20,21
120:22,23 127:16
127:18,19,25 130:5
133:25 134:1,17,22
135:22,24,25 136:1
136:5,7,7,22,24,25
138:19,21,22 139:9
139:20,22,23
140:22,23 141:9
142:13 143:5,7,9
146:8,21 147:7,15
147:16,20 148:19
148:21 149:1,21,24
150:4,12
**accounts**  22:6,6
  43:23 44:3,11,15
  44:19,24 45:7
  88:12 119:23,23
  125:10,11 127:23
  129:18 130:9
  131:11
**accurate**  17:20
  33:17 124:21,25
  125:1
**accurately**  14:20
**accuse**  140:5,9
**accused**  71:16
**acknowledge**  5:9
**acknowledgement**
  72:3
**acronym**  60:3
**acting**  59:13 67:1,6
  79:16,22,22
**action**  22:3 48:10
  48:23 49:1,19 50:3
  50:13,20 51:3,7
  154:10,10
**actions**  47:21,24
  48:3 61:24,24

**activities**  79:20
**activity**  31:20,23
  43:22 44:7,12 45:4
  89:20 107:17
  109:24 110:22
  113:9 118:13
  135:25
**acts**  67:9
**actual**  125:22
  130:7
**ad**  115:22 140:16
**add**  16:7 83:15
  100:22 112:14,16
  151:2
**adding**  143:25
**addition**  66:23
**additional**  95:13
  97:1
**address**  7:2,11,12
  7:17 16:17 35:23
  106:22 107:3
  110:13
**addressed**  79:7
**addresses**  109:9
**addressing**  39:11
**adequacy**  146:19
**adequate**  146:24
  147:2,7,13,18
  148:20,23
**adhere**  138:18
**administering**  5:11
**administrative**
  5:13 77:5,6
**admonished**  116:4
**advice**  13:25
**advisor**  35:3 76:8
  78:15,19 79:12,15
  79:16,17,18,22
  104:23 149:17,17
**advisors**  44:14
  63:21 79:4,24

**advisory**  80:12
**advocate**  62:12,19
  62:21
**affirmed**  54:18
**age**  13:8 80:21
  140:15
**agitated**  115:11
**ago**  7:14 15:21
  20:12,21 38:3
  65:21 91:12 101:21
  131:21
**agree**  5:19 17:23
  68:20 85:24 90:8
  94:2
**agreement**  5:17,17
  12:5 15:14 16:12
  70:8,25 72:4,11
**agreements**  11:12
**agrees**  5:21
**ahead**  12:19 23:24
  56:22,25 62:8,24
  90:24 99:14 104:20
  105:23 109:7 110:4
  111:7 114:21
  122:16 123:15
  145:13 147:25
  149:7 150:22
**ain't**  141:6
**allow**  24:21 116:6
**allowed**  53:7
  144:12
**allows**  74:14,16
**alterations**  17:5
**ambiguous**  86:25
**amended**  38:5
**amount**  31:20 58:7
  63:14,19 77:21
  123:12 124:6 126:5
**amounts**  35:3
**analyses**  56:7 86:19

**analysis** 40:14,16
  43:4 86:5 89:18,21
  104:5 123:10
  131:13 143:3,4,6
  145:23 146:7,10,12
  146:15,17,19 147:5
  147:13,18,19
  148:21,24 149:20
**analytics** 42:16,19
  42:21 45:22,25
  47:16
**analyze** 42:11
  45:13 127:23
**analyzed** 131:12
**analyzing** 43:3
**anderson** 22:14,16
**annual** 86:4 89:18
  89:20,23
**annualization**
  125:6
**annualize** 125:4
**annualized** 118:11
  118:19 119:14
  120:8 125:24 126:1
  126:4 127:7,17
  135:23 136:6,14,23
  138:20 139:21
  147:16
**annualizing** 125:25
**answer** 11:6 12:19
  16:6,9,16 17:17,18
  18:11 23:3,24 25:5
  25:8 26:3,6,15
  27:25 28:17 30:18
  30:22 32:13,17
  33:11 34:6,12,15
  38:6 39:17,21
  40:22 49:22 50:5
  53:20 56:20 58:13
  62:8 64:17 67:10
  70:10,18,20 71:4,8

78:21 84:3,13,20
  89:1,2,4 90:6 91:16
  93:12 94:12 98:24
  100:8 105:23
  107:24 108:2,22
  110:5 111:7,8,8,14
  111:18,21,23
  112:13 114:9,10,12
  118:6 119:7 128:22
  129:4 131:17
  132:14 133:3
  134:18 135:4,5,9
  135:13 137:10,24
  138:4,6,9,11
  139:15,16 141:16
  141:18,19,25 142:1
  142:3 144:1 145:13
  147:25 149:10,11
**answered** 16:15
  83:13,14 85:1
  102:17 112:8,15
  117:25 120:11
  149:5
**answering** 70:15
  90:7 102:14
**answers** 10:14
  18:16 112:9 116:19
  116:21
**anybody** 17:21
  57:5 85:20,21,22
  99:4 120:25
**anymore** 71:21
**anyway** 99:16
**aosc20-23** 5:14
**apologies** 97:21
**apologize** 32:12
  49:15 80:21 128:11
**appeal** 54:14,18,18
**appear** 24:3
**appearances** 2:1

**appeared** 153:7
**appears** 98:22
**applicable** 28:24
**application** 141:10
**apply** 133:24
**appreciate** 9:10
  19:10 24:1 71:25
  111:10 132:24
**appropriate** 17:1
  29:6,19 37:5 85:9
  85:17 94:22 98:16
  100:10,19 102:3,23
  103:20 111:11
  116:24 137:13
**appropriately** 29:2
**approximate** 49:1
  63:8,22 65:19
**approximately**
  36:3 52:12,25
  60:19 73:15 76:17
  122:25 131:11
**arbitration** 6:13
  52:13 53:12,13
  54:15 60:4
**arbitrations** 51:10
  52:17
**area** 24:5
**areas** 56:16
**argue** 79:21 140:14
**arguing** 140:13
**argument** 88:12
**argumentative**
  62:3 70:3 88:5,15
  91:14 114:16
  126:24 145:3 146:2
  150:19
**arguments** 17:15
  17:19 141:5
**arrangement** 5:12
  5:15

**arrangements** 11:8
**arriving** 97:22
**art** 123:4,9
**arthur** 40:12
**article** 69:1,6,11
  109:20
**articles** 60:17,19,22
  60:23 61:1,6,8,9,12
  103:21 110:12
**asked** 12:2 13:7
  16:14,17 28:21
  30:4 34:9,25 35:23
  38:16,18,20 39:4,8
  48:8 51:23 66:12
  68:2,5 70:5 71:7
  90:4 102:14 106:22
  107:3,5 112:8
  114:5 117:25
  120:11 121:12,15
  127:23 135:12
  138:12 143:20
  144:20 149:5
  150:23 151:9,10
**asking** 12:8,24 13:5
  15:7,18,19 21:16
  26:13 29:12,21
  38:22 39:12 40:23
  42:12,14,15 44:5
  50:25 53:4 71:20
  84:14 88:25 89:15
  99:4,10 102:15
  103:17 111:5
  117:14 121:7
  130:21 144:4
**asks** 54:8 80:9
**aspect** 20:8 95:10
**assertible** 29:2
**assets** 44:16
**assignment** 42:20
  47:16

**assignments** 39:3
**assist** 61:23 66:10
  82:7 85:12
**assistance** 21:6
  99:2
**assistant** 67:2,7,9
**assisted** 67:2,22
**assisting** 68:10
**assists** 66:20
**associate** 4:22
**associated** 57:16
**associates** 1:7 4:5
  4:15,20 22:4
**association** 60:4
**assume** 6:8 11:20
  17:18 143:2 147:3
  147:5,10 148:19
**assumed** 87:2
  135:12
**assumes** 48:17
  50:14 94:6 109:5
  110:2 112:25 135:6
  135:12
**assuming** 94:7
**assumption** 142:11
  142:16 144:6
**attacks** 115:8,22
**attempt** 26:12
  119:8
**attention** 94:20
  102:21 107:6 117:6
  118:8
**attorney** 2:4 30:7
  59:2 67:12 154:9
  154:10
**attorneys** 2:17 5:8
**attributes** 22:8
**author** 83:3
**authored** 68:12
**authority** 153:6

**authorized** 154:5
**automatically**
  129:6
**available** 55:2
  74:17 122:11 131:9
**avenue** 2:3,7
**averaged** 125:15
**aware** 55:1 67:11
  67:12 98:19 108:10
  108:25 120:3,24
**azar** 27:8,11,15
  37:19

**b**

**b** 3:6 125:19
**back** 16:21 21:12
  25:4 26:22 32:7,17
  33:2,11 35:20 46:8
  49:9 53:23 56:24
  58:15 63:18 72:21
  73:8 80:22 84:23
  84:23 89:14 104:20
  111:16,18,20,23
  112:10 116:18,20
  125:3,20 129:2
  137:6,9,19 151:15
**background** 10:3
  15:8 25:1 42:4
**backgrounds** 42:1
**bad** 100:2 114:24
**bar** 60:4
**base** 129:13
**based** 21:4 22:6
  23:4 34:19 44:9,16
  44:19,24 53:2 96:3
  96:9 100:1 107:8
  107:10,18 108:12
  108:17 109:2,22,24
  110:23 112:6,7,19
  112:22 113:7,9
  118:10,14,18,21
  119:13,15 120:7,9

120:16,21,22 126:5
  127:16,18 133:25
  135:22 136:1,5,7
  136:22,25 138:19
  138:21 139:20,23
  140:23 149:23
**baseless** 144:13
**basic** 21:1 44:10
**basically** 31:18
  41:22 92:21 121:13
**basis** 45:8 78:3,13
  85:8,17 94:21
  95:22 96:9,13,17
  97:23 98:4,14
  100:9,18 101:19
  102:3,22 103:2,20
  113:13 142:7,9
  143:7 144:10,23
  145:7,9,15 147:1
  150:12
**bathroom** 71:19
**battle** 59:3
**bear** 73:22
**beginning** 38:13
  77:19
**behalf** 1:3
**believe** 23:2 24:7
  24:17 26:16 29:5
  32:11 59:9 71:11
  106:10 130:4
  135:11 143:8
**ben** 4:13 5:19 6:4
  64:9
**ben.suter** 2:8
**bernard** 2:6
**best** 20:19 31:18,21
  36:22 38:2 40:2
  53:4 58:7 80:23
  83:14 84:21 85:1
  126:7 129:6 131:3

**better** 69:21
**beyond** 12:16
  13:15 15:1 34:7
  71:17
**big** 39:24 64:25,25
  65:1
**billings** 58:18,20
**bills** 57:24,24
**bind** 12:25
**binder** 8:22,25 9:1
  9:4 80:15
**binders** 9:11
**binding** 12:6,15
  13:13 14:12
**bit** 10:2 50:10 57:7
  80:6 103:9 104:2
  105:17
**bites** 115:3
**bland** 14:21
**board** 59:23 67:19
  69:11,15,21 70:22
  71:9
**book** 33:24 68:12
  68:17,18,22,25
  75:13,17
**booklet** 10:9 16:23
  16:23
**books** 61:15
**borderlines** 142:9
**boulevard** 2:12
**bound** 13:4 15:13
  16:3,12
**bounds** 24:16
**boutique** 64:25
**boy** 2:12
**brain** 61:19 92:13
  93:25
**branch** 75:7
**break** 9:11 71:19
  72:20 89:3 90:4
  110:4 115:13

**[break - churning]** Page 159

116:20,24 124:1
128:19,23 137:4,8
137:11 147:4
148:17 151:13,15
151:18
**bring** 61:24
**broad** 62:9 89:3
103:14 121:21
**broker** 60:11,13,14
61:25 63:23 64:4
65:6,11 74:16 75:2
75:5,8 78:25 79:10
79:11,11,23 104:23
**brokerage** 33:25
63:15 66:7 68:12
75:10,14 91:8
92:18,19
**brokers** 44:14,15
63:21 149:15,15
150:8
**brought** 9:12
124:11
**bryce** 2:6 4:21
**bryce.cullinane** 2:9
**bully** 18:23,23
**bunch** 14:8
**business** 13:21
61:17,18 63:10,14
73:14 77:21,24,25
78:2,18 79:2 93:21
95:9,10,10
**busy** 78:6
**buy** 85:10,18 94:23
100:20 102:5,24
141:6

**c**

**c** 125:19
**cadre** 13:22 55:24
**calculate** 94:16
**calculation** 88:11
125:23

**calculations** 124:15
124:25
**calculator** 130:14
132:16,21
**california** 2:8 54:2
54:11,13
**call** 14:6 20:24 21:9
21:9,11,15,23,24
90:14
**called** 7:10 39:1
65:15 69:2
**calling** 35:6
**calls** 13:15 15:15
15:23 16:15 18:8
21:17 53:1,18 93:2
93:19 98:8,21
104:18 108:20
120:12 129:20,22
130:16 150:20
**candid** 17:8
**capable** 14:20
**capacities** 80:2
**capacity** 12:13
23:21 29:14 59:14
65:11 67:7 68:15
**career** 64:21
**carillon** 2:16
**carlton** 2:11 4:18
**carltonfields.com**
2:13
**cart** 97:4
**case** 1:6 4:15 8:14
9:2 11:16 15:5,12
21:1,6,14 22:2,8,10
22:11,14,17,21,24
22:25 23:5,6,14,16
23:18,24 24:9,11
24:12,19 25:9,11
25:14,14,17,20,22
26:3,6,10,13,14,24
27:1,5,9,12,19,23

28:7,8,14,16,19
29:8,10,20,21,23
30:14,16 34:8,10
34:11 35:2,13 36:1
37:11,16,21,21,25
38:1,16 39:5,9 40:3
40:4,6 41:1,7,12
43:5 47:25,25
48:15,18,22 49:5
50:1,13,20 51:2,6
51:14,24 52:3,5
53:14 54:2,6,21
55:1,5 56:8,13 57:4
57:6,14,14,17,17
58:3,8,15 59:14
65:3 70:8,25 72:5
72:12,14 88:13
98:16 106:21 107:5
107:14,19 108:7,11
108:14,16 110:8,8
121:6,24 135:2,18
143:3,13 150:7
**caseload** 66:14
**cases** 21:2 27:15
30:20,21 31:25
37:20 38:3 47:15
47:18,20,21 48:2
51:12 52:9,11,12
52:13,17,25 56:9
56:14,19 57:9 63:3
93:24
**categories** 47:22
**caught** 128:8
**causes** 80:21
133:18
**caution** 56:15
**caveat** 64:17
**ceh** 1:6
**cell** 7:25
**certain** 17:9 84:16
88:12 109:16

**certificate** 3:3,4
153:1 154:1
**certification** 81:10
81:14
**certify** 153:6 154:5
154:8
**cetera** 67:19
**challenged** 54:16
**chance** 99:7,9
**change** 47:5 81:18
83:2,2,9,21,23
**changed** 63:9 76:12
77:15,17 82:19
91:16 102:13
**changes** 16:25 17:5
17:9 18:1,4,6,18
82:25 123:24
**changing** 91:11
**chapter** 75:20
**characteristics**
22:8
**characterizing**
133:3
**charged** 58:8
**charging** 31:20
**chart** 150:11
**chats** 41:15
**chatting** 72:1
**check** 128:19
**checked** 124:20
**checker** 67:15
**checks** 69:9
**chimicles** 2:2 5:2
11:8,13 27:17
37:12 38:15
**chimicles.com** 2:4
**choose** 19:19
**chunks** 137:8
**churning** 31:1,3,4
31:6,7,8,16,22 32:1
32:4 33:18,22 34:4

34:11,22 101:9,10
106:14
**circuit** 24:8
**circumstances**
135:3 136:11
147:12
**citation** 117:9
**cite** 69:4
**civil** 1:18 50:17
**clabby** 2:11 4:17,17
**claim** 38:5,5 44:22
44:23 45:2,8 140:7
**claimant's** 45:2
**claimants** 19:16
44:10 60:7 61:23
63:11,12,17,20
66:6
**claims** 44:10
**clarification** 51:21
118:4 132:25
**clarify** 60:8 117:17
**clarifying** 7:18
16:20
**class** 22:3 47:21,24
48:3,10,23 49:1,19
50:3,13,20 51:3,7
81:10,14
**clay** 2:20 4:23
**clear** 7:14 15:2
16:9 30:11 35:9
38:24 51:18 67:24
71:20 93:13 113:4
**clearly** 57:3
**click** 121:4
**client** 23:18 24:9
28:15 30:7 43:16
125:20,21,22
149:21 150:11
**client's** 31:14,18,21
**clients** 22:6 44:11
78:9,13 92:20

93:22
**close** 64:21 126:12
132:20
**closed** 75:19 87:15
113:10 115:23
119:16 127:19
129:18 131:13
133:21 134:2 136:8
137:1 138:22
139:24
**coaching** 143:17,19
**colleagues** 38:15
**college** 46:8
**colorado** 7:3
**column** 125:3
**columns** 45:19
124:16 125:9
**combined** 95:14
**come** 21:2 41:25
43:16 64:21 65:1
72:21 88:20 95:15
96:17,25 98:10
99:8 101:2 103:1
126:12 127:5,7
135:15 142:8 148:2
151:15
**comedy** 142:9
**comes** 45:11 56:3
70:21 143:7
**comfortable** 52:18
**coming** 95:13,24
97:17 102:1 125:5
145:6,8,11
**comment** 17:6 18:5
18:18 27:22 72:2
**comments** 23:3
**commission** 22:6
43:22,24 44:11,24
77:16 107:8 108:7
108:17 109:2,15,22
110:20 112:6,19

113:7 118:10,18
119:13 120:7
125:10 127:16
134:1 135:22 136:5
136:22 138:19
139:20 149:21
153:18,19
**commissions** 31:10
43:23 44:13
**commodities** 74:18
**common** 68:4
**communicated**
36:10,11,23 41:5
55:15,19,20,20,22
55:25 100:6
**communications**
25:19 30:7 82:11
82:12
**company** 78:7
80:12
**complete** 6:20
10:13 18:17 32:13
32:15 47:3 123:24
144:9 154:7
**completed** 16:22
46:22 102:7
**completely** 9:16
143:18 145:12
**compliance** 75:10
95:11
**complicated** 71:13
**compound** 43:8
88:15 90:21 96:20
98:20,21 100:21
101:13 110:2,24
111:4 112:11 127:1
139:13 144:7 145:2
**computer** 8:1,5,8,9
121:3,17,20 122:12
131:8

**computers** 121:22
**con** 139:2
**concept** 31:16
93:20
**concepts** 68:21
93:4
**concerning** 55:15
55:22
**conclude** 126:15
**conclusion** 12:8,24
13:5,6,7,16 15:16
15:18,24 16:15
35:7,7 50:25 53:18
88:25 98:15 100:17
102:1 103:19 109:1
109:21 113:12,14
113:23 120:6
124:23 125:5
127:15 128:1 132:6
135:19 138:17
139:3,7,9,20
146:11,18,23 147:2
150:20 151:4,7
**conclusions** 35:10
35:11 119:3 124:10
126:22 151:10
**conduct** 35:4 101:2
116:10,12 146:6,12
**conducted** 1:11
7:20 77:24 143:3
145:22 146:14
147:13
**conducting** 116:13
**confident** 87:12
**confidential** 56:18
**confidentiality**
64:11 66:3,5 70:8
70:25 71:12 72:4
72:11,13
**confirm** 90:12,17
106:9

**confirmation** 28:11
**conflicts** 20:25
  21:23
**confused** 10:25
  83:7 114:4 140:3
**confusing** 21:14
  22:9 140:2
**confusion** 133:18
**conjunction** 133:17
  139:9
**connect** 148:8
  149:3
**connected** 8:7
  154:10
**connection** 72:5,12
  83:6 128:17,20
  146:7 148:13
**consent** 5:15 143:5
**consider** 61:15
  62:12,15
**consideration**
  133:10 136:21
  140:11
**considered** 89:20
  109:17 139:8
**consistently** 32:22
**consists** 60:6
**consultant** 7:6 23:1
  23:22 27:4 28:5
  56:17 65:16
**consulted** 36:3,11
  55:14,17 95:24
  103:1
**consulting** 24:11
  30:10 65:13,18
  76:11 77:9,14 78:2
  80:13
**contacted** 11:15
  20:12,13,15,17
  22:1,7 57:21

**contains** 17:15
  80:16
**context** 86:15
  135:18
**continue** 144:13
  147:11
**continuing** 144:15
**contract** 11:16,18
  11:22 12:7,10,10
  12:11,14,14,25
  13:4,12,12,24 14:3
  14:25 15:13 16:3
**contract's** 13:4
**contradicted** 91:21
**controverting** 87:5
**conversation** 41:21
**conversations**
  41:15
**convey** 133:20
**copy** 19:17 41:12
**correct** 6:10,11,14
  6:17,21 9:5 16:4
  27:6,7 32:1,4 33:8
  33:16 37:12,15,17
  37:18 40:7,18
  42:17 47:1 50:9
  51:24 52:1 54:14
  54:19 58:18,25
  59:2,4,17,21 61:1
  66:25 68:13,24
  69:2 73:15,18 74:4
  74:7,11,24 75:2,3,5
  75:6,8,9,11,12,15
  77:7,10,18 78:25
  79:25 81:20,23
  90:16 94:17 96:2
  96:10,15 106:3
  107:2 110:23 112:3
  121:10,14 122:23
  127:20,21 138:25
  151:8

**corrections** 16:25
**correctly** 118:23
  138:23
**cost** 31:17,24 43:14
  43:14,23 45:4 85:8
  85:16 86:5 89:18
  89:21,23 94:21
  100:18 101:22
  102:3,22 103:22
  104:2 118:11,19
  119:14 120:8
  125:13 127:17
  135:23 136:6,14,23
  138:20 139:21
  140:21 147:16,20
  149:22 150:12
**costs** 44:7 92:20
  127:7
**counsel** 1:16 4:12
  4:18 5:14 16:24
  19:4,15,16,24 20:1
  22:25 25:20 28:2
  28:11 29:8,14 30:8
  42:10,25 54:24
  56:5,13 58:22
  59:13 70:17 82:11
  84:6 99:22 121:24
  122:1 124:5 145:4
  148:4 154:9,10
**counselor** 135:9
**county** 153:4 154:4
**couple** 44:21 45:19
  54:7 66:12,18 76:6
  79:8 125:4
**course** 38:17 46:7
  46:11,24 47:2,3,7
  47:13 70:21 72:1
  83:22 121:13
  122:21 125:24
**courses** 47:6,11

**court** 1:1 4:6,10 5:6
  5:9,13 6:6,16 10:6
  10:8,14 16:22
  26:21,25 32:16
  33:10 35:19 38:23
  52:13,25 53:12,22
  54:13,17,17,18
  129:1 141:6
**courts** 52:21
**cover** 81:9
**create** 91:2,10,24
  92:2,6 93:6,9 104:8
  104:11,12 124:18
  124:19
**created** 83:18,24
  84:2,7,7 85:4 86:21
  88:2,10,19 90:13
  90:18,19,22 91:15
  92:3,4 94:9,11
  147:15
**creating** 84:10
  92:23 145:9
**creation** 89:6
**credentials** 21:4
**credibility** 144:16
**criteria** 60:15
  129:14 140:13
**criticisms** 119:21
**cross** 28:22 59:10
**crunch** 97:8 130:14
  130:18
**crunched** 127:14
**crunching** 126:16
**cullinan** 4:21,22
**cullinane** 2:6
**cumulatively**
  140:17
**currently** 74:1
**cutting** 48:13
**cv** 1:6

**d**

**d** 3:1 125:19
**dallas** 46:25 47:2
**damage** 87:3 92:17
  123:11
**damages** 94:16
  123:18
**data** 40:14,16
  42:11,16,19 43:2
  43:19 44:6,23
  45:13,22,24 47:16
  87:3 92:17 123:6,8
  123:14,25 124:11
  124:15 126:21
  127:22
**date** 1:13 49:1
**dated** 51:24,25
  66:9 154:12
**dax** 35:3 143:3
  145:8,22 146:6
  148:20 149:16
  150:5,9
**day** 15:3 91:7,9
  124:7,8,8,9 153:10
  154:12
**deal** 27:8
**dealer** 60:13,14
  65:6 74:16 75:2,5,8
  79:11
**dealers** 60:11 61:25
  63:23 64:4 65:11
  78:25
**dealing** 27:11,14
  93:22
**dealings** 40:25
**deals** 22:4
**dean** 64:22
**debbie** 77:1,2,3,4
**decades** 15:21 79:8
  106:2,11

**decent** 63:14,18,19
  123:12 124:6
**decide** 102:16
**decided** 47:9 78:8,9
**decision** 54:14
**decisions** 13:18
**deemed** 130:10
**defendant** 1:8,16
  2:17 4:15,19 62:17
**defendant's** 22:13
**definitely** 33:17
**definition** 31:12
  39:6 57:25 84:15
  84:18 95:4 127:24
  133:11
**degree** 45:18
**demands** 78:6
**depending** 80:20
**deposed** 5:24 6:9
  9:18 10:4
**deposition** 1:11 4:3
  4:8 5:9 7:20 8:5
  15:3 16:22 19:6,13
  20:8 23:15 24:12
  36:2 64:16 70:21
  71:3 72:2 121:14
  122:10 138:18
  154:6
**depositions** 4:9
  10:3
**describe** 38:10 60:1
**described** 21:1
  43:7 45:10 58:22
**description** 118:5
**designated** 22:21
  23:20 50:19,22
  53:6
**designed** 24:4
  98:22
**desk** 8:1

**detail** 128:8
**determination**
  85:13 131:9 136:11
  142:17 144:16,25
  149:2
**determinations**
  144:22
**determine** 86:20
  87:14 98:3,4,15
  131:10 133:24
  134:15,21 149:22
**determined** 43:1
  85:7 123:14
**determining**
  129:19
**devices** 7:19,25
**difference** 21:16
  78:17
**differences** 78:20
  78:22
**different** 90:1 92:5
  92:24 96:7 98:10
  99:8 101:23 102:15
  111:6 121:4 131:16
  148:16
**difficult** 9:15 57:7
**direct** 3:2 6:1
**directing** 94:20
  102:21 107:6 117:6
  118:8
**directions** 42:9
  126:19,20
**directly** 42:10 59:3
**directors** 59:24
**disagree** 140:15
  147:8
**disallow** 53:19
**disallowed** 53:15
  54:1 55:9
**disclose** 28:15

**disclosed** 26:5 28:6
**disclosing** 24:18
**discouraged** 47:9
**discovery** 1:16 23:2
  23:17 24:10 26:8
  28:7 29:10 56:12
  100:11
**discretionary** 78:3
  78:13
**discuss** 23:5 111:5
**discussed** 41:20
  56:5 82:14,16
  85:21,22 120:14
**discusses** 109:6
**discussions** 39:10
  82:18 83:3,10
**disjointed** 148:7
**dispute** 54:3
  146:14,15,16
**distinguishing**
  30:10
**district** 1:1,1 4:6,6
**diversified** 73:17
**division** 1:2 4:7
**doctor** 14:13
**document** 54:3
  81:3 103:24 109:21
  119:11
**documents** 8:19
  9:13 13:7,9,19 14:5
  14:8 37:24 38:1,18
  38:19,20 57:5 87:8
  102:25 103:18
  106:8 119:2
**doing** 10:17 29:18
  59:11 63:18 105:2
  123:10,17 125:8
  141:6
**doings** 52:10
**donaldson** 2:2 5:3

[double - expired]

**double** 138:2
**douglas** 1:11 4:4
 5:22 7:1 81:10
 153:7 154:6
**dozen** 36:17
**drafts** 82:22 123:21
**dramatically** 63:9
**draw** 151:11
**drawn** 17:8
**drew** 12:10
**driver's** 153:22
**drugs** 9:14 14:19
**drunk** 59:7
**due** 38:21
**duly** 5:23 153:8
**dumping** 43:19
**duty** 149:18

**e**

**e** 2:11 3:1,6 36:13
 36:23 41:11
**earlier** 20:13 21:11
 58:22 59:5 120:14
 147:19
**early** 63:14 64:20
 74:10
**easier** 10:14
**econ** 47:7
**education** 45:24
**edward** 22:13,14
 23:18,18 24:9,19
 25:10,13,20 26:3,6
 26:13 27:1,5,9,19
 27:23 28:2,8,14,15
 28:15,18 29:8,14
 30:16 37:21 47:25
 48:15 56:13 57:4
 57:14 63:24 64:8
 64:15 110:9
**efficiency** 43:14
**efficient** 43:15

**eight** 48:7 124:8
**either** 18:12 22:1
 29:5 36:23 38:5
 42:10 50:6 55:8
 56:12 57:17 68:9
 79:13 101:8 103:5
 115:1,7,7,17
 135:13 145:10
**employee** 75:4
 154:9,9
**employees** 76:20
 76:22
**ended** 69:14 97:3
**ends** 73:5 84:20
 152:5
**engaged** 58:4
**engagement** 57:20
 58:21
**english** 66:24 68:1
 68:10,16
**enter** 123:25
**entered** 11:7,12
**entire** 62:10 117:12
**entirely** 23:19
**entities** 64:9 78:11
**entitled** 24:20 30:8
 67:16 75:14 76:10
 142:6
**entity** 7:10 79:14
**equal** 107:9 108:8
 108:18 109:3,23
 110:21 112:6,20
 113:8
**equals** 89:23
**equation** 84:20
**error** 33:8 86:11,15
 86:20,24
**errors** 87:2
**especially** 67:17
**esquire** 2:2,6,6,11
 2:15

**establish** 118:18
 136:4
**established** 82:10
 84:17 98:25 99:2
 131:21
**estimate** 36:22 53:4
 58:7 69:21 124:4
 126:7
**et** 67:19
**evaluate** 149:20
**evaluating** 89:19
**eventually** 84:20
**everybody** 19:23
 21:12 57:19 59:7
 91:9 105:1
**evidence** 48:18
 50:14 87:5 108:21
 110:3 143:12
 145:18 149:6
**evident** 99:11
 140:20 145:17
**exact** 22:12 109:10
 113:5
**exactly** 20:11 21:10
 38:9 42:22 71:9
 82:13 89:13 91:14
 94:9,10 100:3
 110:8,16 120:25
 121:7 123:3 128:8
 130:17 142:18
**examination** 3:2
 6:1
**examined** 5:24
 59:10
**example** 126:2
**examples** 126:3
**excel** 42:24 43:15
 121:2,9,16,19,21
 121:23 122:10,17
 122:20 123:1 124:5
 126:9

**excessive** 31:9,11
 31:13,13 106:14,16
 106:20,23 107:1
**exchange** 77:16
**exchanged** 29:10
**exclude** 139:3,5
**excluding** 12:13
**excuse** 10:24,25
 18:20,20 78:1
 79:17 97:21 98:3
 123:11
**exhibit** 4:25 9:4
 81:1
**exhibits** 8:14,24 9:2
**experience** 21:5
 30:14 61:19 96:24
 107:7 108:16 113:6
**expert** 12:13,17
 15:4,19,22 16:11
 19:7 23:21 25:21
 26:5 27:4 28:3,5,13
 30:11 32:3 34:7,19
 35:7,12 37:7 40:4
 45:22 47:16 48:14
 48:18 50:19 53:7,8
 53:15 55:9,16,23
 57:15 61:3 62:15
 65:7,8 78:6 80:16
 81:5 87:3,10 88:7
 89:6 95:1,3,5
 115:23 120:5
 134:16 141:11
 142:5 144:11,18
**expertise** 35:8
 61:18 93:25
**experts** 87:6,9 96:7
 98:9 99:7,12,15,19
 135:15 140:3,5,9
 140:16 142:8
**expired** 74:10

**expires** 153:18
**explain** 108:2
138:4 139:17,19,25
149:7
**extensive** 101:6
**extent** 17:17 22:20
22:23 23:4,15
26:16 27:25 28:23
35:6 50:24 88:24
93:3 124:25 130:17
131:17

**f**

**fact** 11:3 19:5
28:12 32:21 59:23
64:11 70:5 71:25
78:12 88:22 92:4
94:14,18 110:2
121:12,16 123:5
127:12 141:20
144:10,24 145:7,9
146:12
**factors** 136:12,19
139:4,8 140:10
**facts** 35:13 48:17
50:14 55:12 108:20
144:23 145:18
**factual** 44:25 94:8
**fair** 30:24 61:22
115:15 126:15,18
**fairly** 63:14
**false** 62:1,4,6
145:19,22,24
**familiar** 133:16
**family** 78:10
**fantasy** 145:24
**far** 27:5 61:23 68:7
110:19 126:19
143:10 145:12
148:22 150:17
**fat** 69:2,7

**federal** 1:18 50:16
54:17
**fee** 22:6 44:16,19
107:10,18 108:12
109:24 110:23
112:7,22 113:9
118:14,21 119:15
120:9,16,21,22
127:18 133:25
136:1,7,25 138:21
139:23 140:23
149:23
**feedback** 45:12,15
45:16
**feel** 17:1 61:18
64:17 82:23 87:11
88:21 91:22 112:13
**feeling** 66:13
**fees** 43:23 44:13
58:8 69:2,2,6,7
**felt** 12:5 13:3 21:10
**fetched** 145:12
**fiduciary** 149:18
**field** 35:8 98:6
109:1
**fields** 2:11 4:18
**figure** 24:25 28:22
28:25 70:4 107:17
130:4 132:4
**file** 55:5 66:17
**filed** 4:5 92:7
**filings** 140:7
**fill** 106:17,18
**finalized** 83:11
**finalizing** 123:2
**finally** 123:23
**finance** 78:7
**financial** 2:16 7:6,7
7:9,13,15 35:3
**financially** 154:10

**find** 38:14 54:22
56:6,14 115:6,17
126:21 140:23
**findings** 101:8
103:23
**fine** 14:22 15:6
19:8
**fines** 119:22
**finish** 47:10 111:3
116:22 137:16
142:21,22,23
143:25
**finished** 29:25 30:1
47:6 115:19 143:15
143:16
**finishes** 80:7
**finra** 75:18 78:18
78:24 79:3,19,25
80:13 136:20 139:4
139:8,13,25 140:10
**firm** 7:6,7 9:4 11:4
11:8,9,13,15 12:7
23:13 27:8,12,15
27:18 37:12,13,14
37:19,20 38:11,15
40:14 57:16 59:8
60:5 75:11 76:8,14
79:14,18 92:17
100:3 123:11
**firms** 63:15,25
64:12,25 79:13
91:8 92:18,19
**first** 5:23 9:11
10:24 20:9,17 21:8
21:17,21 25:17
37:11,25 38:18
41:17 48:9,12,18
49:1 57:21 58:4
87:1 100:1 104:22
114:5

**fits** 139:25
**five** 48:7 55:8 63:17
72:20,24,24 73:1
116:20
**fixed** 128:13
**flat** 69:2,6
**floating** 54:5
**florida** 1:1,20 2:1
2:17 4:6,18 5:13
153:3,17 154:3
**focus** 101:24
**focused** 15:3
**follow** 27:21 33:15
**following** 119:11
138:17 147:3
**follows** 5:24 118:9
**footnoted** 117:22
**footnotes** 117:20
**forever** 106:19
**forgot** 71:8,8
**form** 13:14 15:24
24:2 32:4 33:18,22
34:4,23 36:13
40:20 41:8 48:16
53:17 55:11 56:24
62:2,23 84:1 86:7
86:14,25 88:4,14
95:18 97:11 98:7
107:22 110:1
113:16 128:2
136:16 137:2
138:14 139:12
141:14 143:21
146:14 147:22
**formal** 45:24 46:4
52:4 74:15
**format** 19:9 111:11
**formatting** 45:17
123:24
**formed** 16:2 34:24
35:24 39:13

**formula** 83:18 84:15,16,19 86:3 89:14,19,22 90:4,5 90:6,13,15,18,19 91:2,25 92:10,16 92:18,18,21 93:6 93:16,20 94:15 96:10,14,19 98:2 102:8 104:8,12,13 104:15,23,25 105:4 105:9 106:1,9,10 106:12,18 129:11 129:25 130:1,10 141:20 147:15 150:1,1,2,3,3,4,16

**formulas** 83:19,21 83:23 84:7,11,14 85:4 86:5,12,21 87:16,19 88:2,10 88:19,23 89:6,7,10 90:1 91:6,9 93:3 94:9 97:9 124:16 124:18,19 141:10

**formulate** 107:16 108:6

**formulated** 107:13 107:19

**forth** 40:5,9 61:3 80:22 85:7 86:3 89:7 90:2,13,18 91:2,25 93:6 96:12 96:14,19 104:8 117:4 119:4 121:5 136:11,20 139:4,8 139:10

**forward** 23:11 28:10 42:2,2

**found** 116:3 125:20 125:22,22 126:1,6

**foundational** 28:25

**four** 55:8 65:2 90:1 90:9 129:7

**fox** 75:19

**francisco** 2:8

**franklin** 27:8,11

**fraud** 32:4 33:18 33:22,25 34:4,23 68:12 75:14 150:25

**fraudulent** 35:4 150:18

**free** 64:17 82:23 112:13

**freedman** 73:24

**freedom** 44:3,18 45:3 118:14,21 119:15,23 120:1,20 120:23 125:10 127:18 136:1,7,25 138:21 139:23 146:8,20 147:6,15

**friday** 4:2

**friendly** 41:24

**front** 8:20,21 80:17 121:18

**fudge** 91:9

**full** 6:24 78:4 124:8

**fully** 17:8

**fundamental** 29:17

**funny** 60:16 74:8 146:13

**further** 108:2 154:8

**future** 42:6

**g**

**gain** 23:16 115:3

**game** 123:15

**gee** 146:13

**general** 61:13 135:2

**generally** 18:19 98:5 117:23 133:11

**generate** 94:4

**generated** 97:8

**generating** 31:10 44:12

**gentleman** 40:13

**getting** 14:23 16:21 46:10,19 97:4 104:24 115:16 142:20 144:5

**gianluca** 2:15

**give** 10:2,12 17:4 19:10 34:19 36:25 45:12 48:25 49:4 63:22 68:6 70:11 72:19 80:8 96:7 111:7,19 126:20 138:1,4 150:23

**given** 6:6,12,16 10:6 49:19 50:2,7,7 50:10,15 51:5 82:22 95:23 110:25 111:5 112:10 150:25

**giving** 12:22 13:25 49:6 90:9

**glad** 48:20

**glasses** 80:22 89:14

**glitches** 9:22

**go** 12:19 14:15 23:11,24 28:10 31:12 36:5 37:2,2 43:15 46:24 52:9 55:6 56:22,25 62:8 62:24 89:17 90:24 91:21 99:13,20 100:4 104:20,20 105:22 109:7 110:4 111:7,25 114:2,18 114:21 115:1,5,6 115:17 121:3,18 122:16,17 128:6

130:13,15 131:7,19 131:20 132:17,22 140:16,21 141:5 145:13 147:25 149:7 150:5,12,17 150:22 151:10,10 152:2

**goes** 58:15 89:23 128:16

**going** 4:1 9:12 11:19 12:22 14:15 14:16 17:11,11,12 17:13,23 18:7,20 18:22 22:18 23:15 24:20 25:24,24,25 27:24 30:19 35:9 35:11 38:4,21,22 38:22 39:11 43:2,2 44:2 46:18 47:4 48:12 51:15 54:24 57:7,8 64:21 65:24 67:4 70:9 71:1 72:18 73:4,4,8 78:10 80:20 81:17 82:21 87:23 90:3 91:13 93:12,13,14 99:14,15,18 100:4 103:10 111:19 113:5 115:1,2,21 116:10,14,24 119:7 122:10 123:1 126:11 128:4,7 134:3,6,12 141:6 142:23 146:25 148:5 149:19 150:7 152:4

**golf** 75:24 76:4

**good** 4:13,21 5:1 6:3 10:1 30:2 37:10 45:20 48:20 51:20 57:1 61:19 72:22

87:12,15 91:22
132:24
**gotten** 28:11 59:7
**grammar** 66:11,25
68:19 72:15
**grammatical** 68:16
69:9
**great** 7:18 9:13
20:7
**greet** 41:22
**ground** 29:24
**group** 60:6
**guarding** 75:19
**guess** 98:11 99:14
117:1,18
**guy** 42:7 43:2 123:6
123:14
**guys** 59:8 141:3

**h**

**h** 3:6
**half** 137:12
**halfway** 137:11
**hance** 1:19 4:11
153:16 154:5,20
**hand** 132:16
153:10
**handle** 12:9 13:22
51:10
**handled** 48:22
**handy** 121:17
122:4,6
**happen** 24:21
72:16
**happened** 42:8
54:20 123:4
**happening** 78:5
**happy** 128:13
137:15
**hard** 30:22 89:12
105:17 135:17
137:5

**hats** 79:9
**haverford** 2:3
**he'll** 4:24 114:19
**head** 130:19
**heads** 17:4
**hear** 9:23 10:16
32:25 97:19 99:15
99:18,21 128:24,25
128:25
**heard** 17:21 99:20
**hearings** 17:7
**held** 4:8 74:20
**help** 61:20 88:22
128:4 141:3 142:11
**helpful** 132:25
**hen** 75:19
**hey** 42:5 66:15
**hh010389** 153:19
**hi** 41:24
**high** 37:2
**higher** 45:4 63:10
63:16 140:22
149:25 150:13
**hillsborough** 153:4
154:4
**hindsight** 133:14
134:5
**hire** 40:23 97:13
**hired** 22:23 108:11
123:4,5,7,9
**history** 15:8
**hmm** 124:13
**hobbies** 61:14
**hold** 22:18 45:23
46:13 56:10 62:16
71:1 74:1 82:21
85:10,18 94:23
100:20 102:5,24
105:13,13 111:2
113:25,25 122:15
132:8 133:2 141:13

141:13
**hominem** 115:22
**hope** 21:13
**hoping** 126:21,22
126:25
**horse** 97:5
**hosted** 76:5
**hour** 72:19 117:1,1
124:8 151:16,18,19
**hours** 58:1,3
123:18 124:4
137:12
**house** 19:24 20:1
75:19
**houses** 66:7
**hypo** 143:25
**hypothetical** 18:9
120:15 134:19
135:16 142:3,6
143:14,24,25 144:4
144:9,24 145:6,9
147:3,9,10,23
148:6 149:5
**hypotheticals**
144:12 148:8

**i**

**i.e.** 102:2
**iar** 79:17
**idea** 36:16 58:2,5,6
69:12,16,18,20
72:6 117:14 126:13
**ideas** 68:17
**identification**
28:13 153:22
**identified** 19:23
21:19 29:9 40:10
82:8,19 103:5
133:23 134:16
136:13
**identify** 50:1 55:21
95:16 100:16

101:25 102:25
103:17 111:22
112:4,18 113:22
117:10 119:10
**ignored** 140:6
**ignores** 110:25
111:4 112:9
**imagine** 72:16
**imply** 86:17 145:14
**implying** 87:24
**important** 10:11
70:5
**impossible** 36:25
82:13
**impressive** 42:5
**improper** 15:1
17:16 18:24,25
23:19 24:10,15
26:12 29:13 30:5
30:12
**improperly** 56:12
**inaccurate** 125:1
**inadequate** 147:19
**inappropriate**
115:21 133:4
143:18
**include** 49:16
131:2 139:3,7
**included** 39:14
49:15 117:20
**incomplete** 134:18
134:20 142:3
**incredible** 42:4
**incurred** 58:8
**independent** 96:18
**indicate** 5:16 25:16
58:18
**indicated** 52:11
**individual** 12:12
63:6,11 99:3

individual's 79:21
individuals 78:11
industry 15:20,21
  46:16,19 91:7
  106:2 133:16
infer 114:8
inference 17:7
inferred 114:7
influence 24:4
information 14:18
  14:24 24:19 26:11
  26:13 29:11,16
  30:7 42:24 44:2,6
  45:7 125:18 134:21
initial 38:5
initially 38:18
  42:25 43:21
input 67:17
inputting 97:9
inquire 14:17
instances 63:5
  79:19
instruct 17:12,13
  27:24 100:7
instruction 71:2
  114:17
intellectual 61:16
intend 40:5,9
  133:20
interaction 36:2
interest 15:7 31:18
  61:22
interested 19:2
  30:6 115:22 116:2
  116:3 154:10
interests 31:21
internal 149:14
internet 33:5 54:22
  55:2 128:17,20,25
interpose 14:16
  25:25 35:5 142:10

interpret 12:11
interpretations
  101:7 103:23
  110:12
interrupted 32:9
  33:5 102:15 144:5
interruption 33:1
  132:12
introduce 4:12
invest 76:10 77:8
  77:13 78:1,1 80:13
investing 61:21
investment 31:14
  63:21 76:7 78:15
  78:19 79:4,12,15
  79:16,17,18,22,24
  80:12 104:23
  140:15 149:16,17
investments 74:17
investor 73:17 85:9
  85:10,18,19 94:23
  94:23 100:19,20
  102:4,5,24,24
investors 60:3
  61:20 62:19 63:6
  93:23
involved 23:14
  25:2 27:18 29:22
  31:17 61:20 68:8
  68:18 72:14 79:20
  93:23 123:19 126:8
  126:17
involvement 57:17
  124:3
ipad 8:1
ira 79:16
issue 16:18,18 22:5
  24:13 28:20 39:24
  64:13 65:17 79:7
  101:10 106:23
  107:5 109:6,9,13

  125:7 135:2
issues 15:3 21:1
  39:11 43:4,6,9
  44:22 67:10 101:10
  149:21 150:24
italicized 118:10
italics 118:16,17

## j

j 1:11 5:22 81:10
  153:7 154:6
jack 4:17
james 1:7 2:16 4:5
  4:15,19 15:14 16:4
  16:13 19:25 20:1
  20:10 22:4,5 25:14
  35:2 40:4 42:25
  43:12 44:10,14
  63:24 64:8,15 80:3
  80:3 100:2 123:9
  124:6,14,21,24
  126:3
january 16:13
  146:20 147:6
jclabby 2:13
jerome 7:1
job 65:13 78:4,9
john 2:11
johnson 73:24
jones 22:13,14
  23:18,18 24:9,19
  25:10,13,20 26:3,6
  26:13 27:1,5,9,19
  27:23 28:2,8,14,15
  28:16,18 29:8,14
  30:16 37:21 47:25
  48:15 56:13 57:4
  57:14,17 63:24
  64:8,15 110:9
judgment 38:7
july 1:13 4:2
  153:11 154:12

jump 116:14
jumping 80:10
june 39:14,15 40:6
  51:25 52:1 61:3
  66:9 81:5 123:2
justify 31:24

## k

keep 15:2 24:1,15
  57:23 92:20 99:3
  99:10 105:17,19
  111:3,10 135:17
  137:5 141:5 143:24
keesal 2:7,20 4:14
  4:22,24 59:3 115:8
  148:2
kept 150:2
kimberly 1:3 5:4
  15:13 20:10
kind 38:6,7 57:5
  95:10 146:10,17
kindly 35:20
kinds 95:9 110:11
  110:13
klouda's 100:2
knew 44:17 128:7
  132:20
know 8:23 9:20,21
  9:24 11:5,5,6,14,25
  11:25 14:5,6,14
  21:21 22:12,15
  23:23 25:9,15 27:3
  27:17,20 29:7,8,9
  29:12,13 39:21
  41:23,23 42:1,2,5
  43:10,10,18,18,20
  44:1,17,21,25
  45:18 46:21 48:7
  48:12,15 50:15,16
  50:23 51:4,8 52:8
  52:19 53:25 54:6,8
  54:10 55:3 56:14

57:9,22 58:14,15
58:16 59:5,6,7,7,18
60:11,15 62:20,21
63:7 64:8,13,24,24
65:2 66:2,15,15
67:5,15,16,18,25
68:1,1 69:10,17,19
69:22 72:15 75:15
78:4,17,21 79:3
80:8 84:13,14,18
85:23 86:11,16
87:23 89:3 94:7,11
96:22 97:13,15
98:1 103:25 104:24
105:17,19 108:23
110:8,11,19 114:25
119:6 122:6 123:12
123:20 124:7,13
125:18,21 126:12
127:22 128:5,11
135:14,14 137:25
138:1,2,4,10,11
141:3,18 143:17
149:13,14,19,25
150:9,13
**knowledge** 37:7
88:22 95:23 96:24
97:25 98:13 143:6
**knows** 90:7,7
**kriner** 2:2 5:2
**kyl.com** 2:8,9

**l**

**labeled** 51:3 81:22
**lack** 101:9 106:23
**lancaster** 2:3
**language** 14:9
113:5
**laptop** 8:1
**large** 1:20
**larger** 31:20

**late** 47:12
**law** 6:7 9:4 10:6
11:15 12:7 57:16
**laws** 77:15,17
**lawsuit** 14:13 20:9
52:6 86:22
**lawsuits** 52:6
**lawyer** 11:5,25
12:6,22 13:25 18:9
20:16 22:1 29:22
34:18 37:25 58:25
60:14 66:23 67:3
114:24
**lawyers** 12:9,9
13:17,18,22 18:5
20:12,24 21:22
27:14 28:4 36:2
41:6,12,16,18
55:21,24 56:8 57:9
60:7,9
**leads** 148:18
**lean** 2:20 4:23
**learn** 20:9 43:11
**learned** 104:22
**leave** 74:9 93:14
**leeway** 22:22 24:6
**left** 129:9 132:16
**legal** 4:11 11:9 12:8
12:23,24 13:5,15
15:15,18,23 16:15
17:15,19 35:6,10
50:25 53:15,18
55:10 63:25 64:4
66:2 88:25 150:20
**legalese** 14:8
**legally** 10:19
**lending** 13:20
**lends** 7:6
**letter** 12:4 58:21
**license** 74:10,21,23
153:22

**licensed** 44:14
74:15 77:7,23
79:11 149:15
**licenses** 74:2
**light** 31:14 64:16
**limit** 19:6,9
**line** 12:1 28:22
43:15 45:16 65:25
66:1 116:23 137:16
**lined** 45:19
**list** 60:21
**listed** 57:19
**listening** 145:13
**literature** 108:25
109:6,8,11 112:4
119:17,25 120:3
**litigation** 61:21
65:18 85:5 88:3
90:14,20 91:7
104:24
**little** 10:2 22:9
31:19 33:4 39:19
50:10 57:6 66:13
74:8 80:6 105:17
110:7 115:3,10
128:7 142:20
**live** 41:24 150:15
**living** 41:25
**lllp** 7:10,16
**llp** 2:2
**logan** 2:7,20 4:14
4:23,24 115:8
**long** 38:17 59:11
65:21 81:16 105:1
108:11 126:8 137:5
**longer** 7:14 77:21
78:10
**look** 9:8 14:8 42:2
42:25 43:4 45:5,7
45:14,17 55:6
66:15 68:2 91:24

106:8 117:7 121:4
121:19 124:17
132:19,20 133:22
135:15 140:24
151:9
**looked** 9:9 42:1
55:4 126:16
**looking** 42:2 81:5
97:2 140:18
**lose** 150:7
**lost** 24:8
**lot** 13:8,21 21:11
24:6 30:21 42:23
44:1 47:5
**lots** 78:20,21 96:3
109:13
**low** 44:12,24,24
45:4 85:10,18
89:20 94:23 100:20
102:5,24 107:9,17
108:9 109:10,18,24
110:22 113:9
118:13 135:25
140:21,22 150:12
150:12
**luckily** 14:13
**lunch** 137:14
142:21,25 147:1,4
148:17 151:15
152:6
**lynch** 63:24 64:7,15
65:3 73:20

**m**

**m** 2:6
**madam** 137:19
**mail** 36:13,23,23
**mails** 41:11
**main** 39:2,3
**major** 63:15 66:24
**majority** 52:14

**making**  24:2 31:11
   34:13 72:2 85:12
   91:5 95:7 116:16
   144:22 151:10
**manage**  78:11,13
**managed**  120:9,16
   120:19,21,22
**management**  95:11
**manager**  75:7
**managing**  78:3
   93:22
**manner**  5:16
**marked**  3:6
**markets**  78:5
**master's**  46:10
**matching**  131:16
**material**  121:5
**materials**  119:2
**math**  87:7,22
   125:17 129:12
   130:15 150:5
**mathematical**
   84:19 93:4
**matrixes**  134:9
**matter**  4:4 8:20
   36:4 123:5 127:12
**matters**  10:7 25:3
   55:15,22
**maximum**  36:21
   37:1 76:22
**mean**  10:23 34:17
   38:12 39:2 43:13
   48:13 52:24 58:14
   62:20 64:19 68:4
   80:1 87:21,22,23
   95:10 110:6,11
   132:18,19 133:1,8
   134:11 141:3 145:5
   145:5 150:21
**meaning**  14:3 67:5
   134:11,12

**means**  11:4 31:3,6
   31:13 54:1 57:10
   62:21 86:1 98:1
**meant**  34:21 114:6
**measure**  85:9,18
   94:22 100:19 102:4
   102:23
**media**  4:3 73:5,9
   151:13 152:5
**medical**  14:5,18,23
   15:8
**medications**  9:14
**meet**  41:22
**member**  59:18,20
   60:15 67:19 69:10
**members**  59:16
   60:12 66:16
**memorialize**  12:5
**memory**  125:8
   129:23
**mention**  71:8
**mentioned**  10:5
   14:4 67:18
**mere**  134:15
**merely**  136:12
**merrill**  63:24 64:7
   64:15 65:3 73:20
**message**  32:24,25
   33:3
**met**  6:4 41:3 59:6,9
   118:18 127:24
   129:14,14,18 136:4
**metric**  83:18 89:18
   89:19 90:15 104:5
   148:25 149:1
**metrics**  81:23
   117:4 133:22,24
   134:15,22 148:25
**michael**  2:20 4:9
**middle**  1:1 4:6

**mind**  23:8,10 26:19
   35:16 45:11 56:3
   60:5 65:1 88:20
**mindful**  56:17
   64:10 66:4 67:9
**mine**  71:15
**minimum**  118:17
   136:3
**minute**  33:1 72:20
   101:21 116:20
   131:21
**minutes**  50:11
   72:19,24,25 73:1
   119:7 124:4 151:15
   151:19
**mischaracterized**
   132:9 139:13
   142:12 149:5
**mischaracterizes**
   107:20 129:21
   141:14 143:12
   147:24
**mischaracterizing**
   146:2
**misspoken**  102:7
**misstates**  55:12
**mix**  124:11
**mixing**  131:15
**money**  7:6 31:20
   78:3,10,11,13
   95:11
**monitor**  121:17
**months**  7:14 48:15
   122:21 125:4
**morello**  2:15
**morning**  4:13,21
   5:1 6:3
**motion**  38:7
**motions**  38:6
**move**  19:11 29:24
   44:16 70:12 71:22

   100:14 115:18
**moved**  45:3
**muddy**  133:4
**multiple**  31:25
   47:21
**multitask**  71:2
**mumbling**  54:25

                n

**n**  3:1
**name**  4:9,13,17,21
   5:1,17 6:3,24 7:7
   20:16 22:11,12
   25:9 44:17 59:6
   75:20 77:1 85:15
   103:24 104:3
**named**  149:20
   150:10
**names**  10:25 64:3
   65:1
**narrative**  113:17
**narrowed**  109:15
**nasd**  75:18,21
   119:22
**nature**  22:2 30:15
   51:5 64:12
**nauseam**  140:16
**necessarily**  12:12
   63:11 109:14
   119:23 124:8
**necessary**  18:18
**need**  24:15 32:7
   70:4 89:3 102:12
   111:17 114:2
   116:18 131:10,18
   131:19,20 132:16
   132:17,22 134:21
   135:8 140:12
   145:10,16 150:1,3
   151:13
**needed**  43:3 77:21
   78:9 132:5

**needs**  128:13 140:6
**nefarious**  71:16
**negative**  115:3
  138:3,15
**neutral**  62:15
**never**  14:9,10
  17:21 42:7 52:7,8
  52:20 55:4 59:9
  68:7,8 75:1,4,7,10
  106:22 107:3 140:4
  140:6 150:21,23
**new**  70:13,13 99:14
  99:19 105:18 111:7
  141:20
**nguyen**  1:3 4:4 5:4
  15:13 16:3,11
  20:10 40:4 143:5
  144:17 145:8
**nguyen's**  146:7
  147:6,16 148:19
  149:21
**nine**  124:8 140:22
  149:24
**ninth**  24:8
**non**  84:21
**nonexpert**  13:6
  65:11
**nonidentified**
  56:16
**nonlegal**  13:6
**nonspeaking**  24:16
  111:11
**nontestifying**  23:1
  23:22 24:11
**normal**  92:16
**notary**  1:20 153:17
**notebooks**  9:7
**notes**  8:19 154:7
**notice**  1:16 66:16
**notices**  149:14

**novel**  92:5
**number**  6:9 19:24
  36:21 44:11 52:15
  52:19,20 58:3
  63:22 64:24 76:22
  85:9,17,22 94:22
  95:15,23,25 96:1,8
  96:9,12,14,18,25
  97:2,23 98:4,10,14
  98:16 99:8 100:19
  101:16,16 102:4,23
  103:1,5,20,21
  104:25 109:10
  117:20 121:9
  123:18 125:13,13
  125:16 126:4,5,16
  129:13 130:1,7,7
**numbered**  45:6
**numbers**  45:5
  84:16 87:7,10 94:4
  95:14 97:2,8,9
  101:15,17,20,23
  123:8,16 124:20,24
  125:19,25 126:3,20
  127:5,14 129:22
  130:14,18,18
  131:22 143:8
  150:10
**numeric**  88:11
**numerous**  44:22
  79:7 82:11

**o**

**oath**  3:3 5:12,23
  6:5,6,19 10:5,6
  49:4 153:1
**object**  12:16 14:16
  17:11,13 18:7,22
  23:14 40:19,19
  51:15 62:23 70:9
  71:1 82:22 88:4
  90:3 91:13 98:17

102:12 112:24
  116:15 130:12
**objected**  84:6
  91:14 134:25
  142:15
**objecting**  24:13
**objection**  7:22
  10:16 12:16,17,18
  13:14,14,15 14:1
  14:16 15:15,23,24
  16:5 22:19 23:12
  25:25 30:17 34:5,7
  35:6 39:16 40:19
  41:8 43:8 48:16
  49:20 50:21,24
  53:1,1,17,17,18,19
  55:11 56:23 57:1
  61:7 62:2,2,7,23
  67:4 70:3 71:10
  82:9 84:1,1 86:7,7
  86:13,13,14,24,25
  88:4,5,14,14,15,24
  89:9 90:21,22 92:1
  92:12 93:2,18 94:5
  95:18 96:20,20
  97:11,11 98:7,7,8
  98:20,20,21,22
  100:13,21 102:6
  104:16,18 105:11
  105:14 107:20,22
  108:20 109:5 110:1
  110:1,2 112:8,9,11
  112:23 113:16,16
  114:1,16,21 118:5
  119:5 120:11,12
  122:13,15 126:10
  126:24,25,25 128:2
  128:3 129:20,22
  130:16 131:14
  132:9,10,10 133:2
  134:24 136:16

137:2,2 138:14
  139:12,12,13
  141:14,14 143:21
  143:23 144:7,19
  145:2,2 146:1,1,2
  147:22,22,23 148:4
  149:4 150:19,20
**objections**  5:15
  10:22 14:25 16:14
  19:9,10 24:2,3,15
  24:16,17 65:25,25
  83:5,12 86:23
  87:17 93:8 104:10
  105:6,22 110:24
  111:9,11,12 112:12
  117:13,24 119:20
  120:13 143:11
**objective**  81:23
  89:18 104:5 117:4
  118:17 120:12
  129:18,20 136:3
**objectively**  118:12
  118:21 119:16
  120:10 127:19,25
  130:10,22 131:12
  133:1,8,9,13,15,21
  133:24 134:1,4,7
  134:10 135:24
  136:8,25 138:22
  139:10,23 141:10
  143:8 150:14
**objectives**  31:15
  140:16
**obligations**  23:5
  56:18 64:11 66:5
**obstructive**  29:5
**obtain**  19:18 23:17
**obtaining**  88:11
**obviously**  44:21
  64:7 74:17 123:20
  137:10

occasion   10:16
occasionally   80:22
occasions   6:10
   53:10 55:8
occupation   7:4
occupations   7:5
offer   11:9
office   9:9 71:14,15
   121:10
officer   75:10
official   153:10
oh   23:10 45:20
   52:14 81:2 127:12
   128:24 141:22
okay   6:9,12,16,19
   6:23 8:4,10,13,19
   9:3,10,13,18,22,24
   9:25 11:7,18,21
   16:20 17:4,25 18:4
   18:15 19:21 20:5
   20:22 21:8,25 22:7
   22:11,16 25:3,13
   27:8,11,14,17,21
   29:4 31:3,15,25
   32:16 33:7,10,15
   34:3,22 35:13
   37:19,23 40:8,25
   41:14 42:19 44:25
   45:9,12 46:4,15,18
   46:24 47:1,12,15
   48:9,20,25 49:15
   50:16 52:3,23 53:6
   53:10 55:7,14 56:2
   56:5 58:17,20 59:4
   59:16,23 60:1,5,11
   60:17 62:6 68:11
   68:20 69:20 73:14
   73:17,20 74:1,6,10
   74:13,20 75:1,17
   76:7,14,20 77:11
   78:12,17,23 80:10

81:22 82:3 83:18
   83:21 85:4,25 86:3
   90:17 92:10,15
   94:2 95:22 101:24
   104:7,15 105:4
   107:6 115:14 118:4
   118:25 119:2 121:1
   121:9,22 122:9,20
   122:25 124:1 126:7
   126:19 127:4,14,22
   128:4,16 129:1
   130:4 131:7 132:3
   132:24 133:20
   134:14 140:2 142:4
   146:25 147:7,12
   149:12
olsen   40:12,17 41:1
   41:3,5,11,15,21
   42:10,16,20 43:7
   43:17 44:5 45:10
   45:12 47:17 55:20
   55:25 82:12 94:3
   94:11,14,18 97:4,7
   97:14,15 123:19
   124:11 126:8,16,19
   127:14,23 131:19
   132:17,22
olsen's   124:3 127:9
   131:10 132:4
once   16:22 18:1
   21:11,14 30:5 45:2
   56:11 66:13 68:25
   126:16 140:23
ones   52:4 121:23
   122:2
ooh   46:13
open   9:6
opened   9:6 148:21
opening   146:7,20
operate   14:11
   133:12 149:1

operating   4:25
operation   14:7
operations   13:9
opine   34:10
opined   108:16
opinion   13:1 15:11
   15:19 16:2,11,18
   18:12 32:3 34:22
   34:24,25 35:1,22
   35:24 39:25 85:16
   95:1,3,5 97:1
   106:20,25 107:4,7
   107:13,16,18
   108:10,13,15,17
   109:1 112:19 113:7
   114:10 118:9,25
   119:12,18 135:21
   136:10,22 138:25
   139:2 150:24,25
opinionated   39:19
   39:22
opinions   12:23
   15:4 19:7 23:16
   32:22 34:19 35:11
   35:12,12 37:7 39:4
   39:7,8,13,20,23
   40:4,8 57:15 116:1
opportunity   10:12
   16:25 17:6 18:1
opposed   24:2 31:22
   35:7 40:17 67:7
   68:16 103:12 138:5
   140:19
opposite   31:22
   142:18
order   5:13 12:4
   94:15 98:23 120:13
   134:21 136:21
   139:2
organization   75:23

original   82:19 83:3
   83:7 93:3,20 103:6
   104:19 112:12
   114:11 129:18
   130:6 141:21
originally   45:6
   77:15 83:24 84:2
   129:13
outside   41:5 71:14
overbroad   7:22
   14:1,1,2,2 15:1
   30:17 34:5 39:16
   61:7 62:7 82:9 86:8
   89:9 90:23 92:12
   93:19 94:5 96:21
   97:12 98:8 100:21
   112:23 114:1 119:5
   134:25 137:3
   144:19

## p

p.a.   2:11
p.m.   1:14
pace   105:19,19
   111:3
pacific   2:7
package   9:3 38:1
pad   8:21,21
page   3:2,3,4 81:9
   81:25 92:4 105:4
pages   1:22 8:24
painewebber   64:22
pairs   80:21
paragraph   81:25
   82:3,15 85:7 89:17
   90:14,18,19 91:3
   91:24,25 92:11
   93:7,17 94:2,10,15
   94:20 95:8 96:13
   96:15,19 97:24
   100:17 101:3,18,24
   102:2,7,8,22

[paragraph - preparing]                                              Page 172

103:19 104:4,9
105:5 106:10 107:6
107:21 113:2,4,14
113:23 114:2,15,18
117:6,10,21,23
118:2,9,23,25
119:4,12 127:6
128:1 135:19,21
136:12 138:23
139:11
**paragraphs**  82:5,8
82:15,19 83:1,2,9
86:4,12 89:7,24
133:23
**paralegal**  2:20 4:24
21:22,23 22:1
**parallel**  110:8
**parameters**  54:23
**parkway**  2:16
**part**  14:24 18:3
45:2 77:8 107:21
107:25,25,25 108:3
108:3,4,5 144:18
**participating**  5:8
8:5
**particular**  77:20
117:21
**particularly**  61:9
**parties**  5:14 50:8
154:9,9
**partner**  7:15
**partnership**  7:10
7:16
**parts**  110:13
**party**  12:7 47:20,21
50:1
**patently**  17:16
140:25 150:13
**path**  115:5
**paul**  20:18

**pc**  76:11,12
**peer**  85:25 86:5
95:23
**pending**  131:24
**pennsylvania**  2:3
**people**  10:25 12:25
57:18 61:20 96:4
99:6
**percent**  52:16 85:8
85:16 94:21 95:22
96:13,18 97:23
98:14 100:18
101:19 102:3,22
103:1,19 118:11,19
119:14 120:7 127:7
127:17 131:1,11
132:18 135:22
136:5,14,23 138:20
139:21 147:17,17
**percentage**  63:8,10
63:16,19 89:23
127:24 130:9,21
131:2
**percentages**  101:3
**perform**  42:21
146:10
**performed**  146:17
147:20 148:20,23
**period**  32:23 59:24
63:15 69:14
**permitted**  1:17
26:8 28:3
**person**  33:7 39:19
39:22 41:3 97:24
**personal**  14:17,23
37:6
**perspective**  31:5
**peterman**  2:20 4:10
20:3
**petersburg**  2:17

**phone**  8:1 19:24
20:2 36:13,23
41:19 132:12
**phrased**  29:6 56:21
142:3
**physically**  14:21
**piaba**  59:17,19,20
59:24 60:1,9,12,17
60:22,24 61:2,6,9
67:19 69:1,6,15
70:22 75:23 76:4
**piaba's**  69:10
**plaintiff**  1:5 5:3,21
15:12 41:6 62:17
**plaintiff's**  57:14
**plaintiffs**  2:4 60:6
61:23 62:13
**please**  4:12 5:6,16
6:25 7:2 9:24 19:3
25:5,8 26:22 32:18
33:12 35:20 49:9
60:2 70:12 80:7,8
80:19,25 81:25
84:23 102:25 108:2
111:14,21,22 117:7
128:23 129:2
130:23,24 137:20
138:6 139:25
149:12
**plural**  77:12
**point**  23:22 30:10
66:23 71:6 78:12
89:13 94:14 96:9
97:23 98:4 103:20
109:20 110:15,17
119:17 123:6 134:8
137:11 141:4,8
**pointed**  87:3
**pointing**  18:15
**points**  85:8,17
94:22 95:22 96:13

96:17 98:14 100:18
101:19 102:3,23
103:2 115:4 140:20
**policies**  149:14
**portfolio**  109:16
**portion**  25:6 26:23
32:19 33:13 35:21
49:10 53:24 84:24
111:24 119:11
128:15 129:3
137:21 138:17
139:11
**posed**  26:16 111:14
**position**  136:10
**positive**  127:11,12
**possibility**  68:6
**possibly**  25:18
**potentially**  46:10
**pour**  38:19
**practitioner**  120:5
**precise**  69:23 70:1
114:14
**precovid**  75:24
**predecessor**  75:18
**predetermined**
128:1,3
**preliminary**  123:16
124:10
**premise**  24:23,24
147:8
**preparation**  67:2
67:23 82:7 122:18
**prepare**  16:23
38:22 51:9,12,23
**prepared**  10:9
27:22 28:4 40:6
51:2,6,13 52:4,5
58:22 81:14 83:25
123:20
**preparing**  69:6
99:3

**present** 2:19 5:10
41:16
**presented** 38:1
**pressured** 66:14
**pretty** 42:7 57:3
61:19 67:24 78:4
87:18,19 91:8
123:7 125:12
132:20
**prevail** 61:24
**prevented** 55:9
**pride** 33:25 58:24
68:11 69:5 75:13
**primarily** 60:6,9
**primary** 79:2
**printed** 8:23
**prior** 36:2 41:1
53:2 81:14 83:10
122:9,22 123:1
124:3 127:8 134:25
142:12 149:6
**private** 78:11
**privilege** 10:18
24:6 26:9 29:1
56:18,21 64:10
67:11
**privileged** 26:12
**privileges** 28:24
**probable** 88:16
**probably** 30:6
36:20 47:10,23
48:6 52:18 64:2
65:9 66:19,22,24
69:8 84:4 99:15
100:4 101:6 106:17
106:17 124:7,9
126:2 128:18 132:7
132:15
**problem** 29:17
30:20 91:4 98:11
129:24 133:19

**problems** 9:24
**procedure** 1:18
18:17 50:17
**proceed** 64:6 73:12
80:5
**proceeded** 64:16
**proceeding** 10:9
53:16
**proceedings** 5:11
6:13 55:10 63:25
64:5
**process** 19:14
92:20 116:11
126:17 144:4
**produced** 9:2 26:2
28:1 43:12 52:9
121:6 124:14
153:22
**product** 67:13
**professional** 77:5,8
85:15 107:7 108:17
113:6 120:4 154:5
**professionally**
116:11,12,13
**proffered** 118:15
136:2
**proper** 19:9 24:2
31:5 54:22 82:23
97:2
**properly** 26:17
125:4
**proposed** 87:10
**proposing** 87:11
**proprietary** 123:17
**protected** 71:12
**protective** 64:14
98:23 120:13
**prove** 145:18
**provide** 39:4,8 42:9
44:6 45:7

137:7 142:14

**provided** 19:16
42:13,14,24 45:6
51:17 52:5,7,7,8,8
67:17 68:18 94:3
97:10 122:22 124:5
124:24
**providing** 26:11
68:15
**provisions** 66:3
**prudential** 64:23
**public** 1:20 60:3
153:17
**publicly** 55:2
**published** 34:1
**pull** 122:4 130:13
**pulling** 8:13
**punch** 14:7
**punching** 132:21
**punchy** 142:20
**purely** 44:22
**purported** 49:19
49:21 50:2
**purpose** 11:21,23
18:15 30:5,13
31:10 44:5 61:5
84:10,12,12,13
85:5 88:2,10
107:14
**purposes** 1:16,17
8:13 24:19 86:21
90:13,20 107:19
147:9
**pursuant** 1:16 5:12
29:10 58:21
**push** 14:7
**put** 31:5 61:19 92:4
92:7 93:13 110:14
110:14 115:1
120:25,25 126:3
143:5

**puts** 54:22 133:16
**putting** 31:19

**q**

**qualified** 21:5
**question** 12:3
14:21 15:10 16:10
17:14,14,15 18:8
18:19 19:2 20:5
21:15 23:8,10,25
24:14,14 25:4,5,8
26:1,15,19 27:25
28:21 32:7,17
33:11,15 34:12
35:14,16 36:9
40:22 41:9 49:7,16
50:4 53:21 55:18
56:20,24,25 58:13
62:20 70:11,15,16
70:20 71:3,11,22
78:21 80:9 82:20
82:23 83:16 84:22
85:1 87:11 89:2,4
89:11 90:6 96:11
99:4 101:13 102:11
102:13,16,16
107:15 111:14,18
111:21,22 112:13
113:12 114:9,24
115:18 117:8,17
128:14,18,22 129:5
131:24 132:10
133:4,7 134:25
135:6,11 136:9
137:20,24 138:6,7
138:7,12 141:16,25
142:11,15,24
145:14 148:1,3,10
149:10,11
**question's** 110:7
**questioning** 66:1
116:23 137:17

**questions** 9:16
  10:13,20 14:17,25
  15:7 18:25 19:4,13
  19:21 26:14 28:18
  28:23,25 29:6,12
  29:15 30:4 34:13
  34:17 99:4,10
  102:19,20 112:13
  116:18,20 117:3
  141:21 142:6
**quiet** 57:10
**quit** 47:10 77:22
**quite** 42:4 65:9,21
  103:8 104:2
**quote** 68:24 69:1
  75:19,19 87:15,15
  90:14 109:15 113:6
  113:10 115:23,24
  119:13,16 127:16
  127:19 129:18,19
  130:10,22 131:12
  131:13 133:1,8,13
  133:21,21 134:1,2
  135:19,21 136:8,22
  137:1 138:19,22
  139:20,24
**quoted** 139:10

**r**

**r** 2:6
**raise** 22:19 67:4
**raised** 28:20
**ran** 130:1
**rate** 86:11,14,20,24
**rates** 109:17
**ratio** 132:3
**raw** 124:15
**raymond** 1:7 2:16
  4:4,15,19 15:14
  16:4,13 19:25 20:1
  20:10 22:4,5 25:14
  35:2 40:4 42:25

43:12 44:10,13
  63:24 64:8,15 80:3
  80:3 100:2 123:8
  124:6,14,21,24
  126:3
**reach** 119:3 124:10
  124:23 132:5
  135:19 139:2
**reached** 45:9 102:1
  109:21 120:6
  126:23 127:15
  146:18 151:4,7
**reaches** 109:1,21
**read** 14:9 25:4,6
  26:21,23 32:7,17
  32:19 33:2,11,13
  34:14 35:20,21
  49:8,10 53:23,24
  56:24 61:16 66:22
  66:24 68:1 80:20
  84:22,24 87:20
  100:17 102:2 103:4
  103:21,22,23,25
  107:21,21 111:16
  111:17,20,23,24
  112:4,10 113:4,5
  113:14 115:6
  118:23 119:19
  127:6 128:15 129:2
  129:3 135:20 137:6
  137:9,19,21 138:23
  139:11
**reading** 34:20 69:8
  89:13 95:13 96:3
  117:12
**readings** 95:12
**reads** 107:7 118:9
  135:21
**ready** 73:12 121:13
**reality** 142:8
  145:15

**really** 29:24
**reask** 128:13
**reason** 10:18 14:24
  45:9 61:8,10,12
  88:18 118:15 136:2
  140:24 146:9,16
**reasonable** 143:4
**rebuttal** 38:25
  39:15 51:25 87:4
  96:23 103:6 113:19
  114:12 117:11
  151:1
**recall** 9:21 11:17
  20:11,13,14,22
  21:3,10,13,25
  33:23 34:2,9 37:24
  38:9,23 41:20 43:6
  45:15 47:4,5 48:4
  49:23 50:5,6 54:20
  54:21 55:7 56:2
  60:23 61:2 64:3
  65:19,22 75:17
  76:15 81:13,17
  100:3,5,25 125:6
  125:10,11,15
  130:21,25 131:4,5
**receive** 18:2
**received** 9:3 42:20
  86:5 121:9,24,25
  121:25 127:9
**receiving** 37:24
  127:8
**recess** 73:7 152:6
**recognized** 10:19
  19:22
**recollection** 20:19
  33:20 38:2 48:21
  68:5 69:13 72:7
  81:20 129:7,15
  130:8,23 131:3

**recommend** 149:23
  150:11
**recommendation**
  140:21 149:23
**recommendations**
  95:12
**recommended**
  44:16
**recommending**
  123:6
**record** 4:2 5:18
  6:24 10:17 22:25
  51:18 73:5,9 102:2
  113:15 115:2 127:6
  152:2,4 154:7
**recorded** 7:23 10:7
**records** 25:16
  57:23,25 58:17
**reduced** 130:6,6
**refer** 68:9
**reference** 27:1
  75:21 81:22 113:11
**referral** 21:2
**referred** 21:3,17
**referring** 51:19
  101:18 102:11,21
**refers** 101:18
**reflects** 118:16
  136:3
**refresh** 81:19
**refreshed** 48:21
**refuse** 72:17
**regard** 36:1 37:19
  146:20 147:6
**regarding** 14:18
  36:4 41:11 64:11
  92:1 93:2,8,18
  104:10 120:13
**regardless** 118:15
  136:2 144:12

**regional** 64:24
**registered** 74:15
76:7 77:2,4,12,13
77:16,17,19,22,22
78:15,18,19 79:4
79:10,15,24 80:3
80:12,13 149:16,17
154:5
**regularly** 15:22
92:6
**regulates** 78:24
79:3
**regulation** 66:16
141:8
**regulations** 34:20
101:7 110:12
138:11 150:6
**regulator** 77:11
120:5
**regulators** 77:12
101:8 105:1 106:15
149:13
**regulatory** 34:13
34:17,18 101:7
103:23
**related** 8:20 35:13
**relates** 28:19
119:22 150:25
**relating** 22:5 57:6
106:14 141:21
149:22
**relationship** 94:11
131:23
**relative** 87:22
154:8,9
**relatively** 122:6
**releases** 149:13
**relevant** 87:25
**relied** 96:14 102:1
**rely** 119:3 145:10
145:10,16,16

**relying** 136:12
**remember** 20:16
21:2,6 42:22 47:8
48:11,12 54:10
65:3 77:1 84:17
99:25 101:11 103:4
103:7,9,11,24
104:22 123:3,4
124:20 125:5,16
149:16
**remembering**
64:22
**remotely** 5:12 7:21
153:7
**render** 136:21
**rendered** 15:5
32:22 108:15
119:19
**renders** 112:7
**repeat** 53:21
**repeatedly** 134:9
140:17
**repetitively** 140:17
**rephrase** 78:23
90:25 121:7 135:8
**report** 12:17 26:2
28:1 29:9 34:8
38:21,23 39:6,11
39:14,15 51:25
55:23 57:15 61:3
66:9 67:3,14,23
68:9,21,25 69:4
81:6,9,14,23 83:11
83:25 85:20,21
87:6 92:7,8 95:4
96:16,23,23 99:1,3
103:6 104:1 110:19
112:18 113:13,19
113:20 114:11,18
117:5,11,11,22
122:23 123:2,25

129:22 130:13
131:3 134:8,16
135:7 136:13
141:11 143:7 151:1
151:2 154:6
**reporter** 4:10 5:6,8
5:10 10:8,15 16:23
25:6 26:21,23,25
32:17,19 33:11,13
35:19,21 49:8,10
53:23,24 84:24
111:20,24 128:15
129:2,3 137:19,21
154:5
**reporter's** 3:4
154:1
**reporting** 5:11,16
**reports** 27:22
28:19 40:6,10 51:2
51:5,6,9,13,13,16
51:24 52:4,9 55:16
56:7 57:18 80:16
100:23,24 114:3,6
117:12,21,23 140:7
**represent** 4:14 5:3
26:10 64:7 66:1
72:8 146:16
**representation**
11:9 83:22
**representative**
74:15 79:12,17
149:18
**represented** 11:2
107:17
**representing** 19:16
29:14 41:6 63:6
**represents** 11:4
30:8 64:9
**request** 40:15,17
40:18

**requested** 13:7
25:6 26:23 32:19
33:13 35:21 45:13
49:10 53:24 84:24
111:24 128:15
129:3 137:21 154:7
**requesting** 42:21
**require** 140:10
**required** 10:20
70:14 92:19 140:24
149:19 150:5,8,9
**requirements**
139:5 140:25
**requires** 6:20
**reread** 128:11,12
**research** 61:20
95:12,13 96:4,25
101:2,5,25
**respect** 14:19 28:24
40:3 42:11 66:6
86:4,23 117:8
131:15
**respective** 10:13
**respond** 9:15 10:19
102:20 115:21
148:11,14,17
**responsible** 18:9
**rest** 100:8
**result** 42:20 82:18
83:2,10 88:3 97:3
136:13
**results** 127:9
147:15
**resume** 76:15
142:24
**retained** 22:16
25:10,13,14,17,21
29:20 40:13,17
47:24 48:2,10 49:2
49:5 62:16 97:7

retention 38:11
reverse 31:1,3,4,7
    31:16 34:22 101:10
review 38:18,20
    44:6 85:25 86:6
    95:23 121:13
    122:20 154:6
reviewed 98:9
    103:8,10,12,13,16
    103:18 123:21
reviewing 103:12
    124:4
ridiculous 115:8
    148:3,10
right 8:16 10:1,2
    19:18 26:25 27:3
    36:1 37:10 45:11
    52:2 54:16 55:14
    67:1 69:1,4 70:1
    71:14,15 72:18
    73:2 74:9 75:25
    76:18,19 80:15,25
    84:10,18 92:21
    96:12 101:12,13
    104:3,4 106:7,7
    111:25 115:10
    116:17 118:8
    125:17 138:11
    140:15 142:6 146:4
    146:11 148:16,25
    151:14
ring 8:22,25 9:1
risk 31:15
road 7:3 16:22
rocket 87:22
role 19:7 23:4,6
    27:5 30:10,11
    67:14,22 69:6
    144:18
room 7:19 8:16
    9:12

roughly 20:21
    38:12 76:16
rows 125:21
rpr 1:19 153:16
    154:20
rule 50:16 136:20
    139:4,8,13,25
    141:8
rules 1:18 16:21
    26:7 50:17 82:22
run 52:20 76:4,14
    129:25
running 77:13

**s**

s 3:6
sample 127:24
san 2:8
sas 2:4
save 146:25
saying 31:5 32:21
    103:8 110:7 113:1
    141:2 145:19,22,23
says 81:24,24 89:17
    109:11 110:15
school 46:18
schulz 1:11 4:4
    5:22 6:3 7:1,10,16
    10:17,22 11:1,8
    12:19 14:18 15:4
    16:16 22:20 23:20
    25:5 26:2 28:13,23
    40:3 64:6 71:2,6,17
    71:24 73:12 80:7,8
    81:10 111:2,12,15
    130:13 143:2
    145:21 147:25
    153:7 154:6
schulz's 15:7 19:1,6
    23:16 35:8 151:21
schwab 65:14,22
    66:2

schwartz 2:2,2 5:1
    5:2,2,20,20 7:22
    10:23 11:1,9,13,13
    12:16 13:14 14:1
    14:15 15:15,23
    16:5,14 17:11 18:7
    18:20 19:15 22:18
    23:11 24:5 25:24
    27:18,24 28:10,21
    29:4,25 30:1,9,17
    34:5 35:5 38:15
    39:16 40:19 41:8
    43:8 48:16 49:20
    50:21,24 51:15
    53:1,17 55:11
    56:10 61:7 62:2,7
    62:23 64:6 65:24
    67:4 70:3,9 71:1
    72:8,21 73:3 80:5
    82:9,21 83:5,12
    84:1 86:7,13,23
    87:17 88:4,14,24
    89:9 90:3,21 91:13
    92:1,12 93:1,8,18
    94:5 95:18 96:20
    97:11 98:7,17,20
    100:7,10,21 102:6
    104:10,16,18 105:6
    105:11,13,16
    107:20 108:20
    109:5 110:1,24
    111:2,12,22 112:8
    112:23 113:16,25
    114:16 116:8,14
    117:13,24 118:5
    119:5,20 120:11
    122:13,15 126:10
    126:24 128:2
    129:20 130:12
    131:14 132:8 133:2
    134:24 136:16

    137:2,9,18 138:14
    139:12 141:13
    142:10 143:11,15
    143:19,23 144:7,19
    145:2 146:1 147:22
    149:4 150:19,22
    151:17,22
schwartz's 11:4
    27:21 37:14 38:11
    40:14 121:10
science 87:23
scope 12:17 13:15
    14:2 15:1 34:7
    38:10
scout 2:12
screen 8:7,9,10,11
    33:4,5 122:8
screening 92:19
scrutinized 98:2,3
seal 153:10
seale 35:3 143:3
    144:18 145:8,22
    146:6,12 147:6,13
    148:20 150:5,9,17
seale's 146:19
search 54:22
searches 55:2
sec 77:20,22 78:19
    119:22
second 21:14,18,20
    21:24 28:12 45:2
secure 78:1
securities 7:5 15:20
    15:21 46:16,19
    59:2 61:18 64:23
    73:14 74:1 76:10
    77:4,8,14,16 78:1,5
    80:13 85:15 88:7
    93:24 98:6 109:1
    119:18 120:4
    133:12

see   45:8 46:22
  66:17,17 81:11
  89:11 90:1 94:24
  96:7 104:6 107:11
  117:8 123:13
  124:20 125:16
  148:18
seeing   115:22
seek   88:3
seeking   88:7
seen   99:1 110:20
segments   124:1
self   99:11 140:20
  145:17
sell   74:16,18
semester   46:10,21
send   57:24 99:13
sense   31:6 45:21
  67:21 92:3 125:25
senses   79:5,6
sensitive   57:2
sensitivity   71:25
sent   9:11 16:24
  41:11 58:20
sentence   62:10,25
  108:6 110:13,15,16
  113:19 119:19
separate   79:14
  96:24 101:15,17
  109:12
series   74:4,6,10,13
  74:19,20,23 79:10
  79:11,23
serious   87:2
served   71:9
services   73:18
set   38:18 40:5,9
  61:3 85:7 86:3 89:7
  90:2,13,18 91:2,25
  93:6 96:12,14,19
  104:8 117:4 119:4

121:5 136:11,20
  139:4,8,10 141:21
sets   131:16
seven   48:7
shaky   29:23
share   4:25 70:23
  130:23
shared   56:8 57:4
  57:15,18
shares   85:16
shocked   59:6
short   46:9 91:11
shortly   76:12
show   118:12
  135:24
shown   85:20
shut   57:8
side   26:5 28:6
  51:17 52:6 57:15
  87:8
sides   60:9
sifma   103:24
sign   11:18 12:1,4
  13:7,9 14:10,12
  70:7 72:4,11,13
signature   153:15
  154:19
signed   11:16 12:1,2
  12:10,14,25 13:3
  13:11,20,24 14:5
  15:14 16:3,12
  70:24
signing   11:21,23,23
  11:24 13:21
similar   22:8,10
  25:2 29:20 30:15
  119:22 120:22
similarities   30:21
similarly   1:4
simple   87:22

simply   113:12
  133:22,23
single   47:20
sir   7:4 15:10 19:14
  23:8 25:11 26:19
  28:3 29:18 30:4,16
  32:3,8 33:9 34:23
  35:1 42:18 52:2
  53:4 58:19,23 59:1
  59:22 73:1,13,16
  79:6 80:23 81:7
  84:3 85:2 88:3
  90:12,17 91:3 95:1
  98:24 100:8 105:23
  108:4 110:5 115:10
  115:19 117:6
  118:23 131:6 132:2
  133:7 134:14
  135:18 136:9,19
  137:24 144:6
  146:11 149:8
sit   11:16 13:10
  15:11 33:20 34:3
  40:2 48:25 58:2
  70:1 81:13 87:4
  88:20 100:25 103:7
  107:1 112:3 117:11
  119:24 120:24
  125:11 130:8 146:9
sitting   7:20
situated   1:4
situation   18:10
  24:17 79:9
six   59:25 69:14
skip   70:12,13 148:2
skippy   59:3
sleep   132:15
slightly   116:25
slip   141:19
slipped   141:20

small   22:22 58:5
  65:13
smaller   64:25
  137:8
smith   2:2 5:3
snowcrest   7:3
solutions   4:11
somebody   11:16
  13:12 19:25 21:3
  31:19 43:3 54:7
  144:25
somewhat   79:14,20
sorry   16:9 21:15
  23:9 32:6 33:3
  49:13 55:1 76:2
  97:19,19 102:10
  105:15 106:5 131:5
sorts   44:7 51:12
sound   32:12 60:16
  76:17 91:5 115:3
sounds   12:23 54:25
  72:22 76:19 88:16
source   92:10,15
  93:3,16,19,20 95:7
  104:15,19 105:9
  112:19 113:11,22
  119:2
southwest   64:23
space   80:9 105:17
speak   24:3 54:24
  76:2
speaking   19:10
  24:3,16 133:9
special   87:9 134:11
  134:12
specialized   88:21
specific   38:4 39:8
  56:23 68:5 95:7
  101:5,25 102:25
  103:15,17,18,24
  106:8 113:22

114:15 117:9,22
119:10,18 131:2
135:1,2
**specifically** 60:24
89:15 95:16,19
99:25 100:16 104:3
108:6 119:25
130:25
**specify** 114:19
**speculate** 58:10
130:17
**speculating** 37:3
58:9
**speculation** 18:8
37:8 53:2 93:2,19
98:8,21 104:18
120:12 129:21
130:16
**speech** 18:24
**spell** 67:15
**spend** 123:1,12
**spent** 57:20 58:3
122:10 124:4 126:8
**spoke** 65:22 100:12
**spousal** 67:10,11
**spreadsheet** 97:9
129:12 132:17
**spreadsheets** 42:24
43:20 45:17 121:3
121:5,10,17,19,22
121:23 122:11,18
122:20 123:1,17
124:5,13 125:9
126:9 131:8,15,16
131:20
**squeeze** 93:1
**squeezing** 91:19
**st** 2:17
**stage** 22:24 23:6,19
82:13 116:18

**standard** 91:6
92:23 118:17
129:19 136:3
**standing** 29:3
71:14
**standpoint** 44:23
**start** 43:19 80:10
90:10 97:21 115:16
119:8
**started** 19:14 20:7
38:19 46:19 69:14
73:14 76:7 101:7
104:24 123:10,25
**starting** 78:7 80:6
**stat** 46:11
**state** 1:20 6:24
113:13 143:21
153:3,17 154:3
**stated** 32:5 143:24
**statement** 40:7
71:5 94:21 95:8
112:5
**statements** 10:13
116:16
**states** 1:1 4:5 77:20
77:23 110:20 141:9
**stating** 5:17 75:17
**statistician** 46:2
84:17,21 131:19
**statistics** 46:5,7
47:2,7,13
**status** 67:12
**stearns** 73:22
**stenographic** 154:7
**stenographically**
154:6
**stenography** 10:7
**step** 21:7 123:15
**steve** 5:1,20 15:6
19:8,15 24:24
51:21 137:15

143:14 151:21
**steven** 2:2
**stick** 90:5
**stoneman** 34:1
58:24 68:12 69:5
75:14
**stop** 77:25
**stopped** 37:9
**story** 150:15
**straight** 87:18
**straightforward**
87:19
**street** 63:25 75:15
**stretching** 125:3
**strike** 30:24 37:5
63:4 83:22 135:20
**strong** 140:20
**stuff** 92:23 114:24
135:16 142:9
**subject** 23:1,3,23
54:13 55:16,23
71:10 105:22
**subsequently** 43:25
**substantive** 20:8
67:17 68:16
**sufficient** 118:12
135:24
**suggest** 29:24
106:6,6
**suggesting** 106:1
145:21
**suggestions** 45:20
**suit** 106:17
**suitability** 118:18
129:19 136:4,10
142:16 143:3,4
145:23 146:6,10,12
146:15,17,19 147:5
147:13,18,19
148:20,23 149:20

**suitable** 107:10,18
108:12 109:12,25
110:23 112:21
113:10 118:15
134:17,23 136:1
140:2,14,19 141:9
142:13 148:19
149:1,23
**suitcase** 106:18
**suite** 2:12
**summary** 38:7
**supervised** 75:4
**supervision** 95:11
**supervisor** 74:23
75:1
**support** 68:16 97:1
100:24 103:5,18
109:13 113:18
114:5,7,8,10,15
115:23 116:3 117:9
117:10,22 118:1
**support's** 114:25
115:17
**supports** 100:17
112:5 119:11,18
**supposed** 70:18
87:9,9 138:1,3,13
**supposedly** 54:5,6
**supreme** 5:13
**sure** 18:16 19:22
20:18,25 21:20,23
26:11,25 30:9
34:13 36:11 39:22
51:18 53:22 56:22
72:16 89:17 90:12
123:5,7 125:12
132:22 137:15,18
138:12 139:19
**surprised** 59:8
**surrebuttal** 39:1

**suspect** 14:11
**suter** 2:6 3:2 4:13
  4:13,19 5:19,19 6:2
  6:4 7:24 13:2,23
  15:6,9,17 16:1,8,19
  17:24 18:14 19:8
  19:12 20:6 21:10
  22:22 23:7,13 24:1
  24:5,23 25:7 26:16
  26:18,21,24 27:2
  28:9,20 29:4,25
  30:2,3,23 32:16,20
  33:10,14 34:16
  35:9,15,19,25 40:1
  40:24 41:10 44:4
  48:19 49:8,12,25
  51:1,16,20,22 53:3
  53:22 54:12 55:13
  56:11 57:11 59:4
  59:18 61:11 62:5
  62:11 63:1 64:9
  65:4 66:8 67:11,20
  70:6,19 71:16,23
  72:10,18,22 73:1
  73:10,11 80:7,9,11
  82:17,24 83:8,17
  84:5,22,25 86:10
  86:18 87:13 88:1,9
  88:17 89:5,16
  90:11,25 91:1,23
  92:9,14 93:5,15
  94:1,13 95:21 97:6
  97:16 98:12,18
  99:17 100:9,12,15
  101:1 102:10,18
  104:14 105:3,8,25
  107:23 108:24
  109:19 110:18
  111:10,13,16,20,25
  112:2,17 113:3,21
  114:13 115:9 116:9
116:15,22 117:2,16
118:3,7 119:9
120:2,18 122:19
126:14 127:3 128:5
128:12,21 129:1,16
130:3,20 131:25
132:23 133:6
135:10 136:18
137:6,15,19,22,23
138:16 139:18
141:24 142:23
143:1,14,17,21
144:2,14,21 145:20
146:5 148:15 149:9
151:3,12,14,19,25
152:3
**suter's** 17:19
**swear** 5:6
**switch** 22:5 80:22
118:16 136:2
**switching** 118:20
119:15 120:9
127:18 136:7,24
138:21 139:22
**sworn** 5:23 6:12
153:8
**swung** 63:18
**system** 33:8 47:9

**t**

**t** 3:6
**tab** 80:25
**table** 60:10
**tabs** 121:4
**take** 46:24 69:24
70:4,4 84:16 91:24
108:5 114:3,20
115:13 116:6,19,23
123:25 128:19,23
137:10,13 140:10
151:15,17

**taken** 6:6 44:11
46:7 73:7 136:21
152:6
**talented** 42:7
**talk** 10:11 63:2
80:6 105:20
**talked** 41:18 42:1
81:16 103:22 111:6
**talking** 32:9 51:16
101:9,20,21,22
102:8 109:14 122:2
131:22 135:1
**talks** 109:16 119:25
**tampa** 1:2 2:13 4:6
4:18
**technically** 74:8
**technique** 97:17,20
97:22
**technology** 9:23
**teed** 121:13
**teeth** 48:14
**telephone** 41:14
**tell** 6:20 13:18
25:20 28:17 31:3
42:12 50:11 56:4,6
62:6 70:24 81:3
82:13 103:13,15
130:24 134:20
135:11 138:8
**telling** 25:19 82:25
91:19 144:24
**ten** 63:17
**term** 31:1,8 33:16
35:4 79:9 84:18
124:17 133:7,12,16
133:17
**terminal** 121:3
**terminate** 78:2
**terms** 13:5,13
36:22 45:13 103:14
103:15 114:14

126:20 147:1
**test** 98:13 99:7,9,11
129:23
**tested** 97:24 98:1
99:5,13
**testified** 14:19
31:25 33:17,21
50:12 52:12,17,25
55:7 95:17
**testifies** 15:21
**testify** 14:20,22
40:5,9 53:7 54:3
**testifying** 22:21
23:21 25:21,21 27:4
30:11 55:10 56:17
**testimonies** 52:24
**testimony** 6:12,17
17:6 19:1 24:4
33:17 49:4,6,18,19
50:2,7 53:2 81:18
84:8 87:6 91:11,17
110:25 111:4
122:18 129:21
132:9 134:14
136:19 141:15
142:12 145:1,11,16
146:3 147:14,24
**testing** 87:14
**tests** 86:19
**texas** 46:25 47:2
**text** 83:1
**thank** 6:23 7:18
11:1 16:20 19:20
30:2 35:18 37:23
51:20,21 57:12
72:2 73:10 80:24
95:6 106:7 118:4
121:1 127:4 146:18
152:3
**thanks** 70:17,17

**theoretical** 135:16
**theory** 97:17,22
**thing** 33:4 43:14
  65:16 67:25 89:24
  135:20
**things** 43:17,20
  44:8 78:4 93:11
  103:16 110:13
  124:22
**think** 9:1 11:3 12:8
  14:4 17:22 19:5
  20:18,25 21:3,24
  24:14 25:23 29:19
  29:20,23 30:20
  31:4 32:15 33:9,15
  34:11,15 38:4,6,8
  38:25 39:23 40:7
  40:11,14,21,22
  41:17,17,18 43:21
  43:25 44:9,17 45:6
  45:15,19,20 46:8,9
  46:10,20,20 47:7,7
  47:10 49:14 50:5
  51:16 52:3 56:11
  57:3,4 58:15 60:13
  60:13,14,21 65:2
  65:13 67:6,8,16,24
  67:24 68:24,24
  69:24 70:10,11,14
  70:14 72:15 74:25
  75:20 76:12,16,16
  78:7,8 80:5 83:14
  87:19,20,24 88:18
  90:5 91:4,16,18
  95:4 96:16 97:4
  99:24,25 100:1,10
  100:23 102:6 103:3
  103:3,4,8,22 104:1
  104:17 108:5
  109:14 112:24,25
  113:18 114:11

116:17,18 118:1
  121:15,25 122:6
  123:9 124:9 125:2
  125:14 127:21
  128:5,8 129:4,9,12
  129:12,24 130:1
  131:15 133:9 142:2
  142:2,20 148:4
  149:11
**thinking** 12:14
  70:7 71:7,21
**third** 47:8
**thought** 21:5 32:9
  39:6 49:15 50:4,11
  50:15 81:16,17
  83:13 96:25 114:6
  114:6 130:25
  131:20 146:13
**thoughts** 68:17
**thousand** 8:23
  93:23
**thousands** 93:22,23
**three** 8:22,25 9:1
  47:6,22 65:1 67:19
  80:21 125:15 126:2
  129:7 137:12 143:6
  147:14,18
**threshold** 118:16
  136:3
**throw** 150:2,3
**throwing** 135:16
  150:2
**thrown** 129:6,8
**time** 1:14 10:24
  14:2,7 18:6 20:14
  21:8,16 23:22
  33:12 38:24 39:10
  41:17 44:1,18 46:9
  47:5,12 48:9 50:12
  57:20,23,24 59:11
  59:24 63:13 65:5

65:11,21 66:14
  69:24 70:4,11 71:7
  73:2 76:21,23 78:4
  78:6,12 81:16
  83:23,24 89:12
  90:6,9 92:17 94:15
  95:20 108:11 114:3
  114:20 116:6,24
  122:9,25 123:12,21
  124:6 129:2 137:13
  141:17 151:21,21
**timeframe** 42:23
**times** 36:3,9,22
  49:14 63:8,22
  66:12,19 79:8
  140:22 149:24
  150:13
**timing** 21:13
**title** 22:15 81:9
**today** 4:25 11:2,16
  13:10 14:20 15:11
  29:15 33:20 34:3
  36:5,7 40:3 48:25
  49:6,18 58:2 81:13
  87:5 107:1 112:3
  117:12 119:24
  120:24 122:18
  130:8 146:9
**today's** 122:9
**told** 9:8 21:25 25:9
  30:5 38:20 67:25
  142:19
**tolerance** 31:15
**topic** 70:13,13
  142:22,22
**topics** 111:6
**touched** 68:22
**tough** 39:19
**tournament** 75:24
  76:4

**track** 66:18 92:20
  135:17
**tracy** 33:25 58:24
  68:11 69:5 75:13
**trades** 31:11 92:20
  125:23
**trading** 31:9 44:7
  65:17 89:20 106:14
  106:16,20,23,24
  107:2,9,17 108:9
  109:24 110:22
  113:9 118:13
  135:25
**training** 43:22 46:4
  93:24
**transcript** 18:1,5
  133:5 154:6,7
**transfer** 118:14
  135:25
**transferred** 133:25
**treatise** 106:13
**treatises** 103:21
  110:11
**trial** 1:17 17:7
**trick** 24:18
**tried** 14:10
**trier** 88:22
**trouble** 150:7
**true** 59:12 89:24
  154:7
**truth** 6:20,20 91:19
**truthful** 17:8,20
  18:17 145:1,1
**truthfully** 9:16
**try** 18:23 23:15,24
  40:22 56:22 70:10
  71:2 103:9 115:3
  119:10 128:4
  130:18 137:7 138:4
  139:17 140:5
  141:19 142:4

145:14 148:8
**trying** 24:7,10,18
 24:21,24 28:9,21
 28:25 29:4 38:14
 43:16 47:8 56:6,12
 56:13 64:14 67:13
 67:21 86:17 87:20
 93:11 128:6,6,6
 132:3 135:14 141:2
 142:10
**turn** 80:25 81:25
 104:4
**turned** 8:11
**turnover** 44:24
 85:10,18 94:23
 100:20 101:9,9,22
 102:5,24 104:5
 106:14 107:8 108:5
 108:8,18 109:2,10
 109:17,18,23
 110:21 112:5,20
 113:7 118:11,20
 119:14 120:8 125:3
 125:12,13,14,23
 126:4 127:8,17
 135:23 136:6,14,23
 138:20 139:21
 140:22 147:17,21
 149:22 150:12
**twice** 81:18 112:15
**twist** 93:11
**two** 7:5,8,14 9:4
 10:7,25 21:17
 27:15 40:5,10 48:5
 48:6,15 51:6,13,24
 61:15 64:9 79:9
 100:24 101:11,15
 101:17,19,23 126:2
 130:14 131:21,22
 133:17,22,24 134:9
 134:15,22 136:12

142:24 149:2
**type** 115:8 153:22
**typed** 92:3,7,24
 93:13
**types** 103:16
**typically** 31:8
 34:12 51:9,12

**u**

**ultimately** 123:23
 131:12
**un** 112:6
**unauthorized**
 65:17
**unaware** 119:24
**uncommon** 66:19
 68:3
**underlying** 74:17
**underneath** 89:22
**undersigned** 153:6
**understand** 6:5,19
 9:15 10:21 17:2,10
 17:25 18:3,5 30:9
 31:1 35:4 37:4,6,8
 37:9 40:21 41:9
 51:23 62:22,25
 76:1 78:24 82:20
 83:6 85:25 89:11
 96:11 107:15
 117:18 138:6,7
 142:5 144:6,8,9,11
 151:6
**understanding**
 13:11 26:7 34:4,20
 40:2 129:17
**unethical** 115:14
 115:15,16
**unintelligible**
 132:11 143:24
 144:3 147:23 148:6
 148:11 149:4

**unique** 91:5 92:23
 92:25
**unit** 4:3 73:5,9
 152:5
**united** 1:1 4:5
**university** 46:25
 47:2
**unmanaged** 120:17
**unproductive**
 116:17
**unreasonable**
 136:25
**unstable** 128:17
**unsuitable** 88:12
 108:19 109:3,12
 112:7 118:22
 119:16 120:10
 127:19,25 130:11
 130:22 131:12
 133:1,8,10,13,21
 134:1,17,23 136:8
 137:22 138:22
 139:10,23 140:3,19
 141:1,10 142:14
 143:9 149:2 150:4
 150:14,14
**use** 1:16 23:15 28:7
 42:6 53:19 84:6,19
 86:14,20,24 90:22
 91:15 92:18 94:15
 98:16 106:15 123:6
 124:16 134:5,9,15
 148:5
**uses** 91:9
**usually** 11:19 31:9
**utilized** 84:16
 86:12 95:15 103:25
 106:11 127:6

**v**

**vague** 51:15 86:25
 89:9 90:23 122:15
 126:10 132:10
**valerie** 1:19 4:11
 153:16 154:5,20
**vanilla** 91:9
**various** 8:24 43:4
 43:20 77:18,23
 101:8 121:5
**vast** 52:14
**vehicle** 24:12 28:7
**verbiage** 94:10
**veritext** 4:8,11
**version** 19:17
 82:19 83:4,7
**versus** 52:13 79:22
**video** 4:1 19:17,18
 41:15 73:5,8 152:4
**videoconference**
 1:11 9:19 153:8
**videographer** 2:20
 4:1,10 5:5 20:3,4,4
 73:4,8 151:12,13
 152:2,4
**videotaped** 1:11
 4:3 10:10
**view** 150:18
**views** 62:16
**violating** 56:21
**violation** 98:23
**virtual** 4:9
**volume** 1:22
**volunteered** 100:12
**vs** 1:6 4:4 20:10
 22:14 40:4

**w**

**wait** 80:7 102:12
**waive** 5:15

**walk** 28:22

**wall** 63:25 75:14
135:17

**want** 14:20,22 15:2
16:9 18:22 23:11
26:25 28:23 31:12
37:6 51:17 56:4
58:10 64:18 67:8
69:24 70:10,12
71:6,15,20 75:15
82:22 90:9 91:20
101:14 102:16
114:17 116:5,5,5
119:8 128:9,10,10
130:13,17 137:25
141:4 142:21
146:15 151:17

**wanted** 19:22
42:11,15 43:10,10
44:24 45:5,17,18
68:6 90:8 93:1
121:18 123:13
125:16

**warn** 66:4

**way** 18:13 25:17
29:6 33:21 35:24
43:3 44:13 45:21
49:17 56:20 58:24
59:13 64:16,17
66:20 67:5 69:12
75:23 85:23 107:4
108:11 133:5
138:12 142:4
148:12,16 150:24
151:4,7

**ways** 116:5

**we've** 6:4 59:9
72:18 82:10 98:25
99:1 116:24 130:15

**went** 20:14 21:8,12
46:8,21 54:16,17

100:2 125:20
148:11

**west** 2:3,12

**westcliffe** 7:3

**westward** 7:9,13
7:15

**whatnot** 56:22

**whatsoever** 36:13
144:10 148:14

**whichever** 12:6
102:20

**white** 9:7

**whoa** 148:12

**wife** 9:6 33:25 56:1
57:19 58:24 59:13
59:16,20 66:11
67:1,6,7,9,12,18,22
68:11,23 69:5
70:22 71:9,18,20
72:1,11,13 75:13
128:19

**wife's** 71:14 72:14

**wise** 127:24 147:20
147:21

**witness** 5:7,10,23
5:25 7:23 12:21
13:17 14:4,23
15:22,25 16:7,17
17:12,13,21 18:12
18:23 20:5 22:21
24:11,18 27:25
28:4,13,17 30:19
34:9 35:10,14,22
39:18 40:21 41:9
43:9 47:16 48:14
48:17 49:11,23
50:23 51:18 53:7,8
53:21,25 55:9,12
56:15 57:1 61:8
62:4,9,16,25 64:19
66:4 67:8 70:14,17

71:13 72:24 73:2
80:16 82:10 83:6
83:13 84:4 86:9,16
87:1,18 88:6,16
89:2,10 90:4,8
91:18 92:3,13
93:10,21 94:6
95:19 96:22 97:13
98:9,25 100:22
102:12 104:12,17
104:21 105:7,12,15
105:24 108:23
109:8 110:6 111:1
111:17 112:15,24
113:18 114:4,17,22
117:14 118:1 119:6
119:21 120:5,15
122:14,17 126:11
127:2 128:4,16
129:4,24 131:18
132:13 135:5
136:17 137:4
139:16 141:15,17
142:5,18 143:18,19
144:1,8,20 145:4
146:4 148:2 150:21
150:23 151:24
152:1 153:10

**witness's** 24:4,25
111:21 118:6
142:12 147:24

**witnesses** 144:17

**witter** 64:22

**wood** 20:18 21:18
21:21,22,24

**word** 49:20 50:21
53:19 60:8 84:7,15
84:19 86:24 90:22
91:15 92:2 93:9
97:19 104:11
126:25 128:3

133:21 134:4,6,7
134:10 148:5

**words** 42:16 55:19
84:2 86:14 91:19
119:3 121:3 126:22
133:17 144:8

**work** 11:3 22:7
47:13 60:9 63:2,2
63:19 64:24 65:10
66:6 67:13 78:6
79:18 97:3 121:2
127:9,10 131:10
132:4,5 151:16,25

**worked** 37:11
47:15 63:3,23 64:4
64:12 65:3,5 73:17

**working** 11:15
22:10 25:1 37:16
37:20 42:3 46:15
57:13 63:11,16,20
79:15 105:18 126:8

**works** 72:22 80:23

**world** 105:18
119:18 133:12
150:18

**worry** 132:13

**wrap** 137:12

**write** 61:8,9,16

**writing** 61:5,12,14
61:23

**writings** 96:4

**written** 11:12 12:5
33:24 37:24 51:5,9
52:9 58:21 60:17
60:20,21,23 61:2
61:15 103:4 109:20

**wrong** 17:22 24:23
24:24

**wrongfully** 140:9

**wrote** 66:9 68:22
69:2 75:13 82:3

**[wrote - zoom]** Page 183

| |
|---|
| 95:2 |

| **x** |
|---|

**x**   3:1,6 18:25
      123:18

| **y** |
|---|

**y**   18:25
**yeah**   30:19 33:9
      35:5 45:20 53:5,25
      55:19 64:19 70:18
      71:24 73:3 76:3
      82:21 90:8 91:4,4
      91:18 93:10 101:12
      101:12,14 104:7,7
      104:21 110:6 111:1
      113:24 114:4,22
      119:6 121:25
      126:11 128:12,18
      128:22 141:17
      150:21
**year**   20:12,21
      25:12 38:3,12
      58:15 65:19 69:14
      69:17,19,22 125:14
**years**   6:10,13 32:23
      53:14 54:7 59:25
      61:17 63:9,18 64:1
      65:9,12,21 67:19
      76:6,14,16 93:21
      95:9 104:13 106:13
      125:15 143:6
      147:14,18
**yellow**   9:7
**yesterday**   8:23 9:3
**young**   2:7,20 4:14
      4:22,24 115:8

| **z** |
|---|

**z**   18:25
**zoom**   4:9 105:18

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of



the deposition wholly or partly, on motion under
rule 1.330(d)(4).

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Page 155

1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
2                          TAMPA DIVISION
3
    KIMBERLY NGUYEN, On Behalf of
4   Herself and All Others Similarly
    Situated,
5
            Plaintiff,
6                                       Case No.
    vs.                                 8:20-cv-195-CEH-AAS
7
    RAYMOND JAMES & ASSOCIATES, INC.,
8
            Defendant.
9   _____/
10
11           VIDEOTAPED DEPOSITION OF DOUGLAS J. SCHULZ
                    (Conducted Via Videoconference)
12
13    DATE:                July 16, 2021
14
      TIME:                2:18 p.m. to 6:19 p.m.
15
16    PURSUANT TO:         Notice by counsel for Defendant
                           for purposes of discovery, use
17                         at trial or such other purposes
                           as are permitted under the
18                         Federal Rules of Civil Procedure
19
      BEFORE:              Valerie A. Hance, RPR
20                         Notary Public, State of
                           Florida at Large
21
22                         Volume 2
                           Pages 155 to 320
23
24
25

Page 156

1 APPEARANCES:
2 STEVEN A. SCHWARTZ, ESQUIRE
   Chimicles, Schwartz, Kriner & Donaldson-Smith, LLP
3 361 West Lancaster Avenue
   Haverford, Pennsylvania 19041
4 sas@chimicles.com
        Attorney for Plaintiffs
5
6 BERNARD R. SUTER, ESQUIRE
   BRYCE M. CULLINANE, ESQUIRE
7 Keesal, Young & Logan
   450 Pacific Avenue
8 San Francisco, California 94133
   ben.suter@kyl.com
9 bryce.cullinane@kyl.com
10      -and-
11 JOHN E. CLABBY, ESQUIRE
   Carlton Fields, P.A.
12 4221 West Boy Scout Boulevard
   Suite 1000
13 Tampa, Florida 33607
   jclabby@carltonfields.com
14
        -and-
15
   GIANLUCA MORELLO, ESQUIRE
16 Raymond James Financial, Inc.
   880 Carillon Parkway
17 St. Petersburg, Florida 33716-1102
        Attorneys for Defendant
18
19 ALSO PRESENT:
20    Michael Peterman, Videographer
      Clay Lean, Paralegal - Keesal, Young & Logan
21
22
23
24
25

Page 157

1         I N D E X
2 DIRECT EXAMINATION (CONTINUED)          Page 158
   BY MR. SUTER
3
   CROSS-EXAMINATION BY MR. SCHWARTZ      Page 312
4
   REDIRECT EXAMINATION BY MR. SUTER      Page 314
5
   CERTIFICATE OF OATH         Page 317
6
   REPORTER'S CERTIFICATE      Page 318
7
8
        E X H I B I T S
9
10 Exhibit   Description         Marked
11 Exhibit 142  Brokerage Fraud: What Wall  Page 212
              Street Doesn't Want You to
12            Know by Tracy Pride
              Stoneman and Douglas Schulz
13            and
14 Exhibit 143  SEC Release No. 34-51907  Page 213
15 Exhibit 144  Order (November 19, 2020)  Page 230
16 Exhibit 145  Class Action Complaint and  Page 285
              Demand for Jury Trial
17
   Exhibit 146  Letter from SIFMA to      Page 302
18            Brent J. Fields, SEC,
              Re: SIFMA Regulation Best
19            Interest (August 7, 2018)
20
21
22
23
24
25

Page 158

1         THE VIDEOGRAPHER:  Going back on the video
2 record at 2:18.  This is Media Unit 3, No. 1.
3         DOUGLAS J. SCHULZ,
4 the witness herein, being previously duly sworn on oath,
5 was examined and deposed as follows:
6         DIRECT EXAMINATION (CONTINUED)
7 BY MR. SUTER:
8    Q.  Mr. Schulz, before the break, I asked you a
9 number of questions about your opinions, and you stated
10 that -- that, quote, We know from the regulators, the
11 releases and notices.  We know it from your internal
12 policies what your brokers, your licensed brokers."  And
13 then it goes on.
14      Do you recall the question and answer and what
15 you were referring to when you said there were notices
16 from regulators or releases?  What were you referring to
17 then?
18    A.  Well, in preparing my reports, I looked at a
19 number of items, a number of notices, a number of
20 regulations.  I read the SEC finding against
21 Raymond James in 2019.  I read the 2005 finding by NASD
22 of Raymond James.  And then I read a boatload of
23 policies.  And some of them were -- oh, I don't know
24 what you would call that.  It was a -- it was a policy.
25 I guess everything written internally in Raymond James

Page 159

1 is a policy, but some of them were particularly directed
2 at potential movement of accounts and opening of
3 fee-based accounts.  So some combination of those things
4 is what I think I was referring to.
5    Q.  And can you refer us specifically to any
6 regulation that you believe supports your opinion here
7 that it was objection -- objectively unsuitable for
8 Ms. Nguyen to have opened a Freedom account at
9 Raymond James?
10       MR. SCHWARTZ:  Objection to form.  Objection,
11 overbroad.
12       THE WITNESS:  Yeah, it's -- it's -- I don't
13 think that's my opinion.  I don't think I have given
14 an opinion, either in writing or in today's
15 testimony -- I don't think I have -- that I said
16 that the mere fact that -- you mentioned the named
17 client, right, Mrs. Nguyen?
18 BY MR. SUTER:
19    Q.  Yes.
20    A.  That the fact that she opened a Freedom account
21 was per se unsuitable.  I don't -- I don't think I gave
22 that opinion.
23    Q.  Okay.  Well, then I'm glad you're clarifying
24 that.
25       Does your opinion in paragraph 60 that, quote,

Page 160

1  If a commission-based account has both a 0.5 percent
2  annualized cost and a turnover of less than 0.25, then
3  switching that account to a fee-based Freedom account is
4  objectively unsuitable, closed quote.
5        What I'm hearing you say now is that that is
6  not a per se conclusion that one would reach in all
7  instances; is that correct?
8     A.  I never said anything close to that.
9     Q.  Okay.  So you did not intend for the sentence
10 that I just quoted into the record to be a per se litmus
11 test, an objective test as to whether an account was
12 suitable or not suitable, correct?
13       MR. SCHWARTZ:  Mischaracterizes what the
14    witness just said.
15       THE WITNESS:  I have no response.  I don't
16    understand what you're -- I don't -- I don't
17    understand what you're trying to -- I don't know
18    what -- I don't know.  I have no idea what you just
19    said, so I can't respond.
20 BY MR. SUTER:
21    Q.  Okay.  Well, then let me see if I can make it
22 understandable to us.
23       You previously testified that 75.5 percent of
24 the sample that was looked at by you and Mr. Olsen
25 indicated that those accounts were objectively

Page 161

1  unsuitable.
2        Did I accurately state what you testified to?
3     A.  Well, I ran the account on the calculator.  You
4  spent a long time on that 75 percent.  I don't know if
5  that's -- I don't think you're putting -- you're putting
6  testimony together in pieces.  I don't think I ever said
7  what you just said I said.  So no is the answer.  I
8  don't think that's what I said.
9     Q.  Okay.  Does your opinion that I read into the
10 record since we got back from lunch reflect a per se
11 unsuitability standard, in your opinion?
12    A.  What do you -- I -- I don't know what you mean
13 by "per se."
14    Q.  You used that term since we got back from
15 lunch, so I was picking up on that.  Let me ask it this
16 way.
17       Is it your opinion that if the two metrics that
18 are reflected in the paragraph or sentence that I just
19 read from paragraph 60 are met, that any and all
20 accounts are going to be objectively unsuitable?
21    A.  I never said that.
22    Q.  And that is not your opinion?
23    A.  It's not what I said.
24    Q.  Is that your opinion or is it not?
25       MR. SCHWARTZ:  Objection to form.  Object.

Page 162

1        THE WITNESS:  I wouldn't have said that.
2        Your sentence was about this long and just said
3     if -- if -- if accounts don't meet the two criteria,
4     they're unsuitable.  I've never said that.
5        You didn't say "Freedom," you didn't say
6     "fee-based," you didn't say "switched from
7     commission."  You didn't say any of the things I say
8     in my report.  You just took this little thing you
9     made up.  And I'm -- and the answer is no, I never
10    said that.
11 BY MR. SUTER:
12    Q.  I was quoting from paragraph 60, but let's try
13 it one more time here.
14       Is the following sentence that reflects your
15 opinion in paragraph 60, in your mind, a per se standard
16 that applies to all accounts that meet the criteria,
17 quote, If a commission-based account has both a 0.5
18 percent annualized cost and a turnover of less than
19 0.25, then switching that account to a fee-based Freedom
20 account is objectively unsuitable, closed quote?
21    A.  That's what I said and that's my opinion.
22    Q.  And is that a standard that -- in your
23 opinion -- that applies to all accounts that meet the
24 criteria set forth in the sentence from your report that
25 I just read?

Page 163

1        MR. SCHWARTZ:  Objection, vague as to the words
2     "all accounts."
3        THE WITNESS:  Yeah, I don't know what -- I
4     don't know what you mean by "all accounts."  All
5     accounts at Merrill Lynch?  All accounts ever
6     established in the world?  I don't know what "all
7     accounts" mean.
8  BY MR. SUTER:
9     Q.  Well, obviously, this sentence applies to
10 Raymond James, and it applies to commission-based
11 accounts at Raymond James that are switched to Freedom
12 accounts at Raymond James.
13       Is that not correct?
14    A.  That's what I'm talking about in my report.
15    Q.  And that's what I'm talking about in my
16 question.
17       Is it your opinion, sir, that all such accounts
18 that we just agreed on, if they meet the two criteria of
19 a 0.5 percent annualized cost and a turnover of less
20 than 0.25 are per se unsuitable under your standards
21 here?
22    A.  I'm just going to take out the word "per se."
23 If I used it before, I didn't mean to.  I'm just going
24 to say they're unsuitable, and I'm taking out the word
25 "per se."

3 (Pages 160 - 163)

Page 164

1    Q.   Okay.  And there is -- can you determine that
2  they are unsuitable solely on the basis of the two
3  metrics that are included in that sentence from
4  paragraph 60 that I quoted?
5    A.   That's my opinion.
6    Q.   Okay.  And can you identify with any greater
7  specificity any of the rules or regulations or releases
8  that you believe support the opinion that you just
9  confirmed?
10    A.   I think I listed them a minute ago.  You want
11  me to list them again?  Or do you want me to mention
12  them by number?
13    Q.   Can you identify them with greater specificity?
14    A.   Well, not all of them, but I can probably
15  remember some of them.  If you'd like, I'll remember
16  some of them.  I just don't want it misconstrued that
17  that's -- I'm saying that that's all of it.
18    Q.   Please tell us those that you can recall.
19    A.   Well, I think it's Rule 2110.  I think it's the
20  suitability rule.  I think it's 2090, Know Your
21  Customer.  I think it's the 2122 about fair pricing.  I
22  think it's Notice to Member 75 something.  I think I
23  allude to it in my report.  That means the year '75.  I
24  think it's Notice to Members NASD 03-68.  I think it's
25  based on, additionally, the SEC findings which was in

Page 165

1  2019.  I think it's in the NASD finding at 2005.  And I
2  think it's in a number of places in Raymond James'
3  policies and literature.
4    Q.   Okay.  Anything else that comes to mind that
5  supports your -- your review?
6        MR. SCHWARTZ:  Objection, overbroad.
7        THE WITNESS:  I'm sure there is more.  That's
8    all I can remember at this time.
9  BY MR. SUTER:
10    Q.   If a Raymond James commission account meets the
11  two criteria you list in the last paragraph of 60, are
12  there any circumstances where a recommendation to open
13  the Freedom account can be suitable?
14        MR. SCHWARTZ:  Well, objection, overbroad.
15        THE WITNESS:  No, none that I can think of at
16    this time.
17  BY MR. SUTER:
18    Q.   Okay.  And have you given some thought to
19  whether or not the standard that you set forth in that
20  last sentence of paragraph 60 is overinclusive?
21    Q.   What do you mean by "overinclusive"?
22    Q.   In other words, it would capture accounts that
23  would otherwise be suitable for particular customers who
24  wanted a Freedom managed fee-based account?
25    A.   I don't think it's overinclusive.

Page 166

1    Q.   Okay.  Did you give any consideration at any
2  time prior to today as to whether or not your opinion as
3  set forth in the last sentence of paragraph 60 could be
4  overinclusive and capture accounts that were precisely
5  the sort of accounts that the clients wanted to have?
6        MR. SCHWARTZ:  Objection to form.  Objection,
7    asked and answered.
8        THE WITNESS:  So let me make sure I understand
9    your question, because the last three or four words
10    are narrowing this overinclusiveness only down to
11    one issue, unless you didn't mean to do that.
12        The way I heard your question is that my -- my
13    opinion in paragraph 60 could be overinclusive
14    because there may be clients who wanted a Freedom
15    account.
16        Isn't that what you're implying?
17  BY MR. SUTER:
18    Q.   Yes, let's go there, let's use that as the
19  question.
20    A.   I -- I would still -- I don't think it's
21  overinclusive.
22    Q.   Okay.  And if a client who transferred in a
23  hundred thousand dollars the month before, deciding to
24  open a Freedom account after discussions with the
25  broker, did so, and had a zero cost in the month before

Page 167

1  opening the Freedom account and had a zero turnover in
2  the month before opening the Freedom account, that
3  customer would qualify, under your formula in paragraph
4  60, as having opened an account -- a Freedom account
5  that's objectively unsuitable, correct?
6    A.   Correct.
7        MR. SCHWARTZ:  Objection.
8        THE WITNESS:  Sorry.
9        MR. SCHWARTZ:  Objection, incomplete
10    hypothetical.  But the witness can answer.
11        THE WITNESS:  Correct, I -- you're -- that's --
12    that yes.
13  BY MR. SUTER:
14    Q.   And under your theory and analysis, you would
15  be of the view that if that customer who brought in the
16  hundred thousand dollars in the month before opening the
17  Freedom account, if that customer had three years of
18  management of his or her assets, you would consider that
19  account to have been unsuitable the entire three years
20  because of the metrics that you used to reach your
21  conclusion in paragraph 60; is that correct?
22        MR. SCHWARTZ:  Objection to form.  Objection,
23    incomplete hypothetical.
24        THE WITNESS:  I just want to make sure I'm
25    following the hypothetical.  It's the same

4 (Pages 164 - 167)

Page 168

1  hypothetical, but you're now adding additional
2  hypotheticals?  If that's true, just say "yes" and I
3  can try to answer it.
4      We're dealing with the same hypothetical?
5  You're just now adding something about the fact that
6  she then -- when she opened the Freedom account, it
7  was opened three years?  Is that the new addition?
8  BY MR. SUTER:
9      Q.  Sure.  And we can have that read back if you'd
10 like or if you're able to --
11     A.  No, if you say -- if you say it is -- if you
12 say it is, I'm willing to agree it is.  I mean, I'm
13 willing to agree that's what you asked and I'll try to
14 answer it now.
15     Q.  Okay.  Please answer it.
16     A.  Yes.
17     Q.  Okay.  And so in that scenario, it would be
18 your view that the account when opened was unsuitable,
19 and the account during the entire three years was
20 unsuitable; is that correct?
21     MR. SCHWARTZ:  Same objections.
22     THE WITNESS:  Well, it's just one of your
23 experts argues suitability analysis.  I'm not sure
24 I -- you guys want your cake and eat it too.  He
25 argues that suitability analysis only opens at the

Page 169

1  beginning of the account.  So now you've opened that
2  can of oranges and are trying to stick in some
3  apples, so I can -- I can't do both.
4      I can tell you that when it was opened, under
5  my formula it would have been unsuitable.
6      Now, the fact about the unsuitability going
7  forward, that's a second part of the claimant's
8  claim.  And I'm not sure you're trying to get into
9  that question.  The fact that it was opened one
10 year, two years, or three years, other than the
11 issue of inactivity and blah, blah, blah, and the
12 additional cost, I don't want to -- that's too many
13 questions at one time.
14 BY MR. SUTER:
15     Q.  Let me ask you, are you opining solely in your
16 reports that it was unsuitable -- according to your
17 formula and your conclusion in the last sentence of
18 paragraph 60, are you concluding that you're only
19 addressing the opening of the account and not the
20 ongoing account for, in Ms. Nguyen's case, another three
21 years?
22     MR. SCHWARTZ:  Objection, mischaracterizes the
23 most recent answer the witness gave.
24     But you can answer it again.
25     THE WITNESS:  Well, I was about ready to object

Page 170

1  to this last sentence of paragraph 60.
2  BY MR. SUTER:
3      Q.  If you have a problem with the question, just
4  tell me and I'll rephrase it.  Okay?
5      A.  I can't answer the question as asked.
6      Q.  Okay.  Are you rendering opinions that the
7  account that Ms. Nguyen had at Raymond James for the
8  period January 2016 through October 2018 was unsuitable
9  at the time of opening?
10     A.  At the time of the opening the Freedom account,
11 that's my opinion.
12     Q.  Okay.  Are you also rendering any opinions on
13 whether Ms. Nguyen's account after it was opened and
14 through the time it remained open for close to three
15 years was an unsuitable account during that entire
16 period?
17     A.  That's my opinion.
18     Q.  Okay.  So you have -- have you segregated your
19 opinions in the following sense?  Have you done separate
20 analyses as to the first part, the account opening, and
21 subsequent analyses as to whether it remained
22 unsuitable?  That's option one.  Or are you saying that
23 if an account when opened is unsuitable, it remains
24 unsuitable automatically?
25     A.  You're -- I'm not -- I'm trying to help.  It

Page 171

1  sounds like you mixed hypotheticals with reality.
2      Are we talking about the named client or this
3  just totally hypothetical?
4      Q.  Let me ask the question again if you're having
5  difficulty.
6      Your opinion in this case -- one of your
7  opinions is that Ms. Nguyen's account was unsuitable
8  when opened, correct?
9      A.  Correct.
10     Q.  And your basis for concluding that it was
11 unsuitable when opened is because her account meets the
12 criteria that you set forth in the last sentence of
13 paragraph 60; is that correct?
14     A.  Well, I just want to make this clear.  There
15 may be other reasons that the account was unsuitable
16 other than just the fact that it didn't -- the formula
17 proved that she was a buy-and-hold investor.  I -- I
18 don't think I get into those in my report, and I'm not
19 in the -- in the position to opine on that today.  And I
20 haven't been asked to opine on that.
21     So I don't want to just make sure that somebody
22 on the record said, Well, Mr. Schulz, it's your
23 testimony that that account was suitable as long as if
24 maybe had -- she had just been a, you know, notch above
25 the criteria.

1    I haven't said that and I'm not going to say
2  that because I have no opinion on that.
3    Q.  Thank you.  That's a helpful clarification.
4      So your only basis for reaching the conclusion
5  that Ms. Nguyen's account was unsuitable is that it met
6  the two criteria that you have in your report that are
7  reflected in the last sentence of paragraph 60; is that
8  correct?
9    A.  Well, I don't think I can answer yes to that
10  because, unlike the other 32,999 potential Raymond James
11  claimants, I know from reading all the documents and
12  depositions and everything else.  I happen to know a lot
13  more about the named client Ms. Nguyen.  So I am aware
14  that there are other issues that separately, just from
15  her meeting the criteria, that may have made the Freedom
16  account unsuitable.
17    Q.  Okay.  But you have not been asked to render
18  any opinion on those issues nor have you rendered an
19  opinion on those issues; is that correct?
20    A.  I think that may be wrong.  I think that may be
21  false.
22    Q.  Okay.  Well, then please clarify it so that we
23  have a clear record and a clear understanding.
24      Have you, separate and apart from reaching the
25  conclusion based on the two criteria set forth in your

1  expert report, including in the last sentence of
2  paragraph 60, that Ms. Nguyen's Freedom account opened
3  in January 2016 was unsuitable?
4    A.  Well, I think it was -- I don't know.  And here
5  is -- here is a little of a problem.
6      Since I've written both reports, I have read
7  your experts' rebuttal reports and I've read portions of
8  both of their depositions, so I -- my mind might be
9  remembering something that isn't in either one of my
10  reports, but -- and so this opinion of mine -- you
11  remember you asked do I have any opinions, excuse me,
12  that aren't written down?  I apologize here if for some
13  reason you're going to get -- I'm going to say something
14  that maybe isn't written down.
15      But your experts, in defending and helping you
16  defend the case, go on ad nauseam trying to argue using
17  known facts -- let's just call them facts for now --
18  relating to Dax Seale and her and all this other stuff
19  that, in their opinion, it is suitable to switch her to
20  Freedom.
21      And I'm aware of some of those arguments they
22  have made.  And I know that some of those arguments are
23  wrong.  And so I have -- I have those opinions.  I don't
24  know if I've been asked to render them, but you're going
25  down this path, and I'm just trying to go where you want

1  me to go.  Excuse me.  I'm just trying to go where you
2  want me to go.
3    Q.  Well, I'm just trying to get clear on your
4  testimony, because I believe a short while ago you said
5  you've not been asked to render an opinion on whether
6  Ms. Nguyen's account was suitable but for her failure to
7  meet the two criteria set forth in the last sentence of
8  paragraph 60.
9      Am I correct that that is your view or what you
10  believe at this point?
11    A.  Yeah, let me -- let me try to -- let me try to
12  clear that up.  I can understand that confusion on your
13  part, and I don't think it's unfair.  And I think I did
14  say that.  And it comes back, a little bit right prior
15  to lunch I said, "Don't confuse suitable with
16  unsuitable."
17      Is I stick with my work -- my initial opinion
18  that based on my criteria and the formula and doing the
19  math, that a switch -- recommend to switch her to that
20  was unsuitable.
21      What I am saying, that -- though maybe I
22  haven't even been asked to give it.  But what I know, in
23  response to your expert's argument that it is suitable,
24  that many of their arguments don't hold water.  And so I
25  have this additional opinion about the -- maybe the lack

1  of -- the lack of argument for that it was suitable
2  that's wrong on your experts.
3      But it doesn't change my overall number one
4  opinion that I don't -- and I can ignore what your
5  experts say.  I mean, I think everybody can ignore what
6  your experts say, including the Court.  But I think
7  they're all wet on Mrs. Nguyen, and they were wrong
8  about many of the things they tried to argue why it was
9  suitable.
10    Q.  Are you planning to render any opinion, to
11  provide any opinion, in your role as an expert witness
12  here, as to whether or not Ms. Nguyen's account at issue
13  here, the January 2016 Freedom account -- do you plan to
14  render any opinion beyond what's set forth in your two
15  written reports as to whether or not that account was
16  suitable when opened in January 2016?
17      MR. SCHWARTZ:  Objection to form.
18      THE WITNESS:  I -- I don't -- by the way, I'm
19    the expert.  I don't have any plans.  So I guess the
20    answer would be no.  I -- I don't -- I don't have
21    any plans.  I don't even know what's going to happen
22    next in this case.
23  BY MR. SUTER:
24    Q.  Have you been asked to render any opinions by
25  anyone for your opinions that are going to be set forth

1  in this case, to render an opinion regarding the
2  suitability or lack of suitability of Ms. Nguyen's
3  account separate and apart from the criteria that you
4  set forth in the last sentence of paragraph 60?
5      A.  I don't think so.
6      Q.  Well, we are here to find out all of the
7  opinions that you've been asked to provide and that you
8  are prepared to provide.
9      Are you -- you've not been asked to provide
10  such an opinion?  That's -- when you say you don't think
11  so, that's what you're trying to convey, right?
12      MR. SCHWARTZ:  Objection to form, objection to
13  asked and answered, and objection to
14  mischaracterizes the testimony he has given.
15      THE WITNESS:  I thought that's what I said.
16  BY MR. SUTER:
17      Q.  And so if you were to be asked -- well, let me
18  just do it this way.
19      Do you hold an opinion today as to whether or
20  not the suitability analysis done by Raymond James and
21  Mr. Seale, whether that was adequate or inadequate?  Do
22  you have an opinion on that?
23      A.  Well, we got that established at lunch and I
24  said it wasn't.  We already went over that.
25      Q.  Right, that's foundational.

1      And the reason that you believed that it was
2  not adequate is because it did not meet the criteria set
3  forth in the last sentence of paragraph 60, correct?
4      A.  Well, that's misstating what I said.  I
5  didn't -- I said that -- I may have said that's one of
6  the criteria that caused my opinion, but it's by no
7  means the only opinion.
8      Q.  What are other criteria, if any, that led you
9  to conclude that Ms. Nguyen's account was not suitable
10  when opened in January 2016?
11      A.  I thought I did this before lunch.
12      Q.  Well, is there anything that you want to add to
13  what you've testified to before lunch?
14      A.  Got you.  So I'm going to give it to you again.
15  I'm going to help you out.
16      As you guys keep trying to say that my formula
17  is the only thing that the Court needs to rely on when
18  it comes to various clients, including the named client,
19  it's just -- that's just a simple math that we go
20  through to establish to the Court of who these possible
21  people are.
22      But let's take the named client where we have
23  all this information.  Forget my formula.  Forget
24  Doug Schulz -- Douglas Schulz was never born.  We
25  know everybody who makes -- I'm not here -- would know

1  that Dax Seale did not perform an adequate suitability
2  analysis.  Without me, without my formula, without my
3  reports.  That's a given.  That's -- that's fact.
4  That's 101.  Put it up.  Blow it up.  There it is.  He
5  didn't do it.
6      And -- and so you don't need -- you don't need
7  me.  You don't need my formula.  He didn't do it and
8  it's proof positive.  We know that he did not conduct
9  a -- any -- a proper, appropriate -- we can use "due
10  diligence," we can use "reasonable diligence" -- as he's
11  required under the regulations, under the policies,
12  under know your customer, under suitability.
13      When getting ready to recommend a significantly
14  higher cost, nine to 22 times higher, that he didn't go
15  through the process of analyzing what was the cost of
16  turnover account.  And we know that, in and of itself,
17  was a violation.
18      And then we don't -- well, we know he did well.
19  We know he -- we're pretty sure he didn't do it, because
20  he didn't document it as he is required to do.  And if
21  he did do it, he would have -- we know what he would
22  have come up with, because we've done the math.  And he
23  could have done it himself, which he is required to do.
24  Didn't need my formula.  And he would have gone, holy
25  moly, I can't recommend that.  It's nine to 22 times

1  higher cost.  That's not in her best interest.
2      Q.  So are you rendering an opinion or not on
3  whether or not but for Mr. -- strike that.
4      Are you rendering an opinion, sir, that
5  Ms. Nguyen's account was objectively unsuitable on any
6  basis other than the two criteria set forth in the last
7  sentence of paragraph 60?
8      A.  I have not -- I have not given such opinion.
9      Q.  Thank you.
10      If an IRA commission account holder meets the
11  two criteria you list in the last sentence of paragraph
12  60 at the time they open the Freedom account, in your
13  view, could the Freedom account be suitable a year
14  later?
15      MR. SCHWARTZ:  Objection to the hypothetical.
16      THE WITNESS:  I got to wrap my arms around
17  that.  We're now taking a hypothetical, and the
18  commission account is an IRA account?  Is that the
19  hypothetical?
20  BY MR. SUTER:
21      Q.  Yes.
22      A.  Okay.  And somebody, with hypotheticals,
23  wanting to use Raymond James.  And a broker recommends
24  that they take this IRA and put it in a Freedom account.
25  And could that account be suitable a year later?

7 (Pages 176 - 179)

Page 180

1   Q.  Yeah.
2   A.  Well, I have so few facts.  I don't know any --
3   I hardly know anything.  I don't know.  There is so few
4   facts there, I don't know.
5   Q.  Yeah.  Let me -- let me ask the question again.
6   And I may have misspoken.  Let me ask the question
7   again, see if your answer is the same.
8       If an RJA commission account holder meets the
9   two criteria you list in the last sentence of
10  paragraph 60 at the time they open the Freedom account,
11  in your view, could the Freedom account be suitable a
12  year later?
13      MR. SCHWARTZ: Objection, incomplete
14  hypothetical.
15      THE WITNESS: Well, I -- I need -- this is the
16  third time this has happened.  Give me three
17  minutes.  I did not -- I should have brought it up
18  at lunch.  My internet paused you and I didn't hear
19  all your question.  Just give me three minutes.  I'm
20  going to go into my wife's office and see if she
21  knows any reason that we may be getting these small
22  interruptions.  I'll be right back.
23      THE VIDEOGRAPHER: Want to go off?
24      MR. SUTER:  No.  No, we're not going off.
25  We're -- the witness is leaving the room, but he's

Page 181

1   going to come back.  And -- and there is -- there is
2   a question pending, sir.
3       THE WITNESS: Okay.  I apologize.  I'm back.
4   I'm going to have her look into that problem.
5       I'm sorry, sir, I did not -- would you have the
6   court reporter read that back?  I did not hear the
7   last question.
8       MR. SUTER:  Please, Madam Reporter.
9       (The reporter read the portion requested.)
10      THE WITNESS: I thought that was the second
11  question we had before that I said I couldn't answer
12  because there weren't enough facts.  Or even if the
13  hypothetical.  There is not enough information
14  there.  I can't answer that.
15  BY MR. SUTER:
16  Q.  Would you have to know more information about
17  the individual account holder?
18  A.  What?
19  Q.  In order to answer that hypothetical, would you
20  need to have more information about the individual IRA
21  account holder, more information about what their
22  objectives were, what their risk tolerances were, what
23  their time horizons were, and those sorts of things?
24  A.  No.
25      MR. SCHWARTZ: Object to form.  Objection,

Page 182

1   incomplete hypothetical.
2       THE WITNESS: No.
3   BY MR. SUTER:
4   Q.  I think I mis -- misspoke.  But what would you
5   need -- what additional information would you need for
6   you to be able to -- no, strike that.  Let me -- let me
7   ask it this way.
8       Can you, with your formula, simply determine
9   that an account is unsuitable without knowing more about
10  what each individual investor's investment goals, risk
11  tolerances, individual criteria are?
12      MR. SCHWARTZ: Objection to form.
13      THE WITNESS: Yes.
14  BY MR. SUTER:
15  Q.  In other words, are you saying that by virtue
16  of applying the two formulas that are set forth in your
17  report and that result in the opinion that you expressed
18  in the last sentence of paragraph 60, you don't need
19  anything more about individual investors before you can
20  reach the conclusion that the account is objectively
21  unsuitable?
22  A.  Well, just -- just -- I think I'm getting ready
23  to say yeah, but let's make sure we're not -- and in
24  that assumption in my opinion is I -- I would have
25  had -- had the account information.  I will have had

Page 183

1   the -- had the chance to analyze the cost and the
2   turnover.  And then I'm assuming that -- that it's not
3   suitable to go to Freedom.  There is an assumption in
4   there that we're talking about the typical Freedom
5   account that were opened for the potential claimants.
6       If somebody just says, "Mr. Schulz, did you
7   know that there was a Freedom account that had no cost?"
8   then I would say, okay, that's a whole other issue.
9       So there is some assumptions in that opinion,
10  but as long as those assumptions, I have the
11  information, I've analyzed the information.  They didn't
12  meet the criteria.  They've been recommended to a
13  high-cost -- let's just -- we can take the average 1.2
14  or whatever.  Yes, that that's my opinion.
15  Q.  Is it your opinion that the two factors in the
16  last sentence of paragraph 60 equate to unsuitability
17  beyond the moment the Freedom account is opened?
18  A.  Ooh, hold on.  That's going to take a little
19  thought.  Let me repeat your question to speed things
20  up.
21      Your question is -- and I don't know why we're
22  stuck on -- I mean, I have very large reports, but we're
23  stuck on this one sentence.  But whatever.
24      So is -- I'm sorry.  You're going to have to
25  have it read.

8 (Pages 180 - 183)

Page 184

1      MR. SUTER:  Yeah.  Can I have the court
2  reporter read it back, please.
3      MR. SCHWARTZ:  Before you do, I'm going to
4  interpose an objection to it that it's incomplete
5  hypothetical and vague.
6      But go ahead, read it back, and Mr. Schulz can
7  answer.
8      (The reporter read the portion requested.)
9      THE WITNESS:  I think so.
10 BY MR. SUTER:
11     Q.  I'm sorry.  You think so; is that correct?
12     A.  That's what I said.
13     Q.  So that is your opinion then?
14     A.  Well, if it comes out of my mouth, it's my
15 opinion.  I mean, I don't understand.  I gave you the
16 answer.  You asked me again.  I don't understand.  You
17 think I'm giving you --
18     Q.  You used the -- you used the term "think so,"
19 which it seemed --
20     (Unintelligible simultaneous speaking.)
21     THE REPORTER:  Excuse me.  Excuse me.
22     THE WITNESS:  Don't interrupt me when I'm
23 talking.
24 BY MR. SUTER:
25     Q.  Next question.

Page 185

1      Did Dax Seale do any suitability analysis in
2  regard to Ms. Nguyen's account?
3      MR. SCHWARTZ:  Objection, asked and answered.
4      THE WITNESS:  I think he did as it related to
5  getting information to determine what the
6  investments that were going to be made in her
7  Freedom account.  I do think he did that.
8  BY MR. SUTER:
9      Q.  Did you think that Dax Seale knew his customer
10 before the Freedom account was opened in January 2016?
11     MR. SCHWARTZ:  Objection to form.  Vague.
12 BY MR. SUTER:
13     Q.  I'm sorry.  Did -- did you answer?  I didn't
14 hear you.
15     A.  I hope -- I hope this isn't going to be a
16 problem.  I did not hear but half of that question.  Can
17 you read it back.
18     MR. SUTER:  Ms. Reporter, would you read it
19 back, please.
20     (The reporter read the portion requested.)
21     THE WITNESS:  Did I know what?
22     MR. SUTER:  Could you read it.
23     (The reporter read the portion requested.)
24     THE WITNESS:  Oh, he knew her.  He was dealing
25 with her and her husband for years.  Yeah, he knew

Page 186

1  her.
2  BY MR. SUTER:
3      Q.  And is it your understanding that Mr. Seale --
4  strike that.
5      Do you have an opinion as to whether or not
6  Mr. Seale knew his customer within the meaning of FINRA
7  Rule 2090?
8      A.  I've never been asked to opine on that.  I'm
9  not sure I'm going to be able to give you a quick
10 answer.  That's something I have to think about.
11 I've -- I've not been asked to render an opinion on
12 that.  I don't think I can give a quick answer to that.
13 I've never thought about it.
14     Q.  And sitting here today --
15     MR. SCHWARTZ:  I'm sorry.  I just want to
16     interpose an objection, overbroad, before you
17     continue, because the witness answered too quickly.
18 BY MR. SUTER:
19     Q.  As you sit here today, you've not been asked to
20 render an opinion as to whether or not Dax Seale knew
21 his customer within the meaning of FINRA 2090, right?
22     MR. SCHWARTZ:  Same objection.
23     THE WITNESS:  I have not been asked to consider
24     or give an opinion on that issue.
25 BY MR. SUTER:

Page 187

1      Q.  Okay.  And you have not rendered an opinion on
2  whether or not Dax Seale knew his customer within the
3  meaning of FINRA Rule 2090, correct?
4      MR. SCHWARTZ:  Same objection.
5      THE WITNESS:  That's correct.
6  BY MR. SUTER:
7      Q.  By the way, the suitability rule, 2111, has as
8  a prerequisite that a recommendation be made.
9      Do you agree with that?
10     A.  I disagree with that.
11     Q.  Are you saying that FINRA Rule 2111 applies to
12 circumstances where no recommendation has been made?
13     A.  Oh, oh, I'm sorry.  I misunderstood the
14 question.  I take back my answer.  I apologize.  I did
15 not -- I misunderstood the question.
16     No, I think the suitability 2111 applies to
17 recommendations.
18     Q.  You agree that -- that 2111 applies only to
19 circumstances where a financial advisor makes a
20 recommendation to a client?
21     A.  Yes, except for the last word.
22     Q.  Could you explain your answer?
23     A.  Yeah, it's -- it's a -- it's a -- it doesn't
24 come up often.  It comes up in selling away cases,
25 because in a selling away case a broker can make a

9 (Pages 184 - 187)

Page 188

1  recommendation and the individual cannot be a client,
2  and he can still have a suitability violation even
3  though the client was an official client of the firm.
4      Q.  Well, let's exclude selling away cases.
5          Would you agree that FINRA Rule 2111 has a
6  recommendation requirement as a sine qua non of the
7  applicability of the suitability rule?
8      A.  No, because we also have -- we also have
9  another situation that comes up.
10         So I'm a broker and I'm prospecting and I call
11 somebody.  He's not yet a client.  I make a
12 recommendation, but he hasn't opened an account.  He, a
13 week later, opens the account and buys the security I
14 recommended before he was a client.
15         So once again, there was a recommendation, a
16 violation -- or we're assuming here that there was a
17 violation in the recommendation.  But the client is not
18 a client yet.  It's not a selling away case.
19         So there are instances where a suitability rule
20 can be busted and the person is not a client.
21     Q.  The last question didn't say anything about a
22 client, I don't believe.
23         Would you just confirm for me that in order to
24 have a FINRA Rule 2111 violation, there has to be a
25 recommendation made?  Can you answer that question?

Page 189

1          MR. SCHWARTZ:  Objection to form.
2          THE WITNESS:  I would generally agree with
3  that.
4  BY MR. SUTER:
5      Q.  And that's what the rule says, right?  It talks
6  about recommendations, right?
7      A.  Well, I'm not going to quote the rule unless
8  you let me pull it up.
9      Q.  Do you have any reason to believe that FINRA
10 Rule 2111 does not include the word "recommendation"?
11     A.  I don't have any reason to believe it does or
12 doesn't, but I told you, I have it.  I don't infer or I
13 don't get into that game.  You want to ask me what a
14 rule says, let me pull it up and see what it says.
15     Q.  In this case, is it your understanding that a
16 recommendation was made to Ms. Nguyen to open a Freedom
17 account in January of 2016?
18     A.  As far -- as far as I know thus far, I think
19 that's undisputed.
20     Q.  And do you have any understanding as to whether
21 or not a recommendation was made to any of the folks who
22 are potential class members in this case?
23     A.  Are you asking me if I have firsthand knowledge
24 or do I have an opinion if there was one made or not?
25     Q.  Let me ask both.  Do you have any firsthand

Page 190

1  knowledge?
2      A.  I have no firsthand knowledge.
3      Q.  Have you spoken with any potential class
4  members?
5      A.  Well, Ms. -- I don't know if I -- I can't
6  remember if I talked to Ms. Nguyen or not, but nobody
7  else other than her, and I don't even remember if I
8  talked to her.
9      Q.  And is it your custom and practice to speak
10 with individual investors before you render opinions on
11 whether or not there is a suitability issue related to
12 their accounts?
13         MR. SCHWARTZ:  Objection, overbroad.
14         THE WITNESS:  Well, that's -- that's an
15 interesting question, Counselor.  I have some
16 lawyers who don't -- don't want me to talk to their
17 client.  I -- so I -- remember, I've worked for an
18 awful lot of lawyers all over the country, some of
19 them good, some of them not so good.  So there are
20 some people who don't want me to talk to their
21 client, so -- most of the time, I -- I talk to the
22 clients, but sometimes I don't.
23 BY MR. SUTER:
24     Q.  Have you formed any opinion as to whether or
25 not any potential class members had recommendations made

Page 191

1  to them --
2      A.  I have.
3      Q.  -- to switch from --
4      A.  Oh, I'm sorry.
5      Q.  -- commissioned accounts to -- to Freedom
6  accounts, to use your term here?
7      A.  I apologize for interrupting.
8          I have.
9      Q.  With whom have you spoken?
10     A.  Oh, whoa, whoa.  I'm sorry.  Repeat your
11 question.  I heard a different question.
12     Q.  Let me ask that it be read to you.
13         (The reporter read the portion requested.)
14         THE WITNESS:  Right.  That was the question I
15 was answering.
16 BY MR. SUTER:
17     Q.  Yeah.
18     A.  You threw something in about --
19     Q.  Yeah, I misspoke.  Go ahead, please.
20     A.  Oh, thank you.  Threw me off.  I mean, I do
21 have -- I am hard of hearing.
22         Yes, I have an opinion.
23     Q.  What is that opinion?
24     A.  But, yes, that recommendations were made by
25 Raymond James brokers to -- for at least the potential

10 (Pages 188 - 191)

Page 192

1  33,000 potential class members, that the brokers at
2  Raymond James recommended a switch from a commission
3  account to a Freedom based account.
4      Q.  What do you base your opinion that
5  recommendations were made to those 33,000 potential
6  class members?
7      A.  40 years in the business, my training, my
8  expertise, the fact that I'm a certified regulatory
9  compliance professional by FINRA and Wharton, and logic
10 and reasoning and being a very knowledgeable expert on
11 the issue of opening accounts and recommendations.
12     I'll make you a side bet of a very large amount
13 of money that the vast majority, if not every single
14 one, of those people who switched did so because of a
15 recommendation by a Raymond James broker.
16     Q.  Can you determine whether or not a
17 recommendation was made, other than by speaking with
18 each individual account holder?
19     A.  Absolutely.
20     Q.  How can you do that?
21     A.  Because it's logical and it's free.  You know,
22 you and your experts try not to work in the real world.
23 You come up with these things from outer space and throw
24 this stuff around, and none of it has anything to do
25 with how the real world works.

Page 193

1      Q.  Have you now expressed to us --
2      A.  What are you -- what are presupposing, that
3  these clients just had manna from heaven come down and
4  hit them on the head and tell them they should go call
5  their broker and make an unsolicited request that they
6  switch their client -- their accounts that are inactive
7  and not generating commission so they can pay nine to 22
8  times more fees?  That's just -- that's illogical.
9  Nobody is going to buy that argument.
10     So it's logical to conclude that they were
11 recommended.  That's how the system -- that's how the
12 system works.  Brokers make recommendations, clients
13 either follow them or don't follow them.  That's how the
14 system works.
15     Q.  Do you have any other basis for your opinion
16 that recommendations were made to class members here?
17     MR. SCHWARTZ:  Objection, asked and answered.
18     Go ahead.
19     THE WITNESS:  No.
20 BY MR. SUTER:
21     Q.  Are you speculating that recommendations were
22 made?
23     MR. SCHWARTZ:  Objection, asked and answered,
24     mischaracterizes his last testimony.
25     THE WITNESS:  I gave excellent support for

Page 194

1  mine.  I don't think I'm speculating at all.  And if
2  you think I'm speculating, bet me $10,000.
3  BY MR. SUTER:
4      Q.  You mentioned your certified regulatory and
5  compliance professional certificate, right?
6      A.  I'm sorry.  You were mumbling.  I didn't hear
7  you.
8      Q.  You just made reference to a certified
9  regulatory and compliance professional certificate,
10 right?
11     A.  I did.
12     Q.  And you listed that on your resume as the top
13 entry under licenses and some other nomenclature there
14 as a heading.
15     Is this CRPC -- what is that certification?
16     A.  Certified regulatory compliance professional?
17 You asked me what it is?
18     Q.  Right.
19     A.  It's the highest designation for the area of
20 compliance and supervision.
21     Years ago, about 2020, FINRA wanted to come up
22 with a higher level of training and education for people
23 in compliance and supervision.  The highest level of
24 licensing they had was some combination of a 24, which I
25 have, an 8 or a 9 and a 10, but they wanted to take it

Page 195

1  to a whole new level.  So in conjunction with Wharton,
2  the Wharton School of Business in Philadelphia, they
3  created a special training and certification course.
4  And I was the -- in the very first graduating class back
5  in, I think, 2001.
6      Q.  Right.  And back then, that was a four-week
7  course; is that right?
8      A.  Well, it wasn't exactly.  I did it in record
9  time because the -- you had -- let me see if I remember.
10     You had a week in Philadelphia, week in
11 Georgetown, another week in Philadelphia, and then there
12 were courses that you could take around the country.
13 And I had some time in my schedule that I did it
14 relatively quick.  But I don't know what the total time
15 it took me, because I know most of those courses I had
16 to fly to were a day or two-day courses.  But four-week,
17 five-week, somewhere in there, six-week max.
18     Q.  And now it's a two-week course, right?
19     A.  Well, I don't understand.  First you said four
20 weeks, now it's two weeks.
21     Q.  Well, that was 20 years ago.  Didn't you --
22 don't you understand that it's now a two-week course?
23     A.  Oh, yeah, they've shortened it.  Yes, they
24 have.
25     Q.  Right, yeah.

11 (Pages 192 - 195)

Page 196

1    And do you acknowledge that on FINRA's website
2 it says "Important Disclaimer. FINRA does not approve
3 or endorse any professional credential or designation"?
4 That that's on the certified regulatory and compliance
5 professional page? Have you ever seen that?
6    A. I have not seen that.
7    Q. Okay. And as you previously confirmed, you've
8 never been a manager of a brokerage firm, you've never
9 been in a supervisory position or in a compliance
10 officer position, correct?
11    A. Wait, you think -- did you ask me the same set
12 of questions three hours ago? I'm --
13    Q. Okay.
14    (Unintelligible simultaneous speaking.)
15 BY MR. SUTER:
16    Q. I'll take your answer to be a yes. Let's talk
17 about --
18    A. I'm not going to respond.
19    THE REPORTER: I didn't get the answer.
20    THE WITNESS: I'm not going to respond. He's
21    already asked me that and I gave him the answers
22    three hours ago.
23 BY MR. SUTER:
24    Q. When was the first time you reached the
25 conclusion that FINRA Rule 2111 applied to account

Page 197

1 types?
2    A. 40 -- 40 years ago when I entered the industry.
3    Q. And do you know whether there has been any
4 regulatory discussion over whether or not Rule 2111
5 applied to account types?
6    MR. SCHWARTZ: Objection, overbroad.
7    THE WITNESS: I think there is all kinds of
8    regulatory proof that suitability recommendations
9    relate to account type.
10 BY MR. SUTER:
11    Q. Do you know whether or not the suitability rule
12 itself states that it applies to account types, at least
13 during the 2015-to-2018 timeframe?
14    A. I -- I don't think it did.
15    Q. Okay. Have you published any articles
16 or included in your book any chapters whether or not
17 2111 applied to account types?
18    A. I don't think so.
19    Q. Do you know whether the predecessor to 2111,
20 NASD Rule 2310, applied to account types?
21    A. Well, let's -- let's just -- let's just hold on
22 because I think I put it in my report back to the
23 current version that an investment strategy, the type of
24 investment strategy that a broker may be getting ready
25 to pursue in an account is an -- can be an account type.

Page 198

1 And I think that investment strategy is, I think,
2 mentioned in the 2111 or a subset or an interpretation
3 of 2111.
4    So I take back what I said earlier. I do think
5 that 2111 -- 2111 read more broadly definitely does
6 include account type.
7    Q. And your basis for making that statement is
8 what's in 2111? Or is it based on something else?
9    A. I don't recall as I sit here. I mean, I do
10 recall, and I think it's in my report, actually, that I
11 talk about investment strategy. And I think investment
12 strategy is either in the rule or it's in one of the
13 interpretive memos or question and answers talking about
14 the suitability rule, 2111, that they talk about
15 investment strategy. And it's my opinion that
16 investment strategy can be a type of account.
17    Q. All right. Do you know if that's a view held
18 by others within the securities industry?
19    A. Oh, I would say most everybody but your
20 experts.
21    Q. And what's your basis for saying that?
22    A. Because I've read your experts' reports and
23 they basically disagree with any and everything I said.
24    Q. Okay. In your 2002 book, Brokerage Fraud, you
25 have a reference to wrap fees that runs a few pages. Do

Page 199

1 you recall that?
2    A. I don't recall what it says, but I think that's
3 right.
4    Q. Do you have any recollection as to whether or
5 not that section addresses account types when you're
6 discussing suitability?
7    A. I don't recall. I have a copy of the book
8 here. But this is one of those things we talked about
9 earlier.
10    THE WITNESS: I'm going to run. I'll be gone
11    for three minutes. We got an accomodation for me.
12    I'm going to run to the bathroom. I'll be back in
13    three minutes. I'm not even going to turn off the
14    stuff.
15    MR. SUTER: We're going to keep this running
16    here, but we are going to deduct the time that the
17    witness absence result from the deposition.
18    THE VIDEOGRAPHER: You want to stay on?
19    MR. SUTER: I think so.
20    THE WITNESS: Thank you very much for being so
21    considerate. Okay. I'm back.
22 BY MR. SUTER:
23    Q. No problem at all. No --
24    A. I have my book.
25    Q. -- problem at all.

12 (Pages 196 - 199)

Page 200

1    If you look at page 224 of your book.
2        MR. SCHWARTZ: Can I just ask which tab number
3    is this in the --
4        MR. SUTER: Clay -- Clay, can you put this up?
5    It's the wrap account section.
6        THE WITNESS: Page 224?
7        MR. SUTER: Yes. Local firm wrap accounts.
8        THE WITNESS: Yes, sir, I'm there.
9        MR. SCHWARTZ: Just so I have the document in
10   the shared file so I can follow along.
11       THE WITNESS: Sure.
12   BY MR. SUTER:
13   Q.  By the way, while we're waiting for that
14   document to come up, can you tell us what the basis is
15   for saying that the certificate that you got from
16   Wharton is the highest level of license for supervision
17   from FINRA?
18   A.  I never said that.
19   Q.  Okay.  By the way, can you confirm that when
20   you've taken the most recent break and the prior one,
21   you're not speaking with anyone about what's going on in
22   this deposition?
23   A.  Well, at lunch, my wife said, "How is it
24   going?"  And I didn't give her any details, but I had
25   that very brief.  I just said --

Page 201

1    Q.  Sure.
2    A.  I'm not telling you what I said, but she did
3    ask me and I did respond, but I didn't give her any
4    details.
5    Q.  Thank you.  And same holds true this last
6    break, you didn't speak with anyone?
7    A.  I didn't see anybody.  Saw my dogs.  Didn't see
8    my wife.
9    Q.  Great.  All right.
10       MR. SUTER: Is that document up?  Clay, are you
11   there?
12       MR. SCHWARTZ: Yeah, it's not in my folder.
13       MR. SUTER: Is it in your folder?
14       MR. SCHWARTZ: It is not.
15       THE WITNESS: And my folder says empty.
16       MR. SUTER: Okay.  I may not have the support
17   on the line here that I thought I had.
18   BY MR. SUTER:
19   Q.  All right.  Well, let's -- let's just -- let me
20   just ask you about the wrap account section.
21       This says, "Wrap accounts have been around for
22   years, but, lately, firms like Merrill Lynch are
23   bringing money into them by the billions."  And it goes
24   on.
25       Are you talking about -- let me ask you this

Page 202

1    way.  What type of accounts are you talking about there?
2    Are these nonmanaged fee-based accounts?
3    A.  I don't recall.  I wrote it 20 years ago.  I
4    don't recall --
5    Q.  Okay.
6    A.  -- exactly what type of fee-based accounts, but
7    I'm definitely talking about fee-based accounts.  And I
8    see the word "flat fee," so it appears I'm talking about
9    some kind of flat-fee-based account.
10   Q.  And would you agree with me, Mr. Schulz, that
11   as far back as when your book was written that there
12   were two different types of fee accounts, at least?  One
13   was a nonmanaged fee-based account and the other was a
14   managed fee-based account?
15   A.  I -- I got to tell you, I don't think -- I
16   don't think -- in my 40 years of doing this, I have had
17   very little experience with fee-based accounts that are
18   not managed.  I mean, I know they exist, but I've had
19   very little -- not a lot of interaction on those.
20   Q.  Okay.  So most of your work, or at least your
21   experience, has been with managed fee-based accounts; is
22   that correct?
23   A.  That would be correct.
24   Q.  And are managed fee-based accounts accounts
25   that are subject to the 1940 Investment Advisers Act, to

Page 203

1    your knowledge?
2    A.  Well, that's one of the things that applies to
3    them.
4    Q.  Okay.  Do you -- when you -- you have your own
5    RIA firm, correct?
6    A.  I did.
7    Q.  And did you have an understanding that you were
8    required to comply with the Investment Advisors Act of
9    1940 as an RIA?
10   A.  Yes.  And just so it's clear on the record,
11   because it was my own firm, in a sense, I was both.  I
12   was an investment advisor representative because I was
13   the broker at my own firm.  And because I was the
14   president of the firm, I was also an RIA.  So I -- I was
15   both.
16       But yes, yes, yes.  If I didn't answer your
17   question, yes, it was my understanding that the 1940
18   Act, Investment Adviser Act section, did apply to my
19   activities in managing money.
20   Q.  Okay.  And when you -- when you say that money
21   was managed and that's been most of your experience, by
22   whom are you referring -- or to whom are you referring
23   when you say "managed"?  Is this an FA or a professional
24   manager?
25   A.  Well, I -- both.  Both.  When I talk about fee

13 (Pages 200 - 203)

Page 204

1 accounts, wrap accounts, fee-based managed accounts, I'm
2 grouping those together.
3    Q.  Okay.  Do you view an FA-directed fee-based
4 account as a managed account or a nonmanaged account?
5    A.  Well, if he has discretion and he's managing
6 it, obviously, I consider it managed.
7    Q.  Okay.  So is -- is the distinction that you're
8 making between managed fee-based accounts and nonmanaged
9 fee-based accounts one that depends on discretion being
10 exercised by the professional who is managing the money?
11    A.  I think so.
12    Q.  Okay.  And are you aware that there are certain
13 accounts where a financial advisor works with a client
14 and manages the money on the brokerage side of a
15 business?  In other words, an FA manages the money as
16 opposed to a -- a professional money manager and an
17 investment committee, that sort of thing?
18    A.  Not enough facts, so can I ask you about the
19 missing facts in your hypothetical?
20    Q.  Sure.
21    A.  Are you assuming in this hypothetical that this
22 broker-managed account, that he has legal discretionary
23 authority?
24    Q.  Sure.
25    A.  I -- then I think the answer -- I think the

Page 205

1 answer is yes.  That I think the answer is yes to
2 whatever you asked me.
3    Q.  You understand that the regulators distinguish
4 between nonmanaged fee-based accounts and managed
5 fee-based accounts, correct?
6       MR. SCHWARTZ:  Objection, overbroad.
7       THE WITNESS:  I told you I don't have a lot of
8 familiarity.  I mean, I know they exist, but I don't
9 have a lot of experience.  I don't even think I've
10 had a case involve that.  And I think as a -- I
11 mean, in all of my accounts that I managed as a
12 registered investment advisor, I was charging a fee,
13 a fixed fee, and I had a hundred percent discretion.
14 And the same issue, that even when I was -- that's
15 an interesting thing.  Hmm.  I don't remember.
16 BY MR. SUTER:
17    Q.  Let me ask you this.  Are you familiar with
18 scenarios where a FA has a nonmanaged fee-based account
19 for a client and the FA does not have discretion, but
20 otherwise is involved in the decision making on behalf
21 of his client, his or her client?
22    A.  So the broker in this scenario, the client's
23 paying a fixed fee in this scenario you're painting?
24    Q.  Paying a fee based on the assets in the
25 account.

Page 206

1    A.  Is it a fixed fee?
2    Q.  Does that matter to you?
3    A.  Well, I'm not real -- I don't know of many of
4 those.  I just -- I -- and I -- I don't -- I'm trying
5 think of what's the advantage.
6       I mean, yes, I -- I don't know who first
7 offered it.  God, I'm trying to remember.  But it's very
8 rare.  And there just aren't that many people who have
9 fee-based -- fixed fee-based accounts where the broker
10 isn't running it on discretion.  So I just don't see
11 hardly any of those, so --
12       But go ahead.  I mean, I can try to answer the
13 questions.  But I told you, it's a scenario that I very
14 rarely ever see.
15    Q.  All right.  Let me ask you about your PIABA
16 article from 2003 where --
17    A.  Can I put this -- can I put this away?
18    Q.  Sure.  You wrote an article called "Flat Fees
19 or Fat Fees" that references wrap fees, correct?  And
20 you refer to that in your report?
21    A.  I think -- think that's one of the words I
22 used.
23    Q.  All right.  And that article, like your book,
24 does not reference account type suitability.  Are you
25 aware of that?

Page 207

1    A.  I'll take your word.  If it doesn't use the
2 word "account type," I'll take your word for it.
3    Q.  Okay.  Were you discussing managed fee-based
4 accounts in that article or nonmanaged fee-based
5 accounts in that article or not distinguishing between
6 the two?
7    A.  I probably did not distinguish.  Now I can go
8 read it and find out, but I'll try to move things along.
9 Is I don't think I addressed fee -- I mean, managed
10 versus not because, like I do today, the vast majority
11 of all fee-based accounts are managed, so I probably, in
12 my article, was only referring to managed discretionary
13 fee-based wrap and those kinds of accounts.
14    Q.  And when you say "managed," you're talking
15 about being professionally managed by an entity such as
16 AMS with an investment committee and -- and folks that
17 make the investment decisions and rebalance the accounts
18 periodically and that sort of thing?
19    A.  Both.
20       MR. SCHWARTZ:  Objection to form.
21       THE WITNESS:  Both.
22 BY MR. SUTER:
23    Q.  Excuse me?
24    A.  Both.
25    Q.  All right.

14 (Pages 204 - 207)

Page 208

1   A.  Both.
2   Q.  So is it correct that for purposes of your
3   opinions, you are not distinguishing between FA-directed
4   accounts versus accounts managed by, in this case, AMS?
5   A.  No, that's false too.  I didn't say that
6   either.
7   Q.  Do you recognize a distinction that needs to be
8   made between nonmanaged fee-based accounts and managed
9   fee-based accounts or not?
10      MR. SCHWARTZ:  Objection.  Overbroad.
11      THE WITNESS:  Yeah, it's not an issue in this
12  case, as I -- as my understanding, it's not an issue
13  at all, I've not been asked to opine on it, so I
14  don't have an opinion.
15  BY MR. SUTER:
16  Q.  When you say it's not an issue, you understand
17  that the Freedom account here is a managed fee-based
18  account, correct?
19  A.  I do.
20  Q.  And you understand that that involves an
21  investment committee and decisions that are being made
22  by professionals that are part of this registered
23  investment advisor, correct?
24  A.  They're a part of AMS.
25  Q.  Right.  So you would agree that that's your

Page 209

1   understanding of the account at issue here, correct?
2       MR. SCHWARTZ:  Objection to form.
3       THE WITNESS:  Only part of the account.
4   BY MR. SUTER:
5   Q.  What do you mean, "only part of the account"?
6   A.  Well, there was the commissioned accounts and
7   there was a Freedom account.
8   Q.  Right.  But you understand that the Freedom
9   account was a managed fee-based account that was managed
10  by AMS, which was a registered investment advisor,
11  correct?
12  A.  That is correct.
13  Q.  And you understand that there are different
14  types of accounts that Raymond James offered, including
15  the Freedom account that we just talked about and the
16  Ambassador account, for example?  Are you familiar with
17  the Ambassador account?
18      MR. SCHWARTZ:  Object to the form.
19      THE WITNESS:  Only minorly, but I am aware
20  that -- I mean, I even think there was other
21  accounts different or like Freedom at AMS.  Freedom
22  was only one of the different platforms.  So my
23  understanding is there was quite a lot of choices.
24  BY MR. SUTER:
25  Q.  Okay.  But with respect to your understanding

Page 210

1   of the Ambassador account platform, please tell us what
2   that was.  Was that a managed fee-based account that was
3   managed by AMS?  Is that your understanding?
4   A.  No.
5   Q.  Is it your understanding that the Ambassador
6   account was an account that could be FA-directed or
7   something that could be self-directed by an investor?
8   A.  Since I didn't spend a lot of time on it or was
9   asked to, is -- but my limited knowledge is that I
10  thought it was fee-based accounts where the brokers were
11  managing the money, but I could be wrong because I was
12  not asked to look into those accounts.
13  Q.  And you weren't asked to determine if there was
14  any difference between an Ambassador account and a
15  Freedom account; is that correct?
16  A.  I was not asked.
17  Q.  Okay.  And when you were talking previously
18  about fixed-fee accounts, could you clarify for us what
19  you meant by that.  That means a fixed percentage, not a
20  fixed dollar amount, correct?
21  A.  That's what -- yes, sir.
22  Q.  Okay.  Good.
23      And is it your understanding, then, that the
24  Freedom account was managed by professional managers
25  within the AMS registered investment advisor at

Page 211

1   Raymond James and that the Ambassador accounts were
2   broker-managed accounts?
3   A.  If you so represent, I'll agree to that.
4   Q.  Okay.  Do you have any reason to dispute that?
5   A.  No.
6   Q.  You referenced the SEC settlement that -- that
7   was entered into as one of the items that you pointed to
8   as far as the support for your opinions.  Do you recall
9   that?
10  A.  I do.
11  Q.  Okay.  Did you also consider any other
12  securities releases that referenced nonmanaged fee-based
13  accounts in connection with your report?
14  A.  I don't think so.
15      MR. SCHWARTZ:  Objection, overbroad.
16      MR. SUTER:  Okay.  Clay, are you on?
17      MR. LEAN:  Yes.
18      MR. SUTER:  Could you please pull up on Exhibit
19  Share the SEC Release 34-51907.  Thank you.
20      MR. SCHWARTZ:  And is that in the hardcopy
21  books or it's just --
22      MR. SUTER:  No, it's -- it's not.
23      THE WITNESS:  I'm going to do that break again.
24      MR. SUTER:  Okay.  Thank you.
25      While he's -- while he's doing that, do you

15 (Pages 208 - 211)

1  recall after you wrote your book and after --
2      MR. SCHWARTZ:  He's not in the room.
3      THE VIDEOGRAPHER:  He's -- he's not there.
4      MR. SCHWARTZ:  While we're waiting for the
5  exhibit, he went to the bathroom.
6      MR. SUTER:  Oh, okay.
7      THE VIDEOGRAPHER:  You want to stay on?
8      MR. SUTER:  Yeah, let's stay on.
9      MR. SCHWARTZ:  And, Ben, while we wait for the
10 exhibit, maybe target a break sometime between now
11 and 4:00.  That's 25 minutes from now, but --
12     MR. SUTER:  Sure.  Sure, that's fine.  That's
13 fine.
14     MR. SCHWARTZ:  I still don't have the exhibit.
15     MR. SUTER:  Clay, are you able to get that for
16 us?
17     MR. LEAN:  Yes, it's been uploaded.
18     MR. SUTER:  Thank you.  Where do we find it?
19 It's in chat?
20     MR. LEAN:  No, it's at the Veritext Exhibit
21 Share site.
22     MR. SCHWARTZ:  Yeah.  And by the way, did --
23 did we put into the record Exhibit 142, the
24 Brokerage Fraud book?  Because that's in the -- it's
25 in the Veritext document share, but I wasn't sure

1  whether it was ever officially put in the record.
2      And same question about this SEC Release.  Is
3  that going to be marked as Exhibit 143?
4      MR. SUTER:  We can do that.  We actually have
5  three different sections of the book.  And then
6  that's -- I wanted to directly -- I can break --
7  excuse me.  I can mark as the first one --
8      MR. SCHWARTZ:  We'll deal with that at the --
9  at the break, Steve.  Okay?  You can keep going.
10     MR. SUTER:  All right.  Has -- has -- have
11 people been able to pull up this SEC release?
12     MR. SCHWARTZ:  I have it.
13 BY MR. SUTER:
14     Q.  Mr. Schulz, have you been able to pull this up?
15     A.  I have a -- I have my own copy.
16     Q.  Oh, okay.  Is that a release that you're
17 familiar with?
18     A.  Well, I have -- I have actually two.  I have
19 the news release from the SEC, and then I have the
20 full-body report, which I think I attached to my
21 rebuttal report.
22     Q.  No, I think we're talking about two different
23 things here.  This is a -- not a -- we're not talking
24 about the SEC inactive settlement nor are we talking
25 about the press release that you attached to your

1  rebuttal report.  I'm asking you --
2      A.  Oh.
3      Q.  -- to take a look at the Exhibit Share
4  document, which is --
5      A.  I'm sorry.
6      Q.  No, on the Veritext site.  Can you access that,
7  please?
8      A.  Sorry.  I thought you asked me about that.
9      Okay.  So I have "Deposition Douglas."  I have
10 a folder called "Marked Exhibits."  I hit "Marked
11 Exhibit."
12     Oh, now there is two documents in there.
13     Q.  And can you pull the one that was just put up,
14 which is the SEC release?
15     A.  Yeah, I'm getting ready to.  There it goes.
16     Q.  Great.
17     MR. SUTER:  And Creslin -- or, Clay, why don't
18 you put that on screen share, please.
19 BY MR. SUTER:
20     Q.  All right.  Are you familiar with this release?
21     A.  I don't think so.
22     Q.  It's -- it's not referenced in your -- in
23 either of your reports, but it's something that was
24 quoted -- at least a portion of it was quoted by your
25 counsel in response to one of the motions that was

1  pending in this case.
2      This relates to nonmanaged fee-based accounts,
3  correct?
4      A.  I've -- I've never seen it before.  I've never
5  read it.  I don't know anything about it.
6      Q.  Take a look at --
7      MR. SCHWARTZ:  I'm going to -- I'm going to
8  interpose an objection.  It's a 15-page document.
9  If you want to ask the witness questions about it,
10 then I believe the witness has to be given an
11 opportunity to read it.
12 BY MR. SUTER:
13     Q.  My only question at this point is to ask you to
14 take a look at the -- the footnote that's highlighted.
15 You see there is a PIABA commentary letter that -- that
16 was sent in 2004?
17     A.  Is that footnote No. 5?
18     Q.  I believe so.
19     A.  Okay.  So do you want me to read footnote
20 No. 5?  Is that what you want me to do?
21     Q.  There is a reference to PIABA sending in a
22 comment letter.  And my only question to you, sir, is:
23 Did you have any involvement in assisting PIABA with the
24 letter that was sent to PIABA -- excuse me -- sent by
25 PIABA to the SEC in 2004, which is two years after you

Page 216

1 wrote your book and one year after you published your
2 PIABA article, "Flat Fees or Fat Fees"?
3      MR. SCHWARTZ: Objection to form to that
4   question. It's overly compound.
5      THE WITNESS: I didn't consult with anybody.
6   Now, if they used my book or my article as reference
7   or anything, I don't know anything about that.
8 BY MR. SUTER:
9   Q. That's fine. I just wanted to confirm whether
10 you had any involvement or not in the preparation of the
11 letter that was sent to the SEC that dealt with
12 nonmanaged fee-based accounts.
13     MR. SCHWARTZ: I'm also going to object because
14  I'm not sure we've established the witness knows
15  what that PIABA letter is.
16     MR. SUTER: Yeah. Well, I thought if he had
17  written it he would recall it, but apparently he
18  doesn't recall having written such a letter, so that
19  point is taken care of.
20 BY MR. SUTER:
21  Q. From --
22     MR. SCHWARTZ: I'm just -- I'm just going to --
23  I'm just going to object. I'm not sure that answer
24  was there, but if you think you got your answer,
25  then fine.

Page 217

1 BY MR. SUTER:
2   Q. Is it your understanding, based on your
3   experience in the industry and looking briefly at the
4   exhibit before you, that the SEC and New York Stock
5   Exchange back in 2004 distinguished between nonmanaged
6   fee-based accounts and managed fee-based accounts?
7      MR. SCHWARTZ: And I'm going to make the same
8   objection that I want him to refer to this document,
9   15-page document that he said he has not -- he's not
10  familiar with. You need to give him an opportunity
11  to read it.
12 BY MR. SUTER:
13  Q. Can you answer that without reference to the
14  document before you?
15  A. How can I -- how can I answer something when I
16  have never seen this document.
17  Q. No, I'm asking you, based on your experience in
18  the industry, you're familiar with the notion that
19  regulators distinguish between fee-based accounts that
20  are managed and nonmanaged fee-based accounts? Is that
21  your understanding?
22  A. I have no understanding on that.
23  Q. All right. Fine. Well, let's delve into the
24  distinction a little bit more.
25     Can you give us any examples of nonmanaged

Page 218

1 fee-based accounts?
2   A. We already addressed that. I've already --
3   I've already -- I already told you it's not something
4   I'm familiar with. I don't know why you keep asking me
5   that when I told you that. You think I now all of a
6   sudden have a familiarity I didn't have ten minutes ago?
7   Q. You cannot give us any examples, fine. Let me
8   move then to ask you --
9      MR. SCHWARTZ: Objection. Hold on. Objection,
10  asked and answered to the prior question. And
11  objection to the -- the comment you make
12  characterizing his most recent answer.
13 BY MR. SUTER:
14  Q. Well, let me see if I can distinguish this a
15  little bit better for you.
16     Do you have an understanding as to the type of
17  account that was at issue in the SEC proceeding that you
18  attached as an exhibit to your rebuttal report?
19  A. Do I have an understanding about what? I mean,
20  you're talking about the SEC report that I attached to
21  my rebuttal report. What do I understand or not
22  understand about it?
23  Q. Do you have any understanding as to whether
24  that account was dealing with a professionally-managed
25  account, such as the Freedom account, or a FA-managed

Page 219

1 account, such as the Ambassador account?
2      MR. SCHWARTZ: Objection. Assumes not -- facts
3   not in evidence. And objection, compound.
4      THE WITNESS: No, I think it's partly right,
5   partly false.
6 BY MR. SUTER:
7   Q. What part do you disagree with, sir?
8   A. Let me get it back in front of me.
9      The part that your question partially is
10  correct is that the SEC finding against Raymond James
11  does -- I mean, understand there is more than one issue
12  in this finding. But as to inactive accounts, I think
13  we're mainly talking -- I mean, it's mentioned a couple
14  times, but I think the -- it's in their summary on
15  page 2. And then they get into more detail on
16  paragraph 7 where they talk about inactive advisory
17  accounts. And I think they specifically mention the
18  word "the Ambassador managed accounts."
19     But if you go to footnote No. 2, the SEC
20  recognizes that the problems at Raymond James and the
21  violations at Raymond James extend beyond the Ambassador
22  accounts into other -- let me read it into the record.
23     "Raymond James advisors also offer other
24  brokerage clients seeking separately-managed accounts.
25  Some of these programs present the same issues

17 (Pages 216 - 219)

Page 220

1 concerning inactive accounts discussed in this order.
2 And the" -- then it goes on -- "adverse impact on the
3 clients is addressed elsewhere."
4        So they're addressing both.
5     Q.  Do you know how a Freedom account -- strike
6 that.
7        Isn't a Freedom account, by definition, not
8 inactive because it is actively managed?
9        MR. SCHWARTZ:  Objection to form.
10       Yeah, go ahead.
11       THE WITNESS:  I think that's -- that's an
12 interesting question.  Wow.  Well --
13 BY MR. SUTER:
14    Q.  Do you have an opinion, sir, one way or another
15 as to whether or not --
16    A.  You didn't put it -- you didn't put it in your
17 answer, your experts didn't put it in their opinion, so
18 you got to give me a little time to adjust.  This has
19 just come out of thin air.  Ask it again.
20       MR. SUTER:  Ms. Madam Reporter, please read
21 back the question.
22       MR. SCHWARTZ:  And before we do that, can I put
23 Exhibit 143 away now?  Are we -- are we done with
24 that?
25       MR. SUTER:  Sure.

Page 221

1        (The reporter read the portion requested.)
2        THE WITNESS:  I don't think I can agree with
3 that premise.
4 BY MR. SUTER:
5     Q.  What do you disagree with?  Why?
6     A.  I've never -- I mean, you just popped this on
7 me, and I make a habit of not giving opinions about
8 something I haven't had any opportunity to think about.
9 And I'm used to there is a report and your report and a
10 rebuttal report by your people, and now you're
11 bringing -- and it wasn't in your -- any Raymond James's
12 answers, so I think it's a little unfair to throw
13 this -- I don't know what you call it.  Don't even know
14 what to call it -- theory of whatever it is on me
15 unfairly.
16       So I really am uncomfortable answering it, but
17 I think I'll stick with my answer.  And I don't think I
18 have more -- I don't have more of an explanation at this
19 point.  If you'd like me to think about it and when I
20 testify at the hearing, then I'll give you more details.
21    Q.  Well, let me just be clear.  At this point, as
22 you're being deposed as an expert after you prepared two
23 expert reports and looked into the Freedom account
24 that's at issue, you have no understanding as to whether
25 or not the Freedom account is an actively-managed

Page 222

1 account or not?
2     A.  That's a different question.  So let's just not
3 confuse it with the last question.
4        But is it actively managed?  There are people
5 at AMS that are managing the account.  I will give you
6 that.
7     Q.  Okay.  Is that the extent of your ability to --
8 to respond to my question?
9     A.  At this time.
10       MR. SCHWARTZ:  Objection to form.
11 BY MR. SUTER:
12    Q.  Okay.  And you understand the distinction
13 between an FA-directed account, such as the Ambassador
14 account, where there could be no activity whatsoever in
15 a 12-month or longer period, and a
16 professionally-managed account, such as the Freedom
17 account, at AMS; is that correct?
18       MR. SCHWARTZ:  Objection to form.  Objection,
19 compound.
20       THE WITNESS:  It's compound.  I can't answer
21 it.  You're assuming two or three things, and I
22 can't answer it.  Ask me individually and I can
23 answer.
24 BY MR. SUTER:
25    Q.  Sure, let's do that.

Page 223

1        Do you consider the Freedom account to be a
2 separately-managed account, as you quoted from the --
3 from the SEC order?
4     A.  Wait a minute.  Wait a minute.  Wait a minute.
5 Wait.
6        I quoted something from the SEC order?
7     Q.  Yeah, you read -- you read from the SEC order
8 attached to your --
9     A.  I don't think it said "Freedom."
10    Q.  Well, I'm asking you, do you consider the
11 Freedom account to be a separately-managed account as
12 set forth in footnote 2 that you read from on -- in
13 response to a prior question.  This is the SEC order.
14    A.  I would draw a conclusion that I have, that
15 taking the SEC's words and that footnote, that it is
16 highly likely that they're talking about Freedom
17 specifically or another very similar account at
18 Raymond James.
19    Q.  And is that assumption that you just shared
20 with us part of your thought process as you reached your
21 conclusions in your report?
22    A.  Well, I have lots of opinions in two reports,
23 so which opinion are you particularly talking about that
24 I reached?
25    Q.  Yeah, I'm talking about whether or not the

18 (Pages 220 - 223)

1 Freedom account is a separately-managed account as you
2 referred to in footnote 2 of the SEC order?
3     MR. SCHWARTZ: Objection to form.
4     THE WITNESS: That's a circular question.
5   That's a circular question. You're asking me to use
6   the separate account of footnote 2 to support my
7   opinion of separate account and footnote 2.
8 BY MR. SUTER:
9   Q. Let me ask it this way, sir.
10     Do you have an opinion one way or another as to
11 whether or not the Freedom account in which Ms. Nguyen
12 was a customer is a, quote, separately-managed,
13 quote, account?
14   A. Separately-managed account, that's -- yeah,
15 that sounds right.
16   Q. And did that assumption that you just shared
17 with us in any way impact your analysis or your opinions
18 in this case?
19     MR. SCHWARTZ: Objection, overbroad.
20     THE WITNESS: Yeah, I -- I -- I'm not following
21   you. It was a -- it was -- it was an account. It
22   was a Freedom. It was managed. It was managed on a
23   fixed fee. I'm not -- I'm not catching what other
24   distinction that I have given today or in my reports
25   other than that. I don't think I've made any other

1 assumptions.
2 BY MR. SUTER:
3   Q. Well, let me ask you to assume the following in
4 this hypothetical. Please assume that the Freedom
5 account is not one of the separately-managed accounts
6 that are referenced as -- strike that.
7     Please assume the following for this
8 hypothetical. Please assume that the Freedom account is
9 not a separately-managed account as that term is used in
10 footnote 2 of the SEC order.
11     Do you believe that the order would include
12 Freedom as one of the account platforms that the SEC was
13 concerned with in its inactives investigation?
14     MR. SCHWARTZ: Objection to form.
15     THE WITNESS: I think the first part of your
16   sentence says assume in my hypothetical that
17   Mrs. Nguyen's Freedom account is not what's referred
18   to in the SEC report. And then you turn around and
19   say, but can we assume that the account of
20   Ms. Nguyen isn't referred to in the SEC report?
21   Isn't that, in your hypothetical, self-evident;
22   I don't need to give an answer if it's not one of
23   the reports that the SEC is referring to? The SEC
24   isn't referring to it. You don't need an answer to
25   a question that answers itself.

1     MR. SCHWARTZ: That was what the objection was,
2   just so you know.
3 BY MR. SUTER:
4   Q. Well, bottom line is, you don't know whether or
5 not the SEC proceeding applied at all to Freedom
6 accounts? Isn't that the bottom line here, sir?
7   A. I don't have any --
8     MR. SCHWARTZ: Objection.
9     THE WITNESS: -- firsthand knowledge. I don't
10   have --
11     MR. SCHWARTZ: Objection to form.
12     THE WITNESS: I'm sorry. Sorry.
13   I have no firsthand knowledge, but I think it's
14   the proper assumption.
15 BY MR. SUTER:
16   Q. And have you stated all the reasons that you
17 believe it's the proper assumption to assume that the
18 Freedom account is a, quote, separately-managed, closed
19 quote, account as referenced in footnote 2 of this
20 order?
21     MR. SCHWARTZ: Objection to form. Objection to
22   asked and answered.
23     THE WITNESS: Yeah, let me get it back out
24   again.
25     MR. SCHWARTZ: Just so the record's clear, I

1 believe you're referring to your expert report,
2 which someone has that exhibit number, it would be a
3 good idea to get that on the record and have on the
4 record you're looking at Exhibit -- I believe it's
5 Exhibit D of your expert rebuttal report.
6     MR. SUTER: No, we're referring to Exhibit 126,
7   which is Mr. Schulz's rebuttal report. And he
8   attaches as Exhibit A the -- the settlement that's
9   reflected in -- in the SEC order. Sorry.
10   Exhibit B.
11     MR. SCHWARTZ: Right.
12     MR. SUTER: Okay. So we're all on the same
13   page there.
14     THE WITNESS: I'm -- am I allowed to answer
15   now?
16 BY MR. SUTER:
17   Q. Sure, go ahead.
18   A. Yeah, I feel very confident of that. I mean,
19 I'm not always complimentary of the regulators. The SEC
20 has, you know, missed a lot of very obvious things in
21 their coveted career.
22     But we now have proof that Raymond James has
23 systemic problem and was incentivizing brokers to
24 inappropriately recommend low-volume accounts because it
25 wasn't generating any money for Raymond James. And

19 (Pages 224 - 227)

Page 228

1 triple, quadruple, nine times the fees to generate a lot
2 of revenue for Raymond James and the brokers.  And we
3 know it was being done at the very time that the SEC is
4 investigating Raymond James.
5        They're not blind.  They can see what we now
6 see ourselves, that you were doing this -- not only this
7 volatile, unsuitable activity on the part of
8 Raymond James with your Ambassador accounts, but you
9 were also doing it in the Freedom accounts.  I think
10 that's a very logical conclusion.
11        MR. SCHWARTZ:  And before we go on, I'm going
12 to interpose a different objection, which is,
13 instead of playing this game of -- of hide the ball,
14 Mr. Suter, we had asked in discovery for discovery
15 regarding this SEC investigation.  Raymond James
16 refused to provide it to us.  Actually, one, a
17 motion to compel.
18        MR. SUTER:  Is this an objection to a question,
19 Steve?
20        MR. SCHWARTZ:  It's an objection to the whole
21 line of questioning that you're pursuing, so let me
22 finish my statement.
23        And I don't think it's proper for you to hold
24 back documents which would give the very answer that
25 you're now asking the witness to answer.  That is my

Page 229

1 objection.
2 BY MR. SUTER:
3    Q.   All right.  Let me ask you this question,
4 Mr. Schulz.  Is the Freedom account an FA-directed
5 advisory account?  Do you know one way or another?
6    A.   Yes, I know.
7    Q.   And what is the answer?
8    A.   No.
9    Q.   So you agree there is a difference between
10 Freedom account on the one hand and an FA-directed
11 account on the other hand; is that correct?
12    A.   That's correct.
13    Q.   And in Freedom, does the financial advisor have
14 discretion to trade?
15    A.   He does not.
16    Q.   Who does?
17    A.   The various many managers at the AMS
18 department.
19    Q.   All right.  And to -- to follow up on your
20 counsel's comment, have you seen any order from the
21 district court in Florida addressing the SEC order that
22 is attached as Exhibit B to your rebuttal report?
23    A.   No.
24    Q.   Okay.  Let me read the following, and let me
25 ask you if you agree with this.

Page 230

1        MR. SUTER:  Clay, if you could put this up,
2 that would be great.
3 BY MR. SUTER:
4    Q.   Do you agree with the following statement that
5 Magistrate Judge Sansone made in her November 19, 2020,
6 order?
7        MR. SCHWARTZ:  Please wait till it's up --
8 please wait till it's up on the screen so I and the
9 witness can see what you're reading.
10        MR. SUTER:  Sure.
11        Clay, are you able to put that up?
12        THE WITNESS:  While it's coming up, I'm going
13 to the bathroom.
14        MR. SUTER:  Clay, are you there and able to
15 pull up this order from the Court?
16        MR. LEAN:  Yes, I'm looking for it.
17        MR. SCHWARTZ:  And, Ben, when you get to a --
18 yeah, we're now past 4:00.  When you get to a break
19 point, let's take a break.
20        MR. SUTER:  We'll take a break right after we
21 read this.
22        MR. SCHWARTZ:  Sure.
23        THE WITNESS:  You get to see my dogs?  I think
24 they came in when I was out.
25        MR. SUTER:  And we got some -- we got some good

Page 231

1 answers from them.
2        THE WITNESS:  I got to -- they're going to get
3 woodshed tonight.
4        Yes, sir, I'm back.
5        MR. SUTER:  Great.
6        Clay, do you have that up?
7        MR. SCHWARTZ:  I do not have it yet.
8        THE WITNESS:  I don't have it up.
9        MR. SUTER:  Okay.
10        MR. LEAN:  It's up.
11        MR. SUTER:  Thank you.
12        MR. SCHWARTZ:  It's still not here though.
13        THE VIDEOGRAPHER:  Sir, I'm going to need a
14 media break in like three minutes.
15        MR. SUTER:  Yeah, that's -- we'll take two and
16 a half.
17        MR. CLABBY:  Ben, it's Jack.  I can put it up
18 on the screen if you'd like.
19        MR. SUTER:  Yeah, would you, please.
20        MR. CLABBY:  Yeah, hang on.
21        MR. SUTER:  Sorry, it's taking -- I just want
22 to go to the next page.  I think it's paragraph --
23 next page.
24        THE WITNESS:  Can you blow it up?
25        MR. SUTER:  It's starts with "Ms. Nguyen

20 (Pages 228 - 231)

Page 232

1    alleges."
2        THE WITNESS: Thank you. Thank you.
3        MR. SUTER: All right. Keep rolling down.
4        MR. SCHWARTZ: Yeah, I'm going to object that
5    to the extent you want your -- the witness to
6    comment on the document, he said he has not seen
7    before.
8        MR. SUTER: Yeah. Can you roll it --
9        MR. SCHWARTZ: I'm going to request that he be
10   given an opportunity to read it.
11       MR. SUTER: It's not this page, Jack. See if
12   you can roll up to the next page, please. Next
13   page. Next page.
14       MR. CLABBY: Yeah, this is the page starting
15   with "Ms. Nguyen alleges"?
16       MR. SUTER: Can you roll it up a little higher,
17   please. That's good. I just want to read this
18   paragraph and the first clause of the next paragraph
19   and see if Mr. Schulz agrees, disagrees, or has no
20   comment on the following.
21   BY MR. SUTER:
22   Q. "Ms. Nguyen alleges that Raymond James's
23   financial advisor failed to conduct a suitability
24   analysis before and after recommending that Ms. Nguyen
25   transfer her assets into a fee-based account. However,

Page 233

1    unlike the accounts in the SEC proceedings managed by an
2    individual financial advisor and left inactive for over
3    a year, Ms. Nguyen's account was managed and monitored
4    by an investment committee and annually rebalanced."
5        There is a citation, then it goes on.
6        "Because the SEC proceedings concerned
7    fee-based accounts left inactive, Ms. Nguyen's
8    Raymond James Freedom account is different and subject
9    to different claims."
10       And the next paragraph starts, "Although the
11   accounts in the SEC proceeding and this action are
12   different." And then it goes on.
13       My only question before the break is: Do you
14   have any reason to dispute the accuracy of the federal
15   court judge's statement that the SEC proceedings
16   concerning fee-based accounts left inactive and that
17   Ms. Nguyen's Raymond James Freedom account is different
18   and subject to different claims?
19       MR. SCHWARTZ: Now, I'm going to repeat my
20   objection. It's not fair to ask the witness who has
21   not seen this document before to comment on a little
22   portion that you've given to him without giving him
23   the opportunity to read it all.
24       I'd also object to you reading the first
25   sentence of the last paragraph, the first line of

Page 234

1    the last paragraph, without reading the next line
2    which says, "Although there may be a subset of
3    relevant documents within the documents produced to
4    the SEC."
5    BY MR. SUTER:
6    Q. Okay. Go ahead.
7        MR. SCHWARTZ: Hold on. If the witness can
8    answer based on what you've thrown on the screen and
9    read to him, that's fine. If he needs to read the
10   whole document, he gets the opportunity to read it.
11   BY MR. SUTER:
12   Q. Can you answer the question, Mr. Schulz?
13   A. I -- you read it correctly is about the only
14   answer I can give you.
15       MR. SUTER: Okay. Why don't we take a break
16   now. Thank you.
17       MR. SCHWARTZ: When do you want to come back?
18       MR. SUTER: How much time do you need?
19       MR. SCHWARTZ: I'm okay with five minutes or
20   ten minutes, whatever other people need.
21       MR. SUTER: Let's do -- let's just do five
22   then.
23       And if the reporter can tell me how much time
24   we have expended on the record, that would be great.
25       THE VIDEOGRAPHER: We're going off the video

Page 235

1    record at 4:05. This ends Media Unit 3, No. 1.
2        (Recess taken.)
3        THE VIDEOGRAPHER: We are going on the video
4    record at 4:14. Media Unit 4, No. 1.
5    BY MR. SUTER:
6    Q. Okay. Mr. Schulz, take a look at Tab 24, if
7    you would, please. 124. I'm sorry. Which is the
8    opening report of Mr. Klouda.
9    A. Okay. The original report of Mr. Klouda?
10   Q. Right. And I'd like you to turn to the -- just
11   the very back end of it. There is two spreadsheets that
12   are attached.
13   A. All right.
14   Q. Taking a look at the one that is penultimate
15   exhibit, do you see there is a Freedom account summary
16   from January 2016 to November 2018?
17   A. Yeah. In the -- in the -- at the bottom, it
18   has annual rate of return 9.9?
19   Q. Yeah.
20   A. Okay. I'm there.
21   Q. Do you concur that that is an accurate
22   representation of the annual rate of return that was
23   prepared by Mr. Klouda's firm, Bates Capital?
24   A. I do not.
25   Q. Why not?

21 (Pages 232 - 235)

1    A.   Because I wasn't hired or asked to verify or
2  unverify this set of numbers.
3    Q.   Okay.  So you haven't -- you don't dispute this
4  as you sit here today; you just haven't been asked to
5  validate it or invalidate it, correct?
6    A.   I have no opinion whatsoever.
7    Q.   Okay.  Thank you.
8        Turn to the next page, which is Exhibit II.
9  Have you had a chance prior to today to take a look at
10  this spreadsheet?
11    A.   I think I looked at it when I read his report.
12    Q.   Okay.  And did you reach any conclusions or
13  form any opinions as a result of reviewing this report?
14    A.   I didn't find it had anything relevant to do
15  with the case, so I basically ignored it.
16    Q.   Okay.  And why didn't you find it to be
17  relevant?
18    A.   Because there's no relevance.  What's -- what's
19  they're -- who cares?  Nobody cares.  I mean, what's his
20  point he's trying to make here?
21    Q.   Let me -- let me ask you a couple of basic
22  questions about what your understanding is about what
23  happened in the commission account and in the Freedom
24  account.
25        Do you have an understanding as to whether or

1  not the securities that were held in the commission
2  account were liquidated as contemplated by the Freedom
3  account agreement?
4    A.   That's my understanding.
5    Q.   Okay.  And it's your understanding that an
6  entirely new set of securities was purchased in the
7  Freedom program after Ms. Nguyen agreed to open the
8  Freedom account; is that correct?
9    A.   I -- I can agree with different securities were
10  purchased.  As to your qualifier of "entirely," I don't
11  think I can necessarily agree, but they were definitely
12  different.
13    Q.   Okay.  And do you -- I know you haven't
14  reviewed this in detail or relied on it, but have you
15  spoken with Mr. Olsen or anyone else, other than
16  counsel, about this particular analysis that's done that
17  we're looking at here for Mr. Klouda's report?
18    A.   As far as I can tell, I never discussed it with
19  anybody.
20    Q.   Okay.  Do you have any reason to dispute the
21  figures that are on this page or do you just not have
22  any opinion?
23    A.   I have no reason to think that -- I didn't do
24  the analysis, but I've been working against Bates
25  Capital for 30 years.  I don't agree often with their

1  methodology and their opinions, but their numbers on
2  pure numbers are usually correct, so I probably would
3  assume that these numbers are correct.
4    Q.   Okay.  Thank you.
5        Now, you have included in your report a damages
6  model in your original June 4, 2021, report; is that
7  correct?
8    A.   Yes, sir.
9    Q.   You were asked to do so by counsel; is that
10  correct?
11    A.   Yes, sir.
12    Q.   Okay.  And what is the basis on which your
13  damages model is predicated?  How did you come up with
14  the -- the model that you use in here?
15    A.   Do you mind if we turn to that part of my
16  report?
17    Q.   Sure.  No, please.  It's at Tab 123, I believe.
18  And I would say go to page 18.
19    A.   Let's see here.  I don't think page 18 is
20  damages, is it?  Of my original report?
21    Q.   I'm asking you to start there.  And I want to
22  walk through this.  This is the -- starting at
23  Heading D, "Contrary to Industry Regulations."
24        Do you see that?
25    A.   I do see that.

1    Q.   Okay.  Was the analysis -- were the analyses
2  that are done -- that were done in Tables 1, 2, and 3,
3  and 4 related to any damages analyses or conclusions
4  that you reached?
5    A.   4 maybe.
6    Q.   Okay.  Anything else?
7    A.   I'm sorry, what's that?
8    Q.   I just asked if any -- anything else in that
9  section I identified relates to damages.
10    A.   I don't think so.
11    Q.   All right.  Then turn, if you would, please, to
12  page 36.
13    A.   Okay.
14    Q.   You state in paragraph 148, "Using RJA's data,
15  each putative class member's damages can be calculated
16  on a class-wide basis."
17        Is that your opinion?
18    A.   I think so.
19    Q.   And please identify every case in which you
20  have rendered an opinion that damages can be calculated
21  on a class-wide basis.
22    A.   Well, we -- we spent this morning talking about
23  how many classes I could -- did or didn't work on, and I
24  couldn't remember.  We came up with a range in numbers.
25  So I haven't gotten any new memory.  And since I can't

Page 240

1 remember the details of very many of them, I'm sure not
2 going to be able to tell you if I did or didn't
3 calculate damages on cases I can't particularly
4 remember.
5    Q.   So you've -- as you sit here today, you cannot
6 identify any methodology that you used in any other
7 class action that you were involved with as far as
8 damages are concerned; is that right?
9    A.   Boy.  Do that again.
10    Q.   Can you think of any methodology that you used
11 for a class action damages analysis that you may or may
12 not have opined on in the past?
13    A.   I know it's late, tired, and I've got a
14 headache.  I can't answer your question.  I don't
15 understand what you're asking me.  It seems a little
16 nonsensical, but I'm trying.
17    Q.   Have you come up with damage methodologies for
18 determining damages in class actions prior to doing so
19 in this case?
20    A.   Probably.
21    Q.   And as you sit here today, can you identify any
22 such methodologies that you previously came up with in
23 other cases?
24    A.   I can't, but I don't think -- and I think we
25 established that earlier, that I don't think, to the

Page 241

1 best of my recollection, I've had -- been involved in a
2 class action that had -- other than the one we've
3 established we're not going to talk about -- that I've
4 been asked to opine, much less do damages, on a class
5 action that had the same set of facts.
6       So if it didn't have the same set of facts, I
7 probably would not have had the same methodology of
8 damages.  Just to make --
9    Q.   Thank you for -- thank you for that
10 clarification.
11       So the -- and without getting into the details
12 of the Edward Jones case, can you confirm for us that
13 this is the only case in which you came up with the
14 methodology that's set forth starting at page 36 of this
15 report?
16       MR. SCHWARTZ:  I'm going to object to the
17 extent that you're trying to get the witness to
18 disclose what he may have or may not have done in
19 his capacity as a nontestifying consultant in the
20 Edward Jones case where you are opposing counsel in
21 that case.
22       MR. SUTER:  I'm excluding that.  I'm trying to
23 exclude that, Steve, so we don't have this debate on
24 record.
25       MR. SCHWARTZ:  Okay.  Just want to make it

Page 242

1 clear that that was excluded.
2       MR. SUTER:  All right.
3       THE WITNESS:  What's the question?
4 BY MR. SUTER:
5    Q.   Is this the first and only use that you have
6 made of the methodology that you came up with that's
7 reflected on pages 36 and 37 into 38?
8    A.   I think that's probably especially as it
9 relates to a class, but I can't remember or think that I
10 would have come up with a -- utilized the same
11 methodology even in a nonclass case, so I think the
12 answer is this is the first.
13    Q.   Okay.  And as an expert witness here doing this
14 methodology in a class action, what qualifications do
15 you have to make these damages calculations on a
16 class-wide basis?
17    A.   Well, I've been involved and been -- given
18 sworn testimony more than any other securities expert in
19 the country over the last 30 years, other than
20 John Maine.  And I know you guys know who John Maine is.
21 Other than mister famous, John Maine, I think I've not
22 seen anybody's resume that has them having testifying or
23 been hired more than me.
24       And so in the vast majority of cases that I've
25 been hired in over since 1989, I -- I have given opinion

Page 243

1 as to damages.
2       Now, for about a decade, I actually calculated
3 the damages when I had my own number-crunching firm.
4 And so I had a lot of experience, had proprietary design
5 spreadsheets doing these kind of calculations.
6       And I've given numerous sworn testimony in the
7 damages at state and federal court and JAMS and all
8 kinds of arbitrations.  And many times, that's included
9 damages, so -- plus, I'm very familiar with this kind of
10 math, so I feel I'm very -- I'm very qualified.
11    Q.   And do you state in your any other qualifications that
12 you can share with us for rendering an expert opinion on
13 damages in this class action?
14       MR. SCHWARTZ:  Objection, overbroad.
15       Go ahead.
16 BY MR. SUTER:
17    Q.   I'm sorry.  Did you answer?  I didn't hear you?
18    A.   I'm -- I'm trying to see if there is anything I
19 can add to the incredible list I've already given.  I
20 don't think I have anything to add at this point.
21    Q.   And you state in the second sentence of
22 paragraph 148, "I set forth a methodology for
23 calculating all class members' damages which Mr. Olsen
24 has supplied to the data that RJA has already produced
25 to date and can apply to further similar data RJA

Page 244

1 produces in the future."
2      Tell us what the methodology is that you came
3 up with and why you think that applies to anyone beyond
4 Ms. Nguyen.
5      A.  Well, okay.
6      MR. SCHWARTZ:  Object to form.  Objection,
7 overbroad.
8      But go ahead.
9      THE WITNESS:  Yeah, I was going to say, wow,
10 that's like an hourlong answer, I think.  And I got
11 to break it down.
12      One is, separately, why would it apply to
13 anybody other than the -- the named client?  So why
14 don't you ask me that separately, and then let's
15 talk about the methodology, because it's too long to
16 do them both at once.
17      But it's your case.  You can ask me.  But if
18 you ask it that way, it's going to be tough for me
19 to answer.
20 BY MR. SUTER:
21      Q.  I'm trying to be as efficient as I can here
22 with you, Mr. Schulz.  Let's talk about your
23 methodology.
24      Did you develop a methodology for determining
25 what you believe are damages sustained by Ms. Nguyen?

Page 245

1 Was that your first step?
2      A.  I don't think I came up with a methodology just
3 as applying to her.  I think the methodology was what
4 would be the appropriate methodology, and then apply it
5 to everybody, including her.  I think that's how I did
6 it.
7      Q.  Okay.  And when did you develop this
8 methodology?
9      A.  Well -- boy.  When?
10      I started thinking about it the minute I got
11 hired, which you never really got established, but
12 somewhere a year ago roughly, give or take three or four
13 months.  I think I started thinking about it right off
14 the bat.
15      And then I probably didn't -- I probably did
16 not take the time to hone it and perfect it until the
17 numbers came from Raymond James, because that would -- I
18 try to be cost efficient.  And so I probably would have
19 waited until the numbers came in and we started doing
20 that.
21      And then probably right about then I thought,
22 okay, time for me to now -- we're getting down to
23 figuring out the differences -- for me to now put
24 together a formula for how we're going to apply all this
25 to everybody.

Page 246

1      So probably take when you produced those
2 documents, which I can't remember when that was, and add
3 maybe a month to that, maybe less.
4      Q.  Is it -- thank you for that explanation.
5      Is it correct that you created the formula for
6 the damages in this case after getting retained and
7 expressly for this case?
8      A.  I --
9      MR. SCHWARTZ:  Objection.  Vague as to the word
10 "created the formula."
11 BY MR. SUTER:
12      Q.  Can you answer that question, please.
13      A.  I -- I think that's correct.
14      Q.  Okay.  Thank you.
15      And the formula that's on page 37 at
16 paragraph 149, is that something that you created for
17 purposes of testifying in this case?
18      MR. SCHWARTZ:  Same objection to the word
19 "created."
20      THE WITNESS:  Let me turn on some lights.
21 Okay.  Glasses.
22      Are you talking particularly after the sentence
23 is "Damages equals" in paragraph 149?  Is that what
24 your question's about?
25 BY MR. SUTER:

Page 247

1      Q.  Right.  You say that your damages can be
2 expressed as a formula, and then you have this "Damages
3 equal."
4      A.  What's the question?  What's your question
5 about that formula?
6      Q.  Was this damages formula that you have here
7 under paragraph 149 something that you came up with
8 after being retained in this case?
9      MR. SCHWARTZ:  Same objection.
10      THE WITNESS:  Yes, sir.
11 BY MR. SUTER:
12      Q.  Okay.  And in the top of paragraph 149, the
13 first sentence says, "But for RJA's failure to conduct
14 suitability analysis, the class members would have
15 continued to be in their commission-based accounts."
16      Is that your opinion?
17      A.  That's what I wrote.
18      Q.  Right.  Is that your opinion?
19      A.  I thought we established that earlier so we
20 didn't have to waste so much time.  If I wrote it, it
21 was my opinion.
22      Q.  Thank you.
23      And what is the basis for your statement that
24 but for RJA's failure to conduct suitability analysis,
25 that class members would have continued to be in their

24 (Pages 244 - 247)

1 commission-based accounts?
2    A.  Well, the sentence is probably a little
3 incomplete.  It probably should read, "But for RJA's
4 failure to conduct suitability analysis and recommend
5 and switch those commission accounts to Freedom, they
6 would have stayed."  So it's a -- it probably could have
7 been written a little longer.
8    Q.  And am I correct that you don't recall whether
9 or not you've ever spoken with Ms. Nguyen?
10    A.  Yeah.  I haven't tried to remember.  I don't
11 think I have.  I don't think I have.
12    Q.  Is it your opinion that in order to do a proper
13 suitability analysis, one -- whether as an expert or as
14 a broker -- one needs to speak with the client whose
15 account is at issue?
16       MR. SCHWARTZ:  Objection, incomplete
17    hypothetical.
18       THE WITNESS:  That's a ridiculous question.
19    That's a ridiculous question.
20       I'm not licensed anymore.  You can't throw me
21    into the question of the requirement of what a
22    licensed broker is required to do.  That's just a
23    crazy question.  I'm not going to respond.  It's
24    just ridiculous.
25 BY MR. SUTER:

1    Q.  Let me ask you a different question since you
2 refuse to respond to that.
3    A.  Now, wait, wait.  That's -- don't put words in
4 my mouth or we're going to have a fight again.
5       I said I can't answer it because it's
6 nonsensical.  I can't answer.
7    Q.  Let me withdraw the question.  I'll ask another
8 question.
9    A.  Thank you.  Ask a logical question.  Thank you.
10    Q.  As an expert witness, do you feel it's your
11 responsibility, in order to fully understand whether or
12 not an account is suitable for a client, to interview
13 the client to find out what the client wanted and what
14 she or he discussed with the broker?
15       MR. SCHWARTZ:  Objection, overbroad.
16       THE WITNESS:  We've already discussed that and
17    I remember the answer.  I said that, Counselor, I
18    have many lawyers that won't let me talk to their
19    client.
20       So I don't -- I'm not in charge of the cases.
21    I don't get to dictate what the lawyers do and don't
22    do.  And they're in control.  They control their
23    client, they control me.  However, they can't
24    control my opinions, but they can control what I'm
25    allowed to do and not do.

1       So there is many times I've had to give a
2    suitability opinion and, for whatsoever reason, the
3    lawyer did not want me interviewing his client.  So
4    it happens.  And I think we already had that
5    discussion.
6 BY MR. SUTER:
7    Q.  Do you believe it is speculative for you to
8 have the opinion that, quote, class members would have
9 continued to be in commission-based account but for
10 Raymond James's alleged failure to conduct a suitability
11 analysis?
12    A.  I'm making an assumption there.  I don't think
13 it was speculative in nature.  I think when the SEC and
14 FINRA fined Raymond James for similar activities, they
15 made similar assumptions, so I don't think it's
16 inappropriate what I did.
17    Q.  Is there any other reason you don't think it's
18 inappropriate what you did, other than what you just
19 testified to?
20    A.  Because there would be no other way to do -- to
21 figure out the wrongdoing and the damages if you can't
22 make certain assumptions that are proper and logical.
23 It's proper and logical to assume that either all or a
24 major percentage of the Raymond James commission
25 accounts would have still been in commission accounts

1 for a period of time if the brokers hadn't unsuitably
2 recommended the switch.  That's a very proper
3 assumption.
4    Q.  And it's not speculative at all, from your
5 perspective; is that correct?
6       MR. SCHWARTZ:  Objection, asked and answered.
7       THE WITNESS:  I don't think it's speculative.
8    I think it's an assumption.  I mean, we all know
9    what assumption means.
10 BY MR. SUTER:
11    Q.  And is your assumption that some or all of the
12 Raymond James clients would have remained in their
13 commissions, commission accounts?
14    A.  I think for damage purposes, I assumed all.
15    Q.  Okay.  Why did you assume all rather than some?
16    A.  I don't know.  I don't have an answer for that.
17    Q.  Okay.  But your ultimate conclusion here is
18 that all Raymond James customers, whether that numbers
19 32,000 or some other figure, would have remained in
20 their commission accounts, correct?
21    A.  Right.  If you're going to calculate damages,
22 you have to make certain assumptions.  I made that
23 logical assumption.
24    Q.  And you made the further assumption that they
25 would have continued to pay their average commission

25 (Pages 248 - 251)

Page 252

1 rate per year, correct?
2    A.  Yes, with Mr. -- help of Mr. Olsen, we
3 calculated what the percentage commission rate of their
4 assets was, and then we applied that formula, that
5 percentage.  And then to be -- attempt to be fair, we
6 didn't stick with a stagnant base of assets.  We then
7 took that against what was the average equity in the
8 Freedom account.
9    Q.  For how long did you assume, for purposes of
10 creating damages here, that the class of purported class
11 members would have continued to be in their
12 commission-based account?
13    A.  I -- I don't think we made any assumptions.  I
14 think we went with the figures and the facts that
15 Raymond James gave us.  They gave us X number of years
16 that those Freedom accounts continued, and that's what
17 we used.  We didn't make any assumptions at all.
18    Q.  Well, you made the assumption that for whatever
19 length somebody was in a Freedom account, that is the
20 length of time that they would have remained in a
21 commission account; is that correct?
22    A.  Right, I had to -- we had to conduct a
23 comparative analysis, so it's only natural that you have
24 to -- yes, that's what we did and that's the proper
25 assumption.

Page 253

1    Q.  In your experience as -- as somebody who was a
2 registered representative at least in the '80s, the
3 1980s, do you have any experience with clients remaining
4 in accounts without any changes for years and years on
5 end?
6        MR. SCHWARTZ:  Objection, vague.  Objection,
7    overbroad.
8        THE WITNESS:  Well, first of all, you -- I
9    don't know what you're limiting my experience and
10    knowledge to just being a broker.  I've managed
11    money longer than I was a broker, as a registered
12    investment advisor, so I have 13, 14 years of that
13    experience to rely on about what clients do and
14    don't do.
15 BY MR. SUTER:
16    Q.  Can you answer my question, please.
17    A.  No.
18    Q.  Let's have it read back.
19    A.  No, you don't need to.  It's an incomplete
20 hypothetical and I can't answer it as asked.
21        MR. SCHWARTZ:  Objection, incomplete
22    hypothetical.
23 BY MR. SUTER:
24    Q.  In other words, you're refusing to answer my
25 question?

Page 254

1    A.  No.
2        MR. SCHWARTZ:  Objection.  Objection.  That
3    mischaracterizes his testimony.
4        THE WITNESS:  You ask an improper question.
5    That's not my fault.
6 BY MR. SUTER:
7    Q.  Mr. Schulz, is it correct that regardless of
8 whatever experience you had as an FA in the '80s or when
9 you had your, essentially, one person registered
10 investment advisor business, that your clients did not
11 remain stagnant in accounts, but they made changes
12 throughout the year when they were your clients?
13        MR. SCHWARTZ:  Objection, argumentative.
14    Objection, compound.  Objection --
15        THE WITNESS:  I'm not going to.
16        MR. SCHWARTZ:  Hold on.  Objection to
17    overbroad.
18        THE WITNESS:  I'm not going to answer it,
19    especially when you insert personal attacks.
20 BY MR. SUTER:
21    Q.  I apologize.  I did not intend any personal
22 attacks.
23        Did your clients, whenever your -- you were in
24 business, sir, remain stagnant in their accounts; i.e.,
25 if they were in a commission account, they never moved

Page 255

1 from a commission account and never changed their
2 investment over a period of months or years?  Was that
3 your experience when you were in the business?
4        MR. SCHWARTZ:  Objection, compound.  Objection,
5    overbroad.
6        THE WITNESS:  Well, I mean, I can answer that,
7    but it has nothing to do with the facts of this
8    case.  I mean, this whole thing we're talking about
9    is you're arguing that I'm -- it was inappropriate
10    for me to assume they stayed in commission accounts.
11        And now you're asking did your clients keep
12    their investments forever, their underlying stocks
13    and bonds?  Well, that has nothing to do with this
14    presumption.  I'm just presuming they stayed in a
15    commission account.  I never presumed that they
16    weren't going to be making any investments or
17    changing their investments in their commission
18    accounts.  There is no such assumption of that in my
19    report.
20 BY MR. SUTER:
21    Q.  Okay.  And would it be contrary to the
22 assumptions you've made to assume that customers that
23 you prepared damages models for would remain stagnant in
24 an account without making changes to their investments
25 over a period of time, whether that's months or years?

26 (Pages 252 - 255)

Page 256

1   MR. SCHWARTZ: Objection, overbroad. Objection
2   to form.
3   THE WITNESS: I can't -- it's -- it's an
4   illogical question. I can't -- I'm incapable of
5   answering it as asked.
6   BY MR. SUTER:
7   Q. Does your damages methodology assume that
8   investors would be, essentially, frozen in time to the
9   day before they opened their Freedom accounts, and it's
10  on that basis that you assumed that their damages should
11  be calculated?
12  MR. SCHWARTZ: Objection to form. Objection,
13  mischaracterizes the formula that he put in his
14  report.
15  THE WITNESS: No.
16  BY MR. SUTER:
17  Q. Is your assumption, though, that class members
18  would have continued to be in their commission-based
19  accounts and would have paid no more commissions than
20  what you calculated their commissions were in the period
21  of time preceding the opening of the Freedom account?
22  Is that correct?
23  A. That's two separate questions.
24  Q. Can you answer, please.
25  A. No. Ask it individually.

Page 257

1   MR. SCHWARTZ: Objection, compound.
2   BY MR. SUTER:
3   Q. Does your model, sir, assume that any class
4   members would have incurred any additional commissions
5   for whatever period of time that they held their
6   hypothetical commission accounts?
7   A. Yes.
8   Q. And what commissions does your model assume
9   they would have incurred?
10  A. Well, that answer is already we know. Your
11  question was a separate question about would it have
12  increased. And the answer to that question was yes.
13  Q. Your assumption takes as a hypothetical what it
14  was clients paid in a predetermined time before they
15  switched, and it projects that over a future period of
16  time; is that correct?
17  A. I think that's -- I think you said that
18  properly.
19  Q. Okay. And the basis for projecting is what
20  they paid in whatever period of time you calculated it
21  for them; is that correct?
22  A. Well, just wait. Just let's just make -- it's
23  twice you made some inference about the period of time.
24  We didn't select any special time. Raymond James gave
25  us the -- Raymond James, your client, made the numbers.

Page 258

1   We didn't come up with that. They gave us and we
2   included it all. You make it sound like we were being
3   very selective. We -- we took everything you gave us.
4   Q. Ms. Nguyen, for example, had an account for six
5   months, correct? A prior commission account, for six
6   months, before the Freedom account, right?
7   A. At Raymond James?
8   Q. Five or six months, right? At Raymond James.
9   A. That's correct.
10  Q. And she didn't make any trades during that
11  period of time, so you -- you calculated zero for the
12  amount of commissions paid, correct?
13  A. Correct.
14  Q. And then you projected that during the period
15  of time for which she held the account, she would have
16  paid zero commissions in 2015, 2016, 2017, and 2018; is
17  that correct?
18  A. That's correct.
19  Q. And why did you do that?
20  A. That's how the formula works.
21  Q. Okay. Did this formula have any peer review?
22  MR. SCHWARTZ: Same objections as before
23  regarding similar questions.
24  THE WITNESS: You know, you keep assuming
25  something that's just a little nonsensical. I've

Page 259

1   written probably -- I'm one of the most prolific
2   writers in the securities industry. And let me tell
3   you, this is the first time in 30 years that anyone
4   has ever suggested that my articles or all the other
5   articles that I read by some of my compadres on both
6   side of the table, that there is any negativeness or
7   lack of quality because there's not this peer review
8   that one of your experts brought up. It's the most
9   ridiculous, novel thing I've ever heard of.
10  BY MR. SUTER:
11  Q. Can you answer the question, please.
12  A. Good luck on that one.
13  Q. Thank you. Can you answer the question,
14  please.
15  A. Good luck on that one.
16  Q. Can you answer the question, please.
17  A. I would -- I would never have a -- I wouldn't
18  even know how to go through with getting a -- trying to
19  get a peer -- there is no peer group set up to analyze
20  securities articles. There isn't -- it isn't set up
21  anywhere.
22  So tell me about it. I've been writing for --
23  articles extensively for 30 years. I've never known
24  about this peer group that's been set up in advance for
25  me to send my materials through.

27 (Pages 256 - 259)

Q. Did you, in the course of directing Mr. Olsen, take a sample size that at its greatest was 59, and subsequently reduced to a lower figure -- 59 accounts. Did you take that sample and extrapolate what would happen in 32-or-so-thousand accounts?
A. I don't think either -- neither -- as I recall, Counselor, I don't think either Mr. Olsen or myself did any calculations over the amount of 45 accounts. I don't think we did anything on the other ones.
Q. Did you come to any conclusions as to what the amount of -- let me strike that. I was going to say "supposed."
Did you make any calculations as to whether the formula that you used for the accounts here, the sample accounts, what the, quote, damages, closed quote, would be if applied to 32,000 accounts?
A. I don't think either of us have done that math.
Q. Okay. Have you calculated how much, quote, damages, closed quote, you believe the sample size is entitled to based on your conclusion that the Freedom accounts were unsuitable?
A. Well, I think, as of my original report, I thought the number's in there. I think that's what you're talking about. I thought the number was 128,000, I think, but I could be wrong.

Q. Right. Take a look at the center of page 37 of your June 4 report. And that is the number for 34 members. Do you see that?
A. I know it's -- I see it, yes, sir.
Q. And is it your view that the average, quote, damages, closed quote, per class member is -- or should be $37,068 -- $3768? Excuse me.
A. Well, we did the math, came up with a number, and then went back. We had 34 people. We used the numbers -- actually used the real individual numbers for each one of them. I don't think it's average. That's actually the real number. Then we went back.
So that number is the number for the real -- based on my formula, of course -- is the real damage number for all of them. Then I just took the 34 back into it to come out what was the average per 34.
Q. All right. And as far as the second formula that's on page 37 here, have you -- is your testimony similar to what it was in regard to the earlier formula on this page, that this is something that you came up with?
A. Well, I came -- I came up with all the formulas. Yeah, that is -- whatever the formula is, it was me.
Q. Okay. And whatever formula that you came up

with, none of them were subjected to peer review, as ridiculous as you think the peer review concept is; is that correct?
MR. SCHWARTZ: Same objections regarding peer review.
THE WITNESS: I'm not cheating, Counselor. Whatever the -- whatever the peer-review process. There is no process. There is no process. So don't -- your question assumes something that's false. There is no place to do it.
I'd know about it. I've written -- I don't just write for the bar journal. I've written for Securities Arbitration Commentator, which is not a claimants' publication. I've written for PLI, which is --
BY MR. SUTER:
Q. Thank you.
A. Vast majority of those lawyers attend that annual conference are defense lawyers. And none of those people -- and printing my articles in their very prestigious journals -- has ever said, "By the way, we have a peer-review process now."
MR. SCHWARTZ: And before we go forward, Mr. Suter, my understanding is that vast parts of this, Mr. Schulz's reports, have been designated

confidential by Raymond James. And if I am free to circulate that to whoever in the world, I would like to know that, because as I understand it, I cannot do that pursuant to the protective order that your client insisted on and we agreed upon.
MR. SUTER: These documents, the data from Raymond James, is confidential. I don't know that the formulas created by Mr. Schulz themselves are confidential. But we don't need to debate that right now.
MR. SCHWARTZ: No. And I appreciate that, but I -- I -- I cannot send this document, Mr. Schulz cannot send this document because of the position your client held. I'm not saying it's improper position that his reports are going to be subject to confidentiality. But I think the problem that we're having with this whole peer-review thing is that if no one can see these reports and understand what are the formulas in the context of these reports, I just don't understand what your question is as to whether someone else other than your expert would go review these reports and try to give them a blessing or non-blessing.
That's, I think, where you Mr. and Mr. Schulz are getting very crosswise. I think that's where

Page 264

1  the frustration's coming from.  Which is why I asked
2  if you want to remove all confidentiality in these
3  reports.  That may put us into a different
4  situation.
5       MR. SUTER:  Steve, you know that that's not
6  something that we want to do or would do.  I'm
7  asking about the damage methodology and the
8  formulas, not the end results that were churned out
9  as a result of inputting data into those formulas.
10 BY MR. SUTER:
11      Q.  Well, let's move on to --
12      A.  So can I -- can I send around Klouda's and
13 Thomas's reports?
14      MR. SCHWARTZ:  They're subject to the
15 protective order too.  All right?  So my answer is
16 no until that protective order restriction is --
17      THE WITNESS:  Well, let's not -- let's not --
18 it's got to be both ways.  You know, you can't send
19 my report around and I can't send their report
20 around.  That's unfair.
21 BY MR. SUTER:
22      Q.  Mr. Schulz, let's get back to the questioning,
23 and you can talk with your counsel afterwards, but you
24 are subject to the confidentiality order.
25      A.  I'm just letting you know that if I see this

Page 265

1  report somewhere in the next couple of weeks, we'll be
2  talking.
3       THE WITNESS:  I'm going to the bathroom.
4       MR. SUTER:  And please don't wave your finger
5  at me.
6       THE WITNESS:  I'll do whatever I want.
7       Okay.  He's back.  Back.
8  BY MR. SUTER:
9       Q.  Can you identify any specific source that you
10 referenced as you created these formulas that are set
11 forth in Exhibit 149 or 150?
12      MR. SCHWARTZ:  Objection.  Same objections that
13 we raised before about sources of formulas.
14      THE WITNESS:  I cannot.
15 BY MR. SUTER:
16      Q.  Sorry.  All right.  Let me ask you about the --
17 the sample size here.
18      You worked with a sample size of 59.  And,
19 ultimately, have reached a conclusion that 34 class
20 members fit within the class and had projected damages
21 of 128,109.  Is what you have in your report, correct?
22      A.  I think -- I think you're reading that
23 correctly.
24      Q.  Okay.  Are you an expert on sample size
25 requirements for statistical analyses?

Page 266

1       A.  Don't think I claim to have that expertise.
2       Q.  Is it your expert opinion that the damages
3  analyses that you did for the 34 class members is a
4  methodology that can be applied to a larger group such
5  as 32,000 folks?
6       A.  Absolutely.
7       Q.  Okay.  Is it your position that the average
8  damages number per class member that you have here in
9  your report of $3768 is a number that can be
10 extrapolated and projected onto a class of 32,000
11 members?
12      MR. SCHWARTZ:  I'm going to object to the use
13 of the word "position."  And I'm also going to
14 object because we've asked for -- and Raymond James
15 has refused to provide -- a larger --
16      MR. SUTER:  This is a speaking objection.
17      MR. SCHWARTZ:  Let me finish, sir.
18      MR. SUTER:  Please limit your objections.
19      Yeah.  Well, you're coaching the witness, so I
20 don't appreciate that.
21      MR. SCHWARTZ:  I'm not, but you can respond.  I
22 don't think I should be interrupted.
23      And my -- so I can see where I was on the court
24 reporter doc, my objection was that we have
25 requested and asked for a larger or complete sample,

Page 267

1  and Raymond James has refused to produce it.
2       Those are my objections, along with the
3  objection to the word "position" in your question.
4       Mr. Schulz, you can answer.
5       THE WITNESS:  I feel very confident that when
6  we -- when Raymond James ultimately produces the
7  information for all 33 people, that the numbers are
8  going to be very consistent because the -- old
9  saying, "The proof is in the eating of the pudding."
10      The reason Raymond James systemically put
11 together this whole taking advantage, because they
12 realized they had all these clients that weren't
13 generating enough commissions for them, so they
14 convinced their brokers to take all these
15 non-trading, non-commission accounts and pump them
16 up by nine to 22 times costs.
17      Those are the ones you switched.  All the ones
18 that were producing enough commissions that you'd
19 leave them alone, those aren't going to be in the
20 33,000, because you didn't push them.  It's going to
21 be -- I'll make you another side bet.  It's going to
22 be --
23 BY MR. SUTER:
24      Q.  Sir, I'm not interested in side bets.  Let me
25 get back to my questioning here.

29 (Pages 264 - 267)

Page 268

1    A.  I understand.
2    Q.  Do you have any opinion, one way or another, as
3  to whether the sample size that you made your
4  calculations on was statistically valid?
5    A.  Yes.
6    Q.  Understand that term?
7       And you believe it is?
8    A.  Yes, for the reason I just gave.
9    Q.  Okay.  Do you believe that the population was
10  properly chosen and defined?
11       MR. SCHWARTZ:  I'm going to object to this
12    because it was Raymond James that unilaterally chose
13    the random selection process without consulting or
14    getting agreement from us.
15       But go ahead and answer.
16       THE WITNESS:  Yeah, that's what I was going to
17    say.  We can only use what you guys didn't refuse to
18    give us.  It's not our fault.
19  BY MR. SUTER:
20    Q.  Do you have expertise in determining whether
21  the sample that you worked with was representative of
22  the total population?
23    A.  What's the total population?  What are you
24  talking about?  You mean every single Raymond James
25  client?

Page 269

1    Q.  No, sir.  We're talking about what your report
2  refers to as 32,000 potential class members.
3       Let me ask the question again.
4       Do you have any expert opinion as to whether or
5  not the data that you worked with is representative of
6  the data that would be associated with the 32,000
7  accounts?
8    A.  Absolutely, because that's the reason you
9  switched them, because they were low volume.  I think
10  that all those numbers for the whole 33,000 are going to
11  come in very close to the numbers that we have now.
12    Q.  Any other reason?
13    A.  I don't need another reason.
14    Q.  Do you have any expertise in determining
15  whether or not the data that were analyzed were analyzed
16  in accordance with accepted statistical principles?
17    A.  Well, yeah, I am very confident.  I'm very
18  impressed.  I'd never met Mr. Olsen before, but I got to
19  tell you, he is one whiz kid.  And, boy, he has done
20  analyzation in cases that are a hundred times bigger
21  than this one.  Very confident in our numbers.
22    Q.  And Mr. Olsen did not have any input on how you
23  created the formula that you gave to him to populate
24  with data; is that correct?
25    A.  That's correct.

Page 270

1    Q.  Is it your view that the -- the data size that
2  you utilized here, the 59 accounts or, ultimately, the
3  34 accounts, is a sufficiently large sample for
4  projecting forward as to 32,000 accounts?
5       MR. SCHWARTZ:  Objection, asked and answered
6    several times.
7       THE WITNESS:  And I'll repeat it then.
8       Absolutely, because the 33,000, we have the
9    documents that prove that Raymond James particularly
10    went after these low-volume, low-turnover accounts,
11    and so they're all going to look the same.
12  BY MR. SUTER:
13    Q.  And it's your view, based at least on what I
14  perceive to be your -- your passion in your testimony,
15  that you believe that Raymond James was doing something,
16  essentially, nefarious and -- and fraudulent.  Is that a
17  fair assumption?
18       MR. SCHWARTZ:  Objection, compound.  Objection,
19    argumentative.  Objection, asked and answered in
20    parts before.
21       THE WITNESS:  Well, first of all, you've
22    tried -- this is the third time you've tried to get
23    me to give an opinion about fraud, and I've told
24    you, and I'll tell you again, I've never been asked
25    to address that.  I have no opinion of that, so quit

Page 271

1    trying to insert it.
2       Now, nefarious -- nefarious -- if we can define
3    "nefarious" as Raymond James systemically, across
4    the board, violated numerous regulations, both
5    federal and FINRA, if you want to call that
6    nefarious, I'll say that's nefarious.
7  BY MR. SUTER:
8    Q.  Which federal securities laws or regulations
9  did Raymond James violate, in your expert opinion?
10       MR. SCHWARTZ:  Objection, asked and answered.
11    But you can answer.
12       THE WITNESS:  Investment Advisors Act of 1940.
13  BY MR. SUTER:
14    Q.  Have you seen the original complaint in this
15  action?
16    A.  I -- I don't know.  I -- I -- I don't know.  I
17  don't -- I don't know.
18       MR. SUTER:  Clay, if you're around, can you
19    pull up the original complaint.
20       MR. SCHWARTZ:  And I'm --
21       MR. LEAN:  Yes, sir.
22       MR. SCHWARTZ:  -- going to object to the extent
23    that this complaint is superseded and is no longer
24    an operative complaint in this case.
25  BY MR. SUTER:

30 (Pages 268 - 271)

Page 272

1  Q.  Okay. While he's pulling that up, let me --
2  let me ask you about some of the rules and regs that you
3  contend were violated.
4      You cited Notice to Members 03-68 in your
5  report and in your earlier testimony.  Do you recall
6  that?
7  A.  I do.
8  Q.  Okay.  And are you aware of any writings, sir,
9  from FINRA or any other source as to whether or not
10  Notice to Members 03-68 covers customer accounts that
11  fall within the provisions of the Investment Act -- or
12  Advisers Act of 1940?
13  A.  I never -- I don't think I've ever looked into
14  that issue, so I've never considered that issue, I've
15  never been asked to consider that issue, so I have no
16  opinion.
17  Q.  Okay.  Do you have an opinion on the following:
18  The requirements of Notice to Member 03-68 do not apply
19  to accounts that a member services in its capacity as a
20  registered investment advisor?
21  A.  Okay.  Okay.  Wait, wait, wait.
22      03-68 isn't a rule.  It's a notice to members.
23  So with that, can you reask the question.
24      MR. SUTER:  I'll ask the reporter to read it
25  back.

Page 273

1      (The reporter read the portion requested.)
2      MR. SCHWARTZ:  Objection to form.
3  BY MR. SUTER:
4  Q.  Do you have any opinion on whether or not the
5  statement that was just read back by the court reporter
6  is accurate or not accurate?
7  A.  Can I ask for a clarification or not?
8  Q.  Well, let me -- do you have an -- can you
9  render an opinion or give us an answer without
10  clarification?  If not, I'll be happy to -- to see what
11  you need here.
12  A.  Well, let me try without since you don't want
13  that to happen.
14      The Notice to Members 03-68 applies in this
15  case as it relates to Raymond James Series 7 brokers who
16  are also required under Raymond James to be investment
17  advisor representatives.  It is my opinion that that
18  notice applies.
19  Q.  Do you have any understanding as to whether the
20  Freedom account that Ms. Nguyen, the plaintiff here,
21  held was held at the investment advisor AMS as part of
22  Raymond James?
23  A.  That's my understanding.
24  Q.  You have made some statements, I believe, in
25  your report about --

Page 274

1      MR. SUTER:  Oh, actually, before we do that,
2  Clay, do you have the complaint that's been
3  uploaded?
4      MR. LEAN:  Yes, I just uploaded it.
5      MR. SUTER:  Has it come through, Jack?  Or
6  Steve?
7      MR. SCHWARTZ:  I don't have it yet.
8      MR. SUTER:  Okay.  Then I'll come back to that.
9  BY MR. SUTER:
10  Q.  Let me -- let me ask you.
11      Your belief is that Raymond James financial
12  advisors, the FAs on the brokerage side, were
13  incentivized to steer clients into the Freedom account
14  in order to generate more income for themselves without
15  any basis therefor; is that correct?
16  A.  No, that's false.
17  Q.  That's false?  Okay.
18      Tell me what -- what is -- tell me what your
19  opinion is with regard to Raymond James financial
20  advisors and any financial incentive that you believe
21  they might have had.
22  A.  Well, the financial -- I mean, that's -- that's
23  compound.  Let me just give one answer.  And if you want
24  to get the rest, you can come back.
25      They definitely had an incentive, because there

Page 275

1  is no doubt that -- and you can take -- if you want to
2  take the zero-producing commission accounts or whatever
3  you want to do.
4      But for the vast majority of the accounts, at
5  least the 34, they were not generating very much in the
6  way of revenue for Raymond James, which a percentage
7  went to the brokers.  And by taking and moving them to
8  a, on average, 1.2 percent charging and the broker gets,
9  I think, a hundred percent of that going to the grid,
10  that his payout, his take-home, would go up
11  significantly, and that's quite an incentive.
12  Q.  Okay.  Anything else?
13  A.  Well, I -- what do you mean, "anything else"?
14  "Anything else" what?  I mean, I have all kinds of
15  opinions.
16  Q.  Yeah.  No, I meant on that specific topic.
17  Have you fully answered my question?
18  A.  I have other opinions, but you've got to ask
19  specific questions.  Not my job just to --
20  Q.  No, I get it.  I get where you're going with
21  that, sir.
22  A.  What?
23  Q.  I say I understand what you're -- what you're
24  saying here.  I'll ask you specific questions.
25      Has that complaint come through?

31 (Pages 272 - 275)

1    A.  Not on my screen.
2    Q.  Let me ask you about --
3        MR. CLABBY:  I can see it.  I can see it.
4    Maybe we should just refresh.  Sometimes if you just
5    refresh it, because it came through for me.
6        MR. SCHWARTZ:  I had to click on "Marked
7    Exhibits" for the popup, so maybe just click on
8    "Marked Exhibits."
9        THE WITNESS:  Oh, good suggestion, Mr. Clabby.
10   I refreshed it and it did come up.  Thank you.
11       MR. CLABBY:  Okay.  Good.
12   BY MR. SUTER:
13   Q.  Great.  This report -- I'm sorry.
14       Your report does not refer to this original
15   complaint.  Have you ever seen this before?
16   A.  You asked me that, and I said I didn't -- I
17   don't know.
18   Q.  Okay.
19       MR. SCHWARTZ:  Objection, beyond the scope of
20   his opinions on report.
21   BY MR. SUTER:
22   Q.  Did this -- do you understand Ms. Nguyen at one
23   point in time claimed that Raymond James was engaged in
24   a reverse churning scheme?
25   A.  I thought that was the current claim.

1    Q.  Okay.  And the reverse churning claim is
2    something -- strike that.
3        The original complaint contains allegations
4    about the reverse churning claim that was alleged in
5    there.
6        Do you have any understanding as to whether or
7    not the reverse churning claim is, by virtue of its very
8    nature, something that violates not only the Investment
9    Advisers Act, but the Rule 10(b)(5) and Section 10(b) of
10   the '34 act?
11       MR. SCHWARTZ:  Objection, beyond the scope of
12   the report and the opinions he's offered.  Objection
13   regarding the original complaint, which the witness
14   has said he has not seen and he's not used it in his
15   report.  And objection to the extent you're asking
16   the witness to make legal conclusions about 10(b)(5)
17   and the Investers Act, which is not part of his
18   report.
19       THE WITNESS:  Am I -- am I instructed to
20   answer?
21       MR. SCHWARTZ:  You can -- you can answer to the
22   extent you can, if you can, but don't speculate.
23       THE WITNESS:  Yeah, I can't go very far with
24   that.  I think the answer is I don't know.
25   BY MR. SUTER:

1    Q.  Is the answer to the following that you don't
2    know either -- nobody knows how the stock market's going
3    to perform in the future?  Would you agree with that
4    statement?
5        MR. SCHWARTZ:  Objection.  Objection to form.
6    Objection.
7        THE WITNESS:  Can you ask it separately without
8    the intro?
9    BY MR. SUTER:
10   Q.  Sure.  Let me ask it in reference to your --
11   your book Brokerage Fraud.
12       Do you have that in front you still?
13   A.  Oh, I'll get it, sir.
14       Right here.  And if you send me your copy, I'll
15   sign it.  I think Skippy -- I think Skippy has a copy.
16       I have it, sir.
17   Q.  Turn to page 236, please.
18   A.  Let me change my mouse and go up there.
19   It's -- 236.  236.
20       All right.  I am there.  "No One Really Knows."
21   BY MR. SUTER:
22   Q.  Right.  That's the heading of this section of
23   your book; is that right?
24   A.  Yes.  Yes, sir.
25   Q.  Can you read that first paragraph into the

1    record, please.
2    A.  Yes, sir.
3        "The real question should be, if your broker or
4    advisor is able to guess what the market is going to do,
5    what is he -- the real question, if your broker or
6    advisor is able to guess -- what is he going -- what is
7    he doing wasting his time talking to you.  Think about
8    it.  If you had a black box and were always right, why
9    would you tell others?  They might steal the black box.
10   If everyone had a black box, the black box would no
11   longer work because there would be no one on the other
12   side of the tray.  If you had this black box, you could
13   turn a thousand dollars into a billion dollars in a very
14   short amount of time.  And with leverage, options,
15   commodities, and other investments, you could then
16   quickly turn this billion into trillions."
17   Q.  What did you mean by the concept of a black
18   box?
19   A.  Oh, black box means you've -- you've -- you've
20   found the goose that lays the golden eggs.  You have --
21   you have -- that this person -- this person has figured
22   out the formula that he can make money and guess which
23   way the markets are going.  He has this black box, this
24   incredible insight that no one else has.
25   Q.  Okay.  Turn to the next page starting at the

32 (Pages 276 - 279)

Page 280

1 first full paragraph, "There are more." Could you read
2 that paragraph into the record.
3    A.  Yes, sir.
4        MR. SCHWARTZ:  Object to the request to have
5    the witness just read paragraphs of the document
6    into the record, but if that's the way you want to
7    spend your time.
8        Just read slowly so you actually read it
9    accurately, because you may have missed a word or
10   two in the last --
11       THE WITNESS:  Yeah.  I'm sorry.  I do have a
12   tendency to try to move things along.  Okay.
13       "There are more people willing to tell you how
14   to make money investing than there are mothers
15   willing to tell you how to cure a cold.  We all
16   should know by now that there is no cure for the
17   common cold, but who knows that no one knows what
18   the stock market is going to do.  People want to
19   believe that someone knows how the stock market will
20   move.  No one knows what the stock markets are going
21   to do, much less what individual stocks are going to
22   do.  Do you need proof?"
23 BY MR. SUTER:
24   Q.  Is the point of the two passages that I asked
25 you to read, that it would be speculative to try to

Page 281

1 predict how the market would perform in the future?
2    A.  I don't think -- I don't think that's my point.
3    Q.  Would you agree that it would require
4 speculation to predict how any investment might do in
5 the future?
6        MR. SCHWARTZ:  Objection, overbroad.
7        THE WITNESS:  I don't -- I don't -- I don't
8    think that's the opinion of my book.
9 BY MR. SUTER:
10   Q.  Isn't it true that your damages model requires
11 speculation in order to reach the numbers that it's
12 reaching?
13       MR. SCHWARTZ:  Objection, asked and answered.
14   Objection, argumentative.
15       THE WITNESS:  I don't think so at all.
16 BY MR. SUTER:
17   Q.  Do you need to project into the future what
18 investments class members would have made in order to
19 get to your damages model?
20       MR. SCHWARTZ:  Objection, asked and answered.
21       THE WITNESS:  Absolutely not.  What they would
22   or would have made is irrelevant.
23 BY MR. SUTER:
24   Q.  What -- isn't it speculative to project what
25 they would have paid for whatever investments they might

Page 282

1 have gotten into in the future?
2        MR. SCHWARTZ:  Objection, form.  Objection,
3    asked and answered.
4        THE WITNESS:  Absolutely not.  It's very --
5    your experts go on about this for pages, and it's
6    just nonsensical.  These guys don't live in the real
7    world.  They say, "You can't make projections into
8    the future" --
9 BY MR. SUTER:
10   Q.  Okay.
11   A.  -- "for all costs."  I don't -- are you
12 interrupting me?
13   Q.  No, I'm not interrupting you, sir.  Go ahead.
14   A.  Well, then don't talk either.
15       And they go on and on.  And it's -- it's not
16 only illogical; every day, across the nation, investment
17 world, in the business world, people, professionals have
18 to look at cost.  And what they do -- it's very common
19 in the investment world and the mutual fund world, in
20 the money management world, in the business world, that
21 people are looking at their costs and the history of
22 their costs of what it is to a certain point, as we did
23 in our damage model.
24       And then they have to -- because they have to
25 decide all kinds of business decisions or investment

Page 283

1 decisions as to what their costs are going to be in the
2 future.  And the only way to do that logically,
3 statistically, intelligently is to look at your costs in
4 the past to project in the future.
5        And your nincompoop experts say that you can't
6 do that.  Oh, my God.  That was the most ridiculous
7 thing I've ever read.
8    Q.  Mr. Schulz, do you agree with the following
9 statement:  Quote, The only relevant question is whether
10 an investment is suitable for the customer at the time
11 of the investment, closed quote?
12   A.  Wait a minute.  I do not --
13       MR. SCHWARTZ:  Objection to form.  Objection,
14   no context.
15       THE WITNESS:  Okay.  I don't know what you're
16   reading.
17 BY MR. SUTER:
18   Q.  I'm reading from your book at page 76.
19   A.  Okay.
20   Q.  Let me withdraw that.  Let me ask you the
21 following.
22       Is it your expert opinion, as you state on
23 page 84 of your book, that, quote, Fraud and suitability
24 claims go hand in hand.  You hardly ever see one
25 violation without the other because fraud usually

33 (Pages 280 - 283)

1 results in unsuitable investments. Unsuitable
2 investments occur when a broker either misrepresents an
3 investment to a customer or fails to tell the customer
4 of all of the material facts about the investment.
5 That's fraud."
6      Do you agree with that statement?
7      MR. SCHWARTZ: Objection, beyond the scope of
8 his report and expert opinions in this case.
9 Objection to the extent you're asking him that --
10 that statement in any other context that it is in
11 that book on that page.
12      THE WITNESS: I think the only thing that's on
13 the table is that what my book says, and my book
14 speaks for itself. I'm not going to argue that you
15 didn't read it correctly.
16 BY MR. SUTER:
17   Q.  Okay. Thank you.
18      And you are offering opinions on suitability in
19 this case, correct?
20   A.  I am.
21   Q.  Does everybody have the complaint, original
22 complaint, in front of them?
23   A.  Just for my own edification and energy level,
24 can I find out how much longer we have?
25   Q.  Sure. I think we've got about another 35

1 minutes or so. You need a break?
2      MR. SCHWARTZ: You need a break?
3      THE WITNESS: No, I'm try to -- I'll try to
4 make it. But is that right, is that your -- can
5 somebody officially tell us how much time is left?
6      MR. SCHWARTZ: I think -- I think Mr. Suter's
7 estimate was my estimate too, so I think that's --
8      THE WITNESS: Okay. I'm good with that.
9      All right. I -- I see something here called
10 "Exhibit 145." Is that what I'm supposed to hit on?
11 BY MR. SUTER:
12   Q.  Yeah, take a -- just a quick look at that. I
13 just want to ask you about the first paragraph in that
14 document.
15   A.  All righty.
16      MR. SCHWARTZ: And I'll interpose the same
17 objection before, that the witness did not list it
18 in his report as something he reviewed or relied
19 upon and has already testified he has not seen it
20 before, not had an opportunity to read through the
21 whole document.
22 BY MR. SUTER:
23   Q.  Why don't you just read to yourself
24 paragraph 1, please.
25   A.  The one that starts "The nature of the action"?

1   Q.  Yes. Perhaps you can read it in the record, if
2 you would, please.
3   A.  You want me to read it out loud. Okay.
4 BY MR. SUTER:
5   Q.  The one that's --
6      MR. SCHWARTZ: I'm going to --
7 BY MR. SUTER:
8   Q.  The one that's labeled paragraph 1, please.
9      MR. SCHWARTZ: I'm going to object to making my
10 witness write something he did not write, that he
11 has never seen before and will not cite.
12      Mr. Suter, if you want to read it into the
13 record, be my guest, but my witness here is not here
14 to simply be a -- an orator or to pretend that he is
15 playing a part in a play and should read a script.
16 BY MR. SUTER:
17   Q.  All right. I don't actually have that up
18 because of a technical issue here. Why don't you read
19 it to yourself, sir, and tell me if there is anything
20 that you believe is set forth in that first paragraph
21 that is inconsistent with you -- with your understanding
22 of the complaint that you did, in fact, review in this
23 matter.
24      MR. SCHWARTZ: I'm going to object to the
25 extent you're asking the witness to do that

1 comparison on the spot with respect to a document he
2 has never seen before.
3      If you want to put in the current complaint in
4 front of him so he can compare the first paragraph
5 to both, feel free.
6      MR. SUTER: Right. Your objection's noted.
7 BY MR. SUTER:
8   Q.  Can you do that, please, sir.
9   A.  Yes, sir. I'm going to now read the paragraph
10 to myself, not out loud.
11   Q.  That's fine.
12   A.  Let me change glasses.
13      Okay. I've read that.
14      MR. SCHWARTZ: I'm also going to interpose an
15 objection that your question is overbroad.
16 BY MR. SUTER:
17   Q.  All right. Is what you just read to yourself
18 in paragraph 1 consistent with what you understand the
19 claims to be in this case as they relate to reverse
20 churning?
21      MR. SCHWARTZ: Objection, overbroad.
22 Objection -- same objections that I previously spoke
23 about. Objection, calls for speculation to the
24 extent that the current complaint is not in front of
25 the witness.

34 (Pages 284 - 287)

Page 288

1    THE WITNESS:  I -- I've never been asked in
2  this case to get into this kind of -- if the claim
3  or -- first claim or second claim is or isn't
4  appropriate.  No one has ever asked me to do that.
5    But I -- I -- other than that, this seems to be
6  somewhat similar to the current claim.
7  BY MR. SUTER:
8    Q.  Okay.  Sir, are you an expert in regard to
9  whether or not legal requirements for certifying a class
10  have been met?
11    Just want to confirm.  I know you said you're
12  not familiar with Rule 23, but I just want to check that
13  off the list here that that's not something you have an
14  opinion on.
15    MR. SCHWARTZ:  Objection, beyond the scope of
16  the report.
17    THE WITNESS:  Yeah.
18    MR. SCHWARTZ:  Objection, calls for legal
19  conclusion.
20    THE WITNESS:  Yeah, I -- I -- zero.  I have
21  zero expertise in that area.
22  BY MR. SUTER:
23    Q.  Despite your testimony just now, it's your view
24  that damages can be projected on a class-wide basis
25  though, correct?

Page 289

1    MR. SCHWARTZ:  Objection to -- objection to
2  form.  Objection to the preface that a question
3  isn't argumentative.
4    THE WITNESS:  Absolutely.
5  BY MR. SUTER:
6    Q.  Let's talk about rebalancing.  Do you have a
7  view as to whether or not rebalancing is something
8  that's appropriate to be done by a professional money
9  manager such as AMS in accounts like the Freedom
10  account?
11    MR. SCHWARTZ:  Objection, overbroad.
12    THE WITNESS:  I don't understand the -- I mean,
13  generally understand the English word "appropriate."
14    Is there any particular benefit?  Is it a
15  special -- is it worth the higher cost for it?  Was
16  it needed?  Is it really -- has the -- have the
17  statistics out there proven that rebalancing really
18  improves the underlying returns?  Is it worth all
19  the additional taxes?  You want to ask those
20  questions?  But appropriate, that's too broad.
21  BY MR. SUTER:
22    Q.  And you can't ask -- answer the question as
23  asked?  Is that your testimony?
24    A.  Since you -- since you always want to accuse me
25  of not being able to answer it because you don't like my

Page 290

1  qualifiers, which is just a cheap lawyer trick, I'll go
2  ahead and -- to try to appease you without having to go
3  on your little personal games late in the thing here --
4  and say it is very often very inappropriate, not in the
5  client's best interest, and not suitable.  Not always.
6    Q.  When you were managing money as a registered
7  investment advisor, you rebalanced your clients'
8  accounts when you had discretion; isn't that correct?
9    A.  I don't recall if I did or didn't.
10    Q.  Do you recall testifying that you did at least
11  annually in the Henderlight vs. AmSouth Bank case?
12    A.  I don't remember anything about that case.
13    Q.  Do you remember having rebalanced your clients'
14  accounts on at least an annual basis and sometimes more
15  frequently depending on market conditions, such as every
16  six months or so?
17    A.  You already asked me that question and I said I
18  don't recall that if I did or didn't.
19    Q.  Okay.  Well, you said that in regard to this
20  case in particular.  But putting aside this case, isn't
21  it true that when you were handling money on a
22  discretionary basis as a registered investment advisor,
23  you periodically rebalanced your clients' accounts?
24    A.  How many times you going to allow him to ask me
25  the same question?  I've given you that answer, and I've

Page 291

1  told you I have no recollection if I did or didn't.  And
2  I'm not going to change my answer just because you ask
3  me three times.
4    Q.  When did Reg BI come into existence, if you
5  know?
6    A.  Somewhere in the last two years.
7    Q.  It was effective June of 2020.  Does that
8  comport with your recollection?
9    A.  That sounds about right.
10    Q.  Okay.  And did you understand that Reg BI was
11  designed to improve investor protection?
12    A.  I don't think I'd argue with that general broad
13  comment.
14    Q.  You agree that Reg BI stated for the first time
15  in a regulation that that -- the suitability obligation
16  for FINRA brokers was subject to the best interest
17  regulation?
18    Do you recall whether prior to Reg BI there was
19  anything that specifically stated that FINRA brokers
20  needed to act in the best interests of their clients?
21    A.  Brokers --
22    MR. SCHWARTZ:  Object.  Objection.  Objection,
23  compound.  Objection, overbroad.
24    THE WITNESS:  Brokers have always been required
25  to act in the best interests of their clients.  And

35 (Pages 288 - 291)

Page 292

1  if Raymond James wants to put in big writing and put
2  it on their website that says "Raymond James does
3  not have a duty to act in the best interests of
4  their clients" -- and we've never had that until
5  just BI -- put it up there and the firm will be out
6  of business in six months.
7  BY MR. SUTER:
8      Q.  That's not what I stated in my question.  I was
9  talking about regulatory guidance.
10      Do you have any understanding as to why Reg BI
11  was enacted?
12      MR. SCHWARTZ:  Objection.
13      THE WITNESS:  That's a long --
14      MR. SCHWARTZ:  Objection.  Hold on.  Hold on.
15  Hold on.  I want to make my objection first.
16      Objection, overbroad.  Objection, calls for
17  speculation.
18      You can go and answer to the extent you can
19  answer.
20  BY MR. SUTER:
21      Q.  Just a simple, do you have any understanding?
22      A.  Take me an hour.  This whole fight has been
23  going on for 20 years.  I've even testified in Texas
24  Legislature about this issue 20-something years ago.
25  This has been being argued back and forth for a long

Page 293

1  time, and there is all kinds of separate arguments on
2  it, and I cannot answer that in one short why did it
3  finally come into being.  It's multi answers.
4      Q.  Sure.  And -- and to your point, there was
5  vigorous debate for 20 years about whether or not a
6  specific regulation like Reg BI that became effective in
7  June of 2020 should be enacted.  Is that your
8  understanding?
9      MR. SCHWARTZ:  Objection to form.  Objection,
10  overbroad.  Objection to calls for speculation.
11      THE WITNESS:  Yeah, that's one of the many
12  arguments.  I mean, God, I -- I don't think -- there
13  is all kinds of arguments.  That's one of them.
14  There, I'll give you that.  It's one of the many
15  arguments.
16      MR. SUTER:  Thank you.  We've got about
17  20-something minutes left.  Why don't we take a
18  five-minute break.  I want to just consult with my
19  colleagues and see -- see what areas that we may
20  want to still cover.  So can we take five here?
21      MR. SCHWARTZ:  Sure.  5:45?
22      MR. SUTER:  Sure, that's great.  Thank you.
23      THE VIDEOGRAPHER:  We're going off the video
24  record at 5:38.  Media Unit 4, No. 1.
25      (Recess taken.)

Page 294

1      THE VIDEOGRAPHER:  Going back on the video
2  record at 5:51.  Unit No. 4, No. 2.
3      MR. SUTER:  Great.  Thank you very much.
4  BY MR. SUTER:
5      Q.  Mr. Schulz, your two reports that are at -- in
6  the binder before you are the June 4 and June 25
7  reports.  Those reports set forth all of the bases and
8  reasons and support in favor of your opinions; is -- is
9  that correct?
10      A.  I -- I think so.
11      Q.  I'm sorry, I didn't hear you.
12      A.  Oh, I'm sorry.  I thought I answered.  I said,
13  "I think so."
14      Q.  Okay.  Great.  Thank you very much.
15      With regard to suitability, would you concur
16  with me that that is a concept that is a -- either a
17  point of sale or a point of transaction concept?  In
18  other words, one determines whether an individual stock
19  is suitable as of the time that the recommendation was
20  made and the transaction was effected?  Do you agree
21  with that basic concept?
22      MR. SCHWARTZ:  Objection to form.  Objection,
23  compound.  Objection, overbroad.
24      THE WITNESS:  I -- I only agree with the -- the
25  contention that at the time the recommendation is

Page 295

1  made that it must be suitable at that time.  I do
2  not agree with the contention of your experts that
3  from that point on anything to do with the client's
4  portfolio or accounts is no longer a suitability
5  issue.  That -- that they had a very strong opinion
6  that it drops dead after the day of the
7  recommendation.  I disagree with that completely.
8  BY MR. SUTER:
9      Q.  Okay.  Has the concept of suitability evolved
10  during the period that you've either been in the
11  business or acted as an expert witness?
12      MR. SCHWARTZ:  Objection, overbroad.
13      THE WITNESS:  We all know -- especially people
14  like you and me that are always talking about this,
15  we all know that FINRA is always tweaking -- well,
16  they do it -- they tweak by sending out Q and As.
17  They tweak it by sending out notice to members.  And
18  then the suitability rule itself, that seems like
19  every few years they slightly change a word.
20      But I think the intent and the overall rule has
21  changed relatively little over the 40 years I've
22  been in the business.
23  BY MR. SUTER:
24      Q.  Okay.  The one constant is that you need a
25  recommendation to be made in order for the suitability

36 (Pages 292 - 295)

Page 296

1 rule to apply? That has not changed over the years that
2 you've been doing this sort of thing, right?
3    A.  Yeah.  I think --
4       MR. SCHWARTZ:  Objection.
5       THE WITNESS:  I think we had that discussion
6    earlier.
7       I'm sorry.
8       MR. SCHWARTZ:  You know, objection, compound.
9       THE WITNESS:  I think we had that discussion
10   earlier today and I think I agreed with that.
11 BY MR. SUTER:
12   Q.  And as the rule stands now, separate and apart
13 from Reg BI, there is no specific statement about the
14 suitability rule applying -- in the words of 2111, there
15 is no specific statement as to its application to
16 account types; is that correct?
17   A.  No.
18      MR. SCHWARTZ:  Objection, compound.  Objection,
19   asked and answered.
20      THE WITNESS:  If the question is, in the very
21   body of the suitability rule, which is relatively
22   short, does the word "account type" in there?  If
23   that's your -- if that's -- anybody can read.  You
24   don't need me to give an opinion about that.  Either
25   it does or doesn't.  But does it relate to account

Page 297

1 type?  Absolutely.
2 BY MR. SUTER:
3    Q.  All right.  And it's your view that prior to
4 Reg BI that the suitability concept did apply to account
5 types, correct?
6    A.  I did not say anything about Rule BI.
7    Q.  About Reg BI?
8       It's your view that prior to June 2020 that, at
9 least as you view the various authorities and regulatory
10 statements, it was your view that the suitability rule,
11 despite not including the term "account types," did, in
12 fact, have application to account type recommendations,
13 correct?
14   A.  Absolutely.
15   Q.  All right.  And are you -- are you aware of
16 whether or not that was a universally-held view or if
17 others who were, you know, as capable of you -- as you
18 may have had different views?
19      MR. SCHWARTZ:  Objection --
20      THE WITNESS:  No.
21      MR. SCHWARTZ:  Objection, compound.  Objection,
22   calls for speculation.
23      THE WITNESS:  I would be willing to bet that
24   the vast majority of experts would agree with my
25   opinion, other than Bates Capital, because Bates

Page 298

1 Capital changes its opinion based on whatever the
2 lawyers tell them to be.
3    So any credible experts would agree with my
4 opinion, but I would not -- I am not surprised,
5 because the Bates Capital people, they just --
6 they -- they're under the wing.  I mean, they
7 basically work for the brokerage industry, so
8 whatever.  Okay.  What do you want to tell us?
9 We'll tell -- yeah, we'll tell it, we'll put it in
10 writing, whatever you want.  That's Bates Capital.
11 They're not credible.
12 BY MR. SUTER:
13   Q.  Well, as in many other aspects of this case,
14 there are differences of opinion on that topic.
15   A.  Wait, wait, wait, wait.  Oh, that Bates
16 Capital's credible?  Sure, I'm sure they think it's
17 credible.  I agree with that.
18   Q.  Do you know whether -- you know what SIFMA is,
19 correct?
20   A.  I do.
21   Q.  And is SIFMA a credible organization?
22   A.  Well --
23      MR. SCHWARTZ:  Hold on.  Objection, overbroad.
24      THE WITNESS:  I do think it -- I do think it's
25   interesting that you try to introduce your experts

Page 299

1 as unbiased experts, and then he's on a list of all
2 his involvement in SIFMA; which SIFMA -- we know
3 what SIFMA is.  It's the industry lobbying
4 organization that represents all the broker -- major
5 broker-dealers.
6    And so I find that kind of comical that they
7 somehow try to imply that they're unbiased and
8 separate when there is all the SIFMA connections for
9 at least, I think it was, Thomas.
10    But SIFMA has an absolute built-in conflict of
11 interest.  I regularly read, you know, the --
12 whenever there is a new proposed legislation, I
13 regularly read the letters, you know, and SIFMA is
14 always there.  And you can almost predict what
15 they're going to say in advance.  Oh, poor industry.
16    So I don't give a lot of credence.
17    And now -- and, now, let's be careful.  I don't
18 want to be a hypocrite like your experts.  But I
19 do -- did actually read and give some credence.  It
20 was not a SIFMA report -- excuse me -- but they
21 had -- some reason, their name was in that report by
22 a Wendell Hyman or something.
23    But, generally, I don't -- I don't give a lot
24 of credence to SIFMA.
25      MR. SUTER:  Clay, can you put up the

37 (Pages 296 - 299)

Page 300

1  August 7th, 2018, letter that's part of the package
2  that you uploaded, or you can upload.
3       MR. LEAN:  Is that the exhibit in the binder
4  book that I have?
5       MR. SUTER:  No.  No, it's --
6       And, Jack, if you have an easier way to do it,
7  please let me know.
8       But this is a SIFMA letter to the SEC
9  pertaining to -- to Reg BI.  I just wanted to
10  address this issue on account type.
11 BY MR. SUTER:
12   Q.  Your understanding -- while that's being put
13  up, let me just ask a prefatory question.
14       Your understanding is that there was debate
15 within the securities industry for 20-plus years or so
16 as to whether or not suitability rules or -- or
17 regulations should be implemented to require a
18 suitability concept vis-a-vis the opening of an account;
19 is that correct?
20       MR. SCHWARTZ:  Objection, asked and answered.
21  Objection, compound and to form.
22       THE WITNESS:  Well, I think best interest and
23  best interest rules apply just for more just opening
24  the account, but I don't disagree that opening an
25  account was part of the conversation.

Page 301

1 BY MR. SUTER:
2   Q.  Right.  And part of the conversation for at
3 least a couple of decades, right?
4   A.  Well, yeah, I mean, it's been -- it's been
5 going around for a long time.
6   Q.  All right.  And do you recall SIFMA or anyone
7 else making the argument that -- that the making of a
8 recommendation to open a brokerage account, as opposed
9 to an advisory account, should be treated differently
10 for purposes of that Reg BI?
11       MR. SCHWARTZ:  Objection, compound.  Objection,
12  overbroad.
13       THE WITNESS:  Well, since I already -- I said
14  already asked me, and I told you I don't give any
15  credence to SIFMA.  And just -- this is just the
16  perfect example, which I used prior to you asking
17  the question, that they're always writing stuff,
18  whenever there is any proposed legislation, which is
19  so incredibly one-sided, I don't -- I don't give it
20  any credence or credibility.  I don't think I -- I
21  can't imagine why I'd ever give any credence to a
22  SIFMA lesson.
23 BY MR. SUTER:
24   Q.  Okay.  Unlike --
25   A.  Might as well -- might as well have been

Page 302

1 written by the president -- might have been -- might as
2 well have been written by the president of
3 Morgan Stanley.
4   Q.  Unlike the --
5       MR. CLABBY:  If you'd like me to show him.
6       MR. SUTER:  Sure.
7       MR. SCHWARTZ:  It's initially --
8       MR. CLABBY:  And it's been uploaded as well.
9       MR. SCHWARTZ:  So we can upload it.  I like to
10  keep the video screen clean so I can see everyone.
11 BY MR. SUTER:
12   Q.  Well, let's take a quick look at this.
13       You understand, do you not, that SIFMA has
14 supported the -- the implementation of Reg BI?  Do -- is
15 that your understanding?
16       MR. SCHWARTZ:  Hold on one second.  Do we have
17  an exhibit number for the SIFMA letter?
18       And Mr. Schulz, do you have it up on your
19  screen from the -- from the file share?
20 BY MR. SUTER:
21   Q.  It would be the next in order.  I don't have
22  the number.
23       MR. LEAN:  146.
24       THE WITNESS:  I'm not getting it up as we
25  speak.  I see it.

Page 303

1 BY MR. SUTER:
2   Q.  This is a synopsis of the study.  There's --
3 it's a 51-page document, so it's too long to put in
4 here, but I just wanted to touch bases on a couple of
5 aspects of this.
6       First of all, do you agree that the Reg BI, as
7 proposed in 2018 or thereabouts, was the -- was a new
8 proposal following the DOL rule that was essentially
9 quashed by a court?  Is that your understanding?
10       MR. SCHWARTZ:  Objection, calls for
11  speculation.  Objection, overbroad.
12       THE WITNESS:  I -- I don't think I even
13  understood your question, much less know what
14  applies or doesn't apply.
15 BY MR. SUTER:
16   Q.  You understand and you read -- prior to Reg BI,
17 you understood there was a rule called the DOL rule,
18 Department of Labor rule, that is one of the premises
19 of, at least initially, this complaint in here?
20       MR. SCHWARTZ:  Objection, compound.
21 BY MR. SUTER:
22   Q.  Do you have an understanding?
23   A.  Well, yeah, right, I had a compound problem
24 myself, so break it down and then I'll try to answer it.
25   Q.  Let me do it this way.

38 (Pages 300 - 303)

Page 304

1 Take a look at page 2 of this exhibit, please.
2 Do you see with the first highlighted paragraph, it
3 says, "First, the proposed standard requires that
4 recommendations must not only be suitable, but also be
5 in the retail customer's, quote, best interests"? Do
6 you see that?
7 MR. SCHWARTZ: Hold on. I -- I -- I don't see
8 where you are.
9 THE WITNESS: I don't see it either.
10 MR. SUTER: This page -- page 2 of this -- of
11 this two-page synopsis of the August 7, 2018,
12 letter?
13 THE WITNESS: Page 2 is an index.
14 MR. SCHWARTZ: Yeah, page 2 is a table of
15 contents.
16 THE WITNESS: Yeah, sorry, table of contents.
17 MR. SUTER: Clay, did you put up the synopsized
18 version or the entire letter?
19 MR. LEAN: The entire letter.
20 MR. SUTER: Oh, I'm sorry. Turn to page 7 of
21 51 then, please.
22 THE WITNESS: Me?
23 BY MR. SUTER:
24 Q. If you have the entire letter, yeah, please go
25 to page 7.

Page 305

1 A. It says it's page -- it's 51 pages. Is that
2 the right one?
3 Q. Yeah. Yeah. And I had a two-page synopsis
4 here, but apparently that is not the document that was
5 put up. My error. My apologies.
6 A. So we're going to page 7. I'm there.
7 MR. SCHWARTZ: And I'm going to -- I'm going to
8 object to the extent you haven't established that
9 the witness has actually read through this whole
10 document. I want to object to the extent you're
11 asking, you know, questions about specific portions
12 and you don't give him an opportunity to be able to
13 review what he needs to do to understand those
14 portions in context.
15 MR. SUTER: Sure. That's fine.
16 BY MR. SUTER:
17 Q. I just want to take 30 seconds on this just to
18 establish the following.
19 Can -- can you see the paragraph that starts
20 with "First"? It says, "First, the proposed standard
21 requires that recommendations must not only be suitable,
22 but also in the retail customer's best interests."
23 A. I see that. I think you read that correctly.
24 Q. Okay. And is it consistent with your
25 understanding that as of 2018 that standard had not been

Page 306

1 firmly established in any regulation, such as Reg BI, as
2 of that date?
3 A. Well -- go ahead.
4 MR. SCHWARTZ: No, go ahead.
5 THE WITNESS: I've already asked this. I told
6 you --
7 BY MR. SUTER:
8 Q. I'm just asking for confirmation as to the
9 date, as of 2018, sir?
10 MR. SCHWARTZ: Objection to form. Objection,
11 asked and answered.
12 THE WITNESS: I don't understand. What date is
13 important?
14 BY MR. SUTER:
15 Q. You know what, I -- I'm going to not do battle
16 on this one here. Let me -- let me withdraw the
17 question. I won't mark this document as an exhibit
18 because, A, we're running out of time and, B, I don't
19 think we're going to get anywhere with it. So let me
20 ask you specifically.
21 With regard to Dax Seale, based on your
22 experience and having reviewed his testimony, as well as
23 Ms. Nguyen's testimony, did you see anything that
24 Mr. Seale did not do, other than do this comparison of
25 costs that you talked about in your report, that you

Page 307

1 believe was a failure to satisfy the suitability rule?
2 MR. SCHWARTZ: Objection, overbroad.
3 THE WITNESS: I -- I don't think I've opined on
4 this before, but my best recollection, if I were to
5 try to think about what else he failed to do, is
6 that there is a number of policies of Raymond James
7 that required the broker to document the discussion
8 with the client relating to the conflict and
9 increased cost and discuss and document that that
10 discussion took place.
11 And I have looked through all Raymond James's
12 production. And as I sit here today, I've been
13 informed that there is no documentation of that Dax
14 did, in fact, do -- that was -- that relates to his
15 documenting not only that he didn't do the analysis
16 of the cost and turnover, but that he didn't even
17 document that he did have a discussion about the
18 conflicts and additional costs.
19 BY MR. SUTER:
20 Q. It's your view that Mr. Seale failed to satisfy
21 the suitability rule because he didn't document his
22 discussions adequately with Ms. Nguyen?
23 MR. SCHWARTZ: Objection, mischaracterizes the
24 testimony, and asked and answered.
25 THE WITNESS: That's what I was going to say.

39 (Pages 304 - 307)

Page 308

1 That's not what I said. I don't know where you got
2 that.
3 BY MR. SUTER:
4 Q. And you're not opining as to the adequacy of
5 Mr. Seale's suitability analysis, if I recall your prior
6 testimony? Are we in agreement on that?
7 A. That was a total lie. Come on, it's a little
8 late for you to start going down that path. My God, I
9 couldn't be more clear. That's just so --
10 Q. All right. Tell us -- tell us the matters in
11 which --
12 A. That's a blatant lie. That's a blatant lie. I
13 never said that or alluded that in any way.
14 Q. Okay. Then I apologize --
15 A. I dare you to put that on the record.
16 Q. I apologize for misrecollecting your testimony.
17 A. Thank you. I accept your apology.
18 Q. Tell us what you believe Mr. Seale did that
19 complied with his suitability obligations. And then
20 tell us what he didn't do, beyond what you've already
21 told us, if anything.
22 Can you first tell us what he did that you
23 believe complied with the suitability obligations?
24 MR. SCHWARTZ: Objection to form and compound.
25 Objection, asked and answered.

Page 309

1 THE WITNESS: While you're -- sorry.
2 I -- I don't think I have testified or put
3 anything in my reports about what he did do that he
4 was required to do that he did.
5 Is that what you're asking? Forgetting what he
6 didn't do that he was required to do, you just want
7 me to tell you, based on my looking at the evidence,
8 that what he did do that he was required to do? Is
9 that the question?
10 BY MR. SUTER:
11 Q. Yeah, I'd like you to tell me what suitability
12 analysis Mr. Seale did that you felt was adequate or
13 proper, understanding that you believe that there is
14 some -- some things he didn't do that he should have
15 done.
16 MR. SCHWARTZ: Objection, asked and answered.
17 Objection, compound.
18 THE WITNESS: Well, that's kind of convoluted,
19 but let me try to help you since it's late.
20 He did -- your expert -- your experts were
21 wrong when they inferred that I said, "He didn't do
22 any -- conduct any suitability analysis." I never
23 said that. They just make that crap up. I never
24 said that. I know --
25 BY MR. SUTER:

Page 310

1 Q. Your testimony is that Mr. Seale did do some
2 things in connection with fulfillment of his suitability
3 obligations?
4 A. Right.
5 Q. Is that fair?
6 A. I said that early today. And then you asked it
7 again after lunch, and I even expanded or repeated and
8 said yes, that he --
9 Q. Is there anything further -- anything further
10 that you can add?
11 A. Yeah, actually, let me finish. Jesus.
12 MR. SCHWARTZ: Yeah, Mr. Suter, the last five
13 minutes, this is, I believe, you said. And this is
14 the second time you've interrupted the witness.
15 MR. SUTER: We're running out of time. I'm
16 just trying to get through this. So my apologies
17 once again, sir. Finish your answer, and then I'll
18 try to move on.
19 THE WITNESS: All right. I'm trying to hurry.
20 I just didn't want to contradict because we
21 already -- this is the third time we've addressed
22 this.
23 That I said -- and I'll say it again -- that he
24 did do the suitability analysis and filled out some
25 forms. And based on my review, that that was almost

Page 311

1 exclusively to determine -- and this was somewhat
2 based on his own sworn testimony -- that that was to
3 determine what investments would be made in Freedom
4 account that would be suitable for the named client,
5 Ms. Nguyen.
6 THE VIDEOGRAPHER: Mr. Suter, you have a minute
7 and a half.
8 MR. SUTER: All right. I think I've exhausted
9 my repertoire of questions here. Thank you for your
10 cooperation, sir.
11 THE WITNESS: And I'm sorry --
12 MR. SUTER: The best to your wife, who I had
13 the pleasure of dealing with quite a few years ago.
14 THE WITNESS: Well, I've always been very
15 complimentary of your firm, and I've drank with a
16 number of them. And to this very day, Skip Keesal
17 had me on the stand under oath longer than any
18 attorney in the history of my 30 years of doing it.
19 And so it's always great and a pleasure to do battle
20 with Skip -- Keesal, Young & Logan.
21 And great to see you again. I'm sure this
22 won't be the last time. We're a bunch of bulldogs,
23 and I don't think any of look like we're going to
24 retire anytime soon.
25 MR. SCHWARTZ: At the risk of us getting older,

40 (Pages 308 - 311)

Page 312

1    I actually do have a minute or so of questions.  You
2    know, some things, so sorry to prolong this.
3              CROSS-EXAMINATION
4   BY MR. SCHWARTZ:
5    Q.   But Mr. Schulz --
6    A.   You're coming to the cocktail hour, so speed it
7   up.
8    Q.   I'll be as quickly -- quick and efficient as I
9   can.
10        Mr. Schulz, do you recall when Mr. Suter asked
11  if you would offer opinions and analyzes beyond your
12  report and expert report?
13   A.   That I recalled that he asked me about what?
14   Q.   Whether you would be offering opinions in
15  addition to those stated in your expert report and your
16  rebuttal report.
17   A.   I do recall him asking me that.
18   Q.   Did you review the rebuttal reports of
19  Raymond James' experts, Mr. Klouda and Mr. Thomas?
20   A.   I did.
21   Q.   And do you intend to respond to the extent
22  necessary, if asked during the proceedings, to those
23  reports?
24   A.   If counsel asks me to, I will.
25   Q.   And in preparation for your deposition today,

Page 313

1   did you evaluate the rebuttal reports by Raymond James
2   experts?
3    A.   Yes, I read them again in detail yesterday.
4    Q.   Okay.  And if you could just take your expert
5   report and rebuttal report, and if you could just look
6   at the first page of those reports.  Get those out for
7   me, please.
8    A.   They're right here.
9    Q.   Okay.  So for the first report, do you see the
10  "Scope of Assignment" in paragraph 1?  Or "Scope of
11  Engagement"?
12   A.   I do.  Do you want me to look at both
13  simultaneously?
14   Q.   Okay.  So if you look at the scope of what you
15  were asked to do in the scope of your report in
16  paragraph 1 in both of your reports, you don't see
17  anything in either of those paragraphs about the
18  Investers Act of 1940, do you?
19   A.   I don't -- I don't see anything on that.
20   Q.   You don't see anything about SEC Rule 10(b)(5)
21  or the Exchange Act or the Securities Act, do you?
22   A.   I do not.
23   Q.   And did you offer any opinions in your reports,
24  either of them, about the Exchange Act, the Securities
25  Act, or the Act of 1940?

Page 314

1         MR. SUTER:  Objection.  The documents will
2    speak for themselves.  And -- and -- whether he says
3    yes or no, it's not going to change what's in the
4    documents, so object to form of the question.
5         THE WITNESS:  I -- I don't recall the 1940 Act,
6    but I don't think I -- if I did make any reference
7    to it, it was minor.
8   BY MR. SCHWARTZ:
9    Q.   And did you make any reference to the
10  Securities Act or Exchange Act?
11   A.   No.
12        MR. SCHWARTZ:  That's all I have.
13        MR. SUTER:  And just a quick follow-up
14   question.
15             REDIRECT EXAMINATION
16  BY MR. SUTER:
17   Q.   Are all of your opinions, as you formulated
18  those and as set forth in your June 4 and June 25
19  reports, comprehensive of all of your opinions in this
20  case as you sit here today?
21   A.   Well, other than that caveat that Mr. Schwartz
22  just brought up that I have, since issuing both reports,
23  read both of your experts' rebuttal reports, and I have
24  opinions about some of the things they said in their
25  reports.  I have -- I have that in my brain.

Page 315

1    Q.   Right.  Are those opinions that you plan to
2   testify to or may testify about?
3    A.   I -- well, I think he asked -- I think
4   Mr. Schwartz asked that question.
5        If you're so instructed at some point to give
6   testimony about the rebuttal reports, if I'm so asked, I
7   guess I will.
8    Q.   And you've not been so asked; is that correct?
9    A.   That's correct.
10   Q.   Okay.  And one -- one last question about the
11  Investment Act of -- or Advisers Act of 1940 or the
12  other securities law done.
13       Is there a particular reason why you did not
14  include, if you didn't include, the federal securities
15  law references in either of your reports?  Were you
16  instructed to not do that?
17   A.   You mean the '32 or the '34 act?
18   Q.   The '30 -- the Investment Advisers Act of 1940
19  or the '34 act, which is the Exchange Act, or the '33
20  act, which is the Securities Act.
21   A.   Right.  Sorry.  Sorry about getting the numbers
22  wrong.  Of course you would know.  You, of all people,
23  would know.  Thank you for the correction.
24       No, nobody asked me to -- nobody asked me to
25  not apply or apply.

41 (Pages 312 - 315)

**Page 316**

1      MR. SUTER:  All right.  Thank you.  That's all
2  I have.
3      MR. SCHWARTZ:  And that's all I have.  Thanks,
4  everyone.
5      THE REPORTER:  Read or waive?
6      THE WITNESS:  All right.  Nice seeing
7  everybody.  Good luck.  Everybody have a great,
8  wonderful weekend.
9      Hey, California, got to wear a mask again.
10      THE VIDEOGRAPHER:  This concludes the
11  deposition.  We are going off the video record at
12  6:19.  Media Unit 4, No. 2.
13      (Deposition concluded at 6:19 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

**Page 317**

1                CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
4  COUNTY OF HILLSBOROUGH
5
6      I, the undersigned authority, certify that
7  DOUGLAS J. SCHULZ, appeared remotely before me via
8  videoconference and was duly sworn.
9
10      WITNESS my hand and official seal this 19th day
11  of July, 2021.
12
13
14
15      *Valerie A. Hance*
16      Valerie A. Hance, RPR
17      Notary Public - State of Florida
18      My Commission Expires: 09/17/24
19      Commission No. HH010389
20
21
22  Type of Identification Produced:  Driver's License
23
24
25

**Page 318**

1             REPORTER'S CERTIFICATE
2
3  STATE OF FLORIDA
4  COUNTY OF HILLSBOROUGH
5      I, Valerie A. Hance, Registered Professional
   Reporter, certify that I was authorized to and did
6  stenographically report the deposition of DOUGLAS J.
   SCHULZ; and that a review of the transcript was
7  requested; and that the transcript is a true and
   complete record of my stenographic notes.
8
       I further certify that I am not a relative,
9  employee, attorney, or counsel of any of the parties,
   nor am I a relative or employee of any of the parties'
10  attorney or counsel connected with the action, nor am I
   financially interested in the action.
11
12
       Dated this 19th day of July, 2021.
13
14
15
16
17
18
19
20      *Valerie A. Hance*
21      Valerie A. Hance, RPR
22
23
24
25

**Page 319**

1                July 19, 2021
2  STEVEN A  SCHWARTZ, ESQUIRE
   Chimicles, Schwartz, Kriner & Donaldson-Smith, LLP
3  sas@chimicles com
4  RE:  KIMBERLY NGUYEN vs  RAYMOND JAMES & ASSOCIATES, INC
   7/16/2021 / DOUGLAS J  SCHULZ / 4693667
5
   The above-referenced transcript is available for
6  review
7      The witness should read the testimony to verify its
8  accuracy  If there are any changes, the witness should
9  note those with the reason on the attached Errata Sheet
10      The witness should, please, date and sign the
11  Errata Sheet and e-mail to the deposing attorney as well
12  as to Veritext at transcripts-fl@veritext com, and
13  copies will be e-mailed to all ordering parties
14      It is suggested that the completed errata be
15  returned 30 days from receipt of testimony, as
16  considered reasonable under Federal rules*   However,
17  there is no Florida statute to this regard
18      If the witness fails to do so, the transcript may
19  be used as if signed
20      Yours,
21      Veritext Legal Solutions
22  *Federal Civil Procedure Rule 30(e)/Florida Civil
23  Procedure Rule 1 310(e)
24
25

42 (Pages 316 - 319)

Page 320

1 KIMBERLY NGUYEN vs. RAYMOND JAMES & ASSOCIATES, INC.

2 7/16/2021 / DOUGLAS J. SCHULZ / 4693667

3

4      E R R A T A  S H E E T

5 PAGE____ LINE____ CHANGE_____

6 _____

7 REASON_____

8 PAGE____ LINE____ CHANGE_____

9 _____

10 REASON_____

11 PAGE____ LINE____ CHANGE_____

12 _____

13 REASON_____

14 PAGE____ LINE____ CHANGE_____

15 _____

16 REASON_____

17 PAGE____ LINE____ CHANGE_____

18 _____

19 REASON_____

20

21 Under penalties of perjury, I declare that I have read

    the foregoing document and that the facts stated in it

22 are true.

23

    _____  _____

24     DOUGLAS J. SCHULZ       DATE

25

43 (Page 320)

| & |
|---|
| **&** 155:7 156:2,7,20 311:20 319:2,4 320:1 |

| 0 |
|---|
| **0.25** 160:2 162:19 163:20 |
| **0.5** 160:1 162:17 163:19 |
| **03-68** 164:24 272:4 272:10,18,22 273:14 |
| **09/17/24** 317:18 |

| 1 |
|---|
| **1** 158:2 235:1,4 239:2 285:24 286:8 287:18 293:24 313:10,16 |
| **1.2** 183:13 275:8 |
| **1.310** 319:23 |
| **10** 194:25 277:9,9 277:16 313:20 |
| **10,000** 194:2 |
| **1000** 156:12 |
| **101** 178:4 |
| **12** 222:15 |
| **123** 238:17 |
| **124** 235:7 |
| **126** 227:6 |
| **128,000** 260:24 |
| **128,109** 265:21 |
| **13** 253:12 |
| **14** 253:12 |
| **142** 157:11 212:23 |
| **143** 157:14 213:3 220:23 |
| **144** 157:15 |
| **145** 157:16 285:10 |
| **146** 157:17 302:23 |

| |
|---|
| **148** 239:14 243:22 |
| **149** 246:16,23 247:7,12 265:11 |
| **15** 215:8 217:9 |
| **150** 265:11 |
| **155** 155:22 |
| **158** 157:2 |
| **16** 155:13 |
| **18** 238:18,19 |
| **19** 157:15 230:5 319:1 |
| **19041** 156:3 |
| **1940** 202:25 203:9 203:17 271:12 272:12 313:18,25 314:5 315:11,18 |
| **195** 155:6 |
| **1980s** 253:3 |
| **1989** 242:25 |
| **19th** 317:10 318:12 |

| 2 |
|---|
| **2** 155:22 219:15,19 223:12 224:2,6,7 225:10 226:19 239:2 294:2 304:1 304:10,13,14 316:12 |
| **20** 195:21 202:3 292:23,24 293:5,17 300:15 |
| **2001** 195:5 |
| **2002** 198:24 |
| **2003** 206:16 |
| **2004** 215:16,25 217:5 |
| **2005** 158:21 165:1 |
| **2015** 197:13 258:16 |
| **2016** 170:8 173:3 175:13,16 177:10 185:10 189:17 235:16 258:16 |

| |
|---|
| **2017** 258:16 |
| **2018** 157:19 170:8 197:13 235:16 258:16 300:1 303:7 304:11 305:25 306:9 |
| **2019** 158:21 165:1 |
| **2020** 157:15 194:21 230:5 291:7 293:7 297:8 |
| **2021** 155:13 238:6 317:11 318:12 319:1 |
| **2090** 164:20 186:7 186:21 187:3 |
| **2110** 164:19 |
| **2111** 187:7,11,16 187:18 188:5,24 189:10 196:25 197:4,17,19 198:2 198:3,5,5,8,14 296:14 |
| **212** 157:11 |
| **2122** 164:21 |
| **213** 157:14 |
| **22** 178:14,25 193:7 267:16 |
| **224** 200:1,6 |
| **23** 288:12 |
| **230** 157:15 |
| **2310** 197:20 |
| **236** 278:17,19,19 |
| **24** 194:24 235:6 |
| **24988** 317:15 318:20 |
| **25** 212:11 294:6 314:18 |
| **285** 157:16 |
| **2:18** 155:14 158:2 |

| 3 |
|---|
| **3** 158:2 235:1 239:2 |
| **30** 237:25 242:19 259:3,23 305:17 311:18 315:18 319:15,22 |
| **302** 157:17 |
| **312** 157:3 |
| **314** 157:4 |
| **317** 157:5 |
| **318** 157:6 |
| **32** 260:5 315:17 |
| **32,000** 251:19 260:16 266:5,10 269:2,6 270:4 |
| **32,999** 172:10 |
| **320** 155:22 |
| **33** 267:7 315:19 |
| **33,000** 192:1,5 267:20 269:10 270:8 |
| **33607** 156:13 |
| **33716-1102** 156:17 |
| **34** 261:2,9,15,16 265:19 266:3 270:3 275:5 277:10 315:17,19 |
| **34-51907** 157:14 211:19 |
| **35** 284:25 |
| **36** 239:12 241:14 242:7 |
| **361** 156:3 |
| **37** 242:7 246:15 261:1,18 |
| **37,068** 261:7 |
| **3768** 261:7 266:9 |
| **38** 242:7 |

**4**

**4**   235:4 238:6 239:3
239:5 261:2 293:24
294:2,6 314:18
316:12
**40**   192:7 197:2,2
202:16 295:21
**4221**   156:12
**45**   260:8
**450**   156:7
**4693667**   319:4
320:2
**4:00**   212:11 230:18
**4:05**   235:1
**4:14**   235:4

**5**

**5**   215:17,20 277:9
277:16 313:20
**51**   303:3 304:21
305:1
**59**   260:2,3 265:18
270:2
**5:38**   293:24
**5:45**   293:21
**5:51**   294:2

**6**

**60**   159:25 161:19
162:12,15 164:4
165:11,20 166:3,13
167:4,21 169:18
170:1 171:13 172:7
173:2 174:8 176:4
177:3 179:7,12
180:10 182:18
183:16
**6:19**   155:14 316:12
316:13

**7**

**7**   157:19 219:16
273:15 304:11,20
304:25 305:6
**7/16/2021**   319:4
320:2
**75**   161:4 164:22,23
**75.5**   160:23
**76**   283:18
**7th**   300:1

**8**

**8**   194:25
**80s**   253:2 254:8
**84**   283:23
**880**   156:16
**8:20**   155:6

**9**

**9**   194:25
**9.9**   235:18
**94133**   156:8

**a**

**aas**   155:6
**ability**   222:7
**able**   168:10 182:6
186:9 212:15
213:11,14 230:11
230:14 240:2 279:4
279:6 289:25
305:12
**absence**   199:17
**absolute**   299:10
**absolutely**   192:19
266:6 269:8 270:8
281:21 282:4 289:4
297:1,14
**accept**   308:17
**accepted**   269:16
**access**   214:6
**accomodation**
199:11

**account**   159:8,20
160:1,3,3,11 161:3
162:17,19,20
165:10,13,24
166:15,24 167:1,2
167:4,4,17,19
168:6,18,19 169:1
169:19,20 170:7,10
170:13,15,20,23
171:7,11,15,23
172:5,16 173:2
174:6 175:12,13,15
176:3 177:9 178:16
179:5,10,12,13,18
179:18,24,25 180:8
180:10,11 181:17
181:21 182:9,20,25
183:5,7,17 185:2,7
185:10 188:12,13
189:17 192:3,3,18
196:25 197:5,9,12
197:17,20,25,25
198:6,16 199:5
200:5 201:20 202:9
202:13,14 204:4,4
204:4,22 205:18,25
206:24 207:2
208:17,18 209:1,3
209:5,7,9,9,15,16
209:17 210:1,2,6,6
210:14,15,24
218:17,24,25,25
219:1,1 220:5,7
221:23,25 222:1,5
222:13,14,16,17
223:1,2,11,11,17
224:1,1,6,7,11,13
224:14,21 225:5,8
225:9,12,17,19
226:18,19 229:4,5
229:10,11 232:25

233:3,8,17 235:15
236:23,24 237:2,3
237:8 248:15
249:12 250:9 252:8
252:12,19,21
254:25 255:1,15,24
256:21 258:4,5,6
258:15 273:20
274:13 289:10
296:16,22,25 297:4
297:11,12 300:10
300:18,24,25 301:8
301:9 311:4
**accounts**   159:2,3
160:25 161:20
162:3,16,23 163:2
163:4,5,5,7,11,12
163:17 165:22
166:4,5 190:12
191:5,6 192:11
193:6 200:7 201:21
202:1,2,6,7,12,17
202:21,24,24 204:1
204:1,1,8,9,13
205:4,5,11 206:9
207:4,5,11,13,17
208:4,8,9 209:6
209:14,21 210:10
210:12,18 211:1,2
211:13 215:2
216:12 217:6,6,19
217:20 218:1
219:12,17,18,22,24
220:1 225:5 226:6
227:24 228:8,9
233:1,7,11,16
247:15 248:1,5
250:25,25 251:13
251:20 252:16
253:4 254:11,24
255:10,18 256:9,19

257:6 260:3,5,8,14
260:15,16,21
267:15 269:7 270:2
270:3,4,10 272:10
272:19 275:2,4
289:9 290:8,14,23
295:4
**accuracy**   233:14
319:8
**accurate**   235:21
273:6,6
**accurately**   161:2
280:9
**accuse**   289:24
**acknowledge**   196:1
**act**   202:25 203:8,18
203:18 271:12
272:11,12 277:9,10
277:17 291:20,25
292:3 313:18,21,21
313:24,25,25 314:5
314:10,10 315:11
315:11,17,18,19,19
315:20,20
**acted**   295:11
**action**   157:16
233:11 240:7,11
241:2,5 242:14
243:13 271:15
285:25 318:10,10
**actions**   240:18
**actively**   220:8
221:25 222:4
**activities**   203:19
250:14
**activity**   222:14
228:7
**ad**   173:16
**add**   177:12 243:19
243:20 246:2
310:10

**adding**   168:1,5
**addition**   168:7
312:15
**additional**   168:1
169:12 174:25
182:5 257:4 289:19
307:18
**additionally**   164:25
**address**   270:25
300:10
**addressed**   207:9
218:2 220:3 310:21
**addresses**   199:5
**addressing**   169:19
220:4 229:21
**adequacy**   308:4
**adequate**   176:21
177:2 178:1 309:12
**adequately**   307:22
**adjust**   220:18
**advance**   259:24
299:15
**advantage**   206:5
267:11
**adverse**   220:2
**adviser**   203:18
**advisers**   202:25
272:12 277:9
315:11,18
**advisor**   187:19
203:12 204:13
205:12 208:23
209:10 210:25
229:13 232:23
233:2 253:12
254:10 272:20
273:17,21 279:4,6
290:7,22
**advisors**   203:8
219:23 271:12
274:12,20

**advisory**   219:16
229:5 301:9
**ago**   164:10 174:4
194:21 195:21
196:12,22 197:2
202:3 218:6 245:12
292:24 311:13
**agree**   168:12,13
187:9,18 188:5
189:2 202:10
208:25 211:3 221:2
229:9,25 230:4
237:9,11,25 278:3
281:3 283:8 284:6
291:14 294:20,24
295:2 297:24 298:3
298:17 303:6
**agreed**   163:18
237:7 263:5 296:10
**agreement**   237:3
268:14 308:6
**agrees**   232:19
**ahead**   184:6 191:19
193:18 206:12
220:10 227:17
234:6 243:15 244:8
268:15 282:13
290:2 306:3,4
**air**   220:19
**allegations**   277:3
**alleged**   250:10
277:4
**alleges**   232:1,15,22
**allow**   290:24
**allowed**   227:14
249:25
**allude**   164:23
**alluded**   308:13
**ambassador**
209:16,17 210:1,5
210:14 211:1 219:1

219:18,21 222:13
228:8
**amount**   192:12
210:20 258:12
260:8,11 279:14
**ams**   207:16 208:4
208:24 209:10,21
210:3,25 222:5,17
229:17 273:21
289:9
**amsouth**   290:11
**analyses**   170:20,21
239:1,3 265:25
266:3
**analysis**   167:14
168:23,25 176:20
178:2 185:1 224:17
232:24 237:16,24
239:1 240:11
247:14,24 248:4,13
250:11 252:23
307:15 308:5
309:12,22 310:24
**analyzation**   269:20
**analyze**   183:1
259:19
**analyzed**   183:11
269:15,15
**analyzes**   312:11
**analyzing**   178:15
**annual**   235:18,22
262:19 290:14
**annualized**   160:2
162:18 163:19
**annually**   233:4
290:11
**answer**   158:14
161:7 162:9 167:10
168:3,14,15 169:23
169:24 170:5 172:9
175:20 180:7

181:11,14,19 184:7
184:16 185:13
186:10,12 187:14
187:22 188:25
196:16,19 203:16
204:25 205:1,1
206:12 216:23,24
217:13,15 218:12
220:17 221:17
222:20,22,23
225:22,24 227:14
228:24,25 229:7
234:8,12,14 240:14
242:12 243:17
244:10,19 246:12
249:5,6,17 251:16
253:16,20,24
254:18 255:6
256:24 257:10,12
259:11,13,16
264:15 267:4
268:15 271:11
273:9 274:23
277:20,21,24 278:1
289:22,25 290:25
291:2 292:18,19
293:2 303:24
310:17
**answered**  166:7
176:13 185:3
186:17 193:17,23
218:10 226:22
251:6 270:5,19
271:10 275:17
281:13,20 282:3
294:12 296:19
300:20 306:11
307:24 308:25
309:16
**answering**  191:15
221:16 256:5

**answers**  196:21
198:13 221:12
225:25 231:1 293:3
**anybody**  201:7
216:5 237:19
244:13 296:23
**anybody's**  242:22
**anymore**  248:20
**anytime**  311:24
**apart**  172:24 176:3
296:12
**apologies**  305:5
310:16
**apologize**  173:12
181:3 187:14 191:7
254:21 308:14,16
**apology**  308:17
**apparently**  216:17
305:4
**appearances**  156:1
**appeared**  317:7
**appears**  202:8
**appease**  290:2
**apples**  169:3
**applicability**  188:7
**application**  296:15
297:12
**applied**  196:25
197:5,17,20 226:5
252:4 260:16 266:4
**applies**  162:16,23
163:9,10 187:11,16
187:18 197:12
203:2 244:3 273:14
273:18 303:14
**apply**  203:18
243:25 244:12
245:4,24 272:18
296:1 297:4 300:23
303:14 315:25,25

**applying**  182:16
245:3 296:14
**appreciate**  263:11
266:20
**appropriate**  178:9
245:4 288:4 289:8
289:13,20
**approve**  196:2
**arbitration**  262:13
**arbitrations**  243:8
**area**  194:19 288:21
**areas**  293:19
**argue**  173:16 175:8
284:14 291:12
**argued**  292:25
**argues**  168:23,25
**arguing**  255:9
**argument**  174:23
175:1 193:9 301:7
**argumentative**
254:13 270:19
281:14 289:3
**arguments**  173:21
173:22 174:24
293:1,12,13,15
**arms**  179:16
**article**  206:16,18
206:23 207:4,5,12
216:2,6
**articles**  197:15
259:4,5,20,23
262:20
**aside**  290:20
**asked**  158:8 166:7
168:13 170:5
171:20 172:17
173:11,24 174:5,22
175:24 176:7,9,13
176:17 184:16
185:3 186:8,11,19
186:23 193:17,23

194:17 196:21
205:2 208:13 210:9
210:12,13,16 214:8
218:10 226:22
228:14 236:1,4
238:9 239:8 241:4
251:6 253:20 256:5
264:1 266:14,25
270:5,19,24 271:10
272:15 276:16
280:24 281:13,20
282:3 288:1,4
289:23 290:17
296:19 300:20
301:14 306:5,11
307:24 308:25
309:16 310:6
312:10,13,22
313:15 315:3,4,6,8
315:24,24
**asking**  189:23
214:1 217:17 218:4
223:10 224:5
228:25 238:21
240:15 255:11
264:7 277:15 284:9
286:25 301:16
305:11 306:8 309:5
312:17
**asks**  312:24
**aspects**  298:13
303:5
**assets**  167:18
205:24 232:25
252:4,6
**assignment**  313:10
**assisting**  215:23
**associated**  269:6
**associates**  155:7
319:4 320:1

**assume** 225:3,4,7,8 225:16,19 226:17 238:3 250:23 251:15 252:9 255:10,22 256:7 257:3,8
**assumed** 251:14 256:10
**assumes** 219:2 262:9
**assuming** 183:2 188:16 204:21 222:21 258:24
**assumption** 182:24 183:3 223:19 224:16 226:14,17 250:12 251:3,8,9 251:11,23,24 252:18,25 255:18 256:17 257:13 270:17
**assumptions** 183:9 183:10 225:1 250:15,22 251:22 252:13,17 255:22
**attached** 213:20,25 218:18,20 223:8 229:22 235:12 319:9
**attaches** 227:8
**attacks** 254:19,22
**attempt** 252:5
**attend** 262:18
**attorney** 156:4 311:18 318:9,10 319:11
**attorneys** 156:17
**august** 157:19 300:1 304:11
**authorities** 297:9

**authority** 204:23 317:6
**authorized** 318:5
**automatically** 170:24
**available** 319:5
**avenue** 156:3,7
**average** 183:13 251:25 252:7 261:5 261:11,16 266:7 275:8
**aware** 172:13 173:21 204:12 206:25 209:19 272:8 297:15
**awful** 190:18

**b**

**b** 157:8 227:10 229:22 277:9,9,16 306:18 313:20
**back** 158:1 161:10 161:14 168:9 174:14 180:22 181:1,3,6 184:2,6 185:17,19 187:14 195:4,6 197:22 198:4 199:12,21 202:11 217:5 219:8 220:21 226:23 228:24 231:4 234:17 235:11 253:18 261:9,12,15 264:22 265:7,7 267:25 272:25 273:5 274:8,24 292:25 294:1
**ball** 228:13
**bank** 290:11
**bar** 262:12
**base** 192:4 252:6

**based** 159:3 160:1 160:3 162:6,17,19 163:10 164:25 165:24 172:25 174:18 192:3 198:8 202:2,6,7,9,13,14 202:17,21,24 204:1 204:3,8,9 205:4,5 205:18,24 206:9,9 207:3,4,11,13 208:8,9,17 209:9 210:2,10 211:12 215:2 216:12 217:2 217:6,6,17,19,20 218:1 232:25 233:7 233:16 234:8 247:15 248:1 250:9 252:12 256:18 260:20 261:14 270:13 298:1 306:21 309:7 310:25 311:2
**bases** 294:7 303:4
**basic** 236:21 294:21
**basically** 198:23 236:15 298:7
**basis** 164:2 171:10 172:4 179:6 193:15 198:7,21 200:14 238:12 239:16,21 242:16 247:23 256:10 257:19 274:15 288:24 290:14,22
**bat** 245:14
**bates** 235:23 237:24 297:25,25 298:5,10,15
**bathroom** 199:12 212:5 230:13 265:3

**battle** 306:15 311:19
**beginning** 169:1
**behalf** 155:3 205:20
**belief** 274:11
**believe** 159:6 164:8 174:4,10 188:22 189:9,11 215:10,18 225:11 226:17 227:1,4 238:17 244:25 250:7 260:19 268:7,9 270:15 273:24 274:20 280:19 286:20 307:1 308:18,23 309:13 310:13
**believed** 177:1
**ben** 212:9 230:17 231:17
**ben.suter** 156:8
**benefit** 289:14
**bernard** 156:6
**best** 157:18 179:1 241:1 290:5 291:16 291:20,25 292:3 300:22,23 304:5 305:22 307:4 311:12
**bet** 192:12 194:2 267:21 297:23
**bets** 267:24
**better** 218:15
**beyond** 175:14 183:17 219:21 244:3 276:19 277:11 284:7 288:15 308:20 312:11

**bi** 291:4,10,14,18
   292:5,10 293:6
   296:13 297:4,6,7
   300:9 301:10
   302:14 303:6,16
   306:1
**big** 292:1
**bigger** 269:20
**billion** 279:13,16
**billions** 201:23
**binder** 294:6 300:3
**bit** 174:14 217:24
   218:15
**black** 279:8,9,10,10
   279:12,17,19,23
**blah** 169:11,11,11
**blatant** 308:12,12
**blessing** 263:22,23
**blind** 228:5
**blow** 178:4 231:24
**board** 271:4
**boatload** 158:22
**body** 213:20
   296:21
**bonds** 255:13
**book** 197:16
   198:24 199:7,24
   200:1 202:11
   206:23 212:1,24
   213:5 216:1,6
   278:11,23 281:8
   283:18,23 284:11
   284:13,13 300:4
**books** 211:21
**born** 177:24
**bottom** 226:4,6
   235:17
**boulevard** 156:12
**box** 279:8,9,10,10
   279:12,18,19,23

**boy** 156:12 240:9
   245:9 269:19
**brain** 314:25
**break** 158:8 200:20
   201:6 211:23
   212:10 213:6,9
   230:18,19,20
   231:14 233:13
   234:15 244:11
   285:1,2 293:18
   303:24
**brent** 157:18
**brief** 200:25
**briefly** 217:3
**bringing** 201:23
   221:11
**broad** 289:20
   291:12
**broadly** 198:5
**broker** 166:25
   179:23 187:25
   188:10 192:15
   193:5 197:24
   203:13 204:22
   205:22 206:9 211:2
   248:14,22 249:14
   253:10,11 275:8
   279:3,5 284:2
   299:4,5 307:7
**brokerage** 157:11
   196:8 198:24
   204:14 212:24
   219:24 274:12
   278:11 298:7 301:8
**brokers** 158:12,12
   191:25 192:1
   193:12 210:10
   227:23 228:2 251:1
   267:14 273:15
   275:7 291:16,19,21
   291:24

**brought** 167:15
   180:17 259:8
   314:22
**bryce** 156:6
**bryce.cullinane**
   156:9
**built** 299:10
**bulldogs** 311:22
**bunch** 311:22
**business** 192:7
   195:2 204:15
   254:10,24 255:3
   282:17,20,25 292:6
   295:11,22
**busted** 188:20
**buy** 171:17 193:9
**buys** 188:13

**c**

**cake** 168:24
**calculate** 240:3
   251:21
**calculated** 239:15
   239:20 243:2 252:3
   256:11,20 257:20
   258:11 260:18
**calculating** 243:23
**calculations** 242:15
   243:5 260:8,13
   268:4
**calculator** 161:3
**california** 156:8
   316:9
**call** 158:24 173:17
   188:10 193:4
   221:13,14 271:5
**called** 206:18
   214:10 285:9
   303:17
**calls** 287:23 288:18
   292:16 293:10
   297:22 303:10

**capable** 297:17
**capacity** 241:19
   272:19
**capital** 235:23
   237:25 297:25
   298:1,5,10
**capital's** 298:16
**capture** 165:22
   166:4
**care** 216:19
**career** 227:21
**careful** 299:17
**cares** 236:19,19
**carillon** 156:16
**carlton** 156:11
**carltonfields.com**
   156:13
**case** 155:6 169:20
   171:6 173:16
   175:22 176:1
   187:25 188:18
   189:15,22 205:10
   208:4,12 215:1
   224:18 236:15
   239:19 240:19
   241:12,13,20,21
   242:11 244:17
   246:6,7,17 247:8
   255:8 271:24
   273:15 284:8,19
   287:19 288:2
   290:11,12,20,20
   298:13 314:20
**cases** 187:24 188:4
   240:3,23 242:24
   249:20 269:20
**catching** 224:23
**caused** 177:6
**caveat** 314:21
**ceh** 155:6

**center** 261:1
**certain** 204:12
  250:22 251:22
  282:22
**certificate** 157:5,6
  194:5,9 200:15
  317:1 318:1
**certification**
  194:15 195:3
**certified** 192:8
  194:4,8,16 196:4
**certify** 317:6 318:5
  318:8
**certifying** 288:9
**chance** 183:1 236:9
**change** 175:3
  278:18 287:12
  291:2 295:19 314:3
  320:5,8,11,14,17
**changed** 255:1
  295:21 296:1
**changes** 253:4
  254:11 255:24
  298:1 319:8
**changing** 255:17
**chapters** 197:16
**characterizing**
  218:12
**charge** 249:20
**charging** 205:12
  275:8
**chat** 212:19
**cheap** 290:1
**cheating** 262:6
**check** 288:12
**chimicles** 156:2
  319:2
**chimicles.com**
  156:4 319:3
**choices** 209:23

**chose** 268:12
**chosen** 268:10
**churned** 264:8
**churning** 276:24
  277:1,4,7 287:20
**circular** 224:4,5
**circulate** 263:2
**circumstances**
  165:12 187:12,19
**citation** 233:5
**cite** 286:11
**cited** 272:4
**civil** 155:18 319:22
  319:22
**clabby** 156:11
  231:17,20 232:14
  276:3,9,11 302:5,8
**claim** 169:8 266:1
  276:25 277:1,4,7
  288:2,3,3,6
**claimant's** 169:7
**claimants** 172:11
  183:5 262:14
**claimed** 276:23
**claims** 233:9,18
  283:24 287:19
**clarification** 172:3
  241:10 273:7,10
**clarify** 172:22
  210:18
**clarifying** 159:23
**class** 157:16 189:22
  190:3,25 192:1,6
  193:16 195:4
  239:15,16,21 240:7
  240:11,18 241:2,4
  242:9,14,16 243:13
  243:23 247:14,25
  250:8 252:10,10
  256:17 257:3 261:6
  265:19,20 266:3,8

  266:10 269:2
  281:18 288:9,24
**classes** 239:23
**clause** 232:18
**clay** 156:20 200:4,4
  201:10 211:16
  212:15 214:17
  230:1,11,14 231:6
  271:18 274:2
  299:25 304:17
**clean** 302:10
**clear** 171:14
  172:23,23 174:3,12
  203:10 221:21
  226:25 242:1 308:9
**click** 276:6,7
**client** 159:17
  166:22 171:2
  172:13 177:18,22
  187:20 188:1,3,3
  188:11,14,17,18,20
  188:22 190:17,21
  193:6 204:13
  205:19,21,21
  244:13 248:14
  249:12,13,13,19,23
  250:3 257:25 263:5
  263:14 268:25
  307:8 311:4
**client's** 205:22
  290:5 295:3
**clients** 166:5,14
  177:18 190:22
  193:3,12 219:24
  220:3 251:12 253:3
  253:13 254:10,12
  254:23 255:11
  257:14 267:12
  274:13 290:7,13,23
  291:20,25 292:4

**close** 160:8 170:14
  269:11
**closed** 160:4
  162:20 224:12
  226:18 260:15,19
  261:6 283:11
**coaching** 266:19
**cocktail** 312:6
**cold** 280:15,17
**colleagues** 293:19
**combination** 159:3
  194:24
**come** 178:22 181:1
  187:24 192:23
  193:3 194:21
  200:14 220:19
  234:17 238:13
  240:17 242:10
  258:1 260:10
  261:16 269:11
  274:5,8,24 275:25
  276:10 291:4 293:3
  308:7
**comes** 165:4 174:14
  177:18 184:14
  187:24 188:9
**comical** 299:6
**coming** 230:12
  264:1 312:6
**comment** 215:22
  218:11 229:20
  232:6,20 233:21
  291:13
**commentary**
  215:15
**commentator**
  262:13
**commission** 160:1
  162:7,17 163:10
  165:10 179:10,18
  180:8 192:2 193:7

236:23 237:1
247:15 248:1,5
250:9,24,25 251:13
251:20,25 252:3,12
252:21 254:25
255:1,10,15,17
256:18 257:6 258:5
267:15 275:2
317:18,19
**commissioned**
191:5 209:6
**commissions**
251:13 256:19,20
257:4,8 258:12,16
267:13,18
**committee** 204:17
207:16 208:21
233:4
**commodities**
279:15
**common** 280:17
282:18
**compadres** 259:5
**comparative**
252:23
**compare** 287:4
**comparison** 287:1
306:24
**compel** 228:17
**complaint** 157:16
271:14,19,23,24
274:2 275:25
276:15 277:3,13
284:21,22 286:22
287:3,24 303:19
**complete** 266:25
318:7
**completed** 319:14
**completely** 295:7
**compliance** 192:9
194:5,9,16,20,23

196:4,9
**complied** 308:19,23
**complimentary**
227:19 311:15
**comply** 203:8
**comport** 291:8
**compound** 216:4
219:3 222:19,20
254:14 255:4 257:1
270:18 274:23
291:23 294:23
296:8,18 297:21
300:21 301:11
303:20,23 308:24
309:17
**comprehensive**
314:19
**concept** 262:2
279:17 294:16,17
294:21 295:9 297:4
300:18
**concerned** 225:13
233:6 240:8
**concerning** 220:1
233:16
**conclude** 177:9
193:10
**concluded** 316:13
**concludes** 316:10
**concluding** 169:18
171:10
**conclusion** 160:6
167:21 169:17
172:4,25 182:20
196:25 223:14
228:10 251:17
260:20 265:19
288:19
**conclusions** 223:21
236:12 239:3
260:10 277:16

**concur** 235:21
294:15
**conditions** 290:15
**conduct** 178:8
232:23 247:13,24
248:4 250:10
252:22 309:22
**conducted** 155:11
**conference** 262:19
**confident** 227:18
267:5 269:17,21
**confidential** 263:1
263:7,9
**confidentiality**
263:16 264:2,24
**confirm** 188:23
200:19 216:9
241:12 288:11
**confirmation** 306:8
**confirmed** 164:9
196:7
**conflict** 299:10
307:8
**conflicts** 307:18
**confuse** 174:15
222:3
**confusion** 174:12
**conjunction** 195:1
**connected** 318:10
**connection** 211:13
310:2
**connections** 299:8
**consider** 167:18
186:23 204:6
211:11 223:1,10
272:15
**considerate** 199:21
**consideration**
166:1
**considered** 272:14
319:16

**consistent** 267:8
287:18 305:24
**constant** 295:24
**consult** 216:5
293:18
**consultant** 241:19
**consulting** 268:13
**contains** 277:3
**contemplated**
237:2
**contend** 272:3
**contention** 294:25
295:2
**contents** 304:15,16
**context** 263:19
283:14 284:10
305:14
**continue** 186:17
**continued** 157:2
158:6 247:15,25
250:9 251:25
252:11,16 256:18
**contradict** 310:20
**contrary** 238:23
255:21
**control** 249:22,22
249:23,24,24
**conversation**
300:25 301:2
**convey** 176:11
**convinced** 267:14
**convoluted** 309:18
**cooperation** 311:10
**copies** 319:13
**copy** 199:7 213:15
278:14,15
**correct** 160:7,12
163:13 167:5,6,11
167:21 168:20
171:8,9,13 172:8
172:19 174:9 177:3

184:11 187:3,5
196:10 202:22,23
203:5 205:5 206:19
208:2,18,23 209:1
209:11,12 210:15
210:20 215:3
219:10 222:17
229:11,12 236:5
237:8 238:2,3,7,10
246:5,13 248:8
251:5,20 252:1,21
254:7 256:22
257:16,21 258:5,9
258:12,13,17,18
262:3 265:21
269:24,25 274:15
284:19 288:25
290:8 294:9 296:16
297:5,13 298:19
300:19 315:8,9
**correction** 315:23
**correctly** 234:13
265:23 284:15
305:23
**cost** 160:2 162:18
163:19 166:25
169:12 178:14,15
179:1 183:1,7,13
245:18 282:18
289:15 307:9,16
**costs** 267:16 282:11
282:21,22 283:1,3
306:25 307:18
**counsel** 155:16
214:25 237:16
238:9 241:20
264:23 312:24
318:9,10
**counsel's** 229:20
**counselor** 190:15
249:17 260:7 262:6

**country** 190:18
195:12 242:19
**county** 317:4 318:4
**couple** 219:13
236:21 265:1 301:3
303:4
**course** 195:3,7,18
195:22 260:1
261:14 315:22
**courses** 195:12,15
195:16
**court** 155:1 175:6
177:17,20 181:6
184:1 229:21
230:15 233:15
243:7 266:23 273:5
303:9
**cover** 293:20
**covers** 272:10
**coveted** 227:21
**crap** 309:23
**crazy** 248:23
**created** 195:3
246:5,10,16,19
263:8 265:10
269:23
**creating** 252:10
**credence** 299:16,19
299:24 301:15,20
301:21
**credential** 196:3
**credibility** 301:20
**credible** 298:3,11
298:16,17,21
**creslin** 214:17
**criteria** 162:3,16
162:24 163:18
165:11 171:12,25
172:6,15,25 174:7
174:18 176:3 177:2
177:6,8 179:6,11

180:9 182:11
183:12
**cross** 157:3 312:3
**crosswise** 263:25
**crpc** 194:15
**crunching** 243:3
**cullinane** 156:6
**cure** 280:15,16
**current** 197:23
276:25 287:3,24
288:6
**custom** 190:9
**customer** 164:21
167:3,15,17 178:12
185:9 186:6,21
187:2 224:12
272:10 283:10
284:3,3
**customer's** 304:5
305:22
**customers** 165:23
251:18 255:22
**cv** 155:6

**d**

**d** 157:1 227:5
238:23
**damage** 240:17
251:14 261:14
264:7 282:23
**damages** 238:5,13
238:20 239:3,9,15
239:20 240:3,8,11
240:18 241:4,8
242:15 243:1,3,7,9
243:13,23 244:25
246:6,23 247:1,2,6
250:21 251:21
252:10 255:23
256:7,10 260:15,19
261:6 265:20 266:2
266:8 281:10,19

288:24
**dare** 308:15
**data** 239:14 243:24
243:25 263:6 264:9
269:5,6,15,24
270:1
**date** 155:13 243:25
306:2,9,12 319:10
320:24
**dated** 318:12
**dax** 173:18 178:1
185:1,9 186:20
187:2 306:21
307:13
**day** 195:16,16
256:9 282:16 295:6
311:16 317:10
318:12
**days** 319:15
**dead** 295:6
**deal** 213:8
**dealers** 299:5
**dealing** 168:4
185:24 218:24
311:13
**dealt** 216:11
**debate** 241:23
263:9 293:5 300:14
**decade** 243:2
**decades** 301:3
**decide** 282:25
**deciding** 166:23
**decision** 205:20
**decisions** 207:17
208:21 282:25
283:1
**declare** 320:21
**deduct** 199:16
**defend** 173:16
**defendant** 155:8,16
156:17

**defending** 173:15
**defense** 262:19
**define** 271:2
**defined** 268:10
**definitely** 198:5
202:7 237:11
274:25
**definition** 220:7
**delve** 217:23
**demand** 157:16
**department** 229:18
303:18
**depending** 290:15
**depends** 204:9
**deposed** 158:5
221:22
**deposing** 319:11
**deposition** 155:11
199:17 200:22
214:9 312:25
316:11,13 318:6
**depositions** 172:12
173:8
**description** 157:10
**design** 243:4
**designated** 262:25
**designation** 194:19
196:3
**designed** 291:11
**despite** 288:23
297:11
**detail** 219:15
237:14 313:3
**details** 200:24
201:4 221:20 240:1
241:11
**determine** 164:1
182:8 185:5 192:16
210:13 311:1,3
**determines** 294:18

**determining**
240:18 244:24
268:20 269:14
**develop** 244:24
245:7
**dictate** 249:21
**difference** 210:14
229:9
**differences** 245:23
298:14
**different** 191:11
202:12 209:13,21
209:22 213:5,22
222:2 228:12 233:8
233:9,12,17,18
237:9,12 249:1
264:3 297:18
**differently** 301:9
**difficulty** 171:5
**diligence** 178:10,10
**direct** 157:2 158:6
**directed** 159:1
204:3 208:3 210:6
210:7 222:13 229:4
229:10
**directing** 260:1
**directly** 213:6
**disagree** 187:10
198:23 219:7 221:5
295:7 300:24
**disagrees** 232:19
**disclaimer** 196:2
**disclose** 241:18
**discovery** 155:16
228:14,14
**discretion** 204:5,9
205:13,19 206:10
229:14 290:8
**discretionary**
204:22 207:12
290:22

**discuss** 307:9
**discussed** 220:1
237:18 249:14,16
**discussing** 199:6
207:3
**discussion** 197:4
250:5 296:5,9
307:7,10,17
**discussions** 166:24
307:22
**dispute** 211:4
233:14 236:3
237:20
**distinction** 204:7
208:7 217:24
222:12 224:24
**distinguish** 205:3
207:7 217:19
218:14
**distinguished**
217:5
**distinguishing**
207:5 208:3
**district** 155:1,1
229:21
**division** 155:2
**doc** 266:24
**document** 178:20
200:9,14 201:10
212:25 214:4 215:8
217:8,9,14,16
232:6 233:21
234:10 263:12,13
280:5 285:14,21
287:1 303:3 305:4
305:10 306:17
307:7,9,17,21
320:21
**documentation**
307:13

**documenting**
307:15
**documents** 172:11
214:12 228:24
234:3,3 246:2
263:6 270:9 314:1
314:4
**dogs** 201:7 230:23
**doing** 174:18
202:16 211:25
228:6,9 240:18
242:13 243:5
245:19 270:15
279:7 296:2 311:18
**dol** 303:8,17
**dollar** 210:20
**dollars** 166:23
167:16 279:13,13
**donaldson** 156:2
319:2
**doubt** 275:1
**doug** 177:24
**douglas** 155:11
157:12 158:3
177:24 214:9 317:7
318:6 319:4 320:2
320:24
**drank** 311:15
**draw** 223:14
**driver's** 317:22
**drops** 295:6
**due** 178:9
**duly** 158:4 317:8
**duty** 292:3

### e

**e** 156:11 157:1,8
319:11,13,22,23
320:4,4,4
**earlier** 198:4 199:9
240:25 247:19
261:19 272:5 296:6

296:10
early 310:6
easier 300:6
eat 168:24
eating 267:9
edification 284:23
education 194:22
edward 241:12,20
effected 294:20
effective 291:7
293:6
efficient 244:21
245:18 312:8
eggs 279:20
either 159:14 173:9
193:13 198:12
208:6 214:23
250:23 260:6,7,17
278:2 282:14 284:2
294:16 295:10
296:24 304:9
313:17,24 315:15
employee 318:9,9
empty 201:15
enacted 292:11
293:7
endorse 196:3
ends 235:1
energy 284:23
engaged 276:23
engagement 313:11
english 289:13
entered 197:2
211:7
entire 167:19
168:19 170:15
304:18,19,24
entirely 237:6,10
entitled 260:20
entity 207:15

entry 194:13
equal 247:3
equals 246:23
equate 183:16
equity 252:7
errata 319:9,11,14
error 305:5
especially 242:8
254:19 295:13
esquire 156:2,6,6
156:11,15 319:2
essentially 254:9
256:8 270:16 303:8
establish 177:20
305:18
established 163:6
176:23 216:14
240:25 241:3
245:11 247:19
305:8 306:1
estimate 285:7,7
evaluate 313:1
everybody 175:5
177:25 198:19
245:5,25 284:21
316:7,7
evidence 219:3
309:7
evident 225:21
evolved 295:9
exactly 195:8 202:6
examination 157:2
157:3,4 158:6
312:3 314:15
examined 158:5
example 209:16
258:4 301:16
examples 217:25
218:7
excellent 193:25

exchange 217:5
313:21,24 314:10
315:19
exclude 188:4
241:23
excluded 242:1
excluding 241:22
exclusively 311:1
excuse 173:11
174:1 184:21,21
207:23 213:7
215:24 261:7
299:20
exercised 204:10
exhausted 311:8
exhibit 157:10,11
157:14,15,16,17
211:18 212:5,10,14
212:20,23 213:3
214:3,11 217:4
218:18 220:23
227:2,4,5,6,8,10
229:22 235:15
236:8 265:11
285:10 300:3
302:17 304:1
306:17
exhibits 214:10
276:7,8
exist 202:18 205:8
existence 291:4
expanded 310:7
expended 234:24
experience 202:17
202:21 203:21
205:9 217:3,17
243:4 253:1,3,9,13
254:8 255:3 306:22
expert 173:1
175:11,19 192:10
221:22,23 227:1,5

242:13,18 243:12
248:13 249:10
263:21 265:24
266:2 269:4 271:9
283:22 284:8 288:8
295:11 309:20
312:12,15 313:4
expert's 174:23
expertise 192:8
266:1 268:20
269:14 288:21
experts 168:23
173:7,15 175:2,5,6
192:22 198:20,22
220:17 259:8 282:5
283:5 295:2 297:24
298:3,25 299:1,18
309:20 312:19
313:2 314:23
expires 317:18
explain 187:22
explanation 221:18
246:4
expressed 182:17
193:1 247:2
expressly 246:7
extend 219:21
extensively 259:23
extent 222:7 232:5
241:17 271:22
277:15,22 284:9
286:25 287:24
292:18 305:8,10
312:21
extrapolate 260:4
extrapolated
266:10

**f**

fa 203:23 204:3,15
205:18,19 208:3
210:6 218:25

222:13 229:4,10
254:8
**fact** 159:16,20
168:5 169:6,9
171:16 178:3 192:8
286:22 297:12
307:14
**factors** 183:15
**facts** 173:17,17
180:2,4 181:12
204:18,19 219:2
241:5,6 252:14
255:7 284:4 320:21
**failed** 232:23 307:5
307:20
**fails** 284:3 319:18
**failure** 174:6
247:13,24 248:4
250:10 307:1
**fair** 164:21 233:20
252:5 270:17 310:5
**fall** 272:11
**false** 172:21 208:5
219:5 262:10
274:16,17
**familiar** 205:17
209:16 213:17
214:20 217:10,18
218:4 243:9 288:12
**familiarity** 205:8
218:6
**famous** 242:21
**far** 189:18,18,18
202:11 211:8
237:18 240:7
261:17 277:23
**fas** 274:12
**fat** 206:19 216:2
**fault** 254:5 268:18
**favor** 294:8

**federal** 155:18
233:14 243:7 271:5
271:8 315:14
319:16,22
**fee** 159:3 160:3
162:6,19 165:24
202:2,6,7,8,9,12,13
202:14,17,21,24
203:25 204:1,3,8,9
205:4,5,12,13,18
205:23,24 206:1,9
206:9 207:3,4,9,11
207:13 208:8,9,17
209:9 210:2,10,18
211:12 215:2
216:12 217:6,6,19
217:20 218:1
224:23 232:25
233:7,16
**feel** 227:18 243:10
249:10 267:5 287:5
**fees** 193:8 198:25
206:18,19,19 216:2
216:2 228:1
**felt** 309:12
**fields** 156:11
157:18
**fight** 249:4 292:22
**figure** 250:21
251:19 260:3
**figured** 279:21
**figures** 237:21
252:14
**figuring** 245:23
**file** 200:10 302:19
**filled** 310:24
**finally** 293:3
**financial** 156:16
187:19 204:13
229:13 232:23
233:2 274:11,19,20

274:22
**financially** 318:10
**find** 176:6 207:8
212:18 236:14,16
249:13 284:24
299:6
**finding** 158:20,21
165:1 219:10,12
**findings** 164:25
**fine** 212:12,13
216:9,25 217:23
218:7 234:9 287:11
305:15
**fined** 250:14
**finger** 265:4
**finish** 228:22
266:17 310:11,17
**finra** 186:6,21
187:3,11 188:5,24
189:9 192:9 194:21
196:2,25 200:17
250:14 271:5 272:9
291:16,19 295:15
**finra's** 196:1
**firm** 188:3 196:8
200:7 203:5,11,13
203:14 235:23
243:3 292:5 311:15
**firmly** 306:1
**firms** 201:22
**first** 170:20 195:4
195:19 196:24
206:6 213:7 225:15
232:18 233:24,25
242:5,12 245:1
247:13 253:8 259:3
270:21 278:25
280:1 285:13
286:20 287:4 288:3
291:14 292:15
303:6 304:2,3

305:20,20 308:22
313:6,9
**firsthand** 189:23
189:25 190:2 226:9
226:13
**fit** 265:20
**five** 195:17 234:19
234:21 258:8
293:18,20 310:12
**fixed** 205:13,23
206:1,9 210:18,19
210:20 224:23
**fl** 319:12
**flat** 202:8,9 206:18
216:2
**florida** 155:1,20
156:13,17 229:21
317:3,17 318:3
319:17,22
**fly** 195:16
**folder** 201:12,13,15
214:10
**folks** 189:21 207:16
266:5
**follow** 193:13,13
200:10 229:19
314:13
**following** 162:14
167:25 170:19
224:20 225:3,7
229:24 230:4
232:20 272:17
278:1 283:8,21
303:8 305:18
**follows** 158:5
**footnote** 215:14,17
215:19 219:19
223:12,15 224:2,6
224:7 225:10
226:19

**foregoing** 320:21
**forever** 255:12
**forget** 177:23,23
**forgetting** 309:5
**form** 159:10 161:25
  166:6 167:22
  175:17 176:12
  181:25 182:12
  185:11 189:1
  207:20 209:2,18
  216:3 220:9 222:10
  222:18 224:3
  225:14 226:11,21
  236:13 244:6 256:2
  256:12 273:2 278:5
  282:2 283:13 289:2
  293:9 294:22
  300:21 306:10
  308:24 314:4
**formed** 190:24
**forms** 310:25
**formula** 167:3
  169:5,17 171:16
  174:18 177:16,23
  178:2,7,24 182:8
  245:24 246:5,10,15
  247:2,5,6 252:4
  256:13 258:20,21
  260:14 261:14,17
  261:19,23,25
  269:23 279:22
**formulas** 182:16
  261:23 263:8,19
  264:8,9 265:10,13
**formulated** 314:17
**forth** 162:24
  165:19 166:3
  171:12 172:25
  174:7 175:14,25
  176:4 177:3 179:6
  182:16 223:12

241:14 243:22
  265:11 286:20
  292:25 294:7
  314:18
**forward** 169:7
  262:23 270:4
**found** 279:20
**foundational**
  176:25
**four** 166:9 195:6,16
  195:19 245:12
**francisco** 156:8
**fraud** 157:11
  198:24 212:24
  270:23 278:11
  283:23,25 284:5
**fraudulent** 270:16
**free** 192:21 263:1
  287:5
**freedom** 159:8,20
  160:3 162:5,19
  163:11 165:13,24
  166:14,24 167:1,2
  167:4,17 168:6
  170:10 172:15
  173:2,20 175:13
  179:12,13,24
  180:10,11 183:3,4
  183:7,17 185:7,10
  189:16 191:5 192:3
  208:17 209:7,8,15
  209:21,21 210:15
  210:24 218:25
  220:5,7 221:23,25
  222:16 223:1,9,11
  223:16 224:1,11,22
  225:4,8,12,17
  226:5,18 228:9
  229:4,10,13 233:8
  233:17 235:15
  236:23 237:2,7,8

248:5 252:8,16,19
  256:9,21 258:6
  260:20 273:20
  274:13 289:9 311:3
**frequently** 290:15
**front** 219:8 278:12
  284:22 287:4,24
**frozen** 256:8
**frustration's** 264:1
**fulfillment** 310:2
**full** 213:20 280:1
**fully** 249:11 275:17
**fund** 282:19
**further** 243:25
  251:24 310:9,9
  318:8
**future** 244:1
  257:15 278:3 281:1
  281:5,17 282:1,8
  283:2,4

### g

**game** 189:13
  228:13
**games** 290:3
**general** 291:12
**generally** 189:2
  289:13 299:23
**generate** 228:1
  274:14
**generating** 193:7
  227:25 267:13
  275:5
**georgetown** 195:11
**getting** 178:13
  180:21 182:22
  185:5 197:24
  214:15 241:11
  245:22 246:6
  259:18 263:25
  268:14 302:24
  311:25 315:21

**gianluca** 156:15
**give** 166:1 174:22
  177:14 180:16,19
  186:9,12,24 200:24
  201:3 217:10,25
  218:7 220:18
  221:20 222:5
  225:22 228:24
  234:14 245:12
  250:1 263:22
  268:18 270:23
  273:9 274:23
  293:14 296:24
  299:16,19,23
  301:14,19,21
  305:12 315:5
**given** 159:13
  165:18 176:14
  178:3 179:8 215:10
  224:24 232:10
  233:22 242:17,25
  243:6,19 290:25
**giving** 184:17
  221:7 233:22
**glad** 159:23
**glasses** 246:21
  287:12
**go** 166:18 173:16
  173:25 174:1,1,2
  177:19 178:14
  180:20,23 183:3
  184:6 191:19 193:4
  193:18 206:12
  207:7 219:19
  220:10 227:17
  228:11 231:22
  234:6 238:18
  243:15 244:8
  259:18 262:23
  263:21 268:15
  275:10 277:23

278:18 282:5,13,15
283:24 290:1,2
292:18 304:24
306:3,4
**goals** 182:10
**god** 206:7 283:6
293:12 308:8
**goes** 158:13 201:23
214:15 220:2 233:5
233:12
**going** 158:1 161:20
163:22,23 169:6
172:1 173:13,13,24
175:21,25 177:14
177:15 180:20,24
181:1,4 183:18,24
184:3 185:6,15
186:9 189:7 193:9
196:18,20 199:10
199:12,13,15,16
200:21,24 211:23
213:3,9 215:7,7
216:13,22,23 217:7
228:11 230:12
231:2,13 232:4,9
233:19 234:25
235:3 240:2 241:3
241:16 244:9,18
245:24 248:23
249:4 251:21
254:15,18 255:16
260:11 263:15
265:3 266:12,13
267:8,19,20,21
268:11,16 269:10
270:11 271:22
275:9,20 278:2
279:4,6,23 280:18
280:20,21 283:1
284:14 286:6,9,24
287:9,14 290:24

291:2 292:23
293:23 294:1
299:15 301:5 305:6
305:7,7 306:15,19
307:25 308:8
311:23 314:3
316:11
**golden** 279:20
**good** 190:19,19
210:22 227:3
230:25 232:17
259:12,15 276:9,11
285:8 316:7
**goose** 279:20
**gotten** 239:25
282:1
**graduating** 195:4
**great** 201:9 214:16
230:2 231:5 234:24
276:13 293:22
294:3,14 311:19,21
316:7
**greater** 164:6,13
**greatest** 260:2
**grid** 275:9
**group** 259:19,24
266:4
**grouping** 204:2
**guess** 158:25
175:19 279:4,6,22
315:7
**guest** 286:13
**guidance** 292:9
**guys** 168:24 177:16
242:20 268:17
282:6

**h**

**h** 157:8 320:4
**habit** 221:7
**half** 185:16 231:16
311:7

**hance** 155:19
317:16 318:5,21
**hand** 229:10,11
283:24,24 317:10
**handling** 290:21
**hang** 231:20
**happen** 172:12
175:21 260:5
273:13
**happened** 180:16
236:23
**happens** 250:4
**happy** 273:10
**hard** 191:21
**hardcopy** 211:20
**haverford** 156:3
**head** 193:4
**headache** 240:14
**heading** 194:14
238:23 278:22
**hear** 180:18 181:6
185:14,16 194:6
243:17 294:11
**heard** 166:12
191:11 259:9
**hearing** 160:5
191:21 221:20
**heaven** 193:3
**held** 198:17 237:1
257:5 258:15
263:14 273:21,21
297:16
**help** 170:25 177:15
252:2 309:19
**helpful** 172:3
**helping** 173:15
**henderlight** 290:11
**hey** 316:9
**hh010389** 317:19
**hide** 228:13

**high** 183:13
**higher** 178:14,14
179:1 194:22
232:16 289:15
**highest** 194:19,23
200:16
**highlighted** 215:14
304:2
**highly** 223:16
**hillsborough** 317:4
318:4
**hired** 236:1 242:23
242:25 245:11
**history** 282:21
311:18
**hit** 193:4 214:10
285:10
**hmm** 205:15
**hold** 171:17 174:24
176:19 183:18
197:21 218:9
228:23 234:7
254:16 292:14,14
292:15 298:23
302:16 304:7
**holder** 179:10
180:8 181:17,21
192:18
**holds** 201:5
**holy** 178:24
**home** 275:10
**hone** 245:16
**hope** 185:15,15
**horizons** 181:23
**hour** 292:22 312:6
**hourlong** 244:10
**hours** 196:12,22
**hundred** 166:23
167:16 205:13
269:20 275:9

**hurry**  310:19
**husband**  185:25
**hyman**  299:22
**hypocrite**  299:18
**hypothetical**
    167:10,23,25 168:1
    168:4 171:3 179:15
    179:17,19 180:14
    181:13,19 182:1
    184:5 204:19,21
    225:4,8,16,21
    248:17 253:20,22
    257:6,13
**hypotheticals**
    168:2 171:1 179:22

**i**

**i.e.**  254:24
**idea**  160:18 227:3
**identification**
    317:22
**identified**  239:9
**identify**  164:6,13
    239:19 240:6,21
    265:9
**ignore**  175:4,5
**ignored**  236:15
**ii**  236:8
**illogical**  193:8
    256:4 282:16
**imagine**  301:21
**impact**  220:2
    224:17
**implementation**
    302:14
**implemented**
    300:17
**imply**  299:7
**implying**  166:16
**important**  196:2
    306:13

**impressed**  269:18
**improper**  254:4
    263:14
**improve**  291:11
**improves**  289:18
**inactive**  193:6
    213:24 219:12,16
    220:1,8 233:2,7,16
**inactives**  225:13
**inactivity**  169:11
**inadequate**  176:21
**inappropriate**
    250:16,18 255:9
    290:4
**inappropriately**
    227:24
**incapable**  256:4
**incentive**  274:20,25
    275:11
**incentivized**  274:13
**incentivizing**
    227:23
**include**  189:10
    198:6 225:11
    315:14,14
**included**  164:3
    197:16 238:5 243:8
    258:2
**including**  173:1
    175:6 177:18
    209:14 245:5
    297:11
**income**  274:14
**incomplete**  167:9
    167:23 180:13
    182:1 184:4 248:3
    248:16 253:19,21
**inconsistent**  286:21
**increased**  257:12
    307:9

**incredible**  243:19
    279:24
**incredibly**  301:19
**incurred**  257:4,9
**index**  304:13
**indicated**  160:25
**individual**  181:17
    181:20 182:10,11
    182:19 188:1
    190:10 192:18
    233:2 261:10
    280:21 294:18
**individually**  222:22
    256:25
**industry**  197:2
    198:18 217:3,18
    238:23 259:2 298:7
    299:3,15 300:15
**infer**  189:12
**inference**  257:23
**inferred**  309:21
**information**  177:23
    181:13,16,20,21
    182:5,25 183:11,11
    185:5 267:7
**informed**  307:13
**initial**  174:17
**initially**  302:7
    303:19
**input**  269:22
**inputting**  264:9
**insert**  254:19 271:1
**insight**  279:24
**insisted**  263:5
**instances**  160:7
    188:19
**instructed**  277:19
    315:5,16
**intelligently**  283:3
**intend**  160:9
    254:21 312:21

**intent**  295:20
**interaction**  202:19
**interest**  157:19
    179:1 290:5 291:16
    299:11 300:22,23
**interested**  267:24
    318:10
**interesting**  190:15
    205:15 220:12
    298:25
**interests**  291:20,25
    292:3 304:5 305:22
**internal**  158:11
**internally**  158:25
**internet**  180:18
**interpose**  184:4
    186:16 215:8
    228:12 285:16
    287:14
**interpretation**
    198:2
**interpretive**  198:13
**interrupt**  184:22
**interrupted**  266:22
    310:14
**interrupting**  191:7
    282:12,13
**interruptions**
    180:22
**interview**  249:12
**interviewing**  250:3
**intro**  278:8
**introduce**  298:25
**invalidate**  236:5
**investers**  277:17
    313:18
**investigating**  228:4
**investigation**
    225:13 228:15
**investing**  280:14

**investment**  182:10
  197:23,24 198:1,11
  198:11,15,16
  202:25 203:8,12,18
  204:17 205:12
  207:16,17 208:21
  208:23 209:10
  210:25 233:4
  253:12 254:10
  255:2 271:12
  272:11,20 273:16
  273:21 277:8 281:4
  282:16,19,25
  283:10,11 284:3,4
  290:7,22 315:11,18
**investments**  185:6
  255:12,16,17,24
  279:15 281:18,25
  284:1,2 311:3
**investor**  171:17
  210:7 291:11
**investor's**  182:10
**investors**  182:19
  190:10 256:8
**involve**  205:10
**involved**  205:20
  240:7 241:1 242:17
**involvement**
  215:23 216:10
  299:2
**involves**  208:20
**ira**  179:10,18,24
  181:20
**irrelevant**  281:22
**issue**  166:11 169:11
  175:12 183:8
  186:24 190:11
  192:11 205:14
  208:11,12,16 209:1
  218:17 219:11
  221:24 248:15

  272:14,14,15
  286:18 292:24
  295:5 300:10
**issues**  172:14,18,19
  219:25
**issuing**  314:22
**items**  158:19 211:7

**j**

**j**  155:11 157:18
  158:3 317:7 318:6
  319:4 320:2,24
**jack**  231:17 232:11
  274:5 300:6
**james**  155:7 156:16
  158:21,22,25 159:9
  163:10,11,12 165:2
  165:10 170:7
  172:10 176:20
  179:23 191:25
  192:2,15 209:14
  211:1 219:10,20,21
  219:23 223:18
  227:22,25 228:2,4
  228:8,15 233:8,17
  245:17 250:14,24
  251:12,18 252:15
  257:24,25 258:7,8
  263:1,7 266:14
  267:1,6,10 268:12
  268:24 270:9,15
  271:3,9 273:15,16
  273:22 274:11,19
  275:6 276:23 292:1
  292:2 307:6 312:19
  313:1 319:4 320:1
**james's**  221:11
  232:22 250:10
  307:11
**jams**  243:7
**january**  170:8
  173:3 175:13,16

  177:10 185:10
  189:17 235:16
**jclabby**  156:13
**jesus**  310:11
**job**  275:19
**john**  156:11 242:20
  242:20,21
**jones**  241:12,20
**journal**  262:12
**journals**  262:21
**judge**  230:5
**judge's**  233:15
**july**  155:13 317:11
  318:12 319:1
**june**  238:6 261:2
  291:7 293:7 294:6
  294:6 297:8 314:18
  314:18
**jury**  157:16

**k**

**keep**  177:16 199:15
  213:9 218:4 232:3
  255:11 258:24
  302:10
**keesal**  156:7,20
  311:16,20
**kid**  269:19
**kimberly**  155:3
  319:4 320:1
**kind**  202:9 243:5,9
  288:2 299:6 309:18
**kinds**  197:7 207:13
  243:8 275:14
  282:25 293:1,13
**klouda**  235:8,9
  312:19
**klouda's**  235:23
  237:17 264:12
**knew**  185:9,24,25
  186:6,20 187:2

**know**  157:12
  158:10,11,23
  160:17,18 161:4,12
  163:3,4,6 164:20
  171:24 172:11,12
  173:4,22,24 174:22
  175:21 177:25,25
  178:8,12,16,18,19
  178:21 180:2,3,3,4
  181:16 183:7,21
  185:21 189:18
  190:5 192:21
  195:14,15 197:3,11
  197:19 198:17
  202:18 205:8 206:3
  206:6 215:5 216:7
  218:4 220:5 221:13
  221:13 226:2,4
  227:20 228:3 229:5
  229:6 237:13
  240:13 242:20,20
  251:8,16 253:9
  257:10 258:24
  259:18 261:4
  262:11 263:3,7
  264:5,18,25 271:16
  271:16,17 276:17
  277:24 278:2
  280:16 283:15
  288:11 291:5
  295:13,15 296:8
  297:17 298:18,18
  299:2,11,13 300:7
  303:13 305:11
  306:15 308:1
  309:24 312:2
  315:22,23
**knowing**  182:9
**knowledge**  189:23
  190:1,2 203:1
  210:9 226:9,13

253:10
**knowledgeable**
192:10
**known** 173:17
259:23
**knows** 180:21
216:14 278:2,20
280:17,17,19,20
**kriner** 156:2 319:2
**kyl.com** 156:8,9

**l**

**labeled** 286:8
**labor** 303:18
**lack** 174:25 175:1
176:2 259:7
**lancaster** 156:3
**large** 155:20
183:22 192:12
270:3
**larger** 266:4,15,25
**late** 240:13 290:3
308:8 309:19
**lately** 201:22
**law** 315:12,15
**laws** 271:8
**lawyer** 250:3 290:1
**lawyers** 190:16,18
249:18,21 262:18
262:19 298:2
**lays** 279:20
**lean** 156:20 211:17
212:17,20 230:16
231:10 271:21
274:4 300:3 302:23
304:19
**leave** 267:19
**leaving** 180:25
**led** 177:8
**left** 233:2,7,16
285:5 293:17

**legal** 204:22 277:16
288:9,18 319:21
**legislation** 299:12
301:18
**legislature** 292:24
**length** 252:19,20
**lesson** 301:22
**letter** 157:17
215:15,22,24
216:11,15,18 300:1
300:8 302:17
304:12,18,19,24
**letters** 299:13
**letting** 264:25
**level** 194:22,23
195:1 200:16
284:23
**leverage** 279:14
**license** 200:16
317:22
**licensed** 158:12
248:20,22
**licenses** 194:13
**licensing** 194:24
**lie** 308:7,12,12
**lights** 246:20
**limit** 266:18
**limited** 210:9
**limiting** 253:9
**line** 201:17 226:4,6
228:21 233:25
234:1 320:5,8,11
320:14,17
**liquidated** 237:2
**list** 164:11 165:11
179:11 180:9
243:19 285:17
288:13 299:1
**listed** 164:10
194:12

**literature** 165:3
**litmus** 160:10
**little** 162:8 173:5
174:14 183:18
202:17,19 217:24
218:15 220:18
221:12 232:16
233:21 240:15
248:2,7 258:25
290:3 295:21 308:7
**live** 282:6
**llp** 156:2 319:2
**lobbying** 299:3
**local** 200:7
**logan** 156:7,20
311:20
**logic** 192:9
**logical** 192:21
193:10 228:10
249:9 250:22,23
251:23
**logically** 283:2
**long** 161:4 162:2
171:23 183:10
244:15 252:9
292:13,25 301:5
303:3
**longer** 222:15
248:7 253:11
271:23 279:11
284:24 295:4
311:17
**look** 181:4 200:1
210:12 214:3 215:6
215:14 235:6,14
236:9 261:1 270:11
282:18 283:3
285:12 302:12
304:1 311:23 313:5
313:12,14

**looked** 158:18
160:24 221:23
236:11 272:13
307:11
**looking** 217:3
227:4 230:16
237:17 282:21
309:7
**lot** 172:12 190:18
202:19 205:7,9
209:23 210:8
227:20 228:1 243:4
299:16,23
**lots** 223:22
**loud** 286:3 287:10
**low** 227:24 269:9
270:10,10
**lower** 260:3
**luck** 259:12,15
316:7
**lunch** 161:10,15
174:15 176:23
177:11,13 180:18
200:23 310:7
**lynch** 163:5 201:22

**m**

**m** 156:6
**madam** 181:8
220:20
**magistrate** 230:5
**mail** 319:11
**mailed** 319:13
**maine** 242:20,20,21
**major** 250:24 299:4
**majority** 192:13
207:10 242:24
262:18 275:4
297:24
**making** 198:7
204:8 205:20
250:12 255:16,24

286:9 301:7,7
**managed** 165:24
202:14,18,21,24
203:21,23 204:1,4
204:6,8,22 205:4
205:11 207:3,9,11
207:12,14,15 208:4
208:8,17 209:9,9
210:2,3,24 211:2
217:6,20 218:24,25
219:18,24 220:8
221:25 222:4,16
223:2,11 224:1,12
224:14,22,22 225:5
225:9 226:18 233:1
233:3 253:10
**management**
167:18 282:20
**manager** 196:8
203:24 204:16
289:9
**managers** 210:24
229:17
**manages** 204:14,15
**managing** 203:19
204:5,10 210:11
222:5 290:6
**manna** 193:3
**mark** 213:7 306:17
**marked** 157:10
213:3 214:10,10
276:6,8
**market** 279:4
280:18,19 281:1
290:15
**market's** 278:2
**markets** 279:23
280:20
**mask** 316:9
**material** 284:4

**materials** 259:25
**math** 174:19
177:19 178:22
243:10 260:17
261:8
**matter** 206:2
286:23
**matters** 308:10
**max** 195:17
**mean** 161:12 163:4
163:7,23 165:21
166:11 168:12
175:5 183:22
184:15 191:20
198:9 202:18 205:8
205:11 206:6,12
207:9 209:5,20
218:19 219:11,13
221:6 227:18
236:19 251:8 255:6
255:8 268:24
274:22 275:13,14
279:17 289:12
293:12 298:6 301:4
315:17
**meaning** 186:6,21
187:3
**means** 164:23
177:7 210:19 251:9
279:19
**meant** 210:19
275:16
**media** 158:2 231:14
235:1,4 293:24
316:12
**meet** 162:3,16,23
163:18 174:7 177:2
183:12
**meeting** 172:15
**meets** 165:10
171:11 179:10

180:8
**member** 164:22
261:6 266:8 272:18
272:19
**member's** 239:15
**members** 164:24
189:22 190:4,25
192:1,6 193:16
243:23 247:14,25
250:8 252:11
256:17 257:4 261:3
265:20 266:3,11
269:2 272:4,10,22
273:14 281:18
295:17
**memory** 239:25
**memos** 198:13
**mention** 164:11
219:17
**mentioned** 159:16
194:4 198:2 219:13
**mere** 159:16
**merrill** 163:5
201:22
**met** 161:19 172:5
269:18 288:10
**methodologies**
240:17,22
**methodology** 238:1
240:6,10 241:7,14
242:6,11,14 243:22
244:2,15,23,24
245:2,3,4,8 256:7
264:7 266:4
**metrics** 161:17
164:3 167:20
**michael** 156:20
**middle** 155:1
**mind** 162:15 165:4
173:8 238:15

**mine** 173:10 194:1
**minor** 314:7
**minorly** 209:19
**minute** 164:10
223:4,4,4 245:10
283:12 293:18
311:6 312:1
**minutes** 180:17,19
199:11,13 212:11
218:6 231:14
234:19,20 285:1
293:17 310:13
**mis** 182:4
**mischaracterizes**
160:13 169:22
176:14 193:24
254:3 256:13
307:23
**misconstrued**
164:16
**misrecollecting**
308:16
**misrepresents**
284:2
**missed** 227:20
280:9
**missing** 204:19
**misspoke** 182:4
191:19
**misspoken** 180:6
**misstating** 177:4
**mister** 242:21
**misunderstood**
187:13,15
**mixed** 171:1
**model** 238:6,13,14
257:3,8 281:10,19
282:23
**models** 255:23
**moly** 178:25

**moment** 183:17
**money** 192:13
  201:23 203:19,20
  204:10,14,15,16
  210:11 227:25
  253:11 279:22
  280:14 282:20
  289:8 290:6,21
**monitored** 233:3
**month** 166:23,25
  167:2,16 222:15
  246:3
**months** 245:13
  255:2,25 258:5,6,8
  290:16 292:6
**morello** 156:15
**morgan** 302:3
**morning** 239:22
**mothers** 280:14
**motion** 228:17
**motions** 214:25
**mouse** 278:18
**mouth** 184:14
  249:4
**move** 207:8 218:8
  264:11 280:12,20
  310:18
**moved** 254:25
**movement** 159:2
**moving** 275:7
**multi** 293:3
**mumbling** 194:6
**mutual** 282:19

**n**

**n** 157:1
**name** 299:21
**named** 159:16
  171:2 172:13
  177:18,22 244:13
  311:4

**narrowing** 166:10
**nasd** 158:21 164:24
  165:1 197:20
**nation** 282:16
**natural** 252:23
**nature** 250:13
  277:8 285:25
**nauseam** 173:16
**necessarily** 237:11
**necessary** 312:22
**need** 178:6,6,7,24
  180:15 181:20
  182:5,5,18 217:10
  225:22,24 231:13
  234:18,20 253:19
  263:9 269:13
  273:11 280:22
  281:17 285:1,2
  295:24 296:24
**needed** 289:16
  291:20
**needs** 177:17 208:7
  234:9 248:14
  305:13
**nefarious** 270:16
  271:2,2,3,6,6
**negativeness** 259:6
**neither** 260:6
**never** 160:8 161:21
  162:4,9 177:24
  186:8,13 196:8,8
  200:18 215:4,4
  217:16 221:6
  237:18 245:11
  254:25 255:1,15
  259:17,23 269:18
  270:24 272:13,14
  272:15 286:11
  287:2 288:1 292:4
  308:13 309:22,23

**new** 168:7 195:1
  217:4 237:6 239:25
  299:12 303:7
**news** 213:19
**nguyen** 155:3
  159:8,17 170:7
  172:13 175:7
  189:16 190:6
  224:11 225:20
  231:25 232:15,22
  232:24 237:7 244:4
  244:25 248:9 258:4
  273:20 276:22
  307:22 311:5 319:4
  320:1
**nguyen's** 169:20
  170:13 171:7 172:5
  173:2 174:6 175:12
  176:2 177:9 179:5
  185:2 225:17 233:3
  233:7,17 306:23
**nice** 316:6
**nincompoop** 283:5
**nine** 178:14,25
  193:7 228:1 267:16
**nomenclature**
  194:13
**non** 188:6 263:23
  267:15,15
**nonclass** 242:11
**nonmanaged** 202:2
  202:13 204:4,8
  205:4,18 207:4
  208:8 211:12 215:2
  216:12 217:5,20,25
**nonsensical** 240:16
  249:6 258:25 282:6
**nontestifying**
  241:19
**notary** 155:20
  317:17

**notch** 171:24
**note** 319:9
**noted** 287:6
**notes** 318:7
**notice** 155:16
  164:22,24 272:4,10
  272:18,22 273:14
  273:18 295:17
**notices** 158:11,15
  158:19
**notion** 217:18
**novel** 259:9
**november** 157:15
  230:5 235:16
**number** 158:9,19
  158:19,19 164:12
  165:2 175:3 200:2
  227:2 243:3 252:15
  260:24 261:2,8,12
  261:13,13,15 266:8
  266:9 302:17,22
  307:6 311:16
**number's** 260:23
**numbers** 236:2
  238:1,2,3 239:24
  245:17,19 251:18
  257:25 261:10,10
  267:7 269:10,11,21
  281:11 315:21
**numerous** 243:6
  271:4

**o**

**oath** 157:5 158:4
  311:17 317:1
**object** 161:25
  169:25 181:25
  209:18 216:13,23
  232:4 233:24
  241:16 244:6
  266:12,14 268:11
  271:22 280:4 286:9

286:24 291:22
305:8,10 314:4
**objection** 159:7,10
159:10 161:25
163:1 165:6,14
166:6,6 167:7,9,22
167:22 169:22
175:17 176:12,12
176:13 179:15
180:13 181:25
182:12 184:4 185:3
185:11 186:16,22
187:4 189:1 190:13
193:17,23 197:6
205:6 207:20
208:10 209:2
211:15 215:8 216:3
217:8 218:9,9,11
219:2,3 220:9
222:10,18,18 224:3
224:19 225:14
226:1,8,11,21,21
228:12,18,20 229:1
233:20 243:14
244:6 246:9,18
247:9 248:16
249:15 251:6 253:6
253:6,21 254:2,2
254:13,14,14,16
255:4,4 256:1,1,12
256:12 257:1
265:12 266:16,24
267:3 270:5,18,18
270:19 271:10
273:2 276:19
277:11,12,15 278:5
278:5,6 281:6,13
281:14,20 282:2,2
283:13,13 284:7,9
285:17 287:15,21
287:22,23 288:15

288:18 289:1,1,2
289:11 291:22,22
291:23 292:12,14
292:15,16,16 293:9
293:9,10 294:22,22
294:23 295:12
296:4,8,18,18
297:19,21,21
298:23 300:20,21
301:11,11 303:10
303:11,20 306:10
306:10 307:2,23
308:24,25 309:16
309:17 314:1
**objection's** 287:6
**objections** 168:21
258:22 262:4
265:12 266:18
267:2 287:22
**objective** 160:11
**objectively** 159:7
160:4,25 161:20
162:20 167:5 179:5
182:20
**objectives** 181:22
**obligation** 291:15
**obligations** 308:19
308:23 310:3
**obvious** 227:20
**obviously** 163:9
204:6
**occur** 284:2
**october** 170:8
**offer** 219:23 312:11
313:23
**offered** 206:7
209:14 277:12
**offering** 284:18
312:14
**office** 180:20

**officer** 196:10
**official** 188:3
317:10
**officially** 213:1
285:5
**oh** 158:23 185:24
187:13,13 191:4,10
191:20 195:23
198:19 212:6
213:16 214:2,12
274:1 276:9 278:13
279:19 283:6
294:12 298:15
299:15 304:20
**okay** 159:23 160:9
160:21 161:9 164:1
164:6 165:4,18
166:1,22 168:15,17
170:4,6,12,18
172:17,22 179:22
181:3 183:8 187:1
196:7,13 197:15
198:24 199:21
200:19 201:16
202:5,20 203:4,20
204:3,7,12 207:3
209:25 210:17,22
211:4,11,16,24
212:6 213:9,16
214:9 215:19 222:7
222:12 227:12
229:24 231:9 234:6
234:15,19 235:6,9
235:20 236:3,7,12
236:16 237:5,13,20
238:4,12 239:1,6
239:13 241:25
242:13 244:5 245:7
245:22 246:14,21
247:12 251:15,17
255:21 257:19

258:21 260:18
261:25 265:7,24
266:7 268:9 272:1
272:8,17,21,21
274:8,17 275:12
276:11,18 277:1
279:25 280:12
282:10 283:15,19
284:17 285:8 286:3
287:13 288:8
290:19 291:10
294:14 295:9,24
298:8 301:24
305:24 308:14
313:4,9,14 315:10
**old** 267:8
**older** 311:25
**olsen** 160:24
237:15 243:23
252:2 260:1,7
269:18,22
**once** 188:15 244:16
310:17
**ones** 260:9 267:17
267:17
**ongoing** 169:20
**ooh** 183:18
**open** 165:12 166:24
170:14 179:12
180:10 189:16
237:7 301:8
**opened** 159:8,20
167:4 168:6,7,18
169:1,4,9 170:13
170:23 171:8,11
173:2 175:16
177:10 183:5,17
185:10 188:12
256:9
**opening** 159:2
167:1,2,16 169:19

170:9,10,20 192:11
235:8 256:21
300:18,23,24
**opens**  168:25
188:13
**operative**  271:24
**opine**  171:19,20
186:8 208:13 241:4
**opined**  240:12
307:3
**opining**  169:15
308:4
**opinion**  159:6,13
159:14,22,25 161:9
161:11,17,22,24
162:15,21,23
163:17 164:5,8
166:2,13 170:11,17
171:6 172:2,18,19
173:10,19 174:5,17
174:25 175:4,10,11
175:14 176:1,10,19
176:22 177:6,7
179:2,4,8 182:17
182:24 183:9,14,15
184:13,15 186:5,11
186:20,24 187:1
189:24 190:24
191:22,23 192:4
193:15 198:15
208:14 220:14,17
223:23 224:7,10
236:6 237:22
239:17,20 242:25
243:12 247:16,18
247:21 248:12
250:2,8 266:2
268:2 269:4 270:23
270:25 271:9
272:16,17 273:4,9
273:17 274:19

281:8 283:22
288:14 295:5
296:24 297:25
298:1,4,14
**opinions**  158:9
170:6,12,19 171:7
173:11,23 175:24
175:25 176:7
190:10 208:3 211:8
221:7 223:22
224:17 236:13
238:1 249:24
275:15,18 276:20
277:12 284:8,18
294:8 312:11,14
313:23 314:17,19
314:24 315:1
**opportunity**  215:11
217:10 221:8
232:10 233:23
234:10 285:20
305:12
**opposed**  204:16
301:8
**opposing**  241:20
**option**  170:22
**options**  279:14
**oranges**  169:2
**orator**  286:14
**order**  157:15
181:19 188:23
220:1 223:3,6,7,13
224:2 225:10,11
226:20 227:9
229:20,21 230:6,15
248:12 249:11
263:4 264:15,16,24
274:14 281:11,18
295:25 302:21
**ordering**  319:13

**organization**
298:21 299:4
**original**  235:9
238:6,20 260:22
271:14,19 276:14
277:3,13 284:21
**outer**  192:23
**overall**  175:3
295:20
**overbroad**  159:11
165:6,14 186:16
190:13 197:6 205:6
208:10 211:15
224:19 243:14
244:7 249:15 253:7
254:17 255:5 256:1
281:6 287:15,21
289:11 291:23
292:16 293:10
294:23 295:12
298:23 301:12
303:11 307:2
**overinclusive**
165:20,21,25 166:4
166:13,21
**overinclusiveness**
166:10
**overly**  216:4

**p**

**p.a.**  156:11
**p.m.**  155:14,14
316:13
**pacific**  156:7
**package**  300:1
**page**  157:2,3,4,5,6
157:11,14,15,16,17
196:5 200:1,6
215:8 217:9 219:15
227:13 231:22,23
232:11,12,13,13,14
236:8 237:21

238:18,19 239:12
241:14 246:15
261:1,18,20 278:17
279:25 283:18,23
284:11 303:3 304:1
304:10,10,11,13,14
304:20,25 305:1,3
305:6 313:6 320:5
320:8,11,14,17
**pages**  155:22
198:25 242:7 282:5
305:1
**paid**  256:19 257:14
257:20 258:12,16
281:25
**painting**  205:23
**paragraph**  159:25
161:18,19 162:12
162:15 164:4
165:11,20 166:3,13
167:3,21 169:18
170:1 171:13 172:7
173:2 174:8 176:4
177:3 179:7,11
180:10 182:18
183:16 219:16
231:22 232:18,18
233:10,25 234:1
239:14 243:22
246:16,23 247:7,12
278:25 280:1,2
285:13,24 286:8,20
287:4,9,18 304:2
305:19 313:10,16
**paragraphs**  280:5
313:17
**paralegal**  156:20
**parkway**  156:16
**part**  169:7 170:20
174:13 208:22,24
209:3,5 219:7,9

223:20 225:15
228:7 238:15
273:21 277:17
286:15 300:1,25
301:2
**partially** 219:9
**particular** 165:23
237:16 289:14
290:20 315:13
**particularly** 159:1
223:23 240:3
246:22 270:9
**parties** 318:9,9
319:13
**partly** 219:4,5
**parts** 262:24
270:20
**passages** 280:24
**passion** 270:14
**path** 173:25 308:8
**paused** 180:18
**pay** 193:7 251:25
**paying** 205:23,24
**payout** 275:10
**peer** 258:21 259:7
259:19,19,24 262:1
262:2,4,7,22
263:17
**penalties** 320:21
**pending** 181:2
215:1
**pennsylvania** 156:3
**penultimate** 235:14
**people** 177:21
190:20 192:14
194:22 206:8
213:11 221:10
222:4 234:20 261:9
262:20 267:7
280:13,18 282:17
282:21 295:13

298:5 315:22
**perceive** 270:14
**percent** 160:1,23
161:4 162:18
163:19 205:13
275:8,9
**percentage** 210:19
250:24 252:3,5
275:6
**perfect** 245:16
301:16
**perform** 178:1
278:3 281:1
**period** 170:8,16
222:15 251:1 255:2
255:25 256:20
257:5,15,20,23
258:11,14 295:10
**periodically** 207:18
290:23
**perjury** 320:21
**permitted** 155:17
**person** 188:20
254:9 279:21,21
**personal** 254:19,21
290:3
**perspective** 251:5
**pertaining** 300:9
**peterman** 156:20
**petersburg** 156:17
**philadelphia** 195:2
195:10,11
**piaba** 206:15
215:15,21,23,24,25
216:2,15
**picking** 161:15
**pieces** 161:6
**place** 262:10
307:10
**places** 165:2

**plaintiff** 155:5
273:20
**plaintiffs** 156:4
**plan** 175:13 315:1
**planning** 175:10
**plans** 175:19,21
**platform** 210:1
**platforms** 209:22
225:12
**play** 286:15
**playing** 228:13
286:15
**please** 164:18
168:15 172:22
181:8 184:2 185:19
191:19 210:1
211:18 214:7,18
220:20 225:4,7,8
230:7,8 231:19
232:12,17 235:7
238:17 239:11,19
246:12 253:16
256:24 259:11,14
259:16 265:4
266:18 278:17
279:1 285:24 286:2
286:8 287:8 300:7
304:1,21,24 313:7
319:10
**pleasure** 311:13,19
**pli** 262:14
**plus** 243:9 300:15
**point** 174:10
215:13 216:19
221:19,21 230:19
236:20 243:20
276:23 280:24
281:2 282:22 293:4
294:17,17 295:3
315:5

**pointed** 211:7
**policies** 158:12,23
165:3 178:11 307:6
**policy** 158:24 159:1
**poor** 299:15
**popped** 221:6
**populate** 269:23
**population** 268:9
268:22,23
**popup** 276:7
**portfolio** 295:4
**portion** 181:9
184:8 185:20,23
191:13 214:24
221:1 233:22 273:1
**portions** 173:7
305:11,14
**position** 171:19
196:9,10 263:13,15
266:7,13 267:3
**positive** 178:8
**possible** 177:20
**potential** 159:2
172:10 183:5
189:22 190:3,25
191:25 192:1,5
269:2
**practice** 190:9
**preceding** 256:21
**precisely** 166:4
**predecessor** 197:19
**predetermined**
257:14
**predicated** 238:13
**predict** 281:1,4
299:14
**preface** 289:2
**prefatory** 300:13
**premise** 221:3
**premises** 303:18

preparation 216:10
312:25
prepared 176:8
221:22 235:23
255:23
preparing 158:18
prerequisite 187:8
present 156:19
219:25
president 203:14
302:1,2
press 213:25
prestigious 262:21
presumed 255:15
presuming 255:14
presumption
255:14
presupposing
193:2
pretend 286:14
pretty 178:19
previously 158:4
160:23 196:7
210:17 240:22
287:22
pricing 164:21
pride 157:12
principles 269:16
printing 262:20
prior 166:2 174:14
200:20 218:10
223:13 236:9
240:18 258:5
291:18 297:3,8
301:16 303:16
308:5
probably 164:14
207:7,11 238:2
240:20 241:7 242:8
245:15,15,18,21
246:1 248:2,3,6

259:1
problem 170:3
173:5 181:4 185:16
199:23,25 227:23
263:16 303:23
problems 219:20
procedure 155:18
319:22,23
proceeding 218:17
226:5 233:11
proceedings 233:1
233:6,15 312:22
process 178:15
223:20 262:7,8,8
262:22 268:13
produce 267:1
produced 234:3
243:24 246:1
317:22
produces 244:1
267:6
producing 267:18
275:2
production 307:12
professional 192:9
194:5,9,16 196:3,5
203:23 204:10,16
210:24 289:8 318:5
professionally
207:15 218:24
222:16
professionals
208:22 282:17
program 237:7
programs 219:25
project 281:17,24
283:4
projected 258:14
265:20 266:10
288:24

projecting 257:19
270:4
projections 282:7
projects 257:15
prolific 259:1
prolong 312:2
proof 178:8 197:8
227:22 267:9
280:22
proper 178:9
226:14,17 228:23
248:12 250:22,23
251:2 252:24
309:13
properly 257:18
268:10
proposal 303:8
proposed 299:12
301:18 303:7 304:3
305:20
proprietary 243:4
prospecting 188:10
protection 291:11
protective 263:4
264:15,16
prove 270:9
proved 171:17
proven 289:17
provide 175:11
176:7,8,9 228:16
266:15
provisions 272:11
public 155:20
317:17
publication 262:14
published 197:15
216:1
pudding 267:9
pull 189:8,14
211:18 213:11,14
214:13 230:15

271:19
pulling 272:1
pump 267:15
purchased 237:6
237:10
pure 238:2
purported 252:10
purposes 155:16,17
208:2 246:17
251:14 252:9
301:10
pursuant 155:16
263:4
pursue 197:25
pursuing 228:21
push 267:20
put 178:4 179:24
197:22 200:4
206:17,17 212:23
213:1 214:13,18
220:16,16,17,22
230:1,11 231:17
245:23 249:3
256:13 264:3
267:10 287:3 292:1
292:1,5 298:9
299:25 300:12
303:3 304:17 305:5
308:15 309:2
putative 239:15
putting 161:5,5
290:20

## q

qua 188:6
quadruple 228:1
qualifications
242:14 243:11
qualified 243:10
qualifier 237:10
qualifiers 290:1

**qualify** 167:3
**quality** 259:7
**quashed** 303:9
**question** 158:14
163:16 166:9,12,19
169:9 170:3,5
171:4 180:5,6,19
181:2,7,11 183:19
183:21 184:25
185:16 187:14,15
188:21,25 190:15
191:11,11,14
198:13 203:17
213:2 215:13,22
216:4 218:10 219:9
220:12,21 222:2,3
222:8 223:13 224:4
224:5 225:25
228:18 229:3
233:13 234:12
240:14 242:3
246:12 247:4,4
248:18,19,21,23
249:1,7,8,9 253:16
253:25 254:4 256:4
257:11,11,12
259:11,13,16 262:9
263:20 267:3 269:3
272:23 275:17
279:3,5 283:9
287:15 289:2,22
290:17,25 292:8
296:20 300:13
301:17 303:13
306:17 309:9 314:4
314:14 315:4,10
**question's** 246:24
**questioning** 228:21
264:22 267:25
**questions** 158:9
169:13 196:12

206:13 215:9
236:22 256:23
258:23 275:19,24
289:20 305:11
311:9 312:1
**quick** 186:9,12
195:14 285:12
302:12 312:8
314:13
**quickly** 186:17
279:16 312:8
**quit** 270:25
**quite** 209:23
275:11 311:13
**quote** 158:10
159:25 160:4
162:17,20 189:7
224:12,13 226:18
226:19 250:8
260:15,15,18,19
261:5,6 283:9,11
283:23 304:5
**quoted** 160:10
164:4 214:24,24
223:2,6
**quoting** 162:12

**r**

**r** 156:6 320:4,4
**raised** 265:13
**ran** 161:3
**random** 268:13
**range** 239:24
**rare** 206:8
**rarely** 206:14
**rate** 235:18,22
252:1,3
**raymond** 155:7
156:16 158:21,22
158:25 159:9
163:10,11,12 165:2
165:10 170:7

172:10 176:20
179:23 191:25
192:2,15 209:14
211:1 219:10,20,21
219:23 221:11
223:18 227:22,25
228:2,4,8,15
232:22 233:8,17
245:17 250:10,14
250:24 251:12,18
252:15 257:24,25
258:7,8 263:1,7
266:14 267:1,6,10
268:12,24 270:9,15
271:3,9 273:15,16
273:22 274:11,19
275:6 276:23 292:1
292:2 307:6,11
312:19 313:1 319:4
320:1
**reach** 160:6 167:20
182:20 236:12
281:11
**reached** 196:24
223:20,24 239:4
265:19
**reaching** 172:4,24
281:12
**read** 158:20,21,22
161:9,19 162:25
168:9 173:6,7
181:6,9 183:25
184:2,6,8 185:17
185:18,20,22,23
191:12,13 198:5,22
207:8 215:5,11,19
217:11 219:22
220:20 221:1 223:7
223:7,12 229:24
230:21 232:10,17
233:23 234:9,9,10

234:13 236:11
248:3 253:18 259:5
272:24 273:1,5
278:25 280:1,5,8,8
280:25 283:7
284:15 285:20,23
286:1,3,12,15,18
287:9,13,17 296:23
299:11,13,19
303:16 305:9,23
313:3 314:23 316:5
319:7 320:21
**reading** 172:11
230:9 233:24 234:1
265:22 283:16,18
**ready** 169:25
178:13 182:22
197:24 214:15
**real** 192:22,25
206:3 261:10,12,13
261:14 279:3,5
282:6
**reality** 171:1
**realized** 267:12
**really** 221:16
245:11 278:20
289:16,17
**reask** 272:23
**reason** 173:13
177:1 180:21 189:9
189:11 211:4
233:14 237:20,23
250:2,17 267:10
268:8 269:8,12,13
299:21 315:13
319:9 320:7,10,13
320:16,19
**reasonable** 178:10
319:16
**reasoning** 192:10

**reasons** 171:15
  226:16 294:8
**rebalance** 207:17
**rebalanced** 233:4
  290:7,13,23
**rebalancing** 289:6
  289:7,17
**rebuttal** 173:7
  213:21 214:1
  218:18,21 221:10
  227:5,7 229:22
  312:16,18 313:1,5
  314:23 315:6
**recall** 158:14
  164:18 198:9,10
  199:1,2,7 202:3,4
  211:8 212:1 216:17
  216:18 248:8 260:6
  272:5 290:9,10,18
  291:18 301:6 308:5
  312:10,17 314:5
**recalled** 312:13
**receipt** 319:15
**recess** 235:2 293:25
**recognize** 208:7
**recognizes** 219:20
**recollection** 199:4
  241:1 291:1,8
  307:4
**recommend** 174:19
  178:13,25 227:24
  248:4
**recommendation**
  165:12 187:8,12,20
  188:1,6,12,15,17
  188:25 189:10,16
  189:21 192:15,17
  294:19,25 295:7,25
  301:8
**recommendations**
  187:17 189:6

190:25 191:24
  192:5,11 193:12,16
  193:21 197:8
  297:12 304:4
  305:21
**recommended**
  183:12 188:14
  192:2 193:11 251:2
**recommending**
  232:24
**recommends**
  179:23
**record** 158:2
  160:10 161:10
  171:22 172:23
  195:8 203:10
  212:23 213:1
  219:22 227:3,4
  234:24 235:1,4
  241:24 279:1 280:2
  280:6 286:1,13
  293:24 294:2
  308:15 316:11
  318:7
**record's** 226:25
**redirect** 157:4
  314:15
**reduced** 260:3
**refer** 159:5 206:20
  217:8 276:14
**reference** 194:8
  198:25 206:24
  215:21 216:6
  217:13 278:10
  314:6,9
**referenced** 211:6
  211:12 214:22
  225:6 226:19
  265:10 319:5
**references** 206:19
  315:15

**referred** 224:2
  225:17,20
**referring** 158:15
  158:16 159:4
  203:22,22 207:12
  225:23,24 227:1,6
**refers** 269:2
**reflect** 161:10
**reflected** 161:18
  172:7 227:9 242:7
**reflects** 162:14
**refresh** 276:4,5
**refreshed** 276:10
**refuse** 249:2
  268:17
**refused** 228:16
  266:15 267:1
**refusing** 253:24
**reg** 291:4,10,14,18
  292:10 293:6
  296:13 297:4,7
  300:9 301:10
  302:14 303:6,16
  306:1
**regard** 185:2
  261:19 274:19
  288:8 290:19
  294:15 306:21
  319:17
**regarding** 176:1
  228:15 258:23
  262:4 277:13
**regardless** 254:7
**registered** 205:12
  208:22 209:10
  210:25 253:2,11
  254:9 272:20 290:6
  290:22 318:5
**regs** 272:2
**regularly** 299:11
  299:13

**regulation** 157:18
  159:6 291:15,17
  293:6 306:1
**regulations** 158:20
  164:7 178:11
  238:23 271:4,8
  300:17
**regulators** 158:10
  158:16 205:3
  217:19 227:19
**regulatory** 192:8
  194:4,9,16 196:4
  197:4,8 292:9
  297:9
**relate** 197:9 287:19
  296:25
**related** 185:4
  190:11 239:3
**relates** 215:2 239:9
  242:9 273:15
  307:14
**relating** 173:18
  307:8
**relative** 318:8,9
**relatively** 195:14
  295:21 296:21
**release** 157:14
  211:19 213:2,11,16
  213:19,25 214:14
  214:20
**releases** 158:11,16
  164:7 211:12
**relevance** 236:18
**relevant** 234:3
  236:14,17 283:9
**relied** 237:14
  285:18
**rely** 177:17 253:13
**remain** 254:11,24
  255:23

**remained**  170:14
    170:21 251:12,19
    252:20
**remaining**  253:3
**remains**  170:23
**remember**  164:15
    164:15 165:8
    173:11 190:6,7,17
    195:9 205:15 206:7
    239:24 240:1,4
    242:9 246:2 248:10
    249:17 290:12,13
**remembering**
    173:9
**remotely**  317:7
**remove**  264:2
**render**  172:17
    173:24 174:5
    175:10,14,24 176:1
    186:11,20 190:10
    273:9
**rendered**  172:18
    187:1 239:20
**rendering**  170:6,12
    179:2,4 243:12
**repeat**  183:19
    191:10 233:19
    270:7
**repeated**  310:7
**repertoire**  311:9
**rephrase**  170:4
**report**  162:8,24
    163:14 164:23
    171:18 172:6 173:1
    182:17 197:22
    198:10 206:20
    211:13 213:20,21
    214:1 218:18,20,21
    221:9,9,10 223:21
    225:18,20 227:1,5
    227:7 229:22 235:8

235:9 236:11,13
    237:17 238:5,6,16
    238:20 241:15
    255:19 256:14
    260:22 261:2
    264:19,19 265:1,21
    266:9 269:1 272:5
    273:25 276:13,14
    276:20 277:12,15
    277:18 284:8
    285:18 288:16
    299:20,21 306:25
    312:12,12,15,16
    313:5,5,9,15 318:6
**reporter**  181:6,8,9
    184:2,8,21 185:18
    185:20,23 191:13
    196:19 220:20
    221:1 234:23
    266:24 272:24
    273:1,5 316:5
    318:5
**reporter's**  157:6
    318:1
**reports**  158:18
    169:16 173:6,7,10
    175:15 178:3
    183:22 198:22
    214:23 221:23
    223:22 224:24
    225:23 262:25
    263:15,18,19,22
    264:3,13 294:5,7,7
    309:3 312:18,23
    313:1,6,16,23
    314:19,22,23,25
    315:6,15
**represent**  211:3
**representation**
    235:22

**representative**
    203:12 253:2
    268:21 269:5
**representatives**
    273:17
**represents**  299:4
**request**  193:5
    232:9 280:4
**requested**  181:9
    184:8 185:20,23
    191:13 221:1
    266:25 273:1 318:7
**require**  281:3
    300:17
**required**  178:11,20
    178:23 203:8
    248:22 273:16
    291:24 307:7 309:4
    309:6,8
**requirement**  188:6
    248:21
**requirements**
    265:25 272:18
    288:9
**requires**  281:10
    304:3 305:21
**respect**  209:25
    287:1
**respond**  160:19
    196:18,20 201:3
    222:8 248:23 249:2
    266:21 312:21
**response**  160:15
    174:23 214:25
    223:13
**responsibility**
    249:11
**rest**  274:24
**restriction**  264:16
**result**  182:17
    199:17 236:13

264:9
**results**  264:8 284:1
**resume**  194:12
    242:22
**retail**  304:5 305:22
**retained**  246:6
    247:8
**retire**  311:24
**return**  235:18,22
**returned**  319:15
**returns**  289:18
**revenue**  228:2
    275:6
**reverse**  276:24
    277:1,4,7 287:19
**review**  165:5
    258:21 259:7 262:1
    262:2,5,7,22
    263:17,21 286:22
    305:13 310:25
    312:18 318:6 319:6
**reviewed**  237:14
    285:18 306:22
**reviewing**  236:13
**ria**  203:5,9,14
**ridiculous**  248:18
    248:19,24 259:9
    262:2 283:6
**right**  159:17
    174:14 176:11,25
    180:22 186:21
    189:5,6 191:14
    194:5,10,18 195:6
    195:7,18,25 198:17
    199:3 201:9,19
    206:15,23 207:25
    208:25 209:8
    213:10 214:20
    217:23 219:4
    224:15 227:11
    229:3,19 230:20

232:3 235:10,13
239:11 240:8 242:2
245:13,21 247:1,18
251:21 252:22
258:6,8 261:1,17
263:10 264:15
265:16 278:14,20
278:22,23 279:8
285:4,9 286:17
287:6,17 291:9
296:2 297:3,15
301:2,3,6 303:23
305:2 308:10 310:4
310:19 311:8 313:8
315:1,21 316:1,6
**righty**  285:15
**risk**  181:22 182:10
311:25
**rja**  180:8 243:24,25
**rja's**  239:14 247:13
247:24 248:3
**role**  175:11
**roll**  232:8,12,16
**rolling**  232:3
**room**  180:25 212:2
**roughly**  245:12
**rpr**  155:19 317:16
318:21
**rule**  164:19,20
186:7 187:3,7,11
188:5,7,19,24
189:5,7,10,14
196:25 197:4,11,20
198:12,14 272:22
277:9 288:12
295:18,20 296:1,12
296:14,21 297:6,10
303:8,17,17,18
307:1,21 313:20
319:22,23

**rules**  155:18 164:7
272:2 300:16,23
319:16
**run**  199:10,12
**running**  199:15
206:10 306:18
310:15
**runs**  198:25

**s**

**s**  157:8 320:4
**sale**  294:17
**sample**  160:24
260:2,4,14,19
265:17,18,24
266:25 268:3,21
270:3
**san**  156:8
**sansone**  230:5
**sas**  156:4 319:3
**satisfy**  307:1,20
**saw**  201:7
**saying**  164:17
170:22 174:21
182:15 187:11
198:21 200:15
263:14 267:9
275:24
**says**  183:6 189:5,14
189:14 196:2 199:2
201:15,21 225:16
234:2 247:13
284:13 292:2 304:3
305:1,20 314:2
**scenario**  168:17
205:22,23 206:13
**scenarios**  205:18
**schedule**  195:13
**scheme**  276:24
**school**  195:2
**schulz**  155:11
157:12 158:3,8

171:22 177:24,24
183:6 184:6 202:10
213:14 217:14
229:4 232:19
234:12 235:6
244:22 254:7 263:8
263:12,24 264:22
267:4 283:8 294:5
302:18 312:5,10
317:7 318:6 319:4
320:2,24
**schulz's**  227:7
262:25
**schwartz**  156:2,2
157:3 159:10
160:13 161:25
163:1 165:6,14
166:6 167:7,9,22
168:21 169:22
175:17 176:12
179:15 180:13
181:25 182:12
184:3 185:3,11
186:15,22 187:4
189:1 190:13
193:17,23 197:6
200:2,9 201:12,14
205:6 207:20
208:10 209:2,18
211:15,20 212:2,4
212:9,14,22 213:8
213:12 215:7 216:3
216:13,22 217:7
218:9 219:2 220:9
220:22 222:10,18
224:3,19 225:14
226:1,8,11,21,25
227:11 228:11,20
230:7,17,22 231:7
231:12 232:4,9
233:19 234:7,17,19

241:16,25 243:14
244:6 246:9,18
247:9 248:16
249:15 251:6 253:6
253:21 254:2,13,16
255:4 256:1,12
257:1 258:22 262:4
262:23 263:11
264:14 265:12
266:12,17,21
268:11 270:5,18
271:10,20,22 273:2
274:7 276:6,19
277:11,21 278:5
280:4 281:6,13,20
282:2 283:13 284:7
285:2,6,16 286:6,9
286:24 287:14,21
288:15,18 289:1,11
291:22 292:12,14
293:9,21 294:22
295:12 296:4,8,18
297:19,21 298:23
300:20 301:11
302:7,9,16 303:10
303:20 304:7,14
305:7 306:4,10
307:2,23 308:24
309:16 310:12
311:25 312:4 314:8
314:12,21 315:4
316:3 319:2,2
**scope**  276:19
277:11 284:7
288:15 313:10,10
313:14,15
**scout**  156:12
**screen**  214:18
230:8 231:18 234:8
276:1 302:10,19

script  286:15
se  159:21 160:6,10
    161:10,13 162:15
    163:20,22,25
seal  317:10
seale  173:18 176:21
    178:1 185:1,9
    186:3,6,20 187:2
    306:21,24 307:20
    308:18 309:12
    310:1
seale's  308:5
sec  157:14,18
    158:20 164:25
    211:6,19 213:2,11
    213:19,24 214:14
    215:25 216:11
    217:4 218:17,20
    219:10,19 223:3,6
    223:7,13 224:2
    225:10,12,18,20,23
    225:23 226:5 227:9
    227:19 228:3,15
    229:21 233:1,6,11
    233:15 234:4
    250:13 300:8
    313:20
sec's  223:15
second  169:7
    181:10 243:21
    261:17 288:3
    302:16 310:14
seconds  305:17
section  199:5 200:5
    201:20 203:18
    239:9 277:9 278:22
sections  213:5
securities  198:18
    211:12 237:1,6,9
    242:18 259:2,20
    262:13 271:8

300:15 313:21,24
    314:10 315:12,14
    315:20
security  188:13
see  160:21 180:7,20
    189:14 195:9 201:7
    201:7 202:8 206:10
    206:14 215:15
    218:14 228:5,6
    230:9,23 232:11,19
    235:15 238:19,24
    238:25 243:18
    261:3,4 263:18
    264:25 266:23
    273:10 276:3,3
    283:24 285:9
    293:19,19 302:10
    302:25 304:2,6,7,9
    305:19,23 306:23
    311:21 313:9,16,19
    313:20
seeing  316:6
seeking  219:24
seen  196:5,6 215:4
    217:16 229:20
    232:6 233:21
    242:22 271:14
    276:15 277:14
    285:19 286:11
    287:2
segregated  170:18
select  257:24
selection  268:13
selective  258:3
self  210:7 225:21
selling  187:24,25
    188:4,18
send  259:25 263:12
    263:13 264:12,18
    264:19 278:14

sending  215:21
    295:16,17
sense  170:19
    203:11
sent  215:16,24,24
    216:11
sentence  160:9
    161:18 162:2,14,24
    163:9 164:3 165:20
    166:3 169:17 170:1
    171:12 172:7 173:1
    174:7 176:4 177:3
    179:7,11 180:9
    182:18 183:16,23
    225:16 233:25
    243:21 246:22
    247:13 248:2
separate  170:19
    172:24 176:3 224:6
    224:7 256:23
    257:11 293:1
    296:12 299:8
separately  172:14
    219:24 223:2,11
    224:1,12,14 225:5
    225:9 226:18
    244:12,14 278:7
series  273:15
services  272:19
set  162:24 165:19
    166:3 171:12
    172:25 174:7
    175:14,25 176:4
    177:2 179:6 182:16
    196:11 223:12
    236:2 237:6 241:5
    241:6,14 243:22
    259:19,20,24
    265:10 286:20
    294:7 314:18

settlement  211:6
    213:24 227:8
share  211:19
    212:21,25 214:3,18
    243:12 302:19
shared  200:10
    223:19 224:16
sheet  319:9,11
short  174:4 279:14
    293:2 296:22
shortened  195:23
show  302:5
side  192:12 204:14
    259:6 267:21,24
    274:12 279:12
sided  301:19
sifma  157:17,18
    298:18,21 299:2,2
    299:3,8,10,13,20
    299:24 300:8 301:6
    301:15,22 302:13
    302:17
sign  278:15 319:10
signature  317:15
    318:20
signed  319:19
significantly
    178:13 275:11
similar  223:17
    243:25 250:14,15
    258:23 261:19
    288:6
similarly  155:4
simple  177:19
    292:21
simply  182:8
    286:14
simultaneous
    184:20 196:14
simultaneously
    313:13

**sine** 188:6
**single** 192:13
  268:24
**sir** 163:17 179:4
  181:2,5 200:8
  210:21 215:22
  219:7 220:14 224:9
  226:6 231:4,13
  238:8,11 247:10
  254:24 257:3 261:4
  266:17 267:24
  269:1 271:21 272:8
  275:21 278:13,16
  278:24 279:2 280:3
  282:13 286:19
  287:8,9 288:8
  306:9 310:17
  311:10
**sit** 186:19 198:9
  236:4 240:5,21
  307:12 314:20
**site** 212:21 214:6
**sitting** 186:14
**situated** 155:4
**situation** 188:9
  264:4
**six** 195:17 258:4,5
  258:8 290:16 292:6
**size** 260:2,19
  265:17,18,24 268:3
  270:1
**skip** 311:16,20
**skippy** 278:15,15
**slightly** 295:19
**slowly** 280:8
**small** 180:21
**smith** 156:2 319:2
**solely** 164:2 169:15
**solutions** 319:21
**somebody** 171:21
  179:22 183:6

188:11 252:19
  253:1 285:5
**somewhat** 288:6
  311:1
**soon** 311:24
**sorry** 167:8 181:5
  183:24 184:11
  185:13 186:15
  187:13 191:4,10
  194:6 214:5,8
  226:12,12 227:9
  231:21 235:7 239:7
  243:17 265:16
  276:13 280:11
  294:11,12 296:7
  304:16,20 309:1
  311:11 312:2
  315:21,21
**sort** 166:5 204:17
  207:18 296:2
**sorts** 181:23
**sound** 258:2
**sounds** 171:1
  224:15 291:9
**source** 265:9 272:9
**sources** 265:13
**space** 192:23
**speak** 190:9 201:6
  248:14 302:25
  314:2
**speaking** 184:20
  192:17 196:14
  200:21 266:16
**speaks** 284:14
**special** 195:3
  257:24 289:15
**specific** 265:9
  275:16,19,24 293:6
  296:13,15 305:11
**specifically** 159:5
  219:17 223:17

291:19 306:20
**specificity** 164:7,13
**speculate** 277:22
**speculating** 193:21
  194:1,2
**speculation** 281:4
  281:11 287:23
  292:17 293:10
  297:22 303:11
**speculative** 250:7
  250:13 251:4,7
  280:25 281:24
**speed** 183:19 312:6
**spend** 210:8 280:7
**spent** 161:4 239:22
**spoke** 287:22
**spoken** 190:3 191:9
  237:15 248:9
**spot** 287:1
**spreadsheet** 236:10
**spreadsheets**
  235:11 243:5
**st** 156:17
**stagnant** 252:6
  254:11,24 255:23
**stand** 311:17
**standard** 161:11
  162:15,22 165:19
  304:3 305:20,25
**standards** 163:20
**stands** 296:12
**stanley** 302:3
**start** 238:21 308:8
**started** 245:10,13
  245:19
**starting** 232:14
  238:22 241:14
  279:25
**starts** 231:25
  233:10 285:25
  305:19

**state** 155:20 161:2
  239:14 243:7,21
  283:22 317:3,17
  318:3
**stated** 158:9 226:16
  291:14,19 292:8
  312:15 320:21
**statement** 198:7
  228:22 230:4
  233:15 247:23
  273:5 278:4 283:9
  284:6,10 296:13,15
**statements** 273:24
  297:10
**states** 155:1 197:12
**statistical** 265:25
  269:16
**statistically** 268:4
  283:3
**statistics** 289:17
**statute** 319:17
**stay** 199:18 212:7,8
**stayed** 248:6
  255:10,14
**steal** 279:9
**steer** 274:13
**stenographic** 318:7
**stenographically**
  318:6
**step** 245:1
**steve** 213:9 228:19
  241:23 264:5 274:6
**steven** 156:2 319:2
**stick** 169:2 174:17
  221:17 252:6
**stock** 217:4 278:2
  280:18,19,20
  294:18
**stocks** 255:12
  280:21

stoneman 157:12
strategy 197:23,24
  198:1,11,12,15,16
street 157:11
strike 179:3 182:6
  186:4 220:5 225:6
  260:11 277:2
strong 295:5
stuck 183:22,23
study 303:2
stuff 173:18 192:24
  199:14 301:17
subject 202:25
  233:8,18 263:15
  264:14,24 291:16
subjected 262:1
subsequent 170:21
subsequently 260:3
subset 198:2 234:2
sudden 218:6
sufficiently 270:3
suggested 259:4
  319:14
suggestion 276:9
suitability 164:20
  168:23,25 176:2,2
  176:20 178:1,12
  185:1 187:7,16
  188:2,7,19 190:11
  197:8,11 198:14
  199:6 206:24
  232:23 247:14,24
  248:4,13 250:2,10
  283:23 284:18
  291:15 294:15
  295:4,9,18,25
  296:14,21 297:4,10
  300:16,18 307:1,21
  308:5,19,23 309:11
  309:22 310:2,24

suitable 160:12,12
  165:13,23 171:23
  173:19 174:6,15,23
  175:1,9,16 177:9
  179:13,25 180:11
  183:3 249:12
  283:10 290:5
  294:19 295:1 304:4
  305:21 311:4
suite 156:12
summary 219:14
  235:15
superseded 271:23
supervision 194:20
  194:23 200:16
supervisory 196:9
supplied 243:24
support 164:8
  193:25 201:16
  211:8 224:6 294:8
supported 302:14
supports 159:6
  165:5
supposed 260:12
  285:10
sure 165:7 166:8
  167:24 168:9,23
  169:8 171:21
  178:19 182:23
  186:9 200:11 201:1
  204:20,24 206:18
  212:12,12,25
  216:14,23 220:25
  222:25 227:17
  230:10,22 238:17
  240:1 278:10
  284:25 293:4,21,22
  298:16,16 302:6
  305:15 311:21
surprised 298:4

sustained 244:25
suter 156:6 157:2,4
  158:7 159:18
  160:20 162:11
  163:8 165:9,17
  166:17 167:13
  168:8 169:14 170:2
  175:23 176:16
  179:20 180:24
  181:8,15 182:3,14
  184:1,10,24 185:8
  185:12,18,22 186:2
  186:18,25 187:6
  189:4 190:23
  191:16 193:20
  194:3 196:15,23
  197:10 199:15,19
  199:22 200:4,7,12
  201:10,13,16,18
  205:16 207:22
  208:15 209:4,24
  211:16,18,22,24
  212:6,8,12,15,18
  213:4,10,13 214:17
  214:19 215:12
  216:8,16,20 217:1
  217:12 218:13
  219:6 220:13,20,25
  221:4 222:11,24
  224:8 225:2 226:3
  226:15 227:6,12,16
  228:14,18 229:2
  230:1,3,10,14,20
  230:25 231:5,9,11
  231:15,19,21,25
  232:3,8,11,16,21
  234:5,11,15,18,21
  235:5 241:22 242:2
  242:4 243:16
  244:20 246:11,25
  247:11 248:25

250:6 251:10
  253:15,23 254:6,20
  255:20 256:6,16
  257:2 259:10
  262:16,24 263:6
  264:5,10,21 265:4
  265:8,15 266:16,18
  267:23 268:19
  270:12 271:7,13,18
  271:25 272:24
  273:3 274:1,5,8,9
  276:12,21 277:25
  278:9,21 280:23
  281:9,16,23 282:9
  283:17 284:16
  285:11,22 286:4,7
  286:12,16 287:6,7
  287:16 288:7,22
  289:5,21 292:7,20
  293:16,22 294:3,4
  295:8,23 296:11
  297:2 298:12
  299:25 300:5,11
  301:1,23 302:6,11
  302:20 303:1,15,21
  304:10,17,20,23
  305:15,16 306:7,14
  307:19 308:3
  309:10,25 310:12
  310:15 311:6,8,12
  312:10 314:1,13,16
  316:1
suter's 285:6
switch 173:19
  174:19,19 191:3
  192:2 193:6 248:5
  251:2
switched 162:6
  163:11 192:14
  257:15 267:17
  269:9

**switching** 160:3
162:19
**sworn** 158:4
242:18 243:6 311:2
317:8
**synopsis** 303:2
304:11 305:3
**synopsized** 304:17
**system** 193:11,12
193:14
**systemic** 227:23
**systemically**
267:10 271:3

**t**

**t** 157:8 320:4,4
**tab** 200:2 235:6
238:17
**table** 259:6 284:13
304:14,16
**tables** 239:2
**take** 163:22 177:22
179:24 183:13,18
187:14 194:25
195:12 196:16
198:4 207:1,2
214:3 215:6,14
230:19,20 231:15
234:15 235:6 236:9
245:12,16 246:1
260:2,4 261:1
267:14 275:1,2,10
285:12 292:22
293:17,20 302:12
304:1 305:17 313:4
**taken** 200:20
216:19 235:2
293:25
**takes** 257:13
**talk** 190:16,20,21
196:16 198:11,14
203:25 219:16

241:3 244:15,22
249:18 264:23
282:14 289:6
**talked** 190:6,8
199:8 209:15
306:25
**talking** 163:14,15
171:2 183:4 184:23
198:13 201:25
202:1,7,8 207:14
210:17 213:22,23
213:24 218:20
219:13 223:16,23
223:25 239:22
246:22 255:8
260:24 265:2
268:24 269:1 279:7
292:9 295:14
**talks** 189:5
**tampa** 155:2
156:13
**target** 212:10
**taxes** 289:19
**technical** 286:18
**tell** 164:18 169:4
170:4 193:4 200:14
202:15 210:1
234:23 237:18
240:2 244:2 259:2
259:22 269:19
270:24 274:18,18
279:9 280:13,15
284:3 285:5 286:19
298:2,8,9,9 308:10
308:10,18,20,22
309:7,11
**telling** 201:2
**ten** 218:6 234:20
**tendency** 280:12
**term** 161:14 184:18
191:6 225:9 268:6

297:11
**test** 160:11,11
**testified** 160:23
161:2 177:13
250:19 285:19
292:23 309:2
**testify** 221:20
315:2,2
**testifying** 242:22
246:17 290:10
**testimony** 159:15
161:6 171:23 174:4
176:14 193:24
242:18 243:6 254:3
261:18 270:14
272:5 288:23
289:23 306:22,23
307:24 308:6,16
310:1 311:2 315:6
319:7,15
**texas** 292:23
**thank** 172:3 179:9
191:20 199:20
201:5 211:19,24
212:18 231:11
232:2,2 234:16
236:7 238:4 241:9
241:9 246:4,14
247:22 249:9,9
259:13 262:17
276:10 284:17
293:16,22 294:3,14
308:17 311:9
315:23 316:1
**thanks** 316:3
**theory** 167:14
221:14
**thereabouts** 303:7
**therefor** 274:15
**thin** 220:19

**thing** 162:8 177:17
204:17 205:15
207:18 255:8 259:9
263:17 283:7
284:12 290:3 296:2
**things** 159:3 162:7
175:8 181:23
183:19 192:23
199:8 203:2 207:8
213:23 222:21
227:20 280:12
309:14 310:2 312:2
314:24
**think** 159:4,13,13
159:15,21 161:5,6
161:8 164:10,19,19
164:20,21,22,22,24
164:24 165:1,2,15
165:25 166:20
171:18 172:9,20,20
173:4 174:13,13
175:5,6 176:5,10
182:4,22 184:9,11
184:17,18 185:4,7
185:9 186:10,12
187:16 189:18
194:1,2 195:5
196:11 197:7,14,18
197:22 198:1,1,4
198:10,11 199:2,19
202:15,16 204:11
204:25,25 205:1,9
205:10 206:5,21,21
207:9 209:20
211:14 213:20,22
214:21 216:24
218:5 219:4,12,14
219:17 220:11
221:2,8,12,17,17
221:19 223:9
224:25 225:15

226:13 228:9,23
230:23 231:22
236:11 237:11,23
238:19 239:10,18
240:10,24,24,25
242:8,9,11,21
243:20 244:3,10
245:2,3,5,13
246:13 248:11,11
250:4,12,13,15,17
251:7,8,14 252:13
252:14 257:17,17
260:6,7,9,17,22,23
260:25 261:11
262:2 263:16,24,25
265:22,22 266:1,22
269:9 272:13 275:9
277:24 278:15,15
279:7 281:2,2,8,15
284:12,25 285:6,6
285:7 291:12
293:12 294:10,13
295:20 296:3,5,9
296:10 298:16,24
298:24 299:9
300:22 301:20
303:12 305:23
306:19 307:3,5
309:2 311:8,23
314:6 315:3,3
**thinking** 245:10,13
**third** 180:16
270:22 310:21
**thomas** 299:9
312:19
**thomas's** 264:13
**thought** 165:18
176:15 177:11
181:10 183:19
186:13 201:17
210:10 214:8

216:16 223:20
245:21 247:19
260:23,24 276:25
294:12
**thousand** 166:23
167:16 260:5
279:13
**three** 166:9 167:17
167:19 168:7,19
169:10,20 170:14
180:16,19 196:12
196:22 199:11,13
213:5 222:21
231:14 245:12
291:3
**threw** 191:18,20
**throw** 192:23
221:12 248:20
**thrown** 234:8
**till** 230:7,8
**time** 155:14 161:4
162:13 165:8,16
166:2 169:13 170:9
170:10,14 179:12
180:10,16 181:23
190:21 195:9,13,14
196:24 199:16
210:8 220:18 222:9
228:3 234:18,23
245:16,22 247:20
251:1 252:20
255:25 256:8,21
257:5,14,16,20,23
257:24 258:11,15
259:3 270:22
276:23 279:7,14
280:7 283:10 285:5
291:14 293:1
294:19,25 295:1
301:5 306:18
310:14,15,21

311:22
**timeframe** 197:13
**times** 178:14,25
193:8 219:14 228:1
243:8 250:1 267:16
269:20 270:6
290:24 291:3
**tired** 240:13
**today** 166:2 171:19
176:19 186:14,19
207:10 224:24
236:4,9 240:5,21
296:10 307:12
310:6 312:25
314:20
**today's** 159:14
**told** 189:12 205:7
206:13 218:3,5
270:23 291:1
301:14 306:5
308:21
**tolerances** 181:22
182:11
**tonight** 231:3
**top** 194:12 247:12
**topic** 275:16
298:14
**total** 195:14 268:22
268:23 308:7
**totally** 171:3
**touch** 303:4
**tough** 244:18
**tracy** 157:12
**trade** 229:14
**trades** 258:10
**trading** 267:15
**training** 192:7
194:22 195:3
**transaction** 294:17
294:20

**transcript** 318:6,7
319:5,18
**transcripts** 319:12
**transfer** 232:25
**transferred** 166:22
**tray** 279:12
**treated** 301:9
**trial** 155:17 157:16
**trick** 290:1
**tried** 175:8 248:10
270:22,22
**trillions** 279:16
**triple** 228:1
**true** 168:2 201:5
281:10 290:21
318:7 320:22
**try** 162:12 168:3,13
174:11,11 192:22
206:12 207:8
245:18 263:22
273:12 280:12,25
285:3,3 290:2
298:25 299:7
303:24 307:5
309:19 310:18
**trying** 160:17
169:2,8 170:25
173:16,25 174:1,3
176:11 177:16
206:4,7 236:20
240:16 241:17,22
243:18 244:21
259:18 271:1
310:16,19
**turn** 199:13 225:18
235:10 236:8
238:15 239:11
246:20 278:17
279:13,16,25
304:20

turnover  160:2
  162:18 163:19
  167:1 178:16 183:2
  270:10 307:16
tweak  295:16,17
tweaking  295:15
twice  257:23
two  161:17 162:3
  163:18 164:2
  165:11 169:10
  172:6,25 174:7
  175:14 179:6,11
  180:9 182:16
  183:15 195:16,18
  195:20,22 202:12
  207:6 213:18,22
  214:12 215:25
  221:22 222:21
  223:22 231:15
  235:11 256:23
  280:10,24 291:6
  294:5 304:11 305:3
type  197:9,23,25
  198:6,16 202:1,6
  206:24 207:2
  218:16 296:22
  297:1,12 300:10
  317:22
types  197:1,5,12,17
  197:20 199:5
  202:12 209:14
  296:16 297:5,11
typical  183:4

**u**

ultimate  251:17
ultimately  265:19
  267:6 270:2
unbiased  299:1,7
uncomfortable
  221:16

underlying  255:12
  289:18
undersigned  317:6
understand  160:16
  160:17 166:8
  174:12 184:15,16
  195:19,22 205:3
  208:16,20 209:8,13
  218:21,22 219:11
  222:12 240:15
  249:11 263:3,18,20
  268:1,6 275:23
  276:22 287:18
  289:12,13 291:10
  302:13 303:16
  305:13 306:12
understandable
  160:22
understanding
  172:23 186:3
  189:15,20 203:7,17
  208:12 209:1,23,25
  210:3,5,23 217:2
  217:21,22 218:16
  218:19,23 221:24
  236:22,25 237:4,5
  262:24 273:19,23
  277:6 286:21
  292:10,21 293:8
  300:12,14 302:15
  303:9,22 305:25
  309:13
understood  303:13
  303:17
undisputed  189:19
unfair  174:13
  221:12 264:20
unfairly  221:15
unilaterally  268:12
unintelligible
  184:20 196:14

unit  158:2 235:1,4
  293:24 294:2
  316:12
united  155:1
universally  297:16
unsolicited  193:5
unsuitability
  161:11 169:6
  183:16
unsuitable  159:7
  159:21 160:4 161:1
  161:20 162:4,20
  163:20,24 164:2
  167:5,19 168:18,20
  169:5,16 170:8,15
  170:22,23,24 171:7
  171:11,15 172:5,16
  173:3 174:16,20
  179:5 182:9,21
  228:7 260:21 284:1
  284:1
unsuitably  251:1
unverify  236:2
upload  300:2 302:9
uploaded  212:17
  274:3,4 300:2
  302:8
use  155:16 166:18
  178:9,10 179:23
  191:6 207:1 224:5
  238:14 242:5
  266:12 268:17
usually  238:2
  283:25
utilized  242:10
  270:2

**v**

vague  163:1 184:5
  185:11 246:9 253:6
valerie  155:19
  317:16 318:5,21

valid  268:4
validate  236:5
various  177:18
  229:17 297:9
vast  192:13 207:10
  242:24 262:18,24
  275:4 297:24
verify  236:1 319:7
veritext  212:20,25
  214:6 319:12,21
veritext.com
  319:12
version  197:23
  304:18
versus  207:10
  208:4
video  158:1 234:25
  235:3 293:23 294:1
  302:10 316:11
videoconference
  155:11 317:8
videographer
  156:20 158:1
  180:23 199:18
  212:3,7 231:13
  234:25 235:3
  293:23 294:1 311:6
  316:10
videotaped  155:11
view  167:15 168:18
  174:9 179:13
  180:11 198:17
  204:3 261:5 270:1
  270:13 288:23
  289:7 297:3,8,9,10
  297:16 307:20
views  297:18
vigorous  293:5
violate  271:9
violated  271:4
  272:3

**violates** 277:8
**violation** 178:17
  188:2,16,17,24
  283:25
**violations** 219:21
**virtue** 182:15 277:7
**vis** 300:18,18
**volatile** 228:7
**volume** 155:22
  227:24 269:9
  270:10
**vs** 155:6 290:11
  319:4 320:1

**w**

**wait** 196:11 212:9
  223:4,4,4,5 230:7,8
  249:3,3 257:22
  272:21,21,21
  283:12 298:15,15
  298:15,15
**waited** 245:19
**waiting** 200:13
  212:4
**waive** 316:5
**walk** 238:22
**wall** 157:11
**want** 157:11
  164:10,11,16
  167:24 168:24
  169:12 171:14,21
  173:25 174:2
  177:12 180:23
  186:15 189:13
  190:16,20 199:18
  212:7 215:9,19,20
  217:8 231:21 232:5
  232:17 234:17
  238:21 241:25
  250:3 264:2,6
  265:6 271:5 273:12
  274:23 275:1,3

280:6,18 285:13
  286:3,12 287:3
  288:11,12 289:19
  289:24 292:15
  293:18,20 298:8,10
  299:18 305:10,17
  309:6 310:20
  313:12
**wanted** 165:24
  166:5,14 194:21,25
  213:6 216:9 249:13
  300:9 303:4
**wanting** 179:23
**wants** 292:1
**waste** 247:20
**wasting** 279:7
**water** 174:24
**wave** 265:4
**way** 161:16 166:12
  175:18 176:18
  182:7 187:7 200:13
  200:19 202:1
  212:22 220:14
  224:9,10,17 229:5
  244:18 250:20
  262:21 268:2 275:6
  279:23 280:6 283:2
  300:6 303:25
  308:13
**ways** 264:18
**we've** 178:22
  216:14 241:2
  249:16 266:14
  284:25 292:4
  293:16 310:21
**wear** 316:9
**website** 196:1
  292:2
**week** 188:13 195:6
  195:10,10,11,16,17
  195:17,18,22

**weekend** 316:8
**weeks** 195:20,20
  265:1
**wendell** 299:22
**went** 176:24 212:5
  252:14 261:9,12
  270:10 275:7
**west** 156:3,12
**wet** 175:7
**wharton** 192:9
  195:1,2 200:16
**whatsoever** 222:14
  236:6 250:2
**whiz** 269:19
**whoa** 191:10,10
**wide** 239:16,21
  242:16 288:24
**wife** 200:23 201:8
  311:12
**wife's** 180:20
**willing** 168:12,13
  280:13,15 297:23
**wing** 298:6
**withdraw** 249:7
  283:20 306:16
**witness** 158:4
  159:12 160:14,15
  162:1 163:3 165:7
  165:15 166:8 167:8
  167:10,11,24
  168:22 169:23,25
  175:11,18 176:15
  179:16 180:15,25
  181:3,10 182:2,13
  184:9,22 185:4,21
  185:24 186:17,23
  187:5 189:2 190:14
  191:14 193:19,25
  196:20 197:7
  199:10,17,20 200:6
  200:8,11 201:15

205:7 207:21
  208:11 209:3,19
  211:23 215:9,10
  216:5,14 219:4
  220:11 221:2
  222:20 224:4,20
  225:15 226:9,12,23
  227:14 228:25
  230:9,12,23 231:2
  231:8,24 232:2,5
  233:20 234:7
  241:17 242:3,13
  244:9 246:20
  247:10 248:18
  249:10,16 251:7
  253:8 254:4,15,18
  255:6 256:3,15
  258:24 262:6
  264:17 265:3,6,14
  266:19 267:5
  268:16 270:7,21
  271:12 276:9
  277:13,16,19,23
  278:7 280:5,11
  281:7,15,21 282:4
  283:15 284:12
  285:3,8,17 286:10
  286:13,25 287:25
  288:1,17,20 289:4
  289:12 291:24
  292:13 293:11
  294:24 295:11,13
  296:5,9,20 297:20
  297:23 298:24
  300:22 301:13
  302:24 303:12
  304:9,13,16,22
  305:9 306:5,12
  307:3,25 309:1,18
  310:14,19 311:11
  311:14 314:5 316:6

317:10 319:7,8,10
319:18
**wonderful**   316:8
**woodshed**   231:3
**word**   163:22,24
187:21 189:10
202:8 207:1,2,2
219:18 246:9,18
266:13 267:3 280:9
289:13 295:19
296:22
**words**   163:1
165:22 166:9
182:15 204:15
206:21 223:15
249:3 253:24
294:18 296:14
**work**   174:17
192:22 202:20
239:23 279:11
298:7
**worked**   190:17
265:18 268:21
269:5
**working**   237:24
**works**   192:25
193:12,14 204:13
258:20
**world**   163:6 192:22
192:25 263:2 282:7
282:17,17,19,19,20
282:20
**worth**   289:15,18
**wow**   220:12 244:9
**wrap**   179:16
198:25 200:5,7
201:20,21 204:1
206:19 207:13
**write**   262:12
286:10,10

**writers**   259:2
**writing**   159:14
259:22 292:1
298:10 301:17
**writings**   272:8
**written**   158:25
173:6,12,14 175:15
202:11 216:17,18
248:7 259:1 262:11
262:12,14 302:1,2
**wrong**   172:20
173:23 175:2,7
210:11 260:25
309:21 315:22
**wrongdoing**   250:21
**wrote**   202:3 206:18
212:1 216:1 247:17
247:20

**x**

**x**   157:1,8 252:15

**y**

**yeah**   159:12 163:3
174:11 180:1,5
182:23 184:1
185:25 187:23
191:17,19 195:23
195:25 201:12
208:11 212:8,22
214:15 216:16
220:10 223:7,25
224:14,20 226:23
227:18 230:18
231:15,19,20 232:4
232:8,14 235:17,19
244:9 248:10
261:23 266:19
268:16 269:17
275:16 277:23
280:11 285:12
288:17,20 293:11

296:3 298:9 301:4
303:23 304:14,16
304:24 305:3,3
309:11 310:11,12
**year**   164:23 169:10
179:13,25 180:12
216:1 233:3 245:12
252:1 254:12
**years**   167:17,19
168:7,19 169:10,10
169:21 170:15
185:25 192:7
194:21 195:21
197:2 201:22 202:3
202:16 215:25
237:25 242:19
252:15 253:4,4,12
255:2,25 259:3,23
291:6 292:23,24
293:5 295:19,21
296:1 300:15
311:13,18
**yesterday**   313:3
**york**   217:4
**young**   156:7,20
311:20

**z**

**zero**   166:25 167:1
258:11,16 275:2
288:20,21

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of


the deposition wholly or partly, on motion under
rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
                   VERITEXT LEGAL SOLUTIONS
         COMPANY CERTIFICATE AND DISCLOSURE STATEMENT
```

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.



# VERITEXT
### LEGAL SOLUTIONS

**One Biscayne Tower**
**2 South Biscayne Blvd, Suite 2250**
**Miami, Florida 33131**
**(305) 376-8800**

ERRATA SHEET

DEPO OF: <u>Douglas Schulz</u>
TAKEN: <u>7-16-2021</u>
RE: <u>Nguyen v. Raymond James</u>

DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE

| Page # | Line # | Change | Reason |
|---|---|---|---|
| 62 | 9 | "broad" should be "false" | Transcription error |
| 73 | 24 | "& Freedman" should be "Trading" | Transcription error |
| 108 | 12 | "The for" should be "The opinion for" | Typo |
| 144 | 9 | "a complete" should be "an incomplete" | Typo |
| 164 | 19 | "it's Rule 2010" should be "it's Rules 2010 and 2111" | Clarification |
| 301 | 22 | "lesson" should be "opinion" | Clarification |
| 311 | 22 | it should read "we're a couple of old wardogs, and I don't think it looks like we're going to retire anytime soon" | Transcription error |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

State of Florida _____

                        Notary Public _____

Under penalties of perjury, I declare that I have read my deposition transcript and it is true and correct subject to any changes in form or substance entered here.

                                            8/27/2021

Veritext Florida Reporting Co.