# EXHIBIT D

# Regulatory Notice

# 12-25

## Suitability

### Additional Guidance on FINRA's New Suitability Rule

**Implementation Date: July 9, 2012**

### Executive Summary

In November 2010, the Securities and Exchange Commission (SEC) approved FINRA's new suitability rule, FINRA Rule 2111.[1] FINRA then issued *Regulatory Notice 11-02*, which announced the SEC's approval of the new rule and discussed its requirements. FINRA also issued *Regulatory Notice 11-25*, which offered further guidance on the rule and announced a new implementation date of July 9, 2012. This *Notice* provides additional guidance on the rule in response to recent industry questions.

Questions regarding this *Notice* should be directed to James S. Wrona, Vice President and Associate General Counsel, Office of General Counsel, at (202) 728-8270.

### Discussion

New FINRA Rule 2111 requires, in part, that a broker-dealer or associated person "have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the [firm] or associated person to ascertain the customer's investment profile."[2] In general, FINRA's new suitability rule retains the core features of the previous NASD suitability rule, NASD Rule 2310. In addition, Rule 2111 codifies several important interpretations of the predecessor rule and imposes a few new or modified obligations.

The new rule, for instance, codifies and clarifies the three main suitability obligations that previously had been discussed largely in case law:

▶ reasonable-basis suitability (a broker must perform reasonable diligence to understand the nature of the recommended security or investment strategy involving a security or securities, as well as the potential risks and rewards, and determine whether the recommendation is suitable for at least *some* investors based on that understanding);

## May 2012

### Notice Type
▶ Guidance

### Suggested Routing
▶ Compliance
▶ Legal
▶ Senior Management

### Key Topics
▶ Acting in Customers' Best Interests
▶ Complex Securities
▶ Customer
▶ Information Gathering
▶ Institutional-Customer Exemption
▶ Investment Strategies
▶ Reasonable Diligence
▶ Recommendation
▶ Risk-Based Compliance
▶ Suitability

### Referenced Rules and Notices
▶ Bank Secrecy Act
▶ FINRA Rules 0160, 1250, 2010, 2020, 2090, 2111, 2210, 2214, 2330, 2360, 2370, 3270, 4512 and 5310
▶ JOBS Act
▶ NASD Rules 1014, 1021, 1031, 2210, 2310 and 3010
▶ NTMs 05-59, 05-50, 05-26, 05-18, 04-89, 04-30, 03-71, 03-07, 01-23, 99-45, 96-32 and 93-73
▶ Regulatory Notices 12-03, 11-25, 11-15, 11-02, 10-51, 10-22, 10-09, 10-06, 09-73, 09-31 and 08-81
▶ Rule 506 of Regulation D
▶ SEA Rules 17a-3 and 17a-4



**Financial Industry Regulatory Authority**

1

► customer-specific suitability (a broker must have a reasonable basis to believe that a recommendation of a security or investment strategy involving a security or securities is suitable for the particular customer based on the customer's investment profile); and

► quantitative suitability (a broker who has control over a customer account must have a reasonable basis to believe that a series of recommended securities transactions are not excessive).

The new rule also broadens the explicit list of customer-specific factors that firms and associated persons generally must attempt to obtain and analyze when making recommendations to customers.[3] The new rule adds a customer's age, investment experience,[4] time horizon,[5] liquidity needs[6] and risk tolerance[7] to the explicit list of customer-specific factors from the predecessor rule (*i.e.*, other investments,[8] financial situation and needs,[9] tax status,[10] and investment objectives[11]). These factors generally make up a customer's investment profile.

The new rule, moreover, imposes broader obligations on firms and associated persons regarding recommendations of investment strategies involving a security or securities. Not only does the new rule now explicitly cover recommended investment strategies involving a security or securities, but it also states that the term "investment strategy" is to be interpreted "broadly" and includes recommendations to "hold" a security or securities. In addition, the new rule modifies the institutional-customer exemption by changing the definition of institutional customer and requiring an affirmative indication from the institutional customer of its intention to independently analyze the broker-dealer's recommendations. Finally, FINRA stated that firms generally may use a risk-based approach to documenting compliance with the rule.[12]

Soon after the SEC approved Rule 2111, broker-dealers began assessing the extent to which they needed to prepare new or update current procedures, modify automated systems and educate their associated persons regarding compliance with the new rule. In the *Regulatory Notices* referenced above, FINRA addressed numerous issues that firms initially raised. Firms, however, have asked FINRA for additional guidance regarding issues they subsequently identified while developing their approaches to complying with the new rule. This *Notice* provides answers to those questions.

FINRA reiterates, however, that many of the obligations under the new rule are the same as those under the predecessor rule and related case law. Existing guidance and interpretations regarding suitability obligations continue to apply to the extent that they are not inconsistent with the new rule. Furthermore, FINRA appreciates that no two firms are exactly alike. Firms have different business models; offer divergent services, products and investment strategies; and employ distinct approaches to complying with applicable regulatory requirements. FINRA's guidance is not intended to influence any firm's choice of a particular business model or reasonable approach to ensuring compliance with suitability or other regulatory requirements.

## Suitability Questions and Answers

Firms' recent questions regarding Rule 2111 have focused on the following topics: the obligation to act in a customer's best interests; the scope of the terms "recommendation," "customer" and "investment strategy"; the use of a risk-based approach to documenting suitability; information-gathering requirements; reasonable-basis and quantitative suitability; and the institutional-customer exemption. The questions addressed below are representative of the issues firms are attempting to resolve as they finalize their compliance strategies. FINRA emphasizes, however, that it previously addressed numerous issues during the rulemaking process and immediately after the SEC approved the rule. FINRA encourages firms to review its responses to comments[13] and *Regulatory Notices 11-02* and *11-25*, which provide additional information regarding the rule's requirements.

### Acting in a Customer's Best Interests

**Q1.** *Regulatory Notice 11-02* **and a recent SEC staff study on investment adviser and broker-dealer sales-practice obligations cite cases holding that brokers' recommendations must be consistent with their customers' "best interests."[14] What does it mean to act in a customer's best interests?**

**A1.** In interpreting FINRA's suitability rule, numerous cases explicitly state that "a broker's recommendations must be consistent with his customers' best interests."[15] The suitability requirement that a broker make only those recommendations that are consistent with the customer's best interests prohibits a broker from placing his or her interests ahead of the customer's interests.[16] Examples of instances where FINRA and the SEC have found brokers in violation of the suitability rule by placing their interests ahead of customers' interests include the following:

- ▶ A broker whose motivation for recommending one product over another was to receive larger commissions.[17]

- ▶ A broker whose mutual fund recommendations were "designed 'to maximize his commissions rather than to establish an appropriate portfolio' for his customers."[18]

- ▶ A broker who recommended "that his customers purchase promissory notes to give him money to use in his business."[19]

- ▶ A broker who sought to increase his commissions by recommending that customers use margin so that they could purchase larger numbers of securities.[20]

- ▶ A broker who recommended new issues being pushed by his firm so that he could keep his job.[21]

- ▶ A broker who recommended speculative securities that paid high commissions because he felt pressured by his firm to sell the securities.[22]

The requirement that a broker's recommendation must be consistent with the customer's best interests does not obligate a broker to recommend the "least expensive" security or investment strategy (however "least expensive" may be quantified), as long as the recommendation is suitable and the broker is not placing his or her interests ahead of the customer's interests. Some of the cases in which FINRA and the SEC have found that brokers placed their interests ahead of their customers' interests involved cost-related issues. The cost associated with a recommendation, however, ordinarily is only one of many important factors to consider when determining whether the subject security or investment strategy involving a security or securities is suitable.

The customer's investment profile, for example, is critical to the assessment, as are a host of product- or strategy-related factors in addition to cost, such as the product's or strategy's investment objectives, characteristics (including any special or unusual features), liquidity, risks and potential benefits, volatility and likely performance in a variety of market and economic conditions. These are all important considerations in analyzing the suitability of a particular recommendation, which is why the suitability rule and the concept that a broker's recommendation must be consistent with the customer's best interests are inextricably intertwined.[23]

## Recommendation

**Q2.    The suitability rule applies only to recommended securities and investment strategies involving securities, but FINRA does not define the term "recommendation" other than to say that it is a facts and circumstances inquiry. What factors determine whether a recommendation has been made for purposes of the suitability rule?**

A2.    Although FINRA does not define the term "recommendation," it has offered several guiding principles that firms and brokers should consider when determining whether particular communications could be viewed as recommendations. FINRA has extensively addressed those guiding principles in past *Regulatory Notices*, and cases have applied them to specific facts.[24] Some SEC releases and FINRA cases and interpretive letters also have explained that a broker-dealer's use or distribution of marketing or offering materials ordinarily would not, by itself, constitute a "recommendation" for purposes of the suitability rule.[25] The prior guidance and interpretations generally remain applicable,[26] and firms and brokers should review those existing resources for assistance in understanding the breadth of the term "recommendation."

