# EXHIBIT G

Page 1

1               UNITED STATES DISTRICT COURT

                 MIDDLE DISTRICT OF FLORIDA

2                      TAMPA DIVISION

3            CASE NO.:  8:20-cv-195-CEH-AAS

4

5

6    KIMBERLY NGUYEN, On Behalf of

     Herself and All Others

7    Similarly Situated,

8              Plaintiff,

     v.

9

     RAYMOND JAMES & ASSOCIATES,

10   INC.,

11             Defendant.

     _____/

12

13                        Tuesday, July 13, 2021

                          8:59 a.m. PST - 1:39 PST p.m.

14

15

16

17      DEPOSITION TAKEN BY REMOTE VIDEOCONFERENCE

18                   OF ARTHUR OLSEN

19

20

21      Taken on behalf of the Defendant before Yvonne

22   Corrigan, RPR, CRR, Notary Public in and for the State

23   of Florida at Large, pursuant to Notice of Deposition in

24   the above cause.

25

Page 2

```
1  APPEARANCES:
2
3  ATTORNEY FOR PLAINTIFF
4     ZACHARY P. BEATTY, ESQUIRE
         Chimicles Schwartz Kriner & Donaldson-Smith, LLP
5      361 W. Lancaster Avenue
         Haverford, Pennsylvania 19041
6      zpb@chimicles.com
         (610) 642-8500
7
8
9  ATTORNEYS FOR DEFENDANT
10    JOHN E. CLABBY, ESQUIRE
         Carlton Fields, P.A.
11     4221 W. Boy Scout Boulevard
         Suite 1000
12     Tampa, Florida 33601
         jclabby@carltonfields.com
13     (813) 223-7000
14  and
15    BERNARD R. SUTER, ESQUIRE
         Keesal, Young & Logan
16     450 Pacific Avenue
         San Francisco, California 94133
17     ben.suter@kyl.com
         (415) 398-6000
18
19
20  Also Present:  Danyale Willson, Paralegal - Carlton
                    Fields
21
22
23         *** ALL ATTENDEES APPEARED REMOTELY ***
24
25             * * * * *
```

Page 3

```
1              INDEX
2  WITNESS                     PAGE
3  ARTHUR OLSEN
4     Direct Examination By Mr. Clabby ..................5
         Cross-Examination By Mr. Beatty ................187
5
6            EXHIBITS
7  NUMBER      DESCRIPTION              PAGE
8  Exhibit 122 Arthur Olsen's report dated ..............21
                6/4/21
9
     Exhibit 123 Doug Schultz's report dated ..............21
10                6/4/21
11  Exhibit 124 Peter Klouda's report dated ..............21
                6/4/21
12
     Exhibit 125 Joe Thomas report dated 6/4/21 ...........21
13
     Exhibit 126 Doug Schultz rebuttal report ............21
14                dated 6/25/21
15  Exhibit 127 Peter Klouda's rebuttal report ...........21
                dated 6/25/21
16
     Exhibit 128 Joe Thomas rebuttal report dated ........21
17                6/25/21
18  Exhibit 129 Notice of Deposition of Arthur ...........9
                Olsen
19
     Exhibit 130 Unedited and Uncertified rough ...........90
20                deposition transcript of Steven
                   Schwartz dated 5/26/21
21
     Exhibit 131 Letter dated 7/12/21 to Bernard .........93
22                Suter from Zachary Beatty
23
24
25            * * * * *
```

Page 4

```
1           P R O C E E D I N G S
2               * * * * *
3        THE COURT REPORTER:  The attorneys
4   participating in this deposition acknowledge
5   that I, the court reporter, am not present
6   with the witness and that I will be reporting
7   the proceedings and administering the oath
8   remotely.  This arrangement is pursuant to the
9   Florida Supreme Court Administrative Order No.
10  AOSC-20-16 (and extended by AOSC-20-17).  The
11  parties and their counsel consent to this
12  arrangement and waive any objections to this
13  manner of reporting. Please indicate your
14  agreement by stating your name and your
15  agreement on the record.
16       MR. BEATTY:  Zachary Beatty for
17  plaintiffs.  We agree.
18       MR. CLABBY:  Jack Clabby for
19  Raymond James & Associates, Inc., and we
20  agree.
21  Whereupon,
22            ARTHUR OLSEN,
23  was called as a witness and having been first duly sworn
24  and responding, "Yes," was examined and testified as
25  follows:
```

Page 5

```
1        MR. CLABBY:  Thanks.  We'll just do
2   appearances from Raymond James & Associates,
3   Inc.'s side.
4       I'm Jack Clabby from Carlton Fields.
5   With me, but off camera, is Danyale Wilson,
6   who is a paralegal with my office.
7        We also have our co-counsel from
8   Keesal Young & Logan attending, Ben Suter and
9   Bryce Cullinane.
10       In-house counsel for Raymond James &
11  Associates, Inc., Gianluca Morello, may join a
12  little later today.
13       MR. BEATTY:  And for plaintiff, this is
14  Zach Beatty of the Chimicles Schwartz Kriner &
15  Donaldson-Smith firm, on behalf of plaintiff
16  and the putative class.
17       MR. CLABBY:  Thank you.
18       -- DIRECT EXAMINATION --
19  BY MR. CLABBY:
20       Q.  Mr. Olsen, can you just state your full
21  name for the record.
22       A.  Arthur Olsen, O-L-S-E-N.
23       Q.  Thank you.
24           We're just going to first go over a few
25  rules.
```

2 (Pages 2 - 5)

Page 6

1       Please answer all the questions that I
2 ask verbally, not with physical movements like a nod or
3 a shrug, so that the court reporter can record your
4 answer. Do you understand?
5       A.  Yes.
6       Q.  All right. And then please wait until I
7 have completed my questions before responding. If you
8 need to have a question repeated, let me know and the
9 court reporter can read it back to you.
10       Please let me know if you do not
11 understand a question that I ask or if you need me to
12 rephrase it. Does that make sense?
13       A.  Yes.
14       Q.  All right. And let me know at any time
15 if you need a break. We just can't take a break while a
16 question is pending, but we can take a break pretty much
17 any other time.
18       Any questions about those rules,
19 Mr. Olsen?
20       A.  No.
21       Q.  All right. Do you understand that the
22 oath -- do you understand the oath you've just taken?
23       A.  Yes.
24       Q.  And do you have any other devices -- I
25 know you're interfacing with us over a computer, but do

Page 7

1 you have any other devices like a cell phone or an
2 iPad sort of out on the desk in front of you?
3       A.  There's a cell phone. It's on mute and
4 it's not on. I have another screen that I have the --
5 to my right that has the Exhibit Share on it.
6       Q.  Mr. Olsen, is anyone else in the room
7 with you?
8       A.  No.
9       Q.  Mr. Olsen, you've been deposed before on
10 several occasions, right?
11       A.  Yes.
12       Q.  And have you ever done a deposition like
13 this via video conference?
14       A.  Yes.
15       Q.  All right. So then you know that there
16 might be times when our connection breaks or cuts out or
17 one or more of us drop. If that happens, I just ask
18 that you work with us and we'll try and get things up
19 and running again. Does that sound okay?
20       A.  Yes.
21       Q.  Are you on any medications or drugs that
22 might make it difficult for you to understand my
23 questions and answer those questions completely and
24 truthfully?
25       A.  No.

Page 8

1       Q.  Did you receive a FedEx package from my
2 office, it would have been yesterday, July 12th?
3       A.  Yes.
4       Q.  All right. And have you opened that
5 package yet?
6       A.  I opened it this morning and set it right
7 there in case you want me to open it at some point.
8       Q.  Thank you.
9       Do you have available to you a paper copy
10 of your expert report submitted in this matter?
11       A.  I do, and they're over here. And I have
12 seven things that I was asked to print ahead of time,
13 and one of those is my report.
14       Q.  Thank you.
15       A.  I think I'm organized, but we'll see.
16       Q.  We're going to try it out.
17       So that binder that we sent you, if you
18 can just put that in front of you. We're going to look
19 at the very first tab in that binder.
20       A.  Okay.
21       Q.  That's going to be the first exhibit
22 we're going to be showing you today. We're also going
23 to make it available over the Exhibit Share so that it's
24 part of the record in this case.
25       We're going to call that tab 1 because

Page 9

1 it's in front of you, but it's going to be marked as
2 Exhibit 129.
3       (Deposition Exhibit Number 129 marked for
4       identification.)
5 BY MR. CLABBY:
6       Q.  Just let me know when you have that in
7 front of you.
8       A.  It is.
9       Q.  All right. And have you seen this
10 before?
11       A.  I have an electronic copy of it, yes.
12       Q.  Okay. And what is this?
13       A.  It's the document that asked me to be
14 here today, I guess.
15       Q.  Are you testifying today pursuant to this
16 notice?
17       A.  Yes.
18       Q.  All right. And the notice says
19 10:00 a.m. Eastern, but we've agreed with counsel for
20 the plaintiff for you to appear at noon Eastern; is that
21 correct?
22       A.  Yes.
23       Q.  Okay. You can just put that aside then.
24       I want to just ask you some questions
25 first about your retention in this matter.

3 (Pages 6 - 9)

Page 10

1      How did you first learn about this
2 matter?
3      A.  I was contacted by one of the attorneys
4 at Chimicles and asked if I wanted -- or if I had the
5 availability to work on this case.
6      Q.  Who was the attorney who contacted you?
7      A.  Steven -- I forget his last name now.
8 So -- Schwartz, Steven Schwartz.
9      Q.  Just I saw you were looking to the other
10 screen there, Mr. Olsen.  Did you look at something to
11 refresh your recollection as to the name of
12 Mr. Schwartz?
13      A.  Yeah, so it's on the notice.  It's on all
14 these documents.  It's just -- on the front page, it's
15 probably on the notice here today.  Yeah, so it's on
16 Exhibit 129, or whatever, one of the attorneys on the
17 second page.
18      Q.  When did Mr. Schwartz contact you first
19 about potentially working on this matter?
20      A.  I'm not sure.  It would have been earlier
21 this year.  Maybe February, March, somewhere in there
22 would be my best recollection.  We can find that out for
23 sure, but somewhere right around then.
24      Q.  And how did he contact you?
25      A.  Probably an email to start with.

Page 11

1      Q.  What information, if any, did he provide
2 you at that time about the matter?
3      A.  I had worked on other cases with some
4 different attorneys at his firm, and he just asked if I
5 would be -- I don't think there was any information at
6 the beginning.  Just we had a case and would I do some
7 data calculations, or would I be able to do some data
8 calculations.
9      Q.  And did he provide you with any documents
10 as part of that initial contact?
11      A.  I mean, the initial contact was, hey, do
12 you have availability, and then we talked about signing
13 a retention agreement and that kind of thing, so, no.
14      Q.  Did he provide you any documents before
15 you signed a retention agreement?
16      A.  No, I don't believe so.
17      Q.  Did you run conflicts before you agreed
18 to be retained for this matter?
19      A.  I mean, he would have told me who the
20 defendants were, so I don't believe that there's any
21 conflicts.  I mean, really, I haven't worked on a case
22 against them, I haven't worked for them, and I've never
23 honestly kind of even heard of them, so I don't think
24 there could possibly be any conflict.
25      Q.  When you say "them," do you mean the

Page 12

1 defendant, Raymond James & Associates, Inc.?
2      A.  Yes.  Sorry.
3      Q.  Okay.  About how many times did you email
4 with Mr. Schwartz or his colleagues before you were
5 formally retained in this matter?
6      A.  I don't know, a couple of times.  There
7 may have been a brief phone call to say, you know,
8 here's the gist of the case, and is it something you're
9 interested in, that type of thing, something you can
10 help us with.
11      And, you know, part of it is I had never
12 worked directly with Steven before, so part of it is,
13 here's what I normally do, and here's what I'm able to
14 do and able to testify about and that type of thing.
15 So, you know, to see if my skill set fit with what their
16 needs were.  I think there was an initial call there.  I
17 think it was generalities rather than specifics about
18 the case.  But, I mean, there probably was a couple of
19 emails back and forth.
20      Q.  All right.  And you eventually did
21 execute a retainer agreement in this case?
22      A.  Yes.
23      Q.  All right.  And who drafted that
24 agreement?
25      A.  I believe they signed one -- I'm not sure

Page 13

1 exactly where that one originated from.  It's a basic
2 one that kind of says, I agree to work for you and you
3 agree to pay me.  It's really super basic.  It's one
4 sheet.  Usually if somebody asks for a blank one, I try
5 that.  About half the time people are fine with it.
6 Sometimes they want to lawyer it up some.
7      But I mean in this case, it's just the
8 basic vanilla one.  And I'm not sure where that exact
9 language of that came from originally, but it was
10 probably ten or 12 years ago.
11      Q.  When was the last time -- let me ask it a
12 different way.
13      Did you sign a retainer agreement with
14 them, Mr. Olsen?
15      A.  Yes.
16      Q.  You just testified, I think, it sounds
17 like that was on a form you provided; is that right?
18      A.  Yes, I believe so, yes.
19      Q.  I'm sorry, go ahead.
20      A.  I believe so, yes.
21      Q.  Okay.  Other than that engagement letter,
22 have you signed any other agreements that were provided
23 to you by plaintiff's counsel?
24      A.  I believe there was a protective order
25 that I signed.

4 (Pages 10 - 13)

Page 14

1    Q.  All right.  And what -- after you were
2 engaged, you know, what did you understand -- did you
3 have an initial assignment in the matter?  What did you
4 understand your initial assignment to be?
5    A.  I think my role is kind of the same in
6 all the cases that I work on.  I'm here to talk to them
7 about, you know, issues that they might have with
8 gathering data; some questions about, you know, database
9 systems and how they work; and some general knowledge
10 about that type of -- that area.  And then the meat of
11 it is, is once data is made available, I'm here to do
12 specific calculations on that data.
13         And a lot of times, you know, the
14 calculations might be basic, but it might be that the
15 amount of data is just simply too large for the
16 attorneys to handle themselves or, you know, that type
17 of thing.  Or sometimes the calculations are complex.
18         But in this case, my assignment was,
19 look, we have another expert, or there's another expert
20 in this case, and they're going to ask that I perform
21 specific calculations, and they're going to provide the
22 assumptions, and I'm going to perform calculations on
23 the data, bearing in mind in this case that those same
24 calculations may need to be performed in the future on a
25 much larger dataset.

Page 15

1    Q.  Is the nature of that assignment set out
2 in the engagement letter that you signed?
3    A.  No.  Like I said, it's super basic.  It
4 just says, here's the hourly rate, and, you know, I
5 promise to keep things secret.  I mean, it's really
6 basic.
7    Q.  And who -- Mr. Olsen, who hired you?
8    A.  Chimicles, so Steven Schwartz.
9    Q.  Have you ever signed an agreement with --
10 well, you mentioned, Mr. Olsen, another expert.  Who is
11 that other expert?
12    A.  I'm looking -- I think it's -- well,
13 Douglas --
14    Q.  If you don't remember --
15    A.  His name is Doug.  I know he's Doug, and
16 I'm sure we'll get to his report at some point.
17    Q.  Okay.  But as you sit here now, you don't
18 remember his last name?
19    A.  No.
20    Q.  Okay.  All right.  Who directed your work
21 on this case?
22    A.  I believe that the -- it's a combination.
23 So, you know, I may have had some conversations with
24 Steven Schwartz and Zach, who's the attorney here with
25 me today, about some questions that they had, or some

Page 16

1 direction from them.
2         And I also had conversations where Doug
3 was on the phone, and I think that ultimately the
4 calculations originated from Doug, so he requested that
5 specific calculations be done.  And then I would have
6 some questions, perhaps, about, you know, how do you
7 want to handle this case, or that case, or this bit of
8 data or that bit of data, and then those instructions
9 would have come from him.  They may have come through
10 the attorneys at some point, but they originated from
11 him.
12    Q.  How much time have you spent on this
13 engagement for the Chimicles firm since the time you
14 were retained until today?
15    A.  Yeah, I meant to look at that, because I
16 figured you would ask, but I think it's probably about
17 40 or 50 hours.
18    Q.  Is that -- and how much time of the 40 or
19 50 hours did you spend on drafting your report?
20    A.  Some.  I think the problem with answering
21 that question is is, that you know, a lot of the
22 calculations go into the report, so it's kind of hard to
23 differentiate between that.  So if you count it that
24 way, then most of it.
25         But, you know, also the report is -- a

Page 17

1 lot of it I kind of plagiarized myself so I've written
2 it before and I can reuse some of the verbiage.  My
3 background and those things don't change.
4    Q.  Let's put it this way, how much time from
5 when you were retained until the time that you delivered
6 your final report?
7    A.  Yeah, I think all of it was really all
8 the time could have arguably attributed to getting to
9 the point where the report is the end product.  So I
10 think the calculations were part of that, dealing with
11 the data as it came in were part of that, questions
12 about the data.  There may have been some time where,
13 you know, they asked some opinions about just databases
14 in general and how they work, right, to kind of inform
15 some of the questions that they'd ask.
16    Q.  How many times do you think you spoke
17 with Mr. Schultz by phone?
18    A.  Oh, I don't know, maybe six or eight.
19    Q.  And was counsel on the phone for all of
20 those calls?
21    A.  Yes.  Well, actually, I had one or two
22 calls with Doug directly without counsel.  So I change
23 my answer.  I'd say no, technically.
24    Q.  Mr. Olsen, is Doug's last name Schultz?
25    A.  Yeah, that sounds right.  Maybe that's

Page 18

1 part of the confusion. When you see them written,
2 they're almost the same.
3    Q.  And about how many phone calls or video
4 conferences -- well, let's just do phone calls. How
5 many phone calls did you have with counsel at Chimicles
6 between your retention and the time you turned your
7 report in without Mr. Schultz present?
8    A.  I don't know. I mean, probably six or
9 eight, like I said.
10    Q.  Other than with counsel or Mr. Schultz,
11 did you communicate with anyone else about this matter?
12    A.  No. I don't know anyone that would be
13 interested in listening, so...
14    Q.  Did you communicate with anyone at your
15 consulting firm?
16    A.  No.
17    Q.  Have you reviewed the report of
18 Doug Schultz, the final report dated June 4, 2021?
19    A.  Yeah, I kind of read through it. It was
20 interesting, you know, just -- yes, I mean, I read
21 through it.
22    Q.  All right. When did you read through it?
23    A.  I don't know, probably week and a half
24 ago, a week ago. I don't know. It was relatively
25 recent.

Page 19

1    Q.  Okay. And is that the first time that
2 you read it?
3    A.  Yes.
4    Q.  Have you reviewed the report of
5 Peter Klouda dated June 4, 2021?
6    A.  No.
7    Q.  Have you reviewed the report of
8 Joe Thomas dated June 4, 2021?
9    A.  No.
10    Q.  Have you reviewed the rebuttal report of
11 Doug Schultz dated June 25, 2021?
12    A.  Yeah, I think I read through that. That
13 would have been recently, too. I think I got -- was
14 looking at both of those at the same time, the report
15 and the rebuttal report.
16    Q.  Did you review that report in draft form,
17 the rebuttal report of Doug Schultz, or did you review
18 it in final form?
19    A.  I think it was final form.
20    Q.  Have you reviewed the rebuttal report of
21 Peter Klouda dated June 25, 2021?
22    A.  No.
23    Q.  And have you reviewed the rebuttal report
24 of Joe Thomas dated June 25, 2021?
25    A.  No.

Page 20

1    MR. CLABBY:  All right. I'm going to
2 put -- I don't know if we're going to look at
3 all of them, but we've agreed, Zach, to
4 premark all the expert reports, so we're just
5 going to share them by Exhibit Share now so
6 that they're in the record.
7    And then we'll talk about specific ones,
8 Mr. Olsen, but we're just going to put them in
9 the record now. That, also, is what I think
10 you were asked to print, but I'll lead you to
11 the specific ones. But I'm just going to put
12 them on the record now.
13    The expert report -- let's see here.
14 Arthur Olsen's report dated June 4, 2021, will
15 be Exhibit 122.
16    Doug Schultz's report, June 4, 2021, will
17 be Exhibit 123.
18    Peter Klouda's June 4, 2021, report will
19 be Exhibit 124.
20    Joe Thomas' June 4, 2021, report will be
21 Exhibit 125.
22    Doug Schultz's June 25, 2021, rebuttal
23 report will be Exhibit 126.
24    Peter Klouda's June 25, 2021, rebuttal
25 report will be Exhibit 127.

Page 21

1    Joe Thomas' June 25, 2021, rebuttal
2 report will be Exhibit Number 128.
3    (Deposition Exhibit Numbers 122 through
4 128 marked for identification.)
5 BY MR. CLABBY:
6    Q.  We don't need to look at those now, we're
7 just putting those in the record, Mr. Olsen. We'll come
8 back to some of those in a minute.
9    I just want to ask you a little bit about
10 your preparation for today's deposition.
11    Did you do anything to prepare for
12 today's deposition?
13    A.  I reread my report, and I had a
14 conversation with Zach.
15    Q.  Was the conversation that you had with
16 Zach by phone?
17    A.  Yes.
18    Q.  All right. And other than the
19 conversation you had with Zach and rereading your expert
20 report, did you do anything else to prepare for today's
21 deposition?
22    A.  No. I printed a bunch of documents.
23    Q.  Okay. Have you ever spoken with the
24 plaintiff in this case, Kimberly Nguyen?
25    A.  No, but I don't think I've spoken with

6 (Pages 18 - 21)

Page 22

1 the plaintiff in any of the cases I've ever worked on.
2      Q.  Have you ever emailed with the plaintiff,
3 Kimberly Nguyen?
4      A.  No.
5      Q.  If you can, can you take out the paper
6 copy of your expert report, which we've marked as
7 Exhibit 122.
8      A.  Yes.
9      Q.  If you can, we'll just take a look at
10 this.
11      Is this a true and correct copy of your
12 report submitted on June 24, 2021?
13      A.  Yeah.  It's -- but it's the one I
14 printed.  I mean, I assume we're looking at the same
15 thing, but, yes.
16      Q.  Thank you.
17      All right.  Can you turn to page 11 of
18 the document.
19      At the very bottom, it's dated June 4,
20 2021, and then there's a signature above your name.  Did
21 you sign this document?
22      A.  Yes.
23      Q.  And who applied the electronic signature
24 to the final document?
25      A.  The electronic signature?

Page 23

1      Q.  Yes.
2      A.  I mean, I -- I signed it and sent it to
3 them signed.
4      Q.  Did you sign it and scan it?  How did you
5 affix your signature to this document?
6      A.  Oh.  So I signed something, and then
7 scanned my signature and then pasted it on this
8 document, but, yes, I did that.
9      Q.  And then in what -- in what format did
10 you provide this to plaintiff's counsel?
11      A.  Electronic format, but specifically a
12 PDF.
13      Q.  All right.  So after you were retained in
14 this matter, were you provided with any documents in
15 connection with your work?
16      A.  Yeah, I think there were some
17 interrogatories, there was the complaint, and then there
18 were some specific Excel spreadsheets that were produced
19 that contained data.
20      Q.  And how -- how were those documents
21 provided to you?
22      A.  I'm not sure.  I think some of it was
23 emailed.  Some of it was shared through a secure FTP
24 site.  I'd have to go back and look specifically how
25 this case worked.  But I think I downloaded at least the

Page 24

1 data spreadsheets from an FTP site at Chimicles.
2      (Mr. Gianluca Morello, Esq. joined the
3 deposition remotely.)
4 BY MR. CLABBY:
5      Q.  Mr. Olsen, other than from counsel, did
6 you receive documents in connection with this matter
7 from anyone else?
8      A.  I mean, I received emails from Doug, for
9 example, but no documents, I don't think.  They would
10 have all come from counsel.
11      Q.  When you say "they," you mean the
12 documents would have come from counsel?
13      A.  Yeah.  For example, I saw Doug's report,
14 Doug Schultz's report, and his rebuttal report, those
15 kinds of things.  But all the documents I received, even
16 if they came from Doug or from Raymond James, they would
17 have come through plaintiff's counsel to me.
18      Q.  How many emails did you receive from
19 Mr. Schultz in connection with your work on this matter?
20      A.  I mean, I don't know, maybe four or five
21 substantive ones.  And there might have been a bunch of
22 them where we're just trying to agree on a meeting time
23 for a Zoom call or whatever.  But I don't know, maybe
24 four or five.
25      Q.  So you mentioned Zoom calls with

Page 25

1 Mr. Schultz.  How many Zoom calls did you have with
2 Mr. Schultz in connection with this matter?
3      A.  I mean, I think all my answers before
4 were kind of the same.  I didn't really differentiate
5 between the Zoom call or regular call.  To me, they're
6 all kind of calls.  But, I mean, some of them I think --
7 I don't know, they like the faces, so there wasn't any
8 document sharing or any kind of advantage to having a
9 Zoom call other than we can see each other.
10      Q.  So for the documents that counsel
11 provided to you, in addition to those documents, did you
12 review any you found yourself in connection with work on
13 this matter?
14      A.  No.
15      Q.  Did you list in your report all of the
16 documents that you considered in forming your opinions
17 in this matter?
18      A.  Yeah, and I think I was probably
19 overinclusive.  As we get into this, you'll kind of see,
20 you know, for me to do the calculations, really all I
21 need were the instructions and the assumptions and the
22 data itself.  But the other documents were the things I
23 had received and read through, so I listed them.
24      Q.  All right.  Let's look at paragraph 11 of
25 your expert report, which is marked 122.

7 (Pages 22 - 25)

Page 26

1     A.   Okay.
2         Q.   All right.  So who wrote -- who wrote
3   paragraph 11 of your report?
4         A.   So I did.  So this is a list of
5   everything that I had in my folder.  So one of my
6   answers before was that I hadn't read Doug Schultz's
7   report until recently, and I must have scanned it
8   originally when I got it, but I don't really -- I didn't
9   really remember, I guess, reading through it until
10  recently.  But, anyways, these were all of the documents
11  that I had in my Raymond James folder at the time of
12  writing this report.
13        Q.   Right.  And -- all right.  Let's look at,
14  the first part says, "The materials I considered in
15  formulating my opinions are as follows," and then
16  there's a colon, and the first thing listed is first
17  amended complaint.  Did you review that?
18        A.   Yes.
19        Q.   And why did you review that?
20        A.   A lot of times it's just kind of
21  interesting.  But, you know, it was sent to me, and
22  trying to be a little bit informed as to what the case
23  is generally about.
24        Q.   Then the next document you list is the
25  second amended complaint.  Did you review that?

Page 27

1     A.   Yes.
2         Q.   And why did you review that?
3         A.   Again, it's -- it was sent to me, and so
4   maybe they felt it was important that I read it.  It was
5   interesting.
6         Q.   Do you have an understanding of why the
7   plaintiff filed a second amended complaint?
8         A.   No, I mean, not really.  It happens a
9   lot.  I'm not sure why.  Maybe more information came to
10  light and they had to modify it slightly.  I don't know.
11  I didn't really compare them side by side, I guess.
12        Q.   That was going to be my next question.
13        One of the differences -- from your
14  review of the first amended complaint and second amended
15  complaint, did you note any differences?
16        A.   I mean, I didn't really read it with that
17  intent in mind.  So mostly it was -- I think they were
18  mostly the same, from my perspective, I guess.
19        Q.   About how long did it take you to read
20  the second amended complaint?
21        A.   I don't know.  I wouldn't have read the
22  whole thing, you know, word for word.  Probably skimmed
23  through it and looked for parts that seemed interesting.
24  But I don't know, maybe 20 minutes.
25        Q.   All right.  For purposes of drafting your

Page 28

1   report, did you accept as true the allegations in the
2   second amended complaint?
3         A.   I mean, I didn't -- I would say the
4   answer is yes.  I didn't -- meaning that I don't have
5   any reason to disbelieve or believe or -- I mean, it's
6   not -- I don't really know how to answer that, so --
7   because I'm going to do the calculations.  I guess it's
8   for someone else to decide if the allegations are true
9   or not.  I mean, that's not my role.  I don't really
10  have an opinion in that.
11        I'm not sure how to answer that.  I'm
12  sorry.
13        Q.   Well, you understand that in the second
14  amended complaint, there's a series of allegations,
15  though, correct?
16        A.   Yes.
17        Q.   All right.  The next document you list
18  here is the plaintiff's third set of requests for
19  production, and RJA's responses thereto.  Did you review
20  those documents?
21        A.   Yes.
22        Q.   And why did you review those documents?
23        A.   If I remember correctly, we had some
24  conversations about, you know, the challenges that were
25  being discussed regarding the production of data in this

Page 29

1   case.  And, you know, I might have answered some
2   questions specifically about my background and about
3   databases in general, and data in general and how to
4   extract data and produce data and that type of thing.
5         Q.   Did you review the first set of request
6   for production and Raymond James' responses thereto?
7         A.   Yeah, I believe so, yes.
8         Q.   All right.  And did you list those in
9   paragraph 11 of your report?
10        A.   So I guess that would be a no, then,
11  sorry.  I thought that's what we were talking about
12  before, but there's first and second.
13        But like I said, these are -- if it's not
14  on this list at the time of writing the report, it's
15  kind of impossible for me to have looked at it.
16  Because, like I said, it starts with a list of
17  everything in my folder, so these are all the documents
18  that I had been given.
19        Q.   All right.  And then you have the
20  rough -- I'm reading from paragraph 11.  About halfway
21  down the paragraph, the rough deposition transcript of
22  RJA's corporate representative, Mr. Bill Gross,
23  designated to testify as to RJA's data productions and
24  all exhibits thereto.
25        Do you see that?

Page 30

1    A.   Yes.
2    Q.   All right.  Why did you review those
3  materials?
4    A.   I was -- I think, if I remember
5  correctly, I was pointed at specific passages from that
6  about where they testified the data resided in SQL
7  server, and, you know, that they had access to certain
8  tools in order to -- you know, specific data-related
9  issues and comments that he had made about the code that
10  was used in order to generate the data production.
11        But the short answer to your question is,
12  because I was asked to review certain sections of that.
13    Q.   Were you asked by counsel to review
14  certain sections?
15    A.   Yes.
16    Q.   And then the last sentence in that
17  paragraph before the bullet, it says, "Additionally, as
18  described below, I also considered the following
19  Bates-numbered documents produced in this litigation,"
20  and then there's a list.
21        Do you see that?
22    A.   Yes.
23    Q.   Do you know what a Bates number is?
24    A.   Yeah.  I mean, I wouldn't want to write
25  the definition for the dictionary, but it's a numbering

Page 31

1  system that, in these cases, allows the sides to agree,
2  when they're referencing a document, that they're
3  referencing the exact same document.
4    Q.   All right.  And you list in the first
5  bullet below that the expert report of Douglas Schultz.
6  Is that a Bates-numbered document?
7    A.   That's kind of funny, because I guess the
8  first two items really should have been in the top part,
9  where I'm listing the documents.  But no, the first two
10  didn't have Bates numbers, at least that I listed.  I'm
11  sure they probably do now.
12    Q.   All right.  And then for that first
13  bullet, you list that June 4, 2021, expert report of
14  Douglas Schultz.  You know that's dated the same date as
15  your report, correct?
16    A.   Yes.
17    Q.   And are you referring to the final report
18  in this bullet?
19    A.   I guess it would have to have been either
20  one that was going to be final, or -- but, you know, if
21  I looked in my report, it's so -- they must have sent
22  that to me first before I signed this.  Because, like I
23  said, I generated this list of here's all of the
24  documents that I have, so at the moment of finishing
25  this list of documents.

Page 32

1        So I think, if I remember correctly, you
2  know, I'm looking at a copy of this report, and then --
3  yeah, I mean, at the point where I signed this document
4  I would have had what I believed to be the final copy of
5  Doug Schwartz's [sic] report.
6    Q.   How soon before your -- you turned in and
7  finalized your June 4, 2021 report did you receive the
8  June 4, 2021 expert report of Doug Schultz?
9    A.   I'm not sure.  I do remember, you know,
10  working on this last day, finalizing this last
11  day, and having some consternation.  But I don't know,
12  it might have been -- like I said, there was probably
13  copies along the way, and -- I don't remember exactly
14  how that went down.
15    Q.   Do you list anywhere in paragraph 11 that
16  you reviewed a draft of Mr. Olsen's [sic] report in
17  formulating your opinions?
18    A.   In Mr. Schwartz's report?  But, no.
19    Q.   Yeah, let me step back.  I think we both
20  said the wrong name there.
21        Do you list in paragraph 11 --
22    A.   That's true, Schultz.
23    Q.   Anyway, were you given a draft of
24  Mr. Schultz's expert report dated June 4, 2021?
25    A.   No.

Page 33

1    Q.   Do you believe that you reviewed a draft
2  of Mr. Shultz's expert report?
3    A.   You know, it may have been what
4  eventually got signed as final, but by definition, I
5  guess if it hadn't been signed yet, it's still a draft,
6  so I'd have to say probably.
7    Q.   Did you receive it with enough time to
8  consider it in forming your opinions?
9    A.   Really, honestly, this is where it gets
10  tricky for me, because had I not seen his report at all,
11  it doesn't really change my opinions.
12        And the reason why I say that is because
13  the conversations along the way are, please explain to
14  me what calculations you need performed, and then let's
15  talk about, you know, the data that was -- and the
16  specifics of exactly how those calculations are to be
17  performed.  So whether or not I saw his report, at the
18  end of the day, it doesn't really change my opinions.
19    Q.   Just as a factual matter, do you recall
20  receiving a draft more than one day in advance of
21  finalizing your report on June 4, 2021?
22    A.   I don't remember specifically, but it's
23  very possible.
24    Q.   Is it possible that you received a draft
25  of his report a week before June 4, 2021, when you

9 (Pages 30 - 33)

Page 34

1 finalized your report?
2       A.  I mean, since I don't really remember, I
3 would have to say it's possible.
4       Q.  Is there a way -- how would you check if
5 you wanted to check?
6       A.  So when I get emails, I put them into a
7 folder so I have a record.  I don't ever delete those
8 emails.  So I could go back through the Raymond James
9 folder and say, okay, when is the actual first time I
10 actually got a copy of his report.  That's the way I
11 would start with that.
12       Q.  Just to be clear, nowhere in paragraph 11
13 do you disclose that you reviewed a draft of
14 Mr. Schultz's report, correct?
15       A.  That's true.  I guess in all fairness,
16 like I said, it's not something I would have necessarily
17 relied on, so -- but you're right, it's not listed
18 there.
19       Q.  A moment ago you used a phrase
20 "consternation" or the word "consternation" to describe
21 finalizing your report.  What did you mean by
22 "consternation"?
23       A.  I've been kind of very busy, so it's
24 about juggling projects.  You know, people would always
25 like the thing done a week early, if possible, and if

Page 35

1 you're working on the last day, of course there's going
2 to be a little bit of worry that it's actually going to
3 get done.
4       Q.  Mr. Olsen, in your report, you list some
5 formulas that you were provided by Mr. Schultz, correct?
6       A.  Yes.
7       Q.  All right.  And how did you receive those
8 formulas from Mr. Schultz?
9       A.  In email, so I could cut and paste those
10 into my report.
11       Q.  And in paragraph 11 of your -- in
12 paragraph 11 of your report, do you list anywhere emails
13 that you received from Mr. Schultz?
14       A.  No, but I talked about in here that the
15 information came from Mr. Schultz I didn't talk about
16 exactly how.
17       Q.  All right.  In paragraph 11, in the
18 fourth and fifth bullet, you cite two Bates stamp
19 numbers, tabs 120-A and 120-B.  Do you see those?
20       A.  Yes.
21       Q.  What are those?
22       A.  I believe that's actual data for the
23 named plaintiff.
24       Q.  You know what, we can look at these.
25 Let's -- these are tab 15 and 16 in your binder.

Page 36

1       A.  Okay.
2       Oh, sorry.  I was wrong.
3       Q.  Let me just put them on the record first,
4 Mr. Olsen, and then I'll ask a question about them.
5       Tab 15 in your binder is Exhibit 120-A,
6 which has already been marked.  And 120-B, which has
7 already been marked, and the version that we have in the
8 tabs bear those markers.
9       Does seeing these refresh your
10 recollection on what these are?
11       A.  Yeah, these were -- it's SQL, or S-Q-L
12 code, that was represented to me that this was the code
13 that was run against the Microsoft SQL server database
14 in order to generate the results for the named
15 plaintiff.
16       Q.  Did you rely on Exhibits 120-A or 120-B
17 for the analysis that you performed to create your
18 report?
19       A.  No.
20       Q.  All right.  For -- I'm just going to ask
21 you about a couple of other materials and whether you
22 reviewed them.
23       So did you consider in formulating your
24 opinions the deposition transcript, rough or final, of
25 Chris Thurston?

Page 37

1       A.  I mean, I considered it in it informs me
2 about some of the issues that are being discussed about
3 whether, you know, producing this data for the full
4 class and that type of thing.  But in terms of the
5 calculations that are listed in the report, that's on
6 the data that was produced.
7       So how it was produced, which is the code
8 that we just talked about, 15 and 16, Exhibits 15 and
9 16, it doesn't really matter to me.  I'm just looking at
10 the data.
11       And similarly, you know, the second thing
12 that you asked about, it's kind of the same answer,
13 meaning that I did calculations on the data that I was
14 provided at this point and listed them in the report.
15 So those documents weren't necessary in order to do
16 that.
17       Q.  Let me ask it a different way.
18       Have you read the deposition -- or strike
19 that.
20       Before you filed your report in this
21 matter, did you read Chris Thurston's deposition
22 transcript?
23       A.  I don't know that I remember a
24 Chris Thurston's deposition, so I'm going to say no.
25       Q.  Okay.  And before you submitted your

10 (Pages 34 - 37)

Page 38

1 report in this matter, did you read the transcript from
2 Dax Seal's (phonetic) deposition?
3      A.  I don't believe so, no.
4      Q.  All right.  And before you submitted your
5 report in this matter, did you read the deposition
6 transcript from the plaintiff's deposition?
7      A.  No.
8      Q.  Other than the first amended complaint
9 and the second amended complaint, which are listed in
10 paragraph 11, did you review any pleadings, motions, or
11 orders in this case?
12      A.  No.  And like I said, at least at the
13 time of the report, I don't know that I received much
14 afterwards either, to be honest.  But these are all the
15 documents that I had.  So the answer -- unless I'm
16 missing something and it's listed here and it's another
17 name for it, I don't believe so, no.
18      Q.  Did you review the Court's order
19 dismissing the first amended complaint?
20      A.  No.
21      Q.  All right.  So other than the documents
22 that are listed in the report in paragraph 11, and the
23 formulas that are in your report, did you rely on any
24 other documents in formulating your opinions in the
25 report?

Page 39

1      A.  I don't believe so.  And like I said, the
2 formulas and the conversations about the specifics on
3 how to apply the formulas would have been with
4 Mr. Schultz.  And some of that may have been in the form
5 of written emails and some of it would have been in
6 conversations.  But I don't -- I believe the answer to
7 your question is no, no other documents.
8      Q.  All right.  Can we look at -- let's look
9 at paragraph 18 of your report.  It's on page 6 of
10 Exhibit 122.
11      A.  Okay.
12      Q.  Just the last sentence of this is -- it
13 goes on to page 7, "I am informed that on May 20, 2021,
14 RJA alerted plaintiff's counsel that it had missed over
15 5,000 accounts and that the real number is closer to
16 32,000 accounts."
17          Did I read that right?
18      A.  Yes.
19      Q.  All right.  And then there's a citation
20 to Deposition Exhibit 101.  Do you see that?
21      A.  Yes.
22      Q.  Who wrote that sentence and who added
23 that citation?
24      A.  I would have gotten help with the
25 citation.  I'm not really a legal writer, so I would

Page 40

1 have relied on plaintiff's counsel to help me with that
2 citation.  We had talked about the fact that I'm trying
3 to -- I'm trying to indicate, you know, how much -- we
4 have a population that we know that the full class is,
5 if it gets to that point, it's going to -- the
6 calculations are going to need to be performed on the
7 full population, so we're trying to articulate the size
8 of that.
9      Q.  All right.  Have you reviewed Deposition
10 Exhibit 101?
11      A.  I don't believe so.
12      Q.  All right.  Do you recall how it came to
13 be in your report?
14      A.  Yeah, we had a conversation.  That would
15 have originated from plaintiff's counsel to help with
16 that.  So it would have been articulated to me that this
17 is how it went down, that the real number is not going
18 to be 20,000, or whatever, but that it's actually going
19 to be bigger.
20      Q.  All right.  And you included that
21 sentence without reviewing Deposition Exhibit 101; is
22 that right?
23      A.  Like I said, I'm comfortable with that,
24 because, like I said at the beginning of that sentence,
25 you know, I am informed, so, you know, that's what I was

Page 41

1 told and that's what I believe to be true.
2      Q.  And counsel informed you; is that
3 correct?
4      A.  Yes.
5      Q.  Okay.  Let's look at tab 4, and that is
6 Deposition Exhibit 101.
7          Have you seen this before?  It's titled
8 "Plaintiff Kimberly Nguyen's Notice of Video Deposition
9 of Bill Gross."
10      A.  No, I don't believe so.
11      Q.  So does Exhibit 101 support the sentence
12 that it is cited afterwards in your report?
13      A.  It seems like it should, yes.
14      Q.  Well, I guess what I'm asking you is, I
15 think you made -- I'm wondering if -- could it be that
16 Deposition Exhibit 101 is a mistake and you meant to
17 cite another deposition exhibit?
18      A.  Like I said, I relied on help with the
19 citation on that.  If that's wrong, then I apologize.
20 But, like I said, this is what was -- I was informed.
21 So what I'm saying is, this is what was told to me.  I
22 don't have any reason to disbelieve it.  I guess it
23 doesn't really matter, meaning that if there's 27,000 or
24 32,000 or 150,000, at the end of the day, it doesn't
25 really matter to me.

11 (Pages 38 - 41)

Page 42

1    Q.   Why doesn't it matter to you, Mr. Olsen?
2    A.   Because I'm going to be -- if it gets to
3  that point and they say here's the data for the full
4  class, perform the calculations, these same calculations
5  can be performed on 27,000, 32,000, 3 million.  It
6  doesn't -- I don't -- it's writing -- I was trying to be
7  clear.  I mean, this sentence would have come from
8  plaintiff's counsel, and the citation, like I said, I
9  would have had help with.  But for me, I wouldn't have
10  included it on my own.  Meaning that the size of the
11  class, at the end of the day, isn't going to change my
12  opinion that the calculations can be performed on that
13  dataset.
14    Q.   So you included that sentence at the
15  request of counsel; is that right?
16    A.   Yeah, yes.
17    Q.   Did you do any independent research to
18  draft your report?
19    A.   Not specifically, no.
20    Q.   Did you do any independent research
21  generally to draft your report?
22    A.   I mean, I've done research kind of
23  throughout my career in terms of informing how I know
24  what I know about databases in general, but in terms of
25  the specifics related to this report, I would say no.

Page 43

1    Q.   Did you consult any textbooks to perform
2  the analysis and write your report?
3    A.   I mean, it's kind of a similar answer.
4  It's like, if I -- for example, if we're looking at the
5  exhibits that we looked at before that were the code
6  that were written, I mean, I understand that code.  And
7  the reason why I understand that code is, in part,
8  because of textbooks I had looked at in the past.  But
9  in terms of writing this report, no, I didn't look at
10  any textbooks.
11    Q.   Did you consult any user manuals in
12  preparing the analysis and writing this report?
13    A.   No.
14    Q.   And did you consult any websites for
15  preparing the analysis and writing this report?
16    A.   No.
17    Q.   Did you look up any securities industries
18  terms in Google, for example?
19    A.   No.
20    Q.   All right.  Let me just ask you a
21  question about, you have a -- you work with
22  Cassis Technology, LLC; is that right?
23    A.   Yes.
24    Q.   Does it have any employees other than
25  you?

Page 44

1    A.   No.
2    Q.   Have you ever had other employees other
3  than you with Cassis Technology, LLC?
4    A.   I mean, the short answer is no.  I've
5  been an independent consultant since probably 1996.  But
6  at some point I realized that I could do the billing and
7  the paperwork myself, and so I formed a company.  I do
8  work with some other consultants, but they don't
9  technically work for me, so I give them a 1099 as
10  opposed to a W-2.
11    Q.   So does anyone other than you perform the
12  analysis that is reflected in the report that is
13  Exhibit 122?
14    A.   No.
15    Q.   And we talked about the sentence in
16  paragraph 18.  More generally speaking, what was
17  counsel's role in the drafting of your report at
18  Exhibit 122?
19    A.   You know, I listen to what they want and
20  the things that they want to include, and I take a first
21  crack at this and say, here's my report.  And then they
22  say, hey, can you include this, or can we change the
23  language on this.  And, you know, at the end of the day,
24  if -- if it's true and I feel qualified to say it, I'm
25  happy to say it.  And so I think it's just an

Page 45

1  interactive process to make sure that it's covering the
2  things they need it to cover.
3        I don't know what they're all going to
4  use the calculations for, so I'm relying on them a
5  little bit to help with what the report needs to
6  contain.
7    Q.   In putting together the analysis, did you
8  provide them with drafts of a report?
9    A.   Probably, yes.
10    Q.   About how many drafts?
11    A.   I mean, I don't know.  Maybe -- that
12  would be just a rough guess.  A couple, two or three.
13    Q.   And when you provide it, in what form do
14  you provide the drafts?
15    A.   I think we exchanged it in emails, but if
16  you're talking about the form, it's a Word document.
17    Q.   All right.  And then do they provide you
18  with comments in response to the drafts?
19    A.   Yes, I would imagine, yes.  Meaning that
20  I don't know if it was written or we talked about it on
21  the phone, but I think there was some of it that was
22  written.
23    Q.   Are you familiar with the terms "red
24  lines"?
25    A.   Yes.

12 (Pages 42 - 45)

Page 46

1    Q.  All right.  Did they provide you with red
2  lines on the drafts?
3    A.  Probably, yes.
4    Q.  Okay.  And when you received the red
5  lines, what steps did you take next?
6    A.  Like I said, you know, it depends on the
7  red line.  If it's a question that says, hey, we need --
8  can you do this particular calculation and include it,
9  great, I'll do that calculation and include it.  If it's
10  can we change the language here, they don't like my
11  English, like I said, I'm not a writer, so if they don't
12  like my English, and I read it and it says the exact
13  same thing, I would just accept the change.
14      If it's something like we talk about in
15  paragraph 18 and I read that and it says, you know, I
16  was informed that, you know, the real class size is
17  32,000, if they would have added that language, and,
18  yeah, I'm informed of that, it's true, they told me
19  that, so I'm happy to put it in, so I would just accept
20  that as well.
21      And there may be some things where, it's,
22  like, well, I don't feel comfortable saying that, or I
23  don't -- I don't remember specifically if there were
24  those instances in this case, but, you know, in general,
25  if I'm asked to say something I don't feel qualified to

Page 47

1  say, I wouldn't accept it.
2    Q.  Did you provide Mr. Schultz with drafts
3  of your report?
4    A.  I would not have provided to him
5  directly, but I don't know that he didn't get it from
6  plaintiff's counsel.
7    Q.  Do you recall ever seeing comments from
8  Mr. Schultz in a Word document that was sent to you by
9  counsel?
10    A.  I don't recall, but some of the comments
11  may have been from him.  I don't know -- if I had to
12  guess, though, I don't believe he really commented on
13  the document.  I think mostly he was just relaying the
14  exact calculations that he needed in order to do his
15  report.
16    Q.  All right.  We talked about whether you
17  had received a draft of Mr. Schultz's report to do your
18  work.  Do you know if he received a draft of your report
19  to do his work?
20    A.  And I don't know, meaning, like, the
21  conversations between Mr. Schultz and I, really, from my
22  perspective, all I needed to know is what calculations
23  he needs performed and to provide those results.  And
24  I'm speculating, but I think that all he would really
25  need from me is to -- the result of those calculations.

Page 48

1  So I'm not sure that we're interested so much in the
2  language of each other's reports, just the numbers.
3    Q.  How did the numbers from your analysis
4  get from you to Mr. Schultz that he could include them
5  in his report?
6    A.  I would have sent everything through
7  plaintiff's counsel.  It's possible that he was on some
8  of those emails as well, but I believe they all went
9  through plaintiff's counsel and they would have been
10  provided to him that way.
11    Q.  All right.  Let's look at your report,
12  Exhibit 122, the first paragraph, which is on page 1 of
13  Exhibit 122.
14      The very first sentence says, "I have
15  been retained by counsel for plaintiff, Kimberly Nguyen,
16  to provide consulting and expert work regarding data
17  analysis, data extraction, and damage calculations in
18  connection with the above-captioned action and to
19  testify at deposition and trial, if necessary."
20      I want to ask you a question about that
21  phrase, "to provide consulting and expert work."  What
22  was the consulting work that you did as separate from
23  the expert work?
24    A.  I don't know how you would completely
25  separate the two.  But like I said, we had some

Page 49

1  conversations about how do databases work, you know,
2  what -- how do we articulate a question, here's what we
3  want to know, how do we articulate a question so that a
4  technical person might understand it.  Those types of
5  things.  I would say that's kind of consulting.
6      For me, the actual work itself, the
7  expert work -- consulting would be conversations and
8  sharing expertise and that type of things, and guidance
9  in that regard.  And the work itself would be to say,
10  okay, now you've given me data, and the work that I
11  perform on that data to come up with numbers, so
12  results, the calculations would be the expert work.  I
13  think there's a little bit of overlap there depending on
14  how you define those.
15    Q.  Do you segregate in your time sheets the
16  consulting work from the expert work in any way?
17    A.  No, I try to kind of keep track of
18  generally what the -- I write on my little calendar what
19  I worked on that day, about how much time I spent on it,
20  and kind of what I did.  But I don't have a different
21  rate.  It seems like the question comes up a lot of
22  times, for example, what's your rate at deposition, and
23  I assume that maybe it's standard practice to have a
24  different rate.  For me, it's, here's the rate for my
25  time, and it makes it easier for me.

13 (Pages 46 - 49)

Page 50

1   So to categorize it, no, but to -- we
2 might be able to sit down and say, okay, what did you do
3 today? Well, today I had a phone call, and it was about
4 general database practices. Okay, what would you call
5 that? We could call that consulting. I mean, I don't
6 know. I don't break it down like that. I never really
7 thought about it.
8   Q. Does the 40-hour estimate that you
9 provided for your work on this matter include both your
10 consulting and your expert services?
11   A. Yeah, it's just time.
12   Q. All right. And you testified earlier
13 about a folder you keep that has documents in it. Would
14 that folder be the same, or do you have a separate
15 folder for your consulting work?
16   A. No, it's just a folder. So it's kind
17 of -- trying to be organized is the most challenging
18 part of -- probably your job, too. But the -- of this
19 position, meaning, so I'll have a folder, and it will
20 have a subfolder that will be, here's all the data that
21 I received. And here's a subfolder for all the
22 documents that I received. And here's a subfolder for
23 all the results that I sent. And so it's kind of broken
24 down that way. But not by task, meaning that some of
25 it's just emails, too, right. That wouldn't be in the

Page 51

1 folder. That would be in an email folder.
2   Q. I guess as to paragraph 11, the documents
3 you considered in formulating your opinions, are there
4 documents that you've reviewed in this case as part of
5 your consulting work that you have not disclosed in
6 paragraph 11?
7   A. That's an interesting point. Like I
8 said, I didn't really -- I've never really been asked to
9 think about consulting and expert work separately. What
10 I was trying to say before is that I think the list is
11 overinclusive, meaning here's all the documents I was
12 given. And really, if I was given the calculations that
13 needed to be performed, the assumptions that I needed to
14 consider when I was looking at the data and the data
15 itself, that's really kind of all I needed to write this
16 report. So the rest of it was these are all the
17 documents that I've read or looked through that I've
18 been given, that type of thing. So that list is
19 definitely overinclusive.
20   Q. Let's look at paragraph 2 of your report
21 where you say, "I understand that this case involves
22 claims that Raymond James & Associates, Inc., RJA,
23 transferred certain commission-based accounts to a
24 fee-based Freedom Account." Do you see that?
25   A. Yes.

Page 52

1   Q. All right. Did you write that sentence
2 in your report?
3   A. I probably -- I don't remember
4 specifically, but I don't believe so. Meaning that I
5 would have said -- my first copy of this report would
6 say, here's where I want to talk about what the claims
7 are, and I probably took a crack at it and said, here's
8 what I think it is. But it's kind of a layman's, and so
9 I'm sure I got help with cleaning up that language,
10 meaning to make it more readable, I guess. I don't
11 know.
12   Q. Is that sentence true?
13   A. As far as I know, that's what I
14 understand, yes.
15   Q. But you don't know if you wrote that or
16 if it was written by counsel?
17   A. Oh, is that sentence true?
18   Q. Correct.
19   MR. BEATTY: Can you back up a little
20 bit? I think that got --
21 BY MR. CLABBY:
22   Q. Okay. So let's look at the first
23 sentence of paragraph 2 of Exhibit 122, where it says,
24 "I understand that this case involves claims that
25 Raymond James & Associates, Inc., RJA, transferred

Page 53

1 certain commission-based accounts to a fee-based Freedom
2 Account."
3   Is it true that this case involves the
4 claims as described in that sentence?
5   A. I mean, as far as I understand, yeah.
6   Q. Were the commission-based accounts in
7 this sentence, are those commission-based brokerage
8 accounts?
9   A. I'm not sure what the exact definition of
10 a -- I don't know, per se. I know that the data that
11 was provided that was characterized as this is data
12 originating from commission accounts, and this is data
13 originating from Freedom accounts from which the --
14 there was some sort of transfer of assets between the
15 two accounts. I don't -- beyond that, I don't have an
16 opinion on whether the word "brokerage" makes it more
17 accurate or less accurate or what.
18   Q. So do you know if the commission-based
19 data that you saw was from brokerage accounts?
20   A. I don't -- I don't know. It's not really
21 relevant to the work that I did, I don't think.
22   Q. And then the phrase "fee-based Freedom
23 Account," do you see that?
24   A. Yes.
25   Q. Are you aware of any type of Freedom

Page 54

1  Account that is not fee-based?
2      A.  No.
3      Q.  Does the phrase in your report says
4  "transferred certain commission-based accounts," do you
5  see that?
6      A.  Yes.
7      Q.  What does it mean to transfer certain
8  commission-based accounts?  What does "transferred"
9  mean?
10     A.  I mean, I'm not sure, right.  I mean,
11 that's kind of not my role.  So what I'm trying to do is
12 say this is what I understand, is that there's some --
13 from my perspective, I'm doing calculations on a dataset
14 that's represented to me to be commission-based
15 accounts.  And then there's same account holders that
16 have Freedom-based accounts and these were tied
17 together.  So I'm doing calculations.
18     Whether or not -- I mean, I understand
19 this sentence describes the allegations in this case.
20 Plaintiff's counsel seemed satisfied that this described
21 allegations in this case, and so for me, that's kind of
22 the end of it.  It doesn't change the calculations on
23 whether or not this description is 100 percent accurate
24 or not.
25     Q.  I'm just trying to find out what you --

Page 55

1  what your report means when you say transferred.
2      Does the 100 percent of the assets in the
3  commission-based account have to go over to the
4  fee-based Freedom Account for it to be transferred?
5      A.  I don't know.
6      MR. BEATTY:  Objection.  Compound
7  question.
8      THE WITNESS:  Yeah, I don't know.
9  BY MR. CLABBY:
10     Q.  Have you seen any of the materials that
11 you reviewed for this case, any guidance, on what
12 constitutes a transfer of a commission-based account to
13 a fee-based Freedom Account?
14     MR. BEATTY:  I'm going to object.  It's
15 asked and answered.
16     THE WITNESS:  No, like I said, it's not
17 really relevant to the calculations.
18 BY MR. CLABBY:
19     Q.  So the datasets that you were provided on
20 the commission side, did you assume that all of them
21 were transferred from commission-based accounts to
22 fee-based Freedom accounts?
23     A.  I mean, I didn't assume one way or the
24 other.
25     Q.  Do you provide any opinions in your

Page 56

1  report on what constitutes a transfer?
2      A.  No.
3      Q.  Do you supply a methodology in your
4  report by which we could know what percentage of a
5  commission-based account going into a fee-based Freedom
6  Account would qualify as being transferred?
7      MR. BEATTY:  Objection.  Asked and
8  answered.
9      THE WITNESS:  No.
10 BY MR. CLABBY:
11     Q.  Let's look at paragraph 12.
12     The first sentence of paragraph 12, which
13 is at page 5 of Exhibit 122 says, "With instructions
14 from plaintiff's regulatory and industry expert,
15 Mr. Douglas J. Schultz, I was tasked with analyzing data
16 that RJA produced, to date, in this litigation."
17     Do you see that?
18     A.  Yes.
19     Q.  Is the analysis of the data in this
20 sentence expert work, consulting work, or both?
21     A.  Analyzing data, I would say it's expert
22 work.  I would say it's kind of an arbitrary
23 designation.
24     Q.  What does it mean that you had, quote,
25 instructions from plaintiff's regulatory and industry

Page 57

1  expert, closed quote?
2      A.  This is what we were talking about
3  earlier.  So I'm not just going to take the data and
4  start spending time with it without instructions.  So
5  there's specific calculations that were requested and
6  specific assumptions in making those calculations from a
7  data perspective, and those would have all come from
8  Mr. Schultz.
9      Q.  All right.  And then, let's see, the
10 third sentence in that paragraph says, "At this stage, I
11 am informed by Mr. Schultz that a low-trading
12 volume/buy-and-hold account is an account that meets two
13 objective metrics: an annual cost analysis and a
14 turnover analysis."
15     Do you see that?
16     A.  Yes.
17     Q.  How did Mr. Schultz inform you of that
18 fact?
19     A.  The same way that we were talking about
20 before.  I would have had some help on the exact
21 language on that, but there were two data points, two
22 calculation results that resulted in data points, and
23 one was an annual cost and one was a turnover rate, and
24 there were thresholds.  And if the account didn't meet
25 both of those thresholds or -- I guess if it exceeded

Page 58

1 one of those thresholds, then it wasn't considered one
2 of the accounts at issue, if you will.
3      Q.  Do you know what the consequences of --
4 for Mr. Schultz's analysis of an account not being an
5 issue are?
6           MR. BEATTY:  Objection.  Calls for
7      speculation.
8           THE WITNESS:  Yeah, I mean, it's just
9      like kind of any of the other cases I've
10     worked on, I guess.  The first thing is to
11     identify the people that are in the class, and
12     if they're not in the class, they're not in
13     the class.
14          I don't know what you're getting at.  I'm
15     sorry.
16 BY MR. CLABBY:
17     Q.  Let's look at the last sentence here,
18 "Moreover, I was tasked with calculating damages by
19 applying a formula to the data as directed by
20 Mr. Schultz."
21          Do you see that?
22     A.  Yes.
23     Q.  All right.  And so the same question, you
24 received instruction through Mr. Schultz as to these two
25 objective metrics, right?

Page 59

1      A.  Yes.
2      Q.  And you received direction from
3 Mr. Schultz as to calculating damages by applying a
4 formula?
5      A.  Yeah, and I think both of it is formula
6 driven, meaning that in order to determine the result of
7 these metrics, calculations have to be performed at the
8 account level and you arrive at two figures, one for
9 each metric, if you will.  And then the calculations for
10 applying the damage calculation formula was applied to
11 all of the accounts.  Then I was asked later to kind of
12 segregate the ones that didn't meet these metrics and
13 separate those out.
14     Q.  Who asked you to segregate and separate
15 those out?
16     A.  Again, I -- it's my understanding that
17 all of the instructions came from Mr. Schultz, but a lot
18 of it, or most of it, came through plaintiff's counsel.
19     Q.  So in paragraph 12, the last sentence
20 where you say, "as directed by Mr. Schultz," are you
21 referring to Mr. Schultz, or are you referring to
22 counsel telling you what Mr. Schultz told them?
23     A.  I think some of both.
24     Q.  All right.  In paragraph 13, you talk
25 about in the first sentence, "I understand that RJA has

Page 60

1 refused to produce all the data that plaintiff has
2 requested."
3      A.  That's my understanding, yes.
4      Q.  All right.  Are you referring to
5 27,000 account, Freedom Account, the commission side
6 data for those 27,000 accounts there?
7      A.  Yes.
8      Q.  And you believe that you can analyze that
9 dataset work produced using the same analysis that you
10 used on the 59-account spreadsheet?
11     A.  Yes.
12     Q.  All right.  Let's -- by the way, when I
13 refer to the 59-account spreadsheet, what I'm talking
14 about -- and we can look in your report just to make it
15 clear.  In paragraph 17 of your report, Exhibit 122, you
16 reference in the first sentence a Bates stamp number
17 058469.  Can we agree just to call that the 59-account
18 spreadsheet?
19     A.  Sure.
20     Q.  And then in paragraph 18 of your report,
21 you refer to some other spreadsheets with a different
22 Bates range of 59060 to 59067 [sic], and that is for
23 27,322 Freedom Accounts?
24          MR. BEATTY:  Hold on.  Objection, Jack.
25     I think you might have misstated the numbers

Page 61

1      there.
2 BY MR. CLABBY:
3      Q.  Sorry.  For paragraph 18 of Exhibit 122,
4 there's several spreadsheets that have the Bates number
5 059060 to 059063, and you refer to it as a similarly
6 formatted but larger dataset of 27,332 Freedom Accounts.
7          Can we call that the 27,000-account
8 spreadsheet?
9      A.  Sure.
10     Q.  Okay.  Let's look now again at
11 paragraph 17, maybe the third sentence down.  You say,
12 "11 of the 59 accounts have null values on the
13 commission side, but the data for those 11 accounts was
14 included on the Freedom side.  These 11 accounts were
15 removed from consideration on both the commission data
16 and the Freedom data."
17          Who made the decision to remove these 11
18 accounts from consideration on the commission side and
19 the Freedom side?
20     A.  That would have -- I assume it came from
21 Mr. Schultz through the same path that we talked about
22 before.  This is something that I referenced earlier.
23 When given a formula, I'd say, exactly how do you want
24 the formula to work?  And then when I start getting into
25 the data, it's, like, well, how do you want to handle a

16 (Pages 58 - 61)

Page 62

1 case where I have Freedom data but I don't have
2 commission data? So I don't make that decision. I just
3 pose it as a question.
4        And the question got answered, and I
5 believe it came from Mr. Schultz, but it came through
6 plaintiff's counsel.
7        Q. All right. And do you know why they had,
8 quote, null values on the commission side, closed quote?
9        A. No.
10       Q. Did you review any materials in forming
11 your opinions for this report that addresses these 11
12 accounts --
13       A. No.
14       Q. -- other than the 59 -- let me finish --
15 other than the 59-account spreadsheet?
16       A. No.
17       Q. Let's look at tab 3.
18       So tab 3 has already been marked and
19 admitted as 118 in the Gross deposition. We're not
20 marking it again, we're just going to share it on
21 Exhibit Share, but it will be Exhibit 118.
22       All right. Exhibit 118 is an April 14,
23 2021, email. Have you seen this before, Mr. Olsen?
24       A. I mean, it's possible. It doesn't look
25 familiar.

Page 63

1        Q. Let's go back to paragraph 11 of your
2 report, 122. Just keep that open, keep Exhibit 118, but
3 let's go back to paragraph 11 of your report.
4        And just if you can, in paragraph 11 of
5 your report, in the paragraph it mentions that you
6 reviewed the rough deposition transcript of RJA's
7 corporate representative, Mr. Bill Gross, and then it
8 says you also reviewed, quote, all exhibits thereto.
9        Do you remember -- does that refresh your
10 recollection that you've seen this before?
11       A. It's possible. If it was an exhibit to
12 his deposition, then it's probably in my folder. It
13 doesn't mean that I remember reading it.
14       Q. Okay. And can you look at the fourth
15 paragraph down and just read that to yourself.
16       A. Okay.
17       Q. The second sentence says, "If RJA
18 determined that the Freedom Account was funded from a
19 brokerage account held by a different individual, i.e.,
20 a different SSN, than that of the Freedom Account
21 holder, then RJA reflected it on the first sheet of the
22 spreadsheet as NA."
23       Do you see that?
24       A. Yes.
25       Q. All right. Were you aware of that

Page 64

1 representation by counsel for Raymond James & Associates
2 at the time that you wrote your report?
3        A. I mean, I don't believe so, but I still
4 have the same question. Whether I knew that or didn't
5 know that, it doesn't really change my report, my
6 opinions, or the work I did. So I still have the same
7 question. Regardless of why it's an NA, I still need to
8 understand how they want me to handle it in terms of
9 doing the calculations.
10       Q. Would a Freedom Account holder be in the
11 putative class in this case if the Freedom Account was
12 funded from a commission-based account held by a
13 different individual than the Freedom Account holder?
14       MR. BEATTY: Objection. Calls for
15 speculation.
16       THE WITNESS: Yeah, I was waiting for
17 that.
18       I don't have any idea. That's for
19 someone else to decide.
20 BY MR. CLABBY:
21       Q. And do you have an opinion as to whether
22 a Freedom Account holder would be in the putative --
23 well, let me say -- strike that.
24       Did you consider that 11 of the 59 were
25 removed for this reason in determining that you can

Page 65

1 mechanically apply Mr. Schultz's two objective criteria
2 to the larger 27,000 dataset?
3        A. You're saying did I remove them because I
4 couldn't apply the criteria? I guess -- this is an
5 opportunity for me to take advantage of one of the
6 instructions you gave me. Can you re-ask that?
7        Q. Yeah. So you have an opinion in your
8 report that you can mechanically apply the two objective
9 criteria to any dataset that you're provided, correct?
10       A. Yes.
11       Q. All right. But in the dataset that you
12 were provided of the 59 accounts, 11 were removed for
13 the reason that's stated in Exhibit 118, correct?
14       A. Yes.
15       Q. All right. Some portion of the 59, then,
16 were removed. Did your report offer a methodology by
17 which a portion of the 27,000 could be removed who had
18 accounts funded from commission accounts that were not
19 in the name of the Freedom Account holder?
20       A. So I guess -- trying to unwind that
21 question.
22       So with regard to the 59, in regard to
23 your question on whether they should be in the putative
24 class or not, had the data been included for the
25 commission side and the same calculations could be

17 (Pages 62 - 65)

Page 66

1 performed.  So if it's determined that they should be
2 included, then if the data was included, and it looks
3 like from this Exhibit 3, or the tab 3 in this binder
4 that you sent me, that they did it on purpose.  Had they
5 not done that, then the same calculations could be
6 performed.
7         Whether they're in or out or should be
8 part of the calculation or not, that's up to the judge
9 or the jury, or some other expert, somebody else.
10        In terms of whether or not this
11 calculation could be performed on the 27,000, if you're
12 talking about they should be in, then okay, include that
13 in the commission data when it's produced.  If it
14 shouldn't be in, don't include it.  If you want me to
15 make that determination myself, include the Social
16 Security numbers, and if they don't match, then I can
17 make that -- so I guess the answer to your question is,
18 if they can be excluded out of the 59 for that reason,
19 they could be excluded out of the 27- or 32,000 for the
20 same reason.  I don't see the issue there.
21        So -- but I'm not making a determination
22 or I don't have an opinion on whether they should be
23 included or excluded.
24    Q.  But in order to take that 27,000 and
25 exclude those who might be similarly situated to the 11,

Page 67

1 someone has to go through and do that exclusion,
2 correct?
3    A.  Well, I mean, like they said, this is a
4 pretty basic datapoint.  Right?  They're saying that the
5 two accounts didn't have the same Social Security
6 number.  So provide the Social Security number and we
7 can do it ourselves.  It's pretty simple.
8    Q.  Yeah, and you'd have to locate the
9 funding account first and then figure out the Social
10 Security number for the funding account before you can
11 do that simple analysis, right?
12        MR. BEATTY:  Objection.  Asked and
13        answered.  Calls for speculation.
14        THE WITNESS:  I think there's been some
15        conversation about finding the funding
16        account.  I mean, yeah, I think that could
17        certainly be done.
18 BY MR. CLABBY:
19    Q.  Do you offer an opinion in your written
20 expert report, Exhibit Number 122, as to whether that
21 can be done?
22    A.  About which part?
23    Q.  Do you offer an opinion in your expert
24 report, Exhibit 122, as to whether Raymond James can
25 locate the funding account number for the commission

Page 68

1 accounts that funded the Freedom accounts that are at
2 issue in this case?
3    A.  I don't explicitly.  But, you know, like
4 I said, I don't have all the documents.  Or in all the
5 correspondence I have, what's been articulated to me in
6 some of the excerpts from the deposition testimony and
7 stuff like that where Raymond James has said that it's
8 difficult to perform this calculation.  But there's no
9 discussion about why it's difficult.  There's no
10 questions answered by who is doing this and trying to --
11 and it's -- it's not credible to me, based upon my
12 experience in databases and my experience in working
13 with data originating from financial institutions.
14        So at this point, I don't have that data.
15 I wasn't asked to comment on that data in the report.  I
16 was just asked to perform the calculations that were on
17 the data that was provided.  So it wasn't included in
18 this report.
19    Q.  Did you consider the time and the cost to
20 Raymond James in producing the commission-side account,
21 doing that for the 27,000 account population, in
22 reaching the conclusions in your report?
23        MR. BEATTY:  Objection.  Calls for
24        speculation.
25        THE WITNESS:  I did not.

Page 69

1 BY MR. CLABBY:
2    Q.  All right.  So let's go back to
3 paragraph 17.  The next sentence after the 11-account
4 sentence says, "Moreover, three more accounts were
5 missing data on the commission side, accounts 15, 28,
6 and 29.  I understand from plaintiff's counsel that
7 Raymond James' counsel advised them that with respect to
8 these" -- "to these three accounts, the commission
9 accounts used to fund the opening of the corresponding
10 Freedom Accounts were opened in the same month as the
11 Freedom Accounts.  I also removed these accounts from
12 consideration."
13        So who made the decision to pull these
14 three accounts from consideration?
15    A.  Well, presumably -- well, it's the same
16 answer as before, but presumably that came from
17 Mr. Schultz through plaintiff's counsel to me.
18    Q.  Do you have a specific memory of that,
19 Mr. Olsen, or is that an assumption?
20    A.  A specific memory?  I don't know that I
21 would say it's a specific memory.  But I would say that
22 my communications about the calculations were coming
23 from, you know, emails from plaintiff's counsel, and
24 Doug Schultz was on or most of those emails.
25        And I would say I would not have made

18 (Pages 66 - 69)

Page 70

1 this determination on my own. I'm not going to remove
2 these accounts from consideration without asking the
3 question, how do you want me to handle these three? In
4 fact, it was me that pointed out that these three were
5 missing, so I do have specific recollection of that and
6 asking how they want to be handled.
7       Q.   Did anyone tell you, either Mr. Schultz
8 or counsel, that individuals who opened a commission
9 account in the same month as a Freedom Account would not
10 be in the putative class in this case?
11          MR. BEATTY:  Objection. Asked and
12       answered.
13          THE WITNESS:  No, and like I said, I
14       don't know who's in or out of the putative
15       class. And I believe that if the data from
16       the funding account or from the
17       commission-based account was included in the
18       data, whether it's one month or period of a
19       month, whatever, you can apply the same
20       calculations.
21          So if someone makes a determination later
22       that here's the full dataset but exclude, for
23       example, different Social Security numbers
24       from the commission-based account to the
25       Freedom Account, okay, exclude those. If

Page 71

1       they're open within a certain number of days
2       from the opening of the Freedom Account,
3       exclude those. Okay, then you apply that
4       rule. I'm just saying the calculations could
5       be performed. Maybe some of the assumptions
6       change a little bit or some of the parameters
7       change a little bit.
8          MR. CLABBY:  We're going to start a new
9       session in a second, so let's take about a
10       five-minute break. We've been going for about
11       90 minutes. Come back in five minutes?
12          MR. BEATTY:  Sounds good.
13          (Recess taken -- 1:25 p.m.)
14          (Return from recess -- 1:33 p.m.)
15 BY MR. CLABBY:
16       Q.   Mr. Olsen, we were looking at your
17 report, Exhibit 122, and I'd like to draw your attention
18 to page 7, which is paragraph 19.
19          In that first sentence, you mention a
20 Microsoft SQL Server relational database. What is that?
21 Can you describe that for us?
22       A.   Ironically, from the deposition
23 testimony, that's where the data originated, was from a
24 Microsoft SQL Server database. But it's just a
25 relational database product that allows you to ask

Page 72

1 questions about the data and analyze the data. It's a
2 relational database tool.
3       Q.   What was the format that the data was
4 provided in to you?
5       A.   Spreadsheets, Excel spreadsheets.
6       Q.   An Excel spreadsheet? And did you have
7 any problems loading the Microsoft Excel spreadsheets
8 into the Microsoft SQL Server relational database?
9       A.   No.
10       Q.   And this confirmed to you, as you write
11 in your report, quote, the data had been produced in a
12 usable format, closed quote?
13       A.   Yes.
14       Q.   And you also confirm that you were able
15 to, I guess -- strike that.
16          You write here, "I analyzed it to confirm
17 that queries could be run across the various data
18 fields."
19          Did you, in fact, confirm that queries
20 could be run across various data fields?
21       A.   Yes.
22       Q.   What's the advantage of putting it in --
23 if there is one, what's the advantage of putting it in
24 the Microsoft SQL Server relational database versus
25 using another, like, Excel directly?

Page 73

1       A.   Well, probably for the same reason why
2 Raymond James keeps it in SQL Server rather than keeping
3 it in Excel directly. But a relational database is --
4 allows you to write queries across various tables. So
5 meaning that if I have different tabs in Excel and
6 writing queries, it's very difficult. I need to write a
7 formula in a cell, and I need to add up those cells, I
8 need all sorts of processes to go about that.
9          Whereas if I write a query in SQL Server
10 and it says, for example, multiply this field by this
11 field and divide by this field and come up with a number
12 and include every one that has value over this
13 threshold, then I can run that all in one bang and then
14 it spits out the results. I don't have to go through
15 all of the intermediary steps.
16          Let's say the secondary point about that
17 is Microsoft's Excel has a limitation both on size and
18 number of records that it can hold, whereas SQL Server
19 really -- I mean, you reach some hardware limitations
20 depending on how much money you're willing to spend, but
21 for practical purposes, it doesn't really have such a
22 limitation.
23       Q.   And did you run queries to perform the
24 various calculations of the data that are expressed in
25 your report?

19 (Pages 70 - 73)

Page 74

1   A. Yes.
2   Q. And you had to write -- you wrote new
3 queries to accomplish those tasks, right?
4   A. Yes.
5   Q. Were you able to leverage existing work
6 product at all?
7   A. I mean, not really, but, you know, I've
8 been writing queries for 20 years now, so I speak the
9 language probably a little bit more fluently than even
10 English. Right? So my point is, is that writing --
11 none of this was wildly complex. But I think that the
12 writing of the queries, it's very rare that it's going
13 to be exactly leverage-able from one case to another
14 because the column names are going to be different.
15 Even in the datasets that they provided, you might have
16 the exact same columns and exact same pieces of
17 information, but the name of the header was slightly
18 different. They might have abbreviated or spaced or
19 punctuated differently. So I would say that the short
20 answer to that is no, these were all kind of written
21 from scratch.
22   Q. And writing those queries was your
23 methodology for executing the formulas that Mr. Schultz
24 gave you, right?
25   A. Yes.

Page 75

1   Q. Did you attach those queries that you
2 wrote to accomplish the tasks in your report to your
3 report?
4   A. No.
5   Q. Other than the Microsoft SQL Server
6 database, did you use any other computer programs or
7 applications to accomplish the work and analysis
8 reflected in your report?
9   A. I used Word, obviously, to write the
10 report. And I used Excel in order to generate the
11 exhibits. And I used Adobe Acrobat to convert it to a
12 PDF.
13   Q. In paragraph 20, you say, "As noted
14 above, Mr. Schultz provided me with formulas to perform
15 various calculation on the data as follows."
16     Did he provide you with any formulas that
17 you did not use? Like, did he provide you with formulas
18 that you then discarded?
19   A. I don't believe so, no.
20   Q. So are all the formulas that he provided
21 to you reflected in the report?
22   A. Yeah, I believe so. I mean, this is the
23 formula. So like, example, in paragraph 21 is the first
24 formula. So there would have been some iter- --
25 interactions and iterations, some discussion about what

Page 76

1 exactly do you want me to include for this category of
2 other fees per year, which tab does that come from,
3 which field does that come from, what do you want me to
4 consider, what about if the number is positive. You
5 know, those kinds of questions about the specifics. But
6 I believe that this is the formula, and the formula
7 never really changed.
8   Q. You mentioned the questions about which
9 tab, which field does this come from. Is that in
10 reference to the 59 database and the 27,000 database?
11   A. Yes.
12   Q. Did you rely on Mr. Schultz to direct you
13 to certain tabs and fields within the datasets?
14   A. Yes.
15   Q. All right. Other than Mr. Schultz, did
16 you rely on anyone else to direct you to the correct
17 tabs and fields for the database?
18   A. Like I said, the instructions, it's my
19 understanding that they all came from Mr. Schultz. If
20 the plaintiff's counsel, you know, inserted an
21 instruction on their own, I wouldn't know. But from
22 what I understand, all of the instructions came from
23 Mr. Schultz.
24   Q. All right. Let's look at paragraph 21,
25 then.

Page 77

1     This is -- listed there, there's a
2 four-line text that starts with "annual cost percentage"
3 equals.
4   A. Yes.
5   Q. Is that, and the four lines that are
6 contained with it, is that the annual cost percentage
7 formula that Mr. Schultz provided to you?
8   A. Yeah, I cut and paste that from an email.
9   Q. So somewhere there's an email where he
10 provided this to you, correct?
11   A. Yes.
12   Q. And that email is not listed in
13 paragraph 11, and it's not attached to your report,
14 correct?
15   A. That is correct.
16     But I did say, like, in paragraph 20,
17 that Mr. Schultz provided me with the formulas, I just
18 didn't specify exactly how.
19   Q. Okay. When he provided this to you in an
20 email, had you ever heard the phrase "commission account
21 annual cost percentage" before?
22   A. No, sir.
23   Q. Had you ever worked on a data calculation
24 for commission account annual cost percentage before?
25   A. No.

20 (Pages 74 - 77)

Page 78

1     Q.  When he provided this to you, did you
2  have any questions for him?
3     A.  Sure.  Like I tried to be preemptive on
4  that answer.  But like I said, which column represents,
5  for example, commissions per year, where do I get that,
6  which field or which tab.  For each of those items I
7  would have questions.
8     Q.  Okay.  And he provided you with the
9  answers to those questions?
10    A.  Yes.
11    Q.  Have you ever seen the formula that's
12 listed in paragraph 21 of your report before your work
13 on this project?
14    A.  I mean, that exact formula, no.  But, you
15 know, formulas in general, I've seen many formulas with
16 dividing and plussing and minussing and all of that.  So
17 this is my life, is applying formulas to data.  But that
18 exact formula, no.  But I would say that that's probably
19 an answer in any of these cases I've ever worked on,
20 have you ever seen that exact formula before, and the
21 answer is probably no.
22    Q.  All right.  And do you know how
23 Mr. Schultz prepared this formula?
24    A.  He's a -- he's an expert in his field.  I
25 have no idea how he came up with it.

Page 79

1     Q.  Did you ever ask him what steps he took?
2     A.  No.
3     Q.  Do you have an opinion on whether the
4  output of this formula can determine, in whole or in
5  part, whether a Freedom Account is suitable for an RJA
6  client?
7     A.  I don't have an opinion, no.
8     Q.  All right.  Do you have an opinion on
9  whether the output of this formula can determine, in
10 whole or in part, whether RJA conducted a suitability
11 review before recommending that a client with a
12 commission-based account open a Freedom Account using
13 funds in the commission account?
14    A.  Not sure I followed that, but it's
15 probably not really important that I do follow it,
16 because like I said, I was given a formula, and I might
17 have questions about how to apply that formula and some
18 assumptions about the data, I need all that provided.
19 But in terms of what the results show, as long as they
20 accurately reflect the formula in the description of
21 the -- of the, you know, assumptions, then that's the
22 extent of my role.
23        So the answer to your question is, no, I
24 don't have an opinion on that.
25    Q.  All right.  In the 59-account spreadsheet

Page 80

1  on the commission side, there are some accounts for
2  which there's less than a year's worth of data on the
3  commission side; is that right?
4     A.  I believe so, yes.
5     Q.  Like, an account might have been opened
6  in May of 2016, so for that year, you only have from May
7  to December of 2016; is that right?
8     A.  Yes.
9     Q.  How did this formula deal with the
10 partial year situation?
11    A.  So this particular formula has a portion
12 at the end where it's multiplied by -- it's divided by
13 the number of months, the result, and then multiplied by
14 12 to get an annualized number for each year.
15    Q.  Can you walk us through -- are you
16 familiar with the phrase "order of operation"?
17    A.  Yes.
18    Q.  I have to ask it.
19    A.  No, no, it's cool.
20    Q.  Can you walk us through the order of
21 operations for doing the calculation in 21?
22    A.  Really the first step is to say I want to
23 add up all the fees.  Right?  So the order of operation
24 in the first part doesn't really matter, but I'm adding
25 the commissions fees per year, I'm including the other

Page 81

1  fees, but I'm excluding the IRA fees, so I'm not adding
2  those, essentially.
3        And I'm also including the transaction
4  fees for the year.  So then I get a number that's
5  representative of the total number of fees per year.
6  I'm dividing that by the number of months that the
7  account was open to get fees per month.  And then I'm
8  multiplying that result by 12 to get the fees per year.
9     Q.  All right.  And then that whole thing is
10 divided by annual average equity?
11    A.  Yes.
12    Q.  All right.  So step one is you add or
13 subtract the first four fields, commissions per year,
14 other fees per year, IRA fees per year, transaction fees
15 per year.  You take what results from that, divide it by
16 the number of months the account was open.  And then you
17 take the result of that, multiply it by 12 months.  Take
18 the result of that, and divide it by the annual average
19 equity.  Is that right?
20    A.  Yes.
21    Q.  Okay.  And the order of operations that I
22 just went through, did Mr. Schultz provide that to you?
23    A.  I mean, it's in the formula, right, so
24 I'm going to do the parentheses first, and then I'm
25 going to do multiplication and division before adding

21 (Pages 78 - 81)

Page 82

1 and subtracting, and then I'm going to do from left to
2 right. But, yes, I guess he provided it within the
3 formula.
4        It gets kind of convoluted because you
5 have spaces in between the commissions per year, so it's
6 not like an X or a Y, but I think you can clean it up
7 and read it a little bit better if you did that.
8        Q.  I'm just going with what I have in front
9 of me.
10        A.  Yes.
11        Q.  That's what I was wondering, because
12 there's -- in order of operations, does division come
13 before adding?
14        A.  Yes.
15        Q.  So shouldn't there be another --
16 shouldn't there be another set of parentheses before
17 commissions per year and then after transaction fees per
18 year, just to indicate that that addition problem needs
19 to happen first?
20        A.  After transactions per year?
21        Q.  So before commissions per year, just to
22 indicate that that whole first set should be in brackets
23 or something?
24        A.  Yeah, it looks like that's true.
25        Q.  So to understand this, you could put

Page 83

1 brackets before commissions per year, and then put
2 brackets after transaction fees per year, and that would
3 indicate to me that that operation has to occur before
4 the division occurs, and then everything else would work
5 fine, right?
6        A.  Yeah, I think so. But I think as we
7 described the order of operations as they were
8 applied -- and like I said, this is me reading this and
9 saying this is -- I guess partly understanding what
10 they're trying to do in terms of annualizing. I mean,
11 that's something that's been done in other cases.
12        So you're right, it looks like it might
13 not be quite as clear as it needs to be. But, yes, the
14 first portion of that is all -- the addition and
15 subtraction is all one group, but it's not bracketed
16 properly. So, yes, I agree with you.
17        Q.  All right. Let's look at paragraph 22.
18        "In conducting this calculation for the
19 commission account data, I was instructed to do the
20 following."
21        Again, my first question is going to be
22 who instructed you to do the following?
23        A.  Yeah, the answer is always going to be
24 the same on that. So I understand that all the
25 instructions came from Mr. Schultz and that they came

Page 84

1 through plaintiff's counsel.
2        Q.  Okay. In that next sentence that
3 follows, "First, in calculating transaction fees, I
4 included fees that were included at the trade level
5 recorded in RJA's data as a handling fee, a fee, or an
6 other fee."
7        That instruction came from Mr. Schultz,
8 correct?
9        A.  Yes.
10        Q.  You did not make the decision to include
11 those fees specifically, correct?
12        A.  No, and my role would be to say, when you
13 say fees, do you mean other fees, handling fees? And
14 then they would have said all fees, so just add them all
15 together. So that's how that would have gone.
16        Q.  Okay. So you're not making a judgment in
17 your expert experience about what sort of fees should be
18 included in this, correct?
19        A.  No. That is correct.
20        Q.  Okay. It is correct that you're not
21 making that judgment?
22        A.  That is correct, yes.
23        Q.  And then in the second sentence, "Second,
24 I removed any $50 or $60 annual charges which reflect
25 the IRA fees."

Page 85

1        That, again, that was not -- was that
2 your decision?
3        A.  No, it would have been my question is,
4 you say you want to remove the IRA fees in the formula,
5 but what are -- how do I identify the IRA fees. And so
6 the instruction back would be, remove the $50 or $60
7 annual charges.
8        Q.  And then the third sentence, Third, I
9 also removed any net, quote, other, closed quote, fees
10 that were positive.
11        Again, was that your decision to remove
12 the net other fees that were positive?
13        A.  Yeah, it's the same answer. I would have
14 noted that some fees are positive, and I would have
15 asked, how do you want to handle those, how should I
16 handle those?
17        Q.  All right. And then, Fourth, I removed
18 the other fees -- quote-unquote, other fees for one
19 account that were in excess of 400.
20        Again, is that a decision that was made
21 by Mr. Schultz?
22        A.  Yes.
23        Q.  Did he tell you, if at all, why?
24        A.  He may have. I don't really care. So I
25 probably didn't pay very close attention. Meaning that

22 (Pages 82 - 85)

Page 86

1 I'm just trying to understand how to apply this formula
2 to provide the results that he's after.
3     Q.   And you're drafting a query based on this
4 input so you can do your analysis, correct?
5     A.   Yes.
6     Q.   In the last sentence of paragraph 22 of
7 the Exhibit 122, you say, "Finally, I excluded
8 commissions and fees charged on sales of securities in
9 the month the Freedom Account was opened and two months
10 prior."
11     Do you see that?
12     A.   Yes.
13     Q.   All right.  And, again, was this your
14 decision?
15     A.   No.  In this case, I will point out that,
16 you know, after this report was written and later on, I
17 was asked -- and, again, I don't necessarily know why it
18 was excluded or not excluded, per se, but I was asked to
19 redo these calculations and come up with new numbers
20 without this particular parameter.
21     Q.   And when did that happen?  When were you
22 asked to rerun those numbers?
23     A.   I think late last week, like, last
24 Thursday or Friday.
25     Q.   Who asked you to rerun the numbers?

Page 87

1     A.   I'm not sure if that one came from
2 Mr. Schultz or not, but it came from plaintiff's counsel
3 to me.
4     Q.   Did it come in the form of a phone call?
5     A.   I think both, meaning that originally it
6 was sent in an email, and then I was called, and, you
7 know, just to make sure that I understood the urgency
8 that it needed to be done before today, and that they
9 wanted to see what those numbers were.
10     Q.   Well, let me ask you first, just before
11 we get to that, in this last sentence here, you did, for
12 the report's purposes, exclude the commissions and the
13 fees that were charged on sales of securities in the
14 month the Freedom Account was opened and two months
15 prior?
16     A.   Yes.
17     Q.   And did the 59-account spreadsheet
18 contain the date that the Freedom Account was opened?
19     A.   I'm not sure.  We can take a look at
20 that, if it was just based upon when there was first
21 activity or if there was actually an open date.  I think
22 it was when there was first activity, so when the first
23 deposit was put in the account.  I don't know if that
24 date was there or not.
25     Q.   Right.  We may look at that spreadsheet

Page 88

1 later.  But you wrote in the report the months the
2 Freedom Account was opened?
3     A.   Yes.
4     Q.   Okay.  Do you know who decided on two
5 months being the look-back period?
6     A.   Again, my presumption is all those
7 instructions came from Mr. Schultz and came to me
8 through plaintiff's counsel.
9     Q.   All right.  Let's look at Exhibit 123,
10 which has already been marked, which is the Schultz
11 report.  And we're going to look at Mr. Schultz's
12 report, Exhibit 123, at paragraph 51.
13     A.   Okay.
14     Q.   So, Mr. Olsen, you have read
15 Mr. Schultz's report, at least by the day of your
16 deposition, correct?
17     A.   Yeah.  Well, I mean, mostly, yes.
18     Q.   We're looking at paragraph 51.
19     A.   Okay.
20     Q.   There's a sentence about two-thirds of
21 the way down, it starts with, "In addition, because the
22 assets held in the commission-based accounts were often
23 liquidated to open the Freedom Account and that process
24 often took a month or more, the commission charged on
25 sales of securities in the month the Freedom Account was

Page 89

1 opened and two months prior should be ignored."
2     Do you see that?
3     A.   Yes.
4     Q.   At the time you wrote your report, did
5 you have an understanding of whether Mr. Schultz was
6 correct in omitting those two months?
7     A.   I don't have an opinion one way or the
8 other.
9     Q.   You reviewed Bill Gross' deposition
10 transcript, at least a rough copy, before you wrote your
11 report, correct?
12     A.   Yeah, there were some specific passages I
13 think I was kind of directed at.
14     Q.   Did you sit down and do a complete review
15 of it from start to finish?
16     A.   I try not to do that unless I'm asked to,
17 but I don't believe so, no.
18     Q.   Were you asked to do so in this case, to
19 review the report from start to finish?
20     A.   No.  Like I said, I do remember
21 specifically that they were pointing me towards specific
22 sections that were more relevant to my role as either a
23 consultant or as an expert, as you said.
24     Q.   Let's look at tab 17, which is the rough
25 transcript of Mr. Gross' deposition.  We're going to

23 (Pages 86 - 89)

Page 90

1 mark it as -- I think 130 is our next exhibit. So we'll
2 mark this as 130, which is the rough transcript.
3          (Deposition Exhibit Number 130 marked for
4          identification.)
5 BY MR. CLABBY:
6     Q.   This is in the binder, tab 17, that you
7 were provided and you opened earlier today. And we're
8 going to look -- you're welcome to skim through it if
9 you want, but we're going to look at particularly
10 page 173 and 174. It's an uncertified draft, so the
11 page numbers are kind of weird. It's towards the very
12 end of the deposition, and 173 appears in the margins.
13     A.   I think I got it.
14     Q.   All right. And we're going to start
15 on -- it's page 173 in the right-hand margin, but it
16 begins at the top of page 172, so where the answer on
17 the first page is "I don't know whether circumstances
18 that drive which scenario in effect the result is the
19 same."
20          Do you see that page, 173 in the bottom
21 right?
22     A.   Yes.
23     Q.   All right. So there's a question that
24 starts, "But the main thing is if they liquidate it in a
25 commission account, they don't charge a commission when

Page 91

1 they liquidate it. And you accurately anticipated what
2 that take-home question was and that's why it was tied
3 to the work you've done as a designee so you can testify as
4 Raymond James' designee with certainty, that when
5 securities or funds in a commission account are
6 liquidated, they are commissions charged in the
7 commission account as part of the -- that liquidation;
8 is that right?"
9          And then there's an objection.
10          And then the answer, "That's my
11 understanding."
12          And then if you look at the next page,
13 there's another answer. I think it's page 173 that
14 comes over, but the page itself bears the marking 174.
15 There's an answer there, "And agree they operate that
16 they don't charge commissions on the securities that are
17 liquidated to fund the Freedom Account."
18          Was this one of the passages that you
19 read of Mr. Gross' rough transcript, Mr. Olsen?
20     A.   I don't believe so.
21     Q.   Okay. All right. You can close that
22 then, Mr. Olsen.
23          Did you, in fact, run the calculations
24 excluding the -- well, I guess, did you run the
25 calculations restoring the commissions and fees charged

Page 92

1 on sales of securities in the months that the Freedom
2 Account was opened and the two months prior?
3     A.   Yes.
4     Q.   And did you run -- when did you run
5 those?
6     A.   Friday, last Friday.
7     Q.   When did you deliver those, if you did,
8 to plaintiff's counsel?
9     A.   Sometime over the weekend.
10     Q.   Do you know what, if anything, they did
11 with it?
12     A.   I got an email, I think yesterday, that
13 included a letter that was sent that included the
14 results of that or a description of it. So I'm not
15 sure. The short answer is I'm not sure, but I think
16 they told you that we did it.
17     Q.   Did you review the letter that you just
18 mentioned before it went out?
19     A.   No.
20     Q.   Have you reviewed it since then?
21     A.   I didn't really read it all the way
22 through, but, yes, I saw that they had given you some
23 information from -- that resulted from those
24 calculations.
25     Q.   Right. Do you know if the information in

Page 93

1 the letter is accurate as to its representation of your
2 calculations?
3     A.   Oh, I guess I don't know that with
4 certainty. I would assume so, but I guess I didn't look
5 at that.
6     Q.   All right. Let's look -- we should
7 probably look at the letter. So we can share it. I
8 don't have it in your binder, but we can share it on the
9 screen and through Exhibit Share. We're going to mark
10 this as Exhibit 131, and it's a letter dated July 12,
11 2021.
12          (Deposition Exhibit Number 131 marked for
13          identification.)
14 BY MR. CLABBY:
15     Q.   And then, Mr. Olsen, it will come through
16 Exhibit Share and just tell us when you have it open and
17 I'd like you to review it, if you can.
18     A.   I have the letter. I can wait for it to
19 come through on Exhibit Share.
20     Q.   Let's look at it through Exhibit Share so
21 we know we're looking at the same thing.
22          MR. BEATTY: Are you able to pull it up?
23     You might have to refresh.
24          THE WITNESS: Yeah.
25          Okay.

24 (Pages 90 - 93)

Page 94

BY MR. CLABBY:

2     Q.  Have you had a chance to review
3  Exhibit 131?
4     A.  So I've got it open.
5     Q.  Okay.  Take a minute and review it, and
6  then just let us know when you're done.
7     A.  Okay.
8     Q.  All right.  Is this the letter that you
9  mentioned a moment ago as you having received by email
10 today?
11    A.  Yes.  I didn't -- so I received it
12 yesterday.  You just said "today."  I want to make sure
13 that when I say yes, it's all good.  But I received it
14 yesterday.
15    Q.  Thank you.
16        So there are calculations in this report
17 that appear in paragraphs 1, 2, 3, and 4.  Who did those
18 calculations, if you know?
19    A.  I did.
20    Q.  Did you do the calculation -- just to be
21 clear, paragraph 3 at the top of the next page of page 2
22 of Exhibit 131, there's a statement that says, "This
23 calculation illustrates that on average, account holders
24 were paying over 22 times as much in account fees for
25 the Freedom Account."

Page 95

1        Did you do that one?
2     A.  No.  I think that's kind of basic math on
3  the numbers that are in number 3, so indirectly I guess
4  I kind of did.  But I did not do that math and come up
5  with the number 22, no.
6     Q.  Okay.  So then let's go through them all
7  just to make sure we know what you did.
8        In paragraph 1, it represents that
9  there's an annual cost percentage -- we should probably
10 look at -- let's look at 131, and then let's open your
11 report to the corresponding paragraph of 33.
12    A.  Okay.
13    Q.  In paragraph 1, it says that there is an
14 annual cost percentage of assets as .44 percent, and an
15 annual turnover of .118 [sic].  Did you do that
16 calculation?
17        MR. BEATTY:  Objection.  Jack, I think
18    you got the number backwards for the turnover.
19    You said ".118."  It's .188.
20        MR. CLABBY:  Thank you.  We'll do it from
21    the start again.
22    Q.  In the letter, in paragraph 1(a), you say
23 annual cost .44 percent, and in (b) you say annual
24 turnover .188.
25        Did you do that calculation expressed in

Page 96

1  the letter?
2     A.  Yes.
3     Q.  All right.  And then in paragraph 2, it
4  lists 31 accounts had both an average annual cost
5  percentage -- I'm adding the word "accounts" -- 31
6  accounts had both an average annual cost percentage of
7  0.5 percent or lower and an annual turnover of 0.25 or
8  lower.
9        Did you do that calculation?
10    A.  Yes.
11    Q.  All right.  And then you say -- well,
12 then the letter says the average annual cost analysis
13 and annual turnover for the 31 sample class members is
14 0.03 percent and 0.014, respectively.
15        Did you also do that?
16    A.  Yes.
17    Q.  And there are two exhibits to this.  Did
18 you prepare the Exhibit 1 and Exhibit 2 to Deposition
19 Exhibit 133?
20    A.  Yes.
21    Q.  All right.  Then in paragraph 3, there's
22 a chart at the bottom of page 1 which lists the annual
23 cost Freedom Account, the annual cost commission
24 account, and the difference.
25        Did you do those calculations?

Page 97

1     A.  Yes.
2     Q.  All right.  And then on the last page,
3  paragraph 4, you provide a total aggregate damages
4  number of $121,094 or an average of $3,906 per account.
5        Did you do those analyses?
6     A.  I did.  I don't know that I did the
7  average.  I might have had to divide by 31 themselves,
8  but I did, yes.
9     Q.  This letter is not an expert report from
10 you, though, correct, Mr. Olsen?
11    A.  No, that is correct.
12    Q.  And you agree that the new calculations
13 have an impact -- the new calculations are different
14 from the calculations, in many respects, that are in
15 your report, correct?
16    A.  I don't know that I like the term "many
17 respects," meaning that it's just one parameter was
18 changed.  But if you're talking about a number of
19 numbers that are listed in the report change if you add
20 in more fees, then the answer is yes.  Meaning that the
21 only thing that changed was including those fees in
22 commissions for the last two months of the commission
23 account.
24    Q.  All right.  So in paragraph 1, the new
25 calculations are -- at least for annual costs in

25 (Pages 94 - 97)

Page 98

1 Exhibit 131, the letter, it says .44, and in your report
2 you had stated .35. So those numbers are different,
3 correct?
4       A. Yeah. So I guess what I'm saying is, one
5 parameter changed, and, yes, it's going to change a
6 number of the results because anything that had to do
7 with the cost is going to change.
8       Q. So in paragraph 22 of your report, if you
9 were to reverse any of those assumptions, there could be
10 an impact on your calculations?
11      A. I think that any time you change the
12 assumptions and you change the numbers in the formula,
13 it will certainly have an impact on the results. So
14 that's why I was trying to be careful earlier to say
15 that what I want to do in this report is articulate, so
16 here is the type of calculations that could be
17 performed, here is the data I was given, here is the
18 assumptions I was given, here are the results. If the
19 assumptions change, or the parameters change, or the
20 data changes, yes, I think the results will change. I
21 think that's a fair characterization.
22      Q. Do you have an opinion on what the
23 correct number -- well, strike that.
24          Do you have an opinion on whether
25 commissions and fees charged on sales of securities in

Page 99

1 the months the Freedom Account was opened and two months
2 prior should be excluded from the formula in this case?
3          MR. BEATTY: Objection. I'm pretty sure
4          he's asked and answered that question.
5          THE WITNESS: Yeah, I don't have an
6          opinion. I mean, it's a much easier
7          calculation if you don't have to exclude those
8          funds. But other than that, I don't know
9          which one -- I mean, I don't have an opinion
10         on which one should be used.
11 BY MR. CLABBY:
12      Q. All right. So let's look again at the
13 letter, Exhibit 131, in the first paragraph of the
14 letter. There's a quotation of Mr. Klouda in his
15 rebuttal report.
16      A. Okay.
17      Q. He states, quote, Any activity related to
18 the funding of the Freedom Account involving trading
19 securities is done at no cost to the client, closed
20 quote.
21          Do you have an opinion on whether that
22 statement is correct?
23      A. No.
24      Q. All right. Let's look at paragraph 23 of
25 your report.

Page 100

1          So in paragraph 23, there's three lines,
2 what looks to me to be a formula that starts with the
3 word "turnover"?
4       A. Yes.
5       Q. Do you see that?
6       A. Yes.
7       Q. Is this the formula -- I'll say, is this
8 the, quote, commission account annual turnover analysis,
9 closed quote, formula that was provided to you by
10 Mr. Schultz?
11      A. Yes.
12      Q. All right. And how did he provide this
13 to you, in what format?
14      A. He had similar discussion as before, so I
15 would have gotten it in an email, because I cut and
16 paste this. And it doesn't surprise me that when you
17 have me pull up Mr. Schultz's report, that it looks
18 exactly the same, right.
19      Q. And the email that you received that
20 included this is not mentioned in paragraph 11 or
21 attached to your report, correct?
22      A. No, it's kind of mentioned peripherally,
23 I think, in paragraph 20. But the mechanism for giving
24 me this is not --
25      Q. Okay.

Page 101

1       A. -- is not listed.
2       Q. When he provided this formula to you, had
3 you ever heard the phrase "annual turnover analysis"
4 before?
5       A. No. I mean, that's kind of common in all
6 the cases that I work on, is that there's going to be
7 new terms. Essentially, for me, once you put it in a
8 formula to your XYZ, so it's not -- I have not -- the
9 short answer to your question is I had not heard that
10 expression before.
11      Q. Have you ever worked on a data
12 calculation for annual turnover analysis before this
13 project?
14      A. No, just calculations on formulas in
15 general, but not that specific formula.
16      Q. When he provided this formula to you, did
17 you have any questions for him?
18      A. Similar answer as before. I mean, the
19 first, for example, annual total dollar value of
20 purchased securities, I might have looked at the
21 spreadsheet and said, am I getting it from tab G,
22 column A, is that the right place, and that kind of
23 question. But other than that, I think this was a
24 little bit easier and more straightforward than the
25 first formula.

26 (Pages 98 - 101)

Page 102

1    Q. Was there a turnover field already in the
2  59-account spreadsheet?
3    A. I believe -- I get confused between the
4  Freedom and commission and all that, but I believe there
5  was, but I don't think that Mr. Schultz felt like it was
6  annualized correctly. So I think that I would have
7  gotten the same numbers for accounts that were open for
8  12 months. So if you had a full year's worth of data,
9  we should have the same number that was in the
10 spreadsheet. But in cases where the account was open
11 for less than 12 months in a year, then the numbers
12 would be different.
13   Q. How did you approach the
14 less-than-one-year issue for the commission account
15 annual turnover analysis?
16   A. So similar as before. Once you're -- you
17 get the annual total dollar purchased securities and
18 divide it by the number of months that the account was
19 open to get that kind of per month, and then multiply it
20 by 12 to get the annualized value.
21   Q. Let's look again at the Schultz report.
22 So that's Exhibit 123. Let's open that back up. And
23 we're going to go back -- I want to go back to the
24 commission account annual cost percentage issue. Let's
25 look at paragraph 49 of the Schultz report. So this is

Page 103

1  Exhibit 123, paragraph 49.
2        In paragraph 49, he provides one version
3  of an annual cost percentage formula, and then he
4  provides what looks like another one in paragraph 50,
5  and then another one in paragraph 51. And I think in
6  paragraph 21 of your report, you cite the paragraph 51
7  of the Schultz report version.
8        Did you only work with the paragraph 51
9  version, or did you work with the two prior versions?
10   A. I only worked with the 51 version.
11   MR. BEATTY: I'm just going to object
12 here.
13        Art, if you want to read this section of
14 the report, you can go ahead and read this
15 section of the report, Doug's report.
16   THE WITNESS: I guess -- so we're
17 talking -- I'm sorry, it took me a second.
18 But we're going back to the first formula that
19 we talked about, this is no longer turnover?
20 BY MR. CLABBY:
21   Q. Yeah, we're just going back for a minute
22 to paragraph 21 of your report.
23   A. It sounds like he's saying that, you
24 know, we have a basic formula and then you have the
25 annualized component and then you have adding in all the

Page 104

1  fees rather than just the commission fees, and so the
2  end result is this formula in 51, and that's the one
3  that I used.
4    Q. Okay. Thanks.
5        And then kind of similar question now
6  going back to turnover for -- in paragraph 23.
7    A. 23 of my report?
8    Q. Yeah. So you see the turnover there.
9  And then I want to look at, if we can, Mr. Schultz's
10 paragraph 54.
11   A. Okay.
12   Q. And, again, the same question, read that
13 section, and I'm going to ask you about paragraph 54 and
14 55.
15   A. Okay.
16   Q. So he has the two formulas. 55 is the
17 mature formula, and that's the formula that you relied
18 on; is that right?
19   A. Yeah, and we kind of talked about this.
20 I think 54 was the formula that was used by
21 Raymond James in the spreadsheet for their turnover
22 calculation, and then -- but it wasn't annualized, so
23 that was the 55 revision of that formula, and that's
24 one that I used.
25   Q. What do you mean by "annualized"?

Page 105

1    A. I mean, that's what they called it. But
2  to take an average or take an amount, divide it by the
3  number of months to get a monthly amount, then multiply
4  it by the number of year, and then I do similar things
5  in terms of, like, interest calculations in other cases.
6  But it's to try to make the number that's based upon a
7  partial year into a number that's applicable to a full
8  year.
9    Q. Does that overweight the partial year?
10   A. I mean, it does what it does. If
11 somebody determines that it overweights the partial
12 year, then it -- I don't -- it could. It may not. I
13 don't -- I don't know. It seems like -- yeah, I don't
14 know.
15   Q. But, like, if an account is open for one
16 month and you're annualizing it, are you taking one
17 month's worth of data and treating it as if it's a full
18 year by annualizing it, right?
19   MR. BEATTY: Objection. Asked and
20 answered.
21   THE WITNESS: So I think more -- it's
22 saying that if this account had been opened
23 for the whole year, what were the numbers. So
24 it's not like if you say how many fees --
25 there are averages over the course of the

Page 106

1  year, meaning that if I have -- if I'm
2  comparing the -- and I don't know the reasons
3  why Mr. Schultz wanted to do this calculation,
4  but it's kind of speculation on my part. But
5  we're taking an annual average equity and
6  we're comparing it to fees that were assessed
7  in some partial period of the year, so you're
8  comparing a partial year to a full year and
9  then getting a ratio.
10      So what he's saying is, instead, take --
11  annualize it and say what would the fees be if
12  the account had been opened for the full year
13  and then divide by the annual average. To
14  him, or according to Mr. Schultz, that's a
15  more -- that's a more reliable number.
16      But I don't have an opinion, like I said.
17  I just applied the formula.
18  BY MR. CLABBY:
19      Q.  All right. Let's go back to your
20  paragraph 23 in Exhibit 122, which is your report.
21      As to the formula listed in paragraph 25
22  [sic], do you have an opinion on whether this -- do you
23  have an opinion on whether the output of this formula
24  can determine, in whole or in part, whether a Freedom
25  Account is suitable for an RJA client?

Page 107

1      MR. BEATTY: Objection. Ambiguous.
2      THE WITNESS: You said 25. Are you
3  talking about the metrics?
4  BY MR. CLABBY:
5      Q.  No, sorry, we're looking at paragraph 23.
6      A.  Okay. I'm just making sure.
7      Q.  It's the same question I asked you for
8  paragraph 21. Do you have an opinion on whether the
9  output of this formula can determine, in whole or in
10  part, whether a Freedom Account is suitable for an RJA
11  client?
12      A.  No.
13      Q.  Do you have an opinion on whether the
14  output of this formula can determine, in whole or in
15  part, whether RJA conducted a suitability review before
16  recommending that a client with a commission-based
17  account open a Freedom Account using funds in the
18  commission account?
19      A.  No.
20      Q.  All right. Let's look at the next
21  paragraph in Exhibit 122, which is paragraph 25.
22      A.  Okay.
23      Q.  So you say, I then determined whether the
24  individual accounts were class members by determining if
25  each account satisfied two metrics, and then you list

Page 108

1  the two metrics.
2      Do you see that?
3      A.  Yes.
4      Q.  Do you understand that what you were
5  doing was determining whether individual accounts were
6  class members?
7      A.  Yeah, I mean, I understand that I'm
8  identifying people that did fit the class definition or
9  whatever, and -- yes, I mean, I'm identifying people
10  that are in or out based upon this metric. I don't --
11  you can reword it to say whether or not they're included
12  in the calculations or not included in the calculations,
13  but I'm not determining -- making the determination of
14  whether or not they're a class member. I'm just
15  determining whether or not they satisfied those two
16  metrics.
17      Q.  And I think you've already testified, but
18  I'll ask you again, Mr. Schultz came up with the two
19  metrics that are reflected in paragraph 25, correct?
20      A.  Yeah, those would have come over at the
21  same time that the formulas were given to me.
22      Q.  Have you ever seen these two metrics
23  being used together in any other matter on which you've
24  provided expert testimony?
25      A.  I mean, I've never seen either of those

Page 109

1  two metrics, period, because I've not worked on a case
2  like this before. But, again, it's in terms of doing
3  data -- calculations with data, these are the results of
4  calculations and to say, you know, if this is greater
5  than this, and this is greater than this, then include,
6  and don't include, those are just basic data
7  calculations. But the short answer to your question,
8  these specific metrics, no.
9      Q.  All right. And for your role in the
10  analysis of the formula listed in paragraphs 21, 23, and
11  25, you just ran the numbers, correct?
12      A.  Yes.
13      Q.  And you did not develop those formulas,
14  correct?
15      A.  That is correct.
16      Q.  And you were not opining on whether those
17  formulas together create any liability for
18  Raymond James & Associates, Inc., correct?
19      A.  That is correct.
20      Q.  Now, you mentioned the phrase "class
21  definition" a moment ago. You've worked as an expert on
22  class actions before, correct?
23      A.  Yes.
24      Q.  Approximately how many have you served as
25  an expert on?

28 (Pages 106 - 109)

Page 110

1    A.   That's an interesting question, and I
2  don't want to be cagey, it's just how to answer it.
3          So, like, for example, I worked on
4  MDL 2036, and under that there was probably 35 different
5  banks that were a part of that.  And then under each of
6  those, there may be five, six, seven cases that were
7  rolled up into each bank.  So is that one case because
8  it's MDL 2036?  Is it 35 because it's 35 different
9  banks?  Or is it 200 because of all the cases that were
10  rolled up?
11          So I don't know.  But I will say it's
12  been a lot.  And at this point, in terms of just
13  financial institutions, whether they be mortgage
14  companies or banks or credit unions or credit card
15  processors, I've seen data from probably, I don't know,
16  maybe 100 to 130, somewhere in there, different
17  financial institutions.
18    Q.   So you're familiar with the term "class
19  definition," correct?
20    A.   Yes.
21    Q.   All right.  What does it mean?
22    A.   Well, in terms of a class action from --
23  I'm not the lawyer, but from my perspective, it's
24  identifying the people that are covered by the lawsuit.
25  So if it goes to trial or if it settles -- or if it goes

Page 111

1  to trial and they win or it settles, it's these are the
2  people that are covered by the case and these are the
3  ones that presumably get some sort of payout at the end.
4          Again, I'm not the lawyer, but I know
5  that part of these cases is always identifying someone
6  that was affected by a certain practice.
7    Q.   Is there a place where the class
8  definition is written down in a document of a case?
9    A.   I mean, I would assume it's in the
10  complaint.
11    Q.   Do you know what the class definition is
12  in this case?
13    A.   Yeah, I don't.  I mean, I have a -- like
14  I said, we talked about this a little bit before.  I
15  have kind of a general understanding about what the case
16  is.  Sometimes, you know, I'll take a look at that and
17  there might be a component, for example, that says only
18  include people if they live in Washington State, for
19  example.  And I might have a question that says, well,
20  how do I determine if somebody is in Washington State?
21          In this case, this is kind of more
22  typical for me.  They say here's some data, we want you
23  to perform these calculations because we feel -- and
24  "we" could be plaintiff's attorneys, it could be another
25  expert.  But they're saying that we want these

Page 112

1  calculations performed because we feel this identifies
2  class members.
3          Whether that's true or not, I don't know.
4  But what I am saying is that these are the results of
5  these calculations and it's for someone else to decide
6  whether or not that accurately identifies the class
7  members.
8    Q.   So are you aware of what the class
9  definition is in this case?
10    A.   Like I said, I've seen the amended
11  complaint.  And I think that the class definition is
12  ultimately decided when the class is certified and the
13  judge determines what the class -- final class
14  definition is.  I don't know, like I said, I'm not a
15  lawyer.  It's not really particularly relevant to doing
16  the calculations to me.  But I don't.
17    Q.   Let's look at Mr. Schultz's report again,
18  which is Exhibit 123, and look at paragraph 60.
19          If you can, just read that, and I'll ask
20  you some questions about it.
21    A.   Okay.
22    Q.   Do you understand from reading that
23  paragraph 60, that Mr. Schultz is using your work and
24  your report to argue that the two metrics he provides
25  can tell you whether a Freedom Account is, quote,

Page 113

1  objectively suitable, closed quote?
2    A.   I don't read it that way.  It doesn't
3  really reference my work at all.  So he's making the
4  determination that those metrics identified the account
5  regardless of whether or not I did any work.
6    Q.   Understood.
7          So do you understand that he believes
8  that those two metrics would, quote-unquote, objectively
9  show that an account would be a member of the class?
10    MR. BEATTY:  Objection.  Calls for
11  speculation.
12    THE WITNESS:  Well, I agree that he
13  thinks that those are important.  I also think
14  that he agrees that if those aren't met -- or
15  if those two standards are met -- I guess if
16  they're both the low, those numbers, then
17  switching to a fee-based Freedom Account is
18  objectionably unsuitable.  I don't know if
19  he's opining that that makes them a class
20  member or not, because, like, I don't opine
21  that my results mean they're a class member or
22  not.  I just opine that these are the results.
23  I'm not sure if he's opining that or not by
24  reading this paragraph.
25          All I can say is that he's saying that

29 (Pages 110 - 113)

Page 114

1   those two metrics are important and that if
2   they are not met, then switching was
3   objectionably unsuitable.  That seems to be
4   his opinion.  I don't see where he says that
5   they're a class member.
6 BY MR. CLABBY:
7       Q.  Okay.  So you're not offering an opinion
8 today of whether if a commission-based account has both
9 a .5 percent annualized cost and a turnover of less than
10 .25, switching that account to a fee-based Freedom
11 Account is objectively unsuitable?
12      A.  No.
13      Q.  Did Mr. Schultz provide you with a
14 minimum period by which the account holder had to have a
15 commission-based account opened to qualify the class?
16      A.  No.
17      Q.  So if there was an account -- looking
18 back at paragraph 25 of your report where you said, "I
19 then determined whether the individual accounts were
20 class members by determining if each account satisfied
21 two metrics."
22          If a commission-based account was opened
23 for one day and then switched to a Freedom Account and
24 it met these two metrics, would that be a member of the
25 class?

Page 115

1       MR. BEATTY:  Objection.  Calls for
2   speculation.
3       THE WITNESS:  Well, and the reason why
4   I'm hesitating is because I'm not opining on
5   whether or not they would be a member of the
6   class.  I will say, like we talked about
7   earlier, that if they were opened in the same
8   month and the data was excluded, and,
9   therefore, they wouldn't be part of my
10  calculations kind of by definition.  If they
11  were opened on the last day of one month, and
12  then -- and then -- if one was closed the last
13  day of one month, and then the next one was
14  opened on the first day of the following
15  month, I guess it's possible.  But I didn't
16  exclude based upon the number of months it was
17  open.  Raymond James was the only one that did
18  that.
19 BY MR. CLABBY:
20      Q.  Did Mr. Schultz instruct you to exclude
21 anyone on the grounds of how long the commission account
22 was open?
23      A.  I mean, that's a calculation that could
24 certainly be done, but I don't believe that was part of
25 any of the assumptions that I've been given so far, no.

Page 116

1       Q.  Just to round out this suitability idea,
2 are you familiar with the concept of suitability as it
3 pertains to the securities industry?
4       A.  No, not really.
5       Q.  Are you offering any opinion as to
6 suitability in your report?
7       A.  Insofar as I understand what the word
8 means in this case, we're talking about paragraph 60 in
9 Mr. Schultz's report where he's saying it's unsuitable.
10 I don't feel qualified to say it's suitable or
11 unsuitable, no.
12      Q.  Just to the two objective criteria that
13 you mention in paragraph 25 of your report, did they
14 tell you who was transferred, as you use that in
15 paragraph 2 of your report, from a commission account to
16 a Freedom Account?
17          MR. BEATTY:  Objection.  Asked and
18          answered.
19          THE WITNESS:  I mean, I'm not sure if it
20          does or doesn't, meaning that, you know, we
21          had gone through this and if the funds were
22          transferred from a commission account to a
23          Freedom Account but the Social numbers were
24          different, they were excluded.  So it sounds
25          to me like they were all transfers.  But I

Page 117

1   don't know.  I don't -- I wouldn't know that
2   for sure.
3 BY MR. CLABBY:
4       Q.  All right.  Let's look at paragraph 26.
5           Paragraph 26 discusses, the first
6 sentence, For the commission accounts, RJA's data
7 provided the number of trades per account.
8           And then there's a discussion in the next
9 sentence about the number of trades and it kind of gives
10 another formula.
11          What's the relevance of the number of
12 trades in paragraph 26?
13      A.  I'm not sure that it's in the formula,
14 but I think it was provided as part of the results.
15 Number of trades?
16      Q.  If you want to look at any of the
17 exhibits, please feel free to do so.  I was just
18 wondering in paragraph 26 what the discussion of number
19 of trades is about.
20      A.  Yeah, I think at some point it was asked
21 of me to determine that, but -- I don't -- yeah, I don't
22 know.  So number of trades, it's not part of the
23 formula, per se.
24      Q.  All right.  Do you have any conclusions
25 in your report based on paragraph 26?

30 (Pages 114 - 117)

Page 118

1     A.  It doesn't appear so, no.  No, I don't
2 think so.
3     Q.  Is that just a holdover from an earlier
4 draft, do you think?
5     A.  It's possible.  It's a calculation that I
6 must have done.  But maybe when I didn't include it, I
7 didn't remove it from everywhere.  I guess I don't know.
8 I don't even see it in the -- number of trades, I don't
9 see it in the exhibits to the letter either.
10     Q.  All right.  Then paragraph 27 gives you
11 a -- provides another formula that appears after the
12 words, damages equals, and it's three lines in
13 Exhibit 122.
14         Do you see that?
15     A.  Yes, sir.
16     Q.  All right.  And just to close the loop,
17 is this the damages formula that Mr. Schultz provided to
18 you?
19     A.  Yes.
20     Q.  And when he provided it to you, did you
21 have any particular questions for him about this?
22     A.  The same -- you know, I think -- you
23 know, I might have said here's -- it's the same kind of
24 iterative process where I'm saying this is how I read
25 it, this is exactly where I'm getting these numbers

Page 119

1 from, and this is the exact calculation.  But I think
2 that one's relatively straightforward.  So the actual
3 fees in the Freedom Account, I believe that was a
4 datapoint.  Average annualized commission rate.  And
5 that's kind of all shown in the exhibits as well, the
6 basis for that calculation.  And the average equity was
7 another datapoint.  So I don't think it was particularly
8 complex by the time all the other calculations were
9 done.
10     Q.  All right.  Did you know what fields in
11 the data corresponded to the fields that you needed to
12 include in this query here?
13     A.  I mean, some of it might have been in
14 the -- you can see -- they have very English titles, so
15 very clear spelled-out sentences in some cases what this
16 field represent.  So I probably had a pretty good idea.
17 But I still want to make sure that I'm -- because in
18 some cases there are some datapoints that may be in
19 multiple tabs, but maybe one is by year, one's by month,
20 that kind of thing.  So I just wanted to make sure I was
21 pulling it from exactly where I should be pulling it
22 from.
23     Q.  And if you had questions, would
24 Mr. Schultz answer those questions for you?
25     A.  Yes.

Page 120

1     Q.  Did you ever have a disagreement with
2 Mr. Schultz about which field would represent -- which
3 field in the data would reflect the field in a formula
4 he provided?
5     A.  I would say the short answer is no.  But
6 I think by definition, I would never have a disagreement
7 in any of these cases.  Maybe I would say, are you sure,
8 what about this column, and then they say no, no, I'm
9 sure.  Then I don't really disagree with that.  I mean,
10 I'm asked to perform calculations and ultimately his
11 report is the one that says these calculations are
12 important.  So they've got to be the calculations he
13 wants.
14     Q.  Is there a way from your report to know
15 what fields and data you selected for your queries?
16     A.  I -- maybe not.  I don't think there's a
17 lot of -- meaning that if we look at the exhibits, for
18 example, and then go back to the original spreadsheets,
19 I think it's pretty easy to determine.  But I don't -- I
20 didn't spell out the code.  I was never asked to give
21 the SQL code.  And we had looked in the binder earlier,
22 like, tab 14 or 15 where they gave the code, and I don't
23 know that it's particularly useful to you or -- I mean,
24 someone that's not a SQL coder, but, no, I wasn't asked
25 to provide that.

Page 121

1     Q.  Okay.  So for the formula listed in
2 paragraph 27, had you ever seen this formula before your
3 work in this project?
4     A.  No, it's kind of the same answer as
5 before.  Not that exact formula, just formulas in
6 general.
7     Q.  Do you have an opinion on whether the
8 output from this formula in paragraph 27 can determine,
9 in whole or part, damages from RJA recommending an
10 unsuitable Freedom Account for an RJA client?
11         MR. BEATTY:  Objection.  Calls for a
12     legal conclusion.
13         THE WITNESS:  No.  No, I don't have an
14     opinion.
15 BY MR. CLABBY:
16     Q.  And then do you have an opinion on
17 whether the output of this formula in paragraph 27 to
18 determine, in whole or in part, damages from RJA not
19 conducting a suitability review before recommending that
20 a client with a commission-based account opened a
21 Freedom Account using funds in the commission account?
22         MR. BEATTY:  Objection.  Calls for a
23     legal conclusion.
24         THE WITNESS:  Yeah, I do not have an
25     opinion.

31 (Pages 118 - 121)

Page 122

1 BY MR. CLABBY:
2      Q.   Are you opining, Mr. Olsen, that the
3 formula in paragraph 27 is the correct damages formula
4 for the case?
5          MR. BEATTY:  Objection.  Calls for a
6      legal conclusion.
7          THE WITNESS:  No.
8 BY MR. CLABBY:
9      Q.   Is this model an accurate reflection of
10 damages?
11         MR. BEATTY:  Objection.  Calls for a
12     legal conclusion.
13         THE WITNESS:  This formula and the data
14     provided, and the assumptions given and the
15     results, I think the results are accurate
16     based upon all that.  But that's -- from my
17     perspective, that's what it is, it's the
18     results of these calculations.
19 BY MR. CLABBY:
20     Q.   So you performed a calculation regarding
21 the damages model in paragraph 27, correct?
22     A.   Yes.
23     Q.   And your report presents the results of
24 that calculation, correct?
25     A.   Yes.

Page 123

1      Q.   And if the results are accurate, is that
2 the end of your role?
3      A.   For now.  I mean, if somebody says we
4 need -- like, for example, on Friday, we want to change
5 the parameters and run some more calculations.  Or if we
6 receive additional data for 27,000 folks, for example,
7 run those calculations.  Or if the judge comes and says,
8 you know, we need to make -- like I said, I mean, I've
9 worked on cases where the judge has said we need to
10 change a parameter and rerun the calculations and I
11 rerun the calculations.
12         But the short answer is, for now, yeah,
13 that's the extent of my -- I think it's always the
14 extent of my role to run calculations.  It's never to
15 opine on whether or not they accurately reflect damages,
16 only that they're accurate as they're described.
17     Q.   Okay.  Let's look at paragraph 28 right
18 below the damages formula.  In that third line, there's
19 a reference to annualizing cost analysis per year.  What
20 does that mean?
21     A.   So, again, it's a -- the costs are
22 divided by the -- the annual -- the commission rates --
23 so you have an annual percentage -- or an average
24 annual -- I guess it's the same formula as before where
25 you have a portion of the year and you're taking that

Page 124

1 and dividing it by the number of months, and then
2 multiplying it by 12 to get an annualized result.
3      Q.   Is that formula that annualizes, is that
4 anywhere in your report, how you actually do the cost
5 analysis -- annualizing the cost analysis per year, is
6 that formula listed?
7      A.   It's the same formula that's in all of
8 Mr. Schultz's formulas, where it's divide by the number
9 of months and multiply by 12.  But I think it's also
10 reflected in the spreadsheet.  But, no, I don't know
11 that it is.
12     Q.   The results of it are reflected in the
13 spreadsheet, right?
14     A.   Yes.
15     Q.   Okay.
16         MR. BEATTY:  Which spreadsheet?
17         THE WITNESS:  Well, it was produced as a
18     PDF, but it's the -- like, for example, the
19     ones in the letter are the exhibits, there
20     were ones with the report as well.  Actually,
21     they're probably in here, at the end of the
22     report, Exhibit C and D.
23 BY MR. CLABBY:
24     Q.   Exhibit E has a column that says
25 annualized -- annualized -- well, let's turn to it.

Page 125

1 Let's go to Exhibit E, which is -- and we can just look
2 at, I think it's marked as E-2, and there's columns
3 across the top.  One says investor, one says year, one
4 say average yearly equity in the account, total number
5 of months of data for the account, and then annualized
6 annual cost.
7          Is that the annual cost that's stated in
8 28, or is that something different?
9      A.   I believe that came directly from the
10 data, but there was, like, one or two instances where --
11 oh, okay.  So in the Freedom accounts, the annualized
12 annual cost, I think it was -- I'm sorry, I don't really
13 remember specifically, but I believe it was like a data
14 field and it was given for every month.  And the problem
15 was, is that -- it's not necessarily a problem, but the
16 issue that's trying to be addressed here is that in one
17 or two cases -- so, like, the first example on this
18 Exhibit E -- make sure I'm on the first page.  But here
19 is this customer investor number one.  And if you looked
20 in the data, they had 1 percent for every single month,
21 and so clearly it's 1 percent.
22         But later on, there's one, and the likely
23 suspect is number 17, where there was periods where
24 there might have been different values.  So, like, if
25 there was -- if it was .5 for half the year, and it was

Page 126

1 .6 for half the year, then the annualized amount would
2 be .55, right, because they have the amount per month.
3      Q.  But that's a good question.  If you look
4 at page 2 of 6 on E-3 to your report, the last line for
5 17, you've got two months of data, and you've annualized
6 the annual cost there to .8, and you're putting it on
7 equal footing with 12 months of data.  So really it
8 should be one-sixth power when you're averaging them,
9 right?
10      A.  Yeah, I don't know.  I mean, I did the
11 calculation, and this may have been part of the
12 discussion about how to come up with an average.  This
13 is how it was done.  If it needs to be weighted and the
14 parameter needs to be changed, it needs to be changed.
15 But I'm not making a determination whether or not that's
16 the calculation that should be performed.
17      Q.  All right.  And that's Mr. Schultz making
18 the determination of what calculation should be
19 performed, correct?
20      A.  Yes.
21      Q.  All right.  And he communicated to you
22 instructions that you should take two months of data and
23 annualize it and then present it with equal weight to
24 12 months of data?
25      A.  So, again, I presume that they all came

Page 127

1 from Mr. Schultz, but it would have come to me through
2 plaintiff's counsel a lot of the times.
3      Q.  To test that assumption, if it didn't
4 come from Mr. Schultz, who else could it have come from?
5      A.  I guess by definition -- well, I mean, I
6 believe that it did come from Mr. Schultz, but if it
7 came from somewhere else and then the attorneys passed
8 it on, I guess I wouldn't know the answer to that.  It
9 could have come from the attorneys themselves, I
10 suppose.  But like I said, I believe, it's my
11 understanding, that all these assumptions came from
12 Mr. Schultz.
13      Q.  All right.  So back to paragraph 28 of
14 your report, we're talking about the damages
15 calculations.
16          In that same paragraph at the bottom of
17 page -- it's paragraph 28 at the bottom of page 8, you
18 say, "I then multiplied the average annualized
19 commission rate by the average equity in the Freedom
20 Account for each year and then summed up those amounts
21 to get the projected fees."
22          Do you see that?
23      A.  Yes.
24      Q.  What are projected fees?
25      A.  I mean, it's described as a formula,

Page 128

1 right, so it's a calculation.  But presumably it's to
2 say that had those funds been left in the commission
3 account, you know, based upon the percentage of fees
4 that they were paying on the value of the account, what
5 is that percentage that would have been charged had it
6 stayed consistent in the commission account, I guess.
7          This is kind of speculation on my part.
8      Q.  Okay.  Speculation on your part as to the
9 meaning of projected fees?
10      A.  Yeah, meaning that I'll describe the
11 calculation, but really -- I do have a basic
12 understanding of what the calculation means, and they're
13 saying that the monies in the commission account, they
14 would be charged these many fees or this much in fees
15 and it's a percentage of the value of the account.
16          So, you know, if the value of the account
17 goes up, I mean, I guess the projected fees would then
18 go up as well.  Meaning that we're saying that on
19 average, they pay 1 percent in fees of the value of the
20 account every year, then had it been left in that
21 account during the period of time it was a Freedom
22 Account, then the assumption is that same 1 percent
23 would hold.
24      Q.  Okay.  And who authored that assumption?
25 Is that Mr. Schultz?

Page 129

1      A.  Yeah.  And, again, for me, it's not
2 really an assumption from my perspective meaning that
3 it's just a calculation.  So --
4      Q.  Okay.
5      A.  -- I'm just trying to read into what it
6 means.  But, yeah, that would have come from
7 Mr. Schultz, same answer.
8      Q.  Did you ever discuss this concept of
9 projected fees with Mr. Schultz?
10      A.  Only in the context of is this formula --
11 am I applying the formula, am I applying the logic
12 correctly.
13      Q.  All right.  Let's take a look at his
14 report again, which is Exhibit 123, at paragraph 150.
15      A.  150?
16      Q.  Yeah, paragraph 150, it's page 37.  And
17 you can take a look at 149 and 150 together.
18      A.  Okay.
19      Q.  So in paragraph 150, he says, "While the
20 actual fees paid in the fee-based account are known" --
21 well, let's leave it at that.
22          Where in the formula is that concept
23 captured, which is the actual fees paid in the fee-based
24 account?
25      A.  I think that was in the Freedom Account

33 (Pages 126 - 129)

Page 130

1  data. Then there's fees charged, right. This is the
2  amount of fees we charge was like a datapoint.
3      Q.  And in the formula that appears in your
4  report at paragraph 27, it's the first datapoint
5  there --
6      A.  Yes.
7      Q.  -- actual fees in fee-based Freedom
8  Account, right?
9      A.  Yes.
10     Q.  Okay.  That's a real number that you took
11  from the data, correct?
12     A.  Yes.
13     Q.  Okay.  And then the rest of that clause
14  on paragraph 150 of Mr. Schultz's report says, "While
15  the actual fees paid in the fee-based account are known,
16  fees that would have been incurred had the account
17  stayed a commission-based account need to be projected."
18     Do you see that?
19     A.  Yes.
20     Q.  All right.  By the way, do you see --
21  does he cite anything for paragraph 129 [sic] or 150,
22  any footnotes to those two paragraphs?
23     A.  149?
24     Q.  149 or 150.
25     A.  I don't see a footnote.

Page 131

1      Q.  Have you ever yourself reviewed any
2  resources supporting this concept of projection of fees
3  that would have been incurred had the account stayed a
4  commission-based account?
5      A.  No.
6      Q.  You're not offering an opinion today on
7  whether the projected fees is an appropriate damages
8  model, correct?
9      A.  No.
10     MR. BEATTY:  Objection.  Calls for a
11     legal conclusion.
12     THE WITNESS:  No.
13     MR. CLABBY:  All right.  It may be a good
14     breaking point for us.  We've been going for
15     about another 90 minutes.  So let's take maybe
16     a 10-minute break this time.
17     MR. BEATTY:  Sure, sounds good.
18     (Recess taken -- 2:55 p.m.)
19     (Return from recess -- 3:14 p.m.)
20  BY MR. CLABBY:
21     Q.  All right.  In your report, which is
22  Exhibit 122, paragraph 28 at the top of page 9, there's
23  a sentence that -- the first full sentence on the page,
24  it says, "All of this was done mechanically by using
25  queries and formulas in the database."

Page 132

1      What do you mean by "mechanically,"
2  Mr. Olsen?
3      A.  I mean I write the formula, and I say go,
4  and it adds it up for everybody without me having to
5  look at any account individually.
6      Q.  When you say "write the formula," do you
7  mean the queries in the SQL database?
8      A.  Yes.
9      Q.  All right.  And then the -- let's look at
10  paragraph 29, which contains the result of your analysis
11  for plaintiff.
12     Am I reading that right, that under the
13  analysis that you applied under the damages model -- is
14  what's reflected in paragraph 29 the result of your
15  damages analysis, or something else?
16     A.  So it lists the fees -- yes, it is
17  damages.  It also has the turnover amount.
18     Q.  All right.  In applying your analysis
19  to -- taking Mr. Schultz's formula and you analyzing the
20  plaintiff's data, results in a number of 7,432 as
21  damages; is that right?
22     A.  Yes.
23     Q.  But are you offering an opinion that the
24  plaintiff has been damaged in the amount of 7,432 in
25  this case?

Page 133

1      A.  No.
2      MR. BEATTY:  Objection.  Calls for a
3      legal conclusion.
4      THE WITNESS:  Just that these are the
5      results of the calculations.
6  BY MR. CLABBY:
7      Q.  At the beginning, did you say no?
8      A.  Yeah, I said no, I'm just opining that
9  these are the results of the calculation.
10     Q.  Again, in paragraph 32, when you talk
11  about, "Attached hereto as Exhibit C are the results of
12  my damages calculations for the 45 sample accounts."
13     When you say "damages calculations," are
14  you talking about applying the data to the formula that
15  Mr. Schultz gave you?
16     A.  Yeah, I would have applied the formulas
17  that Mr. Schultz gave me to the data, so I worded it a
18  little bit differently.  But, yes, that's what I'm
19  saying.
20     Q.  Okay.  And then in paragraph 34, kind of
21  a similar question, do you agree that your conclusions
22  that 34 of the 45 sample accounts that you reviewed met
23  both of Mr. Schultz's metrics?
24     A.  Yes.
25     Q.  All right.  And you're not offering an

34 (Pages 130 - 133)

Page 134

1 opinion on who is or who is out of the proposed class,
2 correct?
3       A.   Correct.
4       Q.   You're simply saying, you know, if
5 Mr. Schultz's metric defines who's in the class, then
6 these people would be in the class?
7       A.   I guess I'm not even really going that
8 far, meaning that I'm just saying that here are the
9 results and here are the people that met those metrics
10 and here are the people that didn't.
11      Q.   Okay.  And let's just go to your
12 conclusions then on paragraph -- which is 39(b).  Kind
13 of a similar concept.  You say, "Using the data and the
14 formulas discussed above, I can programmatically
15 identify low activity accounts/class members based on
16 the criteria provided by Mr. Schultz."
17           You're not offering an opinion there as
18 to who's in the class, correct?
19      A.   Correct.
20      Q.   You're saying that Mr. Schultz gave me
21 these two criterias, and I can programmatically identify
22 who meets those two criterias given the data?
23           MR. BEATTY:  Is there a question?
24           THE WITNESS:  I'm sorry, it doesn't sound
25      like a question, but, yes, I agree with that.

Page 135

1 BY MR. CLABBY:
2       Q.   Okay.  Thanks.
3           That's the same thing, I guess, for your
4 conclusion at 39(c), which is, "Damages can be
5 calculated programmatically via application of the
6 formulas provided by Mr. Schultz."
7           You're not really saying that application
8 of the formulas of Mr. Schultz is or isn't the proper
9 measure of damages, right?
10      A.   Correct.
11      Q.   You're saying that, I can apply
12 Mr. Schultz's damages formula and produce a result
13 across a set of data?
14      A.   Yeah, or in -- you know, we can modify
15 that calculation based upon whatever parameters are
16 decided.  But, yes, I can perform calculations, and in
17 this case I did the calculations that Mr. Schultz has
18 asked for so far, and yes, so I agree with you.
19      Q.   Okay.  So if we look at paragraph 29
20 again for the plaintiff, the result of the analysis
21 under Mr. Shultz's damages metric is, would you agree, a
22 full refund of the fees that she paid in the Freedom
23 Account?
24      A.   Looks like it, yes.
25      Q.   And then for others that were defined as

Page 136

1 the sample class members in paragraph 34, did some of
2 those also have an average commission cost of .00?
3       A.   I believe so, yes.
4       Q.   And for those then, the damages model
5 would provide them a full refund; is that correct?
6       A.   Yes.
7       Q.   Does the damages model require any of the
8 sample class members to return or account for the
9 profits that they made on their accounts?
10           MR. BEATTY:  Objection.  I believe this
11      is beyond the scope of his opinions.
12           THE WITNESS:  I did not look at that, no,
13      nor was I asked to look at that.
14 BY MR. CLABBY:
15      Q.   If we just look back at the damages
16 formula on paragraph 27, you can see what it includes
17 and what it doesn't include, right?
18      A.   27 doesn't talk about the gains or
19 losses.
20      Q.   I'm talking about paragraph 27 of
21 Exhibit 122.
22      A.   Right.
23      Q.   In that damages calculation, is there any
24 accounting for profits that the Freedom Account holders
25 made in their Freedom Account?

Page 137

1           MR. BEATTY:  Objection.  Vague and
2      ambiguous.
3           THE WITNESS:  It doesn't talk about
4      profits or losses.
5 BY MR. CLABBY:
6       Q.   Let's go back to paragraph 34.
7           So I think from your calculation here, it
8 says 34 of the 45 examined accounts met both metrics
9 from Mr. Schultz, correct?
10      A.   Yes.
11      Q.   Anywhere in your report do you create a
12 fraction from that number and then apply it against the
13 27,000?
14      A.   You mean take 34, divide it by 45, and
15 multiply it by 27,000?
16      Q.   Correct.
17      A.   I didn't put that in the report, no, I
18 don't think so.
19      Q.   Do you know if Mr. Schultz has that in
20 his report?
21      A.   I don't know.  He may.
22      Q.   Did you ever provide him with that
23 calculation?
24      A.   I don't believe so.
25      Q.   Let's just look at Mr. Schultz's report,

35 (Pages 134 - 137)

Page 138

1 which is Exhibit 123, at paragraph 146. So this is
2 Exhibit 123, paragraph 126 [sic].
3     A. Okay.
4     Q. The paragraph begins with, "Because, to
5 date" -- and I just ask that you read that paragraph to
6 yourself.
7     A. Okay.
8     Q. Did you provide that calculation to
9 Mr. Schultz in paragraph 126 -- I'm sorry, 146?
10     A. I provided the numbers that would go into
11 the basic math to come up with that number.
12         (Court reporter seeks clarification.)
13         MR. CLABBY: I'll ask a clean question.
14     Q. In paragraph 145 of Mr. Schultz's report,
15 it cites the 34 out of 45 accounts and cites -- strike
16 that.
17         In paragraph 145 of Mr. Schultz's report,
18 it reports that 45 out of -- 34 out of 45 accounts that
19 RJA provided as a sample satisfied both objective
20 metrics and are, therefore, class members. And it cites
21 your report at paragraph 34, correct?
22     A. Yes.
23     Q. You provided him the 34 out of the 45
24 account statistic, correct?
25     A. Yeah, I provided him those two numbers,

Page 139

1 yes.
2     Q. And in the next paragraph, he creates --
3 appears to create a fraction out of that 34 of the 45
4 and then applies it against the 32,000 fee-based Freedom
5 Accounts.
6         Do you see that?
7     A. Yes.
8     Q. Okay. Did you provide him any
9 calculations for paragraph 146?
10     A. No. He would have divided 34 by 45 to
11 come up with that on his own.
12     Q. Okay. Mr. Olsen, are you familiar with
13 the concept of a class period?
14     A. Yes.
15     Q. And what is your understanding of a class
16 period?
17     A. It's the period covered by the case.
18 Right? For whatever reason they go back a certain
19 distance based on statute of limitations or whatever,
20 and that's the period of time for which data is
21 analyzed, typically.
22     Q. Do you know what the class period is for
23 this case?
24     A. I may have seen that in the complaint or
25 whatever, the proposed class period, but I don't know,

Page 140

1 no.
2     Q. Was it important for you in making your
3 calculations expressed in your report to know when the
4 class period started and ended?
5     A. No, because I was asked to perform the
6 calculations on this particular dataset, and that wasn't
7 an issue brought up. So my assumption is that in RJ- --
8 or Raymond James provided the data that all those
9 accounts included -- all that data was included in the
10 class period.
11     Q. So you --
12     A. If that's something -- if that's
13 something that needs to be done or adjusted by days,
14 certainly it can be done.
15     Q. For your report, Exhibit 122, you just
16 kind of started where the data started and ended where
17 the data ended?
18     A. Yes.
19     Q. All right. Let's look at paragraph 38 of
20 your report, Exhibit 122. I just ask you to read that.
21 It starts with, "I understand that Mr. Schultz." Just
22 read that and let me know when you're done.
23     A. Okay.
24     Q. All right. How did you come to the
25 understanding that Mr. Schultz will opine as to the

Page 141

1 things that you express in this paragraph here,
2 paragraph 38?
3     A. Like I said, you know, most of the
4 communication, if not all of it, the emails and the
5 telephone conversations, Mr. Schultz was on the email,
6 or he was on the telephone conversations, as far as I
7 remember, and, you know, there may have been -- and
8 obviously, like, when some of the emails that I got were
9 excerpts from his report that may have been in a working
10 state at that time, and therefore, I cut and paste that
11 formula, for example.
12         But this would have been something
13 communicated either verbally or in one of those emails
14 that says, hey --
15         For example, the named plaintiff, if it's
16 determined that $7,240 or whatever, it was damages and
17 that should have remained in her account, then she
18 should have earned a return on that money as well, so we
19 may have some additional calculations. And I'm saying,
20 well, as long as you give me the datapoints necessary to
21 do the calculations, I can certainly do that
22 calculation, and, you know, give me the formula, give me
23 the assumptions, and give me the datapoints.
24         So I guess that's what I'm trying to say
25 here is that this is a calculation that could be done,

36 (Pages 138 - 141)

Page 142

1 if asked.  And it's something that's been done in other
2 cases where you say, well, hey, the bank or whatever,
3 took these fees out of the account, they shouldn't have,
4 therefore the balance would be higher, therefore they're
5 entitled to either prejudgment interest or some return
6 on that money in the case of credit card cases.
7        But in any event, the short answer to
8 that, it would have come from Mr. Schultz probably in
9 writing or email.
10     Q.   Okay.  And then do you know how
11 paragraph 38 was written?
12     A.   How it was written?  I think that I was
13 given that text, like, these are the ways that he is
14 intending to opine that could be used.
15        I think -- I'm not the lawyer and I don't
16 want to speak for Mr. Schultz but, you know, a lot of
17 these cases I've worked on I have been asked to provide
18 a number of calculations which were all kind of
19 variations on the same theme with different parameters,
20 and then it's up to the judge to decide.
21        So I think that if I had to guess, I
22 would say that he's saying, you know, if the judge
23 decides it's appropriate to add some additional monies
24 on this based upon a loss of income on these fees that
25 were taken out, then I just want to make sure that

Page 143

1 everyone knows that they're fine making those
2 calculations.
3     Q.   I think you just used the phrase "fees
4 that were taken out," and I want to ask you about that.
5        Is it your understanding that if such a
6 damages model were deployed, it would only apply to
7 monies that were taken out of the account to pay the
8 fees?
9     A.   Yeah, I mean, I don't know exactly
10 what -- like I said, I was given the data that these
11 were fees, so I don't know -- I didn't really ask or
12 look into, or wasn't asked to think about even, what
13 does this mean exactly.  Only insofar as these are the
14 fees and this is what I'm doing with that number in
15 terms of the calculations and the formulas and whatnot.
16 So I don't know if there's a distinction there.
17     Q.   Yeah, I guess so.  I mean, in
18 paragraph 38, the third line, you say, any resulting
19 loss -- well, it's the second line, "Damages would also
20 include any resulting loss of investment gains on the
21 relative accounts due to the reduction of assets in
22 those accounts."
23        So it's a reduction of assets in the
24 Freedom Accounts.  Do you see that?
25     A.   Yes.

Page 144

1     Q.   So to apply this formula, it would only
2 apply to monies that were taken out of the Freedom
3 Account to pay for the Freedom Account, correct?
4     A.   Yeah, it seems like it, yes.
5     Q.   Okay.  Do you know if members of the
6 putative class could pay their Freedom fees from funds
7 that were outside of their accounts?
8        MR. BEATTY:  Objection.  Calls for
9 speculation.
10        THE WITNESS:  Yeah, I don't know.  I
11 mean, if that's the case, then -- I'm not the
12 lawyer, and, again, I'm just doing the
13 calculations.  Right?  But it seems to me that
14 if you're taking money from somewhere else,
15 then that money could have been put in the
16 Freedom Account and earned the return.  So I
17 could see the arguments each way.  But I don't
18 really have an opinion on whether or not that
19 should be considered.  Or if that's possible,
20 or how that works.
21 BY MR. CLABBY:
22     Q.   Did you review data for anyone in
23 connection with your report that indicated that fees
24 were being paid from outside the Freedom Account for the
25 Freedom fees?

Page 145

1     A.   No, the data that was produced was just
2 these are the fees.  I don't know where that money
3 necessarily came from.
4     Q.   As you were drafting your report, did
5 Mr. Schultz or anyone else tell you that Ms. Nguyen, the
6 plaintiff in this case, paid a portion of her Freedom
7 fees from outside her Freedom Account?
8     A.   No, and I don't think that in terms of
9 the calculations that have been performed so far, even
10 if that was important, it's not important at this point.
11 It's only important if under the hypothetical that if
12 additional damages calculations need to be performed on,
13 you know, lost earnings, then maybe those questions need
14 to be answered, but I don't think they're relevant to
15 the calculations I've done so far.
16     Q.   Because you haven't done any
17 calculations, correct, in connection with paragraph 38?
18     A.   That is correct.
19     Q.   On page 11, sort of the next sentence,
20 the first full sentence, it says, "I further understand
21 that Mr. Schultz will opine that these damages can be
22 calculated by applying an appropriate return metric."
23        And then after that he gives three
24 options -- or you give three options.  One, applying the
25 same rate of returns as earned in class members' Freedom

37 (Pages 142 - 145)

Page 146

1 Accounts. And the second one is, or earned in the
2 relevant RJA Model Portfolio investment strategies used
3 for its Freedom accounts. And the third, or an
4 appropriate index such as the S&P 500.
5        Do you see that?
6     A. Yes.
7     Q. Did you have any discussions about these
8 three options with Mr. Schultz?
9     A. No, only insofar as, here are the three
10 options that I'd like you to, you know, mention. Right?
11 Meaning that I don't come up with these independently. I
12 just want to make sure that everyone knows that if you
13 give me the metric and you give me the data, then I can
14 do the calculation.
15    Q. So you don't have an opinion on whether
16 sort of the additional damages calculation in
17 paragraph 38 is the correct damages model for this case?
18    A. No, and it even sounds to me like
19 Mr. Schultz is just making some suggestions and that
20 it's going to be up to the judge or whoever.
21    Q. Do you know if Mr. Schultz has picked one
22 of the three options that's listed in paragraph 38 at
23 this point?
24        MR. BEATTY: Objection. Calls for
25        speculation.

Page 147

1        THE WITNESS: I mean, I don't know. I
2        would be surprised if he had based upon -- he
3        might have recommended one or the other, but I
4        doubt he would have given me options if he was
5        set on one.
6 BY MR. CLABBY:
7     Q. From the data that you've reviewed,
8 particularly the 27,000-account spreadsheet, would you
9 be able to determine if an account holder paid the
10 Freedom Account fees from out of her account?
11    A. I'm not sure. If I was asked to do that,
12 it would be kind of the same process that we described
13 before. I would say where in the data is that -- where
14 can I point to in order to get that? It may be -- you
15 may be able to back it out somehow. I don't know is the
16 short answer. I didn't look at that.
17    Q. All right. Let's look at your
18 conclusions. We've talked about some of your
19 conclusions, I think 39 (b) and (c) we've already
20 discussed. But the title of this is "Conclusion" of
21 paragraph 39. And there's four conclusions here, (a),
22 (b), (c), and (d). Do you agree with that?
23    A. Yes.
24    Q. Are these your expert opinions?
25    A. Yes.

Page 148

1     Q. Okay. For (d), for 39(d), you say, "I
2 could perform any and all of the calculations discussed
3 above on any number of accounts if similar data were to
4 be provided for those accounts."
5        Does that include the -- determining
6 which account holders meet Mr. Schultz's two objective
7 metrics from commission data?
8     A. Yes.
9     Q. All right. And the data that you would
10 need to extend your calculations would be from the
11 brokerage -- or let's call it the commission side data
12 for the 27,000 accounts, or whatever the number is?
13    A. Yes.
14    Q. Okay. And did you consider in forming
15 your opinion in 39D how long it would take Raymond James
16 to compile the data you would need to extend your
17 analysis?
18        MR. BEATTY: Objection. Calls for
19        speculation.
20        THE WITNESS: I mean, they haven't really
21        provided much information other than the fact
22        that it's going to take them a really long
23        time. Right? And, you know, I was a database
24        person and a consultant for a number of years
25        before I ever first got a taste of doing any

Page 149

1        work in the legal realm, and my role, as a
2        consultant, was to go into companies when
3        their data folks said something was impossible
4        or going to take too long, and my role was to
5        go in and resolve that issue.
6        And so what I learned early on was in the
7        data world, that means I don't know how or I
8        don't want to. In the legal realm, it took on
9        a whole 'nother meaning that, you know, we
10        don't want to because it's harmful to our
11        case.
12        Really, because the first case I ever
13        worked on, they testified in writing that it
14        was going to take 19,000 man years because it
15        was some nonsense about 15 minutes per account
16        that they were going to have to look at it.
17        Right?
18        So over and over and over in these cases,
19        the comment is, it's going to be too hard,
20        it's going to take too long. And then the
21        judge orders them to produce the data, or the
22        case settles, and then magically they produce
23        all the data and no one's ever punished for
24        saying these kind of preposterous claims.
25        But I would say that in the case of -- I

38 (Pages 146 - 149)

Page 150

1  told you before I've looked at least 100
2  different data from 100 different financial
3  institutions, and I would say probably
4  two-thirds of them argued it was going to be
5  too hard or too impossible, all this, to
6  produce the data, and yet they did.  So it's
7  hard for me to kind of take it seriously when
8  they say that some person has to go to a front
9  end tool, they have to look at each record
10  individually and make some determinations
11  because all that tool does is query the data
12  on the back end.
13      So it's, like, when I read the deposition
14  testimony and he says, you know, it's going to
15  take weeks for us to give you a list of
16  columns in the database but it's SQL Server
17  database, it takes two minutes to write the
18  query, and it takes another 30 seconds to
19  paste the results in Excel and you have the
20  answer.  So it's hard for me to take any of
21  those claims seriously.
22      So I guess the short answer is no, I
23  didn't consider it because I wasn't really
24  asked to.  But it makes me giggle inside when
25  I hear that it's going to take 15 minutes per

Page 151

1  person in order to make this determination.
2  All right.  It's, like, if I have a Social
3  number on one side, I have an account, I have
4  a Freedom Account, they've already said that
5  we can identify the ones that were funded, but
6  on the other side, if there's only one
7  commission account, what kind of work needs to
8  be done exactly.  Right?  You know which one.
9      So without seeing the data, I don't
10  really have a lot of suggestions.  But I will
11  say that in my history, this is what I do, I
12  go in and I say, okay, let us figure out a way
13  to do this so that we can just, rather than
14  having one person ask the same question 100
15  different times for 100 different customers,
16  let's just have the computer ask the same
17  question for every customer all at once.
18      So on one hand, did I consider it?  No, I
19  wasn't really asked about it.  I just said if
20  I'm given this data, eventually would I be
21  able to do these calculations?  The answer is
22  sure, yes.
23      Is it going to be difficult?  I don't
24  know the answer to that.  I'm skeptical, but I
25  guess that's where we're at.

Page 152

1 BY MR. CLABBY:
2      Q.  So, Mr. Olsen, for the record, is your
3 answer no?
4      A.  So the answer is no, I did not consider
5 how long it was going to take them in order to produce
6 this data, no, in terms of this report.
7      Q.  And did you consider how expensive it
8 would be to Raymond James & Associates to produce the
9 data for your report?
10          MR. BEATTY:  Objection.  Calls for
11      speculation.
12          MR. CLABBY:  Hold on.  It's whether he
13      considered it.
14      Q.  Did you consider how expensive it would
15 be?
16      A.  How much it would cost them?
17      Q.  Correct.
18      A.  No, I just said that if this data is
19 produced, we can do the calculations on it.
20      Q.  In 39D, you also said the words, "I could
21 perform."  Is the idea that you wouldn't know if you
22 could perform it until you saw it?
23      A.  So what I'm saying to you is that when
24 I'm asked to do a calculation, the first question is,
25 what is the calculation you want performed and how do

Page 153

1 you want to use the data that's made available in order
2 to perform this calculation?
3          If the data doesn't support the
4 calculation, then it doesn't support the calculation.
5 But I'm saying that as long as data is produced and the
6 calculation is performable, then it can be performed
7 mechanically through the use of queries and SQL
8 language.
9      Q.  And you were able to use the 59-account
10 spreadsheet as sort of a dry run or test sample to see
11 if you could get everything working, and your conclusion
12 was that it worked?
13      A.  Yeah.  So, you know, like we talked about
14 before, there are some things, like, in paragraph 38
15 where he says, you know, we may be asked to do
16 additional calculations.  And I already know that the
17 parameters changed and it might be through discovery, it
18 might be the judge or whatever, and we've made that
19 change with the calculation that -- or additional
20 calculations that we talked about I did last Friday for
21 removing the two months' fees.
22          So what I'm saying is, is that I
23 understand that the parameters may change, the time
24 frame may change, there may be additional calculations,
25 and as long as the datapoints are there to perform those

39 (Pages 150 - 153)

Page 154

1 calculations, then, yes, we can perform those
2 calculations.
3          And you're right in that if it's
4 determined that the calculations that I just performed
5 are the accurate measure of damages and they want that
6 for the full class and the data is produced for the full
7 class, then I can certainly do it.
8          Q.   Other than the opinions that are stated
9 in paragraph 39, do you have any other opinions in your
10 report?
11         A.   I mean -- I mean, I don't think so.  I
12 think they're summarized in paragraph 39.  But I think
13 the whole report is kind of an opinion, an illustration
14 that these types of calculations can be performed.
15         Q.   Let's look at paragraph 40 where you
16 reserve the right to supplement or modify your opinions
17 herein to the extent that new information and data is
18 made available through discovery or other means.
19         Do you have any supplements or
20 modifications to make today to your opinions?
21         A.   No, and really my opinions, even when
22 we've made the changes or the additional calculations
23 for -- that we keep talking about late last week, they
24 don't really change my opinion that calculations can be
25 performed, just because I'm not saying any one

Page 155

1 calculation is an accurate measure of damages which we
2 already talked about.
3          So I'm just saying that it doesn't change
4 my opinion in that these type of calculations can be
5 performed, and they can be, you know, tweaked, and the
6 parameters can be changed and assumptions can be
7 modified.
8          Q.   Apart from the report that we discussed
9 and the calculations that we discussed that were
10 performed on Friday -- or delivered on Friday, is there
11 any other work you're doing right now in the case?
12         MR. BEATTY:  Objection.  I think that
13         misstates the testimony earlier.
14 BY MR. CLABBY:
15         Q.   Is there any other work -- I'll ask it a
16 different way.
17         Is there any other work that you're doing
18 in the case right now?
19         A.   This is -- I mean, unless I get
20 instruction after this, this deposition kind of
21 concludes where I'm at right now.  Meaning I don't have
22 anything planned.  I'm not working on anything else at
23 the moment.
24         Q.   Have you been retained through trial in
25 the matter, though?

Page 156

1          A.   I think, like I said, the retainer
2 agreement is basic.  So as long as they want to continue
3 to keep me on, I'm happy to stay on, if it goes that
4 far.
5          Q.   But so far as you're concerned, today is
6 the last day until they call on you to do something
7 more?
8          A.   Yeah, I mean, I don't -- it's kind of
9 hard to go to a client and ask them to pay you for
10 something that you did that they didn't want you to do.
11 So I try to limit it to what they actually want or need.
12         Q.   All right.  And you understood that you
13 had the opportunity to file a rebuttal report in this
14 case?
15         A.   I mean, I've filed some rebuttal reports.
16 It's never really kind of my idea.  I think they
17 asked -- usually that goes about they ask to clarify
18 certain things.  In this case, I wasn't asked to file
19 one, so I didn't.
20         Q.   Do you have any firsthand knowledge of
21 Raymond James' computer systems and databases?
22         A.   So if you're talking about the SQL Server
23 platform that a lot of their data originated from, then
24 I certainly have a lot of experience, in the general
25 terms, in how that platform works and what its

Page 157

1 capabilities are.  If you're talking about specifically
2 Raymond James' data, then, no, I've never had access to
3 any of their systems.
4          Q.   You've never worked for Raymond James &
5 Associates, right?
6          A.   Correct.
7          Q.   Have you ever consulted for them?
8          A.   No.
9          Q.   So your knowledge of Raymond James'
10 systems is from your review of the materials that you
11 listed in paragraph 11 of your report and your general
12 experience, correct?
13         A.   Yes.
14         Q.   Earlier, I think you mentioned that you
15 had done work for over -- or with respect to over 100
16 financial institutions.  Were you talking about your
17 work in the MDL class action?
18         A.   So that's some.  There's been mortgage
19 cases.  There's been credit card processor cases.  There
20 have been other credit union and bank cases, a lot of
21 them outside the MDL.
22         The MDL -- the first case I ever worked
23 on was the Gutierrez versus Wells Fargo, and then the
24 MDL was the second case.  And then from there, there had
25 been individual cases.  So I got off to a bang, started

40 (Pages 154 - 157)

Page 158

1 with a bang. I testified in federal court on my very
2 first case and I thought that's what you got to do every
3 time and I was pretty excited. I haven't got to do it
4 since.
5      Q.  All right. So you've worked for credit
6 unions, you've worked for banks, you've worked for
7 mortgage companies. Have you ever worked for a
8 broker/dealer?
9      A.  So just to be clear, I never worked for
10 any of them. So I worked on the other side, I guess.
11      Q.  Okay.
12      A.  But I don't believe that any of them were
13 a brokerage firm.
14      Q.  All right. Have you ever worked against
15 or for a registered investment adviser?
16      A.  I don't believe so, no.
17      Q.  So you have experience against banks,
18 against credit unions, and against mortgage companies,
19 though?
20      A.  And credit card processors. There's a
21 whole bunch of other kind of cases. I guess what I'm
22 saying is for financial institutions in general,
23 there's -- most of the time it's a little bit -- going
24 into the different realms.
25           Like, for example, the first credit card

Page 159

1 processor case, that's a little bit more convoluted for
2 me, because I suspect they have enough data and I
3 suspect they can do things with data, but I don't have
4 any real experience with the programs that they use
5 because a lot of that is written in COBOL from the 1970s
6 and I don't have a lot of experience there.
7           But in terms of this case, I had a little
8 bit of extra insight because their data is originating
9 from SQL Server. So when you hand me the code, for
10 example, I can look at that and I go, well, I mean, they
11 can write queries against their SQL Server database
12 using Enterprise Management so -- Management Studio. So
13 those are something that I'm kind of intimately familiar
14 with.
15           So -- but the answer to your question is
16 no, I don't have any experience working against
17 brokerage, and I don't know anything specific about
18 Raymond James' data other than what has been provided to
19 me.
20      Q.  Let's look at the report, paragraph 3.
21 And we can probably look at 3 through 7 all together.
22           And the question I'm going to ask you,
23 you know, are the representations made in paragraphs 3
24 through 7 accurate?
25      A.  Yeah. I mean, I try to be representative

Page 160

1 of the types of work and the important projects that I
2 did prior to getting into the legal realm. But my job
3 has really kind of always been the same once I got into
4 the database arena.
5           It's kind of like, it looks like I had a
6 plan, and when I did my first case -- I mean, it's
7 Gutierrez, right. It goes to the Supreme Court. It's
8 massive. It's important, and it changes law. And so it
9 looks like -- this is just luck.
10           And so my first real project after doing
11 my Oracle training was to get hired by Microsoft. And
12 here I am the person in charge of a system that they
13 purchased that no one knows how to deal with, that is,
14 you know, 50,000 concurrent internet connections and
15 10 million users, and I have to figure it out. And so
16 this is kind of how you get into consulting, meaning
17 that it's that I'm the person that goes in.
18           So I mean, if I look at one of these
19 banks, like Wells Fargo in the first case and they say
20 it takes 19,000 man years to do this, if they would have
21 said, you know what, if you identify all these people,
22 you get $10 for each account, then all of a sudden
23 they'd be going, oh, my God, we've got to find someone
24 that can do this. Right? And so I'm the kind of person
25 that goes into these systems. And that's why I've

Page 161

1 worked on corporate mergers and acquisitions because
2 they buy a company, the company doesn't have any
3 interest anymore, they just want to -- they want you to
4 understand, figure out their systems.
5           So I guess the short answer -- I'm sorry,
6 I just started talking. But the short answer is, yes, I
7 think all of this is kind of representative of my career
8 path.
9      Q.  So are the representations made in
10 paragraphs 3 through 7 in your report accurate,
11 Mr. Olsen?
12      A.  I believe so, yes.
13      Q.  Let's look at paragraphs 8 and 9.
14           In paragraph 8, is this the Gutierrez
15 matter that you reference in paragraph 8 that you
16 mentioned a few times in our conversation today?
17      A.  Yes.
18      Q.  And then in 9, you mention the checking
19 account overdraft litigation?
20      A.  Yes.
21      Q.  In Gutierrez and the checking account
22 overdraft litigation, were the defendants in those cases
23 banks?
24      A.  Yes.
25      Q.  Is this -- I think you mentioned at the

41 (Pages 158 - 161)

Page 162

1 outset that there was a certain cut-and-paste element to
2 putting this report together. Are these paragraphs that
3 you've used in other expert declarations and other
4 expert reports?
5      A. Yeah, they've been kind of -- the
6 language -- you give it to a lawyer in one case, and
7 they make suggestions and you like it, so it kind of
8 evolved a little bit over time, but I think that's the
9 gist of it, yes.
10     Q. Let's look at Exhibit A to your report,
11 Exhibit 122. Exhibit A. Just take a minute and look at
12 that, and then I'm going to ask you a couple of
13 questions about it.
14     A. I'm pretty familiar with it.
15     Q. All right. Is all the information on
16 Exhibit A, which is attached to Exhibit 122 for the
17 deposition, is this accurate information?
18     A. Yes.
19     Q. Is this document a complete
20 representation of your educational and professional
21 background?
22     A. In terms of the education, yes, formal
23 education, certainly. In terms of the background,
24 it's -- like I said, it's -- it's supposed to be kind of
25 representative of the career path and some highlights

Page 163

1 and stuff along the way. It's not every single case,
2 and it's not every single project. But, yes, I think
3 it's pretty accurate.
4      Q. For the -- on page A-3 of Exhibit 122, it
5 has third down, "Database administrator, developer, and
6 litigation support specialist under contract at
7 Hewlett Packard."
8      A. Yes.
9      Q. What were the years that you were there?
10     A. So I moved to California in 2001. And I
11 think that was about seven years, maybe 2008-ish, when
12 the Hewlett Packard gig ended. It was supposed to be an
13 18-month contract and it ended up being closer to seven
14 years, I think.
15     Q. Let's start, in the IT consultant profile
16 under "Experience," am I correct that some of this is
17 listing the jobs you've held?
18     A. Yeah. And like I said, I started about
19 '9- -- late '90s I went to Microsoft as a consultant, so
20 I've really kind of been a consultant ever since. And
21 so even working at Hewlett Packard, I was working on
22 other projects at the same time, so it's -- there's a
23 lot of overlap.
24     Q. Were you, like, a W-2 employee ever of
25 Microsoft?

Page 164

1      A. So originally I was a 1099, and then they
2 got sued by contractors, and so there was a big push to
3 make everyone W-2s. So I did one year in Reno as a W-2.
4      Q. Got it.
5      And then after you left the -- when did
6 you end that role in Reno with Microsoft, what year?
7      A. March of '91. That's when I went to
8 California and took the gig at Hewlett Packard.
9      Q. That was a contract gig at
10 Hewlett Packard in approximately 1991?
11     A. 2000 -- the Hewlett Packard one was 2001,
12 March of 2001.
13     Q. So between May of 1991 and 2001, what did
14 you do?
15     A. So I graduated from University of
16 Washington in 1989.
17     Q. Okay.
18     A. I went to work -- my business -- my
19 degree was in business finance. I went to work for a
20 company called Northwest Administrators. And originally
21 I was doing compliance audits of employers in support
22 of, like, Taft-Hartley pension funds. And my role -- I
23 guess at that point it was based on a degree in finance.
24     We hired a firm that was supposed to
25 automate our job, and they wrote a program for us, and I

Page 165

1 was a subject matter expert, and so I started
2 interacting with them. And I realized that they made a
3 lot of money and they really weren't any smarter than
4 me. So I started taking classes on the side, computer,
5 and I started to understand that they weren't very good
6 at writing code and we were paying them a lot of money.
7 So I transitioned into an IT role at Northwest
8 Administrators. That's where I did the formal ARIS
9 training for Oracle and kind of started getting really
10 serious about IT.
11     And then from there I went to Microsoft
12 and that's when it really kind of went nuts, if you
13 will. So that occurred -- the Microsoft thing occurred
14 in, like, '98, I think.
15     Q. Just to go back again, what was the year
16 that you were -- what was the year you were in Reno,
17 Nevada?
18     A. March of -- or that was for Y2K, so I
19 went there the end of '99 to March of 2001. And the
20 reason why I remember that is because it was a big scare
21 that all the world was going to shut down in 1999.
22     Q. And then in 2001, you go to California
23 and you perform your contract to Hewlett Packard?
24     A. Yes.
25     Q. And then when -- when does the contract

42 (Pages 162 - 165)

Page 166

1  with Hewlett Packard end?
2      A.  I'm going to say sometime in the 2008-ish
3  time frame.
4      Q.  Okay.  Is that when you start working on
5  litigation consulting, 2008?
6      A.  So it might be helpful to explain how
7  that happened.  At Hewlett Packard -- I learned this
8  after the fact, but they were being sued by Gateway, and
9  they were suing Gateway, and it was a big battle over
10  kind of patent infringement.
11      So I worked -- I was a database owner and
12  I was asked questions by attorneys and I was the one
13  that mined the data.  So, like, for example, if you go
14  to Raymond James and say, hey, we need this data for
15  this case, I was that person at Hewlett Packard.
16      And apparently I was pretty good at it,
17  so I signed some agreements and did a big background
18  check, and then they gave me access to all their
19  systems, and I went around mining data in all of the
20  Hewlett Packard systems for the legal.
21      So when the Hewlett Packard gig kind of
22  ended, I was doing some stuff, and then some friends of
23  mine that started a consulting company, and so I started
24  running my contracts through their company to help them
25  out.  And I put a little blurb on their website trying

Page 167

1  to explain what I did.  I didn't know there was such a
2  thing as data expert or anything like that, but I tried
3  to write a little blurb about how that was kind of cool,
4  because, you know, it's a different project every time,
5  and it seems important.
6      So then I got a call, I remember on
7  vacation, from the lawyers on the Gutierrez case, and
8  the questions are basically, do you know anything about
9  banking?  No.  Do you know anything about banking data?
10  No.  Do you know anything about data?  Yeah, certainly I
11  can help you, right, same kind of things I'm trying to
12  do here.
13      And that's how -- and I wasn't expecting
14  it to ever be more than that, but like I said, I got to
15  testify in federal court the first time and then the
16  people watching that were the leaders of the MDL, and
17  so, and then one thing led to another.  And all of a
18  sudden I was doing this, like, 80 percent of my time.
19      Q.  Is that how much you're doing litigation
20  consulting now, about 80 percent?
21      A.  Probably.  You know, at some point -- I
22  never really liked California.  I really didn't like
23  Reno.  So the first opportunity -- what this afforded me
24  was the opportunity to just fire all my clients that
25  required me to be onsite and move back to Seattle.  So I

Page 168

1  do still have some clients in California that tolerate
2  the remoteness, so I still do work for them from time to
3  time.  But for the most part, it's been this.
4      To me, it's kind of all the same, it's
5  just that in the legal world we have to document it a
6  little bit better.
7      Q.  What was the reason that you left, if
8  there was one, the Microsoft gig in Reno?
9      A.  Honestly, two reasons.  One is, it was
10  Reno.  So I moved there and it was cold and I didn't
11  know anybody.  And then it got warm and it was cool and
12  you can hang out at the lake, go to Tahoe and all that,
13  and then it got cold again, and I didn't really like it.
14  And the other part of it was, like I said, they forced
15  you to become a W-2 instead of a 1099.  And that's just
16  like a lot of extra paperwork that was unrequired.  I
17  just wanted to do the technical work.  I didn't really
18  want to write my reviews, and I didn't really want to do
19  the rest of it.
20      And California at the time, I mean, it
21  was sold to me as a gig -- that was another person I
22  knew that worked for a consulting company, and they were
23  really having a hard time placing people at
24  Hewlett Packard, and they sold it to me as a gig in
25  San Francisco.  So I thought that would be cool.  And

Page 169

1  then I got interviewed over the phone, packed my stuff
2  up in my 4-Runner and drove to California and it turns
3  out it was San Jose, and that's a long way from
4  San Francisco.  So that's how that happened.
5      Q.  And then how did you end up leaving the
6  contract with Hewlett Packard?
7      A.  Like I said, they were worried about the
8  same kind of things, I think, that Microsoft was, in
9  terms of getting sued by a contractor saying they should
10  have been full time.  So I signed an agreement that said
11  that my contract would only be 18 months maximum.  And
12  so that was fine.  And so that was my plan.  Eventually
13  they moved all of the support for the three
14  manufacturing divisions to China.  So as soon as I was
15  done training the Chinese folks, then it was time to do
16  something else.  But at that time, that project kind of
17  winded down over time, and the legal kind of quieted
18  down at some point, and so I really wasn't putting in a
19  lot of time there, so I was doing a lot of consulting
20  projects on the side.
21      Q.  Did they end the contract with you?
22      A.  Yeah, I mean, just kind of parted I think
23  at the end.  It was just done.  They got rid of all of
24  the Cupertino -- or the San Jose employees in that
25  division eventually.  I was one of the last ones.

43 (Pages 166 - 169)

Page 170

1    Q.  Is there anything new about your
2 experience since June 4th that's not included here on
3 the IT consultant profile that is Exhibit A?
4        A.  No.  I mean, I don't think that even the
5 consultant profile is detailed to the point where
6 even -- it's just I have been working on these types of
7 projects.  Some of it's in the legal realm, some of it's
8 not, but it's kind of the same, just working on
9 projects.
10       Q.  At the top -- I think it's page A-2 --
11 sorry, A-3 of Exhibit 122.  There's four bullet points
12 listed under Data Expert Litigation Specialist.
13       A.  Yeah.
14       Q.  And that lists the overdraft litigation,
15 the Gutierrez v. Wells Fargo Bank, and then here's two
16 other cases here.  How did you come to select these four
17 to include here?
18       A.  Yeah, so those were kind of selected a
19 long time ago.  And I think Gutierrez is important
20 because it was the first one.  It was a big one.  I
21 testified in federal court, and you know, whenever
22 anybody brings that up, we can say, yeah, we won, it
23 went to the Supreme Court, still won.  Meaning that it
24 seemed like a good one to start with.  It was a big one.
25       The MDL was obviously very -- that was --

Page 171

1 I really don't think I want to do that again.  That was
2 really brutal.  That was a lot of projects going on all
3 at once, a lot of travel.  But it was big, and it was --
4 you know, when you quote that one, I can say that we
5 looked at data -- when you're looking at data from
6 Bank of America, for example, that's trillions of
7 records, right, so that's a pretty massive project.
8       The other ones were ones that seemed
9 important at the time because it was when I had started
10 getting into other areas and that was insurance, so it
11 was force-placed insurance, and that was, I think,
12 mortgagors.  And I've never really added to this list,
13 but I know that sometimes I'm asked to provide a list of
14 all the cases where I've provided testimony, and then
15 kind of give some more detail on some of the cases I've
16 worked on.
17       Q.  And is that list -- did you produce such
18 a list in this case as Exhibit B to your report?
19       A.  Yeah, I try to keep that current, and
20 then periodically, go back and delete some of the older
21 ones.  But, yeah, those are the cases where, at least
22 since 2016, where I've either been deposed or testified
23 at trial, although that's only happened twice.
24       Q.  What were the two cases you testified at
25 trial?

Page 172

1       A.  One was Gutierrez, and one was -- I'm
2 wondering if that is even on here anymore.  It was a
3 case in Missouri State court, a usury case.  Yeah, I
4 think that one might have aged off.  It's certainly
5 something I could get you the answer to.
6       Q.  Let's just say of the cases that are
7 listed in Exhibit B, were any of them for or against a
8 broker/dealer?
9       A.  No, I don't believe so.
10       Q.  All right.  Do you know if any of these
11 involved allegations of suitability or unsuitability
12 under the securities industry customs, practice, and
13 standards?
14       A.  I don't believe so, no.
15       Q.  Did you represent the defendant in any of
16 these cases?
17       A.  Only one.  And it wasn't really by
18 choice.  I think it's just the way it fell because I got
19 hired by plaintiff's attorney first.
20       Q.  What was that one case?
21       A.  It might have gotten aged off of here as
22 well, but it was a corporate valuation case where one
23 company bought another company, and then they sued them
24 because they said it wasn't valued properly and they
25 overpaid.

Page 173

1       Q.  All right.  Just from your experience --
2 I think we've talked about broker/dealers and registered
3 investment advisers, but I just want to go through a
4 couple of questions to bottom out your experience here.
5       Do you hold any securities licenses?
6       A.  No.
7       Q.  Have you ever held any securities
8 licenses?
9       A.  No.
10       Q.  Have you ever worked as a stockbroker?
11       A.  No.
12       Q.  Have you ever worked as a registered
13 representative for a broker/dealer?
14       A.  No.
15       Q.  Are you or have you ever been an
16 investment adviser representative?
17       A.  No.
18       Q.  Have you ever worked for a registered
19 investment adviser?
20       A.  No.
21       Q.  Have you ever worked as a financial
22 adviser?
23       A.  No.
24       Q.  Ever worked at a bank?
25       A.  Nope.

44 (Pages 170 - 173)

Page 174

1    Q.  All right.  As a consultant or expert,
2  have you ever worked for a bank, a broker/dealer, or a
3  registered investment adviser?
4    A.  No, I'm going to say no.  I didn't get
5  paid by one, so I didn't work for them.
6    Q.  Do you have any training in the rules
7  that govern broker/dealers?
8    A.  No.
9    Q.  Do you have any training in the rules
10  that govern registered investment advisers?
11    A.  No.
12    Q.  Do you have any professional degrees or
13  licenses related to broker/dealers or registered
14  investment advisers?
15    A.  No.
16    Q.  Have you ever attended any professional
17  seminars related to suitability?
18    A.  No.
19    Q.  Any professional seminars related to fees
20  or commissions charged to brokerage clients?
21    A.  No.
22    Q.  How about special seminars related to
23  fees or commissions charged to advisory clients?
24    A.  No.
25    Q.  More generally now, are you a member of

Page 175

1  any professional organizations?
2    A.  No.
3    Q.  Have you ever authored any articles or
4  other published works?
5    A.  No.
6    Q.  Have you ever presented at any
7  conferences?
8    A.  No.
9    Q.  Are you an economist?
10    A.  No.
11    Q.  Or a stock analyst?
12    A.  No.
13    Q.  An accountant?
14    A.  No.
15    Q.  Are you a statistician?
16    A.  No.
17    Q.  Have you ever been retained as an expert
18  in statistics?
19    A.  No.  I mean, I've provided statistics,
20  but I've never been -- opined or claimed that I was a
21  statistician.
22    Q.  Is it fair to say your specialty is data
23  mining and analytics?
24    A.  Yes.  Especially for large systems.
25    Q.  In your previous work as a retained

Page 176

1  expert in litigation, have you ever been involved in the
2  development of damages models?
3    A.  I mean, I think the word "damages" has
4  special meaning in the legal context, but, you know,
5  I've certainly been involved in creating the formulas,
6  meaning that they say we want to do this calculation,
7  and I'm involved in saying this is the data, this is how
8  I suggest that you do this calculation.  But ultimately,
9  someone else has to decide that it's -- it's a fit for
10  damages.
11    Q.  Okay.  In your previous work as a
12  retained expert in litigation, have you been given
13  formulas designed by others, and it was your role then
14  to apply them across a dataset?
15    A.  Yes.
16    Q.  And in these engagements, was your role
17  to extract and organize the necessary data and then
18  perform the calculations?
19    A.  Yeah, sometimes -- sometimes I'm involved
20  in the extraction of the data, sometimes not.  Sometimes
21  it's just provided.  Sometimes it's, you know, run the
22  calculations.  Yes, I think the answer is yes.
23    Q.  All right.  I just want to talk a little
24  bit about your compensation.
25      Have you received any compensation yet in

Page 177

1  connection with your work in this case?
2    A.  I don't believe so.  I think it's my
3  fault because I'm kind of behind on the billing.
4    Q.  Have you sent any bills yet?
5    A.  I don't believe so.  I think I was
6  checking on that this morning.  I figured you'd ask.
7    Q.  And you're charging $350 per hour for
8  your work here?
9    A.  Yes.
10    Q.  And you think you've worked about
11  40 hours or so, I think is what you said before?
12    A.  Probably 40 or 50, somewhere in there,
13  best guess.
14    Q.  And the ballpark of what you -- I'm not
15  going to do the analysis, but the ballpark is it's 350
16  times whatever you've worked, and that's the amount that
17  you'll eventually invoice?
18    A.  Unless there's travel expenses.  I don't
19  bill for anything else.
20    Q.  Have you billed any -- or do you plan to
21  bill for any costs or expenses in this case?
22    A.  I don't think so.  I mean, that's the one
23  thing about COVID, there's not a lot of travel expenses.
24    Q.  So right now, I think there was an
25  80 percent number that we talked about, 80 percent of

45 (Pages 174 - 177)

Page 178

1 your work is litigation consulting. Is that also about
2 roughly how much of your income comes from litigation
3 consulting, about 80 percent? Or is it something
4 different?
5       A. It's probably a little bit higher meaning
6 that some of the rates that I charge, some of the
7 business clients go back so far that I don't have the
8 heart to raise it on them, so some of those rates are a
9 little lower.
10      Q. That Gutierrez case we discussed, I think
11 you said it went to the Supreme Court. Is that right?
12 Do you remember, is that right, it went to the Supreme
13 Court?
14      A. Well, they -- yeah. I'm not the lawyer,
15 but from what I understand, they didn't hear it, or
16 however that worded. They tried to go and they refused
17 to listen, so that was that.
18      Q. Let's look at your report again,
19 Exhibit 122 at page 7. Sorry, not page 7, paragraph 7
20 of your report, Exhibit 122. It's the paragraph that
21 starts, "Since 2008," the bottom of page 2. The last
22 sentence says, "In serving as an expert witness in
23 previous cases, I have withstood Daubert challenges on
24 multiple occasions."
25      What is a Daubert challenge?

Page 179

1       A. You know, like I said, the first case was
2 Gutierrez, and there was definitely one there. And then
3 there were a number of them in the MDL, and I just
4 assumed that was something that happened every time. I
5 didn't kind of realize the significance of it at the
6 time. But from what I understand, it's a questioning
7 whether or not you're qualified to offer the opinions
8 that you're offering.
9       That's why I'm always really careful to
10 say I can do the calculations, I don't feel qualified to
11 tell you that these calculations are an accurate measure
12 of damages, but just that the calculations are correct.
13      Q. In your understanding of Daubert, are
14 there any other aspects of it beyond your
15 qualifications?
16      A. I mean, I don't know. I just know that
17 they're -- yeah, maybe -- maybe -- I don't know all the
18 specifics, no.
19      Q. All right. Just for purposes of this
20 discussion, can we define a Daubert challenge as any
21 motion to exclude or motion to strike you from serving
22 as an expert or submitting a report?
23      A. Okay.
24      Q. So in what cases have you been subject to
25 a Daubert challenge and withstood it?

Page 180

1       A. I'm going to have to go back to figure
2 out that, but I know Gutierrez, for example. I know a
3 number of them in the MDL were, Cap One, for example,
4 was one. I know Judge King was in charge of the MDL,
5 and he ruled on several of them. I think there have
6 been a couple since.
7       Q. So paragraph 7 says you've withstood
8 Daubert challenges on multiple occasions. We've got
9 Gutierrez, MDL, Capital One. Any others you can think
10 of?
11      A. Capital One I think was in part of the
12 MDL. TD Bank maybe. I could find some others.
13      Q. I was just asking about that in
14 paragraph 7. Let's look at Exhibit B to your report.
15      In Gutierrez, do you remember the nature
16 of the challenge to your testimony?
17      A. I read it. They made all sorts of
18 points. It was a lot of legal stuff. I think they were
19 saying it wasn't relevant, I wasn't qualified. All
20 sorts of things. All sorts of mean things.
21      I mean, that was my first foray into this
22 world, and that's the difference between working in the
23 corporate world where everyone says, okay, great job.
24 And then you work in this world and you have people
25 telling you you're an idiot and nothing you did matters.

Page 181

1 But I think it was just basically they didn't feel like
2 the damage calculation was an accurate measure -- or the
3 calculations were an accurate measure of damages.
4       That's why I said I kind of lucked out in
5 the beginning because they never asked me to -- I didn't
6 understand the significance of it at the time, but they
7 never asked me to say that those calculations were
8 damages, only that these were the results of the
9 calculations.
10      Q. So, again, just on that reference in
11 paragraph 7 of your report that you withstood Daubert
12 challenges, from the case list here in Exhibit B to your
13 report, does looking at this refresh whether you faced
14 Daubert challenges in any of these matters that you list
15 in Exhibit B?
16      A. It may. We can go through it. I don't
17 know that it will necessarily. It's -- some of them --
18 one point, I got a list of these. So I could probably
19 pull that out. And I was surprised that some challenges
20 had been raised in some cases that I didn't even know.
21      So, yeah, I mean, I don't -- I'm going to
22 have a hard time. And it seems like they kind of died
23 down over time, there weren't as many of them. Maybe
24 people realized I'm just doing calculations, I'm not
25 trying to be a statistician or something I'm not. But

46 (Pages 178 - 181)

Page 182

1 anyways, so that's a list I could help put together, but
2 I don't think I'm going to be very good on getting it
3 right on these. I think, for example, United Federal
4 Credit Union, that might have been one. Roberts v.
5 Capital One, that was probably one.
6           But I don't know, I'd have to go back and
7 look.
8        Q. Is there -- no, go ahead. Didn't mean to
9 cut you off.
10       A. No, no, I would have to go back. I think
11 that I could find the original list from a couple of
12 years ago that here's all the ones so far, so I started
13 that.
14       Q. Do you remember ever facing a Daubert
15 challenge and having it sustained, such that your report
16 was limited, you were struck or your testimony was
17 excluded?
18       A. The only report that I can think of that
19 was excluded was one where the judge said that the
20 attorneys didn't file it in a timely manner so he wasn't
21 going to look at it, that was the reason.
22       Q. Can you think of a case where -- where
23 your report was accepted but the Court did not follow
24 your opinion?
25       A. Not that I know of. The majority of

Page 183

1 these cases end up settling so then I'm the person that
2 goes in and does the settlement allocation. So not to
3 my knowledge, no.
4        Q. On this case list, on B-2, is a case
5 called Hunters Run v. WCA Waste Corporation.
6        A. Yes.
7        Q. Do you recall a motion to exclude in that
8 case?
9        A. I don't. If you represent to me that
10 there was one, then I would believe you. But I don't
11 believe there was one.
12       Q. Okay. And then, let's see. Another case
13 at the top of B-3 at the top is a case called Childress.
14 Do you remember a motion to exclude in that case?
15       A. I don't believe so. I think that was a
16 case regarding force-placed insurance, I think.
17 Childress. Yeah, one of those Chase cases was for
18 veterans and fees charged to veterans. I'm not sure
19 which one was which at this point. But I don't know.
20 It's possible.
21       Q. And then this one, Kirkpatrick v.
22 HomeAway, do you remember a challenge to you in that
23 case?
24       A. I think there might have been one in that
25 one. I'm not sure, though. I'm sorry. I really,

Page 184

1 I'm -- just not sure.
2        Q. Again, just asking.
3           And then Hoggard v. Nationstar Mortgage,
4 which is, again, on page 3, do you remember a challenge
5 in that case?
6        A. I don't.
7        Q. Smith v. Flagstar Bank, do you remember a
8 challenge in that case?
9        A. It seems like that one fought pretty hard
10 before it settled, so maybe there was one in that one.
11 I don't recall.
12       Q. Do you remember a case called Taylor
13 versus Mission Federal Credit Union. It's not listed on
14 here.
15       A. Okay. Yes.
16       Q. Do you remember a challenge in that case?
17       A. I remember -- I might be confused. I
18 think that there was an issue where they testified that
19 certain data was available, and I said I could do my
20 analysis on that data and then they came back and wrote
21 a declaration that said, okay, we lied or we were
22 mistaken and that data is not really available, and then
23 I was never told about it so I never really got to say
24 that I could do the analysis anyway. I'm not sure
25 exactly how that played out.

Page 185

1        Q. Okay. And that case, I think it's just
2 timed out from being on here, the Taylor case.
3        A. I would think so.
4        Q. All right. So this is a separate
5 question here, have you ever worked with -- I think you
6 mentioned earlier that you worked with some of the
7 lawyers from Chimicles. How many matters have you
8 worked with the lawyers from Chimicles on?
9           MR. BEATTY: Objection. Beyond the
10          scope.
11          THE WITNESS: I think that there are
12          maybe two other cases where I worked with them
13          directly. But the way that I became -- that I
14          met anyone at Chimicles was I think they were
15          peripherally involved in one or more of the
16          cases under the MDL.
17 BY MR. CLABBY:
18       Q. And then have you ever worked with
19 lawyers from Mandelbaum Salsburg, the law firm?
20       A. I apologize to them in advance if I have,
21 but I don't believe so.
22       Q. All right. These are just the lawyers in
23 the case here. And the last one, have you ever worked
24 with Franklin D. Azar & Associates before?
25       A. I don't believe so, no. It's possible, I

47 (Pages 182 - 185)

Page 186

1  mean -- I'm sorry, but it's, like, in the case in the
2  MDL, I had a primary contact, and then I would have a
3  secondary contact for each of the banks.  And then I
4  know there were a lot of law firms on there that I never
5  would have known.  So it's possible, but I don't believe
6  so.
7        Q.  All right.  And then have you ever worked
8  with Doug Schultz before?
9        A.  No.
10       Q.  Have you ever read any of his articles?
11       A.  I had not, no.
12       Q.  Did you first meet him in connection with
13  this case?
14       A.  Yes.
15       Q.  Have you ever been arrested for a crime?
16       A.  No.
17       Q.  Hard left turn there.  Did you say no?
18       A.  Well, that was the first time I've had
19  that question.  I've been deposed a few times, but no.
20          MR. CLABBY:  Let's take a 10-minute break
21       here.  We may be getting to the end, Zach.
22       But yeah, let's take a 10-minute break.  Come
23       back in a few.
24          MR. BEATTY:  Sounds good.
25          (Recess taken -- 4:26 p.m.)

Page 187

1          (Return from recess -- 4:37 p.m.)
2          MR. CLABBY:  Zach, I don't have any other
3       questions now.  We're going to keep it open
4       because of the letter that got sent yesterday,
5       but we don't have any other questions right
6       now.
7          MR. BEATTY:  Sure.  I do have one or two
8       clean-up questions.
9          -- CROSS-EXAMINATION --
10  BY MR. BEATTY:
11       Q.  So first of all, Mr. Olsen, thanks for
12  coming today.  Thanks for testifying.  I have just one
13  set of questions for you today.
14          Let's turn to -- I guess it's paragraph
15  26 of your report, Exhibit 122.  Just read that
16  paragraph for me and tell me when you've reviewed it.
17       A.  Yeah, we talked about this one a bit
18  already, I think, but yes.
19       Q.  Do you recall testifying about that
20  today?
21       A.  Yes.
22       Q.  All right.  Now, if you would, turn to
23  Mr. Schultz's June 4th report, Exhibit 123, footnote 24,
24  which is on page 17.  Can you read that footnote and let
25  me know when you've finished reviewing that?

Page 188

1        A.  Yeah, so I'm not crazy.  Okay.
2        Q.  Okay.  Having reviewed that footnote 24,
3  do you recall why you included paragraph 26 in your
4  report?
5        A.  Yeah, I mean, hopefully it was clear
6  before in that I think all the calculations that I
7  included in the report came from Mr. Schultz.  I didn't
8  know why -- I couldn't remember why that one kind of
9  stood alone.  But, yeah, this is good.  Apparently he
10  asked for it, but that's all he asked for, was just the
11  number.
12       Q.  Do you know why he calculated that
13  number?
14       A.  Well, it would have been because he asked
15  me to.  Just like he says here, I instructed Mr. Olsen
16  to include the annual number of trades in each month in
17  case the finder of fact finds it relevant.  So I did it
18  because I was asked.  At least that's consistent with
19  what I tried to answer.
20          MR. CLABBY:  We're going to keep the
21       deposition open, but we can go off the record
22       now.
23          (The deposition concluded at 1:39 p.m.
24       PST reading and signing were not waived.)
25             * * * * *

Page 189

1       CERTIFICATE OF OATH OF WITNESS
2  STATE OF FLORIDA      )
3  COUNTY OF SARASOTA    )
4
5     I, YVONNE CORRIGAN, Registered Professional
6  Reporter, Certified Realtime Reporter, Notary Public in
7  and for the State of Florida at Large, certify that the
8  witness, ARTHUR OLSEN, remotely appeared before me on
9  July 13, 2021 and was duly sworn by me.
10     WITNESS my hand and official seal this 28th day of
11  July, 2021.
12
13
14
15
        YVONNE CORRIGAN, RPR, CRR
        Notary Public, State of Florida
        Commission No. GG 283606
16      Expires:  January 31, 2023
17
18
19
20
21
22
23
24
25

48 (Pages 186 - 189)

Page 190

1    REPORTER'S DEPOSITION CERTIFICATE

2

3    I, YVONNE CORRIGAN, Registered Professional

4  Reporter, Certified Realtime Reporter, certify that I

5  was authorized to and did stenographically report the

6  foregoing remote deposition of ARTHUR OLSEN, the witness

7  herein on July 13, 2021; that a review of the transcript

8  was requested; and that the foregoing transcript, pages

9  1 through 193, is a true and complete record of my

10  stenographic notes.

11    I FURTHER certify that I am not a relative,

12  employee, attorney, or counsel of any of the parties,

13  nor am I a relative or employee of any of the parties'

14  attorney or counsel connected with the action, nor am I

15  financially interested in the action.

16    Dated this 28th day of July, 2021.

17

18

19

20

21    *Yvonne Corrigan*
     YVONNE CORRIGAN, RPR, CRR

22

23

24

25

---

Page 191

1  RE   : NGUYEN v. RAYMOND JAMES & ASSOCIATES, INC.
   DEPO OF: ARTHUR OLSEN

2  TAKEN : July 13, 2021

3

4

5

6          EXCEPT FOR ANY CORRECTIONS
          MADE ON THE ERRATA SHEET BY
          ME, I CERTIFY THIS IS A TRUE

7          AND ACCURATE TRANSCRIPT.
          FURTHER DEPONENT SAYETH NOT.

8

9    _____
     ARTHUR OLSEN

10

11

12  STATE OF FLORIDA   )
                      ) ss:

13  COUNTY OF _____ )

14    Sworn and subscribed to before me this

15  _____ day of _____, 2021.

16  PERSONALLY KNOWN _____ or I.D. _____

17

18    _____
          Notary Public in and for

19          State of Florida at Large.

20  My commission expires:

21

22

23

24

25

---

Page 192

1  July 27, 2021

2

3  Zachary P. Beatty, ESQUIRE
   Chimicles Schwartz Kriner & Donaldson-Smith, LLP

4  361 W. Lancaster Avenue
   Haverford, Pennsylvania 19041

5  zpb@chimicles.com

6  RE   : Nguyen v. Raymond James & Associates, Inc.
   DEPO OF:  Arthur Olsen

7  TAKEN : July 13, 2021

8    The above-referenced transcript is available for
   review.

9

    The witness should read the testimony to verify its

10  accuracy.  If there are any changes, the witness should
   note those with the reason on the attached Errata Sheet.

11

    The witness should, please, date and sign the

12  Errata Sheet and email to the deposing attorney as well
   as to Veritext at transcripts-fl@veritext.com and copies

13  will be emailed to all ordering parties.

14    It is suggested that the complete errata be
   returned 30 days from receipt of testimony, as

15  considered reasonable under Federal rules*, however,
   there is no Florida statute to this regard.

16

    If the witness fails to do so, the transcript may

17  be used as if signed.

18
    Yours,

19

20  Veritext Legal Solutions

21

    *Federal Civil Procedure Rule 30(e)/Florida Civil

22  Procedure Rule 1.310(e).

23

24

25

---

Page 193

1  RE   : Nguyen v. Raymond James & Associates, Inc.
   DEPO OF:  Arthur Olsen

2  TAKEN : July 13, 2021 - Job # 4696494

3  PAGE _____ LINE _____ CHANGE _____

4  _____

5  REASON_____

6  PAGE _____ LINE _____ CHANGE _____

7  _____

8  REASON_____

9  PAGE _____ LINE _____ CHANGE _____

10  _____

11  REASON_____

12  PAGE _____ LINE _____ CHANGE _____

13  _____

14  REASON_____

15  PAGE _____ LINE _____ CHANGE _____

16  _____

17  REASON_____

18  PAGE _____ LINE _____ CHANGE _____

19  _____

20  REASON_____

21

    Under penalties of perjury, I declare that I have read

22  the foregoing document and that the facts stated in it
   are true.

23

    _____       _____

24  DATE              ARTHUR OLSEN

25

49 (Pages 190 - 193)

**&**

**&**   1:9 2:4,15 4:19
5:2,8,10,14 12:1
51:22 52:25 64:1
109:18 152:8 157:4
185:24 191:1 192:3
192:6 193:1

**0**

**0.014**   96:14
**0.03**   96:14
**0.25**   96:7
**0.5**   96:7
**00**   136:2
**058469**   60:17
**059060**   61:5
**059063**   61:5

**1**

**1**   8:25 48:12 94:17
95:8,13,22 96:18
96:22 97:24 125:20
125:21 128:19,22
190:9
**1.310**   192:22
**10**   131:16 160:15
160:22 186:20,22
**100**   54:23 55:2
110:16 150:1,2
151:14,15 157:15
**1000**   2:11
**101**   39:20 40:10,21
41:6,11,16
**1099**   44:9 164:1
168:15
**10:00**   9:19
**11**   22:17 25:24 26:3
29:9,20 32:15,21
34:12 35:11,12,17
38:10,22 51:2,6
61:12,13,14,17
62:11 63:1,3,4

64:24 65:12 66:25
69:3 77:13 100:20
145:19 157:11
**118**   62:19,21,22
63:2 65:13 95:15
95:19
**12**   13:10 56:11,12
59:19 80:14 81:8
81:17 93:10 102:8
102:11,20 124:2,9
126:7,24
**120**   35:19,19 36:5,6
36:16,16
**121,094**   97:4
**122**   3:8 20:15 21:3
22:7 25:25 39:10
44:13,18 48:12,13
52:23 56:13 60:15
61:3 63:2 67:20,24
71:17 86:7 106:20
107:21 118:13
131:22 136:21
140:15,20 162:11
162:16 163:4
170:11 178:19,20
187:15
**123**   3:9 20:17 88:9
88:12 102:22 103:1
112:18 129:14
138:1,2 187:23
**124**   3:11 20:19
**125**   3:12 20:21
**126**   3:13 20:23
138:2,9
**127**   3:15 20:25
**128**   3:16 21:2,4
**129**   3:18 9:2,3
10:16 130:21
**12th**   8:2
**13**   1:13 59:24 189:9
190:7 191:2 192:7

193:2
**130**   3:19 90:1,2,3
110:16
**131**   3:21 93:10,12
94:3,22 95:10 98:1
99:13
**133**   96:19
**14**   62:22 120:22
**145**   138:14,17
**146**   138:1,9 139:9
**149**   129:17 130:23
130:24
**15**   35:25 36:5 37:8
37:8 69:5 120:22
149:15 150:25
**150**   129:14,15,16
129:17,19 130:14
130:21,24
**150,000**   41:24
**16**   35:25 37:8,9
**16814**   189:14
190:20
**17**   60:15 61:11 69:3
89:24 90:6 125:23
126:5 187:24
**172**   90:16
**173**   90:10,12,15,20
91:13
**174**   90:10 91:14
**18**   39:9 44:16 46:15
60:20 61:3 163:13
169:11
**187**   3:4
**188**   95:19,24
**19**   71:18
**19,000**   149:14
160:20
**19041**   2:5 192:4
**193**   190:9
**195**   1:3

**1970s**   159:5
**1989**   164:16
**1991**   164:10,13
**1996**   44:5
**1999**   165:21
**1:25**   71:13
**1:33**   71:14
**1:39**   1:13 188:23

**2**

**2**   44:10 51:20 52:23
94:17,21 96:3,18
116:15 125:2 126:4
163:24 164:3
168:15 170:10
178:21 183:4
**20**   27:24 39:13 74:8
75:13 77:16 100:23
**20,000**   40:18
**20-16**   4:10
**20-17**   4:10
**200**   110:9
**2000**   164:11
**2001**   163:10 164:11
164:12,13 165:19
165:22
**2008**   163:11 166:2
166:5 178:21
**2016**   80:6,7 171:22
**2021**   1:13 18:18
19:5,8,11,21,24
20:14,16,18,20,22
20:24 21:1 22:12
22:20 31:13 32:7,8
32:24 33:21,25
39:13 62:23 93:11
189:9,11 190:7,16
191:2,15 192:1,7
193:2
**2023**   189:16
**2036**   110:4,8

**21**  3:8,9,11,12,13
3:15,16 75:23
76:24 78:12 80:21
103:6,22 107:8
109:10
**22**  83:17 86:6 94:24
95:5 98:8
**223-7000**  2:13
**23**  99:24 100:1
104:6,7 106:20
107:5 109:10
**24**  22:12 187:23
188:2
**25**  19:11,21,24
20:22,24 21:1
106:21 107:2,21
108:19 109:11
114:10,18 116:13
**26**  117:4,5,12,18,25
187:15 188:3
**27**  66:19 118:10
121:2,8,17 122:3
122:21 130:4
136:16,18,20 192:1
**27,000**  41:23 42:5
60:5,6 61:7 65:2,17
66:11,24 68:21
76:10 123:6 137:13
137:15 147:8
148:12
**27,322**  60:23
**27,332**  61:6
**28**  69:5 123:17
125:8 127:13,17
131:22
**283606**  189:15
**28th**  189:10 190:16
**29**  69:6 132:10,14
135:19
**2:55**  131:18

**2s**  164:3

**3**

**3**  42:5 62:17,18
66:3,3 94:17,21
95:3 96:21 126:4
159:20,21,23
161:10 163:4
170:11 183:13
184:4
**3,906**  97:4
**30**  150:18 192:14
192:21
**31**  96:4,5,13 97:7
189:16
**32**  133:10
**32,000**  39:16 41:24
42:5 46:17 66:19
139:4
**33**  95:11
**33601**  2:12
**34**  133:20,22 136:1
137:6,8,14 138:15
138:18,21,23 139:3
139:10
**35**  98:2 110:4,8,8
**350**  177:7,15
**361**  2:5 192:4
**37**  129:16
**38**  140:19 141:2
142:11 143:18
145:17 146:17,22
153:14
**39**  134:12 135:4
147:19,21 148:1
154:9,12
**398-6000**  2:17
**39d**  148:15 152:20
**3:14**  131:19

**4**

**4**  18:18 19:5,8
20:14,16,18,20
22:19 31:13 32:7,8
32:24 33:21,25
41:5 94:17 97:3
169:2
**40**  16:17,18 50:8
154:15 177:11,12
**400**  85:19
**415**  2:17
**4221**  2:11
**44**  95:14,23 98:1
**45**  133:12,22 137:8
137:14 138:15,18
138:18,23 139:3,10
**450**  2:16
**4696494**  193:2
**49**  102:25 103:1,2
**4:26**  186:25
**4:37**  187:1
**4th**  170:2 187:23

**5**

**5**  3:4 56:13 114:9
125:25
**5,000**  39:15
**5/26/21**  3:20
**50**  16:17,19 84:24
85:6 103:4 177:12
**50,000**  160:14
**500**  146:4
**51**  88:12,18 103:5,6
103:8,10 104:2
**54**  104:10,13,20
**55**  104:14,16,23
126:2
**59**  60:10,13,17
61:12 62:14,15
64:24 65:12,15,22
66:18 76:10 79:25

87:17 102:2 153:9
**59060**  60:22
**59067**  60:22

**6**

**6**  39:9 126:1,4
**6/25/21**  3:14,15,17
**6/4/21**  3:8,10,11,12
**60**  84:24 85:6
112:18,23 116:8
**610**  2:6
**642-8500**  2:6

**7**

**7**  39:13 71:18
159:21,24 161:10
178:19,19,19 180:7
180:14 181:11
**7,240**  141:16
**7,432**  132:20,24
**7/12/21**  3:21

**8**

**8**  126:6 127:17
161:13,14,15
**80**  167:18,20
177:25,25 178:3
**813**  2:13
**8:20**  1:3
**8:59**  1:13

**9**

**9**  3:18 131:22
161:13,18 163:19
**90**  3:19 71:11
131:15
**90s**  163:19
**91**  164:7
**93**  3:21
**94133**  2:16
**98**  165:14
**99**  165:19

**a**

**a.m.** 1:13 9:19
**aas** 1:3
**abbreviated** 74:18
**able** 11:7 12:13,14
50:2 72:14 74:5,13
93:22 147:9,15
151:21 153:9
**accept** 28:1 46:13
46:19 47:1
**accepted** 182:23
**access** 30:7 157:2
166:18
**accomplish** 74:3
75:2,7
**account** 51:24 53:2
53:23 54:1,15 55:3
55:4,12,13 56:5,6
57:12,12,24 58:4
59:8 60:5,5,10,13
60:17 61:7 62:15
63:18,19,20 64:10
64:11,12,13,22
65:19 67:9,10,16
67:25 68:20,21
69:3 70:9,9,16,17
70:24,25 71:2
77:20,24 79:5,12
79:12,13,25 80:5
81:7,16 83:19
85:19 86:9 87:14
87:17,18,23 88:2
88:23,25 90:25
91:5,7,17 92:2
94:23,24,25 96:23
96:24 97:4,23 99:1
99:18 100:8 102:2
102:10,14,18,24
105:15,22 106:12
106:25 107:10,17
107:17,18,25

112:25 113:4,9,17
114:8,10,11,14,15
114:17,20,22,23
115:21 116:15,16
116:22,23 117:7
119:3 121:10,20,21
121:21 125:4,5
127:20 128:3,4,6
128:13,15,16,20,21
128:22 129:20,24
129:25 130:8,15,16
130:17 131:3,4
132:5 135:23 136:8
136:24,25 138:24
141:17 142:3 143:7
144:3,3,16,24
145:7 147:8,9,10
147:10 148:6
149:15 151:3,4,7
153:9 160:22
161:19,21
**accountant** 175:13
**accounting** 136:24
**accounts** 39:15,16
51:23 53:1,6,8,12
53:13,15,19 54:4,8
54:15,16 55:21,22
58:2 59:11 60:6,23
61:6,12,13,14,18
62:12 65:12,18,18
67:5 68:1,1 69:4,5
69:8,9,10,11,11,14
70:2 80:1 88:22
96:4,5,6 102:7
107:24 108:5
114:19 117:6
125:11 133:12,22
134:15 136:9 137:8
138:15,18 139:5
140:9 143:21,22,24
144:7 146:1,3

148:3,4,12
**accuracy** 192:10
**accurate** 53:17,17
54:23 93:1 122:9
122:15 123:1,16
154:5 155:1 159:24
161:10 162:17
163:3 179:11 181:2
181:3 191:7
**accurately** 79:20
91:1 112:6 123:15
**acknowledge** 4:4
**acquisitions** 161:1
**acrobat** 75:11
**action** 48:18
110:22 157:17
190:14,15
**actions** 109:22
**activity** 87:21,22
99:17 134:15
**actual** 34:9 35:22
49:6 119:2 129:20
129:23 130:7,15
**add** 73:7 80:23
81:12 84:14 97:19
142:23
**added** 39:22 46:17
171:12
**adding** 80:24 81:1
81:25 82:13 96:5
103:25
**addition** 25:11
82:18 83:14 88:21
**additional** 123:6
141:19 142:23
145:12 146:16
153:16,19,24
154:22
**additionally** 30:17
**addressed** 125:16

**addresses** 62:11
**adds** 132:4
**adjusted** 140:13
**administering** 4:7
**administrative** 4:9
**administrator**
163:5
**administrators**
164:20 165:8
**admitted** 62:19
**adobe** 75:11
**advance** 33:20
185:20
**advantage** 25:8
65:5 72:22,23
**advised** 69:7
**adviser** 158:15
173:16,19,22 174:3
**advisers** 173:3
174:10,14
**advisory** 174:23
**affix** 23:5
**afforded** 167:23
**aged** 172:4,21
**aggregate** 97:3
**ago** 13:10 18:24,24
34:19 94:9 109:21
170:19 182:12
**agree** 4:17,20 13:2
13:3 24:22 31:1
60:17 83:16 91:15
97:12 113:12
133:21 134:25
135:18,21 147:22
**agreed** 9:19 11:17
20:3
**agreement** 4:14,15
11:13,15 12:21,24
13:13 15:9 156:2
169:10

agreements  13:22
  166:17
agrees  113:14
ahead  8:12 13:19
  103:14 182:8
alerted  39:14
allegations  28:1,8
  28:14 54:19,21
  172:11
allocation  183:2
allows  31:1 71:25
  73:4
ambiguous  107:1
  137:2
amended  26:17,25
  27:7,14,14,20 28:2
  28:14 38:8,9,19
  112:10
america  171:6
amount  14:15
  105:2,3 126:1,2
  130:2 132:17,24
  177:16
amounts  127:20
analyses  97:5
analysis  36:17 43:2
  43:12,15 44:12
  45:7 48:3,17 56:19
  57:13,14 58:4 60:9
  67:11 75:7 86:4
  96:12 100:8 101:3
  101:12 102:15
  109:10 123:19
  124:5,5 132:10,13
  132:15,18 135:20
  148:17 177:15
  184:20,24
analyst  175:11
analytics  175:23
analyze  60:8 72:1

analyzed  72:16
  139:21
analyzing  56:15,21
  132:19
annual  57:13,23
  77:2,6,21,24 81:10
  81:18 84:24 85:7
  95:9,14,15,23,23
  96:4,6,7,12,13,22
  96:23 97:25 100:8
  101:3,12,19 102:15
  102:17,24 103:3
  106:5,13 123:22,23
  123:24 125:6,7,12
  126:6 188:16
annualize  106:11
  126:23
annualized  80:14
  102:6,20 103:25
  104:22,25 114:9
  119:4 124:2,25,25
  125:5,11 126:1,5
  127:18
annualizes  124:3
annualizing  83:10
  105:16,18 123:19
  124:5
answer  6:1,4 7:23
  17:23 28:4,6,11
  30:11 37:12 38:15
  39:6 43:3 44:4
  66:17 69:16 74:20
  78:4,19,21 79:23
  83:23 85:13 90:16
  91:10,13,15 92:15
  97:20 101:9,18
  109:7 110:2 119:24
  120:5 121:4 123:12
  127:8 129:7 142:7
  147:16 150:20,22
  151:21,24 152:3,4

159:15 161:5,6
  172:5 176:22
  188:19
answered  29:1
  55:15 56:8 62:4
  67:13 68:10 70:12
  99:4 105:20 116:18
  145:14
answering  16:20
answers  25:3 26:6
  78:9
anticipated  91:1
anybody  168:11
  170:22
anymore  161:3
  172:2
anyway  32:23
  184:24
anyways  26:10
  182:1
aosc  4:10,10
apart  155:8
apologize  41:19
  185:20
apparently  166:16
  188:9
appear  9:20 94:17
  118:1
appearances  2:1
  5:2
appeared  2:23
  189:8
appears  90:12
  118:11 130:3 139:3
applicable  105:7
application  135:5,7
applications  75:7
applied  22:23
  59:10 83:8 106:17
  132:13 133:16

applies  139:4
apply  39:3 65:1,4,8
  70:19 71:3 79:17
  86:1 135:11 137:12
  143:6 144:1,2
  176:14
applying  58:19
  59:3,10 78:17
  129:11,11 132:18
  133:14 145:22,24
approach  102:13
appropriate  131:7
  142:23 145:22
  146:4
approximately
  109:24 164:10
april  62:22
arbitrary  56:22
area  14:10
areas  171:10
arena  160:4
arguably  17:8
argue  112:24
argued  150:4
arguments  144:17
aris  165:8
arrangement  4:8
  4:12
arrested  186:15
arrive  59:8
art  103:13
arthur  1:18 3:3,8
  3:18 4:22 5:22
  20:14 189:8 190:6
  191:1,9 192:6
  193:1,24
articles  175:3
  186:10
articulate  40:7
  49:2,3 98:15

**articulated** 40:16 68:5

**aside** 9:23

**asked** 8:12 9:13 10:4 11:4 17:13 20:10 30:12,13 37:12 46:25 51:8 55:15 56:7 59:11 59:14 67:12 68:15 68:16 70:11 85:15 86:17,18,22,25 89:16,18 99:4 105:19 107:7 116:17 117:20 120:10,20,24 135:18 136:13 140:5 142:1,17 143:12 147:11 150:24 151:19 152:24 153:15 156:17,18 166:12 171:13 181:5,7 188:10,10,14,18

**asking** 41:14 70:2,6 180:13 184:2

**asks** 13:4

**aspects** 179:14

**assessed** 106:6

**assets** 53:14 55:2 88:22 95:14 143:21 143:23

**assignment** 14:3,4 14:18 15:1

**associates** 1:9 4:19 5:2,11 12:1 51:22 52:25 64:1 109:18 152:8 157:5 185:24 191:1 192:6 193:1

**assume** 22:14 49:23 55:20,23 61:20 93:4 111:9

**assumed** 179:4

**assumption** 69:19 127:3 128:22,24 129:2 140:7

**assumptions** 14:22 25:21 51:13 57:6 71:5 79:18,21 98:9 98:12,18,19 115:25 122:14 127:11 141:23 155:6

**attach** 75:1

**attached** 77:13 100:21 133:11 162:16 192:10

**attended** 174:16

**attendees** 2:23

**attending** 5:8

**attention** 71:17 85:25

**attorney** 2:3 10:6 15:24 172:19 190:12,14 192:12

**attorneys** 2:9 4:3 10:3,16 11:4 14:16 16:10 111:24 127:7 127:9 166:12 182:20

**attributed** 17:8

**audits** 164:21

**authored** 128:24 175:3

**authorized** 190:5

**automate** 164:25

**availability** 10:5 11:12

**available** 8:9,23 14:11 153:1 154:18 184:19,22 192:8

**avenue** 2:5,16 192:4

**average** 81:10,18 94:23 96:4,6,12 97:4,7 105:2 106:5 106:13 119:4,6 123:23 125:4 126:12 127:18,19 128:19 136:2

**averages** 105:25

**averaging** 126:8

**aware** 53:25 63:25 112:8

**azar** 185:24

**b**

**b** 35:19 36:6,16 95:23 134:12 147:19,22 171:18 172:7 180:14 181:12,15 183:4,13

**back** 6:9 12:19 21:8 23:24 32:19 34:8 52:19 63:1,3 69:2 71:11 85:6 88:5 102:22,23,23 103:18,21 104:6 106:19 114:18 120:18 127:13 136:15 137:6 139:18 147:15 150:12 165:15 167:25 171:20 178:7 180:1 182:6 182:10 184:20 186:23

**background** 17:3 29:2 162:21,23 166:17

**backwards** 95:18

**balance** 142:4

**ballpark** 177:14,15

**bang** 73:13 157:25 158:1

**bank** 110:7 142:2 157:20 170:15 171:6 173:24 174:2 180:12 184:7

**banking** 167:9,9

**banks** 110:5,9,14 158:6,17 160:19 161:23 186:3

**based** 51:23,24 53:1,1,6,7,18,22 54:1,4,8,14,16 55:3 55:4,12,13,21,22 56:5,5 64:12 68:11 70:17,24 79:12 86:3 87:20 88:22 105:6 107:16 108:10 113:17 114:8,10,15,22 115:16 117:25 121:20 122:16 128:3 129:20,23 130:7,15,17 131:4 134:15 135:15 139:4,19 142:24 147:2 164:23

**basic** 13:1,3,8 14:14 15:3,6 67:4 95:2 103:24 109:6 128:11 138:11 156:2

**basically** 167:8 181:1

**basis** 119:6

**bates** 30:19,23 31:6 31:10 35:18 60:16 60:22 61:4

**battle** 166:9

**bear** 36:8

**bearing** 14:23

**bears** 91:14

**beatty** 2:4 3:4,22
4:16,16 5:13,14
52:19 55:6,14 56:7
58:6 60:24 64:14
67:12 68:23 70:11
71:12 93:22 95:17
99:3 103:11 105:19
107:1 113:10 115:1
116:17 121:11,22
122:5,11 124:16
131:10,17 133:2
134:23 136:10
137:1 144:8 146:24
148:18 152:10
155:12 185:9
186:24 187:7,10
192:3
**beginning** 11:6
40:24 133:7 181:5
**begins** 90:16 138:4
**behalf** 1:6,21 5:15
**believe** 11:16,20
12:25 13:18,20,24
15:22 28:5 29:7
33:1 35:22 38:3,17
39:1,6 40:11 41:1
41:10 47:12 48:8
52:4 60:8 62:5 64:3
70:15 75:19,22
76:6 80:4 89:17
91:20 102:3,4
115:24 119:3 125:9
125:13 127:6,10
136:3,10 137:24
158:12,16 161:12
172:9,14 177:2,5
183:10,11,15
185:21,25 186:5
**believed** 32:4
**believes** 113:7

**ben** 5:8
**ben.suter** 2:17
**bernard** 2:15 3:21
**best** 10:22 177:13
**better** 82:7 168:6
**beyond** 53:15
136:11 179:14
185:9
**big** 164:2 165:20
166:9,17 170:20,24
171:3
**bigger** 40:19
**bill** 29:22 41:9 63:7
89:9 177:19,21
**billed** 177:20
**billing** 44:6 177:3
**bills** 177:4
**binder** 8:17,19
35:25 36:5 66:3
90:6 93:8 120:21
**bit** 16:7,8 21:9
26:22 35:2 45:5
49:13 52:20 71:6,7
74:9 82:7 101:24
111:14 133:18
158:23 159:1,8
162:8 168:6 176:24
178:5 187:17
**blank** 13:4
**blurb** 166:25 167:3
**bottom** 22:19 90:20
96:22 127:16,17
173:4 178:21
**bought** 172:23
**boulevard** 2:11
**boy** 2:11
**bracketed** 83:15
**brackets** 82:22
83:1,2
**break** 6:15,15,16
50:6 71:10 131:16

186:20,22
**breaking** 131:14
**breaks** 7:16
**brief** 12:7
**brings** 170:22
**broken** 50:23
**broker** 158:8 172:8
173:2,13 174:2,7
174:13
**brokerage** 53:7,16
53:19 63:19 148:11
158:13 159:17
174:20
**brought** 140:7
**brutal** 171:2
**bryce** 5:9
**bullet** 30:17 31:5
31:13,18 35:18
170:11
**bunch** 21:22 24:21
158:21
**business** 164:18,19
178:7
**busy** 34:23
**buy** 57:12 161:2

**c**

**c** 4:1 124:22 133:11
135:4 147:19,22
**cagey** 110:2
**calculated** 135:5
145:22 188:12
**calculating** 58:18
59:3 84:3
**calculation** 46:8,9
57:22 59:10 66:8
66:11 68:8 75:15
77:23 80:21 83:18
94:20,23 95:16,25
96:9 99:7 101:12
104:22 106:3
115:23 118:5 119:1

119:6 122:20,24
126:11,16,18 128:1
128:11,12 129:3
133:9 135:15
136:23 137:7,23
138:8 141:22,25
146:14,16 152:24
152:25 153:2,4,6
153:19 155:1 176:6
176:8 181:2
**calculations** 11:7,8
14:12,14,17,21,22
14:24 16:4,5,22
17:10 25:20 28:7
33:14,16 37:5,13
40:6 42:4,4,12 45:4
47:14,22,25 48:17
49:12 51:12 54:13
54:17,22 55:17
57:5,6 59:7,9 64:9
65:25 66:5 68:16
69:22 70:20 71:4
73:24 86:19 91:23
91:25 92:24 93:2
94:16,18 96:25
97:12,13,14,25
98:10,16 101:14
105:5 108:12,12
109:3,4,7 111:23
112:1,5,16 115:10
119:8 120:10,11,12
122:18 123:5,7,10
123:11,14 127:15
133:5,12,13 135:16
135:17 139:9 140:3
140:6 141:19,21
142:18 143:2,15
144:13 145:9,12,15
145:17 148:2,10
151:21 152:19
153:16,20,24 154:1

**[calculations - chimicles.com]**                                        Page 200

154:2,4,14,22,24
155:4,9 176:18,22
179:10,11,12 181:3
181:7,9,24 188:6
**calendar** 49:18
**california** 2:16
163:10 164:8
165:22 167:22
168:1,20 169:2
**call** 8:25 12:7,16
24:23 25:5,5,9 50:3
50:4,5 60:17 61:7
87:4 148:11 156:6
167:6
**called** 4:23 87:6
105:1 164:20 183:5
183:13 184:12
**calls** 17:20,22 18:3
18:4,5 24:25 25:1,6
58:6 64:14 67:13
68:23 113:10 115:1
121:11,22 122:5,11
131:10 133:2 144:8
146:24 148:18
152:10
**camera** 5:5
**cap** 180:3
**capabilities** 157:1
**capital** 180:9,11
182:5
**captioned** 48:18
**captured** 129:23
**card** 110:14 142:6
157:19 158:20,25
**care** 85:24
**career** 42:23 161:7
162:25
**careful** 98:14 179:9
**carlton** 2:10,20 5:4
**carltonfields.com**
2:12

**case** 1:3 8:7,24 10:5
11:6,21 12:8,18,21
13:7 14:18,20,23
15:21 16:7,7 21:24
23:25 26:22 29:1
38:11 46:24 51:4
51:21 52:24 53:3
54:19,21 55:11
62:1 64:11 68:2
70:10 74:13 86:15
89:18 99:2 109:1
110:7 111:2,8,12
111:15,21 112:9
116:8 122:4 132:25
135:17 139:17,23
142:6 144:11 145:6
146:17 149:11,12
149:22,25 155:11
155:18 156:14,18
157:22,24 158:2
159:1,7 160:6,19
162:6 163:1 166:15
167:7 171:18 172:3
172:3,20,22 177:1
177:21 178:10
179:1 181:12
182:22 183:4,4,8
183:12,13,14,16,23
184:5,8,12,16
185:1,2,23 186:1
186:13 188:17
**cases** 11:3 14:6
22:1 31:1 58:9
78:19 83:11 101:6
102:10 105:5 110:6
110:9 111:5 119:15
119:18 120:7 123:9
125:17 142:2,6,17
149:18 157:19,19
157:20,25 158:21
161:22 170:16

171:14,15,21,24
172:6,16 178:23
179:24 181:20
183:1,17 185:12,16
**cassis** 43:22 44:3
**categorize** 50:1
**category** 76:1
**cause** 1:24
**ceh** 1:3
**cell** 7:1,3 73:7
**cells** 73:7
**certain** 30:7,12,14
51:23 53:1 54:4,7
71:1 76:13 111:6
139:18 156:18
162:1 184:19
**certainly** 67:17
98:13 115:24
140:14 141:21
154:7 156:24
162:23 167:10
172:4 176:5
**certainty** 91:4 93:4
**certificate** 189:1
190:1
**certified** 112:12
189:6 190:4
**certify** 189:7 190:4
190:11 191:6
**challenge** 178:25
179:20,25 180:16
182:15 183:22
184:4,8,16
**challenges** 28:24
178:23 180:8
181:12,14,19
**challenging** 50:17
**chance** 94:2
**change** 17:3,22
33:11,18 42:11
44:22 46:10,13

54:22 64:5 71:6,7
97:19 98:5,7,11,12
98:19,19,20 123:4
123:10 153:19,23
153:24 154:24
155:3 193:3,6,9,12
193:15,18
**changed** 76:7 97:18
97:21 98:5 126:14
126:14 153:17
155:6
**changes** 98:20
154:22 160:8
192:10
**characterization**
98:21
**characterized**
53:11
**charge** 90:25 91:16
130:2 160:12 178:6
180:4
**charged** 86:8 87:13
88:24 91:6,25
98:25 128:5,14
130:1 174:20,23
183:18
**charges** 84:24 85:7
**charging** 177:7
**chart** 96:22
**chase** 183:17
**check** 34:4,5
166:18
**checking** 161:18,21
177:6
**childress** 183:13,17
**chimicles** 2:4 5:14
10:4 15:8 16:13
18:5 24:1 185:7,8
185:14 192:3
**chimicles.com** 2:6
192:5

china  169:14
chinese  169:15
choice  172:18
chris  36:25 37:21
  37:24
circumstances
  90:17
citation  39:19,23
  39:25 40:2 41:19
  42:8
cite  35:18 41:17
  103:6 130:21
cited  41:12
cites  138:15,15,20
civil  192:21,21
clabby  2:10 3:4
  4:18,18 5:1,4,17,19
  9:5 20:1 21:5 24:4
  52:21 55:9,18
  56:10 58:16 61:2
  64:20 67:18 69:1
  71:8,15 90:5 93:14
  94:1 95:20 99:11
  103:20 106:18
  107:4 114:6 115:19
  117:3 121:15 122:1
  122:8,19 124:23
  131:13,20 133:6
  135:1 136:14 137:5
  138:13 144:21
  147:6 152:1,12
  155:14 185:17
  186:20 187:2
  188:20
claimed  175:20
claims  51:22 52:6
  52:24 53:4 149:24
  150:21
clarification
  138:12

clarify  156:17
class  5:16 37:4 40:4
  42:4,11 46:16
  58:11,12,13 64:11
  65:24 70:10,15
  96:13 107:24 108:6
  108:8,14 109:20,22
  110:18,22 111:7,11
  112:2,6,8,11,12,13
  112:13 113:9,19,21
  114:5,15,20,25
  115:6 134:1,5,6,15
  134:18 136:1,8
  138:20 139:13,15
  139:22,25 140:4,10
  144:6 145:25 154:6
  154:7 157:17
classes  165:4
clause  130:13
clean  82:6 138:13
  187:8
cleaning  52:9
clear  34:12 42:7
  60:15 83:13 94:21
  119:15 158:9 188:5
clearly  125:21
client  79:6,11 99:19
  106:25 107:11,16
  121:10,20 156:9
clients  167:24
  168:1 174:20,23
  178:7
close  85:25 91:21
  118:16
closed  57:1 62:8
  72:12 85:9 99:19
  100:9 113:1 115:12
closer  39:15 163:13
cobol  159:5
code  30:9 36:12,12
  37:7 43:5,6,7

120:20,21,22 159:9
  165:6
coder  120:24
cold  168:10,13
colleagues  12:4
colon  26:16
column  74:14 78:4
  101:22 120:8
  124:24
columns  74:16
  125:2 150:16
combination  15:22
come  16:9,9 21:7
  24:10,12,17 42:7
  49:11 57:7 71:11
  73:11 76:2,3,9
  82:12 86:19 87:4
  93:15,19 95:4
  108:20 126:12
  127:1,4,4,6,9 129:6
  138:11 139:11
  140:24 142:8
  146:11 170:16
  186:22
comes  49:21 91:14
  123:7 178:2
comfortable  40:23
  46:22
coming  69:22
  187:12
comment  68:15
  149:19
commented  47:12
comments  30:9
  45:18 47:7,10
commission  51:23
  53:1,6,7,12,18 54:4
  54:8,14 55:3,12,20
  55:21 56:5 60:5
  61:13,15,18 62:2,8
  64:12 65:18,25

66:13 67:25 68:20
  69:5,8 70:8,17,24
  77:20,24 79:12,13
  80:1,3 83:19 88:22
  88:24 90:25,25
  91:5,7 96:23 97:22
  100:8 102:4,14,24
  104:1 107:16,18
  114:8,15,22 115:21
  116:15,22 117:6
  119:4 121:20,21
  123:22 127:19
  128:2,6,13 130:17
  131:4 136:2 148:7
  148:11 151:7
  189:15 191:20
commissions  78:5
  80:25 81:13 82:5
  82:17,21 83:1 86:8
  87:12 91:6,16,25
  97:22 98:25 174:20
  174:23
common  101:5
communicate
  18:11,14
communicated
  126:21 141:13
communication
  141:4
communications
  69:22
companies  110:14
  149:2 158:7,18
company  44:7
  161:2,2 164:20
  166:23,24 168:22
  172:23,23
compare  27:11
comparing  106:2,6
  106:8

compensation
  176:24,25
compile  148:16
complaint  23:17
  26:17,25 27:7,14
  27:15,20 28:2,14
  38:8,9,19 111:10
  112:11 139:24
complete  89:14
  162:19 190:9
  192:14
completed  6:7
completely  7:23
  48:24
complex  14:17
  74:11 119:8
compliance  164:21
component  103:25
  111:17
compound  55:6
computer  6:25 75:6
  151:16 156:21
  165:4
concept  116:2
  129:8,22 131:2
  134:13 139:13
concerned  156:5
concluded  188:23
concludes  155:21
conclusion  121:12
  121:23 122:6,12
  131:11 133:3 135:4
  147:20 153:11
conclusions  68:22
  117:24 133:21
  134:12 147:18,19
  147:21
concurrent  160:14
conducted  79:10
  107:15

conducting  83:18
  121:19
conference  7:13
conferences  18:4
  175:7
confirm  72:14,16
  72:19
confirmed  72:10
conflict  11:24
conflicts  11:17,21
confused  102:3
  184:17
confusion  18:1
connected  190:14
connection  7:16
  23:15 24:6,19 25:2
  25:12 48:18 144:23
  145:17 177:1
  186:12
connections  160:14
consent  4:11
consequences  58:3
consider  33:8
  36:23 51:14 64:24
  68:19 76:4 148:14
  150:23 151:18
  152:4,7,14
consideration
  61:15,18 69:12,14
  70:2
considered  25:16
  26:14 30:18 37:1
  51:3 58:1 144:19
  152:13 192:15
consistent  128:6
  188:18
consternation
  32:11 34:20,20,22
constitutes  55:12
  56:1

consult  43:1,11,14
consultant  44:5
  89:23 148:24 149:2
  163:15,19,20 170:3
  170:5 174:1
consultants  44:8
consulted  157:7
consulting  18:15
  48:16,21,22 49:5,7
  49:16 50:5,10,15
  51:5,9 56:20
  160:16 166:5,23
  167:20 168:22
  169:19 178:1,3
contact  10:18,24
  11:10,11 186:2,3
contacted  10:3,6
contain  45:6 87:18
contained  23:19
  77:6
contains  132:10
context  129:10
  176:4
continue  156:2
contract  163:6,13
  164:9 165:23,25
  169:6,11,21
contractor  169:9
contractors  164:2
contracts  166:24
conversation  21:14
  21:15,19 40:14
  67:15 161:16
conversations
  15:23 16:2 28:24
  33:13 39:2,6 47:21
  49:1,7 141:5,6
convert  75:11
convoluted  82:4
  159:1

cool  80:19 167:3
  168:11,25
copies  32:13
  192:12
copy  8:9 9:11 22:6
  22:11 32:2,4 34:10
  52:5 89:10
corporate  29:22
  63:7 161:1 172:22
  180:23
corporation  183:5
correct  9:21 22:11
  28:15 31:15 34:14
  35:5 41:3 52:18
  65:9,13 67:2 76:16
  77:10,14,15 84:8
  84:11,18,19,20,22
  86:4 88:16 89:6,11
  97:10,11,15 98:3
  98:23 99:22 100:21
  108:19 109:11,14
  109:15,18,19,22
  110:19 122:3,21,24
  126:19 130:11
  131:8 134:2,3,18
  134:19 135:10
  136:5 137:9,16
  138:21,24 144:3
  145:17,18 146:17
  152:17 157:6,12
  163:16 179:12
corrections  191:5
correctly  28:23
  30:5 32:1 102:6
  129:12
corresponded
  119:11
correspondence
  68:5
corresponding
  69:9 95:11

**corrigan**  1:22
189:5,14 190:3,21
**cost**  57:13,23 68:19
77:2,6,21,24 95:9
95:14,23 96:4,6,12
96:23,23 98:7
99:19 102:24 103:3
114:9 123:19 124:4
124:5 125:6,7,12
126:6 136:2 152:16
**costs**  97:25 123:21
177:21
**counsel**  4:11 5:7,10
9:19 13:23 17:19
17:22 18:5,10
23:10 24:5,10,12
24:17 25:10 30:13
39:14 40:1,15 41:2
42:8,15 47:6,9 48:7
48:9,15 52:16
54:20 59:18,22
62:6 64:1 69:6,7,17
69:23 70:8 76:20
84:1 87:2 88:8 92:8
127:2 190:12,14
**counsel's**  44:17
**count**  16:23
**county**  189:3
191:13
**couple**  12:6,18
36:21 45:12 162:12
173:4 180:6 182:11
**course**  35:1 105:25
**court**  1:1 4:3,5,9
6:3,9 138:12 158:1
160:7 167:15
170:21,23 172:3
178:11,13 182:23
**court's**  38:18
**cover**  45:2

**covered**  110:24
111:2 139:17
**covering**  45:1
**covid**  177:23
**crack**  44:21 52:7
**crazy**  188:1
**create**  36:17
109:17 137:11
139:3
**creates**  139:2
**creating**  176:5
**credible**  68:11
**credit**  110:14,14
142:6 157:19,20
158:5,18,20,25
182:4 184:13
**crime**  186:15
**criteria**  65:1,4,9
116:12 134:16
**criterias**  134:21,22
**cross**  3:4 187:9
**crr**  1:22 189:14
190:21
**cullinane**  5:9
**cupertino**  169:24
**current**  171:19
**customer**  125:19
151:17
**customers**  151:15
**customs**  172:12
**cut**  35:9 77:8
100:15 141:10
162:1 182:9
**cuts**  7:16
**cv**  1:3

**d**

**d**  4:1 124:22 147:22
148:1,1 185:24
**damage**  48:17
59:10 181:2

**damaged**  132:24
**damages**  58:18
59:3 97:3 118:12
118:17 121:9,18
122:3,10,21 123:15
123:18 127:14
131:7 132:13,15,17
132:21 133:12,13
135:4,9,12,21
136:4,7,15,23
141:16 143:6,19
145:12,21 146:16
146:17 154:5 155:1
176:2,3,10 179:12
181:3,8
**danyale**  2:20 5:5
**data**  11:7,7 14:8,11
14:12,15,23 16:8,8
17:11,12 23:19
24:1 25:22 28:25
29:3,4,4,23 30:6,8
30:10 33:15 35:22
37:3,6,10,13 42:3
48:16,17 49:10,11
50:20 51:14,14
53:10,11,12,19
56:15,19,21 57:3,7
57:21,22 58:19
60:1,6 61:13,15,16
61:25 62:1,2 65:24
66:2,13 68:13,14
68:15,17 69:5
70:15,18 71:23
72:1,1,3,11,17,20
73:24 75:15 77:23
78:17 79:18 80:2
83:19 84:5 98:17
98:20 101:11 102:8
105:17 109:3,3,6
110:15 111:22
115:8 117:6 119:11

120:3,15 122:13
123:6 125:5,10,13
125:20 126:5,7,22
126:24 130:1,11
132:20 133:14,17
134:13,22 135:13
139:20 140:8,9,16
140:17 143:10
144:22 145:1
146:13 147:7,13
148:3,7,9,11,16
149:3,7,21,23
150:2,6,11 151:9
151:20 152:6,9,18
153:1,3,5 154:6,17
156:23 157:2 159:2
159:3,8,18 166:13
166:14,19 167:2,9
167:10 170:12
171:5,5 175:22
176:7,17,20 184:19
184:20,22
**database**  14:8
36:13 50:4 71:20
71:24,25 72:2,8,24
73:3 75:6 76:10,10
76:17 131:25 132:7
148:23 150:16,17
159:11 160:4 163:5
166:11
**databases**  17:13
29:3 42:24 49:1
68:12 156:21
**datapoint**  67:4
119:4,7 130:2,4
**datapoints**  119:18
141:20,23 153:25
**dataset**  14:25 42:13
54:13 60:9 61:6
65:2,9,11 70:22
140:6 176:14

**datasets** 55:19
74:15 76:13
**date** 31:14 56:16
87:18,21,24 138:5
192:11 193:24
**dated** 3:8,9,11,12
3:14,15,16,20,21
18:18 19:5,8,11,21
19:24 20:14 22:19
31:14 32:24 93:10
190:16
**daubert** 178:23,25
179:13,20,25 180:8
181:11,14 182:14
**dax** 38:2
**day** 32:10,11 33:18
33:20 35:1 41:24
42:11 44:23 49:19
88:15 114:23
115:11,13,14 156:6
189:10 190:16
191:15
**days** 71:1 140:13
192:14
**deal** 80:9 160:13
**dealer** 158:8 172:8
173:13 174:2
**dealers** 173:2 174:7
174:13
**dealing** 17:10
**december** 80:7
**decide** 28:8 64:19
112:5 142:20 176:9
**decided** 88:4
112:12 135:16
**decides** 142:23
**decision** 61:17 62:2
69:13 84:10 85:2
85:11,20 86:14
**declaration** 184:21

**declarations** 162:3
**declare** 193:21
**defendant** 1:11,21
2:9 12:1 172:15
**defendants** 11:20
161:22
**define** 49:14
179:20
**defined** 135:25
**defines** 134:5
**definitely** 51:19
179:2
**definition** 30:25
33:4 53:9 108:8
109:21 110:19
111:8,11 112:9,11
112:14 115:10
120:6 127:5
**degree** 164:19,23
**degrees** 174:12
**delete** 34:7 171:20
**deliver** 92:7
**delivered** 17:5
155:10
**depending** 49:13
73:20
**depends** 46:6
**deployed** 143:6
**depo** 191:1 192:6
193:1
**deponent** 191:7
**deposed** 7:9 171:22
186:19
**deposing** 192:12
**deposit** 87:23
**deposition** 1:17,23
3:18,20 4:4 7:12
9:3 21:3,10,12,21
24:3 29:21 36:24
37:18,21,24 38:2,5
38:6 39:20 40:9,21

41:6,8,16,17 48:19
49:22 62:19 63:6
63:12 68:6 71:22
88:16 89:9,25 90:3
90:12 93:12 96:18
150:13 155:20
162:17 188:21,23
190:1,6
**describe** 34:20
71:21 128:10
**described** 30:18
53:4 54:20 83:7
123:16 127:25
147:12
**describes** 54:19
**description** 3:7
54:23 79:20 92:14
**designated** 29:23
**designation** 56:23
**designed** 176:13
**designee** 91:3,4
**desk** 7:2
**detail** 171:15
**detailed** 170:5
**determination**
66:15,21 70:1,21
108:13 113:4
126:15,18 151:1
**determinations**
150:10
**determine** 59:6
79:4,9 106:24
107:9,14 111:20
117:21 120:19
121:8,18 147:9
**determined** 63:18
66:1 107:23 114:19
141:16 154:4
**determines** 105:11
112:13

**determining** 64:25
107:24 108:5,13,15
114:20 148:5
**develop** 109:13
**developer** 163:5
**development** 176:2
**devices** 6:24 7:1
**dictionary** 30:25
**died** 181:22
**difference** 96:24
180:22
**differences** 27:13
27:15
**different** 11:4
13:12 37:17 49:20
49:24 60:21 63:19
63:20 64:13 70:23
73:5 74:14,18
97:13 98:2 102:12
110:4,8,16 116:24
125:8,24 142:19
150:2,2 151:15,15
155:16 158:24
167:4 178:4
**differentiate** 16:23
25:4
**differently** 74:19
133:18
**difficult** 7:22 68:8
68:9 73:6 151:23
**direct** 3:4 5:18
76:12,16
**directed** 15:20
58:19 59:20 89:13
**direction** 16:1 59:2
**directly** 12:12
17:22 47:5 72:25
73:3 125:9 185:13
**disagree** 120:9
**disagreement**
120:1,6

disbelieve   28:5
  41:22
discarded   75:18
disclose   34:13
disclosed   51:5
discovery   153:17
  154:18
discuss   129:8
discussed   28:25
  37:2 134:14 147:20
  148:2 155:8,9
  178:10
discusses   117:5
discussion   68:9
  75:25 100:14 117:8
  117:18 126:12
  179:20
discussions   146:7
dismissing   38:19
distance   139:19
distinction   143:16
district   1:1,1
divide   73:11 81:15
  81:18 97:7 102:18
  105:2 106:13 124:8
  137:14
divided   80:12
  81:10 123:22
  139:10
dividing   78:16 81:6
  124:1
division   1:2 81:25
  82:12 83:4 169:25
divisions   169:14
document   9:13
  22:18,21,24 23:5,8
  25:8 26:24 28:17
  31:2,3,6 32:3 45:16
  47:8,13 111:8
  162:19 168:5
  193:22

documents   10:14
  11:9,14 21:22
  23:14,20 24:6,9,12
  24:15 25:10,11,16
  25:22 26:10 28:20
  28:22 29:17 30:19
  31:9,24,25 37:15
  38:15,21,24 39:7
  50:13,22 51:2,4,11
  51:17 68:4
doing   54:13,17
  64:9 68:10,21
  80:21 108:5 109:2
  112:15 143:14
  144:12 148:25
  155:11,17 160:10
  164:21 166:22
  167:18,19 169:19
  181:24
dollar   101:19
  102:17
donaldson   2:4 5:15
  192:3
doubt   147:4
doug   3:9,13 15:15
  15:15 16:2,4 17:22
  18:18 19:11,17
  20:16,22 24:8,14
  24:16 26:6 32:5,8
  69:24 186:8
doug's   17:24 24:13
  103:15
douglas   15:13 31:5
  31:14 56:15
downloaded   23:25
draft   19:16 32:16
  32:23 33:1,5,20,24
  34:13 42:18,21
  47:17,18 90:10
  118:4

drafted   12:23
drafting   16:19
  27:25 44:17 86:3
  145:4
drafts   45:8,10,14
  45:18 46:2 47:2
draw   71:17
drive   90:18
driven   59:6
drop   7:17
drove   169:2
drugs   7:21
dry   153:10
due   143:21
duly   4:23 189:9

**e**

e   2:10 4:1,1 5:22
  124:24 125:1,2,18
  126:4 192:21,22
earlier   10:20 50:12
  57:3 61:22 90:7
  98:14 115:7 118:3
  120:21 155:13
  157:14 185:6
early   34:25 149:6
earned   141:18
  144:16 145:25
  146:1
earnings   145:13
easier   49:25 99:6
  101:24
eastern   9:19,20
easy   120:19
economist   175:9
education   162:22
  162:23
educational   162:20
effect   90:18
eight   17:18 18:9
either   31:19 38:14
  70:7 89:22 108:25

118:9 141:13 142:5
  171:22
electronic   9:11
  22:23,25 23:11
element   162:1
email   10:25 12:3
  35:9 51:1 62:23
  77:8,9,12,20 87:6
  92:12 94:9 100:15
  100:19 141:5 142:9
  192:12
emailed   22:2 23:23
  192:13
emails   12:19 24:8
  24:18 34:6,8 35:12
  39:5 45:15 48:8
  50:25 69:23,24
  141:4,8,13
employee   163:24
  190:12,13
employees   43:24
  44:2 169:24
employers   164:21
ended   140:4,16,17
  163:12,13 166:22
engaged   14:2
engagement   13:21
  15:2 16:13
engagements
  176:16
english   46:11,12
  74:10 119:14
enterprise   159:12
entitled   142:5
equal   126:7,23
equals   77:3 118:12
equity   81:10,19
  106:5 119:6 125:4
  127:19
errata   191:6
  192:10,12,14

especially 175:24
esq 24:2
esquire 2:4,10,15
  192:3
essentially 81:2
  101:7
estimate 50:8
event 142:7
eventually 12:20
  33:4 151:20 169:12
  169:25 177:17
everybody 132:4
evolved 162:8
exact 13:8 31:3
  46:12 47:14 53:9
  57:20 74:16,16
  78:14,18,20 119:1
  121:5
exactly 13:1 32:13
  33:16 35:16 61:23
  74:13 76:1 77:18
  100:18 118:25
  119:21 143:9,13
  151:8 184:25
examination 3:4,4
  5:18 187:9
examined 4:24
  137:8
example 24:9,13
  43:4,18 49:22
  70:23 73:10 75:23
  78:5 101:19 110:3
  111:17,19 120:18
  123:4,6 124:18
  125:17 141:11,15
  158:25 159:10
  166:13 171:6 180:2
  180:3 182:3
exceeded 57:25
excel 23:18 72:5,6
  72:7,25 73:3,5,17

75:10 150:19
excerpts 68:6 141:9
excess 85:19
exchanged 45:15
excited 158:3
exclude 66:25
  70:22,25 71:3
  87:12 99:7 115:16
  115:20 179:21
  183:7,14
excluded 66:18,19
  66:23 86:7,18,18
  99:2 115:8 116:24
  182:17,19
excluding 81:1
  91:24
exclusion 67:1
execute 12:21
executing 74:23
exhibit 3:8,9,11,12
  3:13,15,16,18,19
  3:21 7:5 8:21,23
  9:2,3 10:16 20:5,15
  20:17,19,21,23,25
  21:2,3 22:7 36:5
  39:10,20 40:10,21
  41:6,11,16,17
  44:13,18 48:12,13
  52:23 56:13 60:15
  61:3 62:21,21,22
  63:2,11 65:13 66:3
  67:20,24 71:17
  86:7 88:9,12 90:1,3
  93:9,10,12,16,19
  93:20 94:3,22
  96:18,18,19 98:1
  99:13 102:22 103:1
  106:20 107:21
  112:18 118:13
  124:22,24 125:1,18
  129:14 131:22

133:11 136:21
138:1,2 140:15,20
162:10,11,11,16,16
163:4 170:3,11
171:18 172:7
178:19,20 180:14
181:12,15 187:15
187:23
exhibits 3:6 29:24
  36:16 37:8 43:5
  63:8 75:11 96:17
  117:17 118:9 119:5
  120:17 124:19
existing 74:5
expecting 167:13
expenses 177:18,21
  177:23
expensive 152:7,14
experience 68:12
  68:12 84:17 156:24
  157:12 158:17
  159:4,6,16 163:16
  170:2 173:1,4
expert 8:10 14:19
  14:19 15:10,11
  20:4,13 21:19 22:6
  25:25 31:5,13 32:8
  32:24 33:2 48:16
  48:21,23 49:7,12
  49:16 50:10 51:9
  56:14,20,21 57:1
  66:9 67:20,23
  78:24 84:17 89:23
  97:9 108:24 109:21
  109:25 111:25
  147:24 162:3,4
  165:1 167:2 170:12
  174:1 175:17 176:1
  176:12 178:22
  179:22

expertise 49:8
expires 189:16
  191:20
explain 33:13
  166:6 167:1
explicitly 68:3
express 141:1
expressed 73:24
  95:25 140:3
expression 101:10
extend 148:10,16
extended 4:10
extent 79:22
  123:13,14 154:17
extra 159:8 168:16
extract 29:4 176:17
extraction 48:17
  176:20

f

faced 181:13
faces 25:7
facing 182:14
fact 40:2 57:18
  70:4 72:19 91:23
  148:21 166:8
  188:17
facts 193:22
factual 33:19
fails 192:16
fair 98:21 175:22
fairness 34:15
familiar 45:23
  62:25 80:16 110:18
  116:2 139:12
  159:13 162:14
far 52:13 53:5
  115:25 134:8
  135:18 141:6 145:9
  145:15 156:4,5
  178:7 182:12

**fargo**   157:23
160:19 170:15
**fault**   177:3
**february**   10:21
**federal**   158:1
167:15 170:21
182:3 184:13
192:15,21
**fedex**   8:1
**fee**   51:24 53:1,22
54:1 55:4,13,22
56:5 84:5,5,6
113:17 114:10
129:20,23 130:7,15
139:4
**feel**   44:24 46:22,25
111:23 112:1
116:10 117:17
179:10 181:1
**fees**   76:2 80:23,25
81:1,1,4,5,7,8,14
81:14,14 82:17
83:2 84:3,4,11,13
84:13,13,14,17,25
85:4,5,9,12,14,18
85:18 86:8 87:13
91:25 94:24 97:20
97:21 98:25 104:1
104:1 105:24 106:6
106:11 119:3
127:21,24 128:3,9
128:14,14,17,19
129:9,20,23 130:1
130:2,7,15,16
131:2,7 132:16
135:22 142:3,24
143:3,8,11,14
144:6,23,25 145:2
145:7 147:10
153:21 174:19,23
183:18

**fell**   172:18
**felt**   27:4 102:5
**field**   73:10,11,11
76:3,9 78:6,24
102:1 119:16 120:2
120:3,3 125:14
**fields**   2:10,20 5:4
72:18,20 76:13,17
81:13 119:10,11
120:15
**fifth**   35:18
**figure**   67:9 151:12
160:15 161:4 180:1
**figured**   16:16
177:6
**figures**   59:8
**file**   156:13,18
182:20
**filed**   27:7 37:20
156:15
**final**   17:6 18:18
19:18,19 22:24
31:17,20 32:4 33:4
36:24 112:13
**finalized**   32:7 34:1
**finalizing**   32:10
33:21 34:21
**finally**   86:7
**finance**   164:19,23
**financial**   68:13
110:13,17 150:2
157:16 158:22
173:21
**financially**   190:15
**find**   10:22 54:25
160:23 180:12
182:11
**finder**   188:17
**finding**   67:15
**finds**   188:17

**fine**   13:5 83:5
143:1 169:12
**finish**   62:14 89:15
89:19
**finished**   187:25
**finishing**   31:24
**fire**   167:24
**firm**   5:15 11:4
16:13 18:15 158:13
164:24 185:19
**firms**   186:4
**first**   4:23 5:24 8:19
8:21 9:25 10:1,18
19:1 26:14,16,16
27:14 29:5,12 31:4
31:8,9,12,22 34:9
36:3 38:8,19 44:20
48:12,14 52:5,22
56:12 58:10 59:25
60:16 63:21 67:9
71:19 75:23 80:22
80:24 81:13,24
82:19,22 83:14,21
84:3 87:10,20,22
87:22 90:17 99:13
101:19,25 103:18
115:14 117:5
125:17,18 130:4
131:23 145:20
148:25 149:12
152:24 157:22
158:2,25 160:6,10
160:19 167:15,23
170:20 172:19
179:1 180:21
186:12,18 187:11
**firsthand**   156:20
**fit**   12:15 108:8
176:9
**five**   24:20,24 71:10
71:11 110:6

**fl**   192:12
**flagstar**   184:7
**florida**   1:1,23 2:12
4:9 189:2,7,15
191:12,19 192:15
192:21
**fluently**   74:9
**folder**   26:5,11
29:17 34:7,9 50:13
50:14,15,16,19
51:1,1 63:12
**folks**   123:6 149:3
169:15
**follow**   79:15
182:23
**followed**   79:14
**following**   30:18
83:20,22 115:14
**follows**   4:25 26:15
75:15 84:3
**footing**   126:7
**footnote**   130:25
187:23,24 188:2
**footnotes**   130:22
**foray**   180:21
**force**   171:11
183:16
**forced**   168:14
**foregoing**   190:6,8
193:22
**forget**   10:7
**form**   13:17 19:16
19:18,19 39:4
45:13,16 87:4
**formal**   162:22
165:8
**formally**   12:5
**format**   23:9,11
72:3,12 100:13
**formatted**   61:6

| | | | |
|---|---|---|---|
| **formed** 44:7 | **forth** 12:19 | 155:10,10 | **generate** 30:10 |
| **forming** 25:16 33:8 | **fought** 184:9 | **friends** 166:22 | 36:14 75:10 |
| 62:10 148:14 | **found** 25:12 | **front** 7:2 8:18 9:1,7 | **generated** 31:23 |
| **formula** 58:19 59:4 | **four** 24:20,24 77:2 | 10:14 82:8 150:8 | **getting** 17:8 58:14 |
| 59:5,10 61:23,24 | 77:5 81:13 147:21 | **ftp** 23:23 24:1 | 61:24 101:21 106:9 |
| 73:7 75:23,24 76:6 | 170:11,16 | **full** 5:20 37:3 40:4 | 118:25 160:2 165:9 |
| 76:6 77:7 78:11,14 | **fourth** 35:18 63:14 | 40:7 42:3 70:22 | 169:9 171:10 182:2 |
| 78:18,20,23 79:4,9 | 85:17 | 102:8 105:7,17 | 186:21 |
| 79:16,17,20 80:9 | **fraction** 137:12 | 106:8,12 131:23 | **gg** 189:15 |
| 80:11 81:23 82:3 | 139:3 | 135:22 136:5 | **gianluca** 5:11 24:2 |
| 85:4 86:1 98:12 | **frame** 153:24 166:3 | 145:20 154:6,6 | **gig** 163:12 164:8,9 |
| 99:2 100:2,7,9 | **francisco** 2:16 | 169:10 | 166:21 168:8,21,24 |
| 101:2,8,15,16,25 | 168:25 169:4 | **fund** 69:9 91:17 | **giggle** 150:24 |
| 103:3,18,24 104:2 | **franklin** 185:24 | **funded** 63:18 64:12 | **gist** 12:8 162:9 |
| 104:17,17,20,23 | **free** 117:17 | 65:18 68:1 151:5 | **give** 44:9 120:20 |
| 106:17,21,23 107:9 | **freedom** 51:24 53:1 | **funding** 67:9,10,15 | 141:20,22,22,23 |
| 107:14 109:10 | 53:13,22,25 54:16 | 67:25 70:16 99:18 | 145:24 146:13,13 |
| 117:10,13,23 | 55:4,13,22 56:5 | **funds** 79:13 91:5 | 150:15 162:6 |
| 118:11,17 120:3 | 60:5,23 61:6,14,16 | 99:8 107:17 116:21 | 171:15 |
| 121:1,2,5,8,17 | 61:19 62:1 63:18 | 121:21 128:2 144:6 | **given** 29:18 32:23 |
| 122:3,3,13 123:18 | 63:20 64:10,11,13 | 164:22 | 49:10 51:12,12,18 |
| 123:24 124:3,6,7 | 64:22 65:19 68:1 | **funny** 31:7 | 61:23 79:16 92:22 |
| 127:25 129:10,11 | 69:10,11 70:9,25 | **further** 145:20 | 98:17,18 108:21 |
| 129:22 130:3 132:3 | 71:2 79:5,12 86:9 | 190:11 191:7 | 115:25 122:14 |
| 132:6,19 133:14 | 87:14,18 88:2,23 | **future** 14:24 | 125:14 134:22 |
| 135:12 136:16 | 88:25 91:17 92:1 | **g** | 142:13 143:10 |
| 141:11,22 144:1 | 94:25 96:23 99:1 | | 147:4 151:20 |
| **formulas** 35:5,8 | 99:18 102:4 106:24 | **g** 4:1 101:21 | 176:12 |
| 38:23 39:2,3 74:23 | 107:10,17 112:25 | **gains** 136:18 | **gives** 117:9 118:10 |
| 75:14,16,17,20 | 113:17 114:10,23 | 143:20 | 145:23 |
| 77:17 78:15,15,17 | 116:16,23 119:3 | **gateway** 166:8,9 | **giving** 100:23 |
| 101:14 104:16 | 121:10,21 125:11 | **gathering** 14:8 | **go** 5:24 13:19 16:22 |
| 108:21 109:13,17 | 127:19 128:21 | **general** 14:9 17:14 | 23:24 34:8 55:3 |
| 121:5 124:8 131:25 | 129:25 130:7 | 29:3,3 42:24 46:24 | 63:1,3 67:1 69:2 |
| 133:16 134:14 | 135:22 136:24,25 | 50:4 78:15 101:15 | 73:8,14 95:6 |
| 135:6,8 143:15 | 139:4 143:24 144:2 | 111:15 121:6 | 102:23,23 103:14 |
| 176:5,13 | 144:3,6,16,24,25 | 156:24 157:11 | 106:19 120:18 |
| **formulating** 26:15 | 145:6,7,25 146:3 | 158:22 | 125:1 128:18 132:3 |
| 32:17 36:23 38:24 | 147:10 151:4 | **generalities** 12:17 | 134:11 137:6 |
| 51:3 | **friday** 86:24 92:6,6 | **generally** 26:23 | 138:10 139:18 |
| | 123:4 153:20 | 42:21 44:16 49:18 | 149:2,5 150:8 |
| | | 174:25 | |

151:12 156:9
159:10 165:15,22
166:13 168:12
171:20 173:3 178:7
178:16 180:1
181:16 182:6,8,10
188:21
**god** 160:23
**goes** 39:13 110:25
110:25 128:17
156:3,17 160:7,17
160:25 183:2
**going** 5:24 8:16,18
8:21,22,22,25 9:1
14:20,21,22 20:1,2
20:5,8,11 27:12
28:7 31:20 35:1,2
36:20 37:24 40:5,6
40:17,18 42:2,11
45:3 55:14 56:5
57:3 62:20 70:1
71:8,10 74:12,14
81:24,25 82:1,8
83:21,23 88:11
89:25 90:8,9,14
93:9 98:5,7 101:6
102:23 103:11,18
103:21 104:6,13
131:14 134:7
146:20 148:22
149:4,14,16,19,20
150:4,14,25 151:23
152:5 158:23
159:22 160:23
162:12 165:21
166:2 171:2 174:4
177:15 180:1
181:21 182:2,21
187:3 188:20
**good** 71:12 94:13
119:16 126:3

131:13,17 165:5
166:16 170:24
182:2 186:24 188:9
**google** 43:18
**gotten** 39:24
100:15 102:7
172:21
**govern** 174:7,10
**graduated** 164:15
**great** 46:9 180:23
**greater** 109:4,5
**gross** 29:22 41:9
62:19 63:7 89:9,25
91:19
**grounds** 115:21
**group** 83:15
**guess** 9:14 26:9
27:11,18 28:7
29:10 31:7,19 33:5
34:15 41:14,22
45:12 47:12 51:2
52:10 57:25 58:10
65:4,20 66:17
72:15 82:2 83:9
91:24 93:3,4 95:3
98:4 103:16 113:15
115:15 118:7
123:24 127:5,8
128:6,17 134:7
135:3 141:24
142:21 143:17
150:22 151:25
158:10,21 161:5
164:23 177:13
187:14
**guidance** 49:8
55:11
**gutierrez** 157:23
160:7 161:14,21
167:7 170:15,19
172:1 178:10 179:2

180:2,9,15

**h**

**half** 13:5 18:23
125:25 126:1
**halfway** 29:20
**hand** 90:15 151:18
159:9 189:10
**handle** 14:16 16:7
61:25 64:8 70:3
85:15,16
**handled** 70:6
**handling** 84:5,13
**hang** 168:12
**happen** 82:19
86:21
**happened** 166:7
169:4 171:23 179:4
**happens** 7:17 27:8
**happy** 44:25 46:19
156:3
**hard** 16:22 149:19
150:5,7,20 156:9
168:23 181:22
184:9 186:17
**hardware** 73:19
**harmful** 149:10
**hartley** 164:22
**haverford** 2:5
192:4
**header** 74:17
**hear** 150:25 178:15
**heard** 11:23 77:20
101:3,9
**heart** 178:8
**held** 63:19 64:12
88:22 163:17 173:7
**help** 12:10 39:24
40:1,15 41:18 42:9
45:5 52:9 57:20
166:24 167:11
182:1

**helpful** 166:6
**hereto** 133:11
**hesitating** 115:4
**hewlett** 163:7,12,21
164:8,10,11 165:23
166:1,7,15,20,21
168:24 169:6
**hey** 11:11 44:22
46:7 141:14 142:2
166:14
**higher** 142:4 178:5
**highlights** 162:25
**hired** 15:7 160:11
164:24 172:19
**history** 151:11
**hoggard** 184:3
**hold** 57:12 60:24
73:18 128:23
152:12 173:5
**holder** 63:21 64:10
64:13,22 65:19
114:14 147:9
**holders** 54:15
94:23 136:24 148:6
**holdover** 118:3
**home** 91:2
**homeaway** 183:22
**honest** 38:14
**honestly** 11:23 33:9
168:9
**hopefully** 188:5
**hour** 50:8 177:7
**hourly** 15:4
**hours** 16:17,19
177:11
**house** 5:10
**hunters** 183:5
**hypothetical**
145:11

**[i.d. - james]**

**i**

**i.d.** 191:16
**i.e.** 63:19
**idea** 64:18 78:25
  116:1 119:16
  152:21 156:16
**identification** 9:4
  21:4 90:4 93:13
**identified** 113:4
**identifies** 112:1,6
**identify** 58:11 85:5
  134:15,21 151:5
  160:21
**identifying** 108:8,9
  110:24 111:5
**idiot** 180:25
**ignored** 89:1
**illustrates** 94:23
**illustration** 154:13
**imagine** 45:19
**impact** 97:13 98:10
  98:13
**important** 27:4
  79:15 113:13 114:1
  120:12 140:2
  145:10,10,11 160:1
  160:8 167:5 170:19
  171:9
**impossible** 29:15
  149:3 150:5
**inc.'s** 5:3
**include** 44:20,22
  46:8,9 48:4 50:9
  66:12,14,15 73:12
  76:1 84:10 109:5,6
  111:18 118:6
  119:12 136:17
  143:20 148:5
  170:17 188:16
**included** 40:20
  42:10,14 61:14

65:24 66:2,2,23
  68:17 70:17 84:4,4
  84:18 92:13,13
  100:20 108:11,12
  140:9,9 170:2
  188:3,7
**includes** 136:16
**including** 80:25
  81:3 97:21
**income** 142:24
  178:2
**incurred** 130:16
  131:3
**independent** 42:17
  42:20 44:5
**independently**
  146:11
**index** 3:1 146:4
**indicate** 4:13 40:3
  82:18,22 83:3
**indicated** 144:23
**indirectly** 95:3
**individual** 63:19
  64:13 107:24 108:5
  114:19 157:25
**individually** 132:5
  150:10
**individuals** 70:8
**industries** 43:17
**industry** 56:14,25
  116:3 172:12
**inform** 17:14 57:17
**information** 11:1,5
  27:9 35:15 74:17
  92:23,25 148:21
  154:17 162:15,17
**informed** 26:22
  39:13 40:25 41:2
  41:20 46:16,18
  57:11

**informing** 42:23
**informs** 37:1
**infringement**
  166:10
**initial** 11:10,11
  12:16 14:3,4
**input** 86:4
**inserted** 76:20
**inside** 150:24
**insight** 159:8
**insofar** 116:7
  143:13 146:9
**instances** 46:24
  125:10
**institutions** 68:13
  110:13,17 150:3
  157:16 158:22
**instruct** 115:20
**instructed** 83:19,22
  188:15
**instruction** 58:24
  76:21 84:7 85:6
  155:20
**instructions** 16:8
  25:21 56:13,25
  57:4 59:17 65:6
  76:18,22 83:25
  88:7 126:22
**insurance** 171:10
  171:11 183:16
**intending** 142:14
**intent** 27:17
**interacting** 165:2
**interactions** 75:25
**interactive** 45:1
**interest** 105:5
  142:5 161:3
**interested** 12:9
  18:13 48:1 190:15
**interesting** 18:20
  26:21 27:5,23 51:7

110:1
**interfacing** 6:25
**intermediary** 73:15
**internet** 160:14
**interrogatories**
  23:17
**interviewed** 169:1
**intimately** 159:13
**investment** 143:20
  146:2 158:15 173:3
  173:16,19 174:3,10
  174:14
**investor** 125:3,19
**invoice** 177:17
**involved** 172:11
  176:1,5,7,19
  185:15
**involves** 51:21
  52:24 53:3
**involving** 99:18
**ipad** 7:2
**ira** 81:1,14 84:25
  85:4,5
**ironically** 71:22
**ish** 163:11 166:2
**issue** 58:2,5 66:20
  68:2 102:14,24
  125:16 140:7 149:5
  184:18
**issues** 14:7 30:9
  37:2
**items** 31:8 78:6
**iter** 75:24
**iterations** 75:25
**iterative** 118:24

**j**

**j** 56:15
**jack** 4:18 5:4 60:24
  95:17
**james** 1:9 4:19 5:2
  5:10 12:1 24:16

26:11 29:6 34:8
51:22 52:25 64:1
67:24 68:7,20 69:7
73:2 91:4 104:21
109:18 115:17
140:8 148:15 152:8
156:21 157:2,4,9
159:18 166:14
191:1 192:6 193:1
**january** 189:16
**jclabby** 2:12
**job** 50:18 160:2
164:25 180:23
193:2
**jobs** 163:17
**joe** 3:12,16 19:8,24
20:20 21:1
**john** 2:10
**join** 5:11
**joined** 24:2
**jose** 169:3,24
**judge** 66:8 112:13
123:7,9 142:20,22
146:20 149:21
153:18 180:4
182:19
**judgment** 84:16,21
**juggling** 34:24
**july** 1:13 8:2 93:10
189:9,11 190:7,16
191:2 192:1,7
193:2
**june** 18:18 19:5,8
19:11,21,24 20:14
20:16,18,20,22,24
21:1 22:12,19
31:13 32:7,8,24
33:21,25 170:2
187:23
**jury** 66:9

**k**

**keep** 15:5 49:17
50:13 63:2,2
154:23 156:3
171:19 187:3
188:20
**keeping** 73:2
**keeps** 73:2
**keesal** 2:15 5:8
**kimberly** 1:6 21:24
22:3 41:8 48:15
**kind** 11:13,23 13:2
14:5 16:22 17:1,14
18:19 25:4,6,8,19
26:20 29:15 31:7
34:23 37:12 42:22
43:3 49:5,17,20
50:16,23 51:15
52:8 54:11,21
56:22 58:9 59:11
74:20 82:4 89:13
90:11 95:2,4
100:22 101:5,22
102:19 104:5,19
106:4 111:15,21
115:10 117:9
118:23 119:5,20
121:4 128:7 133:20
134:12 140:16
142:18 147:12
149:24 150:7 151:7
154:13 155:20
156:8,16 158:21
159:13 160:3,5,16
160:24 161:7 162:5
162:7,24 163:20
165:9,12 166:10,21
167:3,11 168:4
169:8,16,17,22
170:8,18 171:15
177:3 179:5 181:4

181:22 188:8
**kinds** 24:15 76:5
**king** 180:4
**kirkpatrick** 183:21
**klouda** 19:5,21
99:14
**klouda's** 3:11,15
20:18,24
**knew** 64:4 168:22
**know** 6:8,10,14,25
7:15 9:6 12:6,7,11
12:15 14:2,7,8,13
14:16 15:4,15,23
16:6,21,25 17:13
17:18 18:8,12,20
18:23,24 20:2
24:20,23 25:7,20
26:21 27:10,21,22
27:24 28:6,24 29:1
30:7,8,23 31:14,20
32:2,9,11 33:3,15
34:24 35:24 37:3
37:11,23 38:13
40:3,4,25,25 42:23
42:24 44:19,23
45:3,11,20 46:6,15
46:16,24 47:5,11
47:18,20,22 48:24
49:1,3 50:6 52:11
52:13,15 53:10,10
53:18,20 55:5,8
56:4 58:3,14 62:7
64:5 68:3 69:20,23
70:14 74:7 76:5,20
76:21 78:15,22
79:21 86:16,17
87:7,23 88:4 90:17
92:10,25 93:3,21
94:6,18 95:7 97:6
97:16 99:8 103:24
105:13,14 106:2

109:4 110:11,15
111:4,11,16 112:3
112:14 113:18
116:20 117:1,1,22
118:7,22,23 119:10
120:14,23 123:8
124:10 126:10
127:8 128:3,16
134:4 135:14
137:19,21 139:22
139:25 140:3,22
141:3,7,22 142:10
142:16,22 143:9,11
143:16 144:5,10
145:2,13 146:10,21
147:1,15 148:23
149:7,9 150:14
151:8,24 152:21
153:13,15,16 155:5
159:17,23 160:14
160:21 167:1,4,8,9
167:10,21 168:11
170:21 171:4,13
172:10 176:4,21
179:1,16,16,17
180:2,2,4 181:17
181:20 182:6,25
183:19 186:4
187:25 188:8,12
**knowledge** 14:9
156:20 157:9 183:3
**known** 129:20
130:15 186:5
191:16
**knows** 143:1
146:12 160:13
**kriner** 2:4 5:14
192:3
**kyl.com** 2:17

**l**

**l**  5:22 36:11
**lake**  168:12
**lancaster**  2:5 192:4
**language**  13:9
  44:23 46:10,17
  48:2 52:9 57:21
  74:9 153:8 162:6
**large**  1:23 14:15
  175:24 189:7
  191:19
**larger**  14:25 61:6
  65:2
**late**  86:23 154:23
  163:19
**law**  160:8 185:19
  186:4
**lawsuit**  110:24
**lawyer**  13:6 110:23
  111:4 112:15
  142:15 144:12
  162:6 178:14
**lawyers**  167:7
  185:7,8,19,22
**layman's**  52:8
**lead**  20:10
**leaders**  167:16
**learn**  10:1
**learned**  149:6
  166:7
**leave**  129:21
**leaving**  169:5
**led**  167:17
**left**  82:1 128:2,20
  164:5 168:7 186:17
**legal**  39:25 121:12
  121:23 122:6,12
  131:11 133:3 149:1
  149:8 160:2 166:20
  168:5 169:17 170:7
  176:4 180:18

192:20
**letter**  3:21 13:21
  15:2 92:13,17 93:1
  93:7,10,18 94:8
  95:22 96:1,12 97:9
  98:1 99:13,14
  118:9 124:19 187:4
**level**  59:8 84:4
**leverage**  74:5,13
**liability**  109:17
**licenses**  173:5,8
  174:13
**lied**  184:21
**life**  78:17
**light**  27:10
**liked**  167:22
**limit**  156:11
**limitation**  73:17,22
**limitations**  73:19
  139:19
**limited**  182:16
**line**  46:7 77:2
  123:18 126:4
  143:18,19 193:3,6
  193:9,12,15,18
**lines**  45:24 46:2,5
  77:5 100:1 118:12
**liquidate**  90:24
  91:1
**liquidated**  88:23
  91:6,17
**liquidation**  91:7
**list**  25:15 26:4,24
  28:17 29:8,14,16
  30:20 31:4,13,23
  31:25 32:15,21
  35:4,12 51:10,18
  107:25 150:15
  171:12,13,17,18
  181:12,14,18 182:1
  182:11 183:4

**listed**  25:23 26:16
  31:10 34:17 37:5
  37:14 38:9,16,22
  77:1,12 78:12
  97:19 101:1 106:21
  109:10 121:1 124:6
  146:22 157:11
  170:12 172:7
  184:13
**listen**  44:19 178:17
**listening**  18:13
**listing**  31:9 163:17
**lists**  96:4,22 132:16
  170:14
**litigation**  30:19
  56:16 161:19,22
  163:6 166:5 167:19
  170:12,14 176:1,12
  178:1,2
**little**  5:12 21:9
  26:22 35:2 45:5
  49:13,18 52:19
  71:6,7 74:9 82:7
  101:24 111:14
  133:18 158:23
  159:1,7 162:8
  166:25 167:3 168:6
  176:23 178:5,9
**live**  111:18
**llc**  43:22 44:3
**llp**  2:4 192:3
**loading**  72:7
**locate**  67:8,25
**logan**  2:15 5:8
**logic**  129:11
**long**  27:19 79:19
  115:21 141:20
  148:15,22 149:4,20
  152:5 153:5,25
  156:2 169:3 170:19

**longer**  103:19
**look**  8:18 10:10
  14:19 16:15 20:2
  21:6 22:9 23:24
  25:24 26:13 35:24
  39:8,8 41:5 43:9,17
  48:11 51:20 52:22
  56:11 58:17 60:14
  61:10 62:17,24
  63:14 76:24 83:17
  87:19,25 88:5,9,11
  89:24 90:8,9 91:12
  93:4,6,7,20 95:10
  95:10 99:12,24
  102:21,25 104:9
  107:20 111:16
  112:17,18 117:4,16
  120:17 123:17
  125:1 126:3 129:13
  129:17 132:5,9
  135:19 136:12,13
  136:15 137:25
  140:19 143:12
  147:16,17 149:16
  150:9 154:15
  159:10,20,21
  160:18 161:13
  162:10,11 178:18
  180:14 182:7,21
**looked**  27:23 29:15
  31:21 43:5,8 51:17
  101:20 120:21
  125:19 150:1 171:5
**looking**  10:9 15:12
  19:14 22:14 32:2
  37:9 43:4 51:14
  71:16 88:18 93:21
  107:5 114:17 171:5
  181:13
**looks**  66:2 82:24
  83:12 100:2,17

103:4 135:24 160:5
160:9
**loop** 118:16
**loss** 142:24 143:19
143:20
**losses** 136:19 137:4
**lost** 145:13
**lot** 14:13 16:21
17:1 26:20 27:9
49:21 59:17 110:12
120:17 127:2
142:16 151:10
156:23,24 157:20
159:5,6 163:23
165:3,6 168:16
169:19,19 171:2,3
177:23 180:18
186:4
**low** 57:11 113:16
134:15
**lower** 96:7,8 178:9
**luck** 160:9
**lucked** 181:4

**m**

**magically** 149:22
**main** 90:24
**majority** 182:25
**making** 57:6 66:21
84:16,21 107:6
108:13 113:3
126:15,17 140:2
143:1 146:19
**man** 149:14 160:20
**management**
159:12,12
**mandelbaum**
185:19
**manner** 4:13
182:20
**manuals** 43:11

**manufacturing**
169:14
**march** 10:21 164:7
164:12 165:18,19
**margin** 90:15
**margins** 90:12
**mark** 90:1,2 93:9
**marked** 9:1,3 21:4
22:6 25:25 36:6,7
62:18 88:10 90:3
93:12 125:2
**markers** 36:8
**marking** 62:20
91:14
**massive** 160:8
171:7
**match** 66:16
**materials** 26:14
30:3 36:21 55:10
62:10 157:10
**math** 95:2,4 138:11
**matter** 8:10 9:25
10:2,19 11:2,18
12:5 14:3 18:11
23:14 24:6,19 25:2
25:13,17 33:19
37:9,21 38:1,5
41:23,25 42:1 50:9
80:24 108:23
155:25 161:15
165:1
**matters** 180:25
181:14 185:7
**mature** 104:17
**maximum** 169:11
**mdl** 110:4,8 157:17
157:21,22,24
167:16 170:25
179:3 180:3,4,9,12
185:16 186:2

**mean** 11:11,19,21
11:25 12:18 15:5
18:8,20 22:14 23:2
24:8,11,20 25:3,6
27:8,16 28:3,5,9
30:24 32:3 34:2,21
37:1 42:7,22 43:3,6
44:4 45:11 50:5
53:5 54:7,9,10,10
54:18 55:23 56:24
58:8 62:24 63:13
64:3 67:3,16 73:19
74:7 75:22 78:14
81:23 83:10 84:13
88:17 99:6,9 101:5
101:18 104:25
105:1,10 108:7,9
108:25 110:21
111:9,13 113:21
115:23 116:19
119:13 120:9,23
123:3,8,20 126:10
127:5,25 128:17
132:1,3,7 137:14
143:9,13,17 144:11
147:1 148:20
154:11,11 155:19
156:8,15 159:10,25
160:6,18 168:20
169:22 170:4
175:19 176:3
177:22 179:16
180:20,21 181:21
182:8 186:1 188:5
**meaning** 28:4
37:13 41:23 42:10
45:19 47:20 50:19
50:24 51:11 52:4
52:10 59:6 73:5
85:25 87:5 97:17
97:20 106:1 116:20

120:17 128:9,10,18
129:2 134:8 146:11
149:9 155:21
160:16 170:23
176:4,6 178:5
**means** 55:1 116:8
128:12 129:6 149:7
154:18
**meant** 16:15 41:16
**measure** 135:9
154:5 155:1 179:11
181:2,3
**meat** 14:10
**mechanically** 65:1
65:8 131:24 132:1
153:7
**mechanism** 100:23
**medications** 7:21
**meet** 57:24 59:12
148:6 186:12
**meeting** 24:22
**meets** 57:12 134:22
**member** 108:14
113:9,20,21 114:5
114:24 115:5
174:25
**members** 96:13
107:24 108:6 112:2
112:7 114:20
134:15 136:1,8
138:20 144:5
145:25
**memory** 69:18,20
69:21
**mention** 71:19
116:13 146:10
161:18
**mentioned** 15:10
24:25 76:8 92:18
94:9 100:20,22
109:20 157:14

161:16,25 185:6
mentions  63:5
mergers  161:1
met  113:14,15
   114:2,24 133:22
   134:9 137:8 185:14
methodology  56:3
   65:16 74:23
metric  59:9 108:10
   134:5 135:21
   145:22 146:13
metrics  57:13
   58:25 59:7,12
   107:3,25 108:1,16
   108:19,22 109:1,8
   112:24 113:4,8
   114:1,21,24 133:23
   134:9 137:8 138:20
   148:7
microsoft  36:13
   71:20,24 72:7,8,24
   75:5 160:11 163:19
   163:25 164:6
   165:11,13 168:8
   169:8
microsoft's  73:17
middle  1:1
million  42:5 160:15
mind  14:23 27:17
mine  166:23
mined  166:13
minimum  114:14
mining  166:19
   175:23
minussing  78:16
minute  21:8 71:10
   94:5 103:21 131:16
   162:11 186:20,22
minutes  27:24
   71:11,11 131:15
   149:15 150:17,25

missed  39:14
missing  38:16 69:5
   70:5
mission  184:13
missouri  172:3
misstated  60:25
misstates  155:13
mistake  41:16
mistaken  184:22
model  122:9,21
   131:8 132:13 136:4
   136:7 143:6 146:2
   146:17
models  176:2
modifications
   154:20
modified  155:7
modify  27:10
   135:14 154:16
moment  31:24
   34:19 94:9 109:21
   155:23
money  73:20
   141:18 142:6
   144:14,15 145:2
   165:3,6
monies  128:13
   142:23 143:7 144:2
month  69:10 70:9
   70:18,19 81:7 86:9
   87:14 88:24,25
   102:19 105:16
   115:8,11,13,15
   119:19 125:14,20
   126:2 163:13
   188:16
month's  105:17
monthly  105:3
months  80:13 81:6
   81:16,17 86:9
   87:14 88:1,5 89:1,6

92:1,2 97:22 99:1,1
   102:8,11,18 105:3
   115:16 124:1,9
   125:5 126:5,7,22
   126:24 153:21
   169:11
morello  5:11 24:2
morning  8:6 177:6
mortgage  110:13
   157:18 158:7,18
   184:3
mortgagors  171:12
motion  179:21,21
   183:7,14
motions  38:10
move  167:25
moved  163:10
   168:10 169:13
movements  6:2
multiple  119:19
   178:24 180:8
multiplication
   81:25
multiplied  80:12,13
   127:18
multiply  73:10
   81:17 102:19 105:3
   124:9 137:15
multiplying  81:8
   124:2
mute  7:3

n
n  4:1 5:22
name  4:14 5:21
   10:7,11 15:15,18
   17:24 22:20 32:20
   38:17 65:19 74:17
named  35:23 36:14
   141:15
names  74:14

nationstar  184:3
nature  15:1 180:15
necessarily  34:16
   86:17 125:15 145:3
   181:17
necessary  37:15
   48:19 141:20
   176:17
need  6:8,11,15
   14:24 21:6 25:21
   33:14 40:6 45:2
   46:7 47:25 64:7
   73:6,7,8 79:18
   123:4,8,9 130:17
   145:12,13 148:10
   148:16 156:11
   166:14
needed  47:14,22
   51:13,13,15 87:8
   119:11
needs  12:16 45:5
   47:23 82:18 83:13
   126:13,14,14
   140:13 151:7
net  85:9,12
nevada  165:17
never  11:22 12:11
   50:6 51:8 76:7
   108:25 120:6,20
   123:14 156:16
   157:2,4 158:9
   167:22 171:12
   175:20 181:5,7
   184:23,23 186:4
new  71:8 74:2
   86:19 97:12,13,24
   101:7 154:17 170:1
nguyen  1:6 21:24
   22:3 48:15 145:5
   191:1 192:6 193:1

nguyen's  41:8
nod  6:2
nonsense  149:15
noon  9:20
nope  173:25
normally  12:13
northwest  164:20
  165:7
notary  1:22 189:6
  189:15 191:18
note  27:15 192:10
noted  75:13 85:14
notes  190:10
nother  149:9
notice  1:23 3:18
  9:16,18 10:13,15
  41:8
null  61:12 62:8
number  3:7 9:3
  21:2 30:23 39:15
  40:17 60:16 61:4
  67:6,6,10,20,25
  71:1 73:11,18 76:4
  80:13,14 81:4,5,6
  81:16 90:3 93:12
  95:3,5,18 97:4,18
  98:6,23 102:9,18
  105:3,4,6,7 106:15
  115:16 117:7,9,11
  117:15,18,22 118:8
  124:1,8 125:4,19
  125:23 130:10
  132:20 137:12
  138:11 142:18
  143:14 148:3,12,24
  151:3 177:25 179:3
  180:3 188:11,13,16
numbered  30:19
  31:6
numbering  30:25

numbers  21:3
  31:10 35:19 48:2,3
  49:11 60:25 66:16
  70:23 86:19,22,25
  87:9 90:11 95:3
  97:19 98:2,12
  102:7,11 105:23
  109:11 113:16
  116:23 118:25
  138:10,25
nuts  165:12

**o**

o  4:1 5:22
oath  4:7 6:22,22
  189:1
object  55:14
  103:11
objection  55:6 56:7
  58:6 60:24 64:14
  67:12 68:23 70:11
  91:9 95:17 99:3
  105:19 107:1
  113:10 115:1
  116:17 121:11,22
  122:5,11 131:10
  133:2 136:10 137:1
  144:8 146:24
  148:18 152:10
  155:12 185:9
objectionably
  113:18 114:3
objections  4:12
objective  57:13
  58:25 65:1,8
  116:12 138:19
  148:6
objectively  113:1,8
  114:11
obviously  75:9
  141:8 170:25

occasions  7:10
  178:24 180:8
occur  83:3
occurred  165:13,13
occurs  83:4
offer  65:16 67:19
  67:23 179:7
offering  114:7
  116:5 131:6 132:23
  133:25 134:17
  179:8
office  5:6 8:2
official  189:10
oh  17:18 23:6 36:2
  52:17 93:3 125:11
  160:23
okay  7:19 8:20 9:12
  9:23 12:3 13:21
  15:17,20 19:1
  21:23 26:1 34:9
  36:1 37:25 39:11
  41:5 46:4 49:10
  50:2,4 52:22 61:10
  63:14,16 66:12
  70:25 71:3 77:19
  78:8 81:21 84:2,16
  84:20 88:4,13,19
  91:21 93:25 94:5,7
  95:6,12 99:16
  100:25 104:4,11,15
  107:6,22 112:21
  114:7 121:1 123:17
  124:15 125:11
  128:8,24 129:4,18
  130:10,13 133:20
  134:11 135:2,19
  138:3,7 139:8,12
  140:23 142:10
  144:5 148:1,14
  151:12 158:11
  164:17 166:4

176:11 179:23
  180:23 183:12
  184:15,21 185:1
  188:1,2
older  171:20
olsen  1:18 3:3,18
  4:22 5:20,22 6:19
  7:6,9 10:10 13:14
  15:7,10 17:24 20:8
  21:7 24:5 35:4 36:4
  42:1 62:23 69:19
  71:16 88:14 91:19
  91:22 93:15 97:10
  122:2 132:2 139:12
  152:2 161:11
  187:11 188:15
  189:8 190:6 191:1
  191:9 192:6 193:1
  193:24
olsen's  3:8 20:14
  32:16
omitting  89:6
once  14:11 101:7
  102:16 151:17
  160:3 171:3
one's  119:2,19
  149:23
ones  20:7,11 24:21
  59:12 111:3 124:19
  124:20 151:5
  169:25 171:8,8,21
  182:12
onsite  167:25
open  8:7 63:2 71:1
  79:12 81:7,16
  87:21 88:23 93:16
  94:4 95:10 102:7
  102:10,19,22
  105:15 107:17
  115:17,22 187:3
  188:21

**[opened - paragraph]**                                                    Page 216

**opened** 8:4,6 69:10
70:8 80:5 86:9
87:14,18 88:2 89:1
90:7 92:2 99:1
105:22 106:12
114:15,22 115:7,11
115:14 121:20
**opening** 69:9 71:2
**operate** 91:15
**operation** 80:16,23
83:3
**operations** 80:21
81:21 82:12 83:7
**opine** 113:20,22
123:15 140:25
142:14 145:21
**opined** 175:20
**opining** 109:16
113:19,23 115:4
122:2 133:8
**opinion** 28:10
42:12 53:16 64:21
65:7 66:22 67:19
67:23 79:3,7,8,24
89:7 98:22,24 99:6
99:9,21 106:16,22
106:23 107:8,13
114:4,7 116:5
121:7,14,16,25
131:6 132:23 134:1
134:17 144:18
146:15 148:15
154:13,24 155:4
182:24
**opinions** 17:13
25:16 26:15 32:17
33:8,11,18 36:24
38:24 51:3 55:25
62:11 64:6 136:11
147:24 154:8,9,16
154:20,21 179:7

**opportunity** 65:5
156:13 167:23,24
**opposed** 44:10
**options** 145:24,24
146:8,10,22 147:4
**oracle** 160:11
165:9
**order** 4:9 13:24
30:8,10 36:14
37:15 38:18 47:14
59:6 66:24 75:10
80:16,20,23 81:21
82:12 83:7 147:14
151:1 152:5 153:1
**ordering** 192:13
**orders** 38:11
149:21
**organizations**
175:1
**organize** 176:17
**organized** 8:15
50:17
**original** 120:18
182:11
**originally** 13:9
26:8 87:5 164:1,20
**originated** 13:1
16:4,10 40:15
71:23 156:23
**originating** 53:12
53:13 68:13 159:8
**output** 79:4,9
106:23 107:9,14
121:8,17
**outset** 162:1
**outside** 144:7,24
145:7 157:21
**overdraft** 161:19
161:22 170:14
**overinclusive** 25:19
51:11,19

**overlap** 49:13
163:23
**overpaid** 172:25
**overweight** 105:9
**overweights** 105:11
**owner** 166:11

**p**

**p** 2:4 4:1 192:3
**p.a.** 2:10
**p.m.** 1:13 71:13,14
131:18,19 186:25
187:1 188:23
**pacific** 2:16
**package** 8:1,5
**packard** 163:7,12
163:21 164:8,10,11
165:23 166:1,7,15
166:20,21 168:24
169:6
**packed** 169:1
**page** 3:2,7 10:14,17
22:17 39:9,13
48:12 56:13 71:18
90:10,11,15,16,17
90:20 91:12,13,14
94:21,21 96:22
97:2 125:18 126:4
127:17,17 129:16
131:22,23 145:19
163:4 170:10
178:19,19,21 184:4
187:24 193:3,6,9
193:12,15,18
**pages** 190:8
**paid** 129:20,23
130:15 135:22
144:24 145:6 147:9
174:5
**paper** 8:9 22:5
**paperwork** 44:7
168:16

**paragraph** 25:24
26:3 29:9,20,21
30:17 32:15,21
34:12 35:11,12,17
38:10,22 39:9
44:16 46:15 48:12
51:2,6,20 52:23
56:11,12 57:10
59:19,24 60:15,20
61:3,11 63:1,3,4,5
63:15 69:3 71:18
75:13,23 76:24
77:13,16 78:12
83:17 86:6 88:12
88:18 94:21 95:8
95:11,13,22 96:3
96:21 97:3,24 98:8
99:13,24 100:1,20
100:23 102:25
103:1,2,4,5,6,6,8
103:22 104:6,10,13
106:20,21 107:5,8
107:21,21 108:19
112:18,23 113:24
114:18 116:8,13,15
117:4,5,12,18,25
118:10 121:2,8,17
122:3,21 123:17
127:13,16,17
129:14,16,19 130:4
130:14,21 131:22
132:10,14 133:10
133:20 134:12
135:19 136:1,16,20
137:6 138:1,2,4,5,9
138:14,17,21 139:2
139:9 140:19 141:1
141:2 142:11
143:18 145:17
146:17,22 147:21
153:14 154:9,12,15

**[paragraph - plan]**                                          Page 217

157:11 159:20
161:14,15 178:19
178:20 180:7,14
181:11 187:14,16
188:3
**paragraphs** 94:17
109:10 130:22
159:23 161:10,13
162:2
**paralegal** 2:20 5:6
**parameter** 86:20
97:17 98:5 123:10
126:14
**parameters** 71:6
98:19 123:5 135:15
142:19 153:17,23
155:6
**parentheses** 81:24
82:16
**part** 8:24 11:10
12:11,12 17:10,11
18:1 26:14 31:8
43:7 50:18 51:4
66:8 67:22 79:5,10
80:24 91:7 106:4
106:24 107:10,15
110:5 111:5 115:9
115:24 117:14,22
121:9,18 126:11
128:7,8 168:3,14
180:11
**parted** 169:22
**partial** 80:10 105:7
105:9,11 106:7,8
**participating** 4:4
**particular** 46:8
80:11 86:20 118:21
140:6
**particularly** 90:9
112:15 119:7
120:23 147:8

**parties** 4:11 190:12
190:13 192:13
**partly** 83:9
**parts** 27:23
**passages** 30:5
89:12 91:18
**passed** 127:7
**paste** 35:9 77:8
100:16 141:10
150:19 162:1
**pasted** 23:7
**patent** 166:10
**path** 61:21 161:8
162:25
**pay** 13:3 85:25
128:19 143:7 144:3
144:6 156:9
**paying** 94:24 128:4
165:6
**payout** 111:3
**pdf** 23:12 75:12
124:18
**penalties** 193:21
**pending** 6:16
**pennsylvania** 2:5
192:4
**pension** 164:22
**people** 13:5 34:24
58:11 108:8,9
110:24 111:2,18
134:6,9,10 160:21
167:16 168:23
180:24 181:24
**percent** 54:23 55:2
95:14,23 96:7,14
114:9 125:20,21
128:19,22 167:18
167:20 177:25,25
178:3
**percentage** 56:4
77:2,6,21,24 95:9

95:14 96:5,6
102:24 103:3
123:23 128:3,5,15
**perform** 14:20,22
42:4 43:1 44:11
49:11 68:8,16
73:23 75:14 111:23
120:10 135:16
140:5 148:2 152:21
152:22 153:2,25
154:1 165:23
176:18
**performable** 153:6
**performed** 14:24
33:14,17 36:17
40:6 42:5,12 47:23
51:13 59:7 66:1,6
66:11 71:5 98:17
112:1 122:20
126:16,19 145:9,12
152:25 153:6 154:4
154:14,25 155:5,10
**period** 70:18 88:5
106:7 109:1 114:14
128:21 139:13,16
139:17,20,22,25
140:4,10
**periodically** 171:20
**periods** 125:23
**peripherally**
100:22 185:15
**perjury** 193:21
**person** 49:4 148:24
150:8 151:1,14
160:12,17,24
166:15 168:21
183:1
**personally** 191:16
**perspective** 27:18
47:22 54:13 57:7
110:23 122:17

129:2
**pertains** 116:3
**peter** 3:11,15 19:5
19:21 20:18,24
**phone** 7:1,3 12:7
16:3 17:17,19 18:3
18:4,5 21:16 45:21
50:3 87:4 169:1
**phonetic** 38:2
**phrase** 34:19 48:21
53:22 54:3 77:20
80:16 101:3 109:20
143:3
**physical** 6:2
**picked** 146:21
**pieces** 74:16
**place** 101:22 111:7
**placed** 171:11
183:16
**placing** 168:23
**plagiarized** 17:1
**plaintiff** 1:8 2:3
5:13,15 9:20 21:24
22:1,2 27:7 35:23
36:15 41:8 48:15
60:1 132:11,24
135:20 141:15
145:6
**plaintiff's** 13:23
23:10 24:17 28:18
38:6 39:14 40:1,15
42:8 47:6 48:7,9
54:20 56:14,25
59:18 62:6 69:6,17
69:23 76:20 84:1
87:2 88:8 92:8
111:24 127:2
132:20 172:19
**plaintiffs** 4:17
**plan** 160:6 169:12
177:20

**[planned - provided]**                                                                                    Page 218

planned   155:22
platform   156:23,25
played   184:25
pleadings   38:10
please   4:13 6:1,6
   6:10 33:13 117:17
   192:11
plussing   78:16
point   8:7 15:16
   16:10 17:9 32:3
   37:14 40:5 42:3
   44:6 51:7 68:14
   73:16 74:10 86:15
   110:12 117:20
   131:14 145:10
   146:23 147:14
   164:23 167:21
   169:18 170:5
   181:18 183:19
pointed   30:5 70:4
pointing   89:21
points   57:21,22
   170:11 180:18
population   40:4,7
   68:21
portfolio   146:2
portion   65:15,17
   80:11 83:14 123:25
   145:6
pose   62:3
position   50:19
positive   76:4 85:10
   85:12,14
possible   33:23,24
   34:3,25 48:7 62:24
   63:11 115:15 118:5
   144:19 183:20
   185:25 186:5
possibly   11:24
potentially   10:19

power   126:8
practical   73:21
practice   49:23
   111:6 172:12
practices   50:4
preemptive   78:3
prejudgment   142:5
premark   20:4
preparation   21:10
prepare   21:11,20
   96:18
prepared   78:23
preparing   43:12,15
preposterous
   149:24
present   2:20 4:5
   18:7 126:23
presented   175:6
presents   122:23
presumably   69:15
   69:16 111:3 128:1
presume   126:25
presumption   88:6
pretty   6:16 67:4,7
   99:3 119:16 120:19
   158:3 162:14 163:3
   166:16 171:7 184:9
previous   175:25
   176:11 178:23
primary   186:2
print   8:12 20:10
printed   21:22
   22:14
prior   86:10 87:15
   89:1 92:2 99:2
   103:9 160:2
probably   10:15,25
   12:18 13:10 16:16
   18:8,23 25:18
   27:22 31:11 32:12
   33:6 44:5 45:9 46:3

50:18 52:3,7 63:12
   73:1 74:9 78:18,21
   79:15 85:25 93:7
   95:9 110:4,15
   119:16 124:21
   142:8 150:3 159:21
   167:21 177:12
   178:5 181:18 182:5
problem   16:20
   82:18 125:14,15
problems   72:7
procedure   192:21
   192:22
proceedings   4:7
process   45:1 88:23
   118:24 147:12
processes   73:8
processor   157:19
   159:1
processors   110:15
   158:20
produce   29:4 60:1
   135:12 149:21,22
   150:6 152:5,8
   171:17
produced   23:18
   30:19 37:6,7 56:16
   60:9 66:13 72:11
   124:17 145:1
   152:19 153:5 154:6
producing   37:3
   68:20
product   17:9 71:25
   74:6
production   28:19
   28:25 29:6 30:10
   productions   29:23
professional
   162:20 174:12,16
   174:19 175:1 189:5
   190:3

profile   163:15
   170:3,5
profits   136:9,24
   137:4
program   164:25
programmatically
   134:14,21 135:5
programs   75:6
   159:4
project   78:13
   101:13 121:3
   160:10 163:2 167:4
   169:16 171:7
projected   127:21
   127:24 128:9,17
   129:9 130:17 131:7
projection   131:2
projects   34:24
   160:1 163:22
   169:20 170:7,9
   171:2
promise   15:5
proper   135:8
properly   83:16
   172:24
proposed   134:1
   139:25
protective   13:24
provide   11:1,9,14
   14:21 23:10 45:8
   45:13,14,17 46:1
   47:2,23 48:16,21
   55:25 67:6 75:16
   75:17 81:22 86:2
   97:3 100:12 114:13
   120:25 136:5
   137:22 138:8 139:8
   142:17 171:13
provided   13:17,22
   23:14,21 25:11
   35:5 37:14 47:4

48:10 50:9 53:11
55:19 65:9,12
68:17 72:4 74:15
75:14,20 77:7,10
77:17,19 78:1,8
79:18 82:2 90:7
100:9 101:2,16
108:24 117:7,14
118:17,20 120:4
122:14 134:16
135:6 138:10,19,23
138:25 140:8 148:4
148:21 159:18
171:14 175:19
176:21
**provides**  103:2,4
  112:24 118:11
**pst**  1:13,13 188:24
**public**  1:22 189:6
  189:15 191:18
**published**  175:4
**pull**  69:13 93:22
  100:17 181:19
**pulling**  119:21,21
**punctuated**  74:19
**punished**  149:23
**purchased**  101:20
  102:17 160:13
**purpose**  66:4
**purposes**  27:25
  73:21 87:12 179:19
**pursuant**  1:23 4:8
  9:15
**push**  164:2
**put**  8:18 9:23 17:4
  20:2,8,11 34:6 36:3
  46:19 82:25 83:1
  87:23 101:7 137:17
  144:15 166:25
  182:1

**putative**  5:16 64:11
  64:22 65:23 70:10
  70:14 144:6
**putting**  21:7 45:7
  72:22,23 126:6
  162:2 169:18

**q**

**qualifications**
  179:15
**qualified**  44:24
  46:25 116:10 179:7
  179:10 180:19
**qualify**  56:6 114:15
**queries**  72:17,19
  73:4,6,23 74:3,8,12
  74:22 75:1 120:15
  131:25 132:7 153:7
  159:11
**query**  73:9 86:3
  119:12 150:11,18
**question**  6:8,11,16
  16:21 27:12 30:11
  36:4 39:7 43:21
  46:7 48:20 49:2,3
  49:21 55:7 58:23
  62:3,4 64:4,7 65:21
  65:23 66:17 70:3
  79:23 83:21 85:3
  90:23 91:2 99:4
  101:9,23 104:5,12
  107:7 109:7 110:1
  111:19 126:3
  133:21 134:23,25
  138:13 151:14,17
  152:24 159:15,22
  185:5 186:19
**questioning**  179:6
**questions**  6:1,7,18
  7:23,23 9:24 14:8
  15:25 16:6 17:11
  17:15 29:2 68:10

72:1 76:5,8 78:2,7
78:9 79:17 101:17
112:20 118:21
119:23,24 145:13
162:13 166:12
167:8 173:4 187:3
187:5,8,13
**quieted**  169:17
**quite**  83:13
**quotation**  99:14
**quote**  56:24 57:1
  62:8,8 63:8 72:11
  72:12 85:9,9,18
  99:17,20 100:8,9
  112:25 113:1,8
  171:4

**r**

**r**  2:15 4:1
**raise**  178:8
**raised**  181:20
**ran**  109:11
**range**  60:22
**rare**  74:12
**rate**  15:4 49:21,22
  49:24,24 57:23
  119:4 127:19
  145:25
**rates**  123:22 178:6
  178:8
**ratio**  106:9
**raymond**  1:9 4:19
  5:2,10 12:1 24:16
  26:11 29:6 34:8
  51:22 52:25 64:1
  67:24 68:7,20 69:7
  73:2 91:4 104:21
  109:18 115:17
  140:8 148:15 152:8
  156:21 157:2,4,9
  159:18 166:14
  191:1 192:6 193:1

**reach**  73:19
**reaching**  68:22
**read**  6:9 18:19,20
  18:22 19:2,12
  25:23 26:6 27:4,16
  27:19,21 37:18,21
  38:1,5 39:17 46:12
  46:15 51:17 63:15
  82:7 88:14 91:19
  92:21 103:13,14
  104:12 112:19
  113:2 118:24 129:5
  138:5 140:20,22
  150:13 180:17
  186:10 187:15,24
  192:9 193:21
**readable**  52:10
**reading**  26:9 29:20
  63:13 83:8 112:22
  113:24 132:12
  188:24
**real**  39:15 40:17
  46:16 130:10 159:4
  160:10
**realize**  179:5
**realized**  44:6 165:2
  181:24
**really**  11:21 13:3
  15:5 17:7 25:4,20
  26:8,9 27:8,11,16
  28:6,9 31:8 33:9,11
  33:18 34:2 37:9
  39:25 41:23,25
  47:12,21,24 50:6
  51:8,8,12,15 53:20
  55:17 64:5 73:19
  73:21 74:7 76:7
  79:15 80:22,24
  85:24 92:21 112:15
  113:3 116:4 120:9
  125:12 126:7

128:11 129:2 134:7
135:7 143:11
144:18 148:20,22
149:12 150:23
151:10,19 154:21
154:24 156:16
160:3 163:20 165:3
165:9,12 167:22,22
168:13,17,18,23
169:18 171:1,2,12
172:17 179:9
183:25 184:22,23
**realm** 149:1,8
160:2 170:7
**realms** 158:24
**realtime** 189:6
190:4
**reason** 28:5 33:12
41:22 43:7 64:25
65:13 66:18,20
73:1 115:3 139:18
165:20 168:7
182:21 192:10
193:5,8,11,14,17
193:20
**reasonable** 192:15
**reasons** 106:2
168:9
**rebuttal** 3:13,15,16
19:10,15,17,20,23
20:22,24 21:1
24:14 99:15 156:13
156:15
**recall** 33:19 40:12
47:7,10 183:7
184:11 187:19
188:3
**receipt** 192:14
**receive** 8:1 24:6,18
32:7 33:7 35:7
123:6

**received** 24:8,15
25:23 33:24 35:13
38:13 46:4 47:17
47:18 50:21,22
58:24 59:2 94:9,11
94:13 100:19
176:25
**receiving** 33:20
**recess** 71:13,14
131:18,19 186:25
187:1
**recollection** 10:11
10:22 36:10 63:10
70:5
**recommended**
147:3
**recommending**
79:11 107:16 121:9
121:19
**record** 4:15 5:21
6:3 8:24 20:6,9,12
21:7 34:7 36:3
150:9 152:2 188:21
190:9
**recorded** 84:5
**records** 73:18
171:7
**red** 45:23 46:1,4,7
**redo** 86:19
**reduction** 143:21
143:23
**refer** 60:13,21 61:5
**reference** 60:16
76:10 113:3 123:19
161:15 181:10
**referenced** 61:22
192:8
**referencing** 31:2,3
**referring** 31:17
59:21,21 60:4

**reflect** 79:20 84:24
120:3 123:15
**reflected** 44:12
63:21 75:8,21
108:19 124:10,12
132:14
**reflection** 122:9
**refresh** 10:11 36:9
63:9 93:23 181:13
**refund** 135:22
136:5
**refused** 60:1
178:16
**regard** 49:9 65:22
65:22 192:15
**regarding** 28:25
48:16 122:20
183:16
**regardless** 64:7
113:5
**registered** 158:15
173:2,12,18 174:3
174:10,13 189:5
190:3
**regular** 25:5
**regulatory** 56:14
56:25
**related** 30:8 42:25
99:17 174:13,17,19
174:22
**relational** 71:20,25
72:2,8,24 73:3
**relative** 143:21
190:11,13
**relatively** 18:24
119:2
**relaying** 47:13
**relevance** 117:11
**relevant** 53:21
55:17 89:22 112:15
145:14 146:2

180:19 188:17
**reliable** 106:15
**relied** 34:17 40:1
41:18 104:17
**rely** 36:16 38:23
76:12,16
**relying** 45:4
**remained** 141:17
**remember** 15:14
15:18 26:9 28:23
30:4 32:1,9,13
33:22 34:2 37:23
46:23 52:3 63:9,13
89:20 125:13 141:7
165:20 167:6
178:12 180:15
182:14 183:14,22
184:4,7,12,16,17
188:8
**remote** 1:17 190:6
**remotely** 2:23 4:8
24:3 189:8
**remoteness** 168:2
**remove** 61:17 65:3
70:1 85:4,6,11
118:7
**removed** 61:15
64:25 65:12,16,17
69:11 84:24 85:9
85:17
**removing** 153:21
**reno** 164:3,6
165:16 167:23
168:8,10
**repeated** 6:8
**rephrase** 6:12
**report** 3:8,9,11,12
3:13,15,16 8:10,13
15:16 16:19,22,25
17:6,9 18:7,17,18
19:4,7,10,14,15,16

**[report - revision]**

19:17,20,23 20:13
20:14,16,18,20,23
20:25 21:2,13,20
22:6,12 24:13,14
24:14 25:15,25
26:3,7,12 28:1 29:9
29:14 31:5,13,15
31:17,21 32:2,5,7,8
32:16,18,24 33:2
33:10,17,21,25
34:1,10,14,21 35:4
35:10,12 36:18
37:5,14,20 38:1,5
38:13,22,23,25
39:9 40:13 41:12
42:18,21,25 43:2,9
43:12,15 44:12,17
44:21 45:5,8 47:3
47:15,17,18 48:5
48:11 51:16,20
52:2,5 54:3 55:1
56:1,4 60:14,15,20
62:11 63:2,3,5 64:2
64:5 65:8,16 67:20
67:24 68:15,18,22
71:17 72:11 73:25
75:2,3,8,10,21
77:13 78:12 86:16
88:1,11,12,15 89:4
89:11,19 94:16
95:11 97:9,15,19
98:1,8,15 99:15,25
100:17,21 102:21
102:25 103:6,7,14
103:15,15,22 104:7
106:20 112:17,24
114:18 116:6,9,13
116:15 117:25
120:11,14 122:23
124:4,20,22 126:4
127:14 129:14

130:4,14 131:21
137:11,17,20,25
138:14,17,21 140:3
140:15,20 141:9
144:23 145:4 152:6
152:9 154:10,13
155:8 156:13
157:11 159:20
161:10 162:2,10
171:18 178:18,20
179:22 180:14
181:11,13 182:15
182:18,23 187:15
187:23 188:4,7
190:5
**report's**  87:12
**reporter**  4:3,5 6:3
  6:9 138:12 189:6,6
  190:4,4
**reporter's**  190:1
**reporting**  4:6,13
**reports**  20:4 48:2
  138:18 156:15
  162:4
**represent**  119:16
  120:2 172:15 183:9
**representation**
  64:1 93:1 162:20
**representations**
  159:23 161:9
**representative**
  29:22 63:7 81:5
  159:25 161:7
  162:25 173:13,16
**represented**  36:12
  54:14
**represents**  78:4
  95:8
**request**  29:5 42:15
**requested**  16:4
  57:5 60:2 190:8

**requests**  28:18
**require**  136:7
**required**  167:25
**reread**  21:13
**rereading**  21:19
**rerun**  86:22,25
  123:10,11
**research**  42:17,20
  42:22
**reserve**  154:16
**resided**  30:6
**resolve**  149:5
**resources**  131:2
**respect**  69:7 157:15
**respectively**  96:14
**respects**  97:14,17
**responding**  4:24
  6:7
**response**  45:18
**responses**  28:19
  29:6
**rest**  51:16 130:13
  168:19
**restoring**  91:25
**result**  47:25 59:6
  80:13 81:8,17,18
  90:18 104:2 124:2
  132:10,14 135:12
  135:20
**resulted**  57:22
  92:23
**resulting**  143:18,20
**results**  36:14 47:23
  49:12 50:23 57:22
  73:14 79:19 81:15
  86:2 92:14 98:6,13
  98:18,20 109:3
  112:4 113:21,22
  117:14 122:15,15
  122:18,23 123:1
  124:12 132:20

133:5,9,11 134:9
  150:19 181:8
**retained**  11:18 12:5
  16:14 17:5 23:13
  48:15 155:24
  175:17,25 176:12
**retainer**  12:21
  13:13 156:1
**retention**  9:25
  11:13,15 18:6
**return**  71:14
  131:19 136:8
  141:18 142:5
  144:16 145:22
  187:1
**returned**  192:14
**returns**  145:25
**reuse**  17:2
**reverse**  98:9
**review**  19:16,17
  25:12 26:17,19,25
  27:2,14 28:19,22
  29:5 30:2,12,13
  38:10,18 62:10
  79:11 89:14,19
  92:17 93:17 94:2,5
  107:15 121:19
  144:22 157:10
  190:7 192:8
**reviewed**  18:17
  19:4,7,10,20,23
  32:16 33:1 34:13
  36:22 40:9 51:4
  55:11 63:6,8 89:9
  92:20 131:1 133:22
  147:7 187:16 188:2
**reviewing**  40:21
  187:25
**reviews**  168:18
**revision**  104:23

reword   108:11
rid   169:23
right   6:6,14,21 7:5
  7:10,15 8:4,6 9:9
  9:18 10:23 12:20
  12:23 13:17 14:1
  15:20 17:14,25
  18:22 20:1 21:18
  22:17 23:13 25:24
  26:2,13,13 27:25
  28:17 29:8,19 30:2
  31:4,12 34:17 35:7
  35:17 36:20 38:4
  38:21 39:8,17,19
  40:9,12,20,22
  42:15 43:20,22
  45:17 46:1 47:16
  48:11 50:12,25
  52:1 54:10 57:9
  58:23,25 59:24
  60:4,12 62:7,22
  63:25 65:11,15
  67:4,11 69:2 74:3
  74:10,24 76:15,24
  78:22 79:8,25 80:3
  80:7,23 81:9,12,19
  81:23 82:2 83:5,12
  83:17 85:17 86:13
  87:25 88:9 90:14
  90:15,21,23 91:8
  91:21 92:25 93:6
  94:8 96:3,11,21
  97:2,24 99:12,24
  100:12,18 101:22
  104:18 105:18
  106:19 107:20
  109:9 110:21 117:4
  117:24 118:10,16
  119:10 123:17
  124:13 126:2,9,17
  126:21 127:13

128:1 129:13 130:1
  130:8,20 131:13,21
  132:9,12,18,21
  133:25 135:9
  136:17,22 139:18
  140:19,24 144:13
  146:10 147:17
  148:9,23 149:17
  151:2,8 154:3,16
  155:11,18,21
  156:12 157:5 158:5
  158:14 160:7,24
  162:15 167:11
  171:7 172:10 173:1
  174:1 176:23
  177:24 178:11,12
  179:19 182:3 185:4
  185:22 186:7 187:5
  187:22
rj   140:7
rja   39:14 51:22
  52:25 56:16 59:25
  63:17,21 79:5,10
  106:25 107:10,15
  121:9,10,18 138:19
  146:2
rja's   28:19 29:22
  29:23 63:6 84:5
  117:6
roberts   182:4
role   14:5 28:9
  44:17 54:11 79:22
  84:12 89:22 109:9
  123:2,14 149:1,4
  164:6,22 165:7
  176:13,16
rolled   110:7,10
room   7:6
rough   3:19 29:20
  29:21 36:24 45:12
  63:6 89:10,24 90:2

91:19
roughly   178:2
round   116:1
rpr   1:22 189:14
  190:21
rule   71:4 192:21,22
ruled   180:5
rules   5:25 6:18
  174:6,9 192:15
run   11:17 36:13
  72:17,20 73:13,23
  91:23,24 92:4,4
  123:5,7,14 153:10
  176:21 183:5
runner   169:2
running   7:19
  166:24

### s

s   4:1 5:22 36:11
s&p   146:4
sales   86:8 87:13
  88:25 92:1 98:25
salsburg   185:19
sample   96:13
  133:12,22 136:1,8
  138:19 153:10
san   2:16 168:25
  169:3,4,24
sarasota   189:3
satisfied   54:20
  107:25 108:15
  114:20 138:19
saw   10:9 24:13
  33:17 53:19 92:22
  152:22
sayeth   191:7
saying   41:21 46:22
  65:3 67:4 71:4 83:9
  98:4 103:23 105:22
  106:10 111:25
  112:4 113:25 116:9

118:24 128:13,18
  133:19 134:4,8,20
  135:7,11 141:19
  142:22 149:24
  152:23 153:5,22
  154:25 155:3
  158:22 169:9 176:7
  180:19
says   9:18 13:2 15:4
  26:14 30:17 46:7
  46:12,15 48:14
  52:23 54:3 56:13
  57:10 63:8,17 69:4
  73:10 94:22 95:13
  96:12 98:1 111:17
  111:19 114:4
  120:11 123:3,7
  124:24 125:3,3
  129:19 130:14
  131:24 137:8
  141:14 145:20
  150:14 153:15
  178:22 180:7,23
  188:15
scan   23:4
scanned   23:7 26:7
scare   165:20
scenario   90:18
schultz   3:13 17:17
  17:24 18:7,10,18
  19:11,17 24:19
  25:1,2 31:5,14 32:8
  32:22 35:5,8,13,15
  39:4 47:2,8,21 48:4
  56:15 57:8,11,17
  58:20,24 59:3,17
  59:20,21,22 61:21
  62:5 69:17,24 70:7
  74:23 75:14 76:12
  76:15,19,23 77:7
  77:17 78:23 81:22

83:25 84:7 85:21
87:2 88:7,10 89:5
100:10 102:5,21,25
103:7 106:3,14
108:18 112:23
114:13 115:20
118:17 119:24
120:2 126:17 127:1
127:4,6,12 128:25
129:7,9 133:15,17
134:16,20 135:6,8
135:17 137:9,19
138:9 140:21,25
141:5 142:8,16
145:5,21 146:8,19
146:21 186:8 188:7
**schultz's**   3:9 20:16
20:22 24:14 26:6
32:24 34:14 47:17
58:4 65:1 88:11,15
100:17 104:9
112:17 116:9 124:8
130:14 132:19
133:23 134:5
135:12 137:25
138:14,17 148:6
187:23
**schwartz**   2:4 3:20
5:14 10:8,8,12,18
12:4 15:8,24 192:3
**schwartz's**   32:5,18
**scope**   136:11
185:10
**scout**   2:11
**scratch**   74:21
**screen**   7:4 10:10
93:9
**se**   53:10 86:18
117:23
**seal**   189:10

**seal's**   38:2
**seattle**   167:25
**second**   10:17 26:25
27:7,14,20 28:2,13
29:12 37:11 38:9
63:17 71:9 84:23
84:23 103:17
143:19 146:1
157:24
**secondary**   73:16
186:3
**seconds**   150:18
**secret**   15:5
**section**   103:13,15
104:13
**sections**   30:12,14
89:22
**secure**   23:23
**securities**   43:17
86:8 87:13 88:25
91:5,16 92:1 98:25
99:19 101:20
102:17 116:3
172:12 173:5,7
**security**   66:16 67:5
67:6,10 70:23
**see**   8:15 12:15 18:1
20:13 25:9,19
29:25 30:21 35:19
39:20 51:24 53:23
54:5 56:17 57:9,15
58:21 63:23 66:20
86:11 87:9 89:2
90:20 100:5 104:8
108:2 114:4 118:8
118:9,14 119:14
127:22 130:18,20
130:25 136:16
139:6 143:24
144:17 146:5
153:10 183:12

**seeing**   36:9 47:7
151:9
**seeks**   138:12
**seen**   9:9 33:10 41:7
55:10 62:23 63:10
78:11,15,20 108:22
108:25 110:15
112:10 121:2
139:24
**segregate**   49:15
59:12,14
**select**   170:16
**selected**   120:15
170:18
**seminars**   174:17,19
174:22
**sense**   6:12
**sent**   8:17 23:2
26:21 27:3 31:21
47:8 48:6 50:23
66:4 87:6 92:13
177:4 187:4
**sentence**   30:16
39:12,22 40:21,24
41:11 42:7,14
44:15 48:14 52:1
52:12,17,23 53:4,7
54:19 56:12,20
57:10 58:17 59:19
59:25 60:16 61:11
63:17 69:3,4 71:19
84:2,23 85:8 86:6
87:11 88:20 117:6
117:9 131:23,23
145:19,20 178:22
**sentences**   119:15
**separate**   48:22,25
50:14 59:13,14
185:4
**separately**   51:9

**series**   28:14
**serious**   165:10
**seriously**   150:7,21
**served**   109:24
**server**   30:7 36:13
71:20,24 72:8,24
73:2,9,18 75:5
150:16 156:22
159:9,11
**services**   50:10
**serving**   178:22
179:21
**session**   71:9
**set**   8:6 12:15 15:1
28:18 29:5 82:16
82:22 135:13 147:5
187:13
**settled**   184:10
**settlement**   183:2
**settles**   110:25
111:1 149:22
**settling**   183:1
**seven**   8:12 110:6
163:11,13
**share**   7:5 8:23 20:5
20:5 62:20,21 93:7
93:8,9,16,19,20
**shared**   23:23
**sharing**   25:8 49:8
**sheet**   13:4 63:21
191:6 192:10,12
**sheets**   49:15
**short**   30:11 44:4
74:19 92:15 101:9
109:7 120:5 123:12
142:7 147:16
150:22 161:5,6
**show**   79:19 113:9
**showing**   8:22
**shown**   119:5

shrug 6:3
shultz's 33:2
  135:21
shut 165:21
sic 32:5,16 60:22
  95:15 106:22
  130:21 138:2
side 5:3 27:11,11
  55:20 60:5 61:13
  61:14,18,19 62:8
  65:25 68:20 69:5
  80:1,3 148:11
  151:3,6 158:10
  165:4 169:20
sides 31:1
sign 13:13 22:21
  23:4 192:11
signature 22:20,23
  22:25 23:5,7
  189:14 190:20
signed 11:15 12:25
  13:22,25 15:2,9
  23:2,3,6 31:22 32:3
  33:4,5 166:17
  169:10 192:17
significance 179:5
  181:6
signing 11:12
  188:24
similar 43:3 100:14
  101:18 102:16
  104:5 105:4 133:21
  134:13 148:3
similarly 1:7 37:11
  61:5 66:25
simple 67:7,11
simply 14:15 134:4
single 125:20 163:1
  163:2
sir 77:22 118:15

sit 15:17 50:2 89:14
site 23:24 24:1
situated 1:7 66:25
situation 80:10
six 17:18 18:8
  110:6
sixth 126:8
size 40:7 42:10
  46:16 73:17
skeptical 151:24
skill 12:15
skim 90:8
skimmed 27:22
slightly 27:10
  74:17
smarter 165:3
smith 2:4 5:15
  184:7 192:3
social 66:15 67:5,6
  67:9 70:23 116:23
  151:2
sold 168:21,24
solutions 192:20
somebody 13:4
  66:9 105:11 111:20
  123:3
soon 32:6 169:14
sorry 12:2 13:19
  28:12 29:11 36:2
  58:15 61:3 103:17
  107:5 125:12
  134:24 138:9 161:5
  170:11 178:19
  183:25 186:1
sort 7:2 53:14
  84:17 111:3 145:19
  146:16 153:10
sorts 73:8 180:17
  180:20,20
sound 7:19 134:24

sounds 13:16 17:25
  71:12 103:23
  116:24 131:17
  146:18 186:24
spaced 74:18
spaces 82:5
speak 74:8 142:16
speaking 44:16
special 174:22
  176:4
specialist 163:6
  170:12
specialty 175:22
specific 14:12,21
  16:5 20:7,11 23:18
  30:5,8 57:5,6 69:18
  69:20,21 70:5
  89:12,21 101:15
  109:8 159:17
specifically 23:11
  23:24 29:2 33:22
  42:19 46:23 52:4
  84:11 89:21 125:13
  157:1
specifics 12:17
  33:16 39:2 42:25
  76:5 179:18
specify 77:18
speculating 47:24
speculation 58:7
  64:15 67:13 68:24
  106:4 113:11 115:2
  128:7,8 144:9
  146:25 148:19
  152:11
spell 120:20
spelled 119:15
spend 16:19 73:20
spending 57:4
spent 16:12 49:19

spits 73:14
spoke 17:16
spoken 21:23,25
spreadsheet 60:10
  60:13,18 61:8
  62:15 63:22 72:6
  79:25 87:17,25
  101:21 102:2,10
  104:21 124:10,13
  124:16 147:8
  153:10
spreadsheets 23:18
  24:1 60:21 61:4
  72:5,5,7 120:18
sql 30:6 36:11,13
  71:20,24 72:8,24
  73:2,9,18 75:5
  120:21,24 132:7
  150:16 153:7
  156:22 159:9,11
ss 191:12
ssn 63:20
stage 57:10
stamp 35:18 60:16
standard 49:23
standards 113:15
  172:13
start 10:25 34:11
  57:4 61:24 71:8
  89:15,19 90:14
  95:21 163:15 166:4
  170:24
started 140:4,16,16
  157:25 161:6
  163:18 165:1,4,5,9
  166:23,23 171:9
  182:12
starts 29:16 77:2
  88:21 90:24 100:2
  140:21 178:21

state   1:22 5:20
  111:18,20 141:10
  172:3 189:2,7,15
  191:12,19
stated   65:13 98:2
  125:7 154:8 193:22
statement   94:22
  99:22
states   1:1 99:17
stating   4:14
statistic   138:24
statistician   175:15
  175:21 181:25
statistics   175:18,19
statute   139:19
  192:15
stay   156:3
stayed   128:6
  130:17 131:3
stenographic
  190:10
stenographically
  190:5
step   32:19 80:22
  81:12
steps   46:5 73:15
  79:1
steven   3:20 10:7,8
  12:12 15:8,24
stock   175:11
stockbroker
  173:10
stood   188:9
straightforward
  101:24 119:2
strategies   146:2
strike   37:18 64:23
  72:15 98:23 138:15
  179:21
struck   182:16

studio   159:12
stuff   68:7 163:1
  166:22 169:1
  180:18
subfolder   50:20,21
  50:22
subject   165:1
  179:24
submitted   8:10
  22:12 37:25 38:4
submitting   179:22
subscribed   191:14
substantive   24:21
subtract   81:13
subtracting   82:1
subtraction   83:15
sudden   160:22
  167:18
sued   164:2 166:8
  169:9 172:23
suggest   176:8
suggested   192:14
suggestions   146:19
  151:10 162:7
suing   166:9
suitability   79:10
  107:15 116:1,2,6
  121:19 172:11
  174:17
suitable   79:5
  106:25 107:10
  113:1 116:10
suite   2:11
summarized
  154:12
summed   127:20
super   13:3 15:3
supplement   154:16
supplements
  154:19

supply   56:3
support   41:11
  153:3,4 163:6
  164:21 169:13
supporting   131:2
suppose   127:10
supposed   162:24
  163:12 164:24
supreme   4:9 160:7
  170:23 178:11,12
sure   10:20,23 12:25
  13:8 15:16 23:22
  27:9 28:11 31:11
  32:9 45:1 48:1 52:9
  53:9 54:10 60:19
  61:9 78:3 79:14
  87:1,7,19 92:15,15
  94:12 95:7 99:3
  107:6 113:23
  116:19 117:2,13
  119:17,20 120:7,9
  125:18 131:17
  142:25 146:12
  147:11 151:22
  183:18,25 184:1,24
  187:7
surprise   100:16
surprised   147:2
  181:19
suspect   125:23
  159:2,3
sustained   182:15
suter   2:15 3:22 5:8
switched   114:23
switching   113:17
  114:2,10
sworn   4:23 189:9
  191:14
system   31:1 160:12
systems   14:9
  156:21 157:3,10

160:25 161:4
166:19,20 175:24

**t**

tab   8:19,25 35:25
  36:5 41:5 62:17,18
  66:3 76:2,9 78:6
  89:24 90:6 101:21
  120:22
tables   73:4
tabs   35:19 36:8
  73:5 76:13,17
  119:19
taft   164:22
tahoe   168:12
take   6:15,16 22:5,9
  27:19 44:20 46:5
  57:3 65:5 66:24
  71:9 81:15,17,17
  87:19 91:2 94:5
  105:2,2 106:10
  111:16 126:22
  129:13,17 131:15
  137:14 148:15,22
  149:4,14,20 150:7
  150:15,20,25 152:5
  162:11 186:20,22
taken   1:17,21 6:22
  71:13 131:18
  142:25 143:4,7
  144:2 186:25 191:2
  192:7 193:2
takes   150:17,18
  160:20
talk   14:6 20:7
  33:15 35:15 46:14
  52:6 59:24 133:10
  136:18 137:3
  176:23
talked   11:12 35:14
  37:8 40:2 44:15
  45:20 47:16 61:21

**[talked - time]**                                                                Page 226

103:19 104:19
111:14 115:6
147:18 153:13,20
155:2 173:2 177:25
187:17
**talking**   29:11 45:16
57:2,19 60:13
66:12 97:18 103:17
107:3 116:8 127:14
133:14 136:20
154:23 156:22
157:1,16 161:6
**tampa**   1:2 2:12
**task**   50:24
**tasked**   56:15 58:18
**tasks**   74:3 75:2
**taste**   148:25
**taylor**   184:12 185:2
**td**   180:12
**technical**   49:4
168:17
**technically**   17:23
44:9
**technology**   43:22
44:3
**telephone**   141:5,6
**tell**   70:7 85:23
93:16 112:25
116:14 145:5
179:11 187:16
**telling**   59:22
180:25
**ten**   13:10
**term**   97:16 110:18
**terms**   37:4 42:23
42:24 43:9,18
45:23 64:8 66:10
79:19 83:10 101:7
105:5 109:2 110:12
110:22 143:15
145:8 152:6 156:25

159:7 162:22,23
169:9
**test**   127:3 153:10
**testified**   4:24 13:16
30:6 50:12 108:17
149:13 158:1
170:21 171:22,24
184:18
**testify**   12:14 29:23
48:19 91:3 167:15
**testifying**   9:15
187:12,19
**testimony**   68:6
71:23 108:24
150:14 155:13
171:14 180:16
182:16 192:9,14
**text**   77:2 142:13
**textbooks**   43:1,8,10
**thank**   5:17,23 8:8
8:14 22:16 94:15
95:20
**thanks**   5:1 104:4
135:2 187:11,12
**theme**   142:19
**thereto**   28:19 29:6
29:24 63:8
**thing**   11:13 12:9,14
14:17 22:15 26:16
27:22 29:4 34:25
37:4,11 46:13
51:18 58:10 81:9
90:24 93:21 97:21
119:20 135:3
165:13 167:2,17
177:23
**things**   7:18 8:12
15:5 17:3 24:15
25:22 44:20 45:2
46:21 49:5,8 105:4
141:1 153:14

156:18 159:3
167:11 169:8
180:20,20
**think**   8:15 11:5,23
12:16,17 13:7,16
14:5 15:12 16:3,16
16:20 17:7,10,16
19:12,13,19 20:9
21:25 23:16,22,25
24:9 25:3,6,18
27:17 30:4 32:1,19
41:15 44:25 45:15
45:21 47:13,24
49:13 51:9,10 52:8
52:20 53:21 59:5
59:23 60:25 67:14
67:16 74:11 82:6
83:6,6 86:23 87:5
87:21 89:13 90:1
90:13 91:13 92:12
92:15 95:2,17
98:11,20,21 100:23
101:23 102:5,6
103:5 104:20
105:21 108:17
112:11 113:13
117:14,20 118:2,4
118:22 119:1,7
120:6,16,19 122:15
123:13 124:9 125:2
125:12 129:25
137:7,18 142:12,15
142:21 143:3,12
145:8,14 147:19
154:11,12,12
155:12 156:1,16
157:14 161:7,25
162:8 163:2,11,14
165:14 169:8,22
170:4,10,19 171:1
171:11 172:4,18

173:2 176:3,22
177:2,5,10,11,22
177:24 178:10
180:5,9,11,18
181:1 182:2,3,10
182:18,22 183:15
183:16,24 184:18
185:1,3,5,11,14
187:18 188:6
**thinks**   113:13
**third**   28:18 57:10
61:11 85:8,8
123:18 143:18
146:3 163:5
**thirds**   88:20 150:4
**thomas**   3:12,16
19:8,24 20:20 21:1
**thought**   29:11 50:7
158:2 168:25
**three**   45:12 69:4,8
69:14 70:3,4 100:1
118:12 145:23,24
146:8,9,22 169:13
**threshold**   73:13
**thresholds**   57:24
57:25 58:1
**thursday**   86:24
**thurston**   36:25
**thurston's**   37:21,24
**tied**   54:16 91:2
**time**   6:14,17 8:12
11:2 13:5,11 16:12
16:13,18 17:4,5,8
17:12 18:6 19:1,14
24:22 26:11 29:14
33:7 34:9 38:13
49:15,19,25 50:11
57:4 64:2 68:19
89:4 98:11 108:21
119:8 128:21
131:16 139:20

**[time - understood]** Page 227

141:10 148:23
153:23 158:3,23
162:8 163:22 166:3
167:4,15,18 168:2
168:3,20,23 169:10
169:15,16,17,19
170:19 171:9 179:4
179:6 181:6,22,23
186:18
**timed** 185:2
**timely** 182:20
**times** 7:16 12:3,6
14:13 17:16 26:20
49:22 94:24 127:2
151:15 161:16
177:16 186:19
**title** 147:20
**titled** 41:7
**titles** 119:14
**today** 5:12 8:22
9:14,15 10:15
15:25 16:14 50:3,3
87:8 90:7 94:10,12
114:8 131:6 154:20
156:5 161:16
187:12,13,20
**today's** 21:10,12,20
**told** 11:19 41:1,21
46:18 59:22 92:16
150:1 184:23
**tolerate** 168:1
**tool** 72:2 150:9,11
**tools** 30:8
**top** 31:8 90:16
94:21 125:3 131:22
170:10 183:13,13
**total** 81:5 97:3
101:19 102:17
125:4
**track** 49:17

**trade** 84:4
**trades** 117:7,9,12
117:15,19,22 118:8
188:16
**trading** 57:11
99:18
**training** 160:11
165:9 169:15 174:6
174:9
**transaction** 81:3,14
82:17 83:2 84:3
**transactions** 82:20
**transcript** 3:20
29:21 36:24 37:22
38:1,6 63:6 89:10
89:25 90:2 91:19
190:7,8 191:7
192:8,16
**transcripts** 192:12
**transfer** 53:14 54:7
55:12 56:1
**transferred** 51:23
52:25 54:4,8 55:1,4
55:21 56:6 116:14
116:22
**transfers** 116:25
**transitioned** 165:7
**travel** 171:3 177:18
177:23
**treating** 105:17
**trial** 48:19 110:25
111:1 155:24
171:23,25
**tricky** 33:10
**tried** 78:3 167:2
178:16 188:19
**trillions** 171:6
**true** 22:11 28:1,8
32:22 34:15 41:1
44:24 46:18 52:12
52:17 53:3 82:24

112:3 190:9 191:6
193:22
**truthfully** 7:24
**try** 7:18 8:16 13:4
49:17 89:16 105:6
156:11 159:25
171:19
**trying** 24:22 26:22
40:2,3,7 42:6 50:17
51:10 54:11,25
65:20 68:10 83:10
86:1 98:14 125:16
129:5 141:24
166:25 167:11
181:25
**tuesday** 1:13
**turn** 22:17 124:25
186:17 187:14,22
**turned** 18:6 32:6
**turnover** 57:14,23
95:15,18,24 96:7
96:13 100:3,8
101:3,12 102:1,15
103:19 104:6,8,21
114:9 132:17
**turns** 169:2
**tweaked** 155:5
**twice** 171:23
**two** 17:21 31:8,9
35:18 45:12 48:25
53:15 57:12,21,21
58:24 59:8 65:1,8
67:5 86:9 87:14
88:4,20 89:1,6 92:2
96:17 97:22 99:1
103:9 104:16
107:25 108:1,15,18
108:22 109:1
112:24 113:8,15
114:1,21,24 116:12
125:10,17 126:5,22

130:22 134:21,22
138:25 148:6 150:4
150:17 153:21
168:9 170:15
171:24 185:12
187:7
**type** 12:9,14 14:10
14:16 29:4 37:4
49:8 51:18 53:25
98:16 155:4
**types** 49:4 154:14
160:1 170:6
**typical** 111:22
**typically** 139:21

**u**

**ultimately** 16:3
112:12 120:10
176:8
**uncertified** 3:19
90:10
**understand** 6:4,11
6:21,22 7:22 14:2,4
28:13 43:6,7 49:4
51:21 52:14,24
53:5 54:12,18
59:25 64:8 69:6
76:22 82:25 83:24
86:1 108:4,7
112:22 113:7 116:7
140:21 145:20
153:23 161:4 165:5
178:15 179:6 181:6
**understanding**
27:6 59:16 60:3
76:19 83:9 89:5
91:11 111:15
127:11 128:12
139:15 140:25
143:5 179:13
**understood** 87:7
113:6 156:12

unedited  3:19
union  157:20 182:4
  184:13
unions  110:14
  158:6,18
united  1:1 182:3
university  164:15
unquote  85:18
  113:8
unrequired  168:16
unsuitability
  172:11
unsuitable  113:18
  114:3,11 116:9,11
  121:10
unwind  65:20
urgency  87:7
usable  72:12
use  45:4 75:6,17
  116:14 153:1,7,9
  159:4
useful  120:23
user  43:11
users  160:15
usually  13:4 156:17
usury  172:3

**v**

v  1:8 170:15 182:4
  183:5,21 184:3,7
  191:1 192:6 193:1
vacation  167:7
vague  137:1
valuation  172:22
value  73:12 101:19
  102:20 128:4,15,16
  128:19
valued  172:24
values  61:12 62:8
  125:24
vanilla  13:8

variations  142:19
various  72:17,20
  73:4,24 75:15
verbally  6:2 141:13
verbiage  17:2
verify  192:9
veritext  192:12,20
veritext.com
  192:12
version  36:7 103:2
  103:7,9,10
versions  103:9
versus  72:24
  157:23 184:13
veterans  183:18,18
video  7:13 18:3
  41:8
videoconference
  1:17
volume  57:12

**w**

w  2:5,11 44:10
  163:24 164:3,3
  168:15 192:4
wait  6:6 93:18
waiting  64:16
waive  4:12
waived  188:24
walk  80:15,20
want  8:7 9:24 13:6
  16:7 21:9 30:24
  44:19,20 48:20
  49:3 52:6 61:23,25
  64:8 66:14 70:3,6
  76:1,3 80:22 85:4
  85:15 90:9 94:12
  98:15 102:23
  103:13 104:9 110:2
  111:22,25 117:16
  119:17 123:4
  142:16,25 143:4

146:12 149:8,10
  152:25 153:1 154:5
  156:2,10,11 161:3
  161:3 168:18,18
  171:1 173:3 176:6
  176:23
wanted  10:4 34:5
  87:9 106:3 119:20
  168:17
wants  120:13
warm  168:11
washington  111:18
  111:20 164:16
waste  183:5
watching  167:16
way  13:12 16:24
  17:4 32:13 33:13
  34:4,10 37:17
  48:10 49:16 50:24
  55:23 57:19 60:12
  88:21 89:7 92:21
  113:2 120:14
  130:20 144:17
  151:12 155:16
  163:1 169:3 172:18
  185:13
ways  142:13
wca  183:5
we've  9:19 20:3
  22:6 71:10 131:14
  147:18,19 153:18
  154:22 160:23
  173:2 180:8
website  166:25
websites  43:14
week  18:23,24
  33:25 34:25 86:23
  154:23
weekend  92:9
weeks  150:15

weight  126:23
weighted  126:13
weird  90:11
welcome  90:8
wells  157:23
  160:19 170:15
went  32:14 40:17
  48:8 81:22 92:18
  163:19 164:7,18,19
  165:11,12,19
  166:19 170:23
  178:11,12
whatnot  143:15
wildly  74:11
willing  73:20
willson  2:20
wilson  5:5
win  111:1
winded  169:17
withstood  178:23
  179:25 180:7
  181:11
witness  3:2 4:6,23
  55:8,16 56:9 58:8
  64:16 67:14 68:25
  70:13 93:24 99:5
  103:16 105:21
  107:2 113:12 115:3
  116:19 121:13,24
  122:7,13 124:17
  131:12 133:4
  134:24 136:12
  137:3 144:10 147:1
  148:20 178:22
  185:11 189:1,8,10
  190:6 192:9,10,11
  192:16
won  170:22,23
wondering  41:15
  82:11 117:18 172:2

**word** 27:22,22
34:20 45:16 47:8
53:16 75:9 96:5
100:3 116:7 176:3
**worded** 133:17
178:16
**words** 118:12
152:20
**work** 7:18 10:5
13:2 14:6,9 15:20
17:14 23:15 24:19
25:12 43:21 44:8,9
47:18,19 48:16,21
48:22,23 49:1,6,7,9
49:10,12,16,16
50:9,15 51:5,9
53:21 56:20,20,22
60:9 61:24 64:6
74:5 75:7 78:12
83:4 91:3 101:6
103:8,9 112:23
113:3,5 121:3
149:1 151:7 155:11
155:15,17 157:15
157:17 160:1
164:18,19 168:2,17
174:5 175:25
176:11 177:1,8
178:1 180:24
**worked** 11:3,21,22
12:12 22:1 23:25
49:19 58:10 77:23
78:19 101:11
103:10 109:1,21
110:3 123:9 142:17
149:13 153:12
157:4,22 158:5,6,6
158:7,9,10,14
161:1 166:11
168:22 171:16
173:10,12,18,21,24

174:2 177:10,16
185:5,6,8,12,18,23
186:7
**working** 10:19
32:10 35:1 68:12
141:9 153:11
155:22 159:16
163:21,21 166:4
170:6,8 180:22
**works** 144:20
156:25 175:4
**world** 149:7 165:21
168:5 180:22,23,24
**worried** 169:7
**worry** 35:2
**worth** 80:2 102:8
105:17
**write** 30:24 43:2
49:18 51:15 52:1
72:10,16 73:4,6,9
74:2 75:9 132:3,6
150:17 159:11
167:3 168:18
**writer** 39:25 46:11
**writing** 26:12
29:14 42:6 43:9,12
43:15 73:6 74:8,10
74:12,22 142:9
149:13 165:6
**written** 17:1 18:1
39:5 43:6 45:20,22
52:16 67:19 74:20
86:16 111:8 142:11
142:12 159:5
**wrong** 32:20 36:2
41:19
**wrote** 26:2,2 39:22
52:15 64:2 74:2
75:2 88:1 89:4,10
164:25 184:20

**x**

**x** 82:6
**xyz** 101:8

**y**

**y** 82:6
**y2k** 165:18
**yeah** 10:13,15
16:15 17:7,25
18:19 19:12 22:13
23:16 24:13 25:18
29:7 30:24 32:3,19
36:11 40:14 42:16
46:18 50:11 53:5
55:8 58:8 59:5
64:16 65:7 67:8,16
75:22 77:8 82:24
83:6,23 85:13
88:17 89:12 93:24
98:4 99:5 103:21
104:8,19 105:13
108:7,20 111:13
117:20,21 121:24
123:12 126:10
128:10 129:1,6,16
133:8,16 135:14
138:25 143:9,17
144:4,10 153:13
156:8 159:25 162:5
163:18 167:10
169:22 170:13,18
170:22 171:19,21
172:3 176:19
178:14 179:17
181:21 183:17
186:22 187:17
188:1,5,9
**year** 10:21 76:2
78:5 80:6,10,14,25
81:4,5,8,13,14,14
81:15 82:5,17,18

82:20,21 83:1,2
102:11,14 105:4,7
105:8,9,12,18,23
106:1,7,8,8,12
119:19 123:19,25
124:5 125:3,25
126:1 127:20
128:20 164:3,6
165:15,16
**year's** 80:2 102:8
**yearly** 125:4
**years** 13:10 74:8
148:24 149:14
160:20 163:9,11,14
182:12
**yesterday** 8:2
92:12 94:12,14
187:4
**young** 2:15 5:8
**yvonne** 1:21 189:5
189:14 190:3,21

**z**

**zach** 5:14 15:24
20:3 21:14,16,19
186:21 187:2
**zachary** 2:4 3:22
4:16 192:3
**zoom** 24:23,25 25:1
25:5,9
**zpb** 2:6 192:5

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Page 192

```
 1   July 27, 2021

 2

 3   Zachary P. Beatty, ESQUIRE
     Chimicles Schwartz Kriner & Donaldson-Smith, LLP
 4   361 W. Lancaster Avenue
     Haverford, Pennsylvania  19041
 5   zpb@chimicles.com
 6   RE    :  Nguyen v. Raymond James & Associates, Inc.
     DEPO OF:  Arthur Olsen
 7   TAKEN :  July 13, 2021
 8       The above-referenced transcript is available for
     review.
 9
         The witness should read the testimony to verify its
10   accuracy.  If there are any changes, the witness should
     note those with the reason on the attached Errata Sheet.
11
         The witness should, please, date and sign the
12   Errata Sheet and email to the deposing attorney as well
     as to Veritext at transcripts-fl@veritext.com and copies
13   will be emailed to all ordering parties.
14       It is suggested that the complete errata be
     returned 30 days from receipt of testimony, as
15   considered reasonable under Federal rules*, however,
     there is no Florida statute to this regard.
16
         If the witness fails to do so, the transcript may
17   be used as if signed.
18
     Yours,
19
20   Veritext Legal Solutions
21
     *Federal Civil Procedure Rule 30(e)/Florida Civil
22   Procedure Rule 1.310(e).
23
24
25
```

Page 193

1  RE   :   Nguyen v. Raymond James & Associates, Inc.
   DEPO OF:  Arthur Olsen
2  TAKEN  :  July 13, 2021 - Job # 4696494
3  PAGE __69__ LINE __24__ CHANGE  should read "Schulz was on most
4   of those emails."
5  REASON__Transcription Error
6  PAGE __97__ LINE __7__ CHANGE  should read "They might have had
7   to divide by 31 themselves"
8  REASON__Transcription Error
9  PAGE __100__ LINE __14__ CHANGE  should read "We had a similar
10   discussion as before, so I"
11  REASON__Transcription Error
12  PAGE __140__ LINE __13__ CHANGE  should read "adjusted by date"
13
14  REASON__Transcription Error
15  PAGE __151__ LINE __2__ CHANGE  should read "if I have a Social
16   Security Number"
17  REASON__Transcription Error
18  PAGE __159__ LINE __13__ CHANGE  should read "those are some things"
19
20  REASON__Transcription Error
21   Page 168, Line 16, should read "that was required", Transcription Error
    Under penalties of perjury, I declare that I have read
22  the foregoing document and that the facts stated in it
    are true.
23
    __8/26/2021__                    _____
24  DATE                             ARTHUR OLSEN
25