# EXHIBIT B

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KIMBERLY NGUYEN, On Behalf of
Herself and All Others Similarly Situated,

      Plaintiff,

v.                                  Case No. 8:20-cv-195-CEH-AAS

RAYMOND JAMES & ASSOCIATES, INC.,

      Defendant.

_____/

## DECLARATION OF ALFRED CAUDULLO

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.    My name is Alfred Caudullo and I am the Chief Operating Officer ("COO") of the Asset Management Services ("AMS") division of Raymond James & Associates, Inc. ("RJA"). I joined RJA in 1998, and have held several positions in operations, trading, and leadership. Most recently, I was Vice President in AMS starting in May 2007, was promoted to Senior Vice President in AMS in February 2017, and began my present position as COO in October 2019. I am over 18 years of age and have personal knowledge of the facts and representations set forth in this declaration.

2.    As part of my duties at RJA for the time relevant to this declaration, I oversaw and managed the business operations of AMS and had responsibility for the various account types and investment programs that RJA offered through AMS, including the Freedom Program.

**The Freedom Program**

3.      From 2015 through 2018, RJA offered two separate categories of advisory accounts that charged account-holders (or clients) for services primarily through annual fees calculated based on an agreed-to percentage of certain categories of assets in the accounts (*i.e.*, fee-based accounts): (a) fee-based, individual-financial advisor advisory accounts ("Fee-Based Individual Accounts") and (b) managed accounts ("Managed Accounts").  Fee-Based Individual Accounts were individual, fee-based account categories that were individually advised (on a discretionary or non-discretionary basis[1]) by the account-holder's RJA financial advisor.  Examples of Fee-Based Individual Accounts offered at times during the relevant period include Ambassador and Passport accounts.

4.      Managed Accounts, in contrast, were *not* managed by an account-holder's financial advisor.   Instead, they were managed by AMS's investment committee, by an RJA-affiliate's portfolio management team, or by a third party money manager that was approved by RJA, depending on the investment program selected by the account-holder.  The Managed Account programs offered at times

---

[1] "Discretionary basis" means the account-holder delegates (in writing) "discretion" to RJA or an RJA financial adviser (for Fee-Based Individual Accounts, the account-holder only has the option of delegating discretion to the account-holder's RJA financial adviser).  This discretion gives the financial adviser decision-making authority over the investment activity in the account-holder's account so that the financial adviser can initiate transactions in the account without having to seek authorization from the account-holder.  "Non-discretionary basis" means the account-holder retains decision-making authority over the investment activity in the account-holder's account so that the account-holder has to approve every transaction in the account before it is initiated.

during that period included the following: American Funds Model Portfolios, Eagle Asset Management, Freedom, Freedom UMA, Multiple Discipline Account, Outside Manager Program, Raymond James Consulting Services, Raymond James Research Portfolios, and Russell Investments Model Strategies.  It is the Freedom Program (which clients access through Freedom Accounts) that is at issue in this case.

5.     As already noted, once a Managed Account is selected, Managed Accounts like Freedom Accounts are <u>not</u> managed by the client or the client's financial advisor.  Rather, these accounts are discretionary, and decision-making authority over the investments in the account is delegated to third party investment managers, to RJA's AMS division, or to an RJA affiliate.  For the Freedom Program, in written documentation the client signs, the client appoints RJA, through its AMS division, to act as the client's investment adviser, to have the discretion to trade securities without prior client approval, and to have sole investment authority. AMS exercises that authority through AMS's investment committee (the "AMS Investment Committee").

6.     The Freedom Program offers clients a number of different investment Strategies to choose from.  All of these Strategies involve investing in mutual funds and/or exchange traded funds ("ETFs") that are selected by the AMS Investment Committee to be specifically tailored to the Strategy selected by the client in accordance with each specific client's investment objective and risk tolerance, as well

as any other investment preferences each specific client may have.  Account-holders may switch between Strategies without additional cost.

7.    The AMS Investment Committee — and not the client's financial advisor — is authorized to and does make all investment decisions in the client's Freedom Account, including selecting the investments for the client that are consistent with the selected Strategy and buying and selling those investments without needing the client's approval for each specific trade.  The AMS Investment Committee invests all clients that select the same Freedom Program investment Strategy in the same manner, according to the Strategy.

