EXHIBIT F

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KIMBERLY NGUYEN, on behalf of
herself and all others similarly situated,

     Plaintiff,

v.                                  Case No. 8:20-cv-195-CEH-AAS

RAYMOND JAMES & ASSOCIATES, INC.,

     Defendant.

_____/

**DECLARATION OF JOSEPH J. THOMAS**

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.     My name is Joseph J. Thomas and I am over 21 years of age and competent to testify to the statements set forth in this declaration.

2.     I am currently a Director at Bates Group LLC.  I was retained on behalf of defendant Raymond James & Associates, Inc. ("RJA") to render opinions and testimony as an expert in this case.  I have previously submitted two reports in this matter: Expert Report of Joseph J. Thomas dated June 4, 2021 (copy attached hereto as Exhibit 1) ("Expert Report"), and Rebuttal Expert Report of Joseph J. Thomas dated June 25, 2021 (copy attached hereto as Exhibit 2) ("Rebuttal Report").  I was asked by counsel to review the Plaintiff's Motion for Class Certification and

Memorandum of Law in Support dated July 20, 2021 ("Class Certification Motion") in connection with issues addressed in my Expert Report and Rebuttal Report, including a review of the liability test and damages model proposed by Plaintiff's alleged expert Douglas J. Schulz ("Schulz").[1]

3.       The statements set forth in this declaration are based upon my personal knowledge and my review of the materials identified in my Expert Report and my Rebuttal Report, or cited in this declaration.

**Suitability**

4.       "Suitability" was the securities industry standard before 2020, set by FINRA and approved by the SEC, with which a financial advisor had to comply when recommending an investment to a client.

5.       Neither FINRA Rule 2111, which sets forth the suitability rule, nor any other FINRA or SEC rule, nor any securities law or regulation, contains any language that references any type of arbitrary mathematical formula to determine suitability. There is no support in securities industry laws, regulations, rules, standards, custom, or practice, whatsoever, for the proposition that a financial advisor may not recommend as suitable a managed account (that is, a fee-based advisory account like the Freedom Account, managed by an investment committee or other professional portfolio management team) if the client would fund the account from a commission-based brokerage account ("commission account") that has a .5% "annualized cost"

---

[1] *See* Report of Douglas J. Schulz re Class Certification ¶¶ 148-155, dated June 4, 2021 ("Schulz Report").

and a turnover of less than .25%.  Plaintiff's witness Douglas Schulz has created this standard, without any basis or cited support.

6.      Suitability in the securities industry is determined on an individual, client-by-client basis and requires that the financial advisor have a reasonable basis for a recommendation based on that customer's unique investment profile.  Suitability of a new investment, including type of account, cannot be determined in accord with securities industry laws, regulations, rules, standards, custom, or practice, solely by looking at "annualized cost" and turnover (which is the amount of trading) in the account that would fund the new investment.  Rule 2111 does not require a financial advisor to put on blinders and view just the account that is the source of funds for the investment under consideration, and in fact requires an advisor to review a customer's entire "investment profile," including "other investments."

7.      The reasonable basis for a suitability recommendation is evaluated and determined as of the time of the recommendation and depends on the unique circumstances of each individual client.

8.       The financial advisor's knowledge of his or her client and professional training are the primary components in evaluating the basis for a recommendation of suitability.  Metrics, such as "annualized cost" and turnover, may be helpful in assisting a financial advisor in determining suitability.  But relying on metrics alone or even as a primary determinant of suitability of an investment does not incorporate the client-specific information known to the financial advisor in making a suitability

determination, and could therefore result in the recommended investment being unsuitable for a client.

9.      There are no FINRA Rules, and no other securities industry laws, regulations, rules, standards, custom, or practice (during the time at issue in this case, or now) that required any type of specific metric analysis be conducted in order to recommend that a client liquidate assets in a commission account to open a managed account.

10.      The suitability determination outlined in FINRA Rule 2111 is individual in nature and does not (and indeed cannot) rely on a mathematical algorithm alone.   To evaluate whether a suitability review was done across this putative class would require an account-by-account and, truly, a client-by-client review.

11.      The suitability standard is only triggered if a financial advisor makes a recommendation.   Thus, if a client reaches an investment decision without receiving a recommendation from the financial advisor, that decision does not trigger the suitability standard or any other obligation on behalf of the financial advisor (except the financial advisor's duty to make reasonable efforts to execute the client's investment instruction, which is not implicated in this case).   None of the data relied upon by Plaintiff's purported experts identifies whether any Freedom Account included in that data was opened because the client requested the Freedom Account or because the financial advisor recommended it.

**Documentation**

12.     There was no securities industry law, rule, regulation, standard, custom, or practice during the 2015-2018 period that required a financial advisor to create and maintain a specific, documented analysis of the reasonable basis for his or her recommendation that a transaction or investment strategy involving securities was suitable.

13.     Nonetheless, RJA's financial advisors had several options to document their suitability analyses.  These included new account records, financial plans, investment policy questionnaires, recorded contact management notes, and various forms of correspondence with and between each customer and financial advisor. Suitability information was collected as part of the new account information forms and was retained in the books and records of RJA in accordance with FINRA recordkeeping requirements.  In the case of Ms. Nguyen, there were contact management notes, detailed Financial Plan analysis reviews, portfolio reviews, and memorialized communications between the financial advisor and the client.

14.     Compliance with the suitability obligation does not depend on whether and how the determination was documented, but on whether a reasonable determination was made by the financial advisor that the investment was suitable.  In other words, if a recommendation was suitable, it was suitable regardless of whether the financial advisor documented the information that they considered in reaching that conclusion.

15.     Ms. Nguyen's financial advisor conducted a suitability analysis, including as to account type, before recommending the Freedom Account at issue to Ms. Nguyen, and his recommendation for her to open that account is supported by a reasonable basis.  Ms. Nguyen's financial advisor testified to this suitability analysis as to account type at his deposition, and, even though supporting documentation is not necessary, here the documentation supports the suitability analysis in the form of the financial plan that he created for her immediately before his recommendation and in the form of the account opening paperwork that collected suitability information.

16.     To determine compliance with the suitability obligation across the entire putative class, would require, at least (i) a review of the specific account documentation records for each potential class member, and (ii) speaking to or deposing each client _and_ financial advisor to determine (at a minimum) (a) whether a recommendation was actually made, which is a threshold requirement for the application of the suitability rule, and (b) the reasonable basis for the recommendation as to the specific financial circumstances applicable to each purported class member as of the time the recommendation was made.

**Account Type**

17.     The determination of suitability in the 2015-18 period — when Ms. Nguyen was a customer of RJA — was not commonly interpreted in industry standards, custom, and practice to apply to recommendations as to account type.

18.     During the 2015-2018 time frame, securities industry laws, rules, regulations, standards, custom, and practice required a financial advisor to make a

6

suitability determination before making a recommendation for the purchase or sale of a security, or undertaking an investment strategy involving a security or securities, and did not specifically require such an analysis as to "account type."

19.     RJA nonetheless had policies and procedures in place during the relevant period, and in particular as to suitability, that required the financial advisor to conduct a suitability analysis before recommending that a client open a Freedom Account.

**Damages**

20.     A damages model that attempts to project or "annualize" commissions from a commission account, on one set of securities, and then subtracts those from actual fees charged in a managed account (a fee-based advisory account, like Freedom), applied on a different set of securities, is not a "common formula" that has any acceptance under industry rules, standards, custom, or practice.  I could find no publication or industry rule, standard, or practice endorsing this theory of damages.

21.     Such a damages model also eliminates even the possibility of assigning value to the services provided by RJA through its Asset Management Services ("AMS") division (which were not generally provided in commission accounts), to clients within the Freedom Program. It also eliminates the possibility of assigning value to any of the services, such as financial planning, that any of the financial advisors for the tens of thousands of alleged class members may or may not have provided as part of the client opening and maintaining a Freedom Account.

**Conclusion**

22.     For the reasons stated in my Expert Report and Rebuttal Report, the determination of whether a financial advisor made a recommendation that a Freedom Account was suitable for a particular client, whether that suitability recommendation was supported by a reasonable basis, and whether the Freedom Account was in fact suitable for that client, cannot be determined based on the two factors of "annualized cost" and turnover, at two particular thresholds or otherwise, in a way that is consistent with securities industry laws, rules, regulations, standards, customs, or practice.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Saint Louis, MO on August 31st, 2021.

JOSEPH J. THOMAS

# EXHIBIT 1

**CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT**

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

KIMBERLY NGUYEN, On Behalf of
Herself and All Others Similarly Situated,

      Plaintiff,

v.                                   Case No. 8:20-cv-195-CEH-AAS

RAYMOND JAMES & ASSOCIATES, INC.,

      Defendant.

_____

## EXPERT REPORT OF JOSEPH J. THOMAS

### June 4, 2021

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

## Qualifications

My background and qualifications are found on my Curriculum Vitae, attached hereto as Exhibit A. My testimony history from the past four years is found on a document entitled "Trial, Arbitration, and Deposition Testimony," attached hereto as Exhibit B.

Since 1988, I have been actively involved in the financial and securities industry with particular emphasis and expertise in branch management, compliance matters, supervision issues, and account analysis. I have served as a Registered Branch Manager for sales supervision responsible for regional supervision with Edward Jones, as an Operations professional with Edward Jones, and as a Vice President with A.G. Edwards and Sons Law Department/Wachovia Securities/Wells Fargo Legal Division as a Finance Manager and Litigation Auditor. I have also consulted on organizational structure and supervision related to various types of brokerage models. I have held supervisory and principal licenses since 1994 and general securities licenses since 1993, and I have been involved in all facets of a regional broker-dealer and wirehouse in my career.

I am currently a Director with Bates Group LLC, a full-service financial consulting firm. The group to which I belong specializes in litigation support pertaining to securities and related financial matters. I have been with Bates since 2011. I have been involved in development and presentation of complex account analyses, suitability analysis and issues related to sales supervision, and issues presented in this matter.

In my capacity as a consultant and expert witness in the financial arena for the past 10 years, I have used my background in sales supervision, brokerage operations, and my association with other financial professionals to form expert opinions regarding the securities industry. I have remained familiar with all laws, regulations, customs, and practices in the industry.

## Compensation

I am being compensated by Raymond James & Associates, Inc. ("Raymond James"), at the rate of $450 per hour. The work performed by my staff in reviewing documents and assisting me in preparing the analysis is billed at rates ranging from $130 to $370 per hour. My compensation and the compensation of the Bates Group are in no way dependent on the content of my and/or the

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

Bates Group's analysis, the content of this report, my opinions, or the outcome of these proceedings.

## Materials Reviewed

Materials that I have reviewed are contained in Exhibit C that follows.

## Assignment

I have been asked by counsel for Raymond James to provide opinions on the concept of suitability and industry standards, custom, and practice in making investment recommendations, as to the allegations in the operative complaint.  This includes my opinion as to a financial advisor's recommendation for a client to open a Freedom Account and, once open, the firm's responsibilities with respect to the client's maintaining such an account.  Additionally, I was asked to opine on Ms. Nguyen's claims particular to herself and assess whether recommendations made to her were suitable and otherwise consistent with industry standards, custom, and practice, and standards as to the financial advisor and the firm.  I was also asked to opine on whether the circumstances relative to the inquiry just described were individualized or whether the evaluation as to suitability of an account-type recommendation, both before and after the initial recommendation, can be conducted in regard to a purported class of potentially tens of thousands of Raymond James clients on a class-wide basis.

I was asked to assess the characteristics that might cause an account to have minimal trading activity and what impact this might have on the suitability analysis on such an account, in light of Plaintiff's allegations.  I was asked to assess, in light of the allegations of the operative complaint, the policies, procedures and supervision at Raymond James and how they were carried out relative to the standards, custom, and practice in the financial services industry at the time Ms. Nguyen maintained accounts at Raymond James.

## Summary of Opinions

1. Raymond James Conducted Suitability Analyses in Connection with Its Recommendations to Plaintiff

2. Raymond James's Suitability Analyses Complied with All Applicable Rules, Regulations and Industry Standards

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

3. Raymond James—Which Made an Assessment of the Suitability of the Freedom Account for Plaintiff—Did Not Unilaterally "Transfer" Plaintiff from a Commission-Based Account to a Fee-Based Account

4. Raymond James Conducted an Appropriate Suitability Analysis with Respect to the Type of Fee-Based Account that Raymond James Recommended to Plaintiff

5. The Freedom Account Provided Plaintiff with Discretionary Account Management Services and Benefits that Were Not Available to Her in a Commission-Based Account

6. Plaintiff Received Value for the Fees that She Contractually Agreed to Pay to Invest in the Freedom Program

7. Raymond James Had Industry-Standard Policies and Procedures in Place to Ensure Compliance with Regulatory Requirements

8. Suitability Determinations Cannot Be Made on a Class-Wide Basis Because They Necessarily Require Assessments of Each Client's Individual Circumstances, Objectives, and Risk Tolerances, and the Facts Pertaining to Plaintiff are Not Common to the Individual Suitability Analyses that Must Be Performed for Each Purported Class Member

9. Plaintiff—Who Opened Four Fee-Based Discretionary Accounts at Three Different Broker-Dealers—is Not Typical of the Class She Seeks to Represent

10. Damages Cannot Be Determined on a Class-Wide Basis Inasmuch as Every Raymond James Client's Financial Circumstances Are Individual and Unique

### <u>Overview of Pertinent Allegations in Plaintiff's Second Amended Complaint</u>

The operative complaint has alleged that Raymond James failed to conduct any suitability review and failed to adhere to FINRA rules related to such reviews both before making recommendations to customers to open Freedom Accounts and after those customers opened Freedom Accounts.[1]

The complaint also alleges that Raymond James did not have processes, procedures, and a supervisory structure in place to comply with FINRA rules, with respect to the above.[2]

---

[1] Second Amended Class Action Complaint ("SAC"), para. 1,7,9.
[2] SAC, para. 10.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

## Overview of Pertinent Federal Securities Regulatory Structure

**A. Broker-Dealers and Investment Advisers Are Separately Regulated and Subject to Different Federal Regulatory Regimes**

The U.S. Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA") play important, but different, roles in regulating Investment Advisers ("IAs" or "Advisers") and Broker-Dealers ("BDs" or "Brokers").  IAs are generally subject to the Investment Advisers Act of 1940 and are regulated by the SEC.[3]  BDs are primarily subject to the Securities Exchange Act of 1934, among other laws, and regulation by the SEC and FINRA, and other self-regulatory organizations.  In practice, however, the SEC has "observed that the lines between full-service Brokers and Advisers have blurred.  Advisers and Brokers, for example, provide investment advice both on an episodic and on an ongoing basis."[4]  As a result, the SEC has repeatedly expressed concern that "specific regulatory obligations depend on the statute under which a financial intermediary is registered instead of the services provided."[5]

In general, IAs owe fiduciary duties to their clients.  FINRA does not have jurisdiction over IAs. FINRA does have jurisdiction over BDs, and BDs are subject to a "suitability" standard under FINRA Rule 2111 when making recommendations and suitability is assessed as of the time of the recommendation.

During the period that Plaintiff had accounts with Raymond James in the 2015 to 2018 timeframe, the regulators at the SEC and at FINRA were grappling with how to reconcile the different standards applicable to IAs and BDs in view of the fact that many BDs were "dual registrants," *i.e.,* also registered as IAs.  In 2013, for example, the SEC sought comment on "the benefits and costs that could result from various alternative approaches regarding the standards of conduct and

---

[3] Registration with the SEC generally is required if an Adviser (1) manages more than $100 million in customer assets, (2) advises certain funds or business development companies, or (3) works in a state that does not register Advisers. 17 C.F.R. § 275.203A-1 (2011).  All other Advisers are either subject to state registration systems that have requirements similar to the Advisers Act, or exempt from both regimes, though the exemptions currently available are quite narrow. Advisers are regulated by either the SEC or the states, but not both.

[4] SEC, Duties of Brokers, Dealers, and Investment Advisers, 78 Fed. Reg. 14,848, 14,849 (Mar. 7, 2013).

[5] *Id.*

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

other   obligations   of   broker-dealers   and   investment   advisers." *See,*
https://www.sec.gov/rules/other/2013/34-69013.pdf at pp. 1, 3:

> Today, broker-dealers and investment advisers routinely provide to retail customers
> many of the same services and engage in many similar activities related to
> providing personalized investment advice about securities to retail customers.
> While both investment advisers and broker-dealers are subject to regulation and
> oversight designed to protect retail and other customers, the two regulatory schemes
> do so through different approaches notwithstanding the similarity of certain
> services and activities. Investment advisers are fiduciaries to their clients, and their
> regulation under the Investment Advisers Act of 1940 ("Advisers Act") is largely
> principles-based. In contrast, a broker-dealer is not uniformly considered a
> fiduciary to its customers.  Broker-dealer conduct is subject to comprehensive
> regulation under the Securities Exchange Act of 1934 ("Exchange Act") and the
> rules of each self-regulatory organization ("SRO") to which the broker-dealer
> belongs. Both broker-dealers and investment advisers also are subject to applicable
> antifraud provisions and rules under the federal securities laws.

*See also* SEC, Regulation of Investment Advisers by the U.S. Securities and Exchange
Commission (March 2013) at note 119, https://www.sec.gov/about/offices/oia/oia_investman/
rplaze-042012.pdf: "FINRA does not act as a self-regulatory organization with respect to
investment advisers."

As noted in Section D below, in June 2020, well after Plaintiff ceased doing business with
Raymond James, the SEC adopted Regulation Best Interest ("Reg BI"), which prohibits BDs from
putting the BDs' interests ahead of the customers' interests.

## B.  FINRA's Suitability Rule 2111 Applies to Broker-Dealers Not Acting as Investment Advisers

A reasonable suitability analysis and determination at the time of a recommended transaction is
fundamental to making investment recommendations.

The industry standard for determining the suitability of investment recommendations is established
in the concept of "know your customer," both in SEC and FINRA rules.  This basic principle has
been the custom and practice in the industry for many years, referring to NYSE Rule 405 and
present day FINRA Rule 2090.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

The term "financial advisor" refers to the licensed registered representative of a BD and is commonly used to describe professionals who provide recommendations and advice to their clients.  The basis of a financial advisor's recommendation that a transaction or investment strategy is suitable depends on the financial advisor's reasonable diligence in understanding their customer's investment objectives, risk tolerance, needs, background, and time horizon, among other factors, including information the client may disclose to the financial advisor.  The need to take reasonable steps to understand and assess a client's needs is fundamental to having a reasonable basis for recommendations regarding the suitability of an investment or investment approach.

The brokerage industry standard for suitability as the standard for recommendations is based on FINRA Rule 2111, which was the applicable rule during the time frame when Ms. Nguyen opened and maintained the Freedom Account that is the subject of her present dispute with Raymond James.  The rule as applied in the industry did not clearly establish, between 2015 and 2018, a duty to perform a suitability analysis before recommending a particular *account type* or structure.  The rule more clearly applied to determine the suitability of the overall recommendation for the *underlying investments* at the time of the recommendation.

The suitability rule requires that the financial advisor must have a reasonable basis for making a recommendation for a transaction or investment strategy for a customer, regardless of the account type. That reasonable recommendation may include multiple investment accounts with differing objectives as part of a client's overall portfolio.  In assessing whether there was a reasonable basis that a recommendation was suitable, it is important to note that multiple, different investments or strategies may each be suitable.  The FINRA suitability standard does not require that the recommendation be the best choice or least expensive, but rather it must be reasonable based on the analysis done by the financial advisor.  A suitable recommendation is not based simply on the fees associated with an investment, but on whether the investment is reasonable in light of the client's investment profile.  A suitability analysis might also determine that the client's current investment(s) or strategy, without changes, is suitable, so the financial advisor could recommend that the client "hold" the current investments or strategy.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

The FINRA rule states:

> A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile.[6]

FINRA rules and industry practices require that the suitability analysis for an individual investor be a reasonable analysis -- not a perfect analysis -- and be specific to investor's objectives, time horizons, and other factors. In the case of Ms. Nguyen, part of Mr. Seale's suitability analysis was knowing his customer, which is the foundation of FINRA Rule 2090.

Individual suitability requirements under FINRA Rule 2111 require that the financial advisor have a reasonable basis for recommending a transaction or strategy based on the customer's investment profile. A suitable recommendation is made based on the information known to the financial advisor at the time about the security or strategy and about their client — suitability is not assessed with the benefit of hindsight after the recommendation is made and followed by the client.

## C. The Investment Advisers Act of 1940 Applies to Investment Advisers

In contrast to the standard that applied to BDs in the relevant timeframe, the Investment Advisers Act of 1940 requires that an IA not put their own interest above those of the client. Similar to the guidelines outlined in FINRA Rules 2090 and 2111, though, the '40 Act requires IAs to understand the client's investment profile, background, and financial goals.

## D. After Plaintiff Closed Her Raymond James Accounts in 2018, The SEC and FINRA Adopted the "Best Interest" Rule

Under SEC's Reg BI, which became effective in June 2020 and well after Ms. Nguyen left Raymond James, the BD cannot put their interests ahead of the customer's interests. The BD must assess and take into account the client's needs and objectives, time horizon, risk tolerance, and overall investment experience, just as they would under FINRA Rule 2090. In adopting Reg BI,

---

[6] FINRA Rule 2111.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

the SEC stated that Reg BI's "investment strategy involving securities"—a key phrase that FINRA Rule 2111 largely shares—included "account recommendations."[7]

Applying the standard in place today, under Reg BI, is not correct relative to the time frame Ms. Nguyen opened or maintained the subject Freedom Account at Raymond James.  In January 2016, when Ms. Nguyen opened the Freedom account, and throughout the time she had that account, the rule, standards, custom, and practice in the industry was not "best interest" as to a BD recommendation for opening a Freedom Account.  The standard, at most, was to follow FINRA Rule 2111 and apply a reasonable basis to the recommendation that a fee-based, managed account such as a Freedom Account was suitable.

### Overview of Pertinent Facts Pertaining to Plaintiff and Her Investment History

**A.  Plaintiff Was an Unsophisticated Investor When She Opened Her Freedom Account in January 2016 and She Suffered from "Analysis Paralysis"**

Ms. Nguyen had limited experience making investment decisions and had relied on her husband before his death.  During Mr. Seale's deposition, he testified that he did not believe Ms. Nguyen had the skillset to make investment decisions and she "never acted on [his] recommendations" with regard to rebalancing her accounts.[8]  She had "analysis paralysis" and "was overwhelmed with making those decisions".[9]

Ms. Nguyen testified during her deposition that she decided on a managed account for her 401k rollover (i.e., a Freedom Account) "because I didn't know how to have those funds invested myself."[10]  When asked further about the advantages of a managed account, she answered "that the investments would be picked for me."[11]

---

[7] 17 CFR Part 240, Rel. No. 34-86031, at p. 85 (June 5, 2019).

[8] Deposition of Dax Seale (May 6, 2021) ("Seale Depo."), p. 204:6-19, p. 199:2-18.

[9] Seale Depo., pp. 203:20-204:5.

[10] Deposition of Kimberly Nguyen (January 12, 2021) ("Nguyen Depo."), p. 104:1-2.

