# EXHIBIT H

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KIMBERLY NGUYEN, on behalf of
herself and all others similarly situated,

     Plaintiff,

v.                                Case No. 8:20-cv-195-CEH-AAS

RAYMOND JAMES & ASSOCIATES, INC.,

     Defendant.

_____/

## <u>DECLARATION OF PETER KLOUDA</u>

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      My name is Peter Klouda and I am over 21 years of age and competent to testify to the statements set forth in this declaration.

2.      I am currently a Director at Bates Group LLC.  I was retained on behalf of defendant Raymond James & Associates, Inc. ("RJA") to render opinions and testimony as an expert in this case.  I have previously submitted two reports in this matter: Expert Report of Peter J. Klouda dated June 4, 2021 (copy attached hereto as Exhibit 1) ("Expert Report") and Rebuttal Expert Report of Peter J. Klouda dated June 25, 2021 (copy attached hereto as Exhibit 2) ("Rebuttal Report").  I was asked by counsel to review the Plaintiff's Motion For Class Certification and Memorandum of

1

Law in Support dated July 20, 2021 ("Class Certification Motion") in connection with issues addressed in my Expert Report and Rebuttal Report, including a review of the damages model proposed by Plaintiff's alleged expert Douglas J. Schulz ("Schulz").[1]

3.      The statements set forth in this declaration are based upon my personal knowledge and my review of the materials identified in my Expert Report and Rebuttal Report or cited in this declaration.

4.      Schulz has presented a novel and unsupportable damage model that attempts to calculate purported damages for thousands of individuals in a proposed "class" based upon the difference between ***actual fees*** paid for a Freedom Account minus ***hypothetical fees*** that might have been incurred if purported class members had remained in a commission-based brokerage account ("commission account").[2] According to Schulz, the hypothetical fees are the average annualized commissions from the commission account multiplied by the average equity in the Freedom Account.

5.      The hypothetical fees component (the fees that Schulz professes that clients "would have paid" if they had not opened a Freedom Account) is pure speculation.  There is no factual basis for simply assuming what fees (or commissions) an individual investor would have incurred in a commission account that no longer

---

[1] *See* Report of Douglas J. Schulz re Class Certification ¶¶ 148-155, dated June 4, 2021 ("Schulz Report").

[2] Ibid. ¶ 149.

exists years into the future.  This speculation is made even worse by the fact that Schulz's theory does not even consider what types of assets were in the commission account, and further does not consider any of the facts and circumstances relating to the individual investor or the reasons for past trading patterns.  One cannot, with precision or otherwise, determine an investor's potential trading patterns and level of commissions into future years.  Market conditions, financial advisors, life events, financial circumstances, investment objectives, investment performance, risk tolerances, and other relevant variables change through time.  Thus, Schulz's assumption that the average annualized commission cost from the commission account would have been the same commission cost into future years is not reliable.

6.     The data that Schulz used to derive his hypothetical future trading numbers comes from a mere two-year window (and not all accounts, including Plaintiff's commission account, within the sample or the putative class, even have 2 years of data because they were open for less than that time).  He uses this same short window to assume (or speculate) as to fees that might have been paid multiple years into the future.  There is no reasonable basis to assume that this limited period of trading history would reflect a habit or pattern for each customer that could be used to accurately predict the future (as opposed to representing an anomaly on their trading history); and thus further undermines the reliability of Schulz's damages theory.  Moreover, the fact that each investor had affirmatively decided to move assets, in whole or in part, from a commission account to a Freedom Account could indicate a

change in the investor's investment objectives, or risk tolerance, or other financial characteristics, which are not accounted for in Schulz's damages theory.

7.     As an example, the Plaintiff's commission account that funded her Freedom Account was only open for 6 months prior to her opening the subject Freedom Account in January 2016 because she had transferred to RJA from Edward Jones in July 2015.  There was low trading activity because Plaintiff's husband had been in control of the account, he had passed away, and Plaintiff was unfamiliar with investing and not comfortable making investment decisions.  Based on this 6-month window, Schulz speculates that, had she kept her mutual fund assets in a commission account (instead of selling them and investing the proceeds in a Freedom Account), she would have never traded any assets or incurred any costs during the almost 3-year period she was invested in the Freedom program.  This is not realistic and amounts to pure speculation, as there would have likely been any number of events, such as account rebalancing, life events, or market events, to cause trading in her commission account over a three-year period.    Multiple other purported class members' commission accounts were also open for less than 6 months,[3] indicating there could be thousands of such accounts in the putative class.

8.     Schulz fabricates a two-factor test to determine suitability of the Freedom Account (and presumably class membership), limiting the test to only look at annual

---

[3] *See* Report of Arthur Olsen re Class Certification ("Olsen Report"), Exhibit D. Investors 8, 9, 10, 23, 38 & 41.

cost percentage and turnover, and he then sets, without support, the thresholds for "unsuitability" at 0.5% and 0.25 or lower, respectively.[4]  This test is not recognized as a legitimate test for suitability in the securities industry and would improperly include in Schulz's "unsuitable" bucket countless purported class members for whom a Freedom Account was and is suitable.  In fact, every Freedom Account in Schulz's putative class could be suitable.  For example, in the following scenarios (and no doubt others), a fee-based program like Freedom could very well be suitable, but Schulz's model would improperly include them in the purported class and award damages: 1) commission accounts with large cash balances; 2) commission accounts with concentrated holdings; 3) commission accounts where a client has had a life event or for other reasons seeks professional money management; 4) commission accounts that have poor performance and seek better returns.

9.      There is no basis for concluding liability and, therefore, damages in the above four scenarios.  Yet, in each of the above four scenarios, if the annual cost percentage in the commission account were below 0.5% and turnover below 0.25, Schulz would categorically say that 1) a Freedom Account is per se unsuitable, and 2) any investor in these categories should be excluded from the Freedom Program and awarded damages in all situations.

10.      Further, Schulz's damage model fails to identify or account for the countless purported class members who would have zero damages under Plaintiff's

---

[4] Schulz Report ¶ 60.

liability theory.  The investment made by a purported class member in a Freedom Account could easily have outperformed the different securities (or cash) in a client's commission account, and under a proper damages analysis, such class member would have no damages.

11.     The benefits and services of a Freedom Account differ greatly from any services that may be provided in a commission account; Freedom is not a "flat-fee" version of a commission account, which is how Schulz's damage model treats Freedom Accounts.   The Freedom Account is part of a comprehensive investment program (the Freedom Program) that provides active professional management services through an investment committee in exchange for an annual asset-based fee. These professional management services include the following:

  i.   Creation of a menu of model investment strategies to select from

  ii.  Selection, purchase, and sale of mutual funds and ETFs

  iii. Performance monitoring of mutual funds and ETFs

  iv.  Monitoring of fund managers

  v.   Target allocations of assets

  vi.  Rebalancing of investments in the account

12.     All of the above benefits and services provide value to the client who has invested in a professionally managed Freedom Account, which does not generally occur in a commission account.

13.     In addition to the services and benefits provided through the Freedom Program directly, additional ancillary services could have also been provided by each

RJA individual financial advisor in connection with the Freedom Account, including: 1) asset allocation (*i.e.*, what percentage of a client's assets to allocate to the Freedom Program versus other investments); 2) periodic portfolio review; 3) performance reporting; 4) investment advice; 5) college planning; 6) financial planning; 7) cash flow management; 8) professional model management; and 9) investment consulting. The extent of such services – which Plaintiff's model wholly ignores – could only be determined on an account-by-account review.  Schulz seemingly weighs the value of these services in his Report, in Section H, but then does not account for them in his damages model or, rather, gives them zero value at all.

14.     Returning part or all of the Freedom Account fees to the Plaintiff and purported class members overcompensates the Plaintiff and purported class members since RJA performed its duties under the Freedom Agreement (the agreement between RJA and each putative class member relating to the Freedom Program).  Returning the fees or a portion of the fees would provide the Plaintiff and purported class members a windfall by allowing them to retain the services and benefits of the Freedom Account, which they contracted for, with no compensation to RJA for having provided these services and benefits through the Freedom Program.  Plaintiff was aware of the fees charged for her Freedom Account and paid them regularly for almost 3 years.  RJA cannot unwind the professional money management services it provided – the Plaintiff has already received (and benefited from) them.

15.     Schulz's damages model effectively concludes that certain purported class members, including the Plaintiff, should receive the Freedom Account for free.

There is no valid basis for such a damages model. His model assumes that the investors should receive all of the potential investment gains of the Freedom Account, but at a fraction of the cost – or at zero cost for 68% of accounts in the sample.[5]

16.     Schulz is mixing and comparing components of two entirely different investment programs: an unmanaged commission-based model (commissions are paid when trades occur), and the Freedom Account Program (a professionally managed investment program with specific fee percentages agreed to by each client and based on the amount of assets in the account). Schulz is applying a hypothetical annual cost percentage (derived from activity on unknown assets in each commission account) to the equity amount in the Freedom Program (representing a different set of assets entirely from what was held in the commission account). This is an "apples versus oranges" approach that does not make sense when applied in the real world.

17.     Schulz's model ignores the fees agreed to by the putative class members and applies a "new" fee percentage for the services, benefits, and investment choices that occurred under the Freedom Program. The model then assumes that the purported class members would have paid the same annual cost percentage they paid under the commission-based model (which did not include professional management services) for the Freedom Account (which included professional management services and, for some, additional ancillary services provided by the RJA financial advisor). In essence, Schulz creates a "new" annual fee based on past behavior in a commission

---

[5] Schulz Report ¶ 153.

account and applies it to a different, fee-based managed account, the Freedom Account.  Such a novel and unsupported damage model is not based on industry standards and has no precedent based on prior cases that I have seen in my 12 years of testifying and consulting as an expert in the securities industry.

18.    In addition to the points made above, the Schulz damage model is also defective and unreliable for the following reasons:

- The model fails to look at the individual circumstances of each individual investor, and instead makes inaccurate assumptions that purported class members' trading activity and annual cost percentage would continue into future multiple years; this is unreasonable and speculative.

- Schulz excludes trades done in commission accounts in the 2 months prior to opening a Freedom Account and the month the Freedom Account was opened.  This artificially deflates the annual cost and turnover calculations as it eliminates trading costs and trades on transactions not associated with funding the Freedom Account.  As any trades done to liquidate assets for the Freedom Account are done at zero cost.  This exclusion of trades renders his calculations inaccurate.

- Schulz's model incorrectly assumes that purported class members did not receive any benefits or services from RJA while they were enrolled in the Freedom Program.

- Schulz's model incorrectly assumes that the investment performance of the Freedom Account would equal the investment performance of the commission account over the period the Freedom Account was open.

- Schulz's model does not consider whether the Freedom Account assets would have outperformed the assets held previously in the commission account.

- Schulz's model incorrectly assumes that the assets are the same in the commission account and the Freedom Account when in fact new assets are purchased when a Freedom Account is opened.[6]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Lake Oswego, OR on August 30th, 2021.

_Peter Klouda_

_____

PETER J. KLOUDA

---

[6] _See_ Klouda Expert Report ¶ 17.

# EXHIBIT 1

**CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

KIMBERLY NGUYEN, On Behalf of )
)
Herself and All Others Similarly Situated, )
)
)        Case No. 8:20-cv-195-CEH-AAS
Plaintiff, )
)
vs. )
)
)

RAYMOND JAMES & ASSOCIATES, INC.,


Defendant.


**Expert Report of Peter J. Klouda**

**Bates Group - Director**

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

## EXPERT REPORT OF PETER J. KLOUDA

### I.      Peter Klouda: Summary of Engagement

1.  In connection with the matter *Kimberly Nguyen, on behalf of Herself and All Others Similarly Situated vs. Raymond James & Associates, Inc*., Case No. 8:20-cv-195-CEH-AAS, I have been asked by counsel for Raymond James & Associates, Inc. ("RJA" or "Raymond James") to opine on whether Ms. Nguyen and any purported class members may have suffered damages while invested in Freedom Accounts at RJA.  In addition, I have been asked to assess the viability of applying any particular damages model (if damages exist) to the purported class.

2.  I am being compensated by the Defendant for my work, through Bates Group LLC, at the rate of $285 per hour.  The rates of Bates Group employees, who conducted research and analysis under my direction and supervision, range between $95 and $230 per hour.  My compensation and the compensation of Bates Group are in no way dependent on the content of my and/or Bates Group's analysis, the content of this report, my opinions, or the outcome of these proceedings.

3.  The materials I have considered in forming my opinion are summarized in Appendix III.

### II.      Peter J. Klouda: Background and Qualifications

4.  I am a Director with the Bates Group, which is a financial services consulting and expert services firm.  In this capacity, I have provided consulting services including expert testimony on litigation issues related primarily to retail investor accounts with a focus on profit and loss analyses, benchmark or hypothetical analyses, asset allocation, asset

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

concentration, trading strategies, cost to investors and various other analyses of investment accounts.  A copy of my resume is included in Appendix I.

5. I have over 20 years of experience in the financial services arena including previous experience at Merrill Lynch, a broker-dealer.  During my time at Bates Group, and its prior firm names, I have consulted on thousands of Financial Industry Regulatory Authority (FINRA) related matters involving tens of thousands investment accounts.  Part of my consulting includes an analysis of an account's performance, which includes trading gains or losses, tracking of cash and asset flows, fees, margin interest, trading activity and analysis of specific holdings to name a few.

6. Beyond consulting on thousands of cases, I have testified in more than 30 matters throughout my career across various forums such as FINRA, American Arbitration Association, and U.S. Federal and State Courts.  A detailed list of the matters in which I have testified within the last 4 years can be found in Appendix II.

### III.        Summary of Allegations Made by Ms. Nguyen Related to Fees

7. In her Second Amended Class Action Complaint, Plaintiff alleges that "RJA received substantially more in account fees at the expense of its clients who had minimal trading activity in their accounts (e.g., buy-and-hold investors), who incurred higher account fees for no corresponding benefit."[1]

---

[1] Second Amended Class Action Complaint, para 1.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

8.  Plaintiff further alleges that "…RJA's negligent supervision, has directly and proximately caused Plaintiff and the other Class members to suffer substantial damages, including excessive account fees…"[2]

9.  Regarding her alleged damages, Ms. Nguyen testified in her deposition as follows[3]:

> Q. *In the next paragraph, 23, you reference the fees associated with your Freedom Account.*
> *Do you see that?*
>
> A. *Yes.*
>
> Q. *And what is that number again?*
>
> A. *$7,432.17.*
>
> Q. *And those were the annual asset-based fees that you paid in the Freedom Account, right?*
>
> A. *The 2016 one, yes.*
>
> Q. *The 2016 Freedom Account?*
>
> A. *Yes.*
>
> Q. *Okay. Are you claiming those fees as damages in this lawsuit?*
>    *Do you understand that question?*
>
> A. *Yeah. I don't know.*
>
> Q. *In other words, are you trying to recover or get back those fees in this lawsuit?*
>
> A. *I don't know.*
>
> Q. *What damages are you covering -- are you claiming in this lawsuit?*
>
> A. *I guess it would be the fees then.*

---

[2] Ibid, pg. 43, para 127.
[3] Deposition of Kimberly Nguyen (Jan. 12, 2021) ("Nguyen Dep."), pgs. 219-220, lines 13-25 and 1-14.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

> Q. *Anything else?*
>
> A. *I don't think so.*
>
> Q. *So in this lawsuit, the only damages that you're claiming are the fees that you paid for the 2016 Freedom Account; is that accurate?*
>
> A. *Yes.*

10. In relation to the alleged class damages, Plaintiff testified as follows in her deposition:[4]

> Q. *Other than the fees paid in connection with fee-based accounts, can you think of any other damages that you would be trying to recover on behalf of proposed class members?*
>
> A. *I don't know.*

11. Plaintiff also alleges in the SAC that she paid Raymond James "$7,432.17 in fees associated with the fee-based Freedom Account"[5] and "...upon knowledge and belief Plaintiff would have paid substantially less had she paid a per-transaction commission than she paid in asset-based fees for the same or similar services in 2017 and 2018."[6]

12. In relation to the purported class, Plaintiff alleges, "Like Plaintiff, these clients/putative Class members paid RJA substantial fees, as opposed to the modest per-transaction commissions they would have paid had RJA not transferred their assets from their commission-based accounts into Fee-Based Accounts."[7]

13. Based on the above statements, it is unclear what damages Plaintiff claims in this matter. In her deposition, Plaintiff stated that her damages are the fees paid for her Freedom Account, whereas her Complaint characterizes the damages as only the "excessive" fees,

---

[4] Ibid., pg. 228, lines 6-10.
[5] Second Amended Class Action Complaint, pg. 19, para 52.
[6] Ibid., pg. 20, para 54.
[7] Ibid., pg. 14, para 34.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

and alleges that the Plaintiff and putative class would have paid less in commission accounts.  There is no clear statement of what the damages are and what part, if any, is excessive or how much less Plaintiff and the purported class would have paid in commission-based accounts.  Moreover, there is no clear statement of what would constitute "minimal trading" and/or what a hypothetical "buy-and-hold" investor would be as envisaged by Plaintiff.

14. Outside of the claim related to fees, the Plaintiff is not complaining about the performance of the assets in her Freedom Account, as stated in her responses to RJA's First Set of Requests for Admission.[8]

> Request for Admission No. 8:
> Admit that You have no complaints concerning the performance of assets in your Freedom Accounts.
>
> Response to Request for Admission No. 8:
> Plaintiff incorporates the General Objections above. Subject to those objections, Plaintiff admits this Request.

Plaintiff's satisfaction with the performance of her Freedom Account is presumably due to her assets appreciating by more than $54,000 (after fees) between January 2016 and November 2018, which reflects an annualized return of 9.9 percent.

**IV.      Background on Plaintiff's Freedom Account #▮▮▮▮318**

15.  Plaintiff opened the account in question on January 29th, 2016.[9]  The account remained open until November 2018. [10]  The account was funded with a cash transfer of $183,426

---

[8] Plaintiff Kimberly Nguyen's Amended Responses and Objections to Defendant Raymond James & Associates, Inc.'s First Set of Requests for Admission, pg. 8.
[9] Freedom Investment Management Agreement, pg. 17.  RJA_(NGUYEN)_003877.
[10] Raymond James Monthly Client Statements, November 2018.  RJA_(NGUYEN)_014260.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

from another Raymond James account, #████418.  On January 29th, 2016, account

████418 sold various mutual funds totaling $183,267.25[11]; the proceeds of these

liquidations made up much of the cash transfer into the Freedom Account.  The cash

received into the Freedom Account was then used to make the initial purchases in the

Freedom program.  The initial and subsequent purchases in the Freedom account are

comprised of various mutual funds and ETFs as per the Freedom Account agreement,

monthly statements, and various trade confirms.

16. Over the life of the account, the account holdings generated a profit of $62,031, which

includes appreciation of the investments along with dividends and interest on the same

investments.  In addition, the plaintiff paid fees of $7,432 for the Freedom Account.  A

summary of the profit and fees is attached as Exhibit I.

17. Plaintiff's Freedom Account was not just a fee-based account that held the same mutual

funds held in her commission-based account.  It was an entirely new portfolio with a

different mix of holdings that reflected a shift in previous holdings.  For example,

Plaintiff's Freedom Account ***increased*** Plaintiff's (i) taxable bond holdings by 90% (from

$15,452 to $29,352); (ii) large blend U.S. equity holdings by 44% (from $31,890 to

$45,930); and (iii) large growth international equity holdings by 712% (from $4,068 to

$33,017), and ***decreased*** Plaintiff's (i) large value U.S. equity holdings by 62% (from

$59,925 to $22,928); and (ii) large blend international stock holdings by 70% (from

$36,230 to $11,000).  Plaintiff's Freedom Account also ***added*** large growth, small blend

---

[11] Raymond James Monthly Client Statements Account #32403418, January 2016. RJA_(NGUYEN)_014789-014790.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

and small value U.S. equity holdings that were not part of Plaintiff's commission account, and it **_eliminated_** the large value international equity holdings, the mid value U.S. equity holdings, and municipal bonds that were in Plaintiff's commission account.  See Exhibit II, which demonstrates a shift in the investment style of the funds from the commission-based account to the Freedom Account.  Plaintiff's previous portfolio was not just shifted into a fee-based account. Rather, RJA's Asset Management Services (AMS) division selected mutual funds and ETFs to construct a professionally managed portfolio based on its research into which holdings are best for clients that select the various Freedom Account portfolios it manages.