**Q3.    FINRA has stated that the new suitability rule does not broaden the scope of implicit recommendations applicable to the predecessor rule. What are the conditions under which an implicit recommendation can trigger the suitability rule?**

A3.    FINRA and the SEC have recognized that certain actions constitute implicit recommendations that can trigger suitability obligations. FINRA and the SEC have held, for example, that brokers who effect transactions on a customer's behalf without informing the customer have implicitly recommended those transactions, thereby triggering application of the suitability rule.[27] Although such holdings continue to act as precedent regarding those issues, the new rule does not broaden the scope of implicit recommendations. The new rule, for example, does not apply to *implicit* recommendations to *hold* a security or securities. Thus, the new rule's "hold" language would not apply when a broker remains silent regarding security positions in an account. The hold recommendation must be explicit.[28]

**Q4.    Customers sometimes ask broker-dealer call centers whether they may continue to maintain their investments at the firm if, for instance, they want to move from an employer-sponsored retirement account held at the firm to an individual retirement account held at the firm. If a firm's call center informs customers that they are permitted to continue to maintain their investments at the firm under such circumstances, would FINRA consider those communications to be "hold" recommendations triggering application of the new suitability rule?**

A4.    In general, FINRA would not view those communications as "hold" recommendations for purposes of the rule because the firm's call center is not responding to the question of whether the customer should hold the securities, but rather whether the customer can continue to maintain them at the firm.

**Q5.    Section 201(a) of the Jumpstart Our Business Startups Act (JOBS Act)[29] directs the SEC to amend Rule 506 of Regulation D under the Securities Act of 1933 to eliminate the prohibition on general solicitations to the extent that all purchasers are accredited investors. Does the elimination of the general solicitation prohibition mean that broker-dealers no longer have suitability obligations regarding private placements?**

A5.    No. The JOBS Act removes certain marketing impediments but not a broker-dealer's suitability obligations. In that regard, and as explained above in the answer to question 2, a broker-dealer's general solicitation of a private placement through the use or distribution of marketing or offering materials ordinarily would not, by itself, constitute a recommendation triggering application of the suitability rule.[30] When a broker-dealer "recommends" a private placement, however, the suitability rule applies.[31]

## Customer

**Q6.   What constitutes a "customer" for purposes of the suitability rule?**

A6.   The suitability rule only applies to a broker's recommendation to a "customer." FINRA defines "customer" broadly as including anyone who is not a "broker or dealer."[32] Although in certain circumstances the term may include some additional parameters, a "customer" clearly would include an individual or entity with whom a broker-dealer has even an *informal* business relationship related to brokerage services, as long as that individual or entity is not a broker or dealer. A broker-customer relationship would arise and the suitability rule would apply, for example, when a broker recommends a security to a *potential* investor, even if that potential investor does not have an account at the firm.

## Investment Strategy

**Q7.   The new suitability rule requires that a recommended investment strategy involving a security or securities must be suitable. What is an "investment strategy" under the rule?**

A7.   Rule 2111 states that the term "investment strategy" is to be interpreted "broadly."[33] The new rule would cover a recommended investment strategy involving a security or securities regardless of whether the recommendation results in a securities transaction or even mentions a specific security or securities.[34] FINRA would not consider a broker's recommendation that a customer generally invest in equities or fixed-income securities to be an investment strategy covered by the rule, unless such a recommendation was part of an asset allocation plan not eligible for the safe-harbor provision in Rule 2111.03 (discussed below in the answer to question 8). The rule would, however, apply to recommendations to invest in more specific types of securities, such as high dividend companies or the "Dogs of the Dow,"[35] or in a particular market sector. It also would apply to recommendations generally to use a bond ladder, day trading, "liquefied home equity,"[36] or margin strategy involving securities, irrespective of whether the recommendations mention particular securities.

Additionally, the term would capture an *explicit* recommendation to *hold* a security or securities or to continue to use an investment strategy involving a security or securities.[37] The rule would apply, for example, when an associated person meets with a customer during a quarterly or annual investment review and explicitly advises the customer not to sell any securities in or make any changes to the account or portfolio or to continue to use an investment strategy. However, as explained above in the answer to question 3, the rule would not cover an implicit recommendation to hold.

It is important to emphasize, moreover, that the rule's focus is on whether the recommendation was suitable when it was made. A recommendation to hold securities, maintain an investment strategy involving securities, or use another investment strategy involving securities—as with a recommendation to purchase, sell or exchange securities—normally would not create an ongoing duty to monitor and make subsequent recommendations.

**Q8.** **What is the scope of the safe-harbor provision in Rule 2111.03 regarding a firm's use of an asset allocation model?**

A8. Rule 2111.03 excludes from the suitability rule's coverage various types of communications that are educational in nature even though they could be considered investment strategies involving securities. The rule states that certain communications "are excluded from the coverage of Rule 2111 as long as they do not include (standing alone or in combination with other communications) a recommendation of a particular security or securities[.]"[38] Specifically, the rule provides a safe harbor for firms' use of "[a]sset allocation models that are (i) based on generally accepted investment theory, (ii) accompanied by disclosures of all material facts and assumptions that may affect a reasonable investor's assessment of the asset allocation model or any report generated by such model, and (iii) in compliance with NASD IM-2210-6 (Requirements for the Use of Investment Analysis Tools) (soon to be renumbered as FINRA Rule 2214), if the asset allocation model is an 'investment analysis tool' covered by [the interpretative material]."[39]

Under this provision, the suitability rule would not apply, for example, to a general recommendation that a customer's portfolio have certain percentages of investments in equity securities, fixed-income securities and cash equivalents, if the recommendation is based on an asset allocation model that meets the above criteria and the firm does not recommend a particular security or securities in connection with the allocation. The suitability rule also would not apply to a firm's allocation recommendation regarding broad-based market sectors (*e.g.*, agriculture, construction, finance, manufacturing, mining, retail, services, transportation and public utilities, and wholesale trade).[40] Again, however, the recommendation must be based on an asset allocation model that meets the above criteria and cannot include recommendations of particular securities.

In this regard, firms should note that, as an allocation recommendation becomes narrower or more specific, the recommendation gets closer to becoming a recommendation of particular securities and, thus, subject to the suitability rule, depending on a variety of factors (including the number of issuers that fall within the broker-dealer's allocation recommendation).[41] Accordingly, broker-dealers should assess whether allocation recommendations involving certain types of sub-categories of broader market sectors or even more limited groupings are so specific or narrow that they constitute recommendations of particular securities.[42]

**Q9.    Would a recommendation to maintain an asset mix that was based on an asset allocation model that meets the criteria described in the rule fall within the safe-harbor provision in Rule 2111.03?**

A9.    Yes. The safe-harbor provision in Rule 2111.03 would apply to a recommendation to maintain a generic asset mix based on an asset allocation model that meets the criteria described in the rule if the firm does not explicitly recommend that the customer "hold" the specific securities that make up the allocation.

**Q10.   Does the new rule's "investment strategy" language cover a broker's recommendation involving both a security and a non-security investment?**

A10.   Yes. Just as *Regulatory Notices* and disciplinary actions make clear under the predecessor rule, the new suitability rule would continue to cover a broker's recommendation of an "investment strategy" involving both a security and a non-security.[43] Suitability obligations apply, for example, to a broker's recommendation of an investment strategy to use home equity to purchase securities[44] or to liquidate securities to purchase an investment-related product that is not a security.[45]

Some firms have raised questions regarding their supervisory responsibilities for such recommendations. A firm's supervisory system must be *reasonably* designed to achieve compliance with applicable securities laws and regulations and FINRA rules.[46] Although the reasonableness of a supervisory system will depend on the facts and circumstances, a firm may use a risk-based approach to supervising its brokers' recommendations of investment strategies with both a security and non-security component. For instance, as long as the supervisory system is reasonably designed to achieve compliance with applicable securities laws and regulations and FINRA rules, a firm could focus on the detection, investigation and follow-up of "red flags" indicating that a broker may have recommended an unsuitable investment strategy with both a security and non-security component.[47] A broker's recommendation that a customer with limited means purchase a large position in a security might raise a "red flag" regarding the source of funds for such a purchase. Similarly, a broker's recommendation that a "buy and hold" customer with an investment objective of income liquidate large positions in blue chip stocks paying regular dividends might raise a "red flag" regarding whether that recommendation is part of a broader investment strategy.

**Q11.   Does the new rule cover a "hold" recommendation regarding securities that the broker did not originally recommend? Would a broker, for example, be responsible for a hold recommendation involving blue chip stocks that a customer transferred into an account at the broker-dealer?**

A11.   Where a broker did not recommend the original purchase of a security but *explicitly* recommends that the customer subsequently hold that security, the new suitability rule would apply. However, as stated above and discussed in greater detail below, a

firm may take a risk-based approach to evidencing compliance with the rule. A hold recommendation involving shares of a blue chip stock ordinarily would not present the type of risk, absent unusual facts, that would require a detailed analysis or documentation. Where the hold recommendation involves an overly concentrated position in a security, however, documentation usually would be necessary, even if the broker did not originally recommend the purchase of the security.