8.    During the relevant period, the AMS Investment Committee included five investment professionals, and each had significant experience, certifications, and qualifications in one or more of fund due diligence, investment research, financial analysis, and investment management.   Members, all of whom were securities industry veterans, included representatives of AMS Manager Research & Due Diligence and AMS's then-COO.  Each had a Series 7 license (general securities representative examination), and many had additional qualifications, including Chartered Financial Analyst and a Series 24 (general securities principal examination).  The AMS Investment Committee met monthly at formal meetings, where it kept minutes, and often met informally on a weekly basis.   Between meetings, the members conducted additional business in person and by phone and email.  At meetings, the members would, among other business, report on the performance of the Freedom Strategies, discuss the result of due diligence efforts as

4

to funds and fund managers, discuss other research results, and consider and vote on potential trades, changes to Strategies, and swapping in or out individual mutual funds or ETFs within a Strategy based on research and due diligence. The meetings were often attended by other AMS professionals, including subject matter experts on particular issues to then be discussed.

9. In turn, the AMS Investment Committee leverages the in-depth research and close monitoring of mutual funds and ETFs performed by the AMS Manager Research & Due Diligence department. AMS Manager Research & Due Diligence is comprised of a group of experienced analysts who continually monitor the managers, performance, and underlying investments of the mutual funds and ETFs used in the Freedom Program. AMS Manager Research & Due Diligence analysts do this by regularly contacting fund managers by phone and visiting fund managers in person, including more than a hundred on-the-ground visits each year during the period at issue in this case. The analysts also research performance, make peer comparisons, and make ongoing examination of the managers' portfolio characteristics. The AMS Investment Committee relies on recommendations generated by the comprehensive work of the AMS Manager Research & Due Diligence team to select and to retain or replace specific mutual funds and/or ETFs for each Freedom Program investment Strategy, depending on the Strategy's objectives. The AMS Investment Committee also relies on this work to determine asset allocation within a Strategy, building an appropriate mix of securities.

10.     In addition to researching, selecting, and monitoring the mutual funds and/or ETFs for each Strategy, and developing the model that determines how much of each selected mutual fund and/or ETF to purchase for each Strategy, AMS also rebalances the investments in Freedom Accounts on a periodic basis.  AMS annually rebalances the investments in a client's Freedom Account, based on its anniversary date, if at such time the actual asset allocation varies by more than certain predetermined percentages from the target allocations established by the AMS Investment Committee for the investments in the Strategy selected by each Freedom account-holder.  AMS may also rebalance the investments in a Freedom Account upon request by the client, or on an other-than-annual basis as necessary during AMS's monitoring of the individual accounts (for example, when an account's cash balance falls below a level and is no longer sufficient to cover advisory fees, during fund swaps, to maintain target allocations as a result of client-initiated account withdrawals or additions, among others).

11.     Because the Freedom Accounts have buying power for securities across all owners of a Strategy, account-holders are often able to acquire shares of a particular fund with more favorable terms than if purchased in a commission-based brokerage account.  Freedom mutual fund shares are generally purchased without front-end or back-end sales charges, and certain fees, known as 12b-1 trails, are credited to the Freedom client's account.  In certain instances, the Freedom Account holders receive share classes — such as institutional or platform shares — that may not be offered to clients in commission-based brokerage accounts.  In addition,

6

minimum purchase requirements and certain holding period requirements that apply to mutual fund shares in a typical commission-based brokerage account do not apply to the mutual fund shares used in Freedom, which provides flexibility in investment management.