[11] Nguyen Depo., pp. 103:23-104:5.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

### B.  Plaintiff Has No Complaint with the Performance of the Securities in Her Freedom Account

In response to Raymond James's requests for admission, Ms. Nguyen admitted that she "ha[s] no complaints concerning the performance of assets in [her] Freedom Accounts."[12]

### C.  Plaintiff's Only Complaint is That—With Hindsight—She Wants to Pay Even Less than the Discounted Fees She Agreed to Pay Prior to Enjoying Substantial Market Gains

Ms. Nguyen was familiar with the fee structure of the January 2016 Freedom Account, because she had maintained and paid fees on two other managed accounts (one in the Freedom Program) before she opened the Freedom Account at issue.  Mr. Seale presented her with a discounted fee structure based on the level of Ms. Nguyen's assets.[13]  In her deposition, Ms. Nguyen acknowledged that she understood the annual asset-based fees and that she had initialed a form indicating she knew what they were.[14]

### Overview of Pertinent Facts Pertaining to Plaintiff's Financial Advisor Dax Seale

### A.  Mr. Seale Knew His Customer and Conducted a Robust Suitability Analysis for Plaintiff

Mr. Seale developed a long-term relationship with Ms. Nguyen lasting more than 12 years.  He understood her investing needs and objectives in order to make recommendations.  Ms. Nguyen opened her first managed account while at Edward Jones with Mr. Seale.  She opened her first Freedom Account (her second managed portfolio) following the recommendation of Mr. Seale when she transferred to Raymond James.[15]  At that same time, Ms. Nguyen also opened a brokerage account with securities at Raymond James.[16]

Mr. Seale collected additional client information each time Ms. Nguyen opened an account, which he relied on to make recommendations to her as the client, and that built on what he already knew

---

[12] Plaintiff's Amended Response to Defendant's Requests for Admission, 01/04/2021, Request for Admission No. 8, p. 8.

[13] Seale Depo., Exhibit 44.

[14] Nguyen Depo., pp. 67:19-69:3

[15] RJA_(NGUYEN)_006413-006421.

[16] RJA_(NGUYEN)_027668-027679.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

about her goals and intentions.  He also collected information as he worked with her throughout their relationship.  He created and presented an in-depth, detailed financial plan, titled "Kim's Financial Plan"[17] in December 2015.  This plan allowed Mr. Seale to summarize Ms. Nguyen's goals and current assets, including assets held outside of Raymond James that she disclosed to him.  It details current and recommended asset allocations and includes current and future income projections.

Having reviewed the detailed Financial Plan analysis, Mr. Seale recommended that Ms. Nguyen open a second Freedom Account in January 2016.  He recommended that she purchase securities in that account by using the proceeds from the sale of assets in her brokerage account.  Mr. Seale performed a suitability analysis prior to making this recommendation and collected the information for opening the account in the table below, which is part of the firm's records.[18]



---

[17] RJA_(NGUYEN)_010943.
[18] RJA_(NGUYEN)_003847.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

Mr. Seale also collected the Freedom Account suitability information, reflected in the table below, which was used for the review and approval of the Branch Manager and for later review as to the suitability of the strategy by the Compliance team at the Asset Management Service division ("AMS"):[19]

| Combined Annual Income | Combined Net Worth (Excluding Personal Residence(s)) | Investment Experience Provide your experience, if any, with the following investment types | | | | |
|---|---|---|---|---|---|---|
| | | | None | Limited | Moderate | Extensive |
| ○ $0-$19,999 | ○ $50,001-$100,000 | Equities | ○ | ☑ | ○ | ○ |
| ○ $20,000-$50,000 | ○ $100,001-$250,000 | Bonds | ○ | ☑ | ○ | ○ |
| ☑ $50,001-$100,000 | ○ $250,001-$500,000 | Options/Futures | ☑ | ○ | ○ | ○ |
| ○ $100,001-$200,000 | ○ $500,001-$1,000,000 | Mutual Funds | ○ | ☑ | ○ | ○ |
| ○ $200,000-$500,000 | ☑ $1,000,001-$5,000,000 | Annuities | ☑ | ○ | ○ | ○ |
| ○ $500,001-$1,000,000 | ○ Over $5,000,000 | Margin Trading | ☑ | ○ | ○ | ○ |
| ○ Over $1,000,000 | | | | | | |

| Primary Objective and Associated Risk Tolerance Select Only One Objective and Associated Risk Tolerance | | | Secondary Objective and Associated Risk Tolerance Select Only One Objective and Associated Risk Tolerance | | |
|---|---|---|---|---|---|
| Income | ○ Low | ○ Medium | ○ High | Income | ○ Low | ☑ Medium | ○ High |
| Growth | | ☑ Medium | ○ High | Growth | | ○ Medium | ○ High |

| Primary Time Horizon | | | Secondary Time Horizon | | |
|---|---|---|---|---|---|
| ○ < 3 years | ○ 3 - 5 years | ☑ > 5 years | ○ < 3 years | ○ 3 - 5 years | ☑ > 5 years |

As he testified during his deposition, Mr. Seale carried out a thorough analysis of the client's background and needs—and did that consistently for each individual client.

> We would look at their -- again, their financial situation. We would -- you know, what assets do they have, what assets -- or what types of -- what had they saved already, what might they want to save in the future, what their investment experience has been in the past or just knowledge of investments in general. What their risk tolerance is, their financial goals. So we would do that type of suitability analysis to -- to figure out if those accounts made sense.[20]

Further, when asked about whether he considered accounts, or investments in accounts for suitability, his response was:

---

[19] RJA_(NGUYEN)_003871.
[20] Seale Depo., p. 34:10-19, p. 233:3-20.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

> The type of accounts and then the objective of that account, the investments in that account as well.[21]

In determining suitability, Mr. Seale also testified that his business model takes a holistic approach to a client.[22]

Thus, Mr. Seale and Raymond James conducted a thorough, detailed suitability analysis by knowing Ms. Nguyen over a long period of time and collecting relevant information about her goals, objectives, and investment experience.

### B.  Mr. Seale's Recommendations Were Reasonable and He Put Plaintiff's Interests First

Without a specific rule in place requiring that he do so, Mr. Seale still put his client's interests first.

As outlined in the Raymond James written procedures (discussed below) and memorialized in the client information and profile documents made part of the account opening materials,[23] Mr. Seale gathered information about Ms. Nguyen, including her age, financial situation and needs, investment objectives, investment experience, liquidity needs, and risk tolerance.

Mr. Seale's recommendation that the Freedom Account and the Freedom Hybrid model were suitable for Ms. Nguyen had a reasonable basis.  The account model that was recommended to her met her objectives, risk tolerance, time horizon, diversification, and investment experience. The Freedom Account provided her with other features that were not available to her in a standard brokerage account.   The additional levels of portfolio management Ms. Nguyen received by selecting the Freedom Account included:

- Automatic annual rebalancing of the portfolio specific to the individual plan selected
- Asset Allocation
- Professional Fund Managers
- More diversification and reduce portfolio risk
- Access to different money managers at lower/institutional costs
- Active monitoring and management

---

[21] Seale Depo., p. 34:25-35:2.
[22] Seale Depo., p. 103:11-12.
[23] RJA_(NGUYEN)_003871-003875; 003846-003847.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

- Options to change management models with no additional costs
- Tax strategies employed by the fund managers to reduce short term tax consequences.[24]

During that time, and stated differently, the AMS division of Raymond James provided the services and benefits of the Freedom Portfolio.  Ms. Nguyen received the promised due diligence over the fund managers, performance that was benchmarked against indices, the benefits of the portfolio strategy she selected, and the services of the Investment Committee, which met regularly. This is shown in the minutes of the Investment Committee, in the relevant Form ADV Part 2A and the FA Guides, and in Chris Thurston's deposition.

Other Freedom Account features that she gained were:

> Strategy funds based on forward looking mutual fund research, and institutional investment theory, rather than solely on past performance.[25]

AMS/Freedom benefits were accomplished by the active management of the portfolio.

Mr. Seale stated that, "I felt like Freedom was a great fit for her."[26]  When he was asked about the Freedom services and benefits, he provided more reasons for his recommendation to her, and contrasted the Freedom Account to a self-managed brokerage account, stating the following about the latter:

> She wasn't getting professional money management.  She wasn't getting automatic rebalancing.  She wasn't getting the strategic rebalancing that happens in Freedom accounts.  She wasn't getting diversification across multiple fund families, both active and passive.[27]

Ms. Nguyen understood the objectives and features of the Freedom Portfolio, and when asked what she saw as the advantages, she responded, "that the investments would be picked for me."[28] Plaintiff wrote to Mr. Seale, as late as May 30, 2018, when she and Mr. Seale were discussing other account types by email, that she appreciated and understood the active management of

---

[24] Freedom Account / Financial Advisor Guide, RJA_(NGUYEN)_040415-040424.

[25] Freedom Account / Financial Advisor Guide, RJA_(NGUYEN)_040415.

[26] Seale Depo., p. 199:16-17.

[27] Seale Depo., p. 191:8-13.

[28] Nguyen Depo., pp. 103:23-104:5.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

*Freedom*, confirming that it was still a fit for her: "I was thinking that at one point in the future, when I didn't need as active a management, there would be a platform with less automated managed and, therefore lower fees."[29]  She confirmed this in her deposition, stating that "I thought as I got more education that I could do what my husband did," that is, manage the accounts on her own.[30]

Ms. Nguyen understood the concept of a managed portfolio and that type of account structure.  She was familiar with and authorized the fees charged on her accounts.  At different points in the relationship, she asked several questions about the fee structure, which indicates that she understood how the fees were applied.[31]

Later, in May 2016, Ms. Nguyen also opened yet another fee-based, managed account—her fourth account that she disclosed—at TD Ameritrade, just a few months after she opened the January 2016 Freedom Account at Raymond James.[32]  When she was questioned about why she chose her managed account with TD Ameritrade, Ms. Nguyen explained that she chose it for the same reason she chose her Freedom Account, "I didn't know how to pick the investments."[33]

By June of 2016, then, Ms. Nguyen had experience holding several managed portfolio accounts at three different firms (Edward Jones, Raymond James, and TD Ameritrade) and had authorized the transfer of assets to these accounts and accepted the fees associated with them.  Having had four such managed accounts, she is only complaining about the suitability of the recommendation for one of those accounts.  Additionally, she is only complaining about the fees paid, and not the benefits, services, and investment performance in that account.[34]

---

[29] Nguyen Depo., Ex. 17, at NGUYEN_0000209.

[30] Nguyen Depo., p. 152:18-21; 153:8.

[31] NGUYEN_0000082, NGUYEN_0000160, NGUYEN_0000208.

[32] Kimberly Nguyen Deposition Errata Sheet, Vol. 2.

[33] Nguyen Depo., p. 104:20-25.

[34] *See* Plaintiff's Amended Response to Defendant's Requests for Admission, 01/04/2021, Request for Admission No. 8, p. 8.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

Ms. Nguyen made the decision upon Mr. Seale's recommendation to open the January 2016
Freedom Account, and invest assets into that account, and agreed to the fee basis and admitted her
satisfaction with the account performance.

In the case of Ms. Nguyen, the Freedom Account allocations were suitable and in line with her
objectives, risk tolerance, and time horizon.  Similarly, the account structure recommendation was
suitable and in line with her risk tolerance, time horizon, and investment experience, and the
Financial Advisor assessed and documented this determination in the new account forms.

## C.  Mr. Seale and Raymond James Acted Appropriately Before and After the Opening of the Freedom Account, and Ms. Nguyen Received the Value for the Fees She Agreed to Pay

After Ms. Nguyen opened the Freedom Account, Mr. Seale communicated with her regularly by
phone and email as to her investment goals and her general investment profile.   These
communications are documented in the contact management notes ("CRM"),[35] and emails
between Ms. Nguyen and Mr. Seale.[36]  Mr. Seale also testified to the communications he had with
her by phone,[37] and Ms. Nguyen also testified to those communications.[38]

Those communications included annual account reviews, and would include suggested
rebalancing and updating suitability details for Ms. Nguyen.  One meeting included Mr. Seale
creating a unique, detailed Financial Plan specific to Ms. Nguyen in 2017,[39] similar to the one
created in December 2015.

The AMS division has in place a system for daily monitoring of allocations to assure adherence
with client objectives and risk tolerances.[40]

Further as part of the benefits of the Freedom Account, AMS also conducted regular, documented
Investment Committee meetings in which they made investment policy decisions regarding the

---

[35] RJA_(NGUYEN)_003637-003639.

[36] RJA_(NGUYEN)_000067, RJA_(NGUYEN)_000037, RJA_(NGUYEN)_023843, RJA_(NGUYEN)_023388.

[37] Seale Depo., p. 231:13-17.

[38] Nguyen Depo., p. 121:18-24, p. 130:17-25.

[39] RJA_(NGUYEN)_010879.

[40] Deposition of Chris Thurston ("Thurston Depo."), p. 154:17-23, p. 155:12-16; p. 155:24-156:3; p. 156:19-21; p. 158:11-159:4.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

Freedom Portfolio models, taking a more holistic view of the markets.[41] The AMS group also reviews the accounts shortly after they are opened to evaluate that they are in line with the client's stated objectives.[42]

### Raymond James's Policies and Procedures, and Raymond James's Supervisory Structure, Were and Are Consistent with the Industry Standards

FINRA Rule 3110 outlines the supervisory processes and systems that financial services firms must create and maintain.

All firms are required to establish and maintain a reasonable supervisory system and structure in order to comply with FINRA rules and applicable regulations.  In addition, Rule 3110 requires that a firm establish and maintain written procedures and have a system for internal inspections and transaction oversight.

Raymond James's written policies and procedures as to obtaining client suitability information, making recommendations, and supervision were consistent with industry rules, standards, custom, and practice at all relevant times when Ms. Nguyen maintained accounts with the firm.  Raymond James also maintained written policies and procedures outlining the supervisory structure, including Branch Manager supervision of Financial Advisor activities.

The policies also include approval of all new account applications by a registered principal of the firm, and that occurred for Ms. Nguyen's three accounts discussed above.  Raymond James also had policies in place designed to collect suitability analysis information at the time an account is opened documented in the new account forms for each of the client's accounts.  Ms. Nguyen even acknowledged during her deposition that suitability information was collected as part of opening her Freedom Account.[43]

The execution of these processes to collect and maintain suitability information comply with the books and records rules established by FINRA.

---

[41] Thurston Depo., pp. 156:24-157:7
[42] Thurston Depo., pp. 78:17-79:22; RJA_(NGUYEN)_059112 & RJA_(NGUYEN)_059113.
[43] Nguyen Depo., p. 207:12-16.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

The Branch Manager and the Compliance division have access to additional documentation, as well, including contact management (CRM) notes, emails, financial plans, and other materials that a particular financial advisor may have retained, and both the Branch Manager and Compliance have access directly to the financial advisors themselves.

Negative response verification letters are sent out to a client upon opening an account, and when updating basic account information, and on a regular 3-year cycle. These letters offer the client the opportunity to respond if the information is incorrect and needs to be changed or updated.  One such letter, dated February 10, 2016, was sent to Ms. Nguyen upon the opening of the Freedom Account at issue in this matter.[44]  There is no record of Ms. Nguyen responding with changes or corrections to any verifications she received from Raymond James.

The policies and procedures provide an outline of responsibilities for financial advisors regarding recommendations to clients and for which each financial advisor is subject to review and oversight by their Branch Manager.  The policies also outline the fiduciary responsibilities assumed by the firm in connection with advisory accounts such as Freedom.

The firm had written AMS Policies and Supervisory Procedures while Ms. Nguyen was a client. Raymond James maintained policies and procedures specific to investment advisory accounts.  The policies outline the applicable suitability requirements of a Financial Advisor.

> The primary responsibility for ensuring that investment management account products selected by the client are suitable for his or her financial situation lies with the client's advisor.  This initial determination is also reviewed and approved by a registered principal at the branch office.[45]

The Raymond James procedures related to collecting suitability information state:

> Financial Advisors should be diligent in their efforts to determine each client's specific investment needs, account types, goals, and objectives in adherence to the "Know Your Client" rule. Financial Advisors must also have a reasonable basis for recommending securities, transactions, investment strategies and explicit hold

---

[44] RJA_(NGUYEN)_009928-009929.

[45] AMS Policies and Supervisory Procedures, "Investment Management Account Initial Investment Objective Review," RJA_(NGUYEN)_010782-10783; *see also,* 010774-010775, 015121-015126.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

recommendations whether or not the recommendation results in a transaction with the firm.[46]

Raymond James also had procedures in place based on the Investment Advisers Act of 1940 and related rules.  These procedures included that Investment Advisor Representatives (IARs) "should periodically review advisory accounts to determine whether the account remains appropriate for a client,"[47] and that "Financial Advisors must be appropriately registered as [IARs] prior to engaging clients through investment advisory agreements."[48] Although plaintiff does not specifically invoke the '40 Act as a basis for her claims, relying instead on the concept of suitability, these Raymond James procedures were in line with industry rules, standards, custom, and practice.   These procedures were also reviewed and updated during the relevant period which is a best practice.

Mr. Seale's recommendations to Ms. Nguyen in connection with the January 2016 Freedom Account were based on a thorough suitability analysis and were in accord with the relevant procedures.

The Raymond James supervisory system is also structured to provide a formalized approval process covering internal communications, including sales materials and correspondence with clients.  Raymond James also provided summary materials for financial-advisor education on the products.  In addition to the Form ADV, Part 2A, Raymond James provided Financial Advisor Guides specific to the Freedom Account at issue in this matter.

While Ms. Nguyen was a client at Raymond James, the firm maintained a robust supervisory structure in line with industry standards.  Raymond James supervisory policies and procedures met and/or exceeded industry customs and practices in order to achieve reasonable supervision.

Raymond James at all relevant times had procedures in place requiring that the financial advisor make the determination that the investment advice provided to clients was suitable.  Although excerpted already above in part, a larger excerpt is warranted from the Raymond James procedures in place in January 2016:

---

[46] RJA_(NGUYEN)_019564.

[47] RJA_(NGUYEN)_019544-019545 (Investment Advisory Accounts)

[48] RJA_(NGUYEN)_019421-019422 (Advisory Accounts)

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

As a fiduciary on investment management accounts, Raymond James is obligated to make a determination that the investment advice it gives to clients is suitable, taking into consideration the client's financial situation, investment experience and investment objectives. As such, all managed accounts are subject to suitability requirements.

The primary responsibility for ensuring that investment management account products selected by the client are suitable for his or her financial situation lies with the client's financial advisor. This initial determination is also reviewed and approved by a registered principal at the branch office.

For newly established investment management accounts, AMS Compliance reviews the clients' investment objectives, time horizon, and risk tolerance and other client-provided financial profile information to verify consistency with the clients' selected investment strategy and/or manager's discipline.[49]

The policies and supervisory structure at Raymond James during the entire time Ms. Nguyen was a client met and/or exceeded industry standards with respect to review of account opening processes and the monitoring of suitability for Freedom Accounts.

## The Theory of Plaintiff's Individual and Class Claims is Fundamentally At Odds with Suitability Concepts

### A. Individual Suitability Analyses Must Be Performed for Each Raymond James Individual Client When Financial Advisors Make Recommendations

As discussed above, a suitability analysis for a particular client is completed at the time of a recommended transaction or initiating a strategy.  The standards, custom, and practice in the industry, following FINRA rules, requires that a financial advisor conduct a suitability analysis for each client, that evaluates the client's specific objectives, risk tolerance, experience, and needs. Raymond James' policies met and/or exceeded the regulatory rules and require an individualized evaluation to determine reasonable suitability.

---

[49] RJA_(NGUYEN)_010782-010783 (Investment Management Account Initial Investment Overview).

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

### B.  Plaintiff's Allegation That Raymond James Failed to Conduct Any Suitability Analysis in Regard to Her Freedom Account Is Belied by the Evidence

In the case of Ms. Nguyen, detailed financial plans were developed and provided to the client during the time she maintained her accounts at Raymond James, including one just a few weeks before Mr. Seale's recommendation of the Freedom Account at issue.  Raymond James again collected the necessary client profile information as part of the information collected on the standard forms for account opening.

During his deposition, Mr. Seale was asked a series of questions about whether he had completed a suitability analysis for Ms. Nguyen.  His responses follow:

Q.  Mr. Seale, have you read the second amended complaint?

A.  Yes.

Q.  Do you recall seeing an allegation that you did not do a suitability analysis for Ms. Nguyen?

A.  Yes.

Q.  Is that allegation true?

A.  No.

Q.  Did you, in fact, do a suitability analysis at Raymond James in connection with Ms. Nguyen's decision to open her IRA Freedom account in July 2015?

A.  Yes.

Q.  And did you also do a suitability analysis at Raymond James in connection with Ms. Nguyen's decision to open her second Freedom account in January 2016?

A.  Yes.[50]

---

[50] Seale Depo., p. 233:3-20.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

Mr. Seale knew his customer and evaluated the proposed investments for suitability at the time of the recommendation.

### C.  Supervising Principals at Broker-Dealer Branches Are Required to Confirm The Determination That a Product Is Suitable

Supervision review and oversight of the selection and opening of the Freedom account was done by the branch manager, Paul Elkjer, who signed the account opening documents on January 29, 2016.[51] The portion of the Freedom Agreement containing the client profile was included in the materials that Mr. Elkjer approved.[52]

The AMS Compliance division then reviewed the Freedom Account and associated information about Ms. Nguyen to compare the objectives, risk tolerance, and characteristics to assure that the model selected was in line with those characteristics.[53]

### D.  There Is No Single Definition of a "Buy And Hold" Investor and Hence Commonality Among Investors Cannot Be Established on That Basis Alone

Plaintiff has defined her investment strategy as "buy and hold," and states that her putative class is of those clients "who had minimal trading activity in their accounts (e.g., buy-and-hold investors)."[54]

None of the financial regulatory bodies (i.e., FINRA and SEC) have a specific definition of "Buy and Hold," in rule or practice.  The concept has many different interpretations in the industry and among investors.

Although it is generally seen as a long-term strategy, the length of time a security is held is entirely dependent on the purpose for the investment.  Each specific investor has a different set of circumstances and time horizons as they invest.  That is, investors with "minimal trading activity," can have that minimal trading activity—however you define that—for different reasons.  Standing alone, it is just one data point about an investor.  Similarly, if a client has a shorter or longer time

---

[51] RJA_(NGUYEN)_003850.

[52] Raymond James Freedom Account Client Information & Profile, RJA_(NGUYEN)_003871.

[53] RJA_(NGUYEN)_059112 & RJA_(NGUYEN)_059113.

[54] SAC, para 1.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

horizon, the way they define "Buy and Hold" generally differs considerably based on that time horizon.

It is nearly impossible to define the length of time that would be consistent from one investor to another.  The definition of a long period of time could be 3 to 5 years for some investors, while others might define long term as 10 years or longer.