## V.     Summary of Freedom Account and AMS

18. The Freedom Account is a fee-based, discretionary account in which RJA, through AMS, maintains discretion over mutual fund, ETF or Hybrid Strategies.  Freedom Accounts are opened for the account holder to participate in the Freedom program.  The program has various investment and allocation strategies, and AMS determines the proper course of action related to each portfolio's changes.[12]

19. The AMS Investment Committee is comprised of individuals with years of investment experience and some of the top credentials in the industry such as Chartered Financial Analysts (CFA) and a Chartered Alternative Investment Analyst (CAIA).  They also hold various industry licenses such as Series 6 – Investment Company Products/Variable Contracts Limited Representation Examination; Series 7 – General Securities Representative Examination; Series 24 – General Securities Principal Examination Series;

---

[12] Financial Advisor Guide, Freedom Account. RJA_(NGUYEN)_040415-040416.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

63 – Uniform Securities Agent State Law Examination; Series 65 – Uniform Investment Advisor Law Examination; and Series 66 – Uniform Combined State Law Examination.[13]

## VI.    Summary of Freedom Investment Management Agreement

20. The Freedom Investment Management Agreement ("Agreement") details the services that are provided by Raymond James to its clients that are invested under this fee-based program.  The Agreement states the following terms and conditions as it relates to the services the Plaintiff and purported class members in this program will receive:[14]

a. **Appointment** - "Client appoints RJA, through its Asset Management Services division ('AMS'), to act as Client's investment adviser, assist Client in selecting a compatible investment strategy developed by the AMS Investment Committee, and upon Client's selection of an investment strategy, in recommending and monitoring open-end mutual funds with whom Raymond James has entered into a selling agreement with the fund company, which may include affiliates of Raymond James, and/or exchange traded funds (hereinafter referred to collectively as 'funds.')"

b. **Freedom Program** - "Client has chosen to participate in the Program, through which RJA provides certain asset allocation investment strategies (the 'Strategy' or 'Strategies'). Client understands that AMS develops the Strategies, establishes the respective target allocations, and selects and monitors fund investments in the Strategies."

---

[13] Form ADV, Part 2B, Brochure Supplement for: Asset Management Services ("AMS") Investment Committee. December 17, 2015.  RJA_(NGUYEN)_008527-008529.
[14] Freedom Investment Management Agreement, pgs. 1-2. RJA_(NGUYEN)_003861-003862.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

c. **Duties of AMS** - "Client hereby authorizes AMS to assume all investment duties with respect to assets held in the Account and to exercise sole investment authority with respect to such assets. AMS shall invest and reinvest the assets of the Account in such funds whose shares can be purchased at net asset value (however, such purchases will not be subject to the imposition of any type of sales charge or commission), or other property of any kind as it deems in the best interest of Client in order to achieve the investment objective(s) identified in the Client Profile, without regard to holding period, portfolio turnover or resulting gain or loss…"

"AMS will annually rebalance Client's Account, based on the anniversary date of its establishment, if at such time the actual asset allocation varies by more than certain predetermined percentages from the target allocation, as established by AMS. Client understands that AMS may rebalance the Account upon Client's request."

d. **Fees** - "Client shall pay AMS an annual asset-based fee in accordance with the attached Asset-Based Fee Schedule. Client understands the asset-based fee includes compensation paid to Client's Raymond James financial advisor and RJA for its execution, custodial and advisory services."

21. Some key components of the Freedom Account, which are important to understanding its particular services and benefits, include the following:

a. Selection of mutual funds and ETFs

b. Performance monitoring of mutual funds and ETFs

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

    c.  Asset allocation investment strategies

    d.  Target allocations of assets

    e.  Rebalancing of the investments in the account

**VII.**      **Plaintiff's Acknowledgment of the Freedom Account Services**

22. The signature page of the Freedom Account Agreement states: "By signing below, I acknowledge that I have received, read, understand, and agree to abide by all the terms and conditions set forth in the Freedom Investment Management Agreement with RJA. I further acknowledge that I have reviewed my investment objectives, Raymond James's recommendations regarding the Program and the recommended Strategy, and my options regarding affiliated funds that may participate in the Program."[15]  The Plaintiff signed the Agreement with an electronic signature on January 29, 2016.

23. Under the "Duties of AMS" section of the agreement, the Plaintiff and purported class members agreed that "AMS shall invest and reinvest the assets of the Account…in the best interest of Client in order to achieve the investment objective(s) identified in the Client Profile, without regard to **holding period**, **portfolio turnover** or resulting gain or loss..." (emphasis added.)[16]  There is no pre-set condition in which RJA had to (i) hold positions for a set period of time (e.g. holding period), or (ii) make a certain number of trades (e.g. turnover) in order to justify the fees paid for the Freedom Account.

24.  After Plaintiff signed the Freedom Account Agreement, confirming her acceptance of the Freedom Account terms and the fees she would be paying, she received monthly

---

[15] Ibid., pg. 17. RJA_(NGUYEN)_003877.
[16] Ibid., pg. 1. RJA_(NGUYEN)_003861.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

account statements which showed the fees being paid for the managed account (on the

first statement for each quarter) along with all the investment activity.

VIII.        **Freedom Account Fees Were Fully Disclosed to Plaintiff and Were Not Excessive**

25. The Agreement also outlined the fee schedule related to the Freedom Account program.

The fees are based upon an Aggregate Account Value and an Annualized Fee.  The fee

table[17] states the following terms:

| Aggregate Account Value | Annualized Fee |
|---|---|
| First $500,000 | 2.25% |
| Next $500,000 | 1.75% |
| Next $4,000,000 | 1.25% |
| Over $5,000,000 | 1.00% |

26. In a section labeled "Additional Instructions," a typed note states "Cap at 1.35% fee."[18]

While the Plaintiff alleges that she paid excess fees, the fee table alone suggests that she

actually paid anywhere from 0.90% to 0.40% less than she could have been charged by

RJA.  Per the fee table, Plaintiff could have been charged 2.25% for the first $500,000 and

then 1.75% for the next $500,000 in assets. The actual fee paid by Plaintiff was 1.25%

across all asset levels.  This represents a discount of 23% to 40% over the standard fee

schedule.  Far from constituting excess fees, the table in fact shows that RJA's fees were

substantially discounted for the Plaintiff.

---

[17] Ibid., pg. 13.  RJA_(NGUYEN)_003873.
[18] Ibid.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

27. Based on the Raymond James monthly account statements for this Freedom Account, Plaintiff paid an annual fee of 1.25%.[19]  Therefore, Plaintiff paid fees less than RJA's published fees normally reserved for clients with an aggregate account value of over $1,000,000 while she had approximately half of that value in her two Freedom Accounts.[20]  This fee structure does not constitute "excess fees" as claimed by Plaintiff. These fees were also fully disclosed to the Plaintiff on a quarterly basis on her monthly account statements.

28. The fee table within the Freedom Account Agreement aligns with Form ADV Part 2A, which discloses what other Freedom Account holders would have paid for the services provided in the Freedom Program.

IX.      **Raymond James Fulfilled its Obligations Under the Freedom Investment Management Agreement**

29. The AMS Investment Committee Meeting Minutes detail that AMS was carrying out its duties as outlined in the Agreement.  The meeting minutes discuss performance of the Freedom program, specific holdings, and comparisons to mutual funds in various asset classes. The minutes and related presentations discuss potential trades that the committee would vote on, along with numerous technical analyses such as quarterly, yearly and 1, 3, 5-year ranks of performance, as well as ranking of the various investment holdings.[21]

---

[19] Raymond James March 2016 Monthly Account Statement, pg. 14. RJA_(NGUYEN)_014766.
[20] Plaintiff has a second Freedom Account with an approximate value of $421,712 as of January 2016.
[21] I have reviewed a sample of Investment Committee Meeting Minutes and attachments from the relevant period, which are listed in Appendix III.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

30. AMS met on a regular basis, as documented by the monthly meeting minutes, to review the portfolios and monitor performance and the selection of mutual funds and ETFs. These meeting minutes do not necessarily reflect any day-to-day monitoring and 'behind-the-scenes' research and monitoring that occurred.  Per RJA's 2015 Form ADV, "AMS Manager Research & Due Diligence continually monitors the Funds in the Freedom and Freedom UMA programs."[22] Chris Thurston, Chief Compliance Officer at Raymond James, also testified as follows:[23]

> Q.  *Okay.  And the due diligence -- part of the due diligence process is to identify the mutual funds that will be used to -- or to be invested in for the different asset allocation models; correct?*
>
> A.  *Not just identification, right, but consistent monitoring of those asset managers. Right? On-site visits, consistent review of their direct, you know, but not just selection. Right?  There's that ongoing piece of it, too.*

31. The Freedom Agreement also provides Raymond James the authority to act in the best interest of the client as it relates to "...holding period, portfolio turnover or resulting gain or loss."[24]  Therefore, the amount of trading by Raymond James in the Freedom program was at Raymond James' discretion, and trades were not completed for the purpose of making trades to justify the fees in the account.  A perceived lack of trading activity therefore does not mean that services were not being performed on behalf of the Plaintiff.

---

[22] Form ADV, Part 2A, Appendix 1 Wrap Fee Program Brochure, pg. 10 (Dec. 17, 2015).
RJA_(NGUYEN)_008483.
[23] Deposition of Chris Thurston (May 21, 2021) ("Thurston Dep."), pgs. 126-127, lines 24-25 & 1-7.
[24] Freedom Investment Management Agreement, pg. 1, RJA_(NGUYEN)_003861.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

32. In exchange for the fees, Raymond James provided continual professional oversight of the portfolio, regular monthly meetings, and analysis of the account holdings and trading costs.  As stated in the Agreement, "Client shall pay AMS an annual asset-based fee in accordance with the attached Asset-Based Fee Schedule. Client understands the asset-based fee includes compensation paid to Client's Raymond James financial advisor and RJA for its execution, custodial and advisory services."  A financial advisor (FA) may also provide additional services to their clients.  In the case of Plaintiff's FA, Dax Seale, he provided financial planning as a service to his clients. In his deposition, Mr. Seale testified:[25]

> Q.  *Sure.  You just told me that referring to the client representative wasn't accurate.  I would like to know, like, how I could refer to you that would be accurate.*
>
> A.  *Financial advisor.*
>
> Q.  *Okay.*
>
> A.  *We do -- we do planning.  We make extensive financial plans for our clients. We look at the big picture of their financial situation.*

He separately testified:[26]

> Q.  *Okay.  And so when you say taking a wholistic approach, that includes having managed accounts as well as providing the financial planning and other resources you have discussed, right?*
>
> A.  *Right.  So we're -- we're not -- we're not set up to bill separately for financial plans.  Our business model is we provide the planning along with the -- as -- as under the umbrella of the managed account fee structure as an additional value-add that we provide to our clients.*

---

[25] Deposition of Dax Seale (May 6, 2021) ("Seale Dep."), pg. 28, lines 3-11.
[26] Ibid., pg. 103, lines 13-22.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

Chris Thurston explained the following with regard to additional services[27]:

> Q.   *So one of the factors is the nature and cost of the overall advisory services to be provided to the client.  What are those?  You know, what do they mean by overall advisory services?*
>
> A.   *Advisory services, right, are broader than just asset allocation.  Right?  The financial planning can be a piece of it, other analysis of, you know, from a relationship level.  I think there's many other factors that can be considered of those services. In the case of Freedom, you're looking at the cost when it relates to a professional manager in addition to having, you know, a financial adviser on top of that.*

Trying to figure out which fees were "excessive," then, would require an evaluation of each individual FA and client relationship, as each FA may be providing a different level of service and the levels of service may vary from client to client.

33. Plaintiff also recognized her account would be professionally managed and changes (trades) would be made as necessary to benefit the portfolio, not to increase turnover and "justify" the fees:

> Q. *So you said you understood that the Freedom Account was managed. How do you understand it's managed?*
>
> A. *I was under the impression that there would be someone or a group of -- of professionals monitoring my account, knowing the ins and out of the industry, and make changes to my account as necessary.[28]*

34. Plaintiff also understood that these same professionals would rebalance and monitor her account:

> Q. *Did you understand that the professionals that were managing the account would rebalance the account as necessary?*
>
> A. *Yes.*

---

[27] Thurston Dep., pg. 105, lines 1-13.
[28] Nguyen Dep., pg. 118, lines 7-13.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

Q. *And that they would be monitoring the account to determine if it needed rebalancing?*

A. *"Yes."*[29]

35. Plaintiff thus admits that she understood the services that would be provided to her when entering into the Freedom Agreement with RJA.  Now she wants her fees returned (or some portion of her fees) even though the services she agreed to were performed by RJA.  Plaintiff benefited from the Freedom Account services provided to her: selection of mutual funds and ETFs, monitoring of the portfolio and the managers of the selected mutual funds and ETFs, rebalancing, and professional money management.  In addition, Plaintiff benefited from many other services that her FA performed for her without additional compensation, including financial planning and advice.

36. Freedom Account owners pay a fee to RJA to access the Freedom models and to have the selection of funds that are appropriate for each Freedom portfolio performed by professional managers, and it is the managers of the funds and ETFs that make the trades and have 'turnover' within the mutual funds and ETFs themselves.  If the proper funds are chosen upfront and monitored for changes on a regular basis, Freedom Account holders are paying for this service and in turn paying the mutual funds for their knowledge on trading (turnover) within the portfolios of each mutual fund or ETF. While an individual might hold a single mutual fund or a portfolio of mutual funds, the mutual fund(s), if it is an active mutual fund, is consistently trading. Mutual funds are not "buy-and-hold" (which does not have a singular meaning) investments, mutual funds are active

---

[29] Ibid. pg. 118, lines 17-23.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

investments that on average have turnover rates of about 89%.[30]  In contrast, a holder of a single stock over a period time may have zero turnover and thus not have any changes to an investment portfolio but an active mutual fund is making changes on a regular basis whether the RJA client, who is the holder of the fund, trades that fund or not.  The perceived lack of turnover of the mutual funds and ETF's themselves does not equate to a lack of activity on the part of Raymond James.

X.      **Summary of the Commission Account Agreement**

37.  The account (#████418) that liquidated mutual funds to fund the Freedom Account was a non-fee-based account, otherwise known as a commission-based account.  In reviewing the account opening documents[31] for this account, there is no reference to any professional services that Raymond James would provide.  The Commission Account Agreement is in stark contrast to the Freedom Account Agreement, which lists out the numerous professional services, referenced above, that the Plaintiff would receive under the Freedom Account.  These are two very different account types that cannot be compared side-by-side for purposes of evaluating cost.  The commission-based account incurs commission or sales charges as trades occur, since is it a client-directed account. The Freedom Account, by comparison, receives constant monitoring of the investments, re-balancing of the investments, and selection of the investments by professional money managers.

---

[30] Tracking Fund Turnover.  The Motley Fool, November 10, 2016. https://bit.ly/3uRsoHd
[31] Account Information and Client Agreement, dated July 23, 2015. RJA_(NGUYEN)_027668-027672.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

## XI. Differences between Commission and Freedom Accounts

38. As previously noted, Plaintiff speculates that a commission-based account may have cost her less than the Freedom Account she signed up for.  A commission-based investment account is an account in which the investor pays for each transaction in either the form of a commission for stock, bond and ETF trades or a sales-charge on mutual fund transactions.  A Freedom Account does not charge commissions for transactions but charges a fee based on the amount of assets under management.  Commission-based accounts do not provide the same benefits as a fee-based account and therefore warrant a different cost structure.  A Freedom Account is an entirely different investment product; not just a "flat-fee" commission account.

39. A comparison between a commission-based account and a Freedom Account is not a 1:1 comparison.  In a commission account, the broker generally does not have discretion over the trading in the account and must either solicit a transaction or receive direction from the client to make a trade.  Under the commission model, the broker only earns a payout, and the client only pays, when trades are made.  The account itself may or may not have regular performance reporting beyond the monthly account statements for the overall portfolio itself and the individual investments within the portfolio. A managed fee-based account, like the Freedom Account as noted above, is a professionally managed portfolio that has regular monitoring of the portfolio allocation, monitoring of the performance of the individual holdings, and oversight by a team of professionals.  In exchange for all these services and benefits, fee-based managed accounts charge a fee.  A commission-based account does not come with the same services and benefits as a fee-based managed

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

account.  Because FAs typically do not have discretion in a commission account, the same securities that were selected and traded in Plaintiff's Freedom Account would not necessarily have occurred in her commission account, as Plaintiff would not have had access to the recommendations that come with the Freedom program.  The securities held in Plaintiff's Freedom Account were entirely different from the securities she held in her commission account. *See* Exhibit II. Plaintiff cannot presume as a model of damages that parallel trades would or should have occurred in both account types.  The Freedom Agreement priced the services for which Plaintiff agreed to pay.  Professionally managed fee-based accounts in which the investment manager exercises discretion (such as the Freedom Account) are fundamentally different from non-managed, self-directed commission accounts, as both the SEC and FINRA recognize – and as common sense confirms.

40. Comparing the cost of a Freedom Account to a commission-based account is not as simple as comparing the cost had the trades in the Freedom Account been done in a commission account versus a fee-based account.  That approach does not account for the value the client received of having a professionally managed portfolio, regular monitoring of the investment holdings, re-balancing of the portfolio and a team of professionals behind the scenes making day-to-day decisions on how the portfolio should be managed.  NASD Notice to Members 03-68 states the following, "...finding that a customer would have

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

been charged less in a commission-based account is not conclusive that the account is inappropriate for that customer."[32] [33]

41. In addition to the considerations already noted, the fees charged in a Freedom Account and a commission-based account are not comparable because the types of mutual fund share classes available in each account are different.  Even if the Plaintiff purchased the same portfolio outside of the Freedom Account, she would have paid either up-front sales charges for A-shares or higher ongoing operating costs of C-shares.[34]  These charges and ongoing operating costs would also be an expense to the Plaintiff, thus potentially offsetting part or all of the claimed "excessive" fee.  But this assumes Plaintiff would have had access to the same portfolio and insights as AMS (which she would not have) and would have made the same changes to the portfolio when the Freedom Account made changes.

42. Any damages model attempting to evaluate damages across a putative class based on comparative fees (Freedom versus commission fees) would have to take into account share classes of the mutual funds held by each investor as well.  Freedom gave the investors access to less expensive institutional shares, while commission-based accounts had access to A-shares and C-shares (and potentially other share classes as well).

---

[32] NASD Notice to Members 03-68, pg. 3.
[33] Note that NASD Notice to Members 03-68 is in reference to FA directed fee-based accounts and that this NTM does not apply to managed fee-based programs.
[34] A-shares typically have an upfront sales charge as high as 5%; whereas C-shares have operating costs of about 1% per year.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

## XII.   Alternative Fee-Based Programs to the Freedom Account

43. Outside of the Freedom Account program, RJA offered other fee-based accounts, some of which were under consideration by the Plaintiff in May 2018. In Plaintiff's communications with Dax Seale, she stated "I was thinking that one point in the future, when I didn't need as active a management, there would be a platform with less automated management and, therefore lower fees." [35]  Besides inquiring about lower fees, this comment references Plaintiff's then-current need for active management, which is what the Freedom Account provided her.

44. In this same correspondence with the Plaintiff, RJA's proposed fees for fee-based programs other than Freedom were approximately 1.3%, which is higher than what the Plaintiff actually paid in her Freedom Account.  In addition, RJA's fees for other fee-based programs show that the Freedom Account was one of the lower-cost programs.  Managed Account programs at RJA have fees ranging from 2.50% to 3% for the first $500,000,[36] whereas the Freedom Account starts at 2.25%, as noted above.

45. Therefore, alternative fee-based programs about which the Plaintiff inquired have a higher cost structure than the Freedom Account.

## XIII.   Approaches to Determining Damages

46. In matters involving investment accounts such as the Freedom Account at issue here, there are several common approaches to determining damages.  One approach is the

---

[35] Nguyen Dep., Ex. 17; NGUYEN_0000202-220.
[36] Form ADV, Part 2A, Appendix 1 Wrap Fee Program Brochure, pgs. 13-15 (Dec. 17, 2015). RJA_(NGUYEN)_008486-008488.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

benefit-of-the-bargain model, the aim of which is to put the plaintiff in the position that he, she or it would have been had the contract been executed as promised.  Another common approach is rescission, which is designed to put the plaintiff back in the same position they would have been had a wrongful transaction not occurred.  Lastly, disgorgement is a deterrent measure of damages, which is designed to make the wrongdoing unprofitable by requiring the defendant to forgo fees or commissions paid to them on wrongful trades.[37]   All of these models presume, as a preliminary matter, that the plaintiff is indeed entitled to damages.  But here, Plaintiff is not entitled to damages under any theory:  (i) with regard to the ***benefit-of-the-bargain***, Plaintiff received the exact discounted fees that she contractually agreed to pay, so she has suffered no damages; (ii) with regard to ***rescission***, Plaintiff – who made over $62,000 on the investments that RJA selected for her – has at no time sought to "undo" or "give back" those profits to RJA; she has in fact expressly admitted that she has no complaints with those successful trades, and she cannot establish any wrongdoing on RJA's part that would support a rescission theory of damages; and (iii) with regard to ***disgorgement***, Plaintiff cannot demonstrate that the significantly discounted fees that she agreed to pay were inappropriate or excessive in light of the benefits that she obtained in exchange for the fees.