### Risk-Based Approach to Documenting Compliance With Suitability Obligations

**Q12.** **For purposes of using a risk-based approach to documenting compliance with suitability obligations, what types of recommendations does FINRA generally consider complex or potentially risky?**

A12.  As with many obligations under various rules, a firm will need to make some judgment calls on the types of recommendations that it should document under FINRA's suitability rule. FINRA previously stated that, although a firm has a general obligation to evidence compliance with applicable FINRA rules, the suitability rule does not include explicit documentation requirements, except in a situation where a firm determines not to seek certain customer information in the first place.[48] The suitability rule applies to *all* recommendations of a security or securities or investment strategies involving a security or securities, but the extent to which a firm needs to document its suitability analysis depends on an assessment of the customer's investment profile and the complexity of the recommended security or investment strategy involving a security or securities (in terms of both its structure and potential performance) and/or the risks involved.[49]

The recommendation of a large-cap, value-oriented equity security usually would not require documentation. Conversely, the recommendation of a complex and/or potentially risky security or investment strategy involving a security or securities usually would require documentation. Numerous *Regulatory Notices* and cases discuss various types of complex and/or potentially risky securities and investment strategies involving a security or securities. Firms and brokers may want to consult those *Regulatory Notices*[50] and cases[51] when considering the types of recommended securities and investment strategies involving securities that they should document.

**Q13.** **What types of "hold" recommendations should firms consider documenting?**

A13.  For "hold" recommendations, FINRA has stated that a firm may want to focus on securities that by their nature or due to particular circumstances could be viewed as having a shorter-term investment component; that have a periodic reset or similar mechanism that could alter a product's character over time; that are particularly susceptible to changes in market conditions; or that are otherwise potentially risky or problematic to hold at the time the recommendations are made.[52]

Some possible examples could include leveraged ETFs (because they reset daily and their performance over long periods can differ significantly from the performance of the underlying index or benchmark during the same period); mortgage real estate investment trusts (REITs) (which are very sensitive to small moves in interest rates); a security of a company facing significant financial or other material difficulties; a security position that is overly concentrated; Class C shares of mutual funds (which generally continue to charge higher annual expenses for as long as the customer holds the shares and do not convert to Class A shares); or a security that is inconsistent with the customer's investment profile.

**Q14.** **How should a firm document "hold" recommendations?**

**A14.** The suitability rule does not prescribe the manner in which a firm must document "hold" recommendations when documentation may be necessary. Some firms may create "hold" tickets and some may add "hold" sections to existing order tickets. Other firms may require emails or memoranda to supervisors or emails or letters to customers copying supervisors. Still other firms may create data fields for entering such information into automated supervisory systems.

These are only examples of how some firms may document "hold" recommendations if necessary. Firms do not have to document or individually approve every "hold" recommendation.[53] As with recommendations of other types of investment strategies or of purchases, sales or exchanges of securities, firms may use a risk-based approach to documenting and supervising "hold" recommendations. FINRA emphasizes, moreover, that firms may use methods that are not highlighted in this *Notice* to document and supervise "hold" recommendations as long as those methods are reasonable.

## Information-Gathering Requirements

**Q15.** **Does a broker-dealer have to seek to obtain all of the customer-specific factors listed in the new rule by the rule's implementation date?**

**A15.** No. The rule generally requires a broker-dealer to seek to obtain and analyze the customer-specific factors listed in the rule when making a recommendation to a customer. Accordingly, a broker-dealer could choose to seek to obtain and analyze the customer-specific factors listed in Rule 2111 when it makes new recommendations to customers (regardless of whether they are new or existing customers).[54]

**Q16. What constitutes "reasonable diligence" in attempting to obtain the customer-specific information?**

A16.   Although the reasonableness of the effort will depend on the facts and circumstances, asking a customer for the information ordinarily will suffice. Moreover, absent "red flags" indicating that such information is inaccurate or that the customer is unclear about the information, a broker generally may rely on the customer's responses. A broker may not be able to rely exclusively on a customer's responses in situations such as the following:

▶   the broker poses questions that are confusing or misleading to a degree that the information-gathering process is tainted,

▶   the customer exhibits clear signs of diminished capacity, or

▶   other "red flags" exist indicating that the customer information may be inaccurate.

**Q17. What if a customer refuses to provide certain customer-specific information?**

A17.   Some customers may be reluctant to provide certain types of information to their broker-dealers. A customer, for example, may not want to divulge information about "other investments" held away from the broker-dealer in question. The suitability rule generally requires broker-dealers to use reasonable diligence to seek to obtain and analyze the customer-specific factors listed in the rule. A broker-dealer cannot make assumptions about customer-specific factors for which the customer declines to provide information.[55] Furthermore, when customer information is unavailable despite a broker-dealer's reasonable diligence, the firm must carefully consider whether it has a sufficient understanding of the customer to properly evaluate the suitability of a recommendation.[56] As with the predecessor rule, however, the new rule would not prohibit a broker-dealer from making a recommendation in the absence of certain customer-specific factors as long as the firm has enough information about the customer to have a reasonable basis to believe the recommendation is suitable. The significance of specific types of customer information will depend on the facts and circumstances of the particular case.[57]

**Q18.** **In addition to using reasonable diligence to obtain and analyze certain *specific* factors about the customer, the new suitability rule requires a broker to consider "any other information the customer may disclose" in connection with the recommendation. How much of a duty does a firm have to pursue "any other information the customer may disclose" to see if it has suitability implications? Does the firm have a duty, for example, to ask its customers if there is anything else it should know about them when collecting information for suitability purposes?**

A18.   Where a customer discloses information to a broker in connection with the recommendation, the broker must consider that information as part of the suitability analysis. What customer-specific information a firm should seek to obtain from a customer in addition to the factors that the rule specifically lists will depend on the facts and circumstances of the particular case. Although a firm is not required to affirmatively ask customers if there is anything else it should know about them, the better practice is to attempt to gain as much relevant information as possible before making recommendations.

**Q19.** **What is a firm's responsibility when customers indicate that they have multiple investment objectives that appear inconsistent?**

A19.   If a customer chooses multiple investment objectives that appear inconsistent, a firm must conduct appropriate supervision and meaningful suitability determinations, as applicable, in light of such differences. For example, a firm should, among other things, clarify the customer's intent and, if necessary, reconcile and/or determine how it will handle the customer's differing investment objectives.

**Q20.** **Should the investment experience of a guardian, custodian, trustee or similarly situated third party managing an account be taken into consideration when making account recommendations?**

A20.   In many circumstances, the answer is yes. In the case of a trust held in a brokerage account, for instance, the firm should consider the trustee's investment experience with, and knowledge of, various investments and investment strategies. The firm, however, also must consider factors such as the trust's investment objectives, time horizon and risk tolerance to complete the suitability analysis.

It also is important to note that, where an *institutional* customer has delegated decisionmaking authority to an agent, such as an investment adviser or a bank trust department, Rule 2111(b) makes clear that the factors relevant to determining whether the customer meets the criteria for the institutional-customer exemption will be applied to the agent.

**Q21. Can a broker make recommendations based on a customer's overall portfolio, including investments held at other financial institutions? For instance, does each individual recommendation have to be consistent with the customer's investment profile or can the suitability of a broker's recommendation be judged in light of its consistency with the customer's overall portfolio?**

A21. The answer depends on the facts and circumstances of the particular case. The suitability rule applies on a recommendation-by-recommendation basis. A suitability analysis of a particular recommendation and consideration of a customer's overall investment portfolio, however, are not mutually exclusive concepts. The new suitability rule (as with the predecessor rule) requires a broker to seek to obtain and analyze a customer's other investments. The rule thus explicitly permits a suitability analysis to be performed within the context of a customer's other investments. Some customers, moreover, desire portfolios made up of securities with different levels of liquidity, risk and time horizons. When a broker is aware of a customer's overall portfolio (including investments held at other financial institutions), the broker is permitted to make recommendations based on the customer's overall portfolio as long as the customer is in agreement with such an approach. Under these circumstances, the suitability of a broker's recommendation may be analyzed on the basis of whether the customer's overall portfolio, considering any changes to the portfolio that flow from the broker's recommendation, aligns with the customer's investment profile.[58]

As noted above in the answer to question 17, however, a broker cannot make assumptions about a customer's other holdings.[59] The firm should evidence a customer's approval of a broker's use of a portfolio-based analysis regarding the suitability of the broker's recommendations.[60] Some customers, for instance, may desire all recommendations to be consistent with their stated risk tolerance, investment time horizon or liquidity needs. Accordingly, a broker may not use a portfolio approach to analyzing the suitability of specific recommendations when:

▶ the customer wants each individual recommendation to be consistent with his or her investment profile or particular factors within that profile;

▶ the broker is unaware of the customer's overall portfolio; or

▶ "red flags" exist indicating that a broker's information about the customer's other holdings may be inaccurate.