12.     In summary, there are multiple services and benefits provided with each Freedom Account.   First, there are services and benefits that are provided to all Freedom Account holders, directly, by virtue of the client's participation in the Freedom Program.  As detailed in more depth above, these include:

    a.  Professional management of the account by the AMS Investment Committee.

    b.  The creation, maintenance, and modification of several dozen Strategies, each with a unique selection of securities by asset type and asset allocation.

    c.  The selection of mutual funds and ETFs for and within those model Strategies.

    d.  The ability to switch between model Strategies, without additional cost.

    e.  Monitoring of the mutual funds and ETFs for performance, cost, and other features, and changing those mutual funds and ETFs in favor of more favorable options as warranted.

    f.  Due diligence and research into mutual fund managers, including AMS analysts meeting in person with fund managers.

g. Monitoring of each individual account within the program for drift from the asset allocation.

h. Annual rebalancing of the individual account with the program, and on demand rebalancing at the request of the client through the financial advisor.

i. Trading within the Freedom Account at the discretion of the AMS Investment Committee to automatically implement investment changes.

j. Advantages to the acquisition and ownership of mutual funds and ETFs in Freedom, compared to a commission-based brokerage account.

13.     Second, Freedom Account holders' financial advisors may offer additional, personal financial services to their clients who are in the Freedom Program.  Each financial advisor does not provide these services to each Freedom Account holder.  Instead, whether a financial advisor provides these services depends on the facts and circumstances of each financial advisor's relationship with each client.  The optional, additional services include a spectrum of advice and planning outside of the assets held in the Freedom Program:

a. asset allocation

b. periodic portfolio review

c. performance reporting

d. investment advice

e. college planning

8

    f.  financial planning

    g.  cash flow management

    h.  professional model management

    i.  investment consulting.

For financial advisors who provide one or all of these additional services, the level of those services varies from client to client and, within a particular client relationship, varies from year to year.

**Comparison of the Freedom Program to Other Account Types**

14.     As a managed account program, the Freedom Program differs in many ways from (i) a commission-based brokerage account, (ii) a fee-based brokerage account, and (iii) a Fee-Based Individual Account.

15.     **Commission-based brokerage accounts**. In a commission-based brokerage account, RJA and the account-holder's financial advisor provide a limited number of services related to investments in securities, including: taking customer orders and executing securities transactions; custodying the client's securities; making certain investment research available; and providing general information regarding financial products. The financial advisor may also provide recommendations concerning whether to buy, sell, or hold securities, leaving the decision-making to the client. RJA does not charge a separate fee for such recommendations. Instead, the client pays RJA commissions and other applicable fees each time RJA executes a transaction in the brokerage account in accordance with the client's instructions. In their capacity as broker-dealer and registered

representative, respectively, RJA and the financial adviser do not make investment decisions for the client or manage the client's accounts on a discretionary basis. The financial advisor will only buy or sell securities when the client directs the financial advisor to do so. In other words, these accounts are self-directed.

16.    **Fee-based brokerage accounts.**  In a fee-based brokerage account, RJA and the financial advisor would provide the same limited number of services they provide in a commission-based brokerage account, but instead of receiving commissions and fees on a per-transaction basis, RJA would charge either an annual fixed fee or an annual fee based on a percentage of the assets in the account. Identical to the commission-based brokerage accounts discussed above, RJA and the financial advisor would not make investment decisions for the client or manage the client's accounts on a discretionary basis, and the financial advisor would only buy or sell securities when the client directed the financial advisor to do so. This was also a self-directed account. In short, the client retained all decision-making authority in both commission-based and fee-based brokerage accounts and the *only* difference was whether the client paid for each transaction or whether the client paid an annual amount to be able to execute an unlimited number of transactions.

17.    RJA has not offered fee-based brokerage accounts since 2005.

18.    I am familiar from public documents with the scope of a National Association of Securities Dealers (NASD) censure and fine against RJA and an affiliated company, from April 2005 ("NASD Matter"). The scope of the NASD Matter concerned fee-based brokerage accounts, the primary one of which was

known as Passport Brokerage.  Managed Accounts, such as Freedom Accounts, were not within the scope of the NASD Matter.

19.     While both Managed Accounts and fee-based brokerage accounts are by definition fee-based, the similarities end there.  Managed Accounts are managed, advisory accounts in which discretion is delegated to an investment manager to execute a pre-selected investment strategy, whereas fee-based brokerage accounts are self-directed, brokerage accounts in which the client is free to execute whatever transaction the client selects (or to not execute any transactions).  A Freedom Account also offers substantially different services and benefits than does a fee-based brokerage account.