When asked during her deposition about her definition, Ms. Nguyen provided no clarity.  She confirmed that everyone in the class is a "Buy and Hold" investor "like [her]."[55] While her complaint stated that "buy and hold" meant "customers who generate little or no trades," she testified that it meant someone who keeps a stable portfolio over time.[56]

What is the threshold for generating little or no trades, and would that necessarily indicate someone who had employed a similar strategy?  An account that generated little to no commission—due to "minimal trading activity"—could be the result of indecision, inattention, absence of the ability to conduct their financial affairs, illness or incapacity of the client, or other factors that would impact any investment strategy.  The financial advisor would need to inquire into that, and any review of a recommendation for suitability would need to understand that entire picture, and not simply stop at the number of trades in a brokerage account over a given period.  Accounts that are opened for specific purposes, or limited time horizons, such as trust and estate accounts, would not typically generate trading activity but would not be necessarily indicative of a "Buy and Hold" strategy, or, further, that a recommendation that a fee-based managed program like Freedom is suitable would not have a reasonable basis.  A client's holding period would be dependent on the purpose of the funds in the account and the time horizons associated with them.

When asked to clarify whether everyone who generates little or no trades is a "Buy and Hold" investor, at her deposition, Ms. Nguyen responded "I don't know."[57]  Ms. Nguyen was asked

---

[55] Nguyen Depo., pp. 201:22-202:2.
[56] Nguyen Depo., p. 202:3-24.
[57] Nguyen Depo., p. 203:1-4.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

"[Y]ou have no idea how to define a buy-and-hold investor for purposes of this lawsuit?" and she responded, "Correct."[58]

Ms. Nguyen provided different definitions based on her understanding of the terms at different times during and after her relationship with Raymond James.  She acknowledged that she did not have a clear definition of what represented a "Buy and Hold" investor.

### E.  Comparing the Level of Trading Activity in a Non-Managed, Commission-Based Account to the Level of Trading in a Managed, Discretionary Fee-Based Account Establishes Nothing in Regard to the Suitability of a Freedom Account

Determining whether a financial advisor, or the FA's firm has a reasonable basis for a recommendation that a fee-based managed account is suitable, requires an individualized assessment, including an assessment of the factors in FINRA Rule 2111.  One cannot make an assumption that because the source account had limited (however defined), or no trading activity, the recommendation to open a Freedom Account lacks a reasonable basis.  Customers or customer accounts generating little to no trades may be the result of numerous factors that would require individualized analysis.

To assume that everyone that might be in a class had similar objectives, risk tolerance, age, income status, and time horizons based solely on the coincidence that their accounts generated limited trades or commissions is not a good measure and ignores and omits the suitability components to be considered in FINRA Rule 2111.  Strategies undertaken by each client are individualized, depending on these and other factors.  That would require a significant analytical undertaking to review prior portfolio allocations, subsequent investments, the additions and subtractions of principal from an account, among other metrics.  It would require a conversation with each investor and each financial advisor.

In order to determine if other Freedom Account holders had similar situations, and to analyze this for every individual account holder in the putative class, an expert (and a jury) would have to perform thousands of individualized analyses on investors, in the period before the financial advisor recommended that the investor open a Freedom Account.  One would need to analyze

---

[58] Nguyen Depo., p. 211:l0-13.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

specific holding periods and the reasons for investment, and determine if the risk tolerance, objectives, time horizons, and investment experience provided a reasonable basis for the financial advisor's recommendation and if, in fact, the financial advisor gathered and referenced that material, or the information derived from it.

Additionally, a review of a financial advisor's recommendation of an investment product (including a fee-based, managed account) is not, in isolation sufficient to determine whether the *product* was suitable, although that can be part of it. It is also necessary to review whether the *recommendation* was supported by a reasonable basis, while also considering the other factors that complete the suitability analysis set for, e.g., in FINRA Rule 2111.  Looking only at the number of trades that were done in the brokerage account that funded the Freedom Account does not tell the reviewer (a jury, a judge, or an expert) much about the recommendation.

Suitability recommendations are made on a unique, case-by-case basis.  Using the term "Buy and Hold" investor (particularly as it has no single meaning under industry standard custom and practice) or even the broader (but still vague) "minimal trading activity" does not allow a short cut to the proper suitability evaluation.  Suitability evaluations must be done on a client-by-client basis.

### Plaintiff's Individual Claims Are Without Merit
### Because the Freedom Account Was Suitable for Plaintiff

For the reasons set forth above, Ms. Nguyen's individual claims lack merit because she has no complaint about the performance of the account, she understood and agreed to the fees, a suitability analysis was done at the time of the recommendation, and she made the decision to invest in the Freedom Account.  The Freedom Account model she chose matched her unique individual objectives, risk tolerance, investment experience, and time horizon and goals.

After Ms. Nguyen opened her second Freedom Account, Raymond James conducted itself, with respect to that account and Ms. Nguyen, appropriately and in accord with applicable rules, standards, custom, and practice in the industry.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

At all relevant times that she held this Freedom Account, it remained suitable and in line with her investment objectives, time horizon, risk tolerance, and other relevant considerations, for the reasons stated throughout this report.

### Plaintiff's Class Claims Are Without Merit Because Suitability Analyses Necessarily Require Individualized Client-By-Client Determinations Made by Thousands of Financial Advisors

Suitability analyses are conducted individually and must be done for each client and cannot be made on a wholesale basis.  Each client has unique investing characteristics, and there is no standard definition of a "typical" investor.  Each client's objectives, risk tolerance, age, net worth, annual income, investment experience, time horizons, and personal goals differ.  Account ownership differs, depending on whether they are individual, joint, held in trust or other beneficial forms of ownership, and accounts vary as well based on whether are taxable, retirement, or other types.

Ms. Nguyen's specific circumstances, age, assets, income level, objectives, and time horizons differentiate her from other members of this purported class, but perhaps nothing makes her more different than her having had multiple fee-based, managed accounts, and only complaining about one of them.  Her financial circumstances are individual and unique.

Ms. Nguyen understood the concept of a managed portfolio, made the deliberate decision to invest in the Freedom Program, and acknowledged and accepted the fee structure.

Suitability analyses are done by individual financial advisors and are based significantly on their specific knowledge of their clients and some relationships having developed over long periods of time.   Each financial-advisor-to-client relationship differs in the level and methods of communications.

There can be multiple differences from one Freedom Account holder to another with respect to how long such investors had been clients in traditional commission-based accounts, and the reasons why.

An analysis of any of the above distinctions between customers would require the review of thousands of accounts and client profiles both before and after the investment in the Freedom

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

Account to determine similar holdings, time frames, and the asset allocations in both the commission accounts as well as the Freedom Portfolio.  The Freedom Portfolios offer different investment styles with varying objectives requiring each Freedom Account and its client to be evaluated individually.

Ultimately, investments and recommendations are dependent on each client's personal circumstances and willingness to take risk.

## Conclusions

Having considered all of the evidence contained in the documents, depositions, and data sources I have reviewed, in addition to the 10 specific opinions on page 3-4 above, it is my further opinion that:

1. Mr. Seale and Raymond James conducted a proper, thorough, and appropriate suitability analysis with respect to the Freedom Account at issue at the time of the recommendation, and complied with all applicable rules, regulations, and industry standards.

2. Ms. Nguyen authorized the investment in the Freedom Account understood the advantages, and costs, and she benefited from those services not available to her in a commission-based account.

3. Throughout the period that she held the Freedom Account at issue, Ms. Nguyen received individualized, ongoing, suitable advice that was developed for her unique, personal investment characteristics that differed from other investors.  While she maintained her Freedom Account, Mr. Seale conducted appropriate suitability reviews.

4. After Ms. Nguyen opened her second Freedom Account, Raymond James conducted itself, with respect to that account and Ms. Nguyen, appropriately and in accord with applicable rules, standards, custom, and practice in the industry.

5. At all relevant times that Ms. Nguyen held the Freedom Account, it remained suitable and in line with her investment objectives, time horizon, risk tolerance, and other relevant considerations.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

6. The industry standard for suitability requires a reasonable basis for recommendations of investments and strategies, and Raymond James and its financial advisors documented and carried out that analysis for all clients.

7. Raymond James had robust Supervisory Policies and Procedures, and an appropriate supervision structure, to ensure suitability analyses were done for each client in compliance with regulatory requirements, and industry standards, custom, and practice.

8. The investing characteristics, financial circumstances, and holding periods for each client are unique and making reasonable recommendations as to suitability is dependent on the facts specific to that client.

9. Based on the numerous individual characteristics of each individual investor and the requirement to evaluate each client's suitability on a case-by-case basis, this case is not appropriate for class treatment.

**Submission**

I reserve the right to change or amend this report on the basis of new evidence or additional discovery received, and to supplement my opinions based upon such discovery or additional information. Respectfully submitted on the date above.

Joseph J. Thomas
Director
Bates Group, LLC
Lake Oswego, OR 97035

EXHIBIT A



## Joseph J. Thomas, Director
## St. Louis, MO

Main:   (503) 670-7772
Fax:     (503) 670-0997
Email:   jthomas@batesgroup.com

**BIOGRAPHY**

Joseph Thomas is a Director with Bates Group, working out of St. Louis, MO.  Mr. Thomas has thirty years of securities industry compliance, supervision, operations and administration experience. He has an educational background in quantitative management, and work experience leading teams of associates, implementing process and workflow changes, and developing supervisory systems and policies.  In addition, Mr. Thomas has provided quantitative and substantive witness testimony and opinions in over 100 retail securities litigation, arbitration, and court matters.

While with Wells Fargo/Wachovia Securities/A.G. Edwards & Sons, as Vice President and Finance Manager/Litigation Auditor, Mr. Thomas was responsible for coordinating and supervising the preparation of financial and damages analysis reports.  He was also responsible for consulting and providing opinions on trading patterns, investment product and market risk analysis, investment cost analysis and case assessment related to securities litigation.  In addition, Mr. Thomas provided expert testimony during legal proceedings as to the validity of the financial data and substantive matters including compliance procedures and supervision. Mr. Thomas also served on the Wells Fargo Advisors Information Governance Board, Information Strategy Initiative Committee, Business Continuity Council, and Service Break Committee, Firm Incentive Award Advisory Committee and was a member of the Senior Leadership Council.

Prior to Wells Fargo, Mr. Thomas was with Edward Jones Investments for 17 years. In his role as Area Team Leader, his responsibilities included coordinating the sales and compliance supervision of approximately 780 Investment Representatives in the Southeastern United States, supervising a staff of Field Supervision Directors and providing oversight and development. Mr. Thomas coordinated branch compliance audits, developed and delivered educational training to the department as well as regional Investment Representative Meetings.  He also served as firm representative in arbitration hearings and provided testimony regarding suitability, supervision systems, and performance analysis. Mr. Thomas also participated in Sales Practice Examinations with the NASD and NYSE on a regular basis.

While with Edward Jones, Mr. Thomas spent six years in a Field Supervision Director role where his responsibilities included daily oversight and supervision of 130 Investment Representatives as registered Branch Manager. He reviewed all daily trading activity, provided guidance and instructions directly to the Investment Representatives, and delivered education advice, and compliance presentations at regional meetings.  Mr. Thomas conducted annual compliance audits and oversight of all functions of the branch office.  During this time, he was also involved in the development of supervisory systems as well as an automated new account system.



## EXPERIENCE

**Wells Fargo/Wachovia Securities/A.G. Edwards & Sons**, 2005-2011

*Finance Manager/Litigation Auditor, Vice President, Legal Division* (2009-2011)

*Litigation Auditor, Operations Manager, Vice President, Law Department* (2005-2009)

**Edward Jones Investments**, 1988-2005

*Area Team Leader, Limited Partner* – Field Supervision (2000-2005)

*Field Supervision Director, Limited Partner* (1994-2000)

*Operations Specialist – Product Master File* (1992-1994)

*Cash Operations Relationship Associate* – Branch Cash Receipts (1989-1991)

*Loan Servicing Specialist* – Edward D. Jones Mortgage Operations (1988-1989)


## EDUCATION

**University of Missouri, St. Louis,** *B.S. Business Administration: Management Science/Quantitative Management*


## PROFESSIONAL DESIGNATIONS

Series 7, General Securities Representative

Series 8, General Securities Sales Supervisor

Series 24, Securities Principal

Series 63, State Securities License

Life and Health Insurance License, State of Missouri

Member National Society of Compliance Professionals

Member Securities Industry and Financial Markets Association Compliance and Legal Society

Member Securities Industry and Financial Markets Association Senior Investors Working Group

Member, National Adult Protective Services Association

National Adult Protective Services Association Public Policy Committee


## SPEAKING ENGAGEMENTS

Panelist, FSI One Voice Conference, Aging Clients and Advisors, 2016
Panelist, SIFMA Senior Investors Workshop, Phoenix, AZ, May 2018
Panelist, SIFMA Senior Investors Workshop, Minneapolis, MN, April 2019



Panelist, Bates Group - CLE, Addressing Senior and Vulnerable Investor Protection and Potential Litigation Claims in the Covid-19 World, May 2020

Panelist, Bates Group - CLE, Regulatory and Litigation Issues in a Post Covid-19 World: A Look into the Crystal Ball, May 2020

Panelist, American Bar Association – CLE, Exploitation of Senior and Vulnerable Investors in the Covid-19 Era and Regulatory Responses, November 2020

# EXHIBIT B



## Joseph J Thomas

Main:    503.670.7772
Email:   JThomas@batesgroup.com

**TRIAL, ARBITRATION, MEDIATION, EXPERT REPORT AND DEPOSITION HISTORY**

*Testimony, Deposition*

1.  BBVA Oriental v. Pedro Boj, Hearing site San Juan, PR. FINRA Arbitration 12-02910 (May 2017)

2.  Michael Darius and Miriam Darius v Merrill Lynch, Pierce, Fenner, & Smith, Incorporated. Hearing site: Charleston WV. FINRA Arbitration Case No. 16-00333 (June 2017)

3.  Timothy Slater v Sheila Slater, Deposition, St. Louis, MO. Case No. 15-D-869 (September 2017)

4.  James M. Linick, individually and as Trustee for the James M. Linick Trust U/A DTD 12/16/2015.  Hearing site: Tampa, FL. FINRA Arbitration 16-02747 (October 2017)

5.  Dennis W. Meyers v Wells Fargo Advisors Financial Network, LLC.  Hearing site: Minneapolis MN. FINRA Arbitration No. 17-00852 (January 2018)

6.  Jodene Susan Carr v Bradley Robert Carr, Deposition, St. Louis, MO. Case No. 16SL-DR06059 (May 2018)

7.  James J. Johnson, v LPL Financial, LLC and Wells Fargo Advisors/Wells Fargo Clearing Services, LLC.  Hearing site: Chicago IL. FINRA Arbitration No. 17-00615 (July/September 2018)

8.  Joan Gara v Merrill Lynch, Pierce, Fenner & Smith Incorporated and UBS Financial Services, Inc. FINRA Arbitration No. 17-01152 (September 2018)

9.  Thomas Ionta, IRA, v Mid Atlantic Capital Corporation.  Hearing Site:  Los Angeles, CA. FINRA Arbitration No. 17-00606 (October 2018)

10. Kenneth J. Crawford v Jeanne P. Crawford, Deposition, St. Louis, MO. Case No. 17SL-DR04585 (November 2018)

11. Kathy Engberg vs. Richard D. Dunagan and Wells Fargo Advisors, LLC, Houston, TX. FINRA Arbitration No. 17-02604 (January 2019)

12. Robert F. Hayden IV, Individually and as Personal Representative of the Estate of Mary Ellen Hayden v. Wells Fargo Securities, LLC, Wells Fargo Clearing Services, et al., Boston, MA. FINRA Arbitration No. 17-00799 (April 2019)



13. Melrose Endolyn Whittaker v. Merrill Lynch, Pierce, Fenner & Smith, Boca Raton, FL. FINRA Arbitration No. 18-02840 (July 2019)

14. Sandra C. Alford v. National Planning Corporation, St. Louis, MO. FINRA Arbitration No. 17-02420 (November 2019)

15. Shahida Arunima Hossain v. Wells Fargo Advisors, LLC. Chicago, IL. FINRA Arbitration No. 17-00463 (December 2019)

16. Sara E. Kotthoff v. Ralph C. Kotthoff, St Louis County, MO Circuit Court. Case Number 13SL-DR02377 (October 2020)

17. Elizabeth Old vs. Merrill Lynch, Pierce Fenner & Smith Inc. and Thomas Mccafferty, Expungement Hearing. FINRA Arbitration No. 19-01000 (November 2020)

18. Michael P. Bredenberg v. ReDefine Wealth Management, LLC, A Delaware Corporation; John Nuttall, An Individual; and Jason Inglis, An Individual. AAA (American Arbitration Association) Case No. 01-20-0003-5036. Video Testimony (February 2021)

19. Frank Lestarchick v. Wells Fargo Clearing Services, LLC, Alfonso Allen Gialanella, et al. FINRA Arbitration No. 19-02695. Video Testimony (April 2021)

# EXHIBIT C

CONFIDENTIAL

| *Nguyen v. Raymond James & Associates, Inc.* **Facts and Data Considered** | | |
|---|---|---|
| | | |
| **Begin Bates** | **End Bates** | **Other Description** |
| **Account Opening Documents** | | |
| RJA_(NGUYEN)_006466 | RJA_(NGUYEN)_006485 | |
| RJA_(NGUYEN)_003898 | RJA_(NGUYEN)_003903 | |
| RJA_(NGUYEN)_000001 | RJA_(NGUYEN)_000043 | |
| RJA_(NGUYEN)_027668 | RJA_(NGUYEN)_027679 | |
| RJA_(NGUYEN)_006413 | RJA_(NGUYEN)_006421 | |
| RJA_(NGUYEN)_009928 | RJA_(NGUYEN)_009939 | |
| RJA_(NGUYEN)_003846 | RJA_(NGUYEN)_003897 | |
| RJA_(NGUYEN)_007414 | RJA_(NGUYEN)_007429 | |
| RJA_(NGUYEN)_006302 | RJA_(NGUYEN)_006411 | |
| RJA_(NGUYEN)_001235 | RJA_(NGUYEN)_001271 | |
| RJA_(NGUYEN)_007348 | RJA_(NGUYEN)_007406 | |
| RJA_(NGUYEN)_008474 | RJA_(NGUYEN)_008530 | |
| RJA_(NGUYEN)_010182 | RJA_(NGUYEN)_010241 | |
| **Plaintiff-Specific Correspondence and Documentation** | | |
| NGUYEN_0000037 | | |
| NGUYEN_0000048 | | |
| NGUYEN_0000078 | | |
| NGUYEN_0000082 | | |
| NGUYEN_0000137 | | |
| NGUYEN_0000143 | | |
| NGUYEN_0000146 | | |
| NGUYEN_0000160 | | |
| NGUYEN_0000202 | | |
| NGUYEN_0000207 | | |
| NGUYEN_0000208 | | |
| NGUYEN_0000209 | | |
| NGUYEN_0000211 | | |
| NGUYEN_0000214 | | |