47. Based on the items discussed above, the Plaintiff and purported class members received the services from RJA that it agreed to perform. Each potential class member would have acknowledged these services when signing his, her or its respective Freedom

---

[37] FINRA Office of Dispute Resolution Arbitrator's Guide.  November 2018 Edition, pgs. 66-67.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

Account agreements.  Therefore, because the putative class members received the benefit of their bargains, and no wrongful transaction occurred (and hence neither rescission nor disgorgement is warranted), none of the damages models above would apply to this matter.

XIV.     **Challenges of Applying a One-Size-Fits-All Damages Model to Putative Class Members**

48. The Second Amended Complaint alleges that the putative class members paid RJA substantial fees for the Freedom Account program without any corresponding benefit. The challenge with applying any type of suggested damages model is that each class member is a unique investor with distinctive attributes such as:

    a.  Different fee structures.  Each fee agreement would need to be compared to the fee grid to determine if discounts were applied to the benefit of a class member. Some FAs, like the Plaintiff's FA, charged their clients a lower fee across the board.[38] Other FAs negotiated lower fees with their clients, as was permitted under RJA's procedures.[39] Additionally, some FAs used the breakpoint model, which was part of the fee schedule, in which the first $500K was charged a certain percentage, and the next tier a different percentage. Because of this customization and individualization, each Freedom Account would need to be reviewed individually to determine if and by how much a particular fee would be "excessive".

---

[38] Seale Dep., pg. 114, lines 13-22.
[39] Thurston Dep., pgs. 137-138, lines 3-25 & 1.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

b.  Comparing the past level of trading in a commission account to determine future trading levels is not feasible.  There is a saying in the investment industry: "Past performance is not a guarantee of future results."  The same goes for the level of trading. Past trading patterns do not consider what market conditions or life events an investor may experience that will change their level of trading in the future.

c.  Prior commission-based accounts would have different levels of activity per investor.  Not all purported class members fit into the same bucket in terms of level of activity prior to opening their Freedom Accounts.

d.  Unique holdings prior to Freedom Account opening. All putative class members have different types of investments – equities, bonds, ETFs, mutual funds, etc. – and thus would have unique potential commissions and costs structures to consider.

e.  Investment objectives of each investor are highly variable and suitability for each investor is unique. No two class members are the same, and each one must be treated individually.

f.  Investment objectives could have changed from commission-based account to Freedom Account.  The complaint assumes that all prior commission-based accounts had the same investment objective as the Freedom Accounts.

g.  The transition into the Freedom Account could have been part of a larger investment shift for the investor.

24

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

h. Performance in the Freedom Account, even with fees, could outperform the commission-based account, thereby offsetting potential damages.  This would raise complex questions as to whether the outperformance should be returned to Raymond James.

i. Switches from one Freedom strategy to another Freedom strategy during the period under which damages are measured will vary from investor to investor.

49. There is not a one-size-fits-all approach to damages among all class members, if any injury occurred at all.  Each class member has his, her or its own unique investment attributes that would need to be accounted for to compute any damages model.  All class members would have a unique Account Information and Client Agreement along with a distinctive Freedom Investment Management Agreement that only pertains to that individual investor's account.  Each account would have to go through an individualized analysis to determine if any potential damages may exist.

50. All potential class members would have different cost structures depending on the asset level of the Freedom Account, asset level of other fee-based accounts, and discounts provided to the various account holders.  Therefore, applying a simple damages calculation to the class is not feasible, as each class member would need to be assessed individually to determine whether the fee was "excessive."

XV.        Returning Fees to Plaintiff Overcompensates the Plaintiff

51. Returning part or all of the Freedom Account fees to the Plaintiff and purported class members overcompensates the Plaintiff since RJA performed its duties under the Freedom Agreement. Paying back the fees or a portion of the fees provides the Plaintiff

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

and purported class members all the services and benefits for which they bargained and no compensation to RJA for providing these services and benefits in the Freedom Account. Plaintiff was aware of the fees in her Freedom Account and paid them regularly for almost 3 years. RJA cannot unwind the professional money management services they provided – the Plaintiff has already received (and benefited from) them. Plaintiff is not complaining about the performance of the assets in her account, (as stated in her Response to Request for Admission #8) and has retained the benefit of the account, including by transferring her Freedom Account holdings to Vanguard in November 2018, where she continued to hold them at least through the statements that were made available in this litigation.

52. If the Plaintiff wishes to unwind the fees paid to RJA, then one must also consider unwinding the Freedom Account portfolio and having the Plaintiff return her positions along with the approximately $62,000 in profits from those investments back to the inception of the account. The Plaintiff in turn would request her original commission-based portfolio and the returns on that portfolio. This would rescind the Freedom Account activity and restore the Plaintiff back to her original position. The mechanics of returning the positions may not be feasible, but the dollar amounts could be determined, albeit with a fair amount of work. Such an unwinding that would restore her original securities and the profits or losses therefrom is highly speculative and is not a model that is well accepted in the industry. Such an analysis – whether stopping at the Plaintiff's investment gains in Freedom, or the further work of determining profit or loss based on potential years of "what if" trading – would be highly time consuming for a single plaintiff,

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

let alone a putative class of thousands.  Doing such an analysis across a class would have to be approached account by account and could result in situations where class members owe money back to RJA.

## XVI.    Summary of Opinions

53. The Plaintiff's damages models – either a full refund or a return of the "excessive" portion of her fees ignores the services provided by Raymond James under the Freedom Program that would not have been provided under a commission account arrangement.  The Plaintiff signed the Freedom Investment Management Agreement that states what services the fee is intended to cover, and RJA executed the services as described in the same agreement.  Therefore, the fee is justifiable and not excessive in nature.

54. In her complaint, in her discovery responses, and at her deposition, Plaintiff has failed to articulate a workable model for damages in this case as compared to accepted models in the securities industry for harms against brokerage or advisory firm clients.

55. The fees charged to Plaintiff by RJA were discounted from RJA's standard fee structure and therefore were not "excessive" in nature.  An excessive claim would be based on an overcharge for the services provided.

56. One cannot compare the fees paid for the Freedom Account with a commission account model since the level of benefits provided within in the Freedom Account is different from the limited services provided in a commission-based account.

57. Determining how an investor would have traded a commission account into the future based on past activity (i) would require an account-by-account assessment, and (ii) would rely on speculation, as one cannot go back in time and determine how many trades an

**CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT**

account would have made over the same period of time an individual investor's Freedom Account was open.

58. Returning fees to Plaintiff overcompensates the Plaintiff, as RJA performed the services as described and as agreed to by the Plaintiff in her Freedom Agreement.

59. Each purported class member has a unique set of attributes that would need to be accounted for in determining any alleged damages. A one-size-fits-all approach treats all members the same when the reality is that each member has their own level of prior trading, risk tolerance, Freedom Account portfolio, risk profiles and investment attributes. Additionally, each member of the putative class invested in one of each of the dozens of Freedom Portfolios, and each of those had different asset allocations among other differences that would have to be considered. There is no shortcut to damages in this case. To determine the alleged "excessive" portion of an investor's fees, or to determine a model that does not overcompensate a putative member of the class, would require a time-consuming, individualized review.

60. Damages cannot be calculated on a class-wide basis, as each individual Freedom Account has its own unique attributes that require an individual analysis.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
   CONFIDENTIALITY AGREEMENT

I affirm that the statements, opinions, and conclusions set forth in Sections I-XVI of this

report are true to the best of my knowledge and belief.

Executed this 4th Day of June 2021.

_____

Peter J. Klouda

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

**Appendix I – Curriculum Vitae**


**BIOGRAPHY**

Peter Klouda is a Director at Bates Group, where he uses his experience in accounting and finance to provide detailed forensic analyses of account activity related to securities litigation cases.

Before joining Bates Group, Mr. Klouda was a manager and senior associate with LECG and Bates Private Capital Incorporated, a firm providing litigation consulting, financial analysis, market trend research, and expert testimony for securities and other financial-related matters.

Mr. Klouda was a financial advisor with Merrill Lynch where he helped develop strategies designed to meet client's financial goals, researched suitable stocks, bonds, mutual funds and money managers for client portfolios. He was also a Consumer Loan Assistant with Santa Barbara Bank and Trust.  He was responsible for coordinating consumer loan packages between customers and bank branches.


**EXPERIENCE**

**Bates Group**, Lake Oswego, OR, *Director*, 2013-Present

**Bates Group**, Lake Oswego, OR, *Managing Consultant,* 2011-2013

**LECG**, Lake Oswego, OR, *Managing Consultant,* 2010-2011

**LECG***, Lake Oswego, OR, *Senior Consultant,* 2005-2009

**Bates Private Capital Incorporated**, Lake Oswego, OR, *Manager*, 2004-2005

**Bates Private Capital Incorporated**, Lake Oswego, OR, *Senior Associate,* 2002-2004

**Merrill Lynch**, Santa Barbara, CA, *Financial Advisor,* 1999-2002

**Santa Barbara Bank and Trust**, Santa Barbara, CA, *Consumer Loan Assistant,* 1998-1999


**EDUCATION & PROFESSIONAL QUALIFICATIONS**

**Portland State University**, *MBA*, 2007

**Westmont College**, *BA Chemistry*, 1998

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

## SECURITIES INDUSTRY EXPERTISE & LICENSES HELD

Formerly NASD licensed -- Series 7, 63

### Appendix II – Peter Klouda Trial, Arbitration, Deposition and Expert Report History:

1. Jonathon Jay Marks, Suzana Rockwell Marks v. Morgan Stanley, Lewis Howard Robinson, testified for Respondent in FINRA Arbitration hearing, Case No. 16-02067. June 2017 in Boca Raton, FL (telephonic testimony)

2. H. Michael Labban Jr., Kevin R. Labban, Labban Futures LLC, Melton Labban Investments LLC, Labban Real Estate LLC, James Melton Grantor Trust, Jacquelyn McAdams Family Trust and James Melton Grandchildren Trust v. Morgan Stanley Smith Barney, LLC, Kim Isaacson and Paul W. Shoemaker, testified for Respondent in FINRA Arbitration hearing, Case No. 16-00013. November 2017 in New Orleans, LA

3. The Daniel Rosenberg Testamentary Trust by Robert A. Rosenberg and Eric Rosenberg, Trustees v. Merrill, Lynch, Pierce, Fenner & Smith Incorporated and Sylvia Lanka Barone, testified for Respondent in FINRA Arbitration hearing, Case No. 17-01216. February 2018 in New York, NY

4. Oscar Celasco, Centrica Invt Capital Inc., G.S.S. Capital Group Limited, GSSC Holdings LTD, GSSC SP, Mesoamerica Acre Farms, Inc., Westwood Holding Inc. v. Merrill Lynch Pierce Fenner & Smith Inc., testified for Respondent in FINRA Arbitration hearing, Case No. 16-02805. November 2018 in Los Angeles, CA

5. Howard Hammer, Individually and as Representative of the Estate of Sandra Hammer, Deceased, Andrea Hammer, David Hammer and Zelkjo Brzakovic v. Gary J. Reetz, Van Cleef, Jordan & Wood, Inc. and Nilesh Saldanha., testified for Claimant at Supreme Court of the State of New York, Index No. 55159/2017. April 2019 in New York, NY (telephonic testimony)

6. Jose Torres et al v. Morgan Stanley Smith Barney, testified for Respondent in FINRA Arbitration hearing, Case No. 17-01908. April 2019 in Miami, FL

7. Brian Leggett, Bryson Holdings, LLC v. Wells Fargo, testified for Respondent in FINRA Arbitration hearing, Case No. 17-01077. June 2019 (telephonic testimony)

8. Joseph Cage, Susan Cage, Patricia Harrison Adams, et al v. Raymond James & Associates, Inc. and Thomas O'Brien, testified for Respondent in FINRA Arbitration hearing, Case No. 17-02973. August 2019 in Shreveport, LA

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

9.  Scott Roeth v. Merrill Lynch, Pierce, Fenner & Smith Inc. and Managed Account Advisors LLC, testified for Respondent in FINRA Arbitration hearing, Case No. 19-02198. September 2020 (telephonic testimony)

10. John R. Miller IV v. UBS Financial Services Inc., testified for Respondent in FINRA Arbitration, Case No. 19-03441. December 2020 (video testimony)

11. Madeline Porcelli v. UBS Financial Services, Inc. testified for Respondent in FINRA Arbitration hearing, Case No. 19-02953. February 2021 (video testimony)

12. James W. Johnston, as Trustee of The James W. Johnston Revocable Living Trust v. UBS Financial Services Inc., testified for Respondent in FINRA Arbitration hearing, Case No. 19-01535. February 2021 (video testimony)

13. Matthew V. Fisher and Lisa G. Fisher v. UBS Financial Services, Inc., testified for Respondent in FINRA Arbitration hearing, Case No. 19-02702. March 2021 (video testimony)


**Appendix III – Documents and Data Reviewed**


*See document titled 'Nguyen v. Raymond James & Associates, Inc. Facts and Data Considered'*

# APPENDIX III

CONFIDENTIAL

| Nguyen v. Raymond James & Associates, Inc.<br>Facts and Data Considered | | |
|---|---|---|
| | | |
| Begin Bates | End Bates | Other Description |
| Account Opening Documents | | |
| RJA_(NGUYEN)_006466 | RJA_(NGUYEN)_006485 | |
| RJA_(NGUYEN)_003898 | RJA_(NGUYEN)_003903 | |
| RJA_(NGUYEN)_000001 | RJA_(NGUYEN)_000043 | |
| RJA_(NGUYEN)_027668 | RJA_(NGUYEN)_027679 | |
| RJA_(NGUYEN)_006413 | RJA_(NGUYEN)_006421 | |
| RJA_(NGUYEN)_009928 | RJA_(NGUYEN)_009939 | |
| RJA_(NGUYEN)_003846 | RJA_(NGUYEN)_003897 | |
| RJA_(NGUYEN)_007414 | RJA_(NGUYEN)_007429 | |
| RJA_(NGUYEN)_006302 | RJA_(NGUYEN)_006411 | |
| RJA_(NGUYEN)_001235 | RJA_(NGUYEN)_001271 | |
| RJA_(NGUYEN)_007348 | RJA_(NGUYEN)_007406 | |
| RJA_(NGUYEN)_008474 | RJA_(NGUYEN)_008530 | |
| RJA_(NGUYEN)_010182 | RJA_(NGUYEN)_010241 | |
| Plaintiff-Specific Correspondence and Documentation | | |
| NGUYEN_0000037 | | |
| NGUYEN_0000048 | | |
| NGUYEN_0000078 | | |
| NGUYEN_0000082 | | |
| NGUYEN_0000137 | | |
| NGUYEN_0000143 | | |
| NGUYEN_0000146 | | |
| NGUYEN_0000160 | | |
| NGUYEN_0000202 | | |
| NGUYEN_0000207 | | |
| NGUYEN_0000208 | | |
| NGUYEN_0000209 | | |
| NGUYEN_0000211 | | |
| NGUYEN_0000214 | | |