Nothing in this guidance, moreover, relieves a firm from having to ensure that a customer's investment profile or factors within that profile accurately reflect the customer's decisions.

### Reasonable-Basis Suitability

**Q22. Can a broker who does not understand the risks associated with a recommendation violate the reasonable-basis obligation even if the recommendation is suitable for *some* investors?**

A22.    Yes. The reasonable-basis obligation has two components: a broker must (1) perform reasonable diligence to understand the nature of the recommended security or investment strategy involving a security or securities, as well as the potential risks and rewards, and (2) determine whether the recommendation is suitable for at least *some* investors based on that understanding.[61] A broker must adhere to both components of reasonable-basis suitability. A broker could violate the obligation if he or she did not understand the recommended security or investment strategy, even if the security or investment strategy is suitable for at least *some* investors. A broker must understand the securities and investment strategies involving a security or securities that he or she recommends to customers.[62]

The reasonable-basis obligation is critically important because, in recent years, securities and investment strategies that brokers recommend to customers, including retail investors, have become increasingly complex and, in some cases, risky. Brokers cannot fulfill their suitability responsibilities to customers (including both their reasonable-basis and customer-specific obligations) when they fail to understand the securities and investment strategies they recommend. Firms' supervisory policies and procedures must be reasonably designed to ensure that their brokers comply with this important requirement.[63]

### Quantitative Suitability

**Q23. Is the quantitative suitability obligation under the new rule any different from the excessive trading line of cases under the predecessor rule?**

A23.    No. The quantitative suitability obligation under the new rule simply codifies excessive trading cases. Quantitative suitability requires a broker who has actual or *de facto* control[64] over a customer account to have a reasonable basis for believing that, in light of the customer's investment profile, a series of recommended transactions, even if suitable when viewed in isolation, are not excessive and unsuitable for the customer.[65] Factors such as turnover rate,[66] cost-to-equity ratio,[67] and use of in-and-out trading[68] in a customer's account may provide a basis for finding that the activity at issue was excessive.

## Institutional-Customer Exemption

**Q24. Some third-party vendors have created "Institutional Suitability Certificates" to facilitate firms' compliance with the new institutional-customer exemption in Rule 2111(b). Has FINRA endorsed or approved any of these certificates?**

A24. No. By way of background, the new suitability rule modifies the institutional-customer exemption that existed under the predecessor rule (NASD IM-2310-3). Rule 2111(b) replaces the previous rule's definition of "institutional customer" with the more common definition of "institutional account" in FINRA's "books and records" rule, Rule 4512(c).[69] "Institutional account" means the account of a bank, savings and loan association, insurance company, registered investment company, registered investment adviser or any other person (whether a natural person, corporation, partnership, trust or otherwise) with total assets of at least $50 million.[70] In regard to the "other person" category, the monetary threshold generally changed from at least $10 million invested in securities and/or under management used in the predecessor rule to at least $50 million in assets in the new rule.[71] Moreover, the definition now includes natural persons who meet such criteria.

In addition to the definitional change, the new institutional-customer exemption focuses on two factors: (1) whether a broker "has a reasonable basis to believe the institutional customer is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies involving a security or securities" (a factor used in the predecessor rule), and (2) whether "the institutional customer affirmatively indicates that it is exercising independent judgment" (a new requirement).[72] A broker-dealer fulfills its customer-specific suitability obligation if all of these conditions are satisfied.[73]

Some third-party vendors have created and aggressively marketed proprietary "Institutional Suitability Certificates" to facilitate compliance with the new institutional-customer exemption. FINRA has *not* approved or endorsed any third-party Institutional Suitability Certificates and has *not* contracted with any third-party vendor to create such certificates on FINRA's behalf. FINRA also emphasizes that broker-dealers are not required to use such certificates to comply with the new institutional-customer exemption. As discussed below in the answer to question 26, firms can use any number of approaches to complying with the new exemption requirements.

**Q25. Some of the "Institutional Suitability Certificates" that are being marketed do not identify an institutional customer's experience with particular asset classes or types of securities or investment strategies involving a security or securities. Does FINRA expect broker-dealers or institutional customers to provide more specificity?**

A25. Firms should understand that the use of any such Institutional Suitability Certificate in no way constitutes a safe harbor from the rule. As noted above in the answer to question 24, FINRA has not endorsed or promoted any certificate. What further action a broker-dealer will need to take will depend on the facts and circumstances of the particular case. In general, however, when there is an indication that the institutional customer is not capable of analyzing, or does not intend to exercise independent judgment regarding, *all* of a broker-dealer's recommendations, the broker-dealer necessarily will have to be more specific in its approach to ensuring that it complies with the exemption. A broker-dealer need not automatically use a detailed approach when no such indication exists, although providing at least some level of specificity (even if not required) may help eliminate misunderstandings.

FINRA previously issued written guidance on a customer's *capability* of analyzing risks (a factor used in both the predecessor and new suitability rules).[74] FINRA stated that a broker-dealer may conclude in some cases that a customer is not capable of making independent investment decisions in general. In other cases, the institutional customer may have general capability, but may not be able to understand a particular type of instrument or its risk. If a customer is either generally not capable of evaluating investment risk or lacks sufficient capability to evaluate the particular product or investment strategy that is the subject of a recommendation, the scope of a broker's customer-specific obligations under the suitability rule would not be diminished by the fact that the broker was dealing with an institutional customer. However, the fact that a customer initially needed help understanding a potential investment or investment strategy need not necessarily imply that the customer did not ultimately develop an understanding.

As to an institutional customer's affirmative indication that it intends to *exercise independent judgment* (a new requirement), Rule 2111.07 states that "an institutional customer may indicate that it is exercising independent judgment on a trade-by-trade basis, on an asset-class-by-asset-class basis, or in terms of all potential transactions for its account." In its response to comments during the rulemaking process, however, FINRA noted that a broker-dealer "is free to decide as a business matter to service only those institutional investors that are willing to make the affirmative indication in terms of all potential transactions for its account."[75]

**Q26.** **Does the suitability rule require a broker-dealer to have a hard copy agreement on file reflecting an institutional customer's affirmative indication that it intends to exercise independent judgment?**

A26. As discussed earlier in the answer to question 12, the suitability rule applies to all recommendations of a security or securities or investment strategies involving a security or securities, but the rule generally allows a firm to take a risk-based approach to documenting suitability. In relation to a customer affirmatively indicating the intention to exercise independent judgment, negative consent will not suffice, but the affirmative indication does not necessarily have to be in writing. A firm may use a risk-based approach to documenting compliance with this provision.

A firm could comply with this requirement, for example, by having an institutional customer indicate in a signed customer agreement or other document that the institutional customer will be exercising independent judgment in evaluating recommendations or a firm could call its institutional customer, have that discussion, and (if it chooses or circumstances require) document the conversation to evidence the institutional customer's affirmative indication.

**12-25** May 2012

## Endnotes

1.  *See* 75 Fed. Reg. 71479 (Nov. 23, 2010) (Order Approving Proposed Rule Change; File No. SR-FINRA-2010-039). In addition, the SEC's order approved FINRA Rule 2090 (Know Your Customer), which also is effective on July 9, 2012. *See id.*; *Regulatory Notice 11-25*, at 1.

2.  FINRA Rule 2111(a).

3.  This aspect of the new rule largely codifies case law indicating that brokers generally should consider various customer-specific factors that NASD Rule 2310 did not explicitly reference. FINRA Rule 2111.04 provides, however, that a broker-dealer need not seek to obtain and analyze all of the factors if it "has a reasonable basis to believe, documented with specificity, that one or more of the factors are not relevant components of a customer's investment profile in light of the facts and circumstances of the particular case." If a broker-dealer reasonably determines that certain factors do not require analysis with respect to a category of customers or accounts, then it could document the rationale for this decision in its procedures or elsewhere. *See Regulatory Notice 11-25*, at 4.

4.  FINRA created a model *New Account Application Template*. The template indicates that "investment experience" could include the types of investment products that the customer previously has owned (*e.g.*, mutual funds, exchange-traded funds (ETFs), individual stocks, bonds, options, securities futures, annuities), the number of transactions per year for each category, and the number of years of experience with each category. *See id.* at 5.

    It is important to note that the New Account Application Template is a voluntary model brokerage account form that is provided as a resource to firms when they design or update their new account forms. Firms are under no

regulatory obligation to use the template, in whole or in part. FINRA recognizes that firms may continue to use their proprietary application forms, methods and processes, as long as they meet all applicable regulatory requirements. In addition, use of the voluntary template in whole or in part does not guarantee compliance with or create any safe harbor with respect to FINRA rules, the federal securities laws or state laws. Firms are responsible for ensuring that they comply with all regulatory requirements (including, but not limited to, applicable information-gathering and disclosure obligations).