20.     Additionally, the NASD Matter involved the conversion of brokerage accounts from commission-based to self-directed fee-based, while retaining the same securities and the same services and benefits — in other words, it involved how much clients were paying for the same transactions, services, and benefits.  By contrast, an apples-to-apples "conversion" from a commission-based brokerage account to a Freedom Account is not possible because in the Freedom Account the client delegates discretion to an investment manager that executes the investment Strategy that has been selected by the client — the activity in the Freedom Account cannot be the same as the client's activity in his or her commission-based brokerage account.  Indeed, the client in the commission-based brokerage account would have to first authorize the sale of the securities in the brokerage account, and delegate to

11

RJA the decision-making authority to use the resulting funds to purchase a new set of securities in the Freedom Account in accordance with the selected Strategy.

21.    **Fee-Based Individual Accounts.** Fee-Based Individual Accounts, like the Ambassador account, are fee-based advisory accounts in which the financial advisor provides investment advice and in which discretion is either kept by the client or delegated to the financial advisor.  Thus, a client may self-direct her Fee-Based Individual Account investments, with input and recommendations from her financial advisor.  Or, alternatively, a client may grant discretion to her financial advisor, who in that instance would be responsible for buying and selling investments in the client's account according to the client's objectives, without needing the client to approve each purchase or sale.  Fee-Based Individual Accounts offer the client the ability to pay an asset-based annual fee (paid quarterly) in lieu of a commission for each investment transaction within the account.  Rather than having a third party manager, RJA's AMS division, or an RJA affiliate manage the investments in the customer's account through one of its managed account programs, Fee-Based Individual Accounts offer clients the opportunity either (i) to maintain full decision-making control over every transaction in the account (in non-discretionary accounts); or (ii) to delegate to a financial advisor full control over investment decisions (in discretionary accounts).

22.    I am familiar with the scope of Administrative Proceeding File No. 3-19464 brought by the U.S. Securities and Exchange Commission ("SEC") ("SEC Administrative Proceeding"), that culminated in the September 17, 2019 Order

(Sept. 17, 2019), resolving that matter against RJA and two of its affiliates ("SEC Order").   The scope of the SEC Administrative Proceeding and SEC Order concerned two unrelated matters:  unit investment trusts ("UIT") and "inactive" Fee-Based Individual Accounts, primarily Ambassador accounts.   Managed Accounts like Freedom Accounts were not the subject of the SEC Administrative Proceeding or SEC Order because they cannot be inactive since there is continuous monitoring.

**Opening a Freedom Account**

23.   To open a new Freedom Account, using funds from a commission-based brokerage account or otherwise, a client in the 2016-2018 time period would fill out at least two forms: (i) an Account Information and Client Agreement or a retirement account equivalent ("Client Agreement"); and (ii) a Freedom Investment Management Agreement[2] ("Freedom Agreement").

24.   I have reviewed the January 29, 2016, Client Agreement and Freedom Agreement from Ms. Nguyen's Freedom Account that is the subject of this case.

25.   Ms. Nguyen's Client Agreement, like other Client Agreements in this time frame, had a section titled Account Suitability, which collected combined annual income, combined net worth, investment experience across six types of securities or trading, primary and secondary investment objectives, primary and secondary associated risk tolerances, and primary and secondary time horizons.  The

---

[2] In some years, the Freedom Investment Management Agreement was called the "Freedom Investment Management Client Agreement."

first page of the Client Agreement collected other personal information, including date of birth, occupation, and employer.

26.     Ms. Nguyen's Freedom Agreement, like other Freedom Agreements in this time period, reflected the client's selection of a Strategy from the dozens that were listed in the Freedom Agreement.

27.     In Ms. Nguyen's Freedom Agreement, like other Freedom Agreements in this time period, RJA disclosed the Freedom Fee Schedule.  The financial advisor and the client could agree to a fee that was different, and lower, from that which was published in the Freedom Fee Schedule and, if so, it could be listed in the "Additional Instructions" box on that page.  Financial advisors had the ability to offer a lower fee, and many did, depending on the individual facts and circumstances unique to their practice and their relationship with the client.  Many clients of the Freedom Program negotiated a lower fee.