| | | |
|---|---|---|
| NGUYEN_0000217 | | |
| NGUYEN_0000311 | | |
| RJA_(NGUYEN)_003637 | | |
| RJA_(NGUYEN)_003846 | | |
| RJA_(NGUYEN)_003898 | | |
| RJA_(NGUYEN)_004018 | | |
| RJA_(NGUYEN)_004060 | | |
| RJA_(NGUYEN)_006233 | | |
| RJA_(NGUYEN)_006235 | | |
| RJA_(NGUYEN)_006302 | | |
| RJA_(NGUYEN)_006466 | | |
| RJA_(NGUYEN)_010833 | | |
| RJA_(NGUYEN)_010879 | | |
| RJA_(NGUYEN)_010943 | | |
| RJA_(NGUYEN)_011825 | | |
| RJA_(NGUYEN)_011826 | | |
| RJA_(NGUYEN)_011830 | | |
| RJA_(NGUYEN)_011832 | | |
| RJA_(NGUYEN)_011836 | | |
| RJA_(NGUYEN)_012250 | | |
| RJA_(NGUYEN)_012255 | | |
| RJA_(NGUYEN)_012581 | | |
| RJA_(NGUYEN)_012886 | | |
| RJA_(NGUYEN)_012919 | | |
| RJA_(NGUYEN)_012924 | | |
| RJA_(NGUYEN)_012928 | | |
| RJA_(NGUYEN)_012932 | | |
| RJA_(NGUYEN)_012936 | | |
| RJA_(NGUYEN)_012938 | | |
| RJA_(NGUYEN)_012940 | | |
| RJA_(NGUYEN)_012944 | | |
| RJA_(NGUYEN)_012947 | | |
| RJA_(NGUYEN)_012951 | | |
| RJA_(NGUYEN)_012953 | | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_012955 | | |
| RJA_(NGUYEN)_012956 | | |
| RJA_(NGUYEN)_012958 | | |
| RJA_(NGUYEN)_012994 | | |
| RJA_(NGUYEN)_013024 | | |
| RJA_(NGUYEN)_013027 | | |
| RJA_(NGUYEN)_013112 | | |
| RJA_(NGUYEN)_013214 | | |
| RJA_(NGUYEN)_013217 | | |
| RJA_(NGUYEN)_013366 | | |
| RJA_(NGUYEN)_013476 | | |
| RJA_(NGUYEN)_013672 | | |
| RJA_(NGUYEN)_013787 | | |
| RJA_(NGUYEN)_013809 | | |
| RJA_(NGUYEN)_013827 | | |
| RJA_(NGUYEN)_013959 | | |
| RJA_(NGUYEN)_014062 | | |
| RJA_(NGUYEN)_014074 | | |
| RJA_(NGUYEN)_014256 | | |
| RJA_(NGUYEN)_014917 | | |
| RJA_(NGUYEN)_015059 | | |
| RJA_(NGUYEN)_015068 | | |
| RJA_(NGUYEN)_015069 | | |
| RJA_(NGUYEN)_015070 | | |
| RJA_(NGUYEN)_015072 | | |
| RJA_(NGUYEN)_015079 | | |
| RJA_(NGUYEN)_015082 | | |
| RJA_(NGUYEN)_015088 | | |
| RJA_(NGUYEN)_015093 | | |
| RJA_(NGUYEN)_015094 | | |
| RJA_(NGUYEN)_015129 | | |
| RJA_(NGUYEN)_015131 | | |
| RJA_(NGUYEN)_019848 | | |
| RJA_(NGUYEN)_020169 | | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_021374 | | |
| RJA_(NGUYEN)_022998 | | |
| RJA_(NGUYEN)_023025 | | |
| RJA_(NGUYEN)_023388 | | |
| RJA_(NGUYEN)_023842 | | |
| RJA_(NGUYEN)_023907 | | |
| RJA_(NGUYEN)_059112 | | |
| RJA_(NGUYEN)_059113 | | |
| RJA_(NGUYEN)_014055 | RJA_(NGUYEN)_014056 | |
| RJA_(NGUYEN)_014062 | RJA_(NGUYEN)_014064 | |
| RJA_(NGUYEN)_012581 | RJA_(NGUYEN)_012582 | |
| RJA_(NGUYEN)_013366 | RJA_(NGUYEN)_013367 | |
| RJA_(NGUYEN)_020169 | RJA_(NGUYEN)_020169 | |
| **Compensation & Commissions** | | |
| RJA_(NGUYEN)_041526 | RJA_(NGUYEN)_041526 | |
| RJA_(NGUYEN)_041527 | RJA_(NGUYEN)_041531 | |
| RJA_(NGUYEN)_041532 | RJA_(NGUYEN)_041534 | |
| RJA_(NGUYEN)_041535 | RJA_(NGUYEN)_041536 | |
| RJA_(NGUYEN)_041537 | RJA_(NGUYEN)_041538 | |
| RJA_(NGUYEN)_041539 | RJA_(NGUYEN)_041540 | |
| RJA_(NGUYEN)_041541 | RJA_(NGUYEN)_041542 | |
| RJA_(NGUYEN)_041543 | RJA_(NGUYEN)_041544 | |
| RJA_(NGUYEN)_041545 | RJA_(NGUYEN)_041546 | |
| RJA_(NGUYEN)_041547 | RJA_(NGUYEN)_041547 | |
| RJA_(NGUYEN)_041548 | RJA_(NGUYEN)_041549 | |
| RJA_(NGUYEN)_041550 | RJA_(NGUYEN)_041551 | |
| RJA_(NGUYEN)_041552 | RJA_(NGUYEN)_04153 | |
| RJA_(NGUYEN)_041554 | RJA_(NGUYEN)_041555 | |
| RJA_(NGUYEN)_041556 | RJA_(NGUYEN)_041557 | |
| RJA_(NGUYEN)_041558 | RJA_(NGUYEN)_041559 | |
| RJA_(NGUYEN)_041526 | RJA_(NGUYEN)_041526 | |
| RJA_(NGUYEN)_041527 | RJA_(NGUYEN)_041531 | |
| RJA_(NGUYEN)_041532 | RJA_(NGUYEN)_041534 | |
| RJA_(NGUYEN)_041535 | RJA_(NGUYEN)_041536 | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_041537 | RJA_(NGUYEN)_041538 | |
| RJA_(NGUYEN)_041539 | RJA_(NGUYEN)_041540 | |
| RJA_(NGUYEN)_041541 | RJA_(NGUYEN)_041542 | |
| RJA_(NGUYEN)_041543 | RJA_(NGUYEN)_041544 | |
| RJA_(NGUYEN)_041545 | RJA_(NGUYEN)_041546 | |
| RJA_(NGUYEN)_041547 | RJA_(NGUYEN)_041547 | |
| RJA_(NGUYEN)_041548 | RJA_(NGUYEN)_041549 | |
| RJA_(NGUYEN)_041550 | RJA_(NGUYEN)_041551 | |
| RJA_(NGUYEN)_041552 | RJA_(NGUYEN)_041553 | |
| RJA_(NGUYEN)_041554 | RJA_(NGUYEN)_041555 | |
| RJA_(NGUYEN)_041556 | RJA_(NGUYEN)_041557 | |
| RJA_(NGUYEN)_041558 | RJA_(NGUYEN)_041559 | |
| RJA_(NGUYEN)_059100 | RJA_(NGUYEN)_059101 | |
| RJA_(NGUYEN)_059102 | RJA_(NGUYEN)_059103 | |
| RJA_(NGUYEN)_059104 | RJA_(NGUYEN)_059105 | |
| RJA_(NGUYEN)_059106 | RJA_(NGUYEN)_059107 | |
| **Compliance and Supervisory Manual Sections** | | |
| RJA_(NGUYEN)_019490 | RJA_(NGUYEN)_019491 | Actively Traded Accounts 2014.07.07 to 2016.01.12 |
| RJA_(NGUYEN)_019419 | RJA_(NGUYEN)_019420 | Actively Traded Accounts 2014.07.07 |
| RJA_(NGUYEN)_019492 | RJA_(NGUYEN)_019493 | Actively Traded Accounts 2016.01.12 to Still Active |
| RJA_(NGUYEN)_019664 | RJA_(NGUYEN)_019665 | Actively Traded Accounts 2016.01.12 |
| RJA_(NGUYEN)_019423 | RJA_(NGUYEN)_019424 | Advisory Accounts 2015.09.03 to 2015.12.22 |
| RJA_(NGUYEN)_019494 | RJA_(NGUYEN)_019495 | Advisory Accounts 2015.12.22 to 2016.11.23 |
| RJA_(NGUYEN)_019496 | RJA_(NGUYEN)_019497 | Advisory Accounts 2016.11.23 to 2016.12.30 |
| RJA_(NGUYEN)_019498 | RJA_(NGUYEN)_019499 | Advisory Accounts 2016.12.30 to 2017.03.27 |
| RJA_(NGUYEN)_019577 | RJA_(NGUYEN)_019578 | Advisory Accounts 2017.03.27 to 2018.07.23 |
| RJA_(NGUYEN)_019421 | RJA_(NGUYEN)_019422 | Advisory Accounts Updated 2014.12.01 |
| RJA_(NGUYEN)_019425 | RJA_(NGUYEN)_019426 | Advisory Accounts Updated 2015.12.22 |
| RJA_(NGUYEN)_019500 | RJA_(NGUYEN)_019501 | Annual Compliance Meeting 2014.07.07 to 2016.01.12 |
| RJA_(NGUYEN)_019427 | RJA_(NGUYEN)_019428 | Annual Compliance Meeting 2014.07.07 |
| RJA_(NGUYEN)_019502 | RJA_(NGUYEN)_019503 | Annual Compliance Meeting 2016.01.12 to 2017.04.17 |
| RJA_(NGUYEN)_019668 | RJA_(NGUYEN)_019669 | Annual Compliance Meeting 2017.04.17 |
| RJA_(NGUYEN)_019504 | RJA_(NGUYEN)_019506 | Client Complaints 2014.02.20 to 2017.06.09 |
| RJA_(NGUYEN)_019428 | RJA_(NGUYEN)_019429 | Client Complaints 2014.02.20 |

| | | |
|---|---|---|
| RJA_(NGUYEN)_019670 | RJA_(NGUYEN)_019671 | Client Complaints 2017.06.09 |
| RJA_(NGUYEN)_019430 | RJA_(NGUYEN)_019431 | Compliance Audits and Examinations 2014.08.29 |
| RJA_(NGUYEN)_019507 | RJA_(NGUYEN)_019508 | Compliance Audits and Examinations 2015.10.19 to 2017.05.08 |
| RJA_(NGUYEN)_019432 | RJA_(NGUYEN)_019433 | Compliance Audits and Examinations 2015.10.19 |
| RJA_(NGUYEN)_019590 | RJA_(NGUYEN)_019591 | Compliance Audits and Examinations 2017.05.08 |
| RJA_(NGUYEN)_019485 | RJA_(NGUYEN)_019486 | Compliance Memo 16-01 FA Sales Practice Review 2016.02.08 |
| RJA_(NGUYEN)_019487 | RJA_(NGUYEN)_019487 | Compliance Memo 16-04 Advisory Trading Inactivity - Supervisory Workstation Periodic Alert 2016.04.04 |
| RJA_(NGUYEN)_019488 | RJA_(NGUYEN)_019489 | Compliance Memo 16-10 Policy Update - Inactive Advisory Accounts 2016.12.07 |
| RJA_(NGUYEN)_019509 | RJA_(NGUYEN)_019510 | Continuing Education - Firm Element 2013.11.20 to 2016.01.12 |
| RJA_(NGUYEN)_019434 | RJA_(NGUYEN)_019434 | Continuing Education - Firm Element 2013.11.20 |
| RJA_(NGUYEN)_019511 | RJA_(NGUYEN)_019512 | Continuing Education - Firm Element 2016.01.12 to 2017.03.15 |
| RJA_(NGUYEN)_019672 | RJA_(NGUYEN)_019673 | Continuing Education - Firm Element 2017.03.15 |
| RJA_(NGUYEN)_019435 | RJA_(NGUYEN)_019435 | Continuing Education - Regulatory Element 2014.04.14 |
| RJA_(NGUYEN)_019513 | RJA_(NGUYEN)_019514 | Continuing Education - Regulatory Element 2015.10.16 to 2016.02.01 |
| RJA_(NGUYEN)_019436 | RJA_(NGUYEN)_019436 | Continuing Education - Regulatory Element 2015.10.16 |
| RJA_(NGUYEN)_019515 | RJA_(NGUYEN)_019516 | Continuing Education - Regulatory Element 2016.02.01 to 2016.12.27 |
| RJA_(NGUYEN)_019517 | RJA_(NGUYEN)_019518 | Continuing Education - Regulatory Element 2016.12.27 to 2016.12.27 |
| RJA_(NGUYEN)_019519 | RJA_(NGUYEN)_019520 | Continuing Education - Regulatory Element 2016.12.27 to 2017.02.17 |
| RJA_(NGUYEN)_019598 | RJA_(NGUYEN)_019599 | Continuing Education - Regulatory Element 2017.02.17 to 2017.02.17 |
| RJA_(NGUYEN)_019602 | RJA_(NGUYEN)_019603 | Continuing Education - Regulatory Element 2017.02.17 |
| RJA_(NGUYEN)_019437 | RJA_(NGUYEN)_019438 | Customer Specific Suitability Analysis 2013.10.09 |
| RJA_(NGUYEN)_019439 | RJA_(NGUYEN)_019440 | Customer Specific Suitability Analysis 2015.07.17 |
| RJA_(NGUYEN)_019441 | RJA_(NGUYEN)_019441 | Ethics - Corporate Annual Certification 2014.05.20 |

| | | |
|---|---|---|
| RJA_(NGUYEN)_019521 | RJA_(NGUYEN)_019522 | Ethics - Corporate Annual Certification 2015.07.13 to 2016.08.10 |
| RJA_(NGUYEN)_019442 | RJA_(NGUYEN)_019442 | Ethics - Corporate Annual Certification 2015.07.13 |
| RJA_(NGUYEN)_019523 | RJA_(NGUYEN)_019524 | Ethics - Corporate Annual Certification 2016.08.10 |
| RJA_(NGUYEN)_019604 | RJA_(NGUYEN)_019605 | Ethics - Corporate Annual Certification 2016.08.16 |
| RJA_(NGUYEN)_019443 | RJA_(NGUYEN)_019443 | Fee-Based Accounts - Investment Adviser Representative Registrations 2014.10.17 |
| RJA_(NGUYEN)_019525 | RJA_(NGUYEN)_019526 | Fee-Based Accounts - Investment Adviser Representative Registrations 2015.09.11 to 2016.11.23 |
| RJA_(NGUYEN)_019444 | RJA_(NGUYEN)_019444 | Fee-Based Accounts - Investment Adviser Representative Registrations 2015.09.11 |
| RJA_(NGUYEN)_019527 | RJA_(NGUYEN)_019528 | Fee-Based Accounts - Investment Adviser Representative Registrations 2016.11.23 to 2017.03.27 |
| RJA_(NGUYEN)_019678 | RJA_(NGUYEN)_019679 | Fee-Based Accounts - Investment Adviser Representative Registrations 2017.03.27 |
| RJA_(NGUYEN)_019449 | RJA_(NGUYEN)_019452 | Generally Prohibited Practices 2014.02.12 to 2015.06.02 |
| RJA_(NGUYEN)_019445 | RJA_(NGUYEN)_019448 | Generally Prohibited Practices 2014.02.12 |
| RJA_(NGUYEN)_019453 | RJA_(NGUYEN)_019456 | Generally Prohibited Practices 2015.06.02 |
| RJA_(NGUYEN)_019529 | RJA_(NGUYEN)_019532 | Generally Prohibited Practices 2016.03.16 to 2016.08.03 |
| RJA_(NGUYEN)_019533 | RJA_(NGUYEN)_019536 | Generally Prohibited Practices 2016.08.03 to 2018.02.20 |
| RJA_(NGUYEN)_019457 | RJA_(NGUYEN)_019457 | Home Office (32A-36G) Finanical Advisor Supervision 2013.10.03 |
| RJA_(NGUYEN)_019539 | RJA_(NGUYEN)_019540 | Home Office Non Branch Producer Supervision 2016.05.25 to 2016.08.05 |
| RJA_(NGUYEN)_019541 | RJA_(NGUYEN)_019542 | Home Office Non Branch Producer Supervision 2016.08.05 |
| RJA_(NGUYEN)_019537 | RJA_(NGUYEN)_019538 | Home Office Non Brnch Producer Supervsion 2015.05.19 to 2016.05.25 |
| RJA_(NGUYEN)_019543 | RJA_(NGUYEN)_019543 | Intro to RJ&A Policy and Supervision Procedures - Introduction 2016.06.30 |
| RJA_(NGUYEN)_019544 | RJA_(NGUYEN)_019545 | Investment Advisory Accounts 2016.10.11 to 2017.03.27 |
| RJA_(NGUYEN)_019618 | RJA_(NGUYEN)_019619 | Investment Advisory Accounts 2017.03.27 to 2017.06.15 |
| RJA_(NGUYEN)_019620 | RJA_(NGUYEN)_019622 | Investment Advisory Accounts 2017.06.15 to 2017.06.16 |
| RJA_(NGUYEN)_019623 | RJA_(NGUYEN)_019625 | Investment Advisory Accounts 2017.06.16 to 2018.03.28 |
| RJA_(NGUYEN)_019686 | RJA_(NGUYEN)_019688 | Investment Advisory Accounts 2017.06.16 to Still Active |

| | | |
|---|---|---|
| RJA_(NGUYEN)_015127 | RJA_(NGUYEN)_015128 | Investment Management Account Initial Investment Objective Review 2015.07.13 to 2016.06.30 |
| RJA_(NGUYEN)_015125 | RJA_(NGUYEN)_015126 | Investment Objective Review - Managed Accounts 2016.06.30 to 2016.08.11 |
| RJA_(NGUYEN)_015123 | RJA_(NGUYEN)_015124 | Investment Objective Review - Managed Accounts 2016.08.11 to 2017.06.06 |
| RJA_(NGUYEN)_015121 | RJA_(NGUYEN)_015122 | Investment Objective Review - Managed Accounts 2017.06.06 to 2018.01.05 |
| RJA_(NGUYEN)_015119 | RJA_(NGUYEN)_015120 | Investment Objective Review - Managed Accounts 2018.01.05 to 2018.01.08 |
| RJA_(NGUYEN)_019458 | RJA_(NGUYEN)_019459 | Mark-Up, Mark-Down and Commission Guidelines (Retail) 2014.08.19 |
| RJA_(NGUYEN)_019460 | RJA_(NGUYEN)_019461 | Mark-Up, Mark-Down and Commission Guidelines (Retail) 2015.03.30 to 2015.04.21 |
| RJA_(NGUYEN)_019462 | RJA_(NGUYEN)_019463 | Mark-Up, Mark-Down and Commission Guidelines (Retail) 2015.04.16 |
| RJA_(NGUYEN)_019626 | RJA_(NGUYEN)_019628 | Mark-Up, Mark-Down and Commission Guidelines (Retail) 2016.04.01 to 2017.02.27 |
| RJA_(NGUYEN)_019464 | RJA_(NGUYEN)_019464 | Mark-Ups and Commissions 2014.07.02 |
| RJA_(NGUYEN)_019546 | RJA_(NGUYEN)_019547 | Mark-Ups and Commissions 2015.03.17 to 2017.04.04 |
| RJA_(NGUYEN)_019465 | RJA_(NGUYEN)_019465 | Mark-Ups and Commissions 2015.03.17 |
| RJA_(NGUYEN)_019631 | RJA_(NGUYEN)_019632 | Mark-Ups and Commissions 2017.04.04 to 2017.09.26 |
| RJA_(NGUYEN)_019633 | RJA_(NGUYEN)_019634 | Mark-Ups, Downs and Commissions 2017.09.26 to 2017.12.01 |
| RJA_(NGUYEN)_019635 | RJA_(NGUYEN)_019636 | Mark-Ups, Downs and Commissions 2017.12.01 |
| RJA_(NGUYEN)_015108 | RJA_(NGUYEN)_015110 | Mutual Funds - Sales Practices 2016.02.01 to 2017.06.09 |
| RJA_(NGUYEN)_015105 | RJA_(NGUYEN)_015107 | Mutual Funds - Sales Practices 2017.06.09 to 2017.10.13 |
| RJA_(NGUYEN)_015102 | RJA_(NGUYEN)_015104 | Mutual Funds - Sales Practices 2017.10.13 to 2017.10.13 |
| RJA_(NGUYEN)_015099 | RJA_(NGUYEN)_015101 | Mutual Funds - Sales Practices 2017.10.13 |
| RJA_(NGUYEN)_019637 | RJA_(NGUYEN)_019638 | Options - Supervision of Accounts and Suitability Recommendations 2016.05.17 to 2018.03.21 |
| RJA_(NGUYEN)_019468 | RJA_(NGUYEN)_019469 | Options - Supervsion of Accounts and Suitability of Recommendations 2015.11.24 |

| RJA_(NGUYEN)_019466 | RJA_(NGUYEN)_019467 | Options-Supervision of Accounts and Suitability of Recommendations 2014.07.07 |
|---|---|---|
| RJA_(NGUYEN)_019548 | RJA_(NGUYEN)_019549 | Options-Supervision of Accounts and Suitability of Recommendations 2015.11.24 to 2016.05.17 |
| RJA_(NGUYEN)_019550 | RJA_(NGUYEN)_019551 | Options-Supervision of Accounts and Suitability of Recommendations 2016.05.17 to 2018.03.21 |
| RJA_(NGUYEN)_019691 | RJA_(NGUYEN)_019692 | Options-Supervision of Accounts and Suitability of Recommendations 2016.05.17 to Still Active |
| RJA_(NGUYEN)_019470 | RJA_(NGUYEN)_019471 | RJA Discretionary Program - Financial Advisor Approval 2014.09.09 |
| RJA_(NGUYEN)_019472 | RJA_(NGUYEN)_019473 | RJA Discretionary Program - Financial Advisor Approval 2015.10.06 to 2015.12.22 |
| RJA_(NGUYEN)_019474 | RJA_(NGUYEN)_019475 | RJA Discretionary Program - Financial Advisor Approval 2015.12.22 |
| RJA_(NGUYEN)_019552 | RJA_(NGUYEN)_019553 | RJA Discretionary Program - Financial Advisor Approval 2016.11.09 to 2017.03.27 |
| RJA_(NGUYEN)_019641 | RJA_(NGUYEN)_019642 | RJA Discretionary Program - Financial Advisor Approval 2017.03.27 to 2017.05.09 |
| RJA_(NGUYEN)_019643 | RJA_(NGUYEN)_019644 | RJA Discretionary Program - Financial Advisor Approval 2017.05.09 to 2018.07.23 |
| RJA_(NGUYEN)_019554 | RJA_(NGUYEN)_019555 | Sales Practice Reviews 2014.09.23 to 2016.03.10 |
| RJA_(NGUYEN)_019476 | RJA_(NGUYEN)_019476 | Sales Practice Reviews 2014.09.23 |
| RJA_(NGUYEN)_019645 | RJA_(NGUYEN)_019646 | Sales Practice Reviews 2016.03.10 to 2017.08.04 |
| RJA_(NGUYEN)_019556 | RJA_(NGUYEN)_019557 | Sales Practice Reviews 2016.03.10 to 2017.08.04 |
| RJA_(NGUYEN)_019647 | RJA_(NGUYEN)_019648 | Sales Practice Reviews 2017.08.04 to Still Active |
| RJA_(NGUYEN)_019695 | RJA_(NGUYEN)_019696 | Sales Practice Reviews 2017.08.04 |
| RJA_(NGUYEN)_019477 | RJA_(NGUYEN)_019477 | Satellite Office Supervision 2014.08.29 |
| RJA_(NGUYEN)_019558 | RJA_(NGUYEN)_019559 | Satellite Office Supervision 2015.10.19 to 2016.03.04 |
| RJA_(NGUYEN)_019478 | RJA_(NGUYEN)_019478 | Satellite Office Supervision 2015.10.19 |
| RJA_(NGUYEN)_019560 | RJA_(NGUYEN)_019561 | Satellite Office Supervision 2016.03.04 to 2016.06.15 |
| RJA_(NGUYEN)_019562 | RJA_(NGUYEN)_019563 | Satellite Office Supervision 2016.06.15 |
| RJA_(NGUYEN)_019651 | RJA_(NGUYEN)_019652 | Suitability 2014.10.06 to 2017.07.07 |
| RJA_(NGUYEN)_019564 | RJA_(NGUYEN)_019565 | Suitability 2014.10.06 to 2017.07.07 |
| RJA_(NGUYEN)_019479 | RJA_(NGUYEN)_019480 | Suitability 2014.10.06 |

| | | |
|---|---|---|
| RJA_(NGUYEN)_019653 | RJA_(NGUYEN)_019655 | Suitability 2017.07.07 to 2018.03.20 |
| RJA_(NGUYEN)_019699 | RJA_(NGUYEN)_019701 | Suitability 2017.07.07 |
| RJA_(NGUYEN)_015111 | RJA_(NGUYEN)_015113 | Suitability 2018.03.20 to 2019.05.31 |
| **Deposition Materials** | | |
| | | Kim Nguyen, Final Deposition Transcript (Jan. 12, 2021) |
| | | Dax Seale, Deposition Transcript, Not Final (May 6, 2021) |
| | | Bill Gross, Rough Deposition Transcript (May 26, 2021), including courtesy copy of exhibits |
| | | Chris Thurston, Rough Deposition Transcript (May 21, 2021), including courtesy copy of exhibits |
| **FA Guides and Marketing Materials** | | |
| RJA_(NGUYEN)_036099 | RJA_(NGUYEN)_036203 | |
| RJA_(NGUYEN)_040398 | RJA_(NGUYEN)_040411 | |
| RJA_(NGUYEN)_040412 | RJA_(NGUYEN)_040425 | |
| RJA_(NGUYEN)_040426 | RJA_(NGUYEN)_040439 | |
| RJA_(NGUYEN)_040440 | RJA_(NGUYEN)_040453 | |
| RJA_(NGUYEN)_040454 | RJA_(NGUYEN)_040467 | |
| RJA_(NGUYEN)_040468 | RJA_(NGUYEN)_040481 | |
| RJA_(NGUYEN)_040482 | RJA_(NGUYEN)_040495 | |
| RJA_(NGUYEN)_040496 | RJA_(NGUYEN)_040509 | |
| RJA_(NGUYEN)_040510 | RJA_(NGUYEN)_040522 | |
| RJA_(NGUYEN)_040523 | RJA_(NGUYEN)_040526 | |
| RJA_(NGUYEN)_040537 | RJA_(NGUYEN)_040550 | |
| RJA_(NGUYEN)_036100 | RJA_(NGUYEN)_036203 | |
| **Forms ADV (2016)** | | |
| | | Forms ADV (2016), LPL FINANCIAL LLC, MWP PROGRAM BROCHURE (1.12.2016) |
| | | Forms ADV (2016), LPL FINANCIAL LLC, MWP PROGRAM BROCHURE (10.5.2016) |
| | | Forms ADV (2016), LPL FINANCIAL LLC, MWP PROGRAM BROCHURE (3.30.2016) |
| | | Forms ADV (2016), LPL FINANCIAL LLC, MWP PROGRAM BROCHURE (7.15.2016) |