| | | |
|---|---|---|
| NGUYEN_0000217 | | |
| NGUYEN_0000311 | | |
| RJA_(NGUYEN)_003637 | | |
| RJA_(NGUYEN)_003846 | | |
| RJA_(NGUYEN)_003898 | | |
| RJA_(NGUYEN)_004018 | | |
| RJA_(NGUYEN)_004060 | | |
| RJA_(NGUYEN)_006233 | | |
| RJA_(NGUYEN)_006235 | | |
| RJA_(NGUYEN)_006302 | | |
| RJA_(NGUYEN)_006466 | | |
| RJA_(NGUYEN)_010833 | | |
| RJA_(NGUYEN)_010879 | | |
| RJA_(NGUYEN)_010943 | | |
| RJA_(NGUYEN)_011825 | | |
| RJA_(NGUYEN)_011826 | | |
| RJA_(NGUYEN)_011830 | | |
| RJA_(NGUYEN)_011832 | | |
| RJA_(NGUYEN)_011836 | | |
| RJA_(NGUYEN)_012250 | | |
| RJA_(NGUYEN)_012255 | | |
| RJA_(NGUYEN)_012581 | | |
| RJA_(NGUYEN)_012886 | | |
| RJA_(NGUYEN)_012919 | | |
| RJA_(NGUYEN)_012924 | | |
| RJA_(NGUYEN)_012928 | | |
| RJA_(NGUYEN)_012932 | | |
| RJA_(NGUYEN)_012936 | | |
| RJA_(NGUYEN)_012938 | | |
| RJA_(NGUYEN)_012940 | | |
| RJA_(NGUYEN)_012944 | | |
| RJA_(NGUYEN)_012947 | | |
| RJA_(NGUYEN)_012951 | | |
| RJA_(NGUYEN)_012953 | | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_012955 | | |
| RJA_(NGUYEN)_012956 | | |
| RJA_(NGUYEN)_012958 | | |
| RJA_(NGUYEN)_012994 | | |
| RJA_(NGUYEN)_013024 | | |
| RJA_(NGUYEN)_013027 | | |
| RJA_(NGUYEN)_013112 | | |
| RJA_(NGUYEN)_013214 | | |
| RJA_(NGUYEN)_013217 | | |
| RJA_(NGUYEN)_013366 | | |
| RJA_(NGUYEN)_013476 | | |
| RJA_(NGUYEN)_013672 | | |
| RJA_(NGUYEN)_013787 | | |
| RJA_(NGUYEN)_013809 | | |
| RJA_(NGUYEN)_013827 | | |
| RJA_(NGUYEN)_013959 | | |
| RJA_(NGUYEN)_014062 | | |
| RJA_(NGUYEN)_014074 | | |
| RJA_(NGUYEN)_014256 | | |
| RJA_(NGUYEN)_014917 | | |
| RJA_(NGUYEN)_015059 | | |
| RJA_(NGUYEN)_015068 | | |
| RJA_(NGUYEN)_015069 | | |
| RJA_(NGUYEN)_015070 | | |
| RJA_(NGUYEN)_015072 | | |
| RJA_(NGUYEN)_015079 | | |
| RJA_(NGUYEN)_015082 | | |
| RJA_(NGUYEN)_015088 | | |
| RJA_(NGUYEN)_015093 | | |
| RJA_(NGUYEN)_015094 | | |
| RJA_(NGUYEN)_015129 | | |
| RJA_(NGUYEN)_015131 | | |
| RJA_(NGUYEN)_019848 | | |
| RJA_(NGUYEN)_020169 | | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_021374 | | |
| RJA_(NGUYEN)_022998 | | |
| RJA_(NGUYEN)_023025 | | |
| RJA_(NGUYEN)_023388 | | |
| RJA_(NGUYEN)_023842 | | |
| RJA_(NGUYEN)_023907 | | |
| RJA_(NGUYEN)_059112 | | |
| RJA_(NGUYEN)_059113 | | |
| RJA_(NGUYEN)_014055 | RJA_(NGUYEN)_014056 | |
| RJA_(NGUYEN)_014062 | RJA_(NGUYEN)_014064 | |
| RJA_(NGUYEN)_012581 | RJA_(NGUYEN)_012582 | |
| RJA_(NGUYEN)_013366 | RJA_(NGUYEN)_013367 | |
| RJA_(NGUYEN)_020169 | RJA_(NGUYEN)_020169 | |
| **Compensation & Commissions** | | |
| RJA_(NGUYEN)_041526 | RJA_(NGUYEN)_041526 | |
| RJA_(NGUYEN)_041527 | RJA_(NGUYEN)_041531 | |
| RJA_(NGUYEN)_041532 | RJA_(NGUYEN)_041534 | |
| RJA_(NGUYEN)_041535 | RJA_(NGUYEN)_041536 | |
| RJA_(NGUYEN)_041537 | RJA_(NGUYEN)_041538 | |
| RJA_(NGUYEN)_041539 | RJA_(NGUYEN)_041540 | |
| RJA_(NGUYEN)_041541 | RJA_(NGUYEN)_041542 | |
| RJA_(NGUYEN)_041543 | RJA_(NGUYEN)_041544 | |
| RJA_(NGUYEN)_041545 | RJA_(NGUYEN)_041546 | |
| RJA_(NGUYEN)_041547 | RJA_(NGUYEN)_041547 | |
| RJA_(NGUYEN)_041548 | RJA_(NGUYEN)_041549 | |
| RJA_(NGUYEN)_041550 | RJA_(NGUYEN)_041551 | |
| RJA_(NGUYEN)_041552 | RJA_(NGUYEN)_04153 | |
| RJA_(NGUYEN)_041554 | RJA_(NGUYEN)_041555 | |
| RJA_(NGUYEN)_041556 | RJA_(NGUYEN)_041557 | |
| RJA_(NGUYEN)_041558 | RJA_(NGUYEN)_041559 | |
| RJA_(NGUYEN)_041526 | RJA_(NGUYEN)_041526 | |
| RJA_(NGUYEN)_041527 | RJA_(NGUYEN)_041531 | |
| RJA_(NGUYEN)_041532 | RJA_(NGUYEN)_041534 | |
| RJA_(NGUYEN)_041535 | RJA_(NGUYEN)_041536 | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_041537 | RJA_(NGUYEN)_041538 | |
| RJA_(NGUYEN)_041539 | RJA_(NGUYEN)_041540 | |
| RJA_(NGUYEN)_041541 | RJA_(NGUYEN)_041542 | |
| RJA_(NGUYEN)_041543 | RJA_(NGUYEN)_041544 | |
| RJA_(NGUYEN)_041545 | RJA_(NGUYEN)_041546 | |
| RJA_(NGUYEN)_041547 | RJA_(NGUYEN)_041547 | |
| RJA_(NGUYEN)_041548 | RJA_(NGUYEN)_041549 | |
| RJA_(NGUYEN)_041550 | RJA_(NGUYEN)_041551 | |
| RJA_(NGUYEN)_041552 | RJA_(NGUYEN)_041553 | |
| RJA_(NGUYEN)_041554 | RJA_(NGUYEN)_041555 | |
| RJA_(NGUYEN)_041556 | RJA_(NGUYEN)_041557 | |
| RJA_(NGUYEN)_041558 | RJA_(NGUYEN)_041559 | |
| RJA_(NGUYEN)_059100 | RJA_(NGUYEN)_059101 | |
| RJA_(NGUYEN)_059102 | RJA_(NGUYEN)_059103 | |
| RJA_(NGUYEN)_059104 | RJA_(NGUYEN)_059105 | |
| RJA_(NGUYEN)_059106 | RJA_(NGUYEN)_059107 | |
| **Compliance and Supervisory Manual Sections** | | |
| RJA_(NGUYEN)_019490 | RJA_(NGUYEN)_019491 | Actively Traded Accounts 2014.07.07 to 2016.01.12 |
| RJA_(NGUYEN)_019419 | RJA_(NGUYEN)_019420 | Actively Traded Accounts 2014.07.07 |
| RJA_(NGUYEN)_019492 | RJA_(NGUYEN)_019493 | Actively Traded Accounts 2016.01.12 to Still Active |
| RJA_(NGUYEN)_019664 | RJA_(NGUYEN)_019665 | Actively Traded Accounts 2016.01.12 |
| RJA_(NGUYEN)_019423 | RJA_(NGUYEN)_019424 | Advisory Accounts 2015.09.03 to 2015.12.22 |
| RJA_(NGUYEN)_019494 | RJA_(NGUYEN)_019495 | Advisory Accounts 2015.12.22 to 2016.11.23 |
| RJA_(NGUYEN)_019496 | RJA_(NGUYEN)_019497 | Advisory Accounts 2016.11.23 to 2016.12.30 |
| RJA_(NGUYEN)_019498 | RJA_(NGUYEN)_019499 | Advisory Accounts 2016.12.30 to 2017.03.27 |
| RJA_(NGUYEN)_019577 | RJA_(NGUYEN)_019578 | Advisory Accounts 2017.03.27 to 2018.07.23 |
| RJA_(NGUYEN)_019421 | RJA_(NGUYEN)_019422 | Advisory Accounts Updated 2014.12.01 |
| RJA_(NGUYEN)_019425 | RJA_(NGUYEN)_019426 | Advisory Accounts Updated 2015.12.22 |
| RJA_(NGUYEN)_019500 | RJA_(NGUYEN)_019501 | Annual Compliance Meeting 2014.07.07 to 2016.01.12 |
| RJA_(NGUYEN)_019427 | RJA_(NGUYEN)_019428 | Annual Compliance Meeting 2014.07.07 |
| RJA_(NGUYEN)_019502 | RJA_(NGUYEN)_019503 | Annual Compliance Meeting 2016.01.12 to 2017.04.17 |
| RJA_(NGUYEN)_019668 | RJA_(NGUYEN)_019669 | Annual Compliance Meeting 2017.04.17 |
| RJA_(NGUYEN)_019504 | RJA_(NGUYEN)_019506 | Client Complaints 2014.02.20 to 2017.06.09 |
| RJA_(NGUYEN)_019428 | RJA_(NGUYEN)_019429 | Client Complaints 2014.02.20 |

| RJA_(NGUYEN)_019670 | RJA_(NGUYEN)_019671 | Client Complaints 2017.06.09 |
|---|---|---|
| RJA_(NGUYEN)_019430 | RJA_(NGUYEN)_019431 | Compliance Audits and Examinations 2014.08.29 |
| RJA_(NGUYEN)_019507 | RJA_(NGUYEN)_019508 | Compliance Audits and Examinations 2015.10.19 to 2017.05.08 |
| RJA_(NGUYEN)_019432 | RJA_(NGUYEN)_019433 | Compliance Audits and Examinations 2015.10.19 |
| RJA_(NGUYEN)_019590 | RJA_(NGUYEN)_019591 | Compliance Audits and Examinations 2017.05.08 |
| RJA_(NGUYEN)_019485 | RJA_(NGUYEN)_019486 | Compliance Memo 16-01 FA Sales Practice Review 2016.02.08 |
| RJA_(NGUYEN)_019487 | RJA_(NGUYEN)_019487 | Compliance Memo 16-04 Advisory Trading Inactivity - Supervisory Workstation Periodic Alert 2016.04.04 |
| RJA_(NGUYEN)_019488 | RJA_(NGUYEN)_019489 | Compliance Memo 16-10 Policy Update - Inactive Advisory Accounts 2016.12.07 |
| RJA_(NGUYEN)_019509 | RJA_(NGUYEN)_019510 | Continuing Education - Firm Element 2013.11.20 to 2016.01.12 |
| RJA_(NGUYEN)_019434 | RJA_(NGUYEN)_019434 | Continuing Education - Firm Element 2013.11.20 |
| RJA_(NGUYEN)_019511 | RJA_(NGUYEN)_019512 | Continuing Education - Firm Element 2016.01.12 to 2017.03.15 |
| RJA_(NGUYEN)_019672 | RJA_(NGUYEN)_019673 | Continuing Education - Firm Element 2017.03.15 |
| RJA_(NGUYEN)_019435 | RJA_(NGUYEN)_019435 | Continuing Education - Regulatory Element 2014.04.14 |
| RJA_(NGUYEN)_019513 | RJA_(NGUYEN)_019514 | Continuing Education - Regulatory Element 2015.10.16 to 2016.02.01 |
| RJA_(NGUYEN)_019436 | RJA_(NGUYEN)_019436 | Continuing Education - Regulatory Element 2015.10.16 |
| RJA_(NGUYEN)_019515 | RJA_(NGUYEN)_019516 | Continuing Education - Regulatory Element 2016.02.01 to 2016.12.27 |
| RJA_(NGUYEN)_019517 | RJA_(NGUYEN)_019518 | Continuing Education - Regulatory Element 2016.12.27 to 2016.12.27 |
| RJA_(NGUYEN)_019519 | RJA_(NGUYEN)_019520 | Continuing Education - Regulatory Element 2016.12.27 to 2017.02.17 |
| RJA_(NGUYEN)_019598 | RJA_(NGUYEN)_019599 | Continuing Education - Regulatory Element 2017.02.17 to 2017.02.17 |
| RJA_(NGUYEN)_019602 | RJA_(NGUYEN)_019603 | Continuing Education - Regulatory Element 2017.02.17 |
| RJA_(NGUYEN)_019437 | RJA_(NGUYEN)_019438 | Customer Specific Suitability Analysis 2013.10.09 |
| RJA_(NGUYEN)_019439 | RJA_(NGUYEN)_019440 | Customer Specific Suitability Analysis 2015.07.17 |
| RJA_(NGUYEN)_019441 | RJA_(NGUYEN)_019441 | Ethics - Corporate Annual Certification 2014.05.20 |

| RJA_(NGUYEN)_019521 | RJA_(NGUYEN)_019522 | Ethics - Corporate Annual Certification 2015.07.13 to 2016.08.10 |
|---|---|---|
| RJA_(NGUYEN)_019442 | RJA_(NGUYEN)_019442 | Ethics - Corporate Annual Certification 2015.07.13 |
| RJA_(NGUYEN)_019523 | RJA_(NGUYEN)_019524 | Ethics - Corporate Annual Certification 2016.08.10 |
| RJA_(NGUYEN)_019604 | RJA_(NGUYEN)_019605 | Ethics - Corporate Annual Certification 2016.08.16 |
| RJA_(NGUYEN)_019443 | RJA_(NGUYEN)_019443 | Fee-Based Accounts - Investment Adviser Representative Registrations 2014.10.17 |
| RJA_(NGUYEN)_019525 | RJA_(NGUYEN)_019526 | Fee-Based Accounts - Investment Adviser Representative Registrations 2015.09.11 to 2016.11.23 |
| RJA_(NGUYEN)_019444 | RJA_(NGUYEN)_019444 | Fee-Based Accounts - Investment Adviser Representative Registrations 2015.09.11 |
| RJA_(NGUYEN)_019527 | RJA_(NGUYEN)_019528 | Fee-Based Accounts - Investment Adviser Representative Registrations 2016.11.23 to 2017.03.27 |
| RJA_(NGUYEN)_019678 | RJA_(NGUYEN)_019679 | Fee-Based Accounts - Investment Adviser Representative Registrations 2017.03.27 |
| RJA_(NGUYEN)_019449 | RJA_(NGUYEN)_019452 | Generally Prohibited Practices 2014.02.12 to 2015.06.02 |
| RJA_(NGUYEN)_019445 | RJA_(NGUYEN)_019448 | Generally Prohibited Practices 2014.02.12 |
| RJA_(NGUYEN)_019453 | RJA_(NGUYEN)_019456 | Generally Prohibited Practices 2015.06.02 |
| RJA_(NGUYEN)_019529 | RJA_(NGUYEN)_019532 | Generally Prohibited Practices 2016.03.16 to 2016.08.03 |
| RJA_(NGUYEN)_019533 | RJA_(NGUYEN)_019536 | Generally Prohibited Practices 2016.08.03 to 2018.02.20 |
| RJA_(NGUYEN)_019457 | RJA_(NGUYEN)_019457 | Home Office (32A-36G) Finanical Advisor Supervision 2013.10.03 |
| RJA_(NGUYEN)_019539 | RJA_(NGUYEN)_019540 | Home Office Non Branch Producer Supervision 2016.05.25 to 2016.08.05 |
| RJA_(NGUYEN)_019541 | RJA_(NGUYEN)_019542 | Home Office Non Branch Producer Supervision 2016.08.05 |
| RJA_(NGUYEN)_019537 | RJA_(NGUYEN)_019538 | Home Office Non Brnch Producer Supervsion 2015.05.19 to 2016.05.25 |
| RJA_(NGUYEN)_019543 | RJA_(NGUYEN)_019543 | Intro to RJ&A Policy and Supervision Procedures - Introduction 2016.06.30 |
| RJA_(NGUYEN)_019544 | RJA_(NGUYEN)_019545 | Investment Advisory Accounts 2016.10.11 to 2017.03.27 |
| RJA_(NGUYEN)_019618 | RJA_(NGUYEN)_019619 | Investment Advisory Accounts 2017.03.27 to 2017.06.15 |
| RJA_(NGUYEN)_019620 | RJA_(NGUYEN)_019622 | Investment Advisory Accounts 2017.06.15 to 2017.06.16 |
| RJA_(NGUYEN)_019623 | RJA_(NGUYEN)_019625 | Investment Advisory Accounts 2017.06.16 to 2018.03.28 |
| RJA_(NGUYEN)_019686 | RJA_(NGUYEN)_019688 | Investment Advisory Accounts 2017.06.16 to Still Active |

| | | |
|---|---|---|
| RJA_(NGUYEN)_015127 | RJA_(NGUYEN)_015128 | Investment Management Account Initial Investment Objective Review 2015.07.13 to 2016.06.30 |
| RJA_(NGUYEN)_015125 | RJA_(NGUYEN)_015126 | Investment Objective Review - Managed Accounts 2016.06.30 to 2016.08.11 |
| RJA_(NGUYEN)_015123 | RJA_(NGUYEN)_015124 | Investment Objective Review - Managed Accounts 2016.08.11 to 2017.06.06 |
| RJA_(NGUYEN)_015121 | RJA_(NGUYEN)_015122 | Investment Objective Review - Managed Accounts 2017.06.06 to 2018.01.05 |
| RJA_(NGUYEN)_015119 | RJA_(NGUYEN)_015120 | Investment Objective Review - Managed Accounts 2018.01.05 to 2018.01.08 |
| RJA_(NGUYEN)_019458 | RJA_(NGUYEN)_019459 | Mark-Up, Mark-Down and Commission Guidelines (Retail) 2014.08.19 |
| RJA_(NGUYEN)_019460 | RJA_(NGUYEN)_019461 | Mark-Up, Mark-Down and Commission Guidelines (Retail) 2015.03.30 to 2015.04.21 |
| RJA_(NGUYEN)_019462 | RJA_(NGUYEN)_019463 | Mark-Up, Mark-Down and Commission Guidelines (Retail) 2015.04.16 |
| RJA_(NGUYEN)_019626 | RJA_(NGUYEN)_019628 | Mark-Up, Mark-Down and Commission Guidelines (Retail) 2016.04.01 to 2017.02.27 |
| RJA_(NGUYEN)_019464 | RJA_(NGUYEN)_019464 | Mark-Ups and Commissions 2014.07.02 |
| RJA_(NGUYEN)_019546 | RJA_(NGUYEN)_019547 | Mark-Ups and Commissions 2015.03.17 to 2017.04.04 |
| RJA_(NGUYEN)_019465 | RJA_(NGUYEN)_019465 | Mark-Ups and Commissions 2015.03.17 |
| RJA_(NGUYEN)_019631 | RJA_(NGUYEN)_019632 | Mark-Ups and Commissions 2017.04.04 to 2017.09.26 |
| RJA_(NGUYEN)_019633 | RJA_(NGUYEN)_019634 | Mark-Ups, Downs and Commissions 2017.09.26 to 2017.12.01 |
| RJA_(NGUYEN)_019635 | RJA_(NGUYEN)_019636 | Mark-Ups, Downs and Commissions 2017.12.01 |
| RJA_(NGUYEN)_015108 | RJA_(NGUYEN)_015110 | Mutual Funds - Sales Practices 2016.02.01 to 2017.06.09 |
| RJA_(NGUYEN)_015105 | RJA_(NGUYEN)_015107 | Mutual Funds - Sales Practices 2017.06.09 to 2017.10.13 |
| RJA_(NGUYEN)_015102 | RJA_(NGUYEN)_015104 | Mutual Funds - Sales Practices 2017.10.13 to 2017.10.13 |
| RJA_(NGUYEN)_015099 | RJA_(NGUYEN)_015101 | Mutual Funds - Sales Practices 2017.10.13 |
| RJA_(NGUYEN)_019637 | RJA_(NGUYEN)_019638 | Options - Supervision of Accounts and Suitability Recommendations 2016.05.17 to 2018.03.21 |
| RJA_(NGUYEN)_019468 | RJA_(NGUYEN)_019469 | Options - Supervsion of Accounts and Suitability of Recommendations 2015.11.24 |

| RJA_(NGUYEN)_019466 | RJA_(NGUYEN)_019467 | Options-Supervision of Accounts and Suitability of Recommendations 2014.07.07 |
|---|---|---|
| RJA_(NGUYEN)_019548 | RJA_(NGUYEN)_019549 | Options-Supervision of Accounts and Suitability of Recommendations 2015.11.24 to 2016.05.17 |
| RJA_(NGUYEN)_019550 | RJA_(NGUYEN)_019551 | Options-Supervision of Accounts and Suitability of Recommendations 2016.05.17 to 2018.03.21 |
| RJA_(NGUYEN)_019691 | RJA_(NGUYEN)_019692 | Options-Supervision of Accounts and Suitability of Recommendations 2016.05.17 to Still Active |
| RJA_(NGUYEN)_019470 | RJA_(NGUYEN)_019471 | RJA Discretionary Program - Financial Advisor Approval 2014.09.09 |
| RJA_(NGUYEN)_019472 | RJA_(NGUYEN)_019473 | RJA Discretionary Program - Financial Advisor Approval 2015.10.06 to 2015.12.22 |
| RJA_(NGUYEN)_019474 | RJA_(NGUYEN)_019475 | RJA Discretionary Program - Financial Advisor Approval 2015.12.22 |
| RJA_(NGUYEN)_019552 | RJA_(NGUYEN)_019553 | RJA Discretionary Program - Financial Advisor Approval 2016.11.09 to 2017.03.27 |
| RJA_(NGUYEN)_019641 | RJA_(NGUYEN)_019642 | RJA Discretionary Program - Financial Advisor Approval 2017.03.27 to 2017.05.09 |
| RJA_(NGUYEN)_019643 | RJA_(NGUYEN)_019644 | RJA Discretionary Program - Financial Advisor Approval 2017.05.09 to 2018.07.23 |
| RJA_(NGUYEN)_019554 | RJA_(NGUYEN)_019555 | Sales Practice Reviews 2014.09.23 to 2016.03.10 |
| RJA_(NGUYEN)_019476 | RJA_(NGUYEN)_019476 | Sales Practice Reviews 2014.09.23 |
| RJA_(NGUYEN)_019645 | RJA_(NGUYEN)_019646 | Sales Practice Reviews 2016.03.10 to 2017.08.04 |
| RJA_(NGUYEN)_019556 | RJA_(NGUYEN)_019557 | Sales Practice Reviews 2016.03.10 to 2017.08.04 |
| RJA_(NGUYEN)_019647 | RJA_(NGUYEN)_019648 | Sales Practice Reviews 2017.08.04 to Still Active |
| RJA_(NGUYEN)_019695 | RJA_(NGUYEN)_019696 | Sales Practice Reviews 2017.08.04 |
| RJA_(NGUYEN)_019477 | RJA_(NGUYEN)_019477 | Satellite Office Supervision 2014.08.29 |
| RJA_(NGUYEN)_019558 | RJA_(NGUYEN)_019559 | Satellite Office Supervision 2015.10.19 to 2016.03.04 |
| RJA_(NGUYEN)_019478 | RJA_(NGUYEN)_019478 | Satellite Office Supervision 2015.10.19 |
| RJA_(NGUYEN)_019560 | RJA_(NGUYEN)_019561 | Satellite Office Supervision 2016.03.04 to 2016.06.15 |
| RJA_(NGUYEN)_019562 | RJA_(NGUYEN)_019563 | Satellite Office Supervision 2016.06.15 |
| RJA_(NGUYEN)_019651 | RJA_(NGUYEN)_019652 | Suitability 2014.10.06 to 2017.07.07 |
| RJA_(NGUYEN)_019564 | RJA_(NGUYEN)_019565 | Suitability 2014.10.06 to 2017.07.07 |
| RJA_(NGUYEN)_019479 | RJA_(NGUYEN)_019480 | Suitability 2014.10.06 |