5.  "Time horizon" represents the "expected number of months, years, or decades [a customer plans to invest] to achieve a particular financial goal." *Regulatory Notice 11-25*, at 4.

6.  "Liquidity needs" represent the "extent to which a customer desires the ability or has financial obligations that dictate the need to quickly and easily convert all or a portion of an investment or investments without experiencing significant loss in value from, for example, the lack of a ready market, or incurring significant costs or penalties." *Regulatory Notice 11-25*, at 4. FINRA stated that "examples of possible liquid investments include money market funds, Treasury bills and many blue-chip stocks, ETFs and mutual funds." *Id.* at 9 n.11. FINRA emphasized, however, "that a high level of liquidity does not, in and of itself, mean that the recommended product is suitable for all customers. For instance, some relatively liquid products can be complex and/or risky and therefore unsuitable for some customers." *Id.*

7.  "Risk tolerance" is a customer's "ability and willingness to lose some or all of [the] original investment in exchange for greater potential

© 2012 FINRA. All rights reserved. FINRA and other trademarks of the Financial Industry Regulatory Authority, Inc. may not be used without permission. *Regulatory Notices* attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.

returns." _Regulatory Notice 11-25_, at 4. For a discussion of the relationship between time horizon, liquidity needs and risk tolerance, _see Regulatory Notice 11-25_, at 5.

8. In many circumstances, a broker should have _actual_ knowledge of investments held at the firm where the broker is registered and should use reasonable diligence to ascertain investments held at _other_ financial institutions. A broker generally may satisfy the obligation to seek information about investments held at _other_ financial institutions by asking the customer for such information.

9. "Financial situation and needs" might include, among other things, a customer's annual income, net worth, liquid net worth, annual (recurring) expenses, and special (non-recurring) expenses. _See New Account Application Template_, _supra_ note 4, at 4.

10. "Tax status" could include a customer's highest marginal tax rate. _See New Account Application Template_, _supra_ note 4, at 4.

11. "Investment objectives" might include one or more of the following: generate income; fund retirement; steadily accumulate wealth over the long term; preserve wealth and pass it on to heirs; pay for education; pay for a house; and/or market speculation. _See New Account Application Template_, _supra_ note 4, at 7.

12. Nothing in this guidance, including the discussions relating to a risk-based approach to documenting compliance with Rule 2111, shall be construed as altering in any manner a broker-dealer's obligations under applicable federal securities laws, regulations and rules, including Securities Exchange Act (SEA) Rules 17a-3 and 17a-4 and the Bank Secrecy Act, 31 U.S.C. §§ 5311, _et seq._

13. _See_ FINRA Response to Comments, Oct. 21, 2010; 75 Fed. Reg. 51310, at 51313-51321 (Aug. 19, 2010) (Notice of Filing of Proposed Rule Change to Adopt FINRA Rules 2090 (Know Your Customer) and 2111 (Suitability) in the Consolidated FINRA Rulebook; File No. SR-FINRA-2010-039) (Notice of Proposed Rule Change).

14. _See Regulatory Notice 11-02_, at 7 n.11: SEC Staff Study on Investment Advisers and Broker-Dealers as Required by Section 913 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, at 59 (Jan. 2011) (IA/BD Study). _See also_ Notice of Proposed Rule Change, _supra_ note 13, at 51314-51315.

15. _Raghavan Sathianathan_, Exchange Act Rel. No. 54722, 2006 SEC LEXIS 2572, at *21 (Nov. 8, 2006); _see also Scott Epstein_, Exchange Act Rel. No. 59328, 2009 SEC LEXIS 217, at *40 n.24 (Jan. 30, 2009) ("In interpreting the suitability rule, we have stated that a [broker's] 'recommendations must be consistent with his customer's best interests.'"); _Dane S. Faber_, 57 S.E.C. 297, 310, 2004 SEC LEXIS 277, at *23-24 (2004) (stating that a "broker's recommendations must be consistent with his customer's best interests" and are "not suitable merely because the customer acquiesces in [them]"); _Wendell D. Belden_, 56 S.E.C. 496, 503, 2003 SEC LEXIS 1154, at *11 (2003) ("As we have frequently pointed out, a broker's recommendations must be consistent with his customer's best interests."); _Daniel R. Howard_, 55 S.E.C. 1096, 1100, 2002 SEC LEXIS 1909, at *5-6 (2002) (same), _aff'd_, 77 F. App'x 2 (1st Cir. 2003); _Powell & McGowan, Inc._, 41 S.E.C. 933, 935, 1964 SEC LEXIS 497, at *3-4 (1964) (same); _Dep't of Enforcement v. Evans_, No. 20006005977901, 2011 FINRA Discip. LEXIS 36, at *22 (NAC Oct. 3, 2011) (same); _Dep't of Enforcement v. Cody_, No. 2005003188901,

2010 FINRA Discip. LEXIS 8, at *19 (NAC May 10, 2010) (same), *aff'd*, Exchange Act Rel. No. 64565, 2011 SEC LEXIS 1862 (May 27, 2011); *Dep't of Enforcement v. Bendetsen*, No. C01020025, 2004 NASD Discip. LEXIS 13, at *12 (NAC Aug. 9, 2004) ("[A] broker's recommendations must serve his client's best interests, and the test for whether a broker's recommendations are suitable is not whether the client acquiesced in them, but whether the broker's recommendations were consistent with the client's financial situation and needs."); IA/BD Study, *supra* note 14, at 59 ("[A] central aspect of a broker-dealer's duty of fair dealing is the suitability obligation, which generally requires a broker-dealer to make recommendations that are consistent with the best interests of his customer.").

16.   *See Epstein*, 2009 SEC LEXIS 217, at *42 (stating that the broker's "mutual fund switch recommendations served his own interest by generating substantial production credits, but did not serve the interests of his customers" and emphasizing that the broker violated the suitability rule "when he put his own self-interest ahead of the interests of his customers").

17.   *See Belden*, 56 S.E.C. at 504-05, 2003 SEC LEXIS 1154, at *14.

18.   *Epstein*, 2009 SEC LEXIS 217, at *72; *see also Sathianathan*, 2006 SEC LEXIS 2572, at *23.

19.   *Robin B. McNabb*, 54 S.E.C. 917, 928, 2000 SEC LEXIS 2120, at *24 (2000), *aff'd*, 298 F.3d 1126 (9th Cir. 1990).

20.   *See Stephen T. Rangen*, 52 S.E.C. 1304, 1311, 1997 SEC LEXIS 762, at *19 (1997).

21.   *See Curtis I. Wilson*, 49 S.E.C. 1020, 1022, 1989 SEC LEXIS 25, at *6-7 (1989), *aff'd*, 902 F.2d 1580 (9th Cir. 1990).

22.   *Howard*, 55 S.E.C. at 1100, 2002 SEC LEXIS 1909, at *6-7.

23.   It is important to keep in mind that, in addition to the suitability rule, FINRA has numerous other investor-protection rules. *See, e.g.*, FINRA Rule 2010 (requiring that a broker-dealer, "in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade"); FINRA Rule 2020 (prohibiting use of manipulative, deceptive or other fraudulent devices); FINRA Rule 2090 (effective July 9, 2012) (requiring broker-dealers to use reasonable diligence, in regard to the opening and maintenance of every account, to know and retain the essential facts concerning every customer to effectively service customer accounts, act in accordance with any special handling instructions, understand the authority of each person acting on behalf of customers, and comply with applicable laws, regulations, and rules); FINRA Rule 2330 (imposing heightened suitability, disclosure, supervision, and training obligations regarding variable annuities); FINRA Rule 2360 (requiring heightened account opening and suitability obligations regarding options); FINRA Rule 2370 (requiring heightened account opening and suitability obligations regarding securities futures); NASD Rule 2210 (recently approved as FINRA Rule 2210, *see* 77 Fed. Reg. 20452 (Apr. 4, 2012)) (requiring broker-dealers' communications with the public to, among other things, be fair and balanced. include material information, be free from exaggerated, false or misleading statements or claims, and, as to certain communications, be approved prior to use by a principal and/or filed with FINRA); NASD Rule 3010 (imposing supervisory obligations); FINRA Rule 5310 (requiring broker-dealers to provide best execution). Broker-dealers also must

demonstrate to FINRA, through the membership application process, that they are capable of complying with FINRA rules and the federal securities laws, and their registered persons generally must pass one or more examinations to evidence competence in the areas in which they will work and must comply with important continuing education requirements. *See, e.g.,* NASD Rules 1014, 1021 and 1031, and FINRA Rule 1250. These (and many other) FINRA rules provide broad and significant protections to investors. FINRA BrokerCheck®, moreover, allows investors to review the professional and disciplinary backgrounds of firms and brokers online.