28.     All Client Agreements for Freedom Account clients in this time period, including Ms. Nguyen, contained an arbitration provision.   This arbitration provision required arbitration before the Financial Industry Regulatory Authority ("FINRA") for "[a]ny dispute or controversy, either arising in the future or in existence now" between the client and RJA, with an exception only for putative and certified class actions.

29.     During the time frame at issue in this matter, 2016-2018, to open a Freedom Account with assets from an RJA commission-based brokerage account, a client through the Freedom Agreement itself would direct and authorize RJA,

14

through AMS, to liquidate the securities in the brokerage account.  AMS then used the cash proceeds in the Freedom Account to purchase the new set of securities according to the Strategy that the client selected.  Even if a client had only cash in her commission-based brokerage account, and that cash was transferred to the Freedom Account, it resulted in the purchase of securities in accordance with the selected Strategy.  That is, securities held in the Freedom Account are securities that are part of a Strategy, and are the same securities, in proportion to overall investment, as those held by other Freedom Account clients with the same Strategy.

30.    When a client elected to fund an investment in the Freedom Program using securities in the client's commission-based brokerage account, RJA did not charge a commission to liquidate those securities to then fund the purchase of new securities in the Freedom Account for that client.

31.    There are numerous different ways in the 2016-18 time frame in which an RJA client could have opened and funded a new Freedom Account, using assets from that client's commission-based brokerage account. Ms. Nguyen's Freedom Agreement, which is typical of the Freedom Agreements in this time period, stated that an account may be funded with cash, securities, or a combination of both. Under "Funding with Cash" there are three options, and one or more could be used, such as by check, from a cash transfer from an RJA account, or from cash to be transferred in from an outside source by wire.   Under "Funding Account with Securities," there were also three options, and one or more could be used, including a transfer of securities from an RJA account (either "All securities" or a "Partial

transfer"), a securities transfer from another brokerage firm, or a deposit with a branch office of paper constituting securities.   As a result of these several funding options, there are numerous ways that commission-based brokerage accounts funded Freedom Accounts, in the relevant time frame, which include but are not limited to the following:

   a. The client sold all assets in their commission-based brokerage account, used those assets to purchase the securities in the Freedom Account, and closed the commission-based brokerage account.

   b. The client sold only some assets (or used cash) in their commission-based brokerage account, used those assets to purchase the securities in the Freedom Account, and kept open the commission-based brokerage account to continue holding the rest of the assets (or cash).

   c. The client used a. or b. above, but also used additional funds to purchase the securities in the Freedom Account, from other sources either inside RJA or from outside sources, *at the same time* that they used the commission-based brokerage assets to partially fund the Freedom Account.

   d. The client used a., b., or c., above, and then, *later*, added additional funds to the Freedom Account from the original commission-based brokerage account (if still open), from another RJA account, or from outside sources. It was common for a Freedom Account holder to add

funds to purchase additional securities in a Strategy after account inception.

e. The client used a., b., c., or d. above, or a combination, and then sold some assets in the Freedom Account derived from a. or b., in whole or in part, and kept open the Freedom Account with the remaining assets. It was common for a Freedom Account holder to sell a portion of the assets held in a Freedom Account, without closing the Freedom Account.

f. The client had a commission-based brokerage account open for only a few weeks before funding the Freedom Account with those assets.

g. The client had a commission-based brokerage account with securities in it, added cash to it, and then transferred just the cash in short order to the new Freedom Account, without touching the securities, which remained in the commission-based brokerage account.

h. The client opened a commission-based brokerage account in which to merely deposit cash or securities from an outside source that the client all along intended to use to invest in the Freedom Program.

32.    In the 2016-18 time frame, a Freedom Account client, by executing the Freedom Agreement, would appoint RJA, through AMS, to act as his or her investment advisor.  AMS, and not the individual financial advisor, had discretion to buy and sell securities in the Freedom Account.  Every Freedom Account had a financial advisor associated with it, and a client needed to be associated with a

17

financial advisor in order to open a Freedom Account.  If a financial advisor ceased to be with RJA in this time frame, RJA would appoint another financial advisor to service the Freedom Account, and, in such an event, AMS would continue to have discretion over the Freedom Account.