| | | |
|---|---|---|
| | | Forms ADV (2016), MORGAN STANLEY CONSULTING GROUP ADVISOR PROGRAM BROCHURE (3.30.2016) |
| | | Forms ADV (2016), MORGAN STANLEY CONSULTING GROUP ADVISOR PROGRAM BROCHURE (6.17.2016) |
| | | Forms ADV (2016), MORGAN STANLEY CONSULTING GROUP ADVISOR PROGRAM BROCHURE (8.10.2016) |
| | | Forms ADV (2016), UBS SWISS FINANCIAL ADVISERS WRAP FEE PROGRAM BROCHURE (PART 2(A) FOR MANAGED PROGRAMS) (3.24.2016) |
| **Investment Committee Minutes and Related Materials** | | |
| RJA_(NGUYEN)_041890 | RJA_(NGUYEN)_041891 | |
| RJA_(NGUYEN)_041894 | RJA_(NGUYEN)_041950 | |
| RJA_(NGUYEN)_041892 | RJA_(NGUYEN)_041893 | |
| RJA_(NGUYEN)_041953 | RJA_(NGUYEN)_041998 | |
| RJA_(NGUYEN)_041951 | RJA_(NGUYEN)_041952 | |
| RJA_(NGUYEN)_042001 | RJA_(NGUYEN)_042023 | |
| RJA_(NGUYEN)_041999 | RJA_(NGUYEN)_042000 | |
| RJA_(NGUYEN)_042026 | RJA_(NGUYEN)_042048 | |
| RJA_(NGUYEN)_042024 | RJA_(NGUYEN)_042025 | |
| RJA_(NGUYEN)_042049 | RJA_(NGUYEN)_042050 | |
| RJA_(NGUYEN)_042051 | RJA_(NGUYEN)_042052 | |
| RJA_(NGUYEN)_042053 | RJA_(NGUYEN)_042054 | |
| RJA_(NGUYEN)_042055 | RJA_(NGUYEN)_042056 | |
| RJA_(NGUYEN)_043110 | RJA_(NGUYEN)_043110 | |
| RJA_(NGUYEN)_043111 | RJA_(NGUYEN)_043111 | |
| RJA_(NGUYEN)_043112 | RJA_(NGUYEN)_043112 | |
| RJA_(NGUYEN)_043113 | RJA_(NGUYEN)_043113 | |
| RJA_(NGUYEN)_043114 | RJA_(NGUYEN)_043114 | |
| RJA_(NGUYEN)_043109 | RJA_(NGUYEN)_043109 | |
| RJA_(NGUYEN)_042059 | RJA_(NGUYEN)_042100 | |
| RJA_(NGUYEN)_042057 | RJA_(NGUYEN)_042058 | |
| RJA_(NGUYEN)_042103 | RJA_(NGUYEN)_042138 | |
| RJA_(NGUYEN)_042101 | RJA_(NGUYEN)_042102 | |
| RJA_(NGUYEN)_042141 | RJA_(NGUYEN)_042178 | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_042139 | RJA_(NGUYEN)_042140 | |
| RJA_(NGUYEN)_042179 | RJA_(NGUYEN)_042180 | |
| RJA_(NGUYEN)_042181 | RJA_(NGUYEN)_042236 | |
| RJA_(NGUYEN)_042239 | RJA_(NGUYEN)_042284 | |
| RJA_(NGUYEN)_042237 | RJA_(NGUYEN)_042238 | |
| RJA_(NGUYEN)_042287 | RJA_(NGUYEN)_042312 | |
| RJA_(NGUYEN)_042285 | RJA_(NGUYEN)_042286 | |
| RJA_(NGUYEN)_042314 | RJA_(NGUYEN)_042326 | |
| RJA_(NGUYEN)_042313 | RJA_(NGUYEN)_042313 | |
| RJA_(NGUYEN)_042330 | RJA_(NGUYEN)_042342 | |
| RJA_(NGUYEN)_042327 | RJA_(NGUYEN)_042329 | |
| RJA_(NGUYEN)_042345 | RJA_(NGUYEN)_042403 | |
| RJA_(NGUYEN)_042343 | RJA_(NGUYEN)_042344 | |
| RJA_(NGUYEN)_042404 | RJA_(NGUYEN)_042443 | |
| RJA_(NGUYEN)_042444 | RJA_(NGUYEN)_042482 | |
| RJA_(NGUYEN)_042483 | RJA_(NGUYEN)_042484 | |
| RJA_(NGUYEN)_042485 | RJA_(NGUYEN)_042510 | |
| RJA_(NGUYEN)_042511 | RJA_(NGUYEN)_042568 | |
| RJA_(NGUYEN)_042569 | RJA_(NGUYEN)_042608 | |
| RJA_(NGUYEN)_042609 | RJA_(NGUYEN)_042644 | |
| RJA_(NGUYEN)_042645 | RJA_(NGUYEN)_042693 | |
| RJA_(NGUYEN)_042694 | RJA_(NGUYEN)_042736 | |
| RJA_(NGUYEN)_043116 | RJA_(NGUYEN)_043116 | |
| RJA_(NGUYEN)_043115 | RJA_(NGUYEN)_043115 | |
| RJA_(NGUYEN)_042737 | RJA_(NGUYEN)_042777 | |
| RJA_(NGUYEN)_042778 | RJA_(NGUYEN)_042844 | |
| RJA_(NGUYEN)_042845 | RJA_(NGUYEN)_042879 | |
| RJA_(NGUYEN)_042880 | RJA_(NGUYEN)_042925 | |
| RJA_(NGUYEN)_042926 | RJA_(NGUYEN)_042952 | |
| RJA_(NGUYEN)_042953 | RJA_(NGUYEN)_042985 | |
| RJA_(NGUYEN)_042986 | RJA_(NGUYEN)_043023 | |
| RJA_(NGUYEN)_043024 | RJA_(NGUYEN)_043041 | |
| RJA_(NGUYEN)_043042 | RJA_(NGUYEN)_043052 | |
| RJA_(NGUYEN)_043053 | RJA_(NGUYEN)_043081 | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_043082 | RJA_(NGUYEN)_043087 | |
| RJA_(NGUYEN)_043088 | RJA_(NGUYEN)_043093 | |
| RJA_(NGUYEN)_043094 | RJA_(NGUYEN)_043108 | |
| **Pleadings and Filings** | | |
| | | [DE 46] Plaintiff's Corrected Amended Class Complaint |
| | | [DE 50] RJA Motion to Dismiss Amended Complaint (with Exhibits) |
| | | [DE 59] Plaintiff's Opposition to RJA's Motion to Dismiss Corrected Amended Complaint |
| | | [DE 70] RJA's Reply in Support of Motion to Dismiss Amended Complaint |
| | | [DE 87] Amended Case Management Report |
| | | [DE 88] Plaintiff's Motion to Compel Production & Expedite Briefing |
| | | [DE 91] RJA's Response in Opposition to Plaintiff's Motion to Compel |
| | | [DE 92] Order Denying Plaintiff's Motion to Compel |
| | | [DE 93] RJA's Motion to Compel Plaintiff's Discovery Production and Interrogatory Responses |
| | | [DE 94] Plaintiff's Opposition to RJA's Motion to Compel Production & Responses |
| | | [DE 95] Plaintiff's Motion for Protective Order Precluding Disclosure |
| | | [DE 96] RJA's Opposition to Motion for Protective Order (TD Ameritrade) |
| | | [DE 110] RJA's Notice of Filing Demonstrative Exhibits from 3-5-21 Hearing |
| | | [DE 116] Order on Motion to Dismiss |
| | | [DE 117] Second Amended Class Action Complaint |
| | | [DE 118] Second Amended Case Management & Scheduling Order |
| | | [DE 122] RJA's Motion to Dismiss Plaintiff's Second Amended Complaint |
| **Discovery Requests and Responses** | | |

13

| | | |
|---|---|---|
| | | 2020-10-19 Plaintiff's Response to First Set of Interrogatories |
| | | 2020-10-19 RJA's Responses to Plaintiff's First Set of Interrogatories |
| | | 2020-11-02 Plaintiff's Response to RJA's Requests for Admission |
| | | 2020-12-30 Plaintiff's Third Requests for Production |
| | | 2021-01-04 Plaintiff's Amended Responses to RJA's Requests for Admission |
| | | 2021-01-29 RJA's Responses to Plaintiff's Third Requests for Production of Documents |
| **RFP 51 & 52 Charts** | | |
| RJA_(NGUYEN)_058468 | RJA_(NGUYEN)_058468 | |
| RJA_(NGUYEN)_058469 | RJA_(NGUYEN)_058469 | |
| RJA_(NGUYEN)_059060 | RJA_(NGUYEN)_059060 | |
| RJA_(NGUYEN)_059061 | RJA_(NGUYEN)_059061 | |
| RJA_(NGUYEN)_059062 | RJA_(NGUYEN)_059062 | |
| RJA_(NGUYEN)_059063 | RJA_(NGUYEN)_059063 | |
| **Regulations and Legal Resources** | | |
| | | Proposed Rule - Regulation Best Interest (Apr. 18, 2018) |
| | | Securities and Exchange Commission, Commission Interpretation Regarding Standard of Conduct for Investment Advisers (June 5, 2019) |
| | | Final Rule - Regulation Best Interest (June 5, 2019) |
| | | *Ford v. TD Ameritrade* , 995 F.3d 616 (8th Cir. 2021) |
| | | Securities and Exchange Commission, National Exam Program, Examination Priorities for 2013 (Feb. 21, 2013) |
| | | Additional materials cited in the report itself. |
| **Statements & Confirms** | | |
| RJA_(NGUYEN)_008418 | RJA_(NGUYEN)_008423 | |
| RJA_(NGUYEN)_014895 | RJA_(NGUYEN)_014896 | |
| RJA_(NGUYEN)_008260 | RJA_(NGUYEN)_008265 | |
| RJA_(NGUYEN)_014875 | RJA_(NGUYEN)_014880 | |
| RJA_(NGUYEN)_014897 | RJA_(NGUYEN)_014902 | |

| RJA_(NGUYEN)_014855 | RJA_(NGUYEN)_014860 | |
|---|---|---|
| RJA_(NGUYEN)_014839 | RJA_(NGUYEN)_014844 | |
| RJA_(NGUYEN)_014823 | RJA_(NGUYEN)_014828 | |
| RJA_(NGUYEN)_014803 | RJA_(NGUYEN)_014806 | |
| RJA_(NGUYEN)_014788 | RJA_(NGUYEN)_014790 | |
| RJA_(NGUYEN)_014771 | RJA_(NGUYEN)_014773 | |
| RJA_(NGUYEN)_014755 | RJA_(NGUYEN)_014756 | |
| RJA_(NGUYEN)_014740 | RJA_(NGUYEN)_014741 | |
| RJA_(NGUYEN)_014727 | RJA_(NGUYEN)_014728 | |
| RJA_(NGUYEN)_014705 | RJA_(NGUYEN)_014706 | |
| RJA_(NGUYEN)_014690 | RJA_(NGUYEN)_014691 | |
| RJA_(NGUYEN)_014677 | RJA_(NGUYEN)_014678 | |
| RJA_(NGUYEN)_014657 | RJA_(NGUYEN)_014658 | |
| RJA_(NGUYEN)_014642 | RJA_(NGUYEN)_014643 | |
| RJA_(NGUYEN)_014629 | RJA_(NGUYEN)_014630 | |
| RJA_(NGUYEN)_014603 | RJA_(NGUYEN)_014604 | |
| RJA_(NGUYEN)_014590 | RJA_(NGUYEN)_014591 | |
| RJA_(NGUYEN)_014577 | RJA_(NGUYEN)_014578 | |
| RJA_(NGUYEN)_014559 | RJA_(NGUYEN)_014560 | |
| RJA_(NGUYEN)_014544 | RJA_(NGUYEN)_014546 | |
| RJA_(NGUYEN)_014531 | RJA_(NGUYEN)_014532 | |
| RJA_(NGUYEN)_014513 | RJA_(NGUYEN)_014514 | |
| RJA_(NGUYEN)_014497 | RJA_(NGUYEN)_014499 | |
| RJA_(NGUYEN)_014484 | RJA_(NGUYEN)_014485 | |
| RJA_(NGUYEN)_014466 | RJA_(NGUYEN)_014467 | |
| RJA_(NGUYEN)_014451 | RJA_(NGUYEN)_014452 | |
| RJA_(NGUYEN)_014436 | RJA_(NGUYEN)_014437 | |
| RJA_(NGUYEN)_014412 | RJA_(NGUYEN)_014413 | |
| RJA_(NGUYEN)_014399 | RJA_(NGUYEN)_014400 | |
| RJA_(NGUYEN)_014386 | RJA_(NGUYEN)_014387 | |
| RJA_(NGUYEN)_014370 | RJA_(NGUYEN)_014371 | |
| RJA_(NGUYEN)_014357 | RJA_(NGUYEN)_014358 | |
| RJA_(NGUYEN)_014344 | RJA_(NGUYEN)_014345 | |
| RJA_(NGUYEN)_014324 | RJA_(NGUYEN)_014325 | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_014294 | RJA_(NGUYEN)_014295 | |
| RJA_(NGUYEN)_014276 | RJA_(NGUYEN)_014277 | |
| RJA_(NGUYEN)_014263 | RJA_(NGUYEN)_014264 | |
| RJA_(NGUYEN)_014256 | RJA_(NGUYEN)_014257 | |
| RJA_(NGUYEN)_014309 | RJA_(NGUYEN)_014311 | |
| RJA_(NGUYEN)_006532 | RJA_(NGUYEN)_006537 | |
| RJA_(NGUYEN)_014881 | RJA_(NGUYEN)_014884 | |
| RJA_(NGUYEN)_014903 | RJA_(NGUYEN)_014904 | |
| RJA_(NGUYEN)_014861 | RJA_(NGUYEN)_014864 | |
| RJA_(NGUYEN)_014845 | RJA_(NGUYEN)_014846 | |
| RJA_(NGUYEN)_014829 | RJA_(NGUYEN)_014830 | |
| RJA_(NGUYEN)_014807 | RJA_(NGUYEN)_014809 | |
| RJA_(NGUYEN)_014791 | RJA_(NGUYEN)_014791 | |
| RJA_(NGUYEN)_014774 | RJA_(NGUYEN)_014774 | |
| RJA_(NGUYEN)_014757 | RJA_(NGUYEN)_014758 | |
| RJA_(NGUYEN)_014742 | RJA_(NGUYEN)_014742 | |
| RJA_(NGUYEN)_014729 | RJA_(NGUYEN)_014729 | |
| RJA_(NGUYEN)_014707 | RJA_(NGUYEN)_014708 | |
| RJA_(NGUYEN)_014692 | RJA_(NGUYEN)_014692 | |
| RJA_(NGUYEN)_014679 | RJA_(NGUYEN)_014679 | |
| RJA_(NGUYEN)_014659 | RJA_(NGUYEN)_014660 | |
| RJA_(NGUYEN)_014644 | RJA_(NGUYEN)_014644 | |
| RJA_(NGUYEN)_014631 | RJA_(NGUYEN)_014631 | |
| RJA_(NGUYEN)_014605 | RJA_(NGUYEN)_014607 | |
| RJA_(NGUYEN)_014592 | RJA_(NGUYEN)_014592 | |
| RJA_(NGUYEN)_014579 | RJA_(NGUYEN)_014579 | |
| RJA_(NGUYEN)_014561 | RJA_(NGUYEN)_014562 | |
| RJA_(NGUYEN)_014547 | RJA_(NGUYEN)_014547 | |
| RJA_(NGUYEN)_014533 | RJA_(NGUYEN)_014533 | |
| RJA_(NGUYEN)_014515 | RJA_(NGUYEN)_014516 | |
| RJA_(NGUYEN)_014500 | RJA_(NGUYEN)_014500 | |
| RJA_(NGUYEN)_014486 | RJA_(NGUYEN)_014486 | |
| RJA_(NGUYEN)_014468 | RJA_(NGUYEN)_014469 | |
| RJA_(NGUYEN)_014453 | RJA_(NGUYEN)_014454 | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_014438 | RJA_(NGUYEN)_014438 | |
| RJA_(NGUYEN)_014414 | RJA_(NGUYEN)_014415 | |
| RJA_(NGUYEN)_014401 | RJA_(NGUYEN)_014401 | |
| RJA_(NGUYEN)_014388 | RJA_(NGUYEN)_014388 | |
| RJA_(NGUYEN)_014372 | RJA_(NGUYEN)_014372 | |
| RJA_(NGUYEN)_014359 | RJA_(NGUYEN)_014359 | |
| RJA_(NGUYEN)_014346 | RJA_(NGUYEN)_014346 | |
| RJA_(NGUYEN)_014326 | RJA_(NGUYEN)_014326 | |
| RJA_(NGUYEN)_014296 | RJA_(NGUYEN)_014296 | |
| RJA_(NGUYEN)_014278 | RJA_(NGUYEN)_014278 | |
| RJA_(NGUYEN)_014265 | RJA_(NGUYEN)_014265 | |
| RJA_(NGUYEN)_014312 | RJA_(NGUYEN)_014312 | |
| RJA_(NGUYEN)_007430 | RJA_(NGUYEN)_007453 | |
| RJA_(NGUYEN)_014796 | RJA_(NGUYEN)_014802 | |
| RJA_(NGUYEN)_014779 | RJA_(NGUYEN)_014787 | |
| RJA_(NGUYEN)_014763 | RJA_(NGUYEN)_014770 | |
| RJA_(NGUYEN)_014747 | RJA_(NGUYEN)_014754 | |
| RJA_(NGUYEN)_014734 | RJA_(NGUYEN)_014739 | |
| RJA_(NGUYEN)_014714 | RJA_(NGUYEN)_014726 | |
| RJA_(NGUYEN)_014697 | RJA_(NGUYEN)_014704 | |
| RJA_(NGUYEN)_014684 | RJA_(NGUYEN)_014689 | |
| RJA_(NGUYEN)_014665 | RJA_(NGUYEN)_014676 | |
| RJA_(NGUYEN)_014649 | RJA_(NGUYEN)_014656 | |
| RJA_(NGUYEN)_014635 | RJA_(NGUYEN)_014641 | |
| RJA_(NGUYEN)_014614 | RJA_(NGUYEN)_014628 | |
| RJA_(NGUYEN)_014596 | RJA_(NGUYEN)_014602 | |
| RJA_(NGUYEN)_014583 | RJA_(NGUYEN)_014589 | |
| RJA_(NGUYEN)_014567 | RJA_(NGUYEN)_014576 | |
| RJA_(NGUYEN)_014551 | RJA_(NGUYEN)_014558 | |
| RJA_(NGUYEN)_014537 | RJA_(NGUYEN)_014543 | |
| RJA_(NGUYEN)_014521 | RJA_(NGUYEN)_014530 | |
| RJA_(NGUYEN)_014504 | RJA_(NGUYEN)_014512 | |
| RJA_(NGUYEN)_014490 | RJA_(NGUYEN)_014496 | |
| RJA_(NGUYEN)_014474 | RJA_(NGUYEN)_014483 | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_014458 | RJA_(NGUYEN)_014465 | |
| RJA_(NGUYEN)_014443 | RJA_(NGUYEN)_014450 | |
| RJA_(NGUYEN)_014423 | RJA_(NGUYEN)_014435 | |
| RJA_(NGUYEN)_014405 | RJA_(NGUYEN)_014411 | |
| RJA_(NGUYEN)_014392 | RJA_(NGUYEN)_014398 | |
| RJA_(NGUYEN)_014377 | RJA_(NGUYEN)_014385 | |
| RJA_(NGUYEN)_014363 | RJA_(NGUYEN)_014369 | |
| RJA_(NGUYEN)_014350 | RJA_(NGUYEN)_014356 | |
| RJA_(NGUYEN)_014331 | RJA_(NGUYEN)_014343 | |
| RJA_(NGUYEN)_014301 | RJA_(NGUYEN)_014308 | |
| RJA_(NGUYEN)_014270 | RJA_(NGUYEN)_014275 | |
| RJA_(NGUYEN)_014260 | RJA_(NGUYEN)_014262 | |
| RJA_(NGUYEN)_014317 | RJA_(NGUYEN)_014323 | |
| RJA_(NGUYEN)_014283 | RJA_(NGUYEN)_014293 | |
| RJA_(NGUYEN)_002433 | RJA_(NGUYEN)_002464 | |
| RJA_(NGUYEN)_004470 | RJA_(NGUYEN)_004489 | |
| RJA_(NGUYEN)_004402 | RJA_(NGUYEN)_004417 | |
| RJA_(NGUYEN)_004340 | RJA_(NGUYEN)_004355 | |
| RJA_(NGUYEN)_004288 | RJA_(NGUYEN)_004299 | |
| RJA_(NGUYEN)_007464 | RJA_(NGUYEN)_007470 | |
| RJA_(NGUYEN)_007457 | RJA_(NGUYEN)_007463 | |
| RJA_(NGUYEN)_014905 | RJA_(NGUYEN)_014916 | |
| RJA_(NGUYEN)_014885 | RJA_(NGUYEN)_014894 | |
| RJA_(NGUYEN)_014865 | RJA_(NGUYEN)_014874 | |
| RJA_(NGUYEN)_014847 | RJA_(NGUYEN)_014854 | |
| RJA_(NGUYEN)_014831 | RJA_(NGUYEN)_014838 | |
| RJA_(NGUYEN)_014810 | RJA_(NGUYEN)_014822 | |
| RJA_(NGUYEN)_014792 | RJA_(NGUYEN)_014795 | |
| RJA_(NGUYEN)_014775 | RJA_(NGUYEN)_014778 | |
| RJA_(NGUYEN)_014759 | RJA_(NGUYEN)_014762 | |
| RJA_(NGUYEN)_014743 | RJA_(NGUYEN)_014746 | |
| RJA_(NGUYEN)_014730 | RJA_(NGUYEN)_014733 | |
| RJA_(NGUYEN)_014709 | RJA_(NGUYEN)_014713 | |
| RJA_(NGUYEN)_014693 | RJA_(NGUYEN)_014696 | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_014680 | RJA_(NGUYEN)_014683 | |
| RJA_(NGUYEN)_014661 | RJA_(NGUYEN)_014664 | |
| RJA_(NGUYEN)_014645 | RJA_(NGUYEN)_014648 | |
| RJA_(NGUYEN)_014632 | RJA_(NGUYEN)_014634 | |
| RJA_(NGUYEN)_014608 | RJA_(NGUYEN)_014613 | |
| RJA_(NGUYEN)_014593 | RJA_(NGUYEN)_014595 | |
| RJA_(NGUYEN)_014580 | RJA_(NGUYEN)_014582 | |
| RJA_(NGUYEN)_014563 | RJA_(NGUYEN)_014566 | |
| RJA_(NGUYEN)_014548 | RJA_(NGUYEN)_014550 | |
| RJA_(NGUYEN)_014534 | RJA_(NGUYEN)_014536 | |
| RJA_(NGUYEN)_014517 | RJA_(NGUYEN)_014520 | |
| RJA_(NGUYEN)_014501 | RJA_(NGUYEN)_014503 | |
| RJA_(NGUYEN)_014487 | RJA_(NGUYEN)_014489 | |
| RJA_(NGUYEN)_014470 | RJA_(NGUYEN)_014473 | |
| RJA_(NGUYEN)_014455 | RJA_(NGUYEN)_014457 | |
| RJA_(NGUYEN)_014439 | RJA_(NGUYEN)_014442 | |
| RJA_(NGUYEN)_014416 | RJA_(NGUYEN)_014422 | |
| RJA_(NGUYEN)_014402 | RJA_(NGUYEN)_014404 | |
| RJA_(NGUYEN)_014389 | RJA_(NGUYEN)_014391 | |
| RJA_(NGUYEN)_014373 | RJA_(NGUYEN)_014376 | |
| RJA_(NGUYEN)_014360 | RJA_(NGUYEN)_014362 | |
| RJA_(NGUYEN)_014347 | RJA_(NGUYEN)_014349 | |
| RJA_(NGUYEN)_014327 | RJA_(NGUYEN)_014330 | |
| RJA_(NGUYEN)_014297 | RJA_(NGUYEN)_014300 | |
| RJA_(NGUYEN)_014279 | RJA_(NGUYEN)_014282 | |
| RJA_(NGUYEN)_014266 | RJA_(NGUYEN)_014269 | |
| RJA_(NGUYEN)_014258 | RJA_(NGUYEN)_014259 | |
| RJA_(NGUYEN)_014313 | RJA_(NGUYEN)_014316 | |
| **TD Ameritrade Statements** | | |
| TDA000004 | TDA000279 | |
| TDA000283 | TDA000288 | |
| TDA000292 | TDA000453 | |
| TDA000454 | TDA000774 | |
| TDA000782 | TDA000961 | |