| | | |
|---|---|---|
| RJA_(NGUYEN)_019653 | RJA_(NGUYEN)_019655 | Suitability 2017.07.07 to 2018.03.20 |
| RJA_(NGUYEN)_019699 | RJA_(NGUYEN)_019701 | Suitability 2017.07.07 |
| RJA_(NGUYEN)_015111 | RJA_(NGUYEN)_015113 | Suitability 2018.03.20 to 2019.05.31 |
| **Deposition Materials** | | |
| | | Kim Nguyen, Final Deposition Transcript (Jan. 12, 2021) |
| | | Dax Seale, Deposition Transcript, Not Final (May 6, 2021) |
| | | Bill Gross, Rough Deposition Transcript (May 26, 2021), including courtesy copy of exhibits |
| | | Chris Thurston, Rough Deposition Transcript (May 21, 2021), including courtesy copy of exhibits |
| **FA Guides and Marketing Materials** | | |
| RJA_(NGUYEN)_036099 | RJA_(NGUYEN)_036203 | |
| RJA_(NGUYEN)_040398 | RJA_(NGUYEN)_040411 | |
| RJA_(NGUYEN)_040412 | RJA_(NGUYEN)_040425 | |
| RJA_(NGUYEN)_040426 | RJA_(NGUYEN)_040439 | |
| RJA_(NGUYEN)_040440 | RJA_(NGUYEN)_040453 | |
| RJA_(NGUYEN)_040454 | RJA_(NGUYEN)_040467 | |
| RJA_(NGUYEN)_040468 | RJA_(NGUYEN)_040481 | |
| RJA_(NGUYEN)_040482 | RJA_(NGUYEN)_040495 | |
| RJA_(NGUYEN)_040496 | RJA_(NGUYEN)_040509 | |
| RJA_(NGUYEN)_040510 | RJA_(NGUYEN)_040522 | |
| RJA_(NGUYEN)_040523 | RJA_(NGUYEN)_040526 | |
| RJA_(NGUYEN)_040537 | RJA_(NGUYEN)_040550 | |
| RJA_(NGUYEN)_036100 | RJA_(NGUYEN)_036203 | |
| **Forms ADV (2016)** | | |
| | | Forms ADV (2016), LPL FINANCIAL LLC, MWP PROGRAM BROCHURE (1.12.2016) |
| | | Forms ADV (2016), LPL FINANCIAL LLC, MWP PROGRAM BROCHURE (10.5.2016) |
| | | Forms ADV (2016), LPL FINANCIAL LLC, MWP PROGRAM BROCHURE (3.30.2016) |
| | | Forms ADV (2016), LPL FINANCIAL LLC, MWP PROGRAM BROCHURE (7.15.2016) |

| | | |
|---|---|---|
| | | Forms ADV (2016), MORGAN STANLEY CONSULTING GROUP ADVISOR PROGRAM BROCHURE (3.30.2016) |
| | | Forms ADV (2016), MORGAN STANLEY CONSULTING GROUP ADVISOR PROGRAM BROCHURE (6.17.2016) |
| | | Forms ADV (2016), MORGAN STANLEY CONSULTING GROUP ADVISOR PROGRAM BROCHURE (8.10.2016) |
| | | Forms ADV (2016), UBS SWISS FINANCIAL ADVISERS WRAP FEE PROGRAM BROCHURE (PART 2(A) FOR MANAGED PROGRAMS) (3.24.2016) |
| **Investment Committee Minutes and Related Materials** | | |
| RJA_(NGUYEN)_041890 | RJA_(NGUYEN)_041891 | |
| RJA_(NGUYEN)_041894 | RJA_(NGUYEN)_041950 | |
| RJA_(NGUYEN)_041892 | RJA_(NGUYEN)_041893 | |
| RJA_(NGUYEN)_041953 | RJA_(NGUYEN)_041998 | |
| RJA_(NGUYEN)_041951 | RJA_(NGUYEN)_041952 | |
| RJA_(NGUYEN)_042001 | RJA_(NGUYEN)_042023 | |
| RJA_(NGUYEN)_041999 | RJA_(NGUYEN)_042000 | |
| RJA_(NGUYEN)_042026 | RJA_(NGUYEN)_042048 | |
| RJA_(NGUYEN)_042024 | RJA_(NGUYEN)_042025 | |
| RJA_(NGUYEN)_042049 | RJA_(NGUYEN)_042050 | |
| RJA_(NGUYEN)_042051 | RJA_(NGUYEN)_042052 | |
| RJA_(NGUYEN)_042053 | RJA_(NGUYEN)_042054 | |
| RJA_(NGUYEN)_042055 | RJA_(NGUYEN)_042056 | |
| RJA_(NGUYEN)_043110 | RJA_(NGUYEN)_043110 | |
| RJA_(NGUYEN)_043111 | RJA_(NGUYEN)_043111 | |
| RJA_(NGUYEN)_043112 | RJA_(NGUYEN)_043112 | |
| RJA_(NGUYEN)_043113 | RJA_(NGUYEN)_043113 | |
| RJA_(NGUYEN)_043114 | RJA_(NGUYEN)_043114 | |
| RJA_(NGUYEN)_043109 | RJA_(NGUYEN)_043109 | |
| RJA_(NGUYEN)_042059 | RJA_(NGUYEN)_042100 | |
| RJA_(NGUYEN)_042057 | RJA_(NGUYEN)_042058 | |
| RJA_(NGUYEN)_042103 | RJA_(NGUYEN)_042138 | |
| RJA_(NGUYEN)_042101 | RJA_(NGUYEN)_042102 | |
| RJA_(NGUYEN)_042141 | RJA_(NGUYEN)_042178 | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_042139 | RJA_(NGUYEN)_042140 | |
| RJA_(NGUYEN)_042179 | RJA_(NGUYEN)_042180 | |
| RJA_(NGUYEN)_042181 | RJA_(NGUYEN)_042236 | |
| RJA_(NGUYEN)_042239 | RJA_(NGUYEN)_042284 | |
| RJA_(NGUYEN)_042237 | RJA_(NGUYEN)_042238 | |
| RJA_(NGUYEN)_042287 | RJA_(NGUYEN)_042312 | |
| RJA_(NGUYEN)_042285 | RJA_(NGUYEN)_042286 | |
| RJA_(NGUYEN)_042314 | RJA_(NGUYEN)_042326 | |
| RJA_(NGUYEN)_042313 | RJA_(NGUYEN)_042313 | |
| RJA_(NGUYEN)_042330 | RJA_(NGUYEN)_042342 | |
| RJA_(NGUYEN)_042327 | RJA_(NGUYEN)_042329 | |
| RJA_(NGUYEN)_042345 | RJA_(NGUYEN)_042403 | |
| RJA_(NGUYEN)_042343 | RJA_(NGUYEN)_042344 | |
| RJA_(NGUYEN)_042404 | RJA_(NGUYEN)_042443 | |
| RJA_(NGUYEN)_042444 | RJA_(NGUYEN)_042482 | |
| RJA_(NGUYEN)_042483 | RJA_(NGUYEN)_042484 | |
| RJA_(NGUYEN)_042485 | RJA_(NGUYEN)_042510 | |
| RJA_(NGUYEN)_042511 | RJA_(NGUYEN)_042568 | |
| RJA_(NGUYEN)_042569 | RJA_(NGUYEN)_042608 | |
| RJA_(NGUYEN)_042609 | RJA_(NGUYEN)_042644 | |
| RJA_(NGUYEN)_042645 | RJA_(NGUYEN)_042693 | |
| RJA_(NGUYEN)_042694 | RJA_(NGUYEN)_042736 | |
| RJA_(NGUYEN)_043116 | RJA_(NGUYEN)_043116 | |
| RJA_(NGUYEN)_043115 | RJA_(NGUYEN)_043115 | |
| RJA_(NGUYEN)_042737 | RJA_(NGUYEN)_042777 | |
| RJA_(NGUYEN)_042778 | RJA_(NGUYEN)_042844 | |
| RJA_(NGUYEN)_042845 | RJA_(NGUYEN)_042879 | |
| RJA_(NGUYEN)_042880 | RJA_(NGUYEN)_042925 | |
| RJA_(NGUYEN)_042926 | RJA_(NGUYEN)_042952 | |
| RJA_(NGUYEN)_042953 | RJA_(NGUYEN)_042985 | |
| RJA_(NGUYEN)_042986 | RJA_(NGUYEN)_043023 | |
| RJA_(NGUYEN)_043024 | RJA_(NGUYEN)_043041 | |
| RJA_(NGUYEN)_043042 | RJA_(NGUYEN)_043052 | |
| RJA_(NGUYEN)_043053 | RJA_(NGUYEN)_043081 | |

| RJA_(NGUYEN)_043082 | RJA_(NGUYEN)_043087 | |
| RJA_(NGUYEN)_043088 | RJA_(NGUYEN)_043093 | |
| RJA_(NGUYEN)_043094 | RJA_(NGUYEN)_043108 | |
| **Pleadings and Filings** | | |
| | | [DE 46] Plaintiff's Corrected Amended Class Complaint |
| | | [DE 50] RJA Motion to Dismiss Amended Complaint (with Exhibits) |
| | | [DE 59] Plaintiff's Opposition to RJA's Motion to Dismiss Corrected Amended Complaint |
| | | [DE 70] RJA's Reply in Support of Motion to Dismiss Amended Complaint |
| | | [DE 87] Amended Case Management Report |
| | | [DE 88] Plaintiff's Motion to Compel Production & Expedite Briefing |
| | | [DE 91] RJA's Response in Opposition to Plaintiff's Motion to Compel |
| | | [DE 92] Order Denying Plaintiff's Motion to Compel |
| | | [DE 93] RJA's Motion to Compel Plaintiff's Discovery Production and Interrogatory Responses |
| | | [DE 94] Plaintiff's Opposition to RJA's Motion to Compel Production & Responses |
| | | [DE 95] Plaintiff's Motion for Protective Order Precluding Disclosure |
| | | [DE 96] RJA's Opposition to Motion for Protective Order (TD Ameritrade) |
| | | [DE 110] RJA's Notice of Filing Demonstrative Exhibits from 3-5-21 Hearing |
| | | [DE 116] Order on Motion to Dismiss |
| | | [DE 117] Second Amended Class Action Complaint |
| | | [DE 118] Second Amended Case Management & Scheduling Order |
| | | [DE 122] RJA's Motion to Dismiss Plaintiff's Second Amended Complaint |
| **Discovery Requests and Responses** | | |

| | | |
|---|---|---|
| | | 2020-10-19 Plaintiff's Response to First Set of Interrogatories |
| | | 2020-10-19 RJA's Responses to Plaintiff's First Set of Interrogatories |
| | | 2020-11-02 Plaintiff's Response to RJA's Requests for Admission |
| | | 2020-12-30 Plaintiff's Third Requests for Production |
| | | 2021-01-04 Plaintiff's Amended Responses to RJA's Requests for Admission |
| | | 2021-01-29 RJA's Responses to Plaintiff's Third Requests for Production of Documents |
| **RFP 51 & 52 Charts** | | |
| RJA_(NGUYEN)_058468 | RJA_(NGUYEN)_058468 | |
| RJA_(NGUYEN)_058469 | RJA_(NGUYEN)_058469 | |
| RJA_(NGUYEN)_059060 | RJA_(NGUYEN)_059060 | |
| RJA_(NGUYEN)_059061 | RJA_(NGUYEN)_059061 | |
| RJA_(NGUYEN)_059062 | RJA_(NGUYEN)_059062 | |
| RJA_(NGUYEN)_059063 | RJA_(NGUYEN)_059063 | |
| **Regulations and Legal Resources** | | |
| | | Proposed Rule - Regulation Best Interest (Apr. 18, 2018) |
| | | Securities and Exchange Commission, Commission Interpretation Regarding Standard of Conduct for Investment Advisers (June 5, 2019) |
| | | Final Rule - Regulation Best Interest (June 5, 2019) |
| | | *Ford v. TD Ameritrade*, 995 F.3d 616 (8th Cir. 2021) |
| | | Securities and Exchange Commission, National Exam Program, Examination Priorities for 2013 (Feb. 21, 2013) |
| | | Additional materials cited in the report itself. |
| **Statements & Confirms** | | |
| RJA_(NGUYEN)_008418 | RJA_(NGUYEN)_008423 | |
| RJA_(NGUYEN)_014895 | RJA_(NGUYEN)_014896 | |
| RJA_(NGUYEN)_008260 | RJA_(NGUYEN)_008265 | |
| RJA_(NGUYEN)_014875 | RJA_(NGUYEN)_014880 | |
| RJA_(NGUYEN)_014897 | RJA_(NGUYEN)_014902 | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_014855 | RJA_(NGUYEN)_014860 | |
| RJA_(NGUYEN)_014839 | RJA_(NGUYEN)_014844 | |
| RJA_(NGUYEN)_014823 | RJA_(NGUYEN)_014828 | |
| RJA_(NGUYEN)_014803 | RJA_(NGUYEN)_014806 | |
| RJA_(NGUYEN)_014788 | RJA_(NGUYEN)_014790 | |
| RJA_(NGUYEN)_014771 | RJA_(NGUYEN)_014773 | |
| RJA_(NGUYEN)_014755 | RJA_(NGUYEN)_014756 | |
| RJA_(NGUYEN)_014740 | RJA_(NGUYEN)_014741 | |
| RJA_(NGUYEN)_014727 | RJA_(NGUYEN)_014728 | |
| RJA_(NGUYEN)_014705 | RJA_(NGUYEN)_014706 | |
| RJA_(NGUYEN)_014690 | RJA_(NGUYEN)_014691 | |
| RJA_(NGUYEN)_014677 | RJA_(NGUYEN)_014678 | |
| RJA_(NGUYEN)_014657 | RJA_(NGUYEN)_014658 | |
| RJA_(NGUYEN)_014642 | RJA_(NGUYEN)_014643 | |
| RJA_(NGUYEN)_014629 | RJA_(NGUYEN)_014630 | |
| RJA_(NGUYEN)_014603 | RJA_(NGUYEN)_014604 | |
| RJA_(NGUYEN)_014590 | RJA_(NGUYEN)_014591 | |
| RJA_(NGUYEN)_014577 | RJA_(NGUYEN)_014578 | |
| RJA_(NGUYEN)_014559 | RJA_(NGUYEN)_014560 | |
| RJA_(NGUYEN)_014544 | RJA_(NGUYEN)_014546 | |
| RJA_(NGUYEN)_014531 | RJA_(NGUYEN)_014532 | |
| RJA_(NGUYEN)_014513 | RJA_(NGUYEN)_014514 | |
| RJA_(NGUYEN)_014497 | RJA_(NGUYEN)_014499 | |
| RJA_(NGUYEN)_014484 | RJA_(NGUYEN)_014485 | |
| RJA_(NGUYEN)_014466 | RJA_(NGUYEN)_014467 | |
| RJA_(NGUYEN)_014451 | RJA_(NGUYEN)_014452 | |
| RJA_(NGUYEN)_014436 | RJA_(NGUYEN)_014437 | |
| RJA_(NGUYEN)_014412 | RJA_(NGUYEN)_014413 | |
| RJA_(NGUYEN)_014399 | RJA_(NGUYEN)_014400 | |
| RJA_(NGUYEN)_014386 | RJA_(NGUYEN)_014387 | |
| RJA_(NGUYEN)_014370 | RJA_(NGUYEN)_014371 | |
| RJA_(NGUYEN)_014357 | RJA_(NGUYEN)_014358 | |
| RJA_(NGUYEN)_014344 | RJA_(NGUYEN)_014345 | |
| RJA_(NGUYEN)_014324 | RJA_(NGUYEN)_014325 | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_014294 | RJA_(NGUYEN)_014295 | |
| RJA_(NGUYEN)_014276 | RJA_(NGUYEN)_014277 | |
| RJA_(NGUYEN)_014263 | RJA_(NGUYEN)_014264 | |
| RJA_(NGUYEN)_014256 | RJA_(NGUYEN)_014257 | |
| RJA_(NGUYEN)_014309 | RJA_(NGUYEN)_014311 | |
| RJA_(NGUYEN)_006532 | RJA_(NGUYEN)_006537 | |
| RJA_(NGUYEN)_014881 | RJA_(NGUYEN)_014884 | |
| RJA_(NGUYEN)_014903 | RJA_(NGUYEN)_014904 | |
| RJA_(NGUYEN)_014861 | RJA_(NGUYEN)_014864 | |
| RJA_(NGUYEN)_014845 | RJA_(NGUYEN)_014846 | |
| RJA_(NGUYEN)_014829 | RJA_(NGUYEN)_014830 | |
| RJA_(NGUYEN)_014807 | RJA_(NGUYEN)_014809 | |
| RJA_(NGUYEN)_014791 | RJA_(NGUYEN)_014791 | |
| RJA_(NGUYEN)_014774 | RJA_(NGUYEN)_014774 | |
| RJA_(NGUYEN)_014757 | RJA_(NGUYEN)_014758 | |
| RJA_(NGUYEN)_014742 | RJA_(NGUYEN)_014742 | |
| RJA_(NGUYEN)_014729 | RJA_(NGUYEN)_014729 | |
| RJA_(NGUYEN)_014707 | RJA_(NGUYEN)_014708 | |
| RJA_(NGUYEN)_014692 | RJA_(NGUYEN)_014692 | |
| RJA_(NGUYEN)_014679 | RJA_(NGUYEN)_014679 | |
| RJA_(NGUYEN)_014659 | RJA_(NGUYEN)_014660 | |
| RJA_(NGUYEN)_014644 | RJA_(NGUYEN)_014644 | |
| RJA_(NGUYEN)_014631 | RJA_(NGUYEN)_014631 | |
| RJA_(NGUYEN)_014605 | RJA_(NGUYEN)_014607 | |
| RJA_(NGUYEN)_014592 | RJA_(NGUYEN)_014592 | |
| RJA_(NGUYEN)_014579 | RJA_(NGUYEN)_014579 | |
| RJA_(NGUYEN)_014561 | RJA_(NGUYEN)_014562 | |
| RJA_(NGUYEN)_014547 | RJA_(NGUYEN)_014547 | |
| RJA_(NGUYEN)_014533 | RJA_(NGUYEN)_014533 | |
| RJA_(NGUYEN)_014515 | RJA_(NGUYEN)_014516 | |
| RJA_(NGUYEN)_014500 | RJA_(NGUYEN)_014500 | |
| RJA_(NGUYEN)_014486 | RJA_(NGUYEN)_014486 | |
| RJA_(NGUYEN)_014468 | RJA_(NGUYEN)_014469 | |
| RJA_(NGUYEN)_014453 | RJA_(NGUYEN)_014454 | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_014438 | RJA_(NGUYEN)_014438 | |
| RJA_(NGUYEN)_014414 | RJA_(NGUYEN)_014415 | |
| RJA_(NGUYEN)_014401 | RJA_(NGUYEN)_014401 | |
| RJA_(NGUYEN)_014388 | RJA_(NGUYEN)_014388 | |
| RJA_(NGUYEN)_014372 | RJA_(NGUYEN)_014372 | |
| RJA_(NGUYEN)_014359 | RJA_(NGUYEN)_014359 | |
| RJA_(NGUYEN)_014346 | RJA_(NGUYEN)_014346 | |
| RJA_(NGUYEN)_014326 | RJA_(NGUYEN)_014326 | |
| RJA_(NGUYEN)_014296 | RJA_(NGUYEN)_014296 | |
| RJA_(NGUYEN)_014278 | RJA_(NGUYEN)_014278 | |
| RJA_(NGUYEN)_014265 | RJA_(NGUYEN)_014265 | |
| RJA_(NGUYEN)_014312 | RJA_(NGUYEN)_014312 | |
| RJA_(NGUYEN)_007430 | RJA_(NGUYEN)_007453 | |
| RJA_(NGUYEN)_014796 | RJA_(NGUYEN)_014802 | |
| RJA_(NGUYEN)_014779 | RJA_(NGUYEN)_014787 | |
| RJA_(NGUYEN)_014763 | RJA_(NGUYEN)_014770 | |
| RJA_(NGUYEN)_014747 | RJA_(NGUYEN)_014754 | |
| RJA_(NGUYEN)_014734 | RJA_(NGUYEN)_014739 | |
| RJA_(NGUYEN)_014714 | RJA_(NGUYEN)_014726 | |
| RJA_(NGUYEN)_014697 | RJA_(NGUYEN)_014704 | |
| RJA_(NGUYEN)_014684 | RJA_(NGUYEN)_014689 | |
| RJA_(NGUYEN)_014665 | RJA_(NGUYEN)_014676 | |
| RJA_(NGUYEN)_014649 | RJA_(NGUYEN)_014656 | |
| RJA_(NGUYEN)_014635 | RJA_(NGUYEN)_014641 | |
| RJA_(NGUYEN)_014614 | RJA_(NGUYEN)_014628 | |
| RJA_(NGUYEN)_014596 | RJA_(NGUYEN)_014602 | |
| RJA_(NGUYEN)_014583 | RJA_(NGUYEN)_014589 | |
| RJA_(NGUYEN)_014567 | RJA_(NGUYEN)_014576 | |
| RJA_(NGUYEN)_014551 | RJA_(NGUYEN)_014558 | |
| RJA_(NGUYEN)_014537 | RJA_(NGUYEN)_014543 | |
| RJA_(NGUYEN)_014521 | RJA_(NGUYEN)_014530 | |
| RJA_(NGUYEN)_014504 | RJA_(NGUYEN)_014512 | |
| RJA_(NGUYEN)_014490 | RJA_(NGUYEN)_014496 | |
| RJA_(NGUYEN)_014474 | RJA_(NGUYEN)_014483 | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_014458 | RJA_(NGUYEN)_014465 | |
| RJA_(NGUYEN)_014443 | RJA_(NGUYEN)_014450 | |
| RJA_(NGUYEN)_014423 | RJA_(NGUYEN)_014435 | |
| RJA_(NGUYEN)_014405 | RJA_(NGUYEN)_014411 | |
| RJA_(NGUYEN)_014392 | RJA_(NGUYEN)_014398 | |
| RJA_(NGUYEN)_014377 | RJA_(NGUYEN)_014385 | |
| RJA_(NGUYEN)_014363 | RJA_(NGUYEN)_014369 | |
| RJA_(NGUYEN)_014350 | RJA_(NGUYEN)_014356 | |
| RJA_(NGUYEN)_014331 | RJA_(NGUYEN)_014343 | |
| RJA_(NGUYEN)_014301 | RJA_(NGUYEN)_014308 | |
| RJA_(NGUYEN)_014270 | RJA_(NGUYEN)_014275 | |
| RJA_(NGUYEN)_014260 | RJA_(NGUYEN)_014262 | |
| RJA_(NGUYEN)_014317 | RJA_(NGUYEN)_014323 | |
| RJA_(NGUYEN)_014283 | RJA_(NGUYEN)_014293 | |
| RJA_(NGUYEN)_002433 | RJA_(NGUYEN)_002464 | |
| RJA_(NGUYEN)_004470 | RJA_(NGUYEN)_004489 | |
| RJA_(NGUYEN)_004402 | RJA_(NGUYEN)_004417 | |
| RJA_(NGUYEN)_004340 | RJA_(NGUYEN)_004355 | |
| RJA_(NGUYEN)_004288 | RJA_(NGUYEN)_004299 | |
| RJA_(NGUYEN)_007464 | RJA_(NGUYEN)_007470 | |
| RJA_(NGUYEN)_007457 | RJA_(NGUYEN)_007463 | |
| RJA_(NGUYEN)_014905 | RJA_(NGUYEN)_014916 | |
| RJA_(NGUYEN)_014885 | RJA_(NGUYEN)_014894 | |
| RJA_(NGUYEN)_014865 | RJA_(NGUYEN)_014874 | |
| RJA_(NGUYEN)_014847 | RJA_(NGUYEN)_014854 | |
| RJA_(NGUYEN)_014831 | RJA_(NGUYEN)_014838 | |
| RJA_(NGUYEN)_014810 | RJA_(NGUYEN)_014822 | |
| RJA_(NGUYEN)_014792 | RJA_(NGUYEN)_014795 | |
| RJA_(NGUYEN)_014775 | RJA_(NGUYEN)_014778 | |
| RJA_(NGUYEN)_014759 | RJA_(NGUYEN)_014762 | |
| RJA_(NGUYEN)_014743 | RJA_(NGUYEN)_014746 | |
| RJA_(NGUYEN)_014730 | RJA_(NGUYEN)_014733 | |
| RJA_(NGUYEN)_014709 | RJA_(NGUYEN)_014713 | |
| RJA_(NGUYEN)_014693 | RJA_(NGUYEN)_014696 | |