24.  *See, e.g., Regulatory Notice 11-02*, at 2-3 (discussing FINRA's guiding principles that firms and brokers should consider when determining whether a particular communication could be considered a "recommendation" for purposes of the suitability rule); *Regulatory Notice 10-06*, at 3-4 (Jan. 2010) (providing guidance on recommendations made on blogs and social networking websites); *Notice to Members 01-23* (Apr. 2001) (announcing the guiding principles and providing examples of communications that likely do and do not constitute recommendations); *Michael F. Siegel*, Exchange Act Rel. No. 58737, 2008 SEC LEXIS 2459, at *21-27 (Oct. 6, 2008) (applying the guiding principles to the facts of the case to find a recommendation), *aff'd in relevant part*, 592 F.3d 147 (D.C. Cir.), *cert. denied*, 130 S.Ct. 333 (2010).

25.  *See, e.g.,* SEC Adoption of Rules Under Section 15(b)(10) of the Exchange Act, 32 Fed. Reg. 11637, 11638 (Aug. 11, 1967) (noting that the SEC's now-rescinded suitability rule would not apply to "general distribution of a market letter, research report or other similar material"); Suitability Requirements for Transactions in Certain Securities, 54 Fed. Reg. 6693, 6696 (Feb. 14, 1989) (stating that proposed SEA Rule 15c2-6, which would have required documented suitability determinations for speculative securities, "would not apply to general advertisements not involving a direct recommendation to the individual"); *DBCC v. Kunz*, No. C3A960029, 1999 NASD Discip. LEXIS 20, at *63 (NAC July 7, 1999) (stating that, under the facts of the case, the mere distribution of offering material, without more, did not constitute a recommendation triggering application of the suitability rule), *aff'd*, 55 S.E.C. 551, 2002 SEC LEXIS 104 (2002); *FINRA Interpretive Letter, Mar. 4, 1997* ("[T]he staff agrees that a reference to an investment company or an offer of investment company shares in an advertisement or piece of sales literature would not by itself constitute a 'recommendation' for purposes of [the suitability rule].").

26.  The discussions (and examples provided) in previous *Regulatory Notices*, cases, interpretive letters, and SEC releases remain applicable to the extent that they are not inconsistent with Rule 2111.

27.  *See, e.g., Rafael Pinchas*, 54 S.E.C. 331, 341 n.22, 1999 SEC LEXIS 1754, at *20 n.22 (1999) ("Transactions that were not specifically authorized by a client but were executed on the client's behalf are considered to have been implicitly recommended within the meaning of [FINRA's suitability rule]."); *Paul C. Kettler*, 51 S.E.C. 30, 32 n.11, 1992 SEC LEXIS 2750, at *5 n.11 (1992) (stating that transactions a broker effects for a discretionary account are implicitly recommended).

28. FINRA previously responded to questions regarding whether the absence of a sell order in a discretionary account amounts to an implicit hold recommendation covered by the rule. FINRA stated that, *"[t]o the extent that a customer account at a broker-dealer can be discretionary under applicable federal securities laws*, the suitability rule generally would not apply where a firm refrains from selling a security." *Regulatory Notice 11-25*, at 10 n.21 (emphasis in original).

29. Pub. L. No. 112-106, 126 Stat. 306 (2012).

30. *See supra* note 25.

31. When analyzing whether a particular communication could be viewed as a recommendation triggering application of the suitability rule, firms should consult the prior guidance cited *supra* at notes 24 and 25.

32. *See* FINRA Rule 0160(b)(4) (Definition of Customer).

33. *See* FINRA Rule 2111.03.

34. *See Regulatory Notice 11-25*, at 6; *Regulatory Notice 11-02*, at 3. However, as described in greater detail *infra* in the answer to question 8, there is a safe-harbor provision for certain types of educational information that otherwise could be considered investment strategies captured by the new rule's broad language. *See* FINRA Rule 2111.03.

35. The "Dogs of the Dow" strategy is premised on investing "equal dollar amounts in the ten constituents of the Dow Jones industrial average with the highest dividend yields, hold[ing] them for twelve months and then switch[ing] to a new group of dogs." Vincent Apicella, *Stock Focus: "Dogs of the Dow" Companies*, Forbes.com (May 29, 2001).

36. *See Notice to Members 04-89* (Dec. 2004) (discussing liquefied home equity).

37. *See* FINRA Rule 2111.03.

38. Nonetheless, FINRA has stated that the safe-harbor provision would be strictly construed. *See Regulatory Notice 11-25*, at 7.

39. FINRA Rule 2111.03. NASD IM-2210-6 (Requirements for the Use of Investment Analysis Tools) will soon be renumbered pursuant to the SEC's recent approval of FINRA Rule 2214. *See* 77 Fed. Reg. 20452 (Apr. 4, 2012). As discussed above in the answer to question 8, Rule 2111.03 provides a safe harbor for firms' use of asset allocation models that are, among other things, based on "generally accepted investment theory." These models often take into account the historic returns of different asset classes over defined periods of time. FINRA expects a firm to be capable of explaining how an asset allocation model that it uses is consistent with generally accepted investment theory.

40. The examples of market sectors discussed in this *Notice* are from the Standard Industrial Classification Code. *See* SEC Division of Corporation Finance: Standard Industrial Classification.

41. When a broker-dealer recommends an allocation strategy that includes an allocation in fixed-income securities, FINRA recognizes that a number of additional factors would be relevant in determining if the broker-dealer has "recommended" particular debt securities. A firm's analysis of whether the identification of a more limited universe of fixed-income securities constitutes a recommendation of particular securities may, depending on the facts and circumstances, differ from its assessment regarding equity securities. The issuers' identities

and creditworthiness are important information in determining whether to purchase a debt security, but there may be other factors that affect the pricing and any decision to invest in specific debt securities. Moreover, the relative importance of the issuers to other factors in making fixed-income investment decisions varies depending on the total mix of the relevant facts and circumstances. Thus, identifying a more limited universe of debt issuers may not constitute a recommendation if such issuers have many debt securities outstanding, of many maturities, and having distinct structures or features.

42. In _Notice to Members 01-23_ (Apr. 2001), FINRA explained "that a portfolio analysis tool that merely generates a suggested mix of general classes of financial assets" would not, by itself, trigger a suitability obligation under NASD Rule 2310; however, the more a general class is narrowed (_e.g._, by providing a list of issuers that fit within the class), the more likely such a communication would be considered a "recommendation." _Id._ at 6 n.15. Firms should use a similar approach to analyzing whether particular recommendations are eligible for the Rule 2111.03 safe-harbor provision.

43. If the recommended investment strategy does not have a security component, the suitability rule would not apply. The suitability rule applies only when the recommended investment strategy involves a security or securities (although, as discussed above in the answer to question 7, a broker's recommendation of a strategy need not mention a particular security or result in a transaction for the rule to apply). While the suitability rule applies only to recommendations involving a security or securities, other FINRA rules potentially apply, depending on the facts of the particular case,

to broker-dealers' and associated persons' conduct that does not involve securities. _See, e.g.,_ FINRA Rules 2010 (Standards of Commercial Honor and Principles of Trade); 2210 (_see supra_ note 23) (Communications with the Public); 3270 (Outside Business Activities of Registered Persons); _see also Ialeggio v. SEC_, No. 98-70854, 1999 U.S. App. LEXIS 10362, *4-5 (9th Cir. May 20, 1999) (holding that FINRA's requirement that brokers act in a manner consistent with just and equitable principles of trade applies to all unethical business conduct, regardless of whether the conduct involves securities); _Vail v. SEC_, 101 F.3d 37, 39 (5th Cir. 1996) (same); _Robert L. Wallace_, 53 S.E.C. 989, 995, 1998 SEC LEXIS 2437, at *13 (1998) (emphasizing, in an action involving viatical settlements, that Rule 2210 is "not limited to advertisements for securities, but provide[s] standards applicable to all [broker-dealer] communications with the public").

44. FINRA made similar points regarding recommended investment strategies on several occasions under the predecessor suitability rule. FINRA explained in one instance under the predecessor rule that "recommending liquefying home equity to purchase securities may not be suitable for all investors. [Broker-dealers] should consider not only whether the recommended investments are suitable, but also whether the strategy of investing liquefied home equity in securities is suitable." _Notice to Members 04-89_, at 3 (Dec. 2004). _See also Donna M. Vogt_, AWC No. EAF0400730002 (Feb. 21, 2007) (barring broker for, among other things, recommending to ten customers, many of whom were nearing retirement, that they obtain home equity loans and use the proceeds to purchase securities, without considering whether such recommendations were suitable for such customers in light of their financial situation and

needs); *James A. Kenas*, AWC No. C3B040001 (Jan. 23, 2004) (suspending broker for six months for violating the suitability rule by recommending that his customers use liquefied home equity to purchase mutual fund shares); *Steve C. Morgan*, AWC No. C3A040016 (Mar. 9, 2004) (suspending broker for six months and ordering him to pay restitution of more than $15,000 for recommending that a retired couple use liquefied home equity to purchase a variable annuity).