**RJA's Internal Cost Allocation for Freedom**

33.   From 2016 to 2018, RJA generally recorded a 15 basis point (.15%) internal cost allocation to AMS from fees received from the Freedom Program.  This was not a payment, but an internal cost allocation for accounting purposes.  These 15 basis points alone do not represent the value of AMS's work in the Freedom Program, do not represent the value of the Freedom Program to a client, and do not represent the respective value provided to the client between AMS's work and the financial advisor's work.

34.   The entirety of the Freedom Account fee during this period of time went to the financial advisor's compensation grid, from which a portion was paid to the financial advisor as compensation.  That is, the 15 basis points was not removed from the fee before it went to the grid.  The remaining portion not paid to the financial advisor as compensation reverted to RJA.  AMS is a division of RJA, just like human resources, legal, and others.

**RJA's Production of Data**

35.   I have reviewed the 59-account spreadsheet produced as RJA_(NGUYEN)_058469, and the four spreadsheets that provide data for an

additional 27,273 Freedom Account clients. RJA_(NGUYEN)_059060-63.  The data produced concerned Freedom Accounts opened from 2015 through 2018.

36.    Of the Freedom Accounts listed in the 59-account spreadsheet, approximately 52 of those accounts were still open with RJA of June 30, 2021 (the last full quarter for which data is available).  Of the Freedom Accounts included in the 27,273-account spreadsheets, approximately 24,393 of them were still open as of June 30, 2021.

37.    Of the 59 accounts, 24 of those client or clients (approximately 41% of accounts) had opened one or more other Freedom Accounts before or as of inception of the Freedom Accounts for which data was provided, for a total of 32 additional, related Freedom Accounts.  The account numbers from the 59-account spreadsheet of those 24 accounts with related Freedom Accounts are: #1, #2, #3, #4, #7, #10, #12, #13, #15, #19, #22, #23, #28, #29, #30, #36, #43, #44, #45, #46, #50, #51, #57, #58.

38.    Similarly, of the 27,273 accounts, approximately 14,205 of those client or clients had another Freedom Account open before or as of inception.

39.    From the period of 2015 to 2018, approximately 65% of the total 27,332 Freedom Accounts for which data was produced were first-time Freedom Account client or clients.

### RJA's Freedom Program Is Available Nationwide

40.    From 2016 through 2018, RJA employed about 2,800 financial advisors, on average, in a given year.  During that period, RJA financial advisors

19

resided in at least 40 states, Washington, D.C., and at least one territory.

41.    RJA presently employs about 3,200 financial advisors, in all 50 states, Washington, D.C., and at least one territory.

42.    Freedom Accounts are presently available to investors in all 50 states, Washington, D.C., Puerto Rico, Guam, and the U.S. Virgin Islands, and have been since at least 2016.

43.    There are currently roughly 125,000 Freedom Accounts with RJA, owned by clients who reside in all 50 states, Washington, D.C., several territories, and foreign countries.

44.    For the Freedom Accounts listed in the 59-account spreadsheet, account holders are domiciled in 24 different states. For the accounts included in the 27,273-account spreadsheet, the account holders are domiciled in all 50 states, Washington, D.C., and several territories.

**Plaintiff Nguyen's Freedom Accounts**

45.    I have reviewed account statements from Ms. Nguyen's Freedom Account that is the subject of this case.  Per those statements, the opening value of Ms. Nguyen's Freedom Account in January 2016, from the liquidation of securities in her commission-based brokerage account, was $183,426.48.  The Freedom Account increased in value net of fees more than 14% in 2016 (annualized) and increased in value net of fees more than 16% in 2017, with both percentages time-weighted.  The value of the Freedom Account as of December 30, 2016 was

$209,939.31, and the value of the Freedom Account as of December 29, 2017 was $245,329.63.

46.     When RJA closed the Freedom Account at her direction in October 2018, Ms. Nguyen transferred to Vanguard Group securities worth approximately $241,699.40, with a residual dividend of $25.35 transferred the following month.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 1, 2021

_____
ALFRED CAUDULLO