| TDA000967 | TDA000997 | |
|---|---|---|
| **Vanguard Statements (Select)** | | |
| NGUYEN_001739 | NGUYEN_001741 | |
| NGUYEN_001527 | NGUYEN_001538 | |
| NGUYEN_001581 | NGUYEN_001598 | |
| NGUYEN_001659 | NGUYEN_001678 | |
| NGUYEN_001161 | NGUYEN_001174 | |
| NGUYEN_001223 | NGUYEN_001236 | |
| NGUYEN_001267 | NGUYEN_001282 | |
| NGUYEN_001301 | NGUYEN_001314 | |
| NGUYEN_001333 | NGUYEN_001348 | |
| NGUYEN_001381 | NGUYEN_001396 | |
| NGUYEN_001415 | NGUYEN_001428 | |
| NGUYEN_001447 | NGUYEN_001460 | |
| NGUYEN_001491 | NGUYEN_001506 | |
| NGUYEN_001549 | NGUYEN_001562 | |
| NGUYEN_001617 | NGUYEN_001630 | |
| NGUYEN_001707 | NGUYEN_001726 | |
| NGUYEN_001193 | NGUYEN_001204 | |
| NGUYEN_001735 | NGUYEN_001738 | |
| NGUYEN_001515 | NGUYEN_001526 | |
| NGUYEN_001571 | NGUYEN_001580 | |
| NGUYEN_001645 | NGUYEN_001658 | |
| NGUYEN_001151 | NGUYEN_001160 | |
| NGUYEN_001213 | NGUYEN_001222 | |
| NGUYEN_001257 | NGUYEN_001266 | |
| NGUYEN_001291 | NGUYEN_001300 | |
| NGUYEN_001323 | NGUYEN_001332 | |
| NGUYEN_001369 | NGUYEN_001380 | |
| NGUYEN_001405 | NGUYEN_001414 | |
| NGUYEN_001437 | NGUYEN_001446 | |
| NGUYEN_001481 | NGUYEN_001490 | |
| NGUYEN_001539 | NGUYEN_001548 | |
| NGUYEN_001607 | NGUYEN_001616 | |

| | | |
|---|---|---|
| NGUYEN_001693 | NGUYEN_001706 | |
| NGUYEN_001183 | NGUYEN_001192 | |
| **Edward Jones Statements** | | |
| NGUYEN_001746 | NGUYEN_001753 | |
| NGUYEN_001762 | NGUYEN_001770 | |
| NGUYEN_001779 | NGUYEN_001789 | |
| NGUYEN_001798 | NGUYEN_001806 | |
| NGUYEN_001816 | NGUYEN_001824 | |
| NGUYEN_001833 | NGUYEN_001843 | |
| NGUYEN_001852 | NGUYEN_001855 | |
| NGUYEN_001863 | NGUYEN_001867 | |
| NGUYEN_001876 | NGUYEN_001880 | |
| NGUYEN_001885 | NGUYEN_001888 | |
| NGUYEN_001893 | NGUYEN_001896 | |
| NGUYEN_001902 | NGUYEN_001906 | |
| NGUYEN_001754 | NGUYEN_001757 | |
| NGUYEN_001771 | NGUYEN_001774 | |
| NGUYEN_001790 | NGUYEN_001793 | |
| NGUYEN_001807 | NGUYEN_001810 | |
| NGUYEN_001825 | NGUYEN_001828 | |
| NGUYEN_001844 | NGUYEN_001847 | |
| NGUYEN_001856 | NGUYEN_001859 | |
| NGUYEN_001868 | NGUYEN_001871 | |
| NGUYEN_001881 | NGUYEN_001884 | |
| NGUYEN_001889 | NGUYEN_001892 | |
| NGUYEN_001897 | NGUYEN_001901 | |
| NGUYEN_001907 | NGUYEN_001910 | |
| NGUYEN_001758 | NGUYEN_001761 | |
| NGUYEN_001775 | NGUYEN_001778 | |
| NGUYEN_001794 | NGUYEN_001797 | |
| NGUYEN_001811 | NGUYEN_001815 | |
| NGUYEN_001829 | NGUYEN_001832 | |
| NGUYEN_001848 | NGUYEN_001851 | |
| NGUYEN_001860 | NGUYEN_001862 | |

| | | |
|---|---|---|
| NGUYEN_001872 | NGUYEN_001875 | |
| NGUYEN_001911 | NGUYEN_001914 | |
| NGUYEN_001915 | NGUYEN_001918 | |
| NGUYEN_001919 | NGUYEN_001922 | |
| **Documents Cited in Second Amended Complaint** | | |
| RJA_(NGUYEN)_044886 | | |
| RJA_(NGUYEN)_044669 | | |
| RJA_(NGUYEN)_043502 | | |
| RJA_(NGUYEN)_034643 | | |
| RJA_(NGUYEN)_029784 | | |
| RJA_(NGUYEN)_029336 | | |
| RJA_(NGUYEN)_019922 | | |
| RJA_(NGUYEN)_019783 | | |
| RJA_(NGUYEN)_012336 | | |

# EXHIBIT 2

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

KIMBERLY NGUYEN, On Behalf of
Herself and All Others Similarly Situated,

     Plaintiff,

v.                                  Case No. 8:20-cv-195-CEH-AAS

RAYMOND JAMES & ASSOCIATES, INC.,

     Defendant.

_____

## REBUTTAL EXPERT REPORT OF JOSEPH J. THOMAS

**June 25, 2021**

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

## Qualifications and Compensation

My qualifications and compensation remain unchanged from when that information was
provided in my expert report, served in this case on June 4, 2021 ("my Expert Report").

## Assignment

I have been asked by counsel for Raymond James to review the *Report of Douglas J. Schulz re
Class Certification* served in this case on June 4, 2021 (the "Schulz Report") and to (i) address
the assumptions Mr. Schulz used in drawing his conclusions, (ii) identify any deficiencies in Mr.
Schulz's approach, and (iii) make a determination of the reliability of Mr. Schulz's approach,
methodology, and conclusions.

## Materials Reviewed

In addition to the materials I reviewed in reaching the opinions expressed in my Expert Report, I
have reviewed the Schulz Report and the *Expert Report of Arthur Olsen re Class Certification*
(the "Olson Report") dated June 4, 2021, as well as certain materials to which the Schulz Report
and Olson Report refer.  These additional materials are discussed below, and are listed in Exhibit
1 attached hereto.

## Findings

When I wrote my Expert Report, I reserved the right to amend my opinions based on any
additional data that I received or was made aware of.  After multiple readings of the Schulz
Report, I stand by the conclusions I expressed in my Expert Report.

### *General Concerns*

In my review of the Schulz Report, I note many issues in his summary conclusions that are (i)
inconsistent with industry standards, (ii) unsupported by the FINRA Rules and/or the accepted
norms in the securities industry, and (iii) require discerning and critical consideration:

1)      In paragraph 20(a) of his report, Mr. Schulz states:

> FINRA Rules and Notices to Members reflect minimum industry standards,
> including that broker-dealers have obligations to ensure that an account type is
> and remains suitable for a particular customer, and that registered financial
> advisors must document their analyses as to why an account type is suitable.

Throughout his report, Mr. Schulz inappropriately expands the provisions of the FINRA rules in
force during the 2015-2018 timeframe and reads into the FINRA Rules provisions that were not
part of those rules during the applicable period.  The FINRA Rules did not then, and do not now,
specifically identify "account type" as a component of a financial advisor's suitability analysis,
or that such a recommendation must "remain" suitable.  The determination of suitability is
evaluated at that time of the *recommended transaction* or at the time of a *client implementing an*

2

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

*investment strategy*.  This is a sensible rule, given that no financial advisor has a crystal ball to see into the future of the often unpredictable financial markets or a client's changing circumstances.  Suitability, as outlined in Rule 2111, is that "A member or an associated person must have a reasonable basis to believe that **a recommended transaction or investment strategy** involving a security is suitable for the customer"[1] (emphasis added).  This FINRA Rule requires that a financial advisor have a "reasonable basis" for his or her recommendation, and not an ongoing obligation to "ensure" that the security or investment strategy recommended is – and always will be – suitable (as wrongly stated by Mr. Schulz).

A financial advisor must make reasonable efforts to understand the client's investment profile, including their objectives, investment experience, risk tolerance, time horizon, other investments, and apply that knowledge in making a suitable recommendation at the time of the investment or at the time of initiating an investment strategy.

Plaintiff's financial advisor, Mr. Dax Seale, documented the components that are part of the suitability analysis in the account records of the firm.[2]  During the time period at issue in this case, there were no FINRA Rules that specifically required a member to ensure that an account type was suitable at inception.  Similarly, there were no FINRA Rules or industry standards, custom, or practice that required a member to ensure ongoing suitability after inception, whether of a security recommendation, account type recommendation, or otherwise.

Mr. Schulz's statement that "advisors must document their analyses as to why an account type is suitable" was not an industry standard, custom, or practice at the time, and this issue is addressed in more detail below.

2)      In paragraph 20(b) of his report, Mr. Schulz states:

> Fee-based Freedom Accounts are not suitable for customers with low trading volume/buy-and-hold accounts. For example, fee-based Freedom Accounts are not suitable for low trading volume accounts because they cost excessive capital impairment for little, if any, corresponding benefit.

I do not agree with Mr. Schulz's overbroad and categorical statement.  As a threshold matter, Mr. Schulz's unprecedented efforts to make suitability determinations for tens of thousands of individual investors based on a couple of data points fails to take into consideration the most basic suitability requirements, *i.e.*, that a ***recommendation*** be made.  It is impossible to know whether an investment or investment strategy even required a suitability analysis without knowing whether a recommendation was made.  To generalize that a fee based managed portfolio is not suitable based on "low trading volume accounts," also ignores the underlying individual circumstances that would need to be evaluated before making a recommendation related to the Freedom Account.  As discussed above, the suitability of the recommendation is evaluated and determined at the time of the recommendation and depends on the unique circumstances for each individual client.  Mr. Schulz does not provide a specific definition of

---

[1] FINRA Rule 2111.
[2] RJA_(NGUYEN)_003846-003878; Deposition of Dax Seale (May 6, 2021) ("Seale Depo."), p. 134:17-142:8.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

"low trading activity," and his methodology in selecting a single period of time and a single
account (the funding account), over the lifetime of an investor, is akin to "cherry picking" in
order to isolate a time where minimal trades occurred.

There are significant benefits to a client in a managed portfolio, not the least of which are
monitoring of the investments and automatic rebalancing to meet the client's objectives. In fact,
for someone like the Plaintiff here, Ms. Nguyen, who expressed a desire to have someone else
take the reins for her investments, that naturally meant periodic trading to align the account with
the ever-changing markets. As such, the Freedom Account was a suitable option for her.

3) In paragraph 20(c) of his report, Mr. Schulz states:

> Low trading volume/buy-and-hold accounts can be objectively determined by
> reference to the two metrics set forth below. In other words, if the trading activity
> in a commission-based account was below both of the two objective metrics set
> forth below, then in no event is a fee-based Freedom Account suitable for that
> customer.
>
> > i. Annual Cost Analysis – One metric/formula for evaluating a low trading
> > volume/buy-and-hold investor is one who only incurs commission-based
> > fees that are less than or equal to a certain percentage of their account
> > value. If an account has less than or equal to a 0.5% annual cost, then the
> > investor is low trading volume/buy-and-hold.
> >
> > ii. Annual Turnover Analysis – One metric/formula for evaluating a low
> > trading volume/buy-and-hold investor is one who "turns over" (i.e., swaps
> > in and out) a percentage of the assets in their account in a 12-month
> > period. If an account has less than or equal to a 0.25 turnover, then the
> > investor is low trading volume/buy-and-hold.

These above categorical and absolute conclusions – (i) If an account has less than or equal to a
0.5% annual cost, then the investor is low trading volume/buy-and-hold (ii) If an account has less
than or equal to a 0.25 turnover, then the investor is low trading volume/buy-and-hold – are not
based on any accepted industry standards or peer reviewed or scientific principles, and Mr.
Schulz points to none. Even if Mr. Schulz's two benchmarks above were valid and accepted in
the industry (they are not), a failure to meet the benchmarks does not result in an investment or
account type being unsuitable. There are myriad reasons why a low turnover rate and low annual
cost may be found in an investor's commission-based account, even though a managed account
is suitable for their situation. This could include, but is not limited to, (i) a change in life
situation, (ii) a client becoming more educated about investing, (iii) a client determining to move
out of one asset allocation and pursue another asset allocation through a Freedom model, (iv) an
infusion of new money or assets into the commission account, (v) an occurrence in another
investment account that the client owns, or (vi) an investor who is holding a large cash position.

Mr. Schulz's reliance on nothing but his self-selected data points ignores the analysis that
FINRA Rule 2111 requires when a financial advisor makes a recommendation regarding a

4

security or investment strategy regarding securities, *i.e.*, the individualized analysis of the customer's individualized circumstances.

The reasonable basis standard for suitability, as outlined in FINRA Rule 2111, does not include an objective measurement as a primary or even secondary determinant of a suitable recommendation. The rule clearly states that "a member or associated person must have a reasonable basis"[3] for making a recommendation. This is based on the financial advisor's knowledge of the client's investment profile, financial situation, objectives, risk tolerance, time horizon and other subjective components, not an arbitrary metric analysis.

4)      In paragraph 20(d) of his report, Mr. Schulz states:

> Contrary to industry regulations and industry standards and its own policies, RJA failed to conduct or document proper account-type suitability analyses for its clients, such as Ms. Nguyen, prior to transferring clients' assets from commission-based accounts to fee-based Freedom Accounts. This failure is borne out by an analysis of the data that RJA produced to date, which shows that the relevant commission-based accounts had an average annual cost turnover well below the 0.5% threshold (a mere 0.04%) and an average annual turnover well below the 0.25 threshold (a mere 0.017 turnover).

Mr. Schulz is reaching a conclusion similar to that which is expressed in paragraph 20(a) of his report, and which is similarly flawed. This conclusion is contradicted by the testimony of Ms. Nguyen's financial advisor, Dax Seale, regarding the analysis he performed in conjunction with Ms. Nguyen before recommending that she open her second Freedom Account. During the 2015-2018 timeframe, industry regulations, standards, custom, and practice required a financial advisor to make suitability determination before making a recommendation for a purchase of a security or undertaking an investment strategy and did not specifically require an "account type" analysis. Similarly, industry regulations, standards, custom, and practice did not require documentation of the reasons supporting the recommendation. Nonetheless, documentation is present concerning the recommendation to Ms. Nguyen.

There are no FINRA Rules that require any type of specific metric analysis be conducted in order to recommend that a client liquidate assets in a commission-based account to open a fee-based managed account. Mr. Schulz fails to point to any specific citation or language in any rule, notice to members, or other regulatory directive, requiring such analysis, or providing anything other than an opinion about the analysis quoted above.

Additionally, the statement that Raymond James failed to conduct reviews for its clients beyond Ms. Nguyen is not supported by any individual analysis or collection of records for any of the clients in the potential class at issue. These records, including portfolio recommendation plans, new account records, investment policy questionnaires,[4] recorded contact management notes,

---

[3] FINRA Rule 2111.
[4] Deposition of Chris Thurston (May 21, 2021) ("Thurston Depo."), Ex. 83 (Investment Policy Questionnaire) (RJA_(NGUYEN)_028825).

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

and various forms of correspondence with each unique customer and financial advisor that would
need to be analyzed to understand the specific activities that occurred related to each client or
account.  In order to determine that an investment or account type was unsuitable, a finder of fact
would need to review a significant amount of individual-specific information.  Accordingly, this
suitability analysis does not lend itself to a class consideration.

5)    In paragraph 20(e) of his report, Mr. Schulz states:

> Contrary to industry regulations and industry standards, RJA failed to conduct and
> document proper suitability reviews and monitoring of fee-based Freedom
> Accounts to ensure that the account type remained suitable for its clients, such as
> Ms. Nguyen, after it had transferred them to fee-based Freedom Accounts. It
> appears that RJA never conducted any ongoing suitability reviews of these
> accounts because, for example, RJA again claims that it had no duty under the
> regulations and industry standards to conduct reviews as it relates to the type of
> account. See RJA's interrogatory number 11 response. RJA is wrong because
> FINRA regulations address a brokerage firm's responsibility as to account type.
> In addition, to the extent there was increased trading activity, the benefits that the
> clients received from this "increased" trading activity was not commensurate with
> the fees, and so it was still unsuitable.

As he did in prior points, Mr. Schulz infers that FINRA regulations require a suitability analysis
of "account type" and does not cite specific language in any rule or notice to members to support
this conclusion.  In the instance of Ms. Nguyen, Mr. Seale performed a suitability analysis based
on his extensive knowledge of his client.  A few weeks before making the recommendation to
invest in the Freedom Account at issue, Mr. Seale completed a financial plan for the client which
documented Ms. Nguyen's background and suitability information.  In addition, her specific
suitability information is documented in the account records maintained by Raymond James in
the form of the information collected to open a new account.  Ms. Nguyen was sent verification
letters for each account she opened to provide her an opportunity to review and make any needed
corrections to the account suitability components.

Mr. Seale was actively engaged in regular, ongoing discussions with Ms. Nguyen about her
finances and her holdings.  He updated, and presented to her, financial plans in 2015, 2017, and
2018.[5]  He created a portfolio review for her, as well, in March 2016, just two months after she
opened the Freedom Account that is the subject of this action.[6]  He also created portfolio reviews
for her at or near the times of the 2017 and 2018 financial plans.[7]  Both the financial planning
and the portfolio reviews, as well as the other emails and phone calls that they exchanged
between those events, allowed him to review her suitability information at that time.
Furthermore, Raymond James, through its AMS division, continually monitored her, and other,
Freedom Accounts for drift from the model portfolio, and conducted regular work evaluating the

---

[5] RJA_(NGUYEN)_010943, 010879, 010833.
[6] RJA_(NGUYEN)_041828.
[7] RJA_(NGUYEN)_012672, 023609.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

performance of the funds and fund managers, conducted annual rebalancing, and other routine
work as part of its management of the Freedom program.

Mr. Schulz's argument that "the benefits that the clients received from this 'increased' trading
activity was not commensurate with the fees" fails to quantify the benefits that the clients
received by being enrolled in the Freedom program.  I do not understand how Mr. Schulz can
conclude that an investment strategy that involves extensive fund manager due diligence and
regular rebalancing to allow for continued diversification with only occasional amounts of
trading by professional investment managers is inappropriate (to name only two of the benefits).

6)      In paragraph 20(f) of his report, Mr. Schulz states:

> Contrary to industry regulations and industry standards and its own policies, RJA
> failed to enforce its policies and procedures to conduct and document proper
> suitability analysis or suitability reviews.

This conclusion is not supported by the evidence that has been made available in this case.  Mr.
Schulz overlooks the account documentation maintained and produced by Raymond James
pursuant to this matter.  The suitability information was collected at the time the account opened,
documented in the books and records of the firm, and relied upon by the financial advisor in
making a reasonable recommendation.  This suitability information is collected upon opening all
accounts and approved by a licensed, supervising principal at Raymond James and is in line with
industry standards, custom, and practice during the 2015-2018 timeframe.  In addition, in the
case of Ms. Nguyen, Mr. Seale created and presented a "Financial Plan" unique to her specific
situation, just a few weeks before recommending that she open a second Freedom Account.  Mr.
Schulz also ignores the deposition testimony from Mr. Seale and Ms. Nguyen regarding
conversations that they had where they discussed various components of her suitability
characteristics.  The suitability recommendations and process Mr. Seale undertook to acquire the
information and make an informed recommendation was in line with all Raymond James policies
related to suitability.

Raymond James had in place appropriate policies concerning suitability as discussed below and
in my Expert Report.  As the testimony of Mr. Thurston indicates, there were proper procedures
in place to enforce the suitability policies and procedures.[8]

7)      In paragraph 20(g) of his report, Mr. Schulz states:

> Contrary to industry regulations and industry standards, RJA failed to enforce its
> policies and procedures to document proper suitability analysis or suitability
> reviews for Freedom Accounts.

Just as he did in paragraph 20(f), Mr. Schulz has here failed to support his contention that
Raymond James has failed to enforce its policies and procedures.  Again, I saw no evidence that
would lead me to conclude that Raymond James did not enforce its policies and procedures.

---

[8] *See, e.g.*, Thurston Depo. p. 51:1-79:22.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

As noted above in my response to paragraph 20(f) of Mr. Schulz's report, the suitability information was collected and reviewed and would be for any client opening an account.  In addition, in order to open a Freedom Account, an additional set of questions revolving around client suitability is documented in the Freedom Account application form, which was also approved by a licensed, supervising principal.  After opening a Freedom Account, the account documentation was also reviewed by the Asset Management Services group to assure that the model portfolio was aligned with the client's stated objective.  Raymond James financial advisors rely on the information they have collected regarding client investment characteristics to make an informed suitability recommendation, including a recommendation to invest in a Freedom Portfolio, which is in line with Raymond James policies and procedures governing suitability.

As noted above, Raymond James had appropriate policies and procedures in place regarding suitability.  In addition, AMS reviewed and determined that Ms. Nguyen's Freedom Account strategy aligned with her investment objectives, which is evidence that these policies worked.  I found no materials presented in this case supporting Mr. Schulz's contention that Raymond James did not enforce its policies and procedures.

8)      In paragraph 20(h) of his report, Mr. Schulz states:

> RJA's failure to conduct proper suitability analyses, properly document any suitability analyses, and follow industry regulations and industry standards and its own written policies regarding how to conduct and document suitability analyses was the result of a systemic failure at Raymond James—as reflected by the testimony of Christopher Thurston, RJA's Federal Rule of Civil Procedure 30(b)(6) designee and Chief Compliance Officer for AMS, who "head[s] up a group of compliance associates that support investment advisory and products, packaged products, complex products . . . ."[1] and, additionally, by RJA's sales practices and policies that provide encouragement and incentives to its registered Financial Advisors to switch customers in commission accounts to fee-based Freedom Accounts.