| | | |
|---|---|---|
| RJA_(NGUYEN)_014680 | RJA_(NGUYEN)_014683 | |
| RJA_(NGUYEN)_014661 | RJA_(NGUYEN)_014664 | |
| RJA_(NGUYEN)_014645 | RJA_(NGUYEN)_014648 | |
| RJA_(NGUYEN)_014632 | RJA_(NGUYEN)_014634 | |
| RJA_(NGUYEN)_014608 | RJA_(NGUYEN)_014613 | |
| RJA_(NGUYEN)_014593 | RJA_(NGUYEN)_014595 | |
| RJA_(NGUYEN)_014580 | RJA_(NGUYEN)_014582 | |
| RJA_(NGUYEN)_014563 | RJA_(NGUYEN)_014566 | |
| RJA_(NGUYEN)_014548 | RJA_(NGUYEN)_014550 | |
| RJA_(NGUYEN)_014534 | RJA_(NGUYEN)_014536 | |
| RJA_(NGUYEN)_014517 | RJA_(NGUYEN)_014520 | |
| RJA_(NGUYEN)_014501 | RJA_(NGUYEN)_014503 | |
| RJA_(NGUYEN)_014487 | RJA_(NGUYEN)_014489 | |
| RJA_(NGUYEN)_014470 | RJA_(NGUYEN)_014473 | |
| RJA_(NGUYEN)_014455 | RJA_(NGUYEN)_014457 | |
| RJA_(NGUYEN)_014439 | RJA_(NGUYEN)_014442 | |
| RJA_(NGUYEN)_014416 | RJA_(NGUYEN)_014422 | |
| RJA_(NGUYEN)_014402 | RJA_(NGUYEN)_014404 | |
| RJA_(NGUYEN)_014389 | RJA_(NGUYEN)_014391 | |
| RJA_(NGUYEN)_014373 | RJA_(NGUYEN)_014376 | |
| RJA_(NGUYEN)_014360 | RJA_(NGUYEN)_014362 | |
| RJA_(NGUYEN)_014347 | RJA_(NGUYEN)_014349 | |
| RJA_(NGUYEN)_014327 | RJA_(NGUYEN)_014330 | |
| RJA_(NGUYEN)_014297 | RJA_(NGUYEN)_014300 | |
| RJA_(NGUYEN)_014279 | RJA_(NGUYEN)_014282 | |
| RJA_(NGUYEN)_014266 | RJA_(NGUYEN)_014269 | |
| RJA_(NGUYEN)_014258 | RJA_(NGUYEN)_014259 | |
| RJA_(NGUYEN)_014313 | RJA_(NGUYEN)_014316 | |
| **TD Ameritrade Statements** | | |
| TDA000004 | TDA000279 | |
| TDA000283 | TDA000288 | |
| TDA000292 | TDA000453 | |
| TDA000454 | TDA000774 | |
| TDA000782 | TDA000961 | |

| TDA000967 | TDA000997 | |
|---|---|---|
| **Vanguard Statements (Select)** | | |
| NGUYEN_001739 | NGUYEN_001741 | |
| NGUYEN_001527 | NGUYEN_001538 | |
| NGUYEN_001581 | NGUYEN_001598 | |
| NGUYEN_001659 | NGUYEN_001678 | |
| NGUYEN_001161 | NGUYEN_001174 | |
| NGUYEN_001223 | NGUYEN_001236 | |
| NGUYEN_001267 | NGUYEN_001282 | |
| NGUYEN_001301 | NGUYEN_001314 | |
| NGUYEN_001333 | NGUYEN_001348 | |
| NGUYEN_001381 | NGUYEN_001396 | |
| NGUYEN_001415 | NGUYEN_001428 | |
| NGUYEN_001447 | NGUYEN_001460 | |
| NGUYEN_001491 | NGUYEN_001506 | |
| NGUYEN_001549 | NGUYEN_001562 | |
| NGUYEN_001617 | NGUYEN_001630 | |
| NGUYEN_001707 | NGUYEN_001726 | |
| NGUYEN_001193 | NGUYEN_001204 | |
| NGUYEN_001735 | NGUYEN_001738 | |
| NGUYEN_001515 | NGUYEN_001526 | |
| NGUYEN_001571 | NGUYEN_001580 | |
| NGUYEN_001645 | NGUYEN_001658 | |
| NGUYEN_001151 | NGUYEN_001160 | |
| NGUYEN_001213 | NGUYEN_001222 | |
| NGUYEN_001257 | NGUYEN_001266 | |
| NGUYEN_001291 | NGUYEN_001300 | |
| NGUYEN_001323 | NGUYEN_001332 | |
| NGUYEN_001369 | NGUYEN_001380 | |
| NGUYEN_001405 | NGUYEN_001414 | |
| NGUYEN_001437 | NGUYEN_001446 | |
| NGUYEN_001481 | NGUYEN_001490 | |
| NGUYEN_001539 | NGUYEN_001548 | |
| NGUYEN_001607 | NGUYEN_001616 | |

| | | |
|---|---|---|
| NGUYEN_001693 | NGUYEN_001706 | |
| NGUYEN_001183 | NGUYEN_001192 | |
| **Edward Jones Statements** | | |
| NGUYEN_001746 | NGUYEN_001753 | |
| NGUYEN_001762 | NGUYEN_001770 | |
| NGUYEN_001779 | NGUYEN_001789 | |
| NGUYEN_001798 | NGUYEN_001806 | |
| NGUYEN_001816 | NGUYEN_001824 | |
| NGUYEN_001833 | NGUYEN_001843 | |
| NGUYEN_001852 | NGUYEN_001855 | |
| NGUYEN_001863 | NGUYEN_001867 | |
| NGUYEN_001876 | NGUYEN_001880 | |
| NGUYEN_001885 | NGUYEN_001888 | |
| NGUYEN_001893 | NGUYEN_001896 | |
| NGUYEN_001902 | NGUYEN_001906 | |
| NGUYEN_001754 | NGUYEN_001757 | |
| NGUYEN_001771 | NGUYEN_001774 | |
| NGUYEN_001790 | NGUYEN_001793 | |
| NGUYEN_001807 | NGUYEN_001810 | |
| NGUYEN_001825 | NGUYEN_001828 | |
| NGUYEN_001844 | NGUYEN_001847 | |
| NGUYEN_001856 | NGUYEN_001859 | |
| NGUYEN_001868 | NGUYEN_001871 | |
| NGUYEN_001881 | NGUYEN_001884 | |
| NGUYEN_001889 | NGUYEN_001892 | |
| NGUYEN_001897 | NGUYEN_001901 | |
| NGUYEN_001907 | NGUYEN_001910 | |
| NGUYEN_001758 | NGUYEN_001761 | |
| NGUYEN_001775 | NGUYEN_001778 | |
| NGUYEN_001794 | NGUYEN_001797 | |
| NGUYEN_001811 | NGUYEN_001815 | |
| NGUYEN_001829 | NGUYEN_001832 | |
| NGUYEN_001848 | NGUYEN_001851 | |
| NGUYEN_001860 | NGUYEN_001862 | |

| | | |
|---|---|---|
| NGUYEN_001872 | NGUYEN_001875 | |
| NGUYEN_001911 | NGUYEN_001914 | |
| NGUYEN_001915 | NGUYEN_001918 | |
| NGUYEN_001919 | NGUYEN_001922 | |
| **Documents Cited in Second Amended Complaint** | | |
| RJA_(NGUYEN)_044886 | | |
| RJA_(NGUYEN)_044669 | | |
| RJA_(NGUYEN)_043502 | | |
| RJA_(NGUYEN)_034643 | | |
| RJA_(NGUYEN)_029784 | | |
| RJA_(NGUYEN)_029336 | | |
| RJA_(NGUYEN)_019922 | | |
| RJA_(NGUYEN)_019783 | | |
| RJA_(NGUYEN)_012336 | | |

EXHIBIT I

CONFIDENTIAL

# FREEDOM ACCOUNT SUMMARY

FROM 1/29/16 TO 11/30/18    KIMBERLY NGUYEN███████318

| | |
|---|---:|
| TRADING PROFIT | 54,112.32 |
| DIVIDENDS/INTEREST | 7,918.42 |
| **TOTAL PROFIT FROM FREEDOM HOLDINGS** | **$62,030.74** |
| | |
| FEES PAID FROM FREEDOM ACCOUNT | (2,911.12) |
| FEES PAID FROM OTHER ACCOUNT | (4,521.15) |
| **TOTAL FREEDOM ACCOUNT FEES** | **($7,432.27)** |
| | |
| **OVERALL FREEDOM ACCOUNT PROFIT** | **$54,598.47** |
| | |
| **ANNUAL RATE OF RETURN (IRR)** | **9.9%** |

# EXHIBIT II

CONFIDENTIAL

# PORTFOLIO COMPARISON SUMMARY
# COMMISION BASED ACCOUNT V FREEDOM ACCOUNT
### KIMBERLY NGUYEN ACCOUNTS WITH RAYMOND JAMES

| MORNINGSTAR CATEGORY | EQUITY/BOND STYLE | COMMISSION ACCOUNT | FREEDOM ACCOUNT | DIFFERENCE ($) | DIFFERENCE (%) |
|---|---|---|---|---|---|
| **U.S. EQUITY** | *LARGE BLEND* | 31,890 | 45,930 | 14,040 | 44.0% |
| | *LARGE VALUE* | 59,925 | 22,928 | (36,997) | (61.7%) |
| | *LARGE GROWTH* | - | 11,923 | 11,923 | |
| | *MID VALUE* | 1,817 | - | (1,817) | |
| | *SMALL BLEND* | - | 12,840 | 12,840 | |
| | *SMALL VALUE* | - | 12,840 | 12,840 | |
| | *TOTAL* | $93,632 | $106,461 | $12,829 | 13.7% |
| | *% OF TOTAL* | 51.1% | 59.2% | 8.1% | |
| **INTERNATIONAL EQUITY** | *LARGE GROWTH* | 4,068 | 33,017 | 28,949 | 711.7% |
| | *LARGE VALUE* | 24,391 | - | (24,391) | |
| | *LARGE BLEND* | 36,230 | 11,000 | (25,230) | (69.6%) |
| | *TOTAL* | $64,689 | $44,017 | ($20,672) | (32.0%) |
| | *% OF TOTAL* | 35.3% | 24.5% | (10.8%) | |
| **FIXED INCOME** | *MUNICIPAL BOND* | 9,495 | - | (9,495) | |
| | *TAXABLE BOND* | 15,452 | 29,352 | 13,900 | 90.0% |
| | *TOTAL* | $24,946 | $29,352 | $4,406 | 17.7% |
| | *% OF TOTAL* | 13.6% | 16.3% | 2.7% | |
| | **TOTAL** | $183,267 | $179,830 | | |

# EXHIBIT 2

**CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT**

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| KIMBERLY NGUYEN, On Behalf of | ) | |
| | ) | |
| Herself and All Others Similarly Situated, | ) | |
| | ) | |
| | ) | Case No. 8:20-cv-195-CEH-AAS |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| RAYMOND JAMES & ASSOCIATES, INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**Rebuttal Expert Report of Peter J. Klouda**

**Bates Group - Director**

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

## EXPERT REPORT OF PETER J. KLOUDA

I.      **Peter J. Klouda: Summary of Engagement**

1. In connection with the matter *Kimberly Nguyen, on behalf of Herself and All Others Similarly Situated vs. Raymond James & Associates, Inc*., Case No. 8:20-cv-195-CEH-AAS, I have been asked by counsel for Raymond James & Associates, Inc. ("RJA" or "Raymond James") to prepare a rebuttal report to address the reports of Douglas J. Schulz (Schulz) and Arthur Olsen (Olsen) both dated June 4, 2021.  In this rebuttal report, I have been asked to assess the viability of the assumptions and damage model(s) put forth by both Olsen and Schulz.

2. I am being compensated by Raymond James for my work, through Bates Group LLC, at the rate of $285 per hour.  The rates of Bates Group employees, who conducted research and analysis under my direction and supervision, range between $95 and $230 per hour. My compensation and the compensation of Bates Group are in no way dependent on the content of my and/or Bates Group's analyses, the content of this report, my opinions, or the outcome of these proceedings.

3. The materials I have considered in forming my opinions are summarized in Appendix I, and in Appendix III to my original report in this matter dated June 4, 2021, or cited in this report itself.

II.     **Peter J. Klouda: Background and Qualifications**

4. I incorporate the Expert Background and Qualifications and attachments set forth in and appended to my original report in this matter dated June 4, 2021.

1

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

III.     **Class Members' Purported Damages Cannot Be Calculated Based on an Analysis of RJA's Data**

5.   The damage model presented by Schulz[1] calculates purported damages as the difference between actual fees paid in the Freedom Account minus the purported fees that might have been incurred if purported class members remained in a commission-based account.[2] According to Schulz, the latter part is determined by multiplying two components: 1) average annualized commission rate from commission account and 2) average equity in the Freedom Account.[3]

6.   The actual fees paid in the Freedom Account is the only component of the damage model that is accurate and based on what actually occurred in the purported class members' Freedom Accounts.  The remaining components are based on assumptions from past activity and applying it to future balances.

7.   The calculation to determine the commissions/fees that might have been paid had the purported class members not opened the Freedom Account is speculative in nature.  One cannot, with precision or otherwise, determine an investor's potential trading patterns and level of commissions into future years.  Market conditions, changes in financial advisors, life events, financial circumstances, investment objectives, investment preferences, risk tolerances, and other relevant variables change through time, and no one can with any certainty calculate a future annual cost percentage.[4]

---

[1] Report of Douglas J. Schulz re Class Certification ("Schulz Report"), para. 148-155.
[2] Ibid., para. 149.
[3] Ibid., para. 150.
[4] See Expert Report of Peter Klouda ("Klouda Report"), June 4, 2021, para. 48.b.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

8. Furthermore, Schulz is mixing components of two different investment programs: a commission-based model (commissions are paid when trades occur) and the Freedom program (specific fee percentages are agreed to by each client and are based on the amount of assets in the account).  He is applying a hypothetical annual cost percentage to the equity amount in the Freedom program.  This is an "apples versus oranges" approach that does not make sense when applied in the real world.

9. This model ignores the fees agreed to by the putative class members and applies a "new" fee percentage for the services, benefits, and investment choices that occurred under the Freedom Account program.  The "new" fee percentage is determined by annualizing the ad hoc trading commissions paid in a commission account prior to opening a Freedom Account after excluding the most recent two months of commissions.   The model then assumes that the purported class members would have paid the same annual cost percentage they paid under the commission-based model (which did not include professional management) for the Freedom Account (which included professional management and, for some, ancillary services).  In essence, Schulz creates a "new" annual fee based on past behavior in a commission-based account and applies it to a different, fee-based managed account, the Freedom Account.  Such a novel and unsupported damage model is not based on industry standards.  It takes the "wrong" type of cost (ad hoc commissions) and then applies it to managed, fee-based assets (Freedom assets rather than the assets in a commission-based account).

10. The Schulz model makes the following incorrect assumptions:

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

- The model assumes that purported class members' trading history and annual cost percentage would continue into future years.  This cannot be determined; no crystal ball exists to see how a purported class member would trade and handle their account in future years.

- The model assumes that purported class members did not receive any benefits or services from RJA while they were enrolled in the Freedom Account program.  In fact, RJA provided the following suite of services and benefits in the Freedom Program that were not provided in self-directed commission-based accounts:[5]

  i.   Selection of mutual funds and ETFs

  ii.  Performance monitoring of mutual funds and ETFs

  iii. Asset allocation investment strategies

  iv.  Target allocations of assets

  v.   Rebalancing of the investments in the account

  Schulz is valuing these services at zero by arguing that the commission-based model's "annualized cost" should be used as the "fair" fee to be charged on the fee-based, managed assets (in the Freedom Account) and netting the difference with what was actually paid, as "damages".

- The model assumes that the investment performance of the Freedom Account would equal the investment performance of the commission-based account over the period the Freedom Account was open.  Schulz does not consider whether the

---

[5] Ibid., para. 21.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

Freedom Account assets would have outperformed the same assets held prior in the commission-based account.  Therefore, his model assumes that the investors should receive all of the potential investment gains of the Freedom Account, but at a fraction of the cost – or at zero cost for 68% of accounts in the sample.[6]

- Schulz's model assumes that the assets are the same in the commission-based account and the Freedom Account when in fact new assets were purchased when the Freedom Accounts were opened.[7]

11. If all purported class members signed individual Freedom Investment Management Agreement forms upon opening a Freedom Account, then each purported member acknowledged the benefits and services they were to receive for the agreed upon corresponding fee.  No purported class member agreed to a fee that was based on the past average of the annual cost of the ad hoc trading in their commission-based account.