45. In 2008, FINRA barred a broker, in part, for recommending that some of his customers sell securities to purchase equity indexed annuities (EIAs) that were unsuitable for them. The settlement in *William R. Barto*, Settlement No. 20060043524 (Oct. 27, 2008), states that "Barto recommended to four [of his firm's] customers (two married couples) that they sell or exchange various securities and invest the proceeds in [certain] EIAs, life insurance products sold by Barto as part of an outside business activity approved by [his firm]." *Id.* at 5. The settlement further notes that, "[a]t the time Barto made these recommendations, his customers were at or near retirement and needed immediate access to a large percentage of their funds. The EIAs [at issue], however, [were] long-term, illiquid investments with high surrender penalties that did not match the customers' investment objectives. Based on the financial situations and needs of his customers, Barto did not have reasonable grounds to believe that his recommendations to sell or exchange securities to purchase [the] EIAs were suitable." *Id. See also Notice to Members 05-50*, at 5 (Aug. 2005) ("[R]ecommendations to liquidate or surrender a registered security such as a mutual fund, variable annuity, or variable life contract must be suitable, including where such liquidations or surrender[s] are for the purpose of funding the purchase of an unregistered EIA.").

46. *See* NASD Rule 3010 (Supervision).

47. In *Notice to Members 99-45* (June 1999), FINRA explained that the supervision rule "requires that a [firm's] supervisory system be reasonably designed to achieve compliance with applicable laws and regulations. This standard recognizes that a supervisory system cannot guarantee firm-wide compliance with all laws and regulations. However, this standard does require that the system be a product of sound thinking and within the bounds of common sense, taking into consideration the factors that are unique to a member's business." *Id.* at 295. An associated person, of course, is responsible for having a reasonable basis for believing that *each* recommendation he or she makes of a security or securities or investment strategy involving a security or securities is suitable.

48. *See supra* note 3.

49. Firms should keep in mind, however, that SEA Rule 17a-3 requires that, for each account with a natural person as a customer or owner, a broker-dealer must create a record that includes, among other things, the customer's or owner's name, date of birth, employment status, annual income, and net worth, as well as the account's investment objectives. *See* SEA Rule 17a-3(a)(17)(i)(A). SEA Rule 17a-3 also states that the broker-dealer must furnish such customer or owner a copy of the required account record information or alternative document with all information required by SEA Rule 17a-3(a)(17)(i)(A), including an explanation of any terms regarding investment objectives, for verification within 30 days of account opening and at least once every 36 months thereafter. *See* SEA Rule 17a-3(a)(17)(i)(B)(1). "For purposes of this paragraph (a)(17), the neglect, refusal, or inability of a customer or owner to provide or update any account record

information required under paragraph (a)(17)(i)(A) of [the Rule] shall excuse the member, broker or dealer from obtaining that required information." SEA Rule 17a-3(a)(17)(i)(C). The account record requirements in paragraph (a)(17)(i)(A) of the Rule apply only to accounts for which the broker or dealer is, or within the past 36 months has been, required to make a suitability determination. *See* SEA Rule 17a-3(a)(17)(i)(D).

50. *See, e.g., Regulatory Notice 12-03* (Jan. 2012) (providing guidance to broker-dealers on supervision and suitability obligations for various complex products); *Regulatory Notice 11-15* (Apr. 2011) (providing guidance on low-priced equity securities in customer margin and firm proprietary accounts); *Regulatory Notice 10-51* (Oct. 2010) (reminding broker-dealers of their sales practice obligations for commodity futures-linked securities); *Regulatory Notice 10-22* (Apr. 2010) (discussing broker-dealer obligations when participating in private offerings); *Regulatory Notice 10-09* (Feb. 2010) (reminding broker-dealers of sales practice obligations with reverse exchangeable securities or reverse convertibles); *Regulatory Notice 09-73* (Dec. 2009) (reminding broker-dealers of their sales practice obligations relating to principal-protected notes); *Regulatory Notice 09-31* (June 2009) (reminding broker-dealers of sales practice obligations relating to leveraged and inverse exchange-traded funds); *Regulatory Notice 08-81* (Dec. 2008) (reminding broker-dealers of their obligations regarding the sale of securities in a high yield environment); *Notice to Members 05-59* (Sept. 2005) (providing guidance to broker-dealers on the sale of structured products); *Notice to Members 05-18* (Mar. 2005) (issuing guidance on section 1031 tax-deferred exchanges of real property for certain tenants-in-common interests in real property offerings); *Notice to Members*

*03-71* (Nov. 2003) (reminding broker-dealers of obligations when selling non-conventional investments); *Notice to Members 03-07* (Feb. 2003) (reminding broker-dealers of their obligations when selling hedge funds); *Notice to Members 96-32* (May 1996) (providing best practices when dealing in speculative securities); *Notice to Members 93-73* (Oct. 1993) (reminding members of their obligations when selling collateralized mortgage obligations).

51. *See, e.g., Cody,* 2011 SEC LEXIS 1862, at *36-40 (discussing non-investment grade securities); *Wells Fargo Invs., LLC,* AWC No. 2008015651901 (Dec. 15, 2011) (stating that "[r]everse convertibles are complex structured products that combine a debt instrument and put option into one product," the repayment of principal is linked to the performance of an underlying asset, such as a stock, a basket of stocks or an index, which is generally unrelated to the issuer of the note, and at maturity, if the value of the underlying asset has fallen below a certain level, the investor may receive less than a full return of principal); *Chase Invs. Servs. Corp.,* AWC No. 2008015078603 (Nov. 15, 2011) (discussing the potential risk of floating rate loan funds, if substantially invested in secured senior loans that are extended to entities whose credit quality is generally unrated or rated non-investment grade, and the risks of a unit investment trust, if substantially invested in speculative instruments such as non-investment grade "junk" bonds); *Ferris, Baker Watts Inc.,* AWC No. 20070091803 (Oct. 20, 2010) (discussing reverse convertibles exposing investors to risks in addition to those risks associated with investment in bonds and bond funds, and having complex pay-out structures involving multiple variables); *Jeffrey C. Young,* Exchange Act Rel. No. 61247, 2009 SEC LEXIS 4332, at *3-6 (Dec. 29, 2009)

(discussing the risks of recommendations to certain municipalities to engage in a trading strategy involving buying and selling the same long-term, zero-coupon United States Treasury Bonds (also known as Separate Trading of Registered Interest and Principal of Securities or "STRIPS") within the same day or days using repurchase agreements (repos) to finance such purchases, which "significantly increased the risks...as repos effectively allowed the accounts to borrow large amounts of money in order to hold larger positions of STRIPS"); *Siegel*, 2008 SEC LEXIS 2459, at \*30-32 (holding that recommendations of a private placement were unsuitable where the offering documents contained "conflicting [and] confusing information" and there "was no other information on which a prospective investor could rely to make an investment decision"); *Ronald Pellegrino*, Exchange Act Rel. No. 59125, 2008 SEC LEXIS 2843, at \*7-10 (Dec. 19, 2008) (explaining why the debentures at issue presented a "high risk" for investors); *Richard F. Kresge*, Exchange Act Rel. No. 55988, 2007 SEC LEXIS 1407, at \*21-23 (June 29, 2007) (describing the speculative nature of three low-priced securities at issue); *Faber*, 2004 SEC LEXIS 277, at \*25 (discussing speculative nature of the security of a company that "had no revenues and had never showed any profits"); *Jack H. Stein*, 56 S.E.C. 108, 117, 2003 SEC LEXIS 338, at \*15 (2003) (focusing, in part, on risks of using margin); *James B. Chase*, 56 S.E.C. 149, 153 & 156-157, 2003 SEC LEXIS 566, at \*7-8 & \*13 (2003) (discussing speculative nature of the security of "a start-up company whose business consisted of manufacturing and selling a single product" that was "new and had no established or tested market" and emphasizing the risks associated with overly concentrated securities positions); *Larry I. Klein*, 52 S.E.C. 1030, 1032-1034, 1996 SEC LEXIS 2922, at \*5-10 (1996) (explaining risks associated with certain foreign currency debt securities); *Clinton H. Holland, Jr.*, 52 S.E.C. 562, 565, 1995 LEXIS 3452, at \*9 (1995) (remarking that securities of companies "with a limited history of operations and no profitability" are speculative); *David J. Dambro*, 51 S.E.C. 513, 515, 1993 SEC LEXIS 1521, at \*5 (1993) (discussing risky nature of investing in a company that had a history of operating losses and concentrated its assets in illiquid holdings in other unproven start-up companies in the same industry); *Gordon S. Venters*, 51 S.E.C. 292, 293-94, 1993 SEC LEXIS 3645, at \*3-5 (1993) (discussing risky nature of investing in a company when that company "was losing money, had never paid a dividend, and its prospects were totally speculative"); *Patrick G. Keel*, 51 S.E.C. 282, 284, 1993 SEC LEXIS 41, at \*5 (1993) ("[O]ptions transactions involve a high degree of financial risk. Only investors who understand those risks, and who are able to sustain the costs and financial losses that may be associated with options trading should participate in the listed options markets."); *F.J. Kaufman and Co.*, 50 S.E.C. 164, 165 n.1, 1989 SEC LEXIS 2376, at \*2 n.1 (1989) ("The effect of trading on margin is to leverage any position so that the systematic and unsystematic risks are both greater per dollar of investment.").