Mr. Schulz seems to ignore the facts available to him, and none support that there was a "systemic failure."  Mr. Schulz does not cite or refer to any specific industry standard or rule requiring the documentation of the suitability analysis in the 2015-2018 time period.  He mischaracterizes and at times questions the credibility of testimony provided by Mr. Thurston, without identifying a basis to do so.  He fails to cite one substantive financial incentive to support the assertion that Mr. Seale or any other Raymond James financial advisors were influenced to recommend Freedom Accounts to customers without conducting a suitability analysis, as he asserts.  There were no contests or incentives for opening a certain number of Freedom Accounts.[9]

---

[9] Thurston Depo. p. 179:9-16.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

9)      In paragraph 20(i) of his report, Mr. Schulz states:

> Contrary to regulations and industry standards, RJA charged excessive fees for the "additional" Freedom services provided by financial advisors unrelated to management of the investments in the Freedom Account.

Mr. Schulz's opinion is flawed in that the fees and fee structure in place at Raymond James for the Freedom Account program were in line with industry standards, custom, and practice for professionally managed, fee-based accounts. Mr. Schulz does not offer or cite any comparison or analysis of fees within the industry to substantiate this claim, whether it relates to (i) the fees posted on the fee schedule,[10] (ii) the actual fees that were charged after discounting,[11] (iii) the value of the services that AMS provided, or (iv) the value of any optional / additional services that any individual financial advisors provided and for which those advisors were compensated through Freedom Account fees.

10)     In paragraph 20(j) of his report, Mr. Schulz states:

> Members of the putative class are capable of being identified by an objective analysis of RJA's data via application of a common formula. The Class is defined to include only those customers who were in an RJA commission-based account and were moved to an unsuitable much higher fee-based Freedom Account. An analysis of RJA data by applying the two objective metrics (i.e., annual cost analysis and annual turnover analysis) permits me, with the assistance of Plaintiff's data expert, Mr. Arthur Olsen, to determine which commission-based accounts were unsuitable for fee-based Freedom Accounts because they fell below the two objective metrics above. The steps to identify the class members are objective and automated using the spreadsheets that RJA has produced to date and will produce in the future as discovery proceeds. I instructed Plaintiff's data expert to execute data queries to identify the class members.

Mr. Schulz's methodology is flawed. The key issue based on the pleadings, is whether there was a suitability analysis conducted for Ms. Nguyen and all other putative class members.[12] As an initial matter, Mr. Schulz's methodology cannot determine for any Freedom Account whether it was opened because of a financial advisor's recommendation. If it was not, then the suitability rule would not even come into play. Further, as I discuss above, Mr. Schulz's position is not aligned with the language of the FINRA suitability rule, 2111. The rule is subjective and requires that the financial advisor understand the client's investment profile, which cannot be accomplished by performing a metrics analysis based only upon annualized cost of commissions and turnover. Moreover, each client has unique, individual objectives, risk tolerance, time horizon, liquidity needs, and other information which they share with their financial

---

[10] RJA Form ADV, Part 2A, RJA_(NGUYEN)_008488.
[11] RJA_(NGUYEN)_059060-059063.
[12] It has been established that a suitability review did occur for Ms. Nguyen, and I have opined that the Freedom Account was one of many suitable options for her.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

advisor. That information is not static over time, but rather, regularly changes.  The financial advisor is obligated to use that information, as well as her or his professional judgment, to make a suitable recommendation for a transaction or investment strategy at the point in time when the recommendation is made.[13]

There is an obvious reason that Mr. Schulz's supposed "objective" test is flawed: suitability determinations are necessarily made on an individual, case-by-case basis, and are not based on a formulaic measurement restricted to two values that do not take into consideration the spelled-out criteria for making suitability determinations that are set forth in FINRA Rule 2111.  Mr. Schulz knows nothing related to the investment objectives, risk tolerances, tax situations, time horizons, liquidity needs, net worth, etc., of the members of this purported class.

Additionally, Mr. Schulz does not provide a method to identify which clients were "moved to" a Freedom Account from a commission-based account.  This raises the following questions:

- Does this include only those persons who sold *all* their assets in the commission-based account to fund the Freedom Account?
- Does it include only those persons who sold *more than half* of their assets in the commission-based account to fund the Freedom Account?
- Is there a minimum holding period for which a commission account must be opened before it would be considered as having had assets "moved"?
- What about a client who opened a commission account and then opened a Freedom Account only a few days later, and funded the Freedom Account with a portion of the assets from the commission-based account?

That is, Mr. Schulz does not suggest a minimum period of time for which the funding account had to have been open, nor does he suggest what percentage of assets liquidated from the commission-based account constitutes a client supposedly being "moved to" a Freedom Account.  This may be because he is bound by the facts of Ms. Nguyen, who only had her commission-based account open for six months and who did not liquidate her entire account to fund the Freedom Account.

If Mr. Schulz assumes that the use of *any* assets (regardless of their holding period, amount, or percentage of the whole) from a commission-based account to fund a Freedom Account would constitute being "moved to" a Freedom Account, additional errors are apparent.  Mr. Schulz's two-factor test (applied to this broad putative class) considers all assets in the commission-based accounts and is not limited to just those assets that were liquidated or used to open the Freedom Account.  What if the commission account was a pass-through for cash that was then used to fund the Freedom

---

[13] FINRA Rule 2111: "(a) A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile…"

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

Account?  In such a circumstance, the trading in the commission account of securities that were not liquidated to fund the Freedom Account would be of lesser importance, but Mr. Schulz's two-factor test does not take this into account.

In summary, Mr. Schulz's approach does not define, or even recognize, his first step of what it means to be "moved to" a Freedom Account.  This oversight on his part, when examined, shows additional problems of using his simplistic, two-factor test to determine the suitability of recommendations made to a class of potentially tens-of-thousands of people, each with their own unique circumstances and investment story.

11)   In paragraph 20(k) of his Report, Mr. Schulz states:

> Similarly, class members' damages can be calculated based on objective analysis of RJA's data using a common formula. The damages alleged here are excessive fees incurred in the fee-based accounts. Those excessive asset-based fees would not have been incurred but for the transfer to unsuitable accounts. Therefore, the measure of damages for each class member is: the difference between the fees paid in the fee-based account minus the projected commissions that would have been charged in the fee-based account. All of this can be done through an electronic query of RJA's records, which I have instructed Mr. Olsen to do. Damages would also include any resulting loss of investment gains on the account due to the reduction of assets in the account due to the difference between the fees paid in the fee-based account minus the projected commissions that would have been charged in the fee-based account. This also can be done through an electronic query of RJA's records and/or application of an appropriate return metric (e.g., applying the same rate of returns as earned in class-members' Freedom Accounts or earned in the relevant RJA Model Portfolio investment strategies used for its Freedom Accounts; or an appropriate index such as the S&P 500) all applied on a formulaic basis during the applicable time period.

Mr. Schulz's broad, sweeping assertion that damages calculations can be made on a class-wide basis is sheer speculation based on fundamentally flawed assumptions that include the following: (i) Every Freedom Account was opened because hundreds or thousands of individual financial advisors made recommendations to tens of thousands of individual clients that were each not supported by a reasonable basis, (ii) Each of these tens-of-thousands of Freedom Accounts paid "excessive fees," even though the fees charged were the contractual fees that the clients agreed to pay, (iii) "Excessive fees" can be calculated based on "projected commissions that would have been charged in the fee-based account" – even though no client agreed to pay commissions in any Freedom Account, and (iv) damages "would also include any resulting loss of investment gains on the account due to the reduction of assets in the account due to the difference between the fees paid in the fee-based account minus the projected commissions that would have been

11

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

charged in the fee-based account" - even though account performance is not at issue in this case.[14]

Moreover, Mr. Schulz's class-wide damages theory is not based on a "common formula" that has any acceptance under industry rules, standards, custom, or practice. It is unique and without precedent. It completely eliminates even the possibility of assigning value to the additional services provided by Raymond James through its AMS division, to clients within the Freedom program, all of which are completely discounted by Mr. Schulz. It also eliminates the possibility of assigning value to any of the additional services, such as financial planning, that any of the financial advisors for the tens of thousands of alleged class members may or may not have provided as part of the client opening a Freedom Account, which Mr. Schulz also completely discounts.

### Specific Concerns

Below, I expand on my general critique of Mr. Schulz's Report provided above to address certain specific misstatements or errors within Mr. Schulz's Report. For the convenience of the readers of this report, I have arranged my responses below in headings copied from Mr. Schulz's Report and included the range of paragraphs that are within each section. Note that the limited amount of time available for the preparation of this response necessitated omitting some of the concerns I had with Mr. Schulz's Report. Accordingly, this should not be presumed to be an exhaustive list of every point of Mr. Schulz's Report with which I disagree.

> Mr. Schulz's Report: III.B. NASD and FINRA Rules and Regulatory Notices reflect minimum industry standards regarding proper suitability analysis [Paragraphs 31-43]

I agree with Mr. Schulz that FINRA Rule 2111 was the suitability rule in place during the 2015-2018 timeframe. The rule requires, generally, that FINRA member broker-dealers and associated persons have a reasonable basis to believe that a recommendation is suitable for a customer. The rule does not require that the financial advisor conduct "due diligence" on a specific investment, but rather use information obtained through the "reasonable diligence of the member or associated person to ascertain the customer's investment profile."[15] The customer-specific obligation requires that a member or associated person have a *reasonable basis* to believe that a recommendation of a *security* or *investment strategy* involving a security or securities is suitable for a particular customer based on that customer's investment profile. There is no language in FINRA Rule 2111 that refers specifically to *account type* suitability as written in Mr. Schulz's Report.

Mr. Schulz is incorrect in citing multiple FINRA Rules regarding the determination of initial and ongoing suitability analysis. The suitability rule is clearly defined as FINRA Rule 2111, and is supported by FINRA Rule 2090, which is commonly referred to as "Know Your Customer." These are the rules that are accepted and followed as part of industry standards, custom, and

---

[14] Plaintiff's Amended Response to Defendant's Requests for Admission, 01/04/2021, Request for Admission no. 8, p. 8.
[15] FINRA Rule 2111.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

practice.  FINRA Rules 2010, 2122, and 3110 outline industry requirements related to
"Standards of Commercial Honor,"[16] "Charges for Services Performed,"[17] and the requirement to
establish a reasonable "Supervision"[18] system.  None of these 3 rules specifically create a
suitability obligation.

I agree with Mr. Schulz that FINRA Rule 2010 requires a broker to act in accordance with "just
and equitable principles of trade."  Mr. Schulz mischaracterizes the intent of the rule.  FINRA
Rule 2010, cited by Mr. Schulz, does not contain any language that establishes a "best interest"
requirement as he asserts.  FINRA Rule 2010, which he relies upon in making this allegation,
states, in its entirety: "*A member, in the conduct of its business, shall observe high standards of
commercial honor and just and equitable principles of trade.*"[19]

I would agree that FINRA Rule 2122 focuses on charges and fees for services and that they be
reasonable.  FINRA Rule 2122 states, in its entirety:

> *Charges, if any, for services performed, including, but not limited to,
> miscellaneous services such as collection of monies due for principal, dividends,
> or interest; exchange or transfer of securities; appraisals, safe-keeping or custody
> of securities, and other services shall be reasonable and not unfairly
> discriminatory among customers.*[20]

Mr. Schulz's interpretation mischaracterizes the rule.   The rule as it was in effect during the
2015-2018 timeframe *does not* contain any language that the fees "must be in the client's best
interest."  As it appears Mr. Schulz is being literal, in the sense that he is arguing that a fee is
never in a client's best interest.  But he ignores the services received in exchange for the fee and
the fact that the standard is reasonableness.

Mr. Schulz is incorrect when he asserts that FINRA rules address the issue of "account type" as
it relates to suitability.   He does not cite a specific rule or "standards" to support this position.
He mischaracterizes adding margin capabilities to a new or existing cash account as representing
a different account.  Adding margin to a standard cash account allows for methods of borrowing
to purchase securities in an account.[21]  The standard in the industry when referring to "account
type" relates to the account registration, not the features of an account.

> Mr. Schulz's Report: III.C. At minimum, a proper account suitability analysis requires an
> analysis of two objective metrics to discern low trading activity/buy-and-hold accounts
> for which a fee-based Freedom Account is not suitable. [Paragraphs 44-62]

---

[16] FINRA Rule 2010.
[17] FINRA Rule 2122.
[18] FINRA Rule 3110.
[19] FINRA Rule 2010.
[20] FINRA Rule 2122.
[21] RJA_(NGUYEN)_003846 (Raymond James New Account paperwork).

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

Mr. Schulz's theory that the use of two specific metrics related to trading activity is the primary, or only, determination of suitability is significantly flawed and does not follow the guidance of the FINRA suitability rule, Rule 2111.

There is no language in FINRA Rule 2111 or any other related rule that references any type of arbitrary mathematical formula to determine suitability.   You cannot apply metrics to determine suitability.  **Suitability is determined on an individual, client-by-client basis and requires that the financial advisor have a reasonable basis for a recommendation based on that customer's investment profile**.[22]  The theory Mr. Schulz relies on ignores the concept of knowing your client and making a reasonable recommendation based on understanding their unique financial situation and needs, objectives, risk tolerance, time horizon, liquidity, net worth, and other information that they may have disclosed to the financial advisor.  Given the myriad factors that go into a recommendation to a client for investments that are suitable, a simple, two-metric system is insufficient as a substitute for a suitability analysis.  Additionally, Mr. Schulz's two-metric approach only focuses on a single account – the supposed funding account for the Freedom Account – and attempts to derive exclusionary behavioral data from it.  It ignores other potentially relevant materials that are part of the investment profile, including other investments outside of that account, net worth, other investment experience, and other factors.  Rule 2111 does not require a financial advisor to put on blinders and view just the account that is the source of the investment under consideration.

The financial advisor's knowledge of his or her client and their professional training are the primary components in determining suitability.  Relying on metrics alone or as a primary determinant does not incorporate the client-specific information known to the financial advisor in making a suitability determination.  The suitability determination outlined in FINRA Rule 2111 is individual in nature and cannot rely on a mathematical algorithm. To evaluate whether a suitability review was done across this putative class would require an account-by-account and, truly, a client-by-client review.

Mr. Schulz's analysis, as applied to this plaintiff, is wrong and ignores the evidence that Mr. Seale did conduct a thorough suitability analysis for Ms. Nguyen when recommending that she open her second Freedom Account.  Mr. Seale and Ms. Nguyen both provided testimony in their depositions regarding suitability discussions that did indeed took place.[23]  Mr. Seale created and presented an in-depth financial plan,[24] which details Ms. Nguyen's specific suitability criteria. Mr. Seale had a long-term history and knowledge of his client (she had been with him when he was an advisor at Edward Jones) and acquired an understanding of her investment profile while she was his client.  He relied on her client-specific information and his professional training to make a suitable recommendation.  She had two prior fee-based managed accounts - one at Edward Jones and a prior Freedom Account - and she has complained about neither of them in this litigation.  Mr. Schulz's theory cannot explain how the recommendation to open the earlier

---

[22] FINRA Rule 2111.
[23] Seale Depo. p. 202:13-205:3; 208:9-22; 214:2-216:23; 233:3-20; Deposition of Kimberly Nguyen (January 12, 2021) ("Nguyen Depo."), p. 121:18-24; 130:17-25.
[24] RJA_(NGUYEN)_010943.

14

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

Freedom Account was supported by a reasonable basis while the recommendation to open the
second Freedom Account was not.

Mr. Schulz has no basis to determine that Raymond James did not conduct a suitability analysis
for any *other* Raymond James clients, without having himself reviewed the files and records for
each and every class member and their financial advisors.  There is no evidence that Mr. Schulz
reviewed any new account information, client contact management notes, client specific
documents (such as financial plans and portfolio reviews created for clients) or interviewed any
clients or financial advisors in coming to his conclusion.  Each client and financial advisor
relationship is unique and different and may include significantly different types of
communication.

Mr. Schulz is again incorrect in asserting that FINRA rules address the issue of account type
suitability and fails to cite any specific language to support this argument.  He also
mischaracterizes an NASD settlement from 2005 that is unrelated to the claims being presented
in this matter.[25]  The 2005 settlement relied upon by Mr. Schulz was limited to financial advisor
directed fee-based accounts, not accounts like Freedom, which are managed by AMS and cannot,
by definition, be inactive.  Accordingly, the prior litigation is completely unrelated to the present
issue.

> Mr. Schulz's Report: III.D. Contrary to industry regulations and industry standards, prior
> to transferring clients' assets from commission-based accounts to fee-based Freedom
> Accounts, RJA failed to conduct proper account suitability analyses for its clients,
> including Ms. Nguyen. [Paragraphs 63-70]

As this portion of Mr. Schulz's Report contains arguments whose responses are largely identical
to those of the following section, I have put my responses therein.

> Mr. Schulz's Report: III.E. Contrary to industry regulations and industry standards, RJA
> failed to conduct proper suitability reviews and monitoring of fee-based Freedom
> Accounts to ensure that the account type remained suitable for its clients, including Ms.
> Nguyen, after it had transferred them to fee-based Freedom Accounts. [Paragraphs 71-76]

Mr. Schulz's opinion as to what is a "proper" review is not helpful to a finder of fact when
Plaintiff has alleged not that the suitability review for her account was improper, but that there
was no suitability review performed at all.[26]  If the allegation is, in fact, that reviews were
performed, but they were not "proper," then there is certainly no way to evaluate whether
thousands of reviews were "proper," without investigating each and every recommendation and
the basis to support it.

Mr. Schulz's opinion on whether Raymond James failed to follow industry regulations and
standards is flawed.  Mr. Schulz does not cite any industry regulation or standard to support this
theory that ongoing suitability reviews are required for fee based, managed account.  He relies on
an unrelated case against another firm by the Securities and Exchange Commission that is not

---

[25] Schulz Report p. 10-11.
[26] Second Amended Class Action Complaint, para. 1, 8.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

relevant to this case.   The case cited does not relate to Raymond James and it is specific to
*inactive* fee-based accounts.  The Freedom Account portfolios, by design, are not "inactive."

Mr. Schulz's opinion that ongoing suitability discussions did not occur is not accurate.  There
were documented, ongoing discussions between Mr. Seale and Ms. Nguyen throughout the time
her Freedom Account was open.  Mr. Seale reviewed the individual client suitability and created
and presented an updated Financial Plan document to Ms. Nguyen in 2015, 2017, and 2018 to
review her current portfolio and objectives.

Mr. Schulz seems to ignore the testimony from Mr. Thurston's deposition that at the account
level, the firm relies on the ongoing client and financial advisor experience for primary ongoing
suitability discussions.[27]  The financial advisor who has the relationship with the end client
would then be responsible for updating the suitability information if the individual client's
financial circumstances have changed and relaying it to the AMS division.

Mr. Thurston also testified that the operations team as part of the AMS division would then
implement those updates and changes and reallocation on an ongoing basis to be certain the
individual account remained within the parameters relative to the designated objectives.

> Mr. Schulz's Report: III.F. RJA's policies recognized that a trading-activity analysis was
> required before transfer to the fee-based Freedom Accounts, but contrary to industry
> regulations and industry standards, RJA failed to enforce its policies and procedures.
> [Paragraphs 77-104]

There is no factual basis for Mr. Schulz's conclusion that Raymond James had policies in place
to *require* a trading-activity analysis before investing in a Freedom Account.  The policy that he
cites lists several factors that an Investment Advisor Representative ("IAR") should consider in
determining that an investment advisory account is appropriate.  As Mr. Thurston testified, the
focus of this policy was on financial advisor directed fee-based accounts.  From my review of the
policy, "Investment Advisory Accounts,"[28] it is readily apparent that the policy is oriented
towards monitoring trading inactivity in financial advisor directed advisory accounts.  Mr.
Schulz reads Mr. Thurston's testimony in an overly rigid way, and such a reading does not, in
any event, support Mr. Schulz's absolute conclusions.  While parts of this policy, read broadly,
would apply to Freedom Accounts, this policy is targeted to financial advisor/IARs where they
are directing the investments in a client's fee-based advisory account.

Raymond James had policies and procedures in place to comply with FINRA Rule 3110
requirements related to Supervision and the determination of suitability, which is the key issue in
this matter.  The key policy is labeled "Suitability" which is based on FINRA Rule 2111.  As
stated above the FINRA suitability rule did not require a quantitative trading analysis before
investing in a managed account portfolio.

---

[27] Thurston Depo. p. 52:7-55:2; 127:17-128:14.
[28] Thurston Depo., Ex. 69 (RJA_(NGUYEN)_019544).

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

Another applicable policy is the Investment Management Account Initial Objective Review.  Mr. Schulz says that this policy is inapplicable.[29]  The policy reads, in part:

> *As a fiduciary on investment management accounts, Raymond James is obligated to make a determination that the investment advice it gives to clients is suitable, taking into consideration the client's financial situation, investment experience and investment objectives. As such, AMS-sponsored Managed accounts are subject to suitability requirements. The primary responsibility for ensuring that investment management account products selected by the client are suitable for a client's financial situation lies with the client's financial advisor. This initial determination is also reviewed and approved by a supervisory principal for the financial advisor(s) of record. For newly established and existing AMS-sponsored program investment management accounts, AMS Compliance reviews the clients' investment objectives compared to the client's elected investment strategy and/or manager's discipline to assess whether the client-selected investment strategy or discipline is appropriate. Wealth preservation and Speculation investment objectives are not appropriate for AMS-sponsored account programs.*

> *The primary responsibility for ensuring that investment management account products selected by the client are suitable for his or her financial situation lies with the client's advisor.  This initial determination is also reviewed and approved by a registered principal at the branch office.*[30]

It follows, then, that to the extent this "Investment Advisory Account" policy did apply to a financial advisor's recommendation that a client liquidate assets in a commission-based account to open a Freedom Account (according to Mr. Schulz), there is nothing wrong with it.  Raymond James had procedures in place based on the Investment Advisers Act of 1940 and related rules, and this policy is an example of that.  These procedures included that IARs "should periodically review advisory accounts to determine whether the account remains appropriate for a client,"[31] and that "Financial Advisors must be appropriately registered as [IARs] prior to engaging clients through investment advisory agreements."[32]

From my review of the materials in this matter, including the deposition testimony of Mr. Thurston, there were several ways that Raymond James enforced these policies, including:

Branch Manager review.

AMS Division review of the portfolio selection relative to objectives.

Risk based analysis of various accounts and exceptions.

---

[29] *See* Schulz Report, para. 84.
[30] AMS Policies and Supervisory Procedures, "Investment Management Account Initial Investment Objective Review," RJA_(NGUYEN)_010782-010783; *see also,* 010774-010775, 015121-015126.
[31] RJA_(NGUYEN)_019544-019545 (Investment Advisory Accounts).
[32] RJA_(NGUYEN)_019421-019422 (Advisory Accounts).

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

Branch office examinations, including discussions with financial advisors.[33]

Verification letters sent directly to the clients.

For Ms. Nguyen's account in question, AMS confirmed that the Freedom strategy aligned with Ms. Nguyen's investment goals,[34] and there has been no evidence that such a review was not done for each account that invested in the Freedom Portfolio.  Indeed, determining whether suitability reviews were performed when recommendations were made would require an account-by-account review of tens-of-thousands of accounts.

Mr. Schulz's theory regarding a lack of suitability documentation is incorrect.  The suitability information was collected as part of the new account information and is retained in the books and records of Raymond James, in accordance with FINRA recordkeeping requirements.  In the case of Ms. Nguyen, these records were produced and are available for Mr. Schulz to review. Freedom Account agreements were maintained and produced which also list the objectives and suitability components obtained directly by the financial advisor in line with industry rules, customs, and standards.  In the case of Ms. Nguyen, there were contact management notes, detailed Financial Plan analysis reviews, and memorialized communications between the financial advisor and the client.   In addition, Mr. Seale testified in his deposition regarding the collection of suitability information and his basis for making the determination for Ms. Nguyen.[35]

FINRA Rule 2111 does not list any specific documentation requirements and Mr. Schulz does not cite any other regulatory rule that required such documentation during the 2015-2018 timeframe.  There was no industry standard, custom, or practice to maintain a specific, documented analysis during the 2015-2018 timeframe as Mr. Schulz asserts.

Compliance with the suitability obligation does not depend on whether the determination was documented, but on whether a reasonable determination was made by the financial advisor, which was done for Ms. Nguyen.  To determine this for the entire class, would require (i) a review of the specific account documentation records for each potential class member, and (ii) speaking to the client and financial advisor to determine (a) whether a recommendation was even made, which is a threshold requirement for the application of the suitability rule, and (b) the reasonableness of the recommendation of the specific financial circumstances applicable to each purported class member.

I note that Mr. Schulz quoted and emphasized in paragraph 91 of his report, that "the client's past and anticipated levels of trading activity" must be "documented" and "considered" in making a suitability review.  I cannot fathom how an evaluation of whether these two things – the documentation and the consideration - could be performed on anything other than a case-by-case basis, effectively disallowing a class-based analysis of the issues alleged in this case.

---

[33] Thurston Depo. p. 202:13-205:3; 208:9-22; 214:2-216:23; 233:3-20.
[34] RJA_Nguyen_059112-059113.
[35] Seale Depo. p. 139, 151, 230, 233.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

> Mr. Schulz's Report: III.G. RJA incentivizes its financial advisors to transfer clients from commission-based accounts to fee-based Freedom Accounts without regard to suitability. [Paragraphs 105-115]

Mr. Schulz's conclusion that Raymond James incentivized its financial advisors to transfer clients without regard to suitability misstates the facts.

As spelled out above, Raymond James had policies and procedures in place to require a suitability analysis prior to making a recommendation to a client. There are new account documents, Financial Plans, contact management notes, and sworn testimony from both Mr. Seale and Ms. Nguyen regarding suitability discussions that took place before she made the decision to invest in the Freedom Account portfolio. There is no evidence that the same type of suitability review did not take place for the other clients that might constitute the purported class.

Mr. Schulz does not cite any specific financial incentive for the individual financial advisor that would renumerate them at a higher level based on their clients investing in a Freedom Account portfolio versus investing in other types of securities or holding an advisory account managed by the financial advisor. The testimony in this case established that there was no additional compensation for a financial advisor who generated revenue from a Freedom Account compared to one who generated the same amount of revenue from a commission-based brokerage account. Furthermore, there was no testimony presented that Raymond James provided any incentive to any of its financial advisors to recommend a Freedom Account to their clients without conducting a suitability review. Mr. Seale actually testified that the flexibility offered by Raymond James to its advisors to recommend to their clients the investment products that they felt best met the client's needs was one aspect of Raymond James that caused him to join the firm.

Mr. Schulz cites internal advisor guides and testimonials as having influence over a financial advisor. In the case of the Plaintiff, Mr. Seale testified in his deposition that he did not recall seeing or reviewing any of the testimonial or internal "marketing" pieces[36] and accordingly, they had no influence on making an individualized suitability determination for Ms. Nguyen.

Mr. Thurston stated that the marketing materials that he was shown were the specific experiences of those individuals and did not represent Raymond James's policies.[37] From my review of the materials cited by Mr. Schulz in this section, it is evident that Raymond James did not instruct, or encourage, its financial advisors to recommend that their clients open a Freedom Account (using assets in a commission-based account or otherwise) *without* a suitability review.

Mr. Schulz also attempts to draw attention to a NASD finding from 2005 regarding sales literature that was sent to clients. This finding was a full 10 years prior to when Ms. Nguyen opened her account(s) at Raymond James and is irrelevant to the Freedom Account portfolio at issue.

---

[36] Seale Depo. p. 226:22-228:19.
[37] Thurston Depo. p. 207:15-208:15.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

> Mr. Schulz's Report: III.H. The Freedom Account's other "services" and "benefits" do
> not make the account suitable. [Paragraphs 116-142]

I do not agree with Mr. Schulz's opinion regarding the other "services" and "benefits."

Mr. Schulz's conclusion that objective metrics are the only determining factor for suitability does
not meet the FINRA Rule 2111 suitability definition or requirement.  Reasonable basis suitability
is an individualized process and is subjective based on unique characteristics of the client.  Nor is
this process limited to activity in the single-funding account, but rather takes into account the
available investment profile of the client, including information that may touch on other
investments or holdings.  There is no language in the suitability rule for an objective metric
measure being the primary determining factor in a suitability analysis before a recommendation
is made.

Mr. Schulz in paragraph 118 recites some of the benefits of Asset Management Services
conducting research, monitoring allocations, performance of securities, and performance of fund
managers.  The Plaintiff testified in her deposition that she understood that she would be
receiving professional management, monitoring of the account, and rebalancing.  She also
testified that she was aware of the fee structure with the discount (1.25%) that Mr. Seale applied,
and made the decision to invest in the Freedom Account Hybrid Portfolio.  Mr. Schulz's
allegation that Ms. Nguyen was already receiving "rebalancing" is incorrect.  Mr. Seale testified
in his deposition that although he was making rebalancing recommendations for her brokerage
account, Ms. Nguyen did not follow his advice and was not rebalancing her account.[38]

Each of the services provided by the individual financial advisor (beyond the services that AMS
provides as part of the Freedom program) are unique to the individual client.  Some clients and
financial advisors might elect to receive and perform, respectively, these individual services
while others do not.  There are services that are individually driven and may represent a value to
the client versus the cost.  A review of each Freedom Account client's use of the additional
services would need to be conducted on an individual basis and would not be representative of
the experience of another member of the putative class.  Similarly, due to the available
discounting, clients paid a variety of fee percentages for their Freedom program, which would
also have an impact if Mr. Schulz wanted to appropriately "weigh" Freedom's services and
benefits against its costs to that individual client.

Under Mr. Schulz's logic, a client should simply receive the additional services of the Freedom
Account for no charge whatsoever, because either they provide no value, or it overly complicates
his damages model.  Such a conclusion - that such services should be received for free – is not in
line with industry standards, or with the individual contracts that each and every purported class
member entered into when opening his/her/its Freedom Account.  The fees charged by Raymond
James in the Freedom program both represent a value to the clients and are similar to those of
other firms in the industry.

---

[38] Seale Depo. p. 198:22-205:3.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

Mr. Schulz's Report: IV. CLASS MEMBERS CAN BE IDENTIFIED BASED ON AN OBJECTIVE REVIEW OF RJA'S DATA. [Paragraphs 143-147]

For the reasons stated above, class members cannot be identified based on an "objective" review of Raymond James's data.  In sum, Mr. Schulz's self-created two-factor test for determining whether a Freedom Account is suitable is not supported by industry rules, standards, custom, or practice.  Additionally, in order to identify whether a recommendation was made and, if at issue, whether the recommendation was supported by a reasonable basis that the Freedom Account was suitable, a finder of fact would have to review the circumstances of each and every member of the purported class, including review of documents and, where available, an interview or other testimony of the individual client and their financial advisor.  Hence, contrary to Mr. Schulz's statement, purported class members cannot be identified by simplistically using Mr. Schulz's novel and unsupported two-factor metric.

Mr. Schulz's Report: V. CLASS MEMBERS' DAMAGES CAN BE CALCULATED BASED ON AN ANALYSIS OF RJA'S DATA. [Paragraphs 148-155]

For the reasons stated above, damages cannot be calculated based on an analysis of data alone, in a way that is consistent with industry standards, custom, or practice.  The damages model proposed by Mr. Schulz suffers from a variety of flaws, including speculation and a failure to treat individual class members consistently with their unique circumstances.  Thus, Mr. Schulz's proposed damages analysis / protocol – which lacks peer review, and which has no acceptance under industry standards, custom, or practice – lacks legitimacy, and cannot be the basis for calculating damages for purported class members.

## <u>Conclusions</u>

Having considered all of the evidence I have reviewed in this case, my conclusions as expressed in my Expert Report remain unchanged.  As expressed above, the conclusions contained in the Schulz Report are insufficiently supported due to the flawed assumptions and analysis contained therein.

**CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT**

## **Submission**

I reserve the right to change or amend this report on the basis of new evidence or additional discovery received, and to supplement my opinions based upon such discovery or additional information.  Respectfully submitted on the date above.


Joseph J. Thomas
Director
Bates Group, LLC
Lake Oswego, OR 97035

EXHIBIT 1

CONFIDENTIAL

*Nguyen v. Raymond James Associates, Inc.*
Additional Facts and Data Considered in Rebuttal Report

| Begin Bates | End Bates | Other Description |
|---|---|---|
| **Portfolio Reviews** | | |
| RJA_(NGUYEN)_041828 | RJA_(NGUYEN)_041841 | |
| RJA_(NGUYEN)_023609 | RJA_(NGUYEN)_023625 | |
| RJA_(NGUYEN)_012672 | RJA_(NGUYEN)_012696 | |
| **Chart of Freedom Program Data (30(b)(6) Topic #6)** | | |
| RJA_(NGUYEN)_059108 | RJA_(NGUYEN)_059109 | |
| **Arthur Olsen's Report and Documents Cited Therein** | | |
| | | Expert Report of Arthur Olsen re Class Certification |
| RJA_(NGUYEN)_058468 | RJA_(NGUYEN)_058468 | |
| RJA_(NGUYEN)_058469 | RJA_(NGUYEN)_058469 | |
| RJA_(NGUYEN)_059060 | RJA_(NGUYEN)_059060 | |
| RJA_(NGUYEN)_059061 | RJA_(NGUYEN)_059061 | |
| RJA_(NGUYEN)_059062 | RJA_(NGUYEN)_059062 | |
| RJA_(NGUYEN)_059063 | RJA_(NGUYEN)_059063 | |
| RJA_(NGUYEN)_059108 | RJA_(NGUYEN)_059109 | |
| RJA_(NGUYEN)_059110 | | |
| RJA_(NGUYEN)_059111 | | |
| | | Tab 120 Nguyen - 2021-05-25 Letter to counsel enclosing selected queries |
| **Douglas J. Schulz's Report and Documents Cited Therein** | | |
| | | Report of Douglas J. Schulz re Class Certification |
| NGUYEN_0000403 | NGUYEN_0000405 | |
| NGUYEN_0000406 | NGUYEN_0000409 | |
| NGUYEN_0000410 | NGUYEN_0000428 | |
| NGUYEN_0000429 | NGUYEN_0000430 | |
| NGUYEN_0000431 | NGUYEN_0000439 | |
| NGUYEN_0000440 | NGUYEN_0000445 | |
| NGUYEN_0000446 | NGUYEN_0000448 | |
| NGUYEN_0000449 | NGUYEN_0000452 | |
| NGUYEN_0000453 | NGUYEN_0000456 | |
| NGUYEN_0000457 | NGUYEN_0000461 | |
| NGUYEN_0000462 | NGUYEN_0000464 | |
| NGUYEN_0000465 | NGUYEN_0000468 | |
| NGUYEN_0000914 | NGUYEN_0000966 | Edward Jones Statements |
| NGUYEN_000550 | NGUYEN_000590 | 2015 Statements |

CONFIDENTIAL

*Nguyen v. Raymond James Associates, Inc.*
Additional Facts and Data Considered in Rebuttal Report

| Begin Bates | End Bates | Other Description |
|---|---|---|
| NGUYEN_000591 | NGUYEN_000702 | 2016 Statements |
| NGUYEN_000703 | NGUYEN_000783 | 2017 Statements |
| NGUYEN_000784 | NGUYEN_000866 | 2018 Statements |
| NGUYEN_000871 | NGUYEN_000913 | Trade Confirmations |
| NGUYEN_000914 | NGUYEN_000966 | |
| NGUYEN_002064 | NGUYEN_002065 | |
| RJA_(NGUYEN)_000001 | RJA_(NGUYEN)_000043 | |
| RJA_(NGUYEN)_003637 | RJA_(NGUYEN)_003645 | |
| RJA_(NGUYEN)_003846 | RJA_(NGUYEN)_003897 | |
| RJA_(NGUYEN)_004286 | RJA_(NGUYEN)_004550 | IRA Statements |
| RJA_(NGUYEN)_006302 | RJA_(NGUYEN)_006411 | |
| RJA_(NGUYEN)_010943 | RJA_(NGUYEN)_010969 | |
| RJA_(NGUYEN)_010970 | RJA_(NGUYEN)_011106 | |
| RJA_(NGUYEN)_012336 | RJA_(NGUYEN)_012337 | |
| RJA_(NGUYEN)_014917 | RJA_(NGUYEN)_015058 | |
| RJA_(NGUYEN)_015094 | RJA_(NGUYEN)_015128 | |
| RJA_(NGUYEN)_019419 | RJA_(NGUYEN)_019420 | |
| RJA_(NGUYEN)_019421 | RJA_(NGUYEN)_019422 | |
| RJA_(NGUYEN)_019425 | RJA_(NGUYEN)_019426 | |
| RJA_(NGUYEN)_019437 | RJA_(NGUYEN)_019438 | |
| RJA_(NGUYEN)_019443 | RJA_(NGUYEN)_019443 | |
| RJA_(NGUYEN)_019466 | RJA_(NGUYEN)_019467 | |
| RJA_(NGUYEN)_019468 | RJA_(NGUYEN)_019469 | |
| RJA_(NGUYEN)_019479 | RJA_(NGUYEN)_019480 | |
| RJA_(NGUYEN)_019485 | RJA_(NGUYEN)_019486 | |
| RJA_(NGUYEN)_019487 | RJA_(NGUYEN)_019487 | |
| RJA_(NGUYEN)_019488 | RJA_(NGUYEN)_019489 | |
| RJA_(NGUYEN)_019490 | RJA_(NGUYEN)_019491 | |
| RJA_(NGUYEN)_019492 | RJA_(NGUYEN)_019493 | |
| RJA_(NGUYEN)_019544 | RJA_(NGUYEN)_019545 | |
| RJA_(NGUYEN)_019548 | RJA_(NGUYEN)_019549 | |
| RJA_(NGUYEN)_019550 | RJA_(NGUYEN)_019551 | |
| RJA_(NGUYEN)_019564 | RJA_(NGUYEN)_019565 | |
| RJA_(NGUYEN)_019573 | RJA_(NGUYEN)_019574 | |

CONFIDENTIAL

*Nguyen v. Raymond James Associates, Inc.*
Additional Facts and Data Considered in Rebuttal Report

| Begin Bates | End Bates | Other Description |
|---|---|---|
| RJA_(NGUYEN)_019620 | RJA_(NGUYEN)_019622 | |
| RJA_(NGUYEN)_019623 | RJA_(NGUYEN)_019625 | |
| RJA_(NGUYEN)_019637 | RJA_(NGUYEN)_019638 | |
| RJA_(NGUYEN)_019645 | RJA_(NGUYEN)_019646 | |
| RJA_(NGUYEN)_019647 | RJA_(NGUYEN)_019648 | |
| RJA_(NGUYEN)_019651 | RJA_(NGUYEN)_019652 | |
| RJA_(NGUYEN)_019653 | RJA_(NGUYEN)_019655 | |
| RJA_(NGUYEN)_019664 | RJA_(NGUYEN)_019665 | |
| RJA_(NGUYEN)_019686 | RJA_(NGUYEN)_019688 | |
| RJA_(NGUYEN)_019691 | RJA_(NGUYEN)_019692 | |
| RJA_(NGUYEN)_019699 | RJA_(NGUYEN)_019701 | |
| RJA_(NGUYEN)_019783 | RJA_(NGUYEN)_019785 | |
| RJA_(NGUYEN)_019922 | RJA_(NGUYEN)_019922 | |
| RJA_(NGUYEN)_022052 | RJA_(NGUYEN)_022057 | |
| RJA_(NGUYEN)_023498 | RJA_(NGUYEN)_023529 | |
| RJA_(NGUYEN)_023593 | RJA_(NGUYEN)_023596 | |
| RJA_(NGUYEN)_023597 | RJA_(NGUYEN)_023597 | |
| RJA_(NGUYEN)_023853 | RJA_(NGUYEN)_023853 | |
| RJA_(NGUYEN)_028991 | RJA_(NGUYEN)_028993 | |
| RJA_(NGUYEN)_029336 | RJA_(NGUYEN)_029351 | |
| RJA_(NGUYEN)_029388 | RJA_(NGUYEN)_029399 | |
| RJA_(NGUYEN)_029784 | RJA_(NGUYEN)_029785 | |
| RJA_(NGUYEN)_029809 | RJA_(NGUYEN)_029823 | |
| RJA_(NGUYEN)_030201 | RJA_(NGUYEN)_030208 | |
| RJA_(NGUYEN)_030368 | RJA_(NGUYEN)_030375 | |
| RJA_(NGUYEN)_030794 | RJA_(NGUYEN)_030795 | |
| RJA_(NGUYEN)_032013 | RJA_(NGUYEN)_032165 | |
| RJA_(NGUYEN)_032177 | RJA_(NGUYEN)_032193 | |
| RJA_(NGUYEN)_032715 | RJA_(NGUYEN)_032715 | |
| RJA_(NGUYEN)_032716 | RJA_(NGUYEN)_032717 | |
| RJA_(NGUYEN)_033116 | RJA_(NGUYEN)_033121 | |
| RJA_(NGUYEN)_034643 | RJA_(NGUYEN)_034644 | |
| RJA_(NGUYEN)_034658 | RJA_(NGUYEN)_034658 | |
| RJA_(NGUYEN)_035050 | RJA_(NGUYEN)_035054 | |

*Nguyen v. Raymond James Associates, Inc.*
Additional Facts and Data Considered in Rebuttal Report

| Begin Bates | End Bates | Other Description |
|---|---|---|
| RJA_(NGUYEN)_035112 | RJA_(NGUYEN)_035152 | |
| RJA_(NGUYEN)_036100 | RJA_(NGUYEN)_036203 | |
| RJA_(NGUYEN)_040398 | RJA_(NGUYEN)_040411 | |
| RJA_(NGUYEN)_040412 | RJA_(NGUYEN)_040425 | |
| RJA_(NGUYEN)_040426 | RJA_(NGUYEN)_040439 | |
| RJA_(NGUYEN)_040440 | RJA_(NGUYEN)_040453 | |
| RJA_(NGUYEN)_040454 | RJA_(NGUYEN)_040467 | |
| RJA_(NGUYEN)_040468 | RJA_(NGUYEN)_040481 | |
| RJA_(NGUYEN)_040482 | RJA_(NGUYEN)_040495 | |
| RJA_(NGUYEN)_040496 | RJA_(NGUYEN)_040509 | |
| RJA_(NGUYEN)_040510 | RJA_(NGUYEN)_040522 | |
| RJA_(NGUYEN)_040523 | RJA_(NGUYEN)_040536 | |
| RJA_(NGUYEN)_040537 | RJA_(NGUYEN)_040550 | |
| RJA_(NGUYEN)_041217 | RJA_(NGUYEN)_041272 | |
| RJA_(NGUYEN)_043502 | RJA_(NGUYEN)_043502 | |
| RJA_(NGUYEN)_044669 | RJA_(NGUYEN)_044670 | |
| RJA_(NGUYEN)_044886 | RJA_(NGUYEN)_044889 | |
| RJA_(NGUYEN)_046437 | RJA_(NGUYEN)_046440 | |
| RJA_(NGUYEN)_058468 | | |
| RJA_(NGUYEN)_058469 | | |
| RJA_(NGUYEN)_059060 | | |
| RJA_(NGUYEN)_059061 | | |
| RJA_(NGUYEN)_059062 | | |
| RJA_(NGUYEN)_059063 | | |
| RJA_(NGUYEN)_059100 | RJA_(NGUYEN)_059107 | |
| RJA_(NGUYEN)_059108 | RJA_(NGUYEN)_059109 | |
| RJA_(NGUYEN)_059112 | | |
| RJA_(NGUYEN)_059113 | | |
| | | Akhilesh Ganti, Brokerage Fee Definition |
| | | Bruce Kelly, What zero commissions mean for B-Ds - InvestmentNews |
| | | Chad Langager, Investing in Stocks_ How to Start for Beginners |
| | | Daniela Sirtori-Cortina, Commission vs fees_ How the new brokerage model will impact advisor recruitment |
| | | ETF Versus Mutual Fund Fees - Fidelity |

CONFIDENTIAL

*Nguyen v. Raymond James Associates, Inc.*
Additional Facts and Data Considered in Rebuttal Report

| Begin Bates | End Bates | Other Description |
|---|---|---|
| | | Federal Register volume 81, No. 68-Friday, April 8, 2016-rules and regulations |
| | | Final Rule_ Shareholder Reports and Quarterly Portfolio Disclosure of Registered Management Investment Companies |
| | | FINRA NTM 03-68 |
| | | FINRA NTM 12 – 25 New Suitability Rule Q&A |
| | | FINRA Rule 2111 (Suitability) FAQ |
| | | Flat Fees or Fat Fees, PIABA Bar Journal 2003 |
| | | In re Royal All. Assocs., Inc., SEC Release No. 4351 |
| | | Jake Frankenfield, Commission Definition |
| | | JB Maverick, What Is Considered a Good Expense Ratio |
| | | John Rekenthaler, Upfront Investment Fees Are (Almost) No More _ Morningstar |
| | | Kent Thune, How to Benefit From Using a Mutual Fund Turnover Ratio |
| | | Lisa Shidler, PriceMetrix launches free equity commission guide - InvestmentNews |
| | | Morningstar US_FeeStudy_060120 |
| | | Nancy Condon & Herb Perone, FINRA Fines Robert W. Baird & Co. $500,000 for Fee-Based Account, Breakpoint Violations _ FINRA.org |
| | | NASD NTM 96 – 33 Investment Adviser Brokers |
| | | NYSE Regulation fines A.G. Edwards & Sons _ Investment Executive |
| | | People Handling Other Peoples' Money – SEC Investment Adviser Association |
| | | Robert Baird FINRA sanction No. 20070094878 |
| | | Rusty Vanneman, ETF Analysis_ Don't Forget Portfolio Turnover |
| | | SEC Investor Bulletin, How Fees and Expenses Affect Your Investment Portfolio |
| | | SEC Release No. 28064 |
| | | Stephan A. Abrham, Turnover ratios and fund quality |
| | | Study On Investment Advisors And Broker Dealers, SEC Staff Study |
| | | Timothy J. O'Connor, Dual Registrants and the Best Interest Rule |