12. Schulz's damage model wrongfully allows the purported class members to receive all the benefits and services that they bargained for in the Freedom Account at the "cost" of their commission-based account. He ignores the fact that the services, asset allocation, and investment selection differed between the two account types.

13. For the Plaintiff, Schulz's damage model states that she paid $7,432 in fees and that her commission-based account cost her 0% when calculated as an "annual fee"; therefore, her damages are $7,432.  This comparison is very imprecise, as Schulz relies on only *6 months* of trading data in the Plaintiff's commission-based account, that had zero trades

---

[6] Schulz Report, para. 153.
[7] See Klouda Report, para. 17.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

during that short window of time, and then applies a "new" fee of 0% to her Freedom Account assets for a *3-year period*. Assuming no trades would have occurred for 3 years, based on only 6 months of trading data, is not a workable model and likely does not reflect how the Plaintiff would have traded in future years.

14. He further states that 23 of 34 purported class members he identified in the sample also paid 0% in annualized fees in their commission-based accounts and therefore are entitled to all their Freedom fees returned as part of their damages.[8]  Schulz's model therefore computes that these purported class members, including the Plaintiff, should have received the Freedom Account, and all its benefits, services, and performance, for free. This would result in a potential windfall to the purported class members.  No professionally managed portfolio is provided to any customer at zero cost.  Plaintiff was aware of the fees in her Freedom Account and paid them regularly for almost 3 years. RJA cannot unwind the benefits, services, and performance they provided – the Plaintiff has already received (and benefited from) them.[9]

15. Additionally, Schulz's model ignores any difference in investment performance, account level risk, and investment holdings between a commission-based account and the Freedom Account.  As noted above, Schulz's model suggests that 23 of 34 purported class members should receive all of their Freedom Account fees back (while retaining the benefits).  But what if the Freedom Account portfolio of assets outperformed what the commission-based account would have generated?  Does that customer get to keep their

---

[8] Schulz Report, para. 153.
[9] See Klouda Report, para. 51.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

gains from the Freedom Account?  Or give them back?  Or are that investor's purported

damages cancelled out by the gains? Or what if a purported class member selected a

Freedom Account strategy that presented less risk than did their prior commission-based

account and therefore less opportunity for investment gains?   Is this person still an

appropriate member of the class?  Additionally, perhaps a client was invested in 100%

domestic large-cap equities prior to opening a Freedom Account and then opened a

Freedom Account that contains investments in fixed-income products or other market

segments such as small and mid-cap equities.  No valid comparison can be made in that

scenario between the two different accounts.   None of these permutations are

considered by Schulz, as they would require him to review each individual account (rather

than the one-size-fits-all approach he suggests) for not only suitability but other factors,

to determine if any damages occurred.

16. Schulz is partly taking the approach of a benefit-of-the-bargain model by saying that the

purported class members should be restored back to the annual cost percentage they

paid before Freedom.  Among other areas, though, he fails to address restoring the

purported class members back to their original financial position prior to agreeing to

invest in the Freedom Program in terms of their investment holdings.  He wants the

benefit of a hypothetical lower fee structure and then all the benefits, investment gains,

and services Freedom provided its clients.   He cannot have both.

17. In paragraph 38 of the Olsen Report[10], Olsen states that Schulz will also opine that:

---

[10] See Schulz Report, para. 20.k.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

"[D]amages would also include any resulting loss of investment gains on the relevant accounts due to the reduction of assets in those accounts due to the difference between the fees paid in the fee-based accounts minus the projected commissions that would have been charged in the fee based accounts. I further understand that Mr. Schulz will opine that these damages can be calculated by applying an appropriate return metric (*e.g.*, applying the same rate of returns as earned in class-members' Freedom Accounts; or earned in the relevant RJA Model Portfolio investment strategies used for its Freedom Accounts; *or* an appropriate index such as the S&P 500) to the Freedom Accounts during the relevant time period."

This additional layer of purported damages fails to account for scenarios in which the Freedom Accounts could have outperformed the commission-based accounts and thus no damages would have been incurred by the purported class members, as the performance difference in certain scenarios may overcome the hypothetical damages suggested by Olsen.  Also, Schulz suggests a reinvestment into Freedom, the very program he says is unsuitable for the purported class members, along with the S&P 500, which assumes (without basis for any determination of suitability) that the clients wanted 100% equities.  These return metrics do not restore the purported class members back to their original positions; they potentially enhance their investment returns beyond what they bargained for.

18. An alternative approach, albeit time consuming, for attempting to quantify purported "damages" – assuming that liability could be imposed – would be to determine Freedom Account by Freedom Account how the commission-based assets would have performed against the Freedom Account assets to determine the difference in performance (positive or negative) and then account for the difference in hypothetical commission-based fees

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

and actual fees paid for the Freedom Account.[11] There are of course serious limitations

to this, including speculation on how purported class members would trade or continue

to hold assets in a commission-based account for this time period.

19. Schulz and Olsen also do not explain what should happen to the Freedom Account assets.

Should purported class members be restored back to their original positions held in the

commission accounts? The damage model put forth by Schulz appears to ask that

purported class members receive all the assets purchased and managed for them under

the Freedom Account at a "new" rate, and therefore are proposing a renegotiation or

resetting of fees in the Freedom Account.  Hence, Schulz must also then agree that assets

in the Freedom Account are suitable for the purported class members and the only

supposed problem is the fee percentage.

20. Schulz's model as applied by Olsen does not properly determine damages for this matter.

Neither the Plaintiff in this matter, nor the purported class members, nor RJA, agreed to

a contractual relationship in which RJA would provide professional money management

services (Freedom Account) at the "annualized" cost of a commission-based account.

**IV.        Rebuttal of Schulz's Objective Metrics – Annual Cost Analysis and Turnover Analysis**

21. In paragraph 52 of his Report, Schulz states "In my experience and professional opinion,

if a commission-based account has an annual cost percentage equal to or less than 0.5%,

then it is a low trading activity account that paid very few commissions for which a fee-

based account is not be (sic) suitable."  In addition, in paragraph 57, Schulz states "In my

---

[11] See Klouda Report, para. 52.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

experience and professional opinion, if a commission-based account has a turnover less than or equal to 0.25, then it is a low trading activity account for which a fee-based account is not suitable."  These two opinions by Schulz are not based on any industry standards that Schulz identifies in his report or that I am aware of.  As an initial matter, these opinions are irrelevant because Plaintiff was not selecting between a commission-based account and a fee-based account; she was selecting between a commission-based brokerage account and investing in a managed program (Freedom Account).  But even setting this critical difference aside, determining whether a fee-based account is suitable and then determining damages, based only on these two metrics, is without support or precedent in the industry.  Schulz's two factors are so absolute that it would include the following scenarios (and very likely others), where a fee-based program might be suitable, but where he would nonetheless apply damages:

- Cash Accounts – a client could be 100% cash for multiple years (0% annual cost percentage; 0.00 turnover) in an investment account then decide to invest their money into securities in a fee-based, managed program.

- Concentrated Positions – a client could hold one security in their investment account that has not been traded in over 2 years and thus has an annual cost percentage below 0.5% and turnover below 0.25%.  The client realizes the risk the concentrated position presents and determines a diversified portfolio, like the ones Freedom offers, is better in the long term.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

- Life events – a client with an annual cost percentage less than 0.5% and turnover below 0.25% has decided to make life changes and no longer wants to take the time to manage their assets and seeks professional help to do so.

- Poor performance – a client has not received the returns they had hoped for in a commission-based account, picking investments themselves, with an annual cost percentage below 0.5% and turnover below 0.25% and has decided to open a Freedom Account.

22. In all the above scenarios, Schulz's criteria would categorically say that 1) a Freedom Account is per se unsuitable and 2) any investor in these categories should be excluded from the Freedom program and awarded damages in all situations since the cost equity in the commission-based account would be below 0.5% and turnover below 0.25%.

23. In paragraphs 51 and 56, Schulz discusses how for both the annual cost percentage and turnover rates, he directed Olsen to remove any costs and trading value related to securities transacted in the month the Freedom Account was opened and the two months prior.   By removing this data, Schulz may be artificially lowering the annual cost percentage of the accounts.  It is my understanding that any activity related to the funding of the Freedom Account involving trading securities is done at no cost to the client.[12] Therefore, all trades and commissions should be included in his calculations since trades with zero commissions would not have an effect on his annual cost percentage metric. If

---

[12] See Financial Advisor Guide, Freedom Account (2015), pg. 11 (RJA_(Nguyen)_040409); Deposition of Bill Gross (May 26, 2021) ("Gross Dep."), 227:15-17.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

additional trades occurred that should be included, they would increase the annual cost percentage thus potentially excluding some purported class members from the class.

24. The data that Schulz used to analyze his selected metrics is only a two-year window into the annual costs and turnover of accounts (which he then applies to the multi-year history of the Freedom Accounts going forward).  This limited period likely does not capture the full trading history of the client before opening the Freedom Account.  As an example, the Plaintiff's commission account was only open for 6 months prior to her opening the subject Freedom Account.  Based on this 6-month window, Schulz, through his damage model, projects that she would have never traded her assets or incurred any costs during the almost 3-year period she was invested in the Freedom program had she stayed in a commission-based account.  This is not realistic, as there would have likely been some future trading due to either rebalancing the account, life events, or market events which would cause the Plaintiff to alter her portfolio.  As for the purported class members, they could have made significant transactions in the 3+ years prior to opening a Freedom Account that would affect both the annual cost percentage and turnover metrics used by Schulz.  For example, a class member could have purchased a portfolio of A-share mutual funds with front-end loads of 4% three years before opening a Freedom Account.  This significant expense would not be captured in Schulz's damage model.

25. In addition, the data used by Schulz does not consider that a single Freedom Account could have been funded by multiple sources, in addition to the one commission-based account that he examines, including one or more of: cash, another commission-based account, and other account types and outside assets.  The data set relied on by Schulz

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

assumes one commission account funded one Freedom Account; this myopic view limits the possibilities of multiple funding sources.  It also does not consider additional funding post inception of the Freedom Account that could have come from an account(s) with annual costs greater than 0.5% or turnover greater than 0.25, or any other source. His model would allow recovery of Freedom fees paid as a percentage of these outside assets. Lastly, his focus only on the commission-based account that funded the Freedom Account does not consider purported class members' annual cost and turnover across the broad spectrum of accounts a client could maintain.  Perhaps the commission account assets were not performing as well as other fee-based accounts or actively traded accounts that a purported class member maintained, so they desired to liquidate assets in the commission-based account and open a Freedom Account.

V.      **The Freedom Account's Services and Benefits are Advantageous and, at a Minimum, are Different from those of a Commission-Based Account**

26. The benefits and services of a Freedom Account differ greatly from any services that may be provided in a commission-based account.  The Freedom Account is an entirely different investment product than a self-directed commission account; Freedom is not just a "flat-fee" version of a commission account, which is how Schulz's damage model treats Freedom Accounts.    As noted above, the Freedom Account provides the following services in exchange for the fee:

      i.   Menu of model of investment strategies to select from

      ii.   Selection of mutual funds and ETFs

      iii.   Performance monitoring of mutual funds and ETFs

13

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

    iv.  Monitoring of fund managers

    v.  Target allocations of assets

    vi.  Rebalancing of the investments in the account

27. Each of the above items is advantageous to the client in terms of providing a professionally managed account with ongoing monitoring of the assets and the fund managers, which does not occur in a commission-based account.  As noted in my expert report in paragraphs 38-39, there are multiple differences between a managed account and commission-based brokerage account, including:

- In a commission account, the broker generally does not have discretion over the trading in the account and must either solicit a transaction or receive direction from the client to make a trade.

- The Freedom Account is a professionally managed portfolio that has regular monitoring of the portfolio allocation, monitoring of the performance of the individual holdings, and oversight by a team of professionals.[13]

- A commission-based account does not come with the same services and benefits as a fee-based managed account.

- The portfolio that was selected and traded in Plaintiff's Freedom Account would not necessarily have occurred in her commission account, as Plaintiff would not have had access to the investment strategies that come with the Freedom program.

---

[13] Deposition of Chris Thurston (May 21, 2021) ("Thurston Dep."), 127:3-7; 128:23-129:6.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

**VI.      Responses to Schulz's Issues with the Services and Benefits of the Freedom Account**

28. In paragraph 118, Schulz states "RJA pays AMS just 15 basis points (0.15%) for all of the services provided by AMS, while charging clients anywhere up to 2.25% for those services plus "additional" services provided by the financial advisor."   What Schulz calls a "payment" of 15 basis points to AMS is no such thing, but is instead a cost allocation by RJA to one of its several divisions.[14]   RJA has a payout to the financial advisor based on their grid payout[15] with the remaining percentage going to RJA,  which covers its internal costs through its usual budgeting, including costs associated with divisions such as legal, compliance, and AMS.[16]  The 15-basis point allocation to AMS (a division of RJA) is a cost allocation measure by RJA and does not reflect the value of the services AMS provides for the Freedom Program.  There is no evidence that the 15 basis points is the complete value of the services provided by AMS for the Freedom Program.

29. Additional services could have also been provided by each individual financial advisor in the Freedom Account including: 1) asset allocation; 2) periodic portfolio review; 3) performance reporting; 4) investment advice; 5) college planning; 6) financial planning; 7) cash flow management; 8) professional model management; and 9) investment consulting.[17]  The extent of such services – which Plaintiff's model wholly ignores – could only be determined on an account-by-account review.[18]  Schulz weighs the value of these

---

[14] Ibid., 120:24-121:5.
[15] Ibid., 162:24-163:15.
[16] Ibid., 133:12-134:19.
[17] "Converting from a Brokerage to a Fee-Based Practice," pg. 3 (RJA_(Nguyen)_046439).
[18] Thurston Dep., 162:16-23.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

services in section H of his report but then does not account for the value of these services in his damages model.

30. In paragraphs 120 - 123, Schulz questions the value of the "other services" that financial advisors may provide to clients enrolled in the Freedom Account program.  He makes the assumption that the "other services" are offered to all clients at RJA but he makes no distinction as to whether or not the clients received these services.  The level to which clients received "other services" will vary client-to-client and Schulz places no value on these services for his damage model.  If Client A regularly received the "other services" and Client B did not, then Client A received additional value that should be accounted for in the damage model.

31. In paragraph 123, Schulz states "Plaintiff did not actually gain any management services from being placed in the Freedom Account, yet she paid higher fees."  As noted above (paragraph 26), the Plaintiff received numerous services and benefits from the Freedom Account program. To the extent she was already receiving other ancillary services from her financial advisor, because she had an earlier Freedom Account and the financial advisor's practice was based on financial planning,[19] that will not be the case for all the purported class members.  The putative class contains those who opened Freedom Accounts, and many of those clients would be opening their first Freedom Account, not their second like Plaintiff did.

32. In paragraph 124, Schulz states "…whatever benefits/features the Freedom Accounts offer, they do not outweigh the negatives for the much higher costs for clients

---

[19] Deposition of Dax Seale (May 6, 2021) ("Seale Dep."), 102:23-103:12.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

transferring in from low trading activity/buy-and-hold accounts."  Schulz is weighing the benefits and features, and credits them at zero, which is unsupported by the evidence.  In any event, he ignores the fact that the services and benefits of the two-account types are *different*.

33. In paragraph 125, Schulz then walks through an example of investing $50,000 and paying a commission of 1% upfront and nothing more in future years.  He compares this to paying 1% in a Freedom Account every year going forward to show the cost difference.  But this example does not reflect the facts of this case.  None of the Plaintiff's funds she held in her commission-based account had a 1% upfront fee.  In fact, all the funds would have had an upfront sales charge of 3.5-4.75% (Exhibit I).[20]  The example provided by Schulz does not correlate at all to the commission costs the Plaintiff and the purported class members experienced when purchasing mutual funds in a commission-based account.  In reviewing the 20 largest mutual fund transactions in the data provided by RJA, totaling almost $300,000 in purchases (67% of all mutual fund purchases in the commission-based accounts), $95,834 in A-shares are purchased and $173,210 in C-shares are purchased.[21]  This discredits Schulz's example as most of the largest mutual fund transactions either included an upfront fee of up to 5% (A-shares) or an ongoing fee of 1% (C-shares).  Therefore, purported class members would have either paid 1) greater upfront fees than the 1% he states or 2) ongoing fees of about 1% which is higher than his example of 0%.  Depending on how long the A or C-shares are held, the upfront and ongoing costs could

---

[20] Per current Morningstar data; also assumes rights of accumulation by fund family.
[21] See RJA_(NGUYEN)_058469, tab 51-j.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED
CONFIDENTIALITY AGREEMENT

rival the fees charged under the Freedom Account program and without the benefits and

services of the Freedom Account program.

34. In paragraph 126, Schulz states:

> "Because the Freedom Account is composed of mutual funds and ETFs that
> already charge a management fee, RJA is "double-dipping" on management fees.
> Double dipping is a term in the securities industry that refers to when a broker or
> adviser is charging the client twice on the management of the client's assets."

The holders of a Freedom Account incur a fee charged by RJA, and the mutual funds also

have internal fees at the fund level, but RJA and the mutual funds are providing different

services to the client in exchange for those fees.  RJA is providing, among other things: 1)

selection of mutual funds and ETFs; 2) performance and management monitoring of

mutual funds and ETFs; 3) asset allocation investment strategies; 4) target allocations of

assets; and 5) rebalancing of the investments in the account. The mutual funds on the

other hand provide the investment selection that fits their performance objectives.  These

are two distinct services that warrant a charge back to the client.  This point by Schulz

further breaks down because he would also have to consider sales charges on a mutual

fund purchase as "double-dipping" in a commission-based account since (under his

flawed theory) RJA would presumably be charging the client "twice" on the assets.

35. In paragraph 129, Schulz discusses his thoughts on periodic rebalancing with the following

points:

- "Rebalancing causes unnecessary increased transaction costs."

18

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

    i. Contrary to Schulz's assertion, the costs for rebalancing Plaintiff's Freedom Account are de minimis. There is no additional cost to the client when buying and selling mutual funds in a Freedom Account.  Furthermore, the bid-ask spread for the ETFs are about 0.01%[22] and the Plaintiff's account had about 33% of the assets in ETFs.  Therefore, the overall transactions costs assuming all the ETFs are traded is 0.0033%.

- "Rebalancing causes increased taxes, which are capital impairments."

    i. Taxes are part of investing.  If an investor pays taxes on an investment, it is proof that an investment had a positive performance, which is the goal of investing.  Taxes will have to be paid at some point in time and can be offset by losses in other investments.

- "Rebalancing contradicts one of the oldest and most fundamental investment strategies: sell your losers and let your winners ride. In a rebalance, you are selling your best performers (winners) and buying more of your lowest performers (losers), just to maintain some pre-determined ratio. There is little to no value to "annual," "automatic," or "strategic" rebalances from the fee-based Freedom Accounts here."

    i. Letting your "winners ride" can create unnecessary risk in a portfolio, which is one of the primary reasons that investors should rebalance their portfolio.  If a suitable portfolio for an investor is 70% equities and 30%

---

[22] See Fidelity Research, ETFs
https://screener.fidelity.com/ftgw/etf/goto/snapshot/snapshot.jhtml?symbols=voo. Relevant symbols are IEFA, AGG and VOO.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

fixed income and if, over time, the allocation becomes 90% equities and 10% fixed income, the portfolio may no longer be suitable and a rebalance needs to occur.  An article from Morningstar, a financial services firm that publishes extensive investment research, states that "Rebalancing, or selling a portfolio's best performers to buy the worst performers periodically, is one of the best ways to protect against market movements altering a portfolio's risk profile."[23] And Fidelity states "As markets move over time, some asset classes may perform better than others.  This can shift the mix of investments in your account.  As a result, the level of risk in your account may be higher than where it started."[24]

36. This rebalancing point by Schulz is an academic point and has no bearing on the damage model he supports.  RJA agreed to provide these services and did.  Purported class members were promised the services of the Freedom Account program, including rebalancing.  It ensures the portfolio maintains the proper allocation[25] and risk parameters the client agreed to when completing the Freedom Account Agreement.

37. In paragraph 131, Schulz states "An additional negative to the fee-based Freedom accounts is the fact that they *charged a Freedom management fee on cash balances* up to a maximum of 20% of the account.  In commission-based accounts, there is no charge for your money invested in securities, much less in cash."  The intent of the Freedom

---

[23] See https://www.morningstar.com/articles/962396/heres-why-you-should-rebalance.
[24] See https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/fidelity/rebalancing-is-a-key-component.pdf.
[25] Thurston Dep., 159:20-160:2.

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

Program is not to maintain large cash balances; RJA Form ADV[26] states: "Cash balances are generally expected to be a small percentage of the overall account value in EHNW, **Freedom, Freedom UMA**, MDA, RJCS and Russell managed accounts, although cash balances may fluctuate at any given time at the discretion of the portfolio manager or the AMS Investment Committee, as applicable."  My review of the Plaintiff's Freedom Account shows that the cash balance was never greater than 3%.

## VII.  Rebuttal of Schulz's Various Comments on Fees Related to the Freedom Account

38. In paragraph 28, Schulz states "…Ms. Nguyen and other customers paid the mutual fund operating expenses for each fund they invested in.  For Ms. Nguyen, the mutual fund fees ranged from 0.46% to 1.29%."  Schulz further states, in paragraph 29: "Thus, Ms. Nguyen paid an average of 2% of her portfolio assets for RJA and mutual fund fees every year. Other Freedom Customers paying higher fees to RJA could pay up to 3% per year. And, notably, RJA's regressive fee schedule meant that it was charging the clients who could least afford it, the most."

39. Schulz fails to account for the lower operating costs of the funds held in the Freedom Program since most of the mutual fund holdings are institutional shares versus higher cost A-shares held in the Plaintiff's commission-based account.  From my review of information on Morningstar, institutional shares that are purchased in the Freedom Accounts can be greater than 25 basis points lower in operating costs when compared to A-shares.  Schulz's damage model does not take this into account across the purported

---

[26] Form ADV, Part 2A, Appendix 1 Wrap Fee Program Brochure (Dec. 17, 2015) (RJA_(NGUYEN)_008490).

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

class.  Additionally, the variation of holding periods impacts the damage model when taking cost differences into account.

40. In addition, per the Freedom Account Agreement:

> "Certain open-end mutual funds ("fund" or "funds") which may be acquired in Client's Account, may, in addition to assessing management fees, assess other internal expenses such as distribution, shareholder service and/or 12b-1 fees, administrative fees and "other expenses". To the extent that Raymond James may receive shareholder service and/or 12(b)-1 fees from funds, Client will receive a credit to the Account in an amount equal to such fees received from the funds held in Client's Account. The foregoing fees are generally included in the calculation of operating expenses of a fund and are disclosed in the fund prospectus."[27]

Thus, because the 12b-1 fees are refunded and because Freedom invests in lower cost institutional shares, the operating costs of the mutual funds held within the Freedom Accounts are less than an investor would pay in a commission-based account.  This variance of cost is not included in any part of Schulz's damage calculation and should be a consideration.

## VIII.    Summary of Opinions

41. The two metrics that Schulz uses to determine suitability, annual cost percentage equal to or less than 0.5% and annual turnover of less than or equal to 0.25, are not based on industry standards, and he cites none.

42. The calculation to determine the commissions/fees that would have been paid had the purported class members not enrolled in the Freedom Account is speculative in nature.

---

[27] Freedom Investment Management Agreement, pg. 17 (RJA_(NGUYEN)_003866).

CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT

One cannot precisely determine an investor's potential trading patterns and level of commissions into future years.

43. In determining damages, Olsen and Schulz are mixing components of two different investment programs: a commission-based model and the Freedom program.  Their damage model thus cannot result in an accurate comparison.

44. The limited time period of a 2-year look back of commission-based trading likely does not capture the full trading history of a client, thereby misstating the two metrics Schulz relies upon.   Applying it to multiple years of the Freedom Account further amplifies the speculative nature of the damage model.   Even more speculation results when the commission-based account was open for less than two years, such as the 6 months that Plaintiff's commission account was open before she opened the subject Freedom Account.

45. Schulz's damage model wrongfully allows the purported class members to receive all the benefits and services that they bargained for, along with the potential for better investment performance, at the annualized cost of a commission-based account versus paying the fee they agreed to pay.

46. The benefits and services with a Freedom Account differ greatly from any services that may be provided in a commission-based account, and it is reasonable for RJA to be compensated for these services and benefits.

47. Schulz's model computes that certain purported class members, including the Plaintiff, should have received the Freedom Account for free.  This grossly overcompensates the

**CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT**

purported class members since they received the benefits and services of the Freedom program along with an entirely new portfolio of investments.   No portfolio is professionally managed at zero cost to a client.

48. Schulz's model ignores any investment performance, account level risk, and the investment asset differences that occur between the commission-based account and the Freedom Account.

49. Schulz's damage model is not consistent with any industry established damages models.

50. The Schulz model fails to account for any cost differences between the commission-based accounts and the Freedom Account related to mutual fund share types that reduce the cost of owning mutual funds in a Freedom Account.

I affirm that the statements, opinions, and conclusions set forth in Sections I-VIII of this report are true to the best of my knowledge and belief.

Executed this 25th Day of June 2021.

_____

Peter J. Klouda

**CONFIDENTIAL - CONTAINS CONFIDENTIAL MATERIALS UNDER ¶ 3 OF THE PARTIES' STIPULATED CONFIDENTIALITY AGREEMENT**

**Appendix I – Documents and Data Reviewed**

*See document titled 'Nguyen v. Raymond James & Associates, Inc. Additional Facts and Data*

*Considered in Rebuttal Report'*

# APPENDIX I

*Nguyen v. Raymond James Associates, Inc.*
Additional Facts and Data Considered in Rebuttal Report

| Begin Bates | End Bates | Other Description |
|---|---|---|
| **Portfolio Reviews** | | |
| RJA_(NGUYEN)_041828 | RJA_(NGUYEN)_041841 | |
| RJA_(NGUYEN)_023609 | RJA_(NGUYEN)_023625 | |
| RJA_(NGUYEN)_012672 | RJA_(NGUYEN)_012696 | |
| **Chart of Freedom Program Data (30(b)(6) Topic #6)** | | |
| RJA_(NGUYEN)_059108 | RJA_(NGUYEN)_059109 | |
| **Arthur Olsen's Report and Documents Cited Therein** | | |
| | | Expert Report of Arthur Olsen re Class Certification |
| RJA_(NGUYEN)_058468 | RJA_(NGUYEN)_058468 | |
| RJA_(NGUYEN)_058469 | RJA_(NGUYEN)_058469 | |
| RJA_(NGUYEN)_059060 | RJA_(NGUYEN)_059060 | |
| RJA_(NGUYEN)_059061 | RJA_(NGUYEN)_059061 | |
| RJA_(NGUYEN)_059062 | RJA_(NGUYEN)_059062 | |
| RJA_(NGUYEN)_059063 | RJA_(NGUYEN)_059063 | |
| RJA_(NGUYEN)_059108 | RJA_(NGUYEN)_059109 | |
| RJA_(NGUYEN)_059110 | | |
| RJA_(NGUYEN)_059111 | | |
| | | Tab 120 Nguyen - 2021-05-25 Letter to counsel enclosing selected queries |
| **Douglas J. Schulz's Report and Documents Cited Therein** | | |
| | | Report of Douglas J. Schulz re Class Certification |
| NGUYEN_0000403 | NGUYEN_0000405 | |
| NGUYEN_0000406 | NGUYEN_0000409 | |
| NGUYEN_0000410 | NGUYEN_0000428 | |
| NGUYEN_0000429 | NGUYEN_0000430 | |
| NGUYEN_0000431 | NGUYEN_0000439 | |
| NGUYEN_0000440 | NGUYEN_0000445 | |
| NGUYEN_0000446 | NGUYEN_0000448 | |
| NGUYEN_0000449 | NGUYEN_0000452 | |
| NGUYEN_0000453 | NGUYEN_0000456 | |
| NGUYEN_0000457 | NGUYEN_0000461 | |
| NGUYEN_0000462 | NGUYEN_0000464 | |
| NGUYEN_0000465 | NGUYEN_0000468 | |
| NGUYEN_0000914 | NGUYEN_0000966 | Edward Jones Statements |
| NGUYEN_000550 | NGUYEN_000590 | 2015 Statements |

*Nguyen v. Raymond James Associates, Inc.*
Additional Facts and Data Considered in Rebuttal Report

| Begin Bates | End Bates | Other Description |
|---|---|---|
| NGUYEN_000591 | NGUYEN_000702 | 2016 Statements |
| NGUYEN_000703 | NGUYEN_000783 | 2017 Statements |
| NGUYEN_000784 | NGUYEN_000866 | 2018 Statements |
| NGUYEN_000871 | NGUYEN_000913 | Trade Confirmations |
| NGUYEN_000914 | NGUYEN_000966 | |
| NGUYEN_002064 | NGUYEN_002065 | |
| RJA_(NGUYEN)_000001 | RJA_(NGUYEN)_000043 | |
| RJA_(NGUYEN)_003637 | RJA_(NGUYEN)_003645 | |
| RJA_(NGUYEN)_003846 | RJA_(NGUYEN)_003897 | |
| RJA_(NGUYEN)_004286 | RJA_(NGUYEN)_004550 | IRA Statements |
| RJA_(NGUYEN)_006302 | RJA_(NGUYEN)_006411 | |
| RJA_(NGUYEN)_010943 | RJA_(NGUYEN)_010969 | |
| RJA_(NGUYEN)_010970 | RJA_(NGUYEN)_011106 | |
| RJA_(NGUYEN)_012336 | RJA_(NGUYEN)_012337 | |
| RJA_(NGUYEN)_014917 | RJA_(NGUYEN)_015058 | |
| RJA_(NGUYEN)_015094 | RJA_(NGUYEN)_015128 | |
| RJA_(NGUYEN)_019419 | RJA_(NGUYEN)_019420 | |
| RJA_(NGUYEN)_019421 | RJA_(NGUYEN)_019422 | |
| RJA_(NGUYEN)_019425 | RJA_(NGUYEN)_019426 | |
| RJA_(NGUYEN)_019437 | RJA_(NGUYEN)_019438 | |
| RJA_(NGUYEN)_019443 | RJA_(NGUYEN)_019443 | |
| RJA_(NGUYEN)_019466 | RJA_(NGUYEN)_019467 | |
| RJA_(NGUYEN)_019468 | RJA_(NGUYEN)_019469 | |
| RJA_(NGUYEN)_019479 | RJA_(NGUYEN)_019480 | |
| RJA_(NGUYEN)_019485 | RJA_(NGUYEN)_019486 | |
| RJA_(NGUYEN)_019487 | RJA_(NGUYEN)_019487 | |
| RJA_(NGUYEN)_019488 | RJA_(NGUYEN)_019489 | |
| RJA_(NGUYEN)_019490 | RJA_(NGUYEN)_019491 | |
| RJA_(NGUYEN)_019492 | RJA_(NGUYEN)_019493 | |
| RJA_(NGUYEN)_019544 | RJA_(NGUYEN)_019545 | |
| RJA_(NGUYEN)_019548 | RJA_(NGUYEN)_019549 | |
| RJA_(NGUYEN)_019550 | RJA_(NGUYEN)_019551 | |
| RJA_(NGUYEN)_019564 | RJA_(NGUYEN)_019565 | |
| RJA_(NGUYEN)_019573 | RJA_(NGUYEN)_019574 | |

*Nguyen v. Raymond James Associates, Inc.*

Additional Facts and Data Considered in Rebuttal Report

| Begin Bates | End Bates | Other Description |
|---|---|---|
| RJA_(NGUYEN)_019620 | RJA_(NGUYEN)_019622 | |
| RJA_(NGUYEN)_019623 | RJA_(NGUYEN)_019625 | |
| RJA_(NGUYEN)_019637 | RJA_(NGUYEN)_019638 | |
| RJA_(NGUYEN)_019645 | RJA_(NGUYEN)_019646 | |
| RJA_(NGUYEN)_019647 | RJA_(NGUYEN)_019648 | |
| RJA_(NGUYEN)_019651 | RJA_(NGUYEN)_019652 | |
| RJA_(NGUYEN)_019653 | RJA_(NGUYEN)_019655 | |
| RJA_(NGUYEN)_019664 | RJA_(NGUYEN)_019665 | |
| RJA_(NGUYEN)_019686 | RJA_(NGUYEN)_019688 | |
| RJA_(NGUYEN)_019691 | RJA_(NGUYEN)_019692 | |
| RJA_(NGUYEN)_019699 | RJA_(NGUYEN)_019701 | |
| RJA_(NGUYEN)_019783 | RJA_(NGUYEN)_019785 | |
| RJA_(NGUYEN)_019922 | RJA_(NGUYEN)_019922 | |
| RJA_(NGUYEN)_022052 | RJA_(NGUYEN)_022057 | |
| RJA_(NGUYEN)_023498 | RJA_(NGUYEN)_023529 | |
| RJA_(NGUYEN)_023593 | RJA_(NGUYEN)_023596 | |
| RJA_(NGUYEN)_023597 | RJA_(NGUYEN)_023597 | |
| RJA_(NGUYEN)_023853 | RJA_(NGUYEN)_023853 | |
| RJA_(NGUYEN)_028991 | RJA_(NGUYEN)_028993 | |
| RJA_(NGUYEN)_029336 | RJA_(NGUYEN)_029351 | |
| RJA_(NGUYEN)_029388 | RJA_(NGUYEN)_029399 | |
| RJA_(NGUYEN)_029784 | RJA_(NGUYEN)_029785 | |
| RJA_(NGUYEN)_029809 | RJA_(NGUYEN)_029823 | |
| RJA_(NGUYEN)_030201 | RJA_(NGUYEN)_030208 | |
| RJA_(NGUYEN)_030368 | RJA_(NGUYEN)_030375 | |
| RJA_(NGUYEN)_030794 | RJA_(NGUYEN)_030795 | |
| RJA_(NGUYEN)_032013 | RJA_(NGUYEN)_032165 | |
| RJA_(NGUYEN)_032177 | RJA_(NGUYEN)_032193 | |
| RJA_(NGUYEN)_032715 | RJA_(NGUYEN)_032715 | |
| RJA_(NGUYEN)_032716 | RJA_(NGUYEN)_032717 | |
| RJA_(NGUYEN)_033116 | RJA_(NGUYEN)_033121 | |
| RJA_(NGUYEN)_034643 | RJA_(NGUYEN)_034644 | |
| RJA_(NGUYEN)_034658 | RJA_(NGUYEN)_034658 | |
| RJA_(NGUYEN)_035050 | RJA_(NGUYEN)_035054 | |

CONFIDENTIAL

*Nguyen v. Raymond James Associates, Inc.*

Additional Facts and Data Considered in Rebuttal Report

| Begin Bates | End Bates | Other Description |
|---|---|---|
| RJA_(NGUYEN)_035112 | RJA_(NGUYEN)_035152 | |
| RJA_(NGUYEN)_036100 | RJA_(NGUYEN)_036203 | |
| RJA_(NGUYEN)_040398 | RJA_(NGUYEN)_040411 | |
| RJA_(NGUYEN)_040412 | RJA_(NGUYEN)_040425 | |
| RJA_(NGUYEN)_040426 | RJA_(NGUYEN)_040439 | |
| RJA_(NGUYEN)_040440 | RJA_(NGUYEN)_040453 | |
| RJA_(NGUYEN)_040454 | RJA_(NGUYEN)_040467 | |
| RJA_(NGUYEN)_040468 | RJA_(NGUYEN)_040481 | |
| RJA_(NGUYEN)_040482 | RJA_(NGUYEN)_040495 | |
| RJA_(NGUYEN)_040496 | RJA_(NGUYEN)_040509 | |
| RJA_(NGUYEN)_040510 | RJA_(NGUYEN)_040522 | |
| RJA_(NGUYEN)_040523 | RJA_(NGUYEN)_040536 | |
| RJA_(NGUYEN)_040537 | RJA_(NGUYEN)_040550 | |
| RJA_(NGUYEN)_041217 | RJA_(NGUYEN)_041272 | |
| RJA_(NGUYEN)_043502 | RJA_(NGUYEN)_043502 | |
| RJA_(NGUYEN)_044669 | RJA_(NGUYEN)_044670 | |
| RJA_(NGUYEN)_044886 | RJA_(NGUYEN)_044889 | |
| RJA_(NGUYEN)_046437 | RJA_(NGUYEN)_046440 | |
| RJA_(NGUYEN)_058468 | | |
| RJA_(NGUYEN)_058469 | | |
| RJA_(NGUYEN)_059060 | | |
| RJA_(NGUYEN)_059061 | | |
| RJA_(NGUYEN)_059062 | | |
| RJA_(NGUYEN)_059063 | | |
| RJA_(NGUYEN)_059100 | RJA_(NGUYEN)_059107 | |
| RJA_(NGUYEN)_059108 | RJA_(NGUYEN)_059109 | |
| RJA_(NGUYEN)_059112 | | |
| RJA_(NGUYEN)_059113 | | |
| | | Akhilesh Ganti, Brokerage Fee Definition |
| | | Bruce Kelly, What zero commissions mean for B-Ds - InvestmentNews |
| | | Chad Langager, Investing in Stocks_ How to Start for Beginners |
| | | Daniela Sirtori-Cortina, Commission vs fees_ How the new brokerage model will impact advisor recruitment |
| | | ETF Versus Mutual Fund Fees - Fidelity |

CONFIDENTIAL

*Nguyen v. Raymond James Associates, Inc.*
Additional Facts and Data Considered in Rebuttal Report

| Begin Bates | End Bates | Other Description |
|---|---|---|
| | | Federal Register volume 81, No. 68-Friday, April 8, 2016-rules and regulations |
| | | Final Rule_ Shareholder Reports and Quarterly Portfolio Disclosure of Registered Management Investment Companies |
| | | FINRA NTM 03-68 |
| | | FINRA NTM 12 – 25 New Suitability Rule Q&A |
| | | FINRA Rule 2111 (Suitability) FAQ |
| | | Flat Fees or Fat Fees, PIABA Bar Journal 2003 |
| | | In re Royal All. Assocs., Inc., SEC Release No. 4351 |
| | | Jake Frankenfield, Commission Definition |
| | | JB Maverick, What Is Considered a Good Expense Ratio |
| | | John Rekenthaler, Upfront Investment Fees Are (Almost) No More _ Morningstar |
| | | Kent Thune, How to Benefit From Using a Mutual Fund Turnover Ratio |
| | | Lisa Shidler, PriceMetrix launches free equity commission guide - InvestmentNews |
| | | Morningstar US_FeeStudy_060120 |
| | | Nancy Condon & Herb Perone, FINRA Fines Robert W. Baird & Co. $500,000 for Fee-Based Account, Breakpoint Violations _ FINRA.org |
| | | NASD NTM 96 – 33 Investment Adviser Brokers |
| | | NYSE Regulation fines A.G. Edwards & Sons _ Investment Executive |
| | | People Handling Other Peoples' Money – SEC Investment Adviser Association |
| | | Robert Baird FINRA sanction No. 20070094878 |
| | | Rusty Vanneman, ETF Analysis_ Don't Forget Portfolio Turnover |
| | | SEC Investor Bulletin, How Fees and Expenses Affect Your Investment Portfolio |
| | | SEC Release No. 28064 |
| | | Stephan A. Abrham, Turnover ratios and fund quality |
| | | Study On Investment Advisors And Broker Dealers, SEC Staff Study |
| | | Timothy J. O'Connor, Dual Registrants and the Best Interest Rule |

EXHIBIT I

CONFIDENTIAL

# HYPOTHETICAL FRONT-END LOAD SUMMARY
## KIMBERLY NGUYEN/████418

| A | B | C | D |
|---|---|---|---|
| | FUND NAME | TICKER | FRONT-END LOAD % |
| 1 | AMERICAN FD CAP INCM BUILDER FD CL A | CAIBX | 3.50% |
| 2 | AMERICAN FD CAP WORLD GRWTH & INCM FD CL A | CWGIX | 3.50% |
| 3 | AMERICAN FD EUROPACIFIC GRWTH FD CL A | AEPGX | 3.50% |
| 4 | AMERICAN FD HIGH INCM MUNI BD FD CL A | AMHIX | 3.50% |
| 5 | AMERICAN FD T/E BD FD (OF AMERICA) CL A | AFTEX | 3.50% |
| 6 | LORD ABBETT AFFILIATED FD CL A | LAFFX | 4.75% |
| 7 | LORD ABBETT FUNDAMENTAL EQ FD CL A | LDFVX | 4.75% |
| 8 | LORD ABBETT M/C VAL FD CL A | LAVLX | 4.75% |

ANALYSIS APPLIED BREAKPOINTS ASSUMING RIGHTS OF ACCUMULATION BY FUND FAMILY