52.   *Regulatory Notice 11-25*, at 7.

53.   Firms are reminded, however, that copies of all communications relating to their business as such and memoranda of brokerage orders are required to be preserved for three years. *See* SEA Rules 17a-3(a)(6) and 17a-4(b)(1) and (b)(4).

54.   For an expanded discussion of this issue, *see Regulatory Notice 11-25*, at 3-4. *See also supra* note 3.

55. *See DBCC v. Hurni*, No. C07960035, 1997 NASD Discip. LEXIS 15, at *9 (NBCC Mar. 7, 1997) ("A broker has a duty to make recommendations based upon the information he has about his customer, rather than based on speculation."); *see also Stein*, 56 S.E.C. at 114, 2003 SEC LEXIS 338, at *11 (explaining that, when a customer refuses to supply information, a broker must "make recommendations only on the basis of the concrete information that the customer did supply and not on the basis of guesswork"); *Dambro*, 51 S.E.C. at 516-17, 1993 SEC LEXIS 1521, at *9-10 (same).

56. *See Regulatory Notice 11-25*, at 3-4.

57. *See Regulatory Notice 11-25*, at 4.

58. FINRA also previously stated that a customer with multiple accounts at a single firm could have different investment profiles or investment-profile factors (*e.g.*, objectives, time horizons, risk tolerance) for those different accounts. FINRA cautioned, however, that a firm should evidence a customer's intent to use different investment profiles or factors for the different accounts. In addition, FINRA explained that, where a firm allows a customer to use different investment profiles or factors for different accounts rather than using a single customer profile for all of the customer's accounts, a firm could not borrow profile factors from the different accounts to justify a recommendation that would not be appropriate for the account for which the recommendation was made. *See Regulatory Notice 11-25*, at 5.

59. *See supra* note 55 and cases cited therein.

60. Firms should note, however, that SEA Rule 17a-3 requires that, for *each* account with a natural person as a customer or owner, a broker-dealer generally must create a record that includes,

among other things, the account's investment objectives. *See SEA Rules 17a-3(a)(17)(i)*. *See also supra* notes 12 and 49.

61. FINRA Rule 2111.05(a). The new rule explains that, "[i]n general, what constitutes reasonable diligence will vary depending on, among other things, the complexity of and risks associated with the security or investment strategy and the [broker-dealer's] familiarity with the security or investment strategy. A [broker-dealer's] reasonable diligence must provide [it] with an understanding of the potential risks and rewards associated with the recommended security or strategy." *Id*.

62. That is true under case law addressing the predecessor suitability rule as well. *See Cody*, 2011 SEC LEXIS 1862, at *30-32 (stating that a broker can violate reasonable-basis suitability by failing to perform a reasonable investigation of the recommended product and to understand its risks even though the recommendation is otherwise suitable); *Siegel*, 2008 SEC LEXIS 2459, at *28-30 (finding violation for failing to perform reasonable diligence to understand the security). *See also Notice to Members 04-30*, at 341 (Apr. 2004) (discussing broker-dealers' reasonable-basis obligations regarding bonds and bond funds); *Notice to Members 03-71*, at 767 (Nov. 11, 2003) ("[T]he reasonable-basis suitability analysis can only be undertaken when a [broker-dealer] understands the investment products it sells. Accordingly, a [firm] must perform appropriate due diligence to ensure that it understands the nature of the product, as well as the potential risks and rewards associated with the product.").

63. FINRA previously responded to a question asking whether, for purposes of compliance with the reasonable-basis obligation, it is sufficient that a firm's "product committee," which conducts

due diligence on products, has approved a product for sale. FINRA explained that, although due diligence reviews by such committees can be extremely beneficial (*see, e.g.,* Notice to Members 05-26 (Apr. 2005)), a firm's approval of a product for sale does not necessarily mean that an associated person has complied with the reasonable-basis obligation. "That is, even if a firm's product committee has approved a product for sale, an individual broker's lack of understanding of a recommended product or strategy could violate the obligation, notwithstanding that the recommendation is suitable for some investors." Regulatory Notice 11-25, at 8.

FINRA stated that "[a] firm should educate its associated persons on the potential risks and rewards of the products that the firm permits them to recommend. In general, an associated person may rely on a firm's fair and balanced explanation of the potential risks and rewards of a product." *Id.* FINRA cautioned, however, that, "if the associated person remains uncertain about the potential risks and rewards of a product, or has reason to believe that the firm failed to address a particular issue or has done so in an incomplete or inaccurate manner, then the associated person would need to engage in further inquiry before recommending the product." *Id.*

64. A broker-dealer would have *actual* control, for instance, if it has discretionary authority over the account. *See Peter C. Bucchieri*, 52 S.E.C. 800, 805 n.11, 1996 SEC LEXIS 1331, at *12 n.11 (1996). A broker-dealer would have *de facto* control over an account if the customer routinely follows the broker-dealer's advice "because the customer is unable to evaluate the broker's recommendations and [to] exercise independent judgment." *Harry Gliksman*, 54 S.E.C. 471, 475, 1999 SEC LEXIS 2685, at *7 (1999).

65. FINRA Rule 2111.05(c).

66. Turnover rate is calculated by "dividing the aggregate amount of purchases in an account by the average monthly investment. The average monthly investment is the cumulative total of the net investment in the account at the end of each month, exclusive of loans, divided by the number of months under consideration." *Pinchas*, 54 S.E.C. at 339-40 n.14, 1999 SEC LEXIS 1754, at *17 n.14. Turnover rates between three and six may trigger liability for excessive trading. *See Cody*, 2011 SEC LEXIS 1862, at *48 (finding turnover rate of three provided support for excessive trading); *Dep't of Enforcement v. Stein*, No. C07000003, 2001 NASD Discip. LEXIS 38, at *17 (NAC Dec. 3, 2001) ("Turnover rates between three and five have triggered liability for excessive trading"). A turnover rate greater than six creates a presumption that the trading was excessive. *See Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 490 (6th Cir. 1990); *Arceneaux v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 767 F.2d 1498, 1502 (11th Cir. 1985).

67. The cost-to-equity ratio represents "the percentage of return on the customer's average net equity needed to pay broker-dealer commissions and other expenses." *Pinchas*, 54 S.E.C. at 340, 1999 SEC LEXIS 1754, at *18. Cost-to-equity ratios as low as 8.7 have been considered indicative of excessive trading, and ratios above 12 generally are viewed as very strong evidence of excessive trading. *See Cody*, 2011 SEC LEXIS 1862, at *49 & *55 (finding cost-to-equity ratio of 8.7 percent excessive); *Thomas F. Bandyk*, Exchange Act Rel. No. 35415, 1995 SEC LEXIS 481, at *2-3 (Feb. 24, 1995) ("His excessive trading yielded an annualized commission to equity ratio ranging between 12.1% and 18.0%.").

68. In-and-out trading refers to the "sale of all or part of a customer's portfolio, with the money reinvested in other securities, followed by the sale of the newly acquired securities." *Costello v. Oppenheimer & Co.*, 711 F.2d 1361, 1369 n.9 (7th Cir. 1983). A broker's use of in-and-out trading ordinarily is a strong indicator of excessive trading. *Id.*

69. *See* FINRA Rule 2111(b).

70. *See* FINRA Rule 4512(c).

71. *Compare* FINRA Rules 2111(b) and 4512(c) *with* NASD IM-2310-3.

72. FINRA Rule 2111(b).

73. FINRA Rule 2111(b). The institutional-customer exemption does not apply to reasonable-basis and quantitative suitability. *See id.; Regulatory Notice 11-02*, at 4-5. Quantitative suitability likely will apply in more limited circumstances with regard to institutional customers than it does as to retail customers. The factors that must exist for an institutional customer to qualify for the exemption may, depending on the facts, negate some of the elements relevant to a showing of a broker's "control" over the account. That will not always be the case, however. *See Pryor, McClendon, Counts & Co.*, Exchange Act Rel. No. 45402, 2002 SEC LEXIS 284, at *20-21 & n.10 (Feb. 6, 2002) (holding that the defendant broker "controlled" the account because he essentially was a co-conspirator with the institutional customer's investment officer, who was authorized to place orders for the institutional customer's account).

74. *See Regulatory Notice 11-02*, at 8 n.24.

75. FINRA Response to Comments, Oct. 21, 2010, at